PAUL E. FISHER, State Bar No. 125309
The Law Office of Paul E. Fisher
537 Newport Center Dr., #289
Newport Beach, CA 92660
Telephone: (949) 675-5619
Facsimile: (949) 675-5641

ERIC HECKER (admission *pro hac vice* pending)
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Telephone: (212) 763-5000
Facsimile: (212) 763-5001

ATTORNEYS FOR PLAINTIFF METRO FUEL LLC

| | |
|---|---|
| METRO FUEL LLC, a Delaware limited liability company, | ) )<br>*07-06067*<br>) |
| Plaintiff, | ) No. ~~C07-60~~67 JSW |
| vs. | ) **AMENDED COMPLAINT**<br>) **AND DEMAND FOR JURY TRIAL** |
| CITY OF SAN FRANCISCO, a municipal corporation, COUNTY OF SAN FRANCISCO, a subdivision of the State of California, CITY AND COUNTY OF SAN FRANCISCO, a chartered California city and county. | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

Plaintiff Metro Fuel LLC, by and through its attorneys, The Law Office of Paul E.

Fisher and Emery Celli Brinckerhoff & Abady LLP, for its Amended Complaint alleges as

follows:

## NATURE OF THE CASE

1.    This First Amendment challenge to the City of San Francisco's scheme for regulating advertising signs is, first and foremost, about government hypocrisy.

2.    Plaintiff Metro Fuel LLC ("Fuel") is engaged in the business of outdoor advertising in San Francisco (as well as in several other major metropolitan areas) through its operation of so-called "panel signs." Panel signs, also known as "light boxes," are internally illuminated poster advertisements that have a surface area of approximately 24 square feet (approximately 6 feet by 4 feet).

3.    Article 6 of the San Francisco Planning Code (the "Sign Ordinance") places severe restrictions on Fuel's ability to operate panel signs. Indeed, through its adoption of Proposition G in March 2002, San Francisco added Section 611 to its Sign Ordinance, which purports to impose a complete and total ban on any and all new "general advertising signs" – signs that direct attention to goods, services, or activities offered elsewhere than on the premises upon which the sign is located – including virtually all of Fuel's panel signs.

4.    The City has claimed that its total ban on new advertising signs – including Fuel's panel signs – is necessary to preserve and protect "traffic safety" and "aesthetics." The City's own conduct, however, belies these supposed justifications and proves that they are nothing more than empty pretexts.

5.    Tellingly, in enacting the Sign Ordinance, the City bestowed itself with blanket exemptions for thousands of its *own* advertising signs – signs that are virtually identical to Fuel's panel signs in terms of size, illumination and appearance; often are located in close proximity to Fuel's panel signs; but, unlike Fuel's signs, generate hundreds of millions of dollars in revenue for the City.

2

6.     The most glaring example of this phenomenon is the City's exclusive contract with Clear Channel Outdoor, Inc. ("Clear Channel") to place general advertising signs on all of the City's transit shelters and kiosks. Clear Channel has been afforded the right to place advertising on each and every shelter and kiosk, notwithstanding that all such advertising violates the very Sign Ordinance provisions that supposedly render Fuel's panel signs illegal.

7.     It cannot seriously be disputed that the Clear Channel ads that blanket the City are at least as "dangerous" and "unsightly" as Fuel's panel signs allegedly are. The Clear Channel ads are at least as big as Fuel's ads. The Clear Channel ads are located closer to the curb line, and thus are more visible and distracting to motorists and pedestrians. And yet the City has exempted the Clear Channel ads from its Sign Ordinance. The reason for this exemption is obvious: Clear Channel's ads make money for the City, while Fuel's ads do not.

8.     Fuel does not dispute the City's authority to make reasonable determinations about what is in the public's interest, or to enact and enforce regulations that are narrowly tailored to serving and protecting the public interest. But it is axiomatic that the City cannot infringe on core First Amendment rights when its reasons for doing so are blatantly pretextual – especially where, as here, the City's true motivation is to inhibit competition and reserve for itself a monopoly in the outdoor advertising business.

9.     For all of these reasons, the provisions of the City's Sign Ordinance that apply to Fuel's signs should be declared unconstitutional, and Fuel should be allowed to continue to operate its panel signs unless and until the City devises a neutral set of rules that apply evenhandedly to all advertising signs, including the ones that enrich the City.

3

## THE PARTIES

10.    Plaintiff Metro Fuel LLC ("Plaintiff" or "Fuel") is a Delaware limited liability company doing business in the City and County of San Francisco, State of California. Fuel is engaged in the business of outdoor advertising.

11.    Defendant City of San Francisco is a municipality organized and existing under the laws of the State of California. At all times relevant hereto, the City of San Francisco was and is responsible for the establishment and enforcement of outdoor advertising regulations within San Francisco.

12.    Defendant County of San Francisco is a political subdivision of the State of California.

13.    The City and County of San Francisco are collectively referred to herein as the "City" or "San Francisco" or "Defendants."

## JURISDICTION AND VENUE

14.    This action arises under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201 and 2202, and the First and Fourteenth Amendments to the United States Constitution.

15.    The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331 and 1343.

16.    The acts complained of occurred in the Northern District of California and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

17.    Plaintiff demands trial by jury in this action.

4

## FACTUAL ALLEGATIONS

### A.    Fuel's Panel Signs

18.    Fuel entered the panel sign business in San Francisco by acquiring substantially all of the assets of Metro Lights, LLC ("Metro Lights") on or about August 24, 2006. Prior to Fuel's acquisition of Metro Lights, Fuel did not operate any panel signs in San Francisco.

19.    For purposes of this Complaint, a "panel sign" is an internally illuminated advertising sign measuring approximately 6 feet high by 4 feet wide (*i.e.*, with a total surface area of approximately 24 square feet).

20.    Fuel operates approximately 160 panel signs in San Francisco.

21.    These signs are situated generally in one of several ways: they are affixed to the exterior of mixed use commercial properties; they are located in parking lots, either affixed to an adjacent building or mounted on a pole; they are placed on the inside of a parking garage near the door to the garage; or they are placed in the lobbies of office buildings. Fuel typically rents space from the landlord in exchange for the right to place a panel sign on or inside of the property. Most of Fuel's panel signs do not project from the building line onto the adjacent sidewalk, and the few that do project do so only by a few inches. Several of Fuel's panels are not visible from the street.

22.    Fuel's panel signs are made available to national and local advertisers on an "all comers" basis in a fashion similar to newspaper, magazine, and broadcast advertising. Fuel's panel signs may be used to display a variety of commercial and noncommercial messages, including political, religious, charitable, and public service messages. Fuel's panel signs are a forum for the communication and expression of ideas and messages – both commercial and

5

noncommercial messages – that are protected by the First Amendment to the United States Constitution.

**B.    The City's (Near) Total Ban on General Advertising Signs; Except on Its Own Street Furniture**

23.    The City's Sign Ordinance defines a "sign" to include any writing, trademark, emblem, or other representation that is attached to, painted on, or in any other manner represented on a building or other structure, and that is used to announce, direct attention to, or advertise, and that is visible from outside of a building. S.F. Planning Code § 602.19.[1]

24.    The Sign Ordinance distinguishes among several "signs," including "business signs," "general advertising signs" and "exempted signs."

25.    A "business sign" is a sign that directs attention a business, commodity, industry or service conducted, sold or offered *on the premises* where the sign is located. S.F. Planning Code § 602.3 (definition of "business sign"). Business signs are also referred to as "on-site signs."

26.    A "general advertising sign" is a sign that directs attention to a business, commodity, industry or service conducted, sold or offered *elsewhere than upon the premises* where the sign is located. S.F. Planning Code § 602.3 (definition of "general advertising sign"). General advertising signs are also referred to as "off-site signs."

27.    Exempted signs are signs that are not regulated by the Sign Ordinance. There are 14 categories of exempted signs, including; (i) "temporary display posters, without independent structural support, in connection with political campaigns and with civic

---

[1]    Several of Fuel's panel signs are not visible from the street and thus are not "signs" that are subject to regulation under the Sign Ordinance.

noncommercial health, safety and welfare campaigns"; (ii) "temporary displays of a patriotic, religious, charitable or other civic character"; (iii) "two general advertising signs each not exceeding 24 square feet in area on either a transit shelter or associated advertising kiosk furnished by contract with the Municipal Transportation Agency"; (iv) "two general advertising signs each not exceeding 52 square feet in area on a public service kiosk furnished by contract with the Department of Public Works"; and, (v) advertising placed on newsstands.  S.F. Planning Code § 603 (c), (d), (j), (m) & (n).

28.     In 2002, the City amended the Sign Ordinance to include § 611, enacted by the public as Proposition G.

29.     Section 611 is as concise as it is sweeping: "No new general advertising signs shall be permitted at any location within the City as of March 5, 2002."  S.F. Planning Code § 611(a).

30.     As amended, the Sign Ordinance purports to increase "public safety," reduce "blight and visual clutter as well as the commercialization of public spaces within the City," stem the "proliferation of general advertising signs visible from, on, and near historically significant buildings and districts, public buildings and open spaces," and protect the City's "character and dignity."  S.F. Planning Code § 611(f).

31.     Notwithstanding the unambiguous language of this ban, at the time § 611 was enacted, the City had already entered into several agreements with a few City-chosen advertising contractors to do what the City claims all others are prohibited from doing:  namely, erecting off-site advertising signs.

32.     These colossal exceptions to the otherwise total ban on all new general advertising signs substantially – indeed fatally – undermine any claim the City had that the Sign

Ordinance is necessary to increase public safety, to reduce blight, visual clutter or the commercialization of public spaces or to protect the City's character and dignity.

### C.    The City's Ban on Fuel's Panel Signs Does Not Directly or Materially Advance Any Purported Interest in Promoting Traffic Safety and Aesthetics

33.    The Sign Ordinance states that the (near) total ban on all new general advertising signs is necessary because the City has a substantial interest in promoting "traffic safety" and "aesthetics."

34.    However, no scientific study has ever demonstrated that there is any connection between panel signs and traffic safety or that panel signs compromise traffic safety in any way.

35.    Indeed, on information and belief, the City has never studied whether there is any connection whatsoever between panel signs and traffic safety or whether panel signs compromise traffic safety in any way.

36.    There is, in fact, no connection between panel signs and traffic safety. Fuel's panel signs do not affect or compromise traffic safety in any way.

37.    Even assuming there were some connection between panel signs and traffic safety – which there is not – it would make no sense, and would be entirely irrational, to allow such supposedly dangerous panel signs on bus shelters and other street furniture located beside the street bed, but prohibit them on building walls or inside parking garages.

38.    Nor does the City's scheme directly or materially advance its purported interest in promoting aesthetics. On information and belief, the City has not conducted any studies concluding or demonstrating that panel signs substantially compromise or adversely affect the attractiveness of the urban landscape.

8

39.    The City has not engaged in any comprehensive or coordinated effort to study or address aesthetic issues in residential, commercial, or manufacturing districts.

40.    Plaintiff's panel signs do not affect or compromise the aesthetics of the urban landscape in San Francisco.

**D.    The City's Ban of Fuel's Panel Signs Is Not Narrowly Drawn to Its Purported Interest in Promoting Traffic Safety and Aesthetics**

41.    To say that the City's scheme is not narrowly drawn to its purported interest in promoting "traffic safety" and "aesthetics" would be a considerable understatement. Far from regulating outdoor advertising in a consistent and evenhanded manner, the City itself has directly sponsored – and profited handsomely from – the widespread proliferation of advertising signs on the City's sidewalks and streets that, if the City's position regarding "traffic safety" and "aesthetics" is accepted, are far more dangerous and unattractive than Fuel's panel signs allegedly are.

42.    Despite its purported interest in limiting the placement of advertising signs in order to promote traffic safety and aesthetics, the City itself is affirmatively placing thousands of its own advertising signs on so-called "street furniture" – including transit shelters, newsstands and public service kiosks – along the City's sidewalks.

43.    In many instances – including the transit shelter and public service kiosks agreements – the City stands to reap huge profits from the very advertising the Sign Ordinance purports to ban throughout the City.

44.    Any purported gains in the area of "traffic safety" and "aesthetics" attributable to the City's absolute ban of advertising signs under the Sign Ordinance is more than offset – indeed, dramatically so – by the City's encouragement of the widespread proliferation of

9

new advertising signs under its transit shelters, newsstands, and public service kiosks agreements.

### (i)    Transit Shelters

45.    By contract dated December 10, 2007, the City granted to Clear Channel Outdoor, Inc. ("Clear Channel") the exclusive right to place general advertising signs on City transit shelters and kiosks. In exchange for this monopoly, Clear Channel agreed to replace all existing transit shelters and kiosks and maintain 1,100-1,500 new shelters and 39-150 new commercial kiosks or commercial signal control covers.

46.    Every single one of the new transit shelters will display advertising. The transit shelter ads – like Fuel's panels – measure six feet by four feet, or 24 square feet in area, and will be back-lit.

47.    Clear Channel's new transit shelters are specifically designed to maximize their visual impact on drivers. The advertising panels are oriented perpendicular to the street, such that they are visible to motorists. Indeed, the transit shelters are located near the curb lines, and the advertising panels are placed as close to the curb lines as possible, to ensure maximum visibility by passing motorists.

48.    As Clear Channel's website boasts, its transit shelters "[o]ffer outstanding visibility," ensure "visual impact 24 hours a day" because of their "back-lit illumination," and "[d]eliver high circulation figures due to [their] curbside positioning along main roadways."

49.    In this way, Fuel's panel signs stand in stark contrast to the transit shelter signs that the City is permitting Clear Channel to roll out across the City. Fuel's panel signs invariably are located in parking lots, inside parking garages, affixed to buildings or, in many

instances, placed in the lobbies of office buildings. Fuel's signs generally do not project from a building line out over a sidewalk – and those that do project do so only by a matter of inches – much less do they ever come anywhere close to a curb line. Because Clear Channel's transit shelter signs invariably are located immediately adjacent to curb lines – and thus are much more visible than Fuel's panel signs, both to passing motorists and pedestrians – Clear Channel's signs plainly are, by design, more dangerous and less attractive than Fuel's panel signs allegedly are.

50.    All advertising placed on the transit shelter panels is governed by the MTA Advertising Policy, which prohibits any advertisements that, among other things: (i) concern a declared political candidate, ballot measure or initiative petition; (ii) appear to promote the use of firearms; or (iii) promote alcoholic beverages or tobacco products. This content-based Policy, coupled with the ban in § 611, among other things, substantially limits the fora for political speech.

51.    Additionally, the City has the right to use any unsold advertising space, at no charge to the City, to advertise for its own public purposes, thereby perpetuating, not eliminating, advertising in the City. This practice also renders the City as one of the more significant outdoor advertisers in San Francisco

52.    The transit shelter signs blatantly violate the very Sign Ordinance that Fuel's panel signs allegedly violate. But the City is not applying the Sign Ordinance to these signs simply because they generate money for the City.

53.    Having conferred on a single private contractor the right to erect *all* new general advertising in the City, the City stands to reap huge profits by requiring Clear Channel to pay handsomely for the privilege of blanketing San Francisco with new off-site ads. In addition to a one-time payment of $5 million, the City expects to receive payments of between $306

million to $381 million over the next twenty years through its transit shelter contract with Clear Channel.

### (ii)    Newsstands

54.    In 2002, the City licensed to Clear Channel the right to install, operate and maintain on public property up to 1,000 so-called "fixed pedestal units" (or "newsstands"). The agreement between the City and Clear Channel continues for a period of 20 years.

55.    The new newsstands will be self-supporting structures, containing six news rack boxes. Each stand measures 30 inches in height and 60 inches in width.

56.    Clear Channel can sell advertising space on 485 of the newsstands.

57.    Clear Channel promotes the advertising panels on these newsstands as reaching a "captured population of nearly 300,000" and offering "[t]remendous exposure to both vehicular and pedestrian traffic."

58.    The newsstand advertising panels may be up to 18 square feet and be backlit or illuminated.

59.    The City has agreed to make "reasonable efforts" to preclude any other advertising company (such as Fuel) from placing newsstands within 15 feet of the Clear Channel newsstands. The City also grants Clear Channel the exclusive right to place advertising on newsstands throughout San Francisco.

60.    These new newsstands are, by design, visible to passing motorists as well as pedestrians and are located on congested streets in Downtown San Francisco, adjacent to the nearest lane of traffic.

61.     These newsstand advertising panels will be more dangerous and unattractive than Fuel's panel signs allegedly are.

62.     These newsstand signs blatantly violate the very Sign Ordinance that prohibits Fuel's panels. But the City is not applying the Sign Ordinance to these newsstand signs simply because they generate money for the City.

### (iii)     "Public Service" Kiosks

63.     In addition, the City has licensed to JCDecaux the right to place so-called "public service" kiosks throughout key areas of San Francisco's downtown area.

64.     Although referred to as "public service" kiosks, to the average pedestrian or driver these are simply 17-foot advertising towers.

65.     Indeed, on its website, JCDecaux boasts that these advertising kiosks are "the most impactful advertising spaces for pedestrians and vehicular traffic in the Bay area" and that they have a "potential audience of 7 million people in any two-week period."

66.     The advertising posters are back-lit 24-hours per day and can be up to 52 square feet in area (substantially larger that Fuel's 24 square feet panels).  Advertising posters may be placed on two of three panels on the public service kiosks.

67.     As part of its deal with JCDecaux, the City has promised not to authorize any other advertising company (such as Fuel) to place advertising panels of from 18 to 55 square feet on any free-standing structure in the public right-of-way anywhere in the Downtown area, or anywhere within a 300-foot radius of any public service kiosk.

13

68.    This monopoly control of advertising panels in the City is infringed only by the City's other exclusive grants of advertising rights, namely to Clear Channel (for transit shelters and newsstands).

69.    The exclusive right granted to JCDecaux to erect and maintain public service kiosks, and its attendant right to place advertising on them, is in exchange for the installation, operation and maintenance of a much smaller number of automatic public toilets.

70.    JCDecaux has agreed to install and maintain as many as 50 automatic public toilets; in exchange, it can create (and sell advertising space on) up to 225 public service kiosks, or 450 advertising panels.

71.    In exchange for its huge advertising profits, JCDecaux agrees to pay the City tens of millions of dollars (and potentially hundreds of millions of dollars) over the lifetime of the 20 year contract.

72.    The 225 public service kiosks – again, containing 450 advertising panels each of which can measure up to 52 square feet or be as tall as 12 feet – will be placed at or close to the curbside in order to ensure the greatest number of viewers in a high-density part of downtown San Francisco.

73.    They are designed with the specific purpose of attracting pedestrians and drivers. As such, the City cannot legitimately claim that these advertising posters – which are more than double the size of Fuel's panels and which are prominently placed by the City street bed – improve traffic safety or the City's aesthetics.

74.    The advertising panels on the public service kiosks will be more dangerous and unattractive than Fuel's panel signs allegedly are.

(iv)    **Banners**

75.    In addition to advertisements on transit shelters, newsstands, and public service kiosks, the City allows advertising banners to be placed on City-owned utility poles.

76.    In theory, these banners are supposed to promote City-sponsored, City-funded and City-wide special events. However, up to 15% of the banners may be used to advertise commercial sponsorship of an event. In practice, therefore, the banners are used substantially for commercial advertising.

77.    Notably, these banners are allowed to be up to 3 feet wide and 6 feet long – substantially similar in size to Fuel's panel signs. However, these banners are more dangerous and unattractive than Fuel's panel signs allegedly are, because the banners are almost always located beyond the curb line, literally dangling directly over the City's streets.

(v)    **Taxi Cabs**

78.    The City has also contracted with various outdoor advertisers to place advertisements on City taxi cabs.

79.    On information and belief, the City has issued thousands of rooftop advertising permits to taxi operators. Moreover, many of these rooftop ads contain dynamic digital copy – such as flashing news or sports scores – that is specifically designed to attract the attention of motorists and pedestrians to the maximum degree possible.

80.    Because many of these rooftop taxi advertisements contain digital copy, and because their very purpose is to attract the attention of adjacent motorists, these advertisements are more dangerous and unattractive than Fuel's panel signs allegedly are.

E.    **San Francisco's Scheme to Reserve for Itself a Monopoly Over Outdoor Advertising and to Wield that Power to Exercise Control Over the Content of Outdoor Signage**

81.    The practical effect of the City's complete ban on new off-site advertising signs on private property is that the City has set the stage for reserving for itself a monopoly over outdoor advertising in San Francisco.

82.    The City contends that, following the enactment of the ban, those off-site advertising signs on private property that pre-date the ban have been reduced to so-called "non-conforming use" status. The City contends that such "non-conforming" signs may remain as they are where they are, but that they may not be substantially altered or rebuilt. By taking this position, the City's goal is to steadily reduce, and eventually eliminate, off-site advertising signs on private property.

83.    Through this scheme, the City seeks to transform a system in which off-site messages are controlled by a diverse array of private property owners of varying backgrounds and viewpoints into a system in which off-site messages are controlled exclusively by the City's hand-chosen contractors.

84.    Such sweeping control by the government over off-site speech is unconstitutional because it raises the prospect that the government, as the exclusive media provider, will censor advertising based on the content of the speaker's message.

85.    Unfortunately, one need not speculate about whether Defendants will use their burgeoning monopoly power to impose content-based restrictions on off-site advertising, because they already have.

86.    Under the transit shelter agreement, the City has prohibited Clear Channel from posting various categories of advertisements based on the content thereof,

16

including political advertisements and advertisements that "appear to promote the use of firearms."

87.     The City's decision to ban all political speech on transit shelters is particularly troubling given that political speech enjoys the highest level of protection under the First Amendment, and given the City's evident goal of exerting more and more control over more and more speech going forward.

88.     Such content-based restrictions on speech – including especially core political speech – trigger strict scrutiny, which this scheme surely cannot survive.

89.     The remedy for the City's unconstitutional scheme is more speech rather than enforced silence. The ban on new off-site advertising signs must be struck down to ensure that the government will not control and be in a position to impose content-based restrictions on the only allowable form of outdoor advertising.

### F.     The Sign Ordinance Discriminates Against Non-Commercial Speech

90.     The Constitution affords greater protection to non-commercial speech than commercial speech.

91.     Although a municipality has some discretion to distinguish between the relative values of different forms of commercial speech, it does not have the same range of choice with respect to non-commercial speech.

92.     San Francisco's Sign Ordinance violates this fundamental constitutional precept in three independent ways.

93.     First, it imposes greater restrictions on non-commercial messages than on commercial messages.

94.    For example, with respect to pre-2002 signs, general advertising signs (which include non-commercial signs) are prohibited in any C-1 Districts (Neighborhood Shopping Districts). There is no mention – and therefore no such restriction – of on-site business signs in C-1 Districts. Because virtually all (if not all) non-commercial signs are, by definition, off-site signs, the Sign Ordinance imposes greater restrictions on non-commercial signs than commercial signs.

95.    Moreover, with respect to post-2002 signs, all off-site signs (including non-commercial signs) are banned, whereas commercial on-site signs are completely exempted from the 2002 ban.

96.    Second, although the Sign Ordinance allows certain limited categories of non-commercial messages, non-commercial signs are allowed or prohibited based upon the content of their messages.

97.    The Sign Ordinance allows "temporary displays of a patriotic, religious, charitable or other civic character." Other non-commercial messages – including, it would seem, certain political messages, anti-war messages, or messages promoting non-profit educational institutions – are not allowed solely because of the content of their non-commercial messages.

98.    The Constitution forbids the selective prohibition of protected non-commercial speech based on its content. With respect to non-commercial speech, a municipality may not choose the appropriate subjects for public discourse.

99.    Because the non-commercial exceptions to the restrictions imposed by the Sign Ordinance are content-based, the Sign Ordinance itself is content-based.

100.    Third, the limited exception to the ban of non-commercial off-site signs – allowing "temporary displays of a patriotic, religious, charitable or other civic character" –

is woefully and unconstitutionally vague. No reasonable speaker could possibly know what it means for a sign to be "temporary," to constitute a "display," to be "patriotic," or to be of "other civic character," terms that the Sign Ordinance nowhere defines.

101.    In addition to being unconstitutionally vague, the Sign Ordinance, by virtue of this entirely unclear exception for certain types of non-commercial messages but not others, unconstitutionally vests government officials with unbridled discretion to allow or not allow any given sign to remain. It contains no standards at all – let alone sufficiently narrow, definite, and objective standards – to cabin official discretion or to facilitate meaningful judicial review.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (42 U.S.C. § 1983 – First and Fourteenth Amendments)

102.    Plaintiff repeats and realleges each of the foregoing paragraphs as if they were fully set forth at length herein.

103.    The messages contained on Plaintiff's panel signs constitute speech that is entitled to full First Amendment protection.

104.    The messages contained on Plaintiff's panel signs are not misleading and do not relate to unlawful activity.

105.    The City has no substantial, much less compelling, interest that justifies the suppression of Plaintiff's protected commercial speech.

106.    The City's scheme for regulating outdoor advertising does not directly advance its purported interest in promoting traffic safety and aesthetics.

107. The City's scheme for regulating outdoor advertising is not reasonably related to, much less narrowly tailored to, its purported interest in promoting traffic safety and aesthetics.

108. The City did not carefully calculate the costs and benefits of its scheme for regulating outdoor advertising.

109. The City's scheme does not leave open adequate alternative means for communication.

110. The purpose of the City's scheme is in substantial part to inhibit competition in the outdoor advertising market in order to increase the value of its outdoor advertising assets.

111. The City's scheme purports to reserve for the City a monopoly over outdoor advertising, through which it can and will control the content of outdoor advertising.

112. The City's scheme impermissibly favors commercial speech over non-commercial speech.

113. The City's scheme for regulating outdoor advertising violates the First Amendment to the United States Constitution, as incorporated through the Fourteenth Amendment thereto.

114. The violation of Plaintiff's rights has been caused by an official policy and custom of the City.

115. Absent relief, Plaintiff has suffered and will continue to suffer irreparable harm.

116. Absent relief, the First Amendment rights of members of the public will continue to be chilled.

117.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff has been deprived of rents, profits, and goodwill, and has suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

1.    an order declaring that the Sign Ordinance violates the United States Constitution on its face and as applied to Plaintiff;

2.    an order preliminarily and permanently enjoining Defendants from enforcing the Sign Ordinance against Plaintiff or otherwise regulating Plaintiff's panel signs;

3.    an order awarding money damages in an amount to be determined at trial;

4.    an order awarding reasonable attorneys' fees and costs; and

5.    an order directing such other and further relief as the Court may deem just and proper.

Dated: April 17, 2008

Respectfully submitted,

By:    _____
Paul E. Fisher (SBN 125309)

LAW OFFICE OF PAUL E. FISHER
537 Newport Center Dr., #289
Newport Beach CA 92660
(949) 675-5619

Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
(212) 763-5000

Attorneys for Plaintiff Metro Fuel LLC

21