1  PAUL E. FISHER, State Bar No. 125309
   The Law Office of Paul E. Fisher
2  537 Newport Center Dr., #289
   Newport Beach, CA 92660
3  Telephone: (949) 675-5619
   Facsimile:  (949) 675-5641
4
   ERIC HECKER (admitted *pro hac vice*)
5  Emery Celli Brinckerhoff & Abady LLP
   75 Rockefeller Plaza, 20th Floor
6  New York, NY 10019
   Telephone: (212) 763-5000
7  Facsimile:  (212) 763-5001

8  ATTORNEYS FOR PLAINTIFF
   METRO FUEL LLC
9

10              UNITED STATES DISTRICT COURT

11        FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13 | METRO FUEL LLC, a Delaware limited         Case No. C07-6067 (JSW)
14 | liability company,
                                                The Hon. Jeffrey S. White
15              Plaintiff,
                                                **PLAINTIFF'S NOTICE OF MOTION,**
16       vs.                                    **MOTION, AND MEMORANDUM OF**
                                                **POINTS AND AUTHORITIES IN**
17 | CITY OF SAN FRANCISCO, a municipal         **SUPPORT OF ITS MOTION FOR A**
   | corporation, COUNTY OF SAN                 **PRELIMINARY INJUNCTION**
18 | FRANCISCO, a subdivision of the State of
   | California, CITY AND COUNTY OF SAN         Date:      T.B.D.
19 | FRANCISCO, a chartered California city and Time:      T.B.D.
   | county,                                    Ctrm.      2, 17th Fl.
20
              Defendants.
21

22

23

24

25

26

27

28
                                        **CASE NO. C07-6067 (JSW)**
                                        **MOTION FOR PRELIM. INJ.**

## TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-iv

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Plaintiff's Outdoor Advertising Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The City's Regulation of General Advertising Signs . . . . . . . . . . . . . . . . . . . 3

    C.    The City's Outdoor Advertising Franchises . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.    Bus Shelters and Commerical Kiosks . . . . . . . . . . . . . . . . . . . . . . . . . 4

        2.    Public Service Kiosks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        3.    Newsracks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        4.    Lamp Post Banners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D.    The City Opts to Ignore Its Own Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    E.    The City's Efforts To Disrupt Plaintiff's Business . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.    PLAINTIFF HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS, OR AT LEAST THE EXISTENCE OF SERIOUS QUESTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.    Commercial Advertising Signs Enjoy Robust First Amendment Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.    The Underinclusiveness Case Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        C.    The City's Scheme Fails the Third and Fourth Prongs of *Central Hudson* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

1.  Third Prong .............................................. 17

2.  Fourth Prong ............................................. 19

D.  Courts Must Be Particularly Skeptical of Regulatory Schemes
    Through Which the Government Discriminates In Favor of Its
    Own Speech ................................................ 22

E.  Other Legal Theories ...................................... 24

II.  PLAINTIFF HAS ESTABLISHED A LIKELIHOOD OF IRREPARABLE
     HARM ..................................................... 25

CONCLUSION ..................................................... 25

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                                    **PAGE NO(s):**

*Ballen v. City of Redmond,*
    466 F.3d 736 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of New York,*
    447 U.S. 557 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12, 13, 19

*Desert Outdoor Advertising, Inc. v. City of Moreno Valley,*
    103 F.3d 814 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Edenfield v. Fane,*
    507 U.S. 761 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

*Elrod v. Burns,*
    427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Energy Reserves Group, Inc. v. Kansas Power & Light,*
    459 U.S. 400 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Greater New Orleans Broadcasting Assn., Inc. v. United States,*
    527 U.S. 173 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Horizon Outdoor, LLC v. City of Industry,*
    228 F. Supp. 2d 1113 (C.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

*Lamar Advertising of Penn, LLC, v. Orchard Park,*
    2008 WL 781865 (W.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Metro Lights, LLC v. City of Los Angeles,*
    488 F. Supp. 2d 927 (C.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Metromedia, Inc. v. City of San Diego,*
    453 U.S. 490 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18, 21-23

*National Advertising Co. v. City of Orange,*
    861 F.2d 246 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Nichols Media Group v. Town of Babylon,*
    365 F. Supp. 2d 295 (E.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*North Olmstead Chamber of Commerce v. City of North Olmstead,*
    86 F. Supp. 2d 755 (N.D. Ohio 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*NRDC v. Winter,*
    518 F.3d 658 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Outdoor Media Group, Inc. v. City of Beaumont,*
    506 F.3d 895 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Preferred Communications v. City of Los Angeles,*
    754 F.2d 1396 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Rubin v. Coors Brewing Co.,*
    514 U.S. 476 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15, 22

*Sammartano v. First Judicial Dist. Ct.,*
    303 F.3d 959 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Sonoran, Inc. v. Flowers,*
    408 F.3d 1113 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Topanga Press, Inc. v. City of Los Angeles,*
    989 F.2d 1524 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*U.S. Trust Co. of New York v. New Jersey,*
    431 U.S. 1 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*U.S. v. Winstar Corp.,*
    518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Walczak v. EPL Prolong, Inc.,*
    198 F.3d 725 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Warsoldier v. Woodford,*
    418 F.3d 989 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*World Wide Rush, LLC v. City of Los Angeles,*
    __ F. Supp.2d __, 2008 WL 2477440 (C.D. Cal. Jun. 9, 2008) . . . . . . . . . . . . . . 1, 16, 21

## NOTICE OF MOTION AND MOTION

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on a date and time to be determined by the Court, as soon as counsel may be heard, in Courtroom 2 of the United States Courthouse located at 450 Golden Gate Avenue, San Francisco, California, Plaintiff Metro Fuel LLC ("Fuel") will and does hereby move for the issuance of a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.

Plaintiff seeks a preliminary injunction restraining and enjoining the City and County of San Francisco (the "City"), its officers, agents, servants, employees, and attorneys, and all those in active concert or participation with them, from enforcing any aspect of Article 6 of the San Francisco Planning Code against Plaintiff's general advertising panel signs, or from interfering in any way with the general advertising panel signs operated by Plaintiff within the City's jurisdiction.

This motion is based on this Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the concurrently filed declarations of Eric Hecker, Esq., Michael A. Freedman, Jerry Wachtel, Jeremy Paul, Charles Fetterman, Devandra Patel, Nazir Javaid, Stephanie Fonseca, Anton Halteh, Vijay Patel, and Jennifer Lenh, and all of the pleadings and records on file in this action.

Date: July 18, 2008                              LAW OFFICE OF PAUL E. FISHER


                                                 _____/s/_____
                                          By:    PAUL E. FISHER, State Bar No. 125309
                                                 The Law Office of Paul E. Fisher
                                                 537 Newport Center Dr., #289
                                                 Newport Beach, CA 92660
                                                 Telephone: (949) 675-5619
                                                 Facsimile:  (949) 675-5641

                                                 ERIC HECKER (admitted *pro hac vice*)
                                                 Emery Celli Brinckerhoff & Abady LLP
                                                 75 Rockefeller Plaza, 20th Floor
                                                 New York, NY 10019
                                                 Telephone: (212) 763-5000
                                                 Facsimile:  (212) 763-5001

                                                 ATTORNEYS FOR PLAINTIFF
                                                 METRO FUEL LLC

## SUMMARY OF ARGUMENT

This motion turns on a straightforward legal question: whether a municipality relinquishes its otherwise broad authority to severely restrict advertising signage on private property when, in order to generate revenue, the municipality itself has purposefully blanketed its streetscape with thousands of its own, essentially identical advertising signs.

Two federal District Courts have addressed this question, both of which, applying well-established Supreme Court commercial speech doctrine, held that a municipality simply cannot have it both ways. Both granted the preliminary injunctive relief sought herein. *See Metro Lights, LLC v. City of Los Angeles*, 488 F. Supp. 2d 927 (C.D. Cal. 2006); *World Wide Rush, LLC v. City of Los Angeles*, ___ F. Supp. 2d ___, 2008 WL 2477440 (C.D. Cal. Jun. 9. 2008).

The City's purported justifications for restricting Fuel's panel signs – its supposed concerns for "traffic safety" and "aesthetics" – are belied by the gaping exemptions the City has bestowed upon its various street furniture franchisees. The vast majority of the City's street furniture advertising signs are at least as big (if not substantially bigger) than Fuel's signs, and all of the City's signs are located significantly closer to the curb line where they are considerably more visible to passing motorists and pedestrians. Given the undisputed fact that the City chooses not to follow its own rules, its purported justifications for suppressing Fuel's protected speech fall of their own weight.

The *Metro Lights* and *World Wide Rush* decisions, which factually are squarely on point (even the City admits that the issues are "close"), apply an unbroken line of Supreme Court cases confirming that a regulatory scheme restricting commercial speech cannot stand if it is pierced by exceptions that substantially undermine its purported rationale. *See Greater New Orleans Broadcasting Assn., Inc. v. United States*, 527 U.S. 173 (1999); *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 420 (1993).

As the *Metro Lights* Court made clear, the City has "many alternatives" at its disposal that would pass constitutional muster, including, "[m]ost obviously," "impos[ing] the same requirements" on its street furniture franchisees that it purports to impose on other advertising companies. 488 F. Supp. 2d at 950. But the City has no authority to restrict protected speech in order to reserve for itself a monopoly over the outdoor advertising business.

Given the overwhelming strength of the case law, and given Fuel's formidable showing of irreparable harm (which is presumed in First Amendment cases in any event), it is respectfully submitted that the preliminary injunction Fuel seeks should be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Plaintiff's Outdoor Advertising Business

Plaintiff Metro Fuel LLC ("Fuel") is engaged in the business of outdoor advertising in San Francisco (as well as in several other major metropolitan areas) through its operation of so-called "panel signs." Panel signs are internally illuminated poster advertisements that have a surface area of approximately 24 square feet (6 feet by 4 feet). Declaration of Michael A. Freedman ¶ 3.

Fuel operates 164 panel signs in San Francisco. Fuel's panel signs generally are situated in one of several ways: they are affixed to the exterior of mixed use commercial properties; they are located in parking lots, either affixed to an adjacent building or mounted on a pole; they are placed on the inside of a parking garage near the door to the garage; or they are placed in the lobbies of office buildings. Fuel typically rents space from the landlord in exchange for the right to place a panel sign on or inside of the property. Most of Fuel's panel signs do not project from the building line onto the adjacent sidewalk, and the few that do project do so only by a few inches. Several of Fuel's panels are not visible from the street. *Id.* ¶¶ 3-5, Exh. A.

Fuel's panel signs are made available to national and local advertisers on an "all comers" basis in a fashion similar to newspaper, magazine, and broadcast advertising. Fuel's panel signs

may be used to display a variety of commercial and noncommercial messages, including political, religious, charitable, and public service messages. *Id.* ¶ 6.

## B.    The City's Regulation of General Advertising Signs

Article 6 of the San Francisco Planning Code places severe restrictions on the ability of companies like Fuel to operate general advertising signs in San Francisco.[1]  These restrictions fall into two basic categories.

First, through its adoption of Proposition G in March 2002, the City added Section 611 to its Planning Code, which purports to impose a complete and total ban on any and all new general advertising signs erected after that date (including virtually all of Fuel's panel signs).

Second, with respect to those panel signs that were installed prior to March 2002 and therefore are not subject to the prospective ban, Article 6 of the Planning Code contains a slew of highly restrictive underlying zoning regulations that, if enforced, would prohibit most of Fuel's panel signs.  For example, general advertising signs are completely prohibited in residential zoning districts (Planning Code § 606(a)(3)); in close proximity to schools and parks (Planning Code § 608.2); along certain streets that have been designated as scenic (Planning Code § 608.6); and in a variety of designated special sign districts (*e.g.*, Planning Code §§ 608.3, 608.9, 609.10).

The City claims that both of these categories of restrictions – the complete ban on all post-2002 advertising signs, and the district-based zoning restrictions governing pre-2002 advertising

---

[1] The Planning Code distinguishes between "business signs" and "general advertising signs."  A "business sign" is a sign that directs attention to a business or service sold or offered *on the premises* where the sign is located.  Planning Code § 602.3 (definition of "business sign"). Business signs are also commonly referred to as "on-site signs."  A "general advertising sign" is a sign that directs attention to a business or service sold or offered *elsewhere* than on the premises where the sign is located.  Planning Code § 602.3 (definition of "general advertising sign"). General advertising signs are also referred to as "off-site signs."

CASE NO. C07-6067 (JSW)
MOTION FOR PRELIM. INJ.

1    signs – are necessary to preserve and protect "traffic safety" and "aesthetics."  Planning Code §

2    611(f); *see also id.* § 601.

3
### C.    The City's Outdoor Advertising Franchises

4         Notwithstanding its purported concerns about "traffic safety" and "aesthetics," the City

5    itself operates (through contracts with various franchisees) *thousands* of general advertising signs

6    on street furniture structures throughout the City.  As detailed below, The City's advertising signs

7    plainly are at least as "dangerous" and "unsightly" as Fuel's signs allegedly are, but they are

8    permitted because they generate hundreds of millions of dollars in revenue for the City.

9

10        1.    Bus Shelters and Commercial Kiosks

11        On December 10, 2007, the City entered into a 15-year agreement (with an additional

12    5-year option) with Clear Channel Outdoor, Inc. ("Clear Channel") to rebuild and replace all of

13    the City's existing bus shelters and so-called "commercial kiosks," and to construct hundreds of

14    additional bus shelters and commercial kiosks (the "Shelter Agreement").

15
16        When the City entered into the Shelter Agreement with Clear Channel in December 2007,

17    there were a total of 1,063 existing bus shelters that had been installed and maintained under a

18    previous agreement with CBS Outdoor Inc.  Declaration of Eric Hecker, Esq., Exh. A, ¶ 1.19,

19    Exhs. B1, B2.  Of these 1,063 existing bus shelters, 697 displayed commercial general advertising

20    signs.  *Id.*  Pursuant to the Shelter Agreement, Clear Channel became obligated not only to replace

21    these 1,063 existing bus shelters, but also to build at least 37 and as many as 437 new bus shelters,

22    such that there will be a total of between 1,100 and 1,500 bus shelters when construction is

23    complete.  *Id.* ¶¶ 4.1.1, 4.1.2.  Of these 1,100 to 1,500 bus shelters, two thirds of them – upwards

24
25    of 1,000 – will display commercial general advertising signs.  *Id.* ¶ 4.1.2.

26        Each bus shelter contains two panel signs displaying commercial advertising.  These bus

27    shelter advertising signs are remarkably similar to Fuel's panel signs.  The bus shelter signs are six

28

feet high and four feet wide, just like Fuel's panel signs. *Id.* ¶ 1.29; Declaration of Jerry Wachtel ¶ 23. They are internally illuminated, just like Fuel's panel signs. *Id.* ¶ 6.2. Photographs of a variety of these bus shelters are attached to the Hecker Declaration as Exhibit B.

In addition to the bus shelter signs, the Shelter Agreement also entitles Clear Channel to install and operate up to 150 so-called "commercial kiosks" along the City's sidewalks. Hecker Decl., Exh. A., ¶ 4.1.2. These kiosks are three-sided structures that serve no purpose other than to display three commercial advertising panel signs. *Id.* ¶¶ 1.26, 6.3. Photographs of these triangular advertising kiosks are attached to the Hecker Declaration as Exhibit C.

The City stands to profit handsomely from the Shelter Agreement. Clear Channel made an upfront payment of $5 million to the City, and is required to pay the City ongoing base fees of $965,000.00 per year. Hecker Decl., Exh. A., ¶¶ 7.1(a), 7.1(b)(i)-(iii). In addition to this initial payment and ongoing base fees, Clear Channel is required to pay the City the greater of (i) 55% of Clear Channel's gross advertising revenues or (i) an escalating scale of "minimum annual guarantees." In the first year of the Shelter Agreement, the minimum annual guarantee is about $7 million, escalating to about $18 million in year fifteen. *Id.* ¶ 7.1(b)(iv). All in all, the City is guaranteed to collect *in excess of $300 million* under the Shelter Agreement, and perhaps a great deal more depending upon advertising revenue. *Id.*[2]

The City's bus shelters are specifically designed to maximize their visual impact on drivers. The advertising panels are oriented perpendicular to the street, such that they are visible

_____

[2] Not surprisingly, the City required Clear Channel to agree to use its "best efforts" to "maximize advertising revenues through the sale of advertising space," and guaranteed Clear Channel that it would not allow any other advertising companies to place advertising signs on the City's sidewalks within 60 feet of Clear Channel's bus shelters and commercial kiosks. *Id.* ¶¶ 2.2, 6.1. The City also retained the right to display its own messages, free of charge, on any bus shelter or commercial kiosk advertising panels that Clear Channel cannot sell. *Id.* ¶ 5.3.1.

CASE NO. C07-6067 (JSW)
MOTION FOR PRELIM. INJ.

to motorists.  Hecker Decl., Exh. B.  Indeed, the bus shelters are located near the curb lines, and the advertising panels are placed as close to the curb lines as possible, to ensure maximum visibility by passing motorists.  Wachtel Decl. ¶ 20.  As Clear Channel's website boasts, its bus shelters "[o]ffer outstanding visibility," ensure "visual impact 24 hours a day" because of their "back-lit illumination," and "[d]eliver high circulation figures due to [their] curbside positioning along main roadways."[3]

### 2.    "Public Service Kiosks"

On August 2, 1994, the City entered into a 20-year agreement (the "Public Toilet Agreement") with JCDecaux United Street Furniture ("JCDecaux") to construct both automated public toilets and so-called "public service kiosks."  The basic *quid pro quo* under the Public Toilet Agreements is that JCDecaux agreed to pay for the cost of constructing of up to 50 automated public toilets on the City's sidewalks, in exchange for which JCDecaux received the right to install up to 225 so-called "public service kiosks" bearing commercial advertising signs on the City's sidewalks (at a ratio of 4.5 advertising kiosks for each toilet).  Hecker Decl., Exh. D, ¶¶ 1.08, 2.04, 3.04.

The term "public service kiosk" is a misnomer, for these structures are nothing other than giant commercial advertising pillars.  Standing between 14 and 18 feet tall, each of these free-standing circular kiosks bears two enormous, illuminated general advertising sign panels measuring up to 52 square feet each (up to 12 feet high and 5 feet wide).  *Id*. ¶¶ 1.01(N), 4.02, App. D.  (In other words, each of the two advertising panels is w*ell more than double* the size of Fuel's panel signs.)  The only "public service" offered by these kiosks is that they contain a third

---

[3]  *See* http://www.clearchanneloutdoor.com/products/transit_shelter.htm

**CASE NO. C07-6067 (JSW)**
**MOTION FOR PRELIM. INJ.**

panel on which the City is entitled to display its own messages or offer various services.  *Id.* ¶¶ 4.03(B), 5.10.[4]

On its website, JCDecaux boasts that these advertising kiosks "cannot be missed," and that they are "the most impactful advertising spaces for pedestrians and vehicular traffic in the Bay area" and that they have a "potential audience of 7 million people in any two-week period."[5] Photographs of a variety of these public service kiosks are attached to the Hecker Declaration as Exhibit E.

As with the Shelter Agreement, the Public Toilet Agreement provides for substantial cash payments from JCDecaux to the City.  JCDecaux pays the City a base fee of at least $25,000.00 per year for each public toilet it has installed, escalating with the cost of inflation.  Hecker Decl., Exh. D, ¶ 1.10.  In addition, JCDecaux pays the City between 5% and 7% of its gross advertising revenues (provided that such revenues exceed certain threshold amounts).  *Id.* ¶ 1.25 (added by Third Amendment, ¶ 4).

3.    Newsracks

In 2002, the City entered into a 20-year agreement (the "Newsrack Agreement") with Clear Channel Adshel, Inc. to construct pedestal-mounted newsracks.   Pursuant to the Newsrack Agreement, Clear Channel will construct up to 1,000 newsracks, up to 485 of which will bear advertising signs.  Hecker Decl., Exh. F, ¶ 3.1.[6]

---

[4]  As part of its deal with JCDecaux, the City has promised not to authorize any other advertising company to place any advertising signs on any free-standing structures (other than bus shelters) anywhere in the Downtown area, or anywhere within a 300-foot radius of any JCDecaux public service kiosk.  *Id.* ¶ 1.08.

[5]  *See* http://www.jcdecauxna.com/pages/street/ViewMarket.aspx?mid=142

[6]  The newsracks bearing advertising signs are to be located in the "Advertising Zone" – the

**CASE NO. C07-6067 (JSW)**
**MOTION FOR PRELIM. INJ.**

The Clear Channel newsracks bearing advertising signs each contain a single advertising panel measuring 18 square feet. *Id.* ¶ 6.2. These advertising panels are illuminated, and they are placed on the rear of the newsrack structures, facing the street, within 18 inches of the curb. *Id.* ¶¶ 6.1(a), 6.2; Wachtel Decl. ¶ 20. Photographs of a variety of these newsracks are attached to the Hecker Declaration as Exhibit G.

### 4.    Lamp Post Banners

In addition to advertisements on bus shelters, commercial kiosks, public service kiosks, and newsracks, the City also allows advertising banners to be placed on City-owned lamp posts poles. S.F. Public Works Code § 184.78.

Advertising banners are permitted to be 18 square feet – 36 inches wide and 72 inches tall. *Id.* § 184.78(g)(3). They are cantilevered from lamp posts such that they hang directly over active roadways. In theory, these advertising banners are supposed to promote City-sponsored, City-funded, or City-wide special events. However, up to 15% of the total area of the banner may be used to advertise commercial sponsorship. *Id.* § 184.78(g)(1).

The City expressly found it important to allow the widespread dissemination of these advertising banners because of "the significant economic benefits that the City gains from tourism" and "the significant economic benefits that the City gains from the events held at the City's convention facilities." *Id.* § 174.78(a)(2), (a)(3).

Photographs of a variety of these lamp post advertising banners are attached to the Hecker Declaration as Exhibit I.[7]

---

northeastern quadrant of the City east of Polk Street and north of AT&T Park. *Id.* ¶ 1.1(b).

[7]  The City also has contracted with Clear Channel to install and maintain a slew of general advertising signs at the San Francisco International Airport. Although these City-sanctioned

CASE NO. C07-6067 (JSW)
MOTION FOR PRELIM. INJ.

### D.    The City Opts to Ignore Its Own Rules

The City has granted itself a blanket exemption from the otherwise total ban on new general advertising signs that was enacted in March 2002:  "Nothing in this ordinance shall be construed to prohibit the placement of signs . . . in the public right-of-way . . . ."  Planning Code § 611(b).  But for this blanket exemption, *all* of the *thousands* of new bus shelter and commercial kiosk signs contemplated under the December 2007 Shelter Agreement would be illegal.

The City has likewise exempted *all* of its street furniture general advertising signs – those on bus shelters, commercial kiosks, public service kiosks, and newsracks – from the underlying district-based zoning restrictions that supposedly are critical to the City's efforts to protect "traffic safety" and "aesthetics."  Planning Code § 603(j) (exempting bus shelters and associated kiosks from all of the district-based restrictions contained in Article 6); *id.* § 603(m) (public service kiosks); *id.* § 603(n) (newsracks).

As the City undoubtedly was aware when it granted itself these sweeping exemptions, many of the general advertising signs it authorized its franchisees to install blatantly violate the City's supposedly carefully crafted zoning rules.  As set forth in more detail in the accompanying Declaration of Jeremy Paul, the City has placed numerous street furniture general advertising signs in residential zoning districts, where they are prohibited by section 606(a)(3) of the Planning Code; within 100 feet of a school or 200 feet of a park, where they are prohibited by section 608.2 of the Planning Code; along designated scenic streets, where they are prohibited by section 608.6

---

general advertising signs do not directly implicate traffic safety or aesthetics (because they are located inside), they further underscore the extent to which the City tolerates (indeed, encourages) out-of-home advertising that generates revenue for its coffers.  Under its airport agreement with Clear Channel, the City receives minimum annual guaranteed payments in excess of $4 million per year.  Hecker Decl., Exh. H, Amend. No. 1, ¶ 2.3 (and Attachment 2).

of the Planning Code; and within the Civic Center, Jackson Square, and Upper Market Special Sign Districts, where they are prohibited by sections 608.3, 608.9(b)(1), and 608.10(b)(1) and (b)(2) of the Planning Code – to name just a few illustrative examples. *See* Paul Decl. ¶¶ 4-15.

The fact that the City chose to grant its otherwise illegal street furniture advertising signs blanket exemptions is curious – and telling – given that the City's street furniture signs obviously are at least as "dangerous" and "unsightly" as Fuel signs allegedly are.

As set forth in the accompanying Declaration of Jerry Wachtel – an esteemed traffic safety engineer with over thirty years of experience in the areas of traffic safety, human factors, ergonomics, and engineering psychology – Fuel's panel signs have, without exception, less potential to cause driver distraction than the general advertising signs that the City has placed on its street furniture structures. Wachtel Decl. ¶¶ 6, 29-32. This is so because the City's street furniture advertising signs are generally at least as large as (if not larger than) Fuel's signs, and invariably are sited considerably closer to the curb; as such, the City's signs are far more likely to enter a driver's "cone of vision" and cause an unwarranted distraction. *Id.* ¶¶ 14-15, 17, 20-26, 29-32.

### E.     The City's Efforts To Disrupt Plaintiff's Business

In recent months, the City has issued numerous Notices of Violation against dozens of Fuel's panel sign lessors, claiming that Fuel's panel signs have not been issued permits pursuant to section 604 of the San Francisco Planning Code (the "Code"), have not been registered with the San Francisco Planning Department (the "Planning Department") pursuant to section 604.2 of the Code, and/or otherwise violate the limitations on general advertising signs imposed by the Code. Freedman Decl. ¶ 8.[8]

---

[8] Fuel attempted to obtain permits for its San Francisco panel signs after it acquired Metro Lights in late 2006. However, the San Francisco Planning Department inexplicably refused even

**CASE NO. C07-6067 (JSW)**
**MOTION FOR PRELIM. INJ.**

1    The City's enforcement tactics have caused widespread and growing unrest among Fuel's

2    lessors.  As described in greater detail in the accompanying declarations submitted by various Fuel

3    lessors, many lessors have grown extremely and increasingly agitated by the escalating fines that

4    the City has purported to impose on them.  These lessors, many of whom are small business

5    owners lacking substantial financial resources, are afraid of the liens that the City has threatened to

6    place on their properties, and are concerned about what would happen to them if Fuel failed to

7    indemnify them as it has promised to do in certain cases.  They also have serious concerns about

8    these notices of violation compromising their ability to obtain other permits necessary for the

9    operation of their businesses.  As these declarations demonstrate, many of these lessors have

10    threatened to remove Fuel's panel signs from their properties – notwithstanding their lease

11    agreements – if this Court does not issue an injunction imminently, and at least two lessors

12    (Devandra Patel and Stephanie Fonseca) have already done so.  *See* Declarations of Charles

13    Fetterman, Devandra Patel, Nazir Javaid, Stephanie Fonseca, Anton Halteh, Vijay Patel, and

14    Jennifer Lenh.

15    Indeed, one lessor, John Yuen, recently went so far as to *sue* Fuel in Superior Court,

16    alleging that Fuel has not done enough to "seek the[] expeditious resolution" of the violations

17    issued by the City for the Fuel panel sign located on his property.  Freedman Decl., Exh. B.

18    In addition to threatening Fuel's existing lessor base, the City's enforcement of its

19    unconstitutional rules is directly impeding Fuel's relationships with prospective lessors and with

20    advertisers.  Freedman Decl. ¶¶ 14-15.

21    _____

22    to accept for filing – let alone meaningfully consider – Fuel's permit applications.  Freedman
      Decl. ¶ 9.  For this reason, Fuel has not yet registered its advertising sign inventory with the
23    Planning Department as contemplated by section 604.2 of the Code.  Section 604.2(d) purports to
      require a duly authorized officer of Fuel to swear, under penalty of perjury, that all of the signs in
24    Fuel's inventory have been issued all permits required by the Planning Department.  Fuel
25    obviously cannot do this because the City refuses even to consider issuing advertising sign permits
      for Fuel's signs.  Once the City processes Fuel's applications and issues permits or otherwise
26    confirms that Fuel's panel signs are compliant with all constitutional rules, Fuel will promptly
      register its sign inventory with the Planning Department.  *Id*. ¶ 10.
27

28

                                11                    **CASE NO. C07-6067 (JSW)**
                                                      **MOTION FOR PRELIM. INJ.**

**ARGUMENT**

A preliminary injunction is warranted where the movant demonstrates "a likelihood of success on the merits and the possibility of irreparable injury" or "that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999); *NRDC v. Winter*, 518 F.3d 658, 677 (9th Cir. 2008).

As the Ninth Circuit has explained, "[t]hese two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases," and vice versa. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005). Under this "sliding scale" formulation, a party seeking a preliminary injunction "need not demonstrate that he will succeed on the merits, but must at least show that his cause presents serious questions of law worthy of litigation." *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993).

Applying these standards, Plaintiff plainly is entitled to the interim relief it seeks.

## I.   PLAINTIFF HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS, OR AT LEAST THE EXISTENCE OF SERIOUS QUESTIONS

### A.   Commercial Advertising Signs Enjoy Robust First Amendment Protection

The First Amendment "protects commercial speech from unwarranted government regulation." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of New York*, 447 U.S. 557, 561 (1980). The Supreme Court has repeatedly held that "speech does not lose its First Amendment protection because money is spent to protect it, as in a paid advertisement of one form or another." *E.g., City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 420 (1993) (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)). To the contrary, it is firmly established that speech is protected by the First Amendment "even though it is carried in a form that is 'sold' for a profit." *Id.* This is so because

commercial speech serves important societal interests that transcend the commercial interest of the speaker: "Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Central Hudson*, 447 U.S. at 561-62.

The Supreme Court has emphasized that outdoor advertising signs such as those at issue in this case are entitled to robust First Amendment protection. "Billboards are a well-established medium of communication, used to convey a broad range of different kinds of messages." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 501 (1981) (plurality opinion); *see also id*. at 524 (Brennan, J., concurring) (observing that "[m]any businesses and politicians and other persons rely upon outdoor advertising because other forms of advertising are insufficient, inappropriate and prohibitively expensive"). As the Court has recognized, "[t]he outdoor sign or symbol is a venerable medium for expressing political, social and commercial ideas," and "outdoor signs have played a prominent role throughout American history, rallying support for political and social causes." *Metromedia*, 453 U.S. at 501 (plurality opinion) (quotation omitted).

Against this backdrop, the Supreme Court has developed a four-prong test for determining whether restrictions on commercial speech withstand constitutional scrutiny: (1) whether the advertising is neither unlawful nor misleading, and therefore entitled to First Amendment protection; (2) whether the regulation seeks to further a substantial governmental interest; (3) whether the regulation directly and materially advances that interest; and (4) whether the ordinance reaches no further than necessary to accomplish its stated goals. *See Central Hudson*, 447 U.S. at 563-66; *Greater New Orleans Broadcasting Assn., Inc. v. United States*, 527 U.S. 173, 183 (1999).

The burden of establishing all four prongs under the *Central Hudson* test lies squarely with the City. *See, e.g., Greater New Orleans*, 527 U.S. at 183; *Discovery Network*, 507 U.S. at 416; *Horizon Outdoor, LLC v. City of Industry*, 228 F. Supp. 2d 1113, 1126 (C.D. Cal. 2002). The City's burden "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites

1    are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*,

2    507 U.S. 761, 770-771 (1993).

3           The first two prongs of the *Central Hudson* test are not disputed in this case. The City

4    does not and cannot contend that the advertisements on Plaintiff's signs concern unlawful

5    activities or are misleading, and Plaintiff accepts that the City's purported goals of promoting

6    traffic safety and aesthetics are, in theory, substantial governmental interests. However, as will be

7    demonstrated below, the City cannot meet its formidable burden with respect to the third or fourth

8    prongs of the *Central Hudson* test:  establishing that the regulations at issue directly advance the

9    City's stated interests and are narrowly tailored to serve those interests.

10

11   **B.      The Underinclusiveness Case Law**

12          The Supreme Court has long made clear that where a scheme restricting commercial

13   speech is pierced with exceptions that substantially undermine the government's stated objectives,

14   such underinclusiveness is fatal under the third and fourth prongs of the *Central Hudson* test. The

15   leading case is *Greater New Orleans*.

16          In *Greater New Orleans*, the Court struck down a federal ban on radio and television

17   advertisements for privately operated commercial casino gambling. The "fundamental" flaw in

18   the regulatory scheme was that it was "so pierced by exemptions and inconsistencies that the

19   Government [could not] hope to exonerate it." 527 U.S. at 190. Whereas broadcasters were

20

21   barred from carrying any advertising for privately operated casino gambling, advertisements for

22   tribal casino gambling sanctioned by federal law were exempted from the ban, as were various

23   other government-operated commercial casinos. *Id.* The Court emphasized the blatant hypocrisy

24   of the government's patchwork scheme, refusing to "ignore Congress's simultaneous

25   encouragement of tribal casino gambling," which was "growing at a rate exceeding any increase in

26

27   gambling . . . that private casino advertising could produce." *Id.* at 189. The regulations failed the

28   *Central Hudson* test because they "distinguishe[d] among the indistinct, permitting a variety of

1   speech that pose[d] the same risks the Government purports to fear, while banning messages

2   unlikely to cause any harm at all." *Id*. at 195. Notably, the Court also rejected the argument that

3   the exceptions were necessary to generate revenue for the government. *Id*. at 191.

4       Similarly, in *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995), the Supreme Court struck

5   down a federal law prohibiting beer labels from displaying alcohol content, which the government

6   contended was necessary to curtail so-called "strength wars." Applying *Central Hudson*, the

7   Court concluded that the scheme did not directly or materially advance the government's asserted

8   interest because beer manufacturers were permitted to advertise the alcohol content of their beer –

9   just not on the labels themselves – and because the labeling restriction applied only to beer but not

10  to wine or spirits. *Id*. at 488. The Court observed that "[t]he failure to prohibit the disclosure of

11  alcohol content in advertising, which would seem to constitute a more influential weapon in any

12  strength war than labels, makes no rational sense if the Government's true aim is to suppress

13  strength wars," and that "[i]f combating strength wars were the goal, we would assume that

14  Congress would regulate alcohol content for the strongest beverages as well as for the weakest

15  ones." *Id*. These "exceptions and inconsistencies" were constitutionally fatal because they

16  "undermine[d] and counteract[ed]" the government's proffered justification for regulating. *Id*. at

17  489.

18      Applying *Greater New Orleans* and *Rubin* to a factual scenario identical to the one

19  presented here, the United States District Court for the Central District of California preliminarily

20  enjoined, and ultimately struck down, Los Angeles's prospective ban on all off-site advertising

21  signs in *Metro Lights, LLC v. City of Los Angeles*, 488 F. Supp. 2d 927 (C.D. Cal. 2006). In

22  *Metro Lights*, Los Angeles, like the City in this case, had contracted with a franchisee to place

23  thousands of off-site advertising signs on street furniture in exchange for millions of dollars in

24  revenue sharing, and had exempted all such street furniture advertising from the otherwise total

ban on all new advertising signs. The District Court struck down this scheme because the total

ban, coupled with the enormous street furniture exception, "operate[d] at cross purposes." *Id.* at

945. The Court explained:

> At the same time that the City, through its Sign Ordinance, bans the erection of all new off-site signs, the City's Street Furniture Program gives the City's contractor an exclusive right to place thousands of off-site signs next to traffic lanes in every area of the City where a traffic shelter, kiosk or "amenity" is located. This dichotomy undermines the Sign Ordinance's stated interests [in protecting traffic safety and aesthetics] since many of the Street Furniture advertisements, which are placed at street level, are designed precisely to attract the attention of all who pass by . . . .

*Id.* at 943; *see also id.* at 948 ("Again, as in *Greater New Orleans*, the City cannot persuasively

argue that its Ordinance complies with *Central Hudson* by directly advancing a substantial

government interest while the City promulgates other policies that undermine the stated interest.").

Indeed, the *Metro Lights* Court did not view that case as a close one, observing that "the

inconsistency and the reasons for its existence are *less subtle* than those discussed in *Greater New

Orleans*." *Id.* at 949 (emphasis added).

More recently, in *World Wide Rush, LLC v. City of Los Angeles*, __ F. Supp. 2d __, 2008

WL 2477440 (C.D. Cal. Jun. 9. 2008), the District Court preliminarily enjoined one of the zoning

restrictions (the prohibition of advertising signs located within 2,000 feet of a freeway) underlying

Los Angeles's prospective total ban of all advertising signs. Relying on *Greater New Orleans* and

*Metro Lights*, the *World Wide Rush* Court concluded that the fact that the City had granted

exceptions approving five highway advertising billboards fatally undermined its stated goals of

preserving traffic safety and aesthetics:

> Plaintiffs here have persuasively demonstrated that, despite the City's interests in safety and aesthetics that support its ban on signs within 2,000 feet of a freeway, the City has permitted giant commercial billboards in these areas that directly undermine those interests.

*Id.* at *15.

### C.    The City's Scheme Fails the Third and Fourth Prongs of *Central Hudson*

Based on the case law discussed above, there is no doubt that the advertising sign regulatory scheme at issue in this case fails both the third and fourth prongs of *Central Hudson*.

### 1.    Third Prong

On information and belief, the City has not performed any studies – formal or informal, scientific or anecdotal – regarding whether advertising signs truly pose a threat to traffic safety or meaningfully affect the aesthetics of the streetscape.  This omission is itself fatal to the City's regulatory scheme, for the Supreme Court has repeatedly held that a regulation restricting commercial speech will be struck down where the government "has not 'carefully calculated' the costs and benefits associated with the burden on speech imposed by its prohibition." *Discovery Network*, 527 U.S. at 417; *see also Central Hudson*, 447 U.S. at 564 (holding that a "regulation may not be sustained if it provides only ineffective or remote support for the government's [stated] purpose").

As the Court has explained, the requirement that the government support its purported regulatory interest with specific, credible evidence of a demonstrated need to act – rather than "mere speculation or conjecture," *Edenfield*, 507 U.S. at 770 – is "critical" because it serves to prevent the government from doing precisely what the City has done here:  manufacturing a pretextual regulatory justification (promoting "safety and aesthetics") to mask its actual, impermissible purpose (maximizing revenue at the expense of protected speech).  *Rubin*, 514 U.S. at 487 (holding that it is "critical" that the government support its position with specific, credible evidence of a need to act because "otherwise, 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression'") (quoting *Edenfield*, 507 U.S. at 771).

The opinion of the District Court in *Horizon Outdoor, LLC v. City of Industry*, 228 F. Supp. 2d 1113 (C.D. Cal. 2002), is instructive on this point.  *Horizon Outdoor* involved a challenge to a municipal ordinance banning offsite advertising within a specified distance from major roadways.  The city claimed that its ban was designed to promote "safety" and to prevent

1 "visual blight," but the city proffered no evidence that it had considered "any reports or studies or

2 other evidence indicating that the ban actually serves those interests." *Id.* at 1126-27. Because the

3 city had not "presented any statistics indicating" that the ban was likely to increase traffic safety,

4 the court entered a preliminary injunction enjoining its enforcement. *Id.* at 1127.

5       Here, the City cannot point to any evidence that enforcing its restrictions on general

6 advertising signs will increase traffic safety one iota. The City's failure to take even rudimentary

7 steps to do its homework before imposing such substantial restrictions on commercial speech is

8 unconstitutional. *See Metromedia*, 453 U.S. at 528 (Brennan, J., concurring) (for restrictions on

9 offsite billboard advertising to be constitutional, there is no "adequate substitute for evidence *in*

10 *this case* that banning billboards directly furthers traffic safety") (emphasis in original). This is

11 especially true where, as here, the record contains expert testimony establishing that the City's

12 street furniture signs – the vast majority of which are at least as large Fuel's signs, and which

13 invariably are located considerably closer to the curb and therefore are considerably more visible

14 to passing motorists – are, if anything, *more* likely to distract motorists than Fuel's signs are.

15 Wachtel Decl. ¶¶ 6, 14-15, 20-26, 29-32.

16       So too with the City's ostensible interest in protecting "aesthetics." As Justice Brennan

17 observed in *Metromedia*, the government cannot justify substantial restrictions on commercial

18 speech based on general "aesthetic" concerns unless its decision to regulate advertising signs

19 stems from a detailed and comprehensive analysis of the attractiveness of the municipal

20 environment as a whole:

21     [B]efore deferring to a city's judgment [with respect to aesthetic concerns], a court must be
22     convinced that the city is seriously and comprehensively addressing aesthetic concerns
    with respect to its environment. Here, San Diego has failed to demonstrate a
23     comprehensive and coordinated effort in its commercial and industrial areas to address
    other obvious contributors to an unattractive environment. In this sense the ordinance is
24     [fatally] underinclusive.

25 453 U.S. at 531. In this case, the City cannot credibly claim that it has engaged in any meaningful

26 analysis of the impact of advertising signs on the urban landscape, much less that it has done so

27 "seriously and comprehensively."

28

1    Because the City cannot adduce any evidence that Fuel's panel signs actually compromise

2  traffic safety or meaningfully threaten the urban landscape in its full context, the City's scheme

3  does not "directly and materially" advance any government interest under the third prong of

4  *Central Hudson.*

5

6    2.  Fourth Prong

7    Ultimately, this Court need not identify the precise quantum of evidence that is required

8  for the City to prove that its scheme is directly and materially advancing its purported interests

9  because the City's scheme has, as the Supreme Court put it in *Greater New Orleans*, a "more

10  fundamental" flaw that is fatal under the fourth prong of *Central Hudson*:  its "regulatory regime

11  is so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it."

12  527 U.S. at 190.

13

14    To satisfy the fourth *Central Hudson* prong, there must be "a reasonable fit between the

15  restriction and the goal," and "the challenged regulation [must] include a means narrowly tailored

16  to achieve the desired objective."  *Ballen v. City of Redmond*, 466 F.3d 736, 742 (9th Cir. 2006)

17  (citations and quotation omitted).  "A regulation need not be absolutely the least severe that will

18  achieve the desired end, but if there are numerous and obvious less-burdensome alternatives to the

19  restriction on commercial speech, that is certainly a relevant consideration in determining whether

20  the fit between ends and means is reasonable."  *Id*. (quoting *Discovery Network*, 507 U.S. at 417

21  n.13).

22

23    The City cannot credibly contend that its restrictions on Fuel's panel signs are narrowly

24  tailored to its purported traffic safety goal given the blanket exemptions that the City has granted

25  to *thousands* of its own street furniture advertising signs.  *See* Planning Code §§ 603(j), (m), (n).

26  As Fuel's expert traffic safety engineer testifies in his accompanying declaration, the City's street

27  furniture signs pose a significantly greater threat to traffic safety than Fuel's panel signs

28

**CASE NO. C07-6067 (JSW)**
**MOTION FOR PRELIM. INJ.**

supposedly do. Wachtel Decl. ¶¶ 6, 14-15, 20-26, 29-32 (discussing, among other things, the "cone of vision" issue). The Wachtel Declaration confirms scientifically what common sense makes obvious: because the City's street furniture signs are considerably more visible to passing motorists than Fuel's signs, the City's decision to categorically exempt its signs is fatal to any claim that its scheme is narrowly tailored. *See Metro Lights*, 488 F. Supp. 2d at 944 (crediting similar expert testimony, but noting that "this evidence is not necessary to the Court's ruling since the study tends to confirm that which common sense suggests").

The same is true for the City's incredible claim that its regulatory scheme, including its massive exemptions for its own signs, is narrowly tailored to its supposed aesthetic goals. The Court should peruse the photographic evidence that is appended to the Hecker Declaration as Exhibits B, C, E, G, and I, which depicts the various types of street furniture bearing advertising signs, including bus shelters, commercial kiosks, public service kiosks, newsracks, and utility pole banners. The Court should also peruse the photos of various Fuel panel signs, which are appended to the Freedman Declaration as Exhibit A. There simply is no way that anyone could conclude that Fuel's panel signs have any greater impact on aesthetics than the City's exempted signs do. *See Discovery Network*, 507 U.S. at 425 (striking down selective ban on newsracks because "respondent publishers' newsracks are no greater an eyesore than the newsracks permitted to remain on Cincinnati's sidewalks"); *see also Ballen*, 466 F.3d at 743 (striking down ban on portable advertising signs in part because "[t]he City has failed to show how the exempted signs reduce vehicular and pedestrian safety or besmirch community aesthetics any less than the prohibited signs").[9]

---

[9] Furthermore, as *Metro Lights* observed, "it is unclear whether aesthetics alone is a sufficiently substantial justification for a restriction on commercial speech." 488 F. Supp. 2d at 947 n.10. At

CASE NO. C07-6067 (JSW)
MOTION FOR PRELIM. INJ.

It bears emphasis that the glaring underinclusiveness of the City's regulatory scheme has two distinct aspects:  the City's failure to comply with the prospective ban on all new general advertising signs erected after March 2002 (Planning Code § 611); and its refusal to comply with its underlying zoning provisions that restricted the placement of pre-ban general advertising signs based on location (Planning Code §§ 605-608).

With respect to the post-2002 ban, it is plain that the City has constructed and will continue to construct thousands of new general advertising signs following the purported ban.  Indeed, the Shelter Agreement requires Clear Channel not only to redesign, replace, and rebuild all of the City's existing bus shelters, but also to build hundreds of *additional* shelters bearing advertising signs that did not exist prior to the enactment of the ban.  Hecker Decl. Exh. A, ¶¶ 4.1.1, 4.1.2. This is the very same issue addressed by the Court in *Metro Lights*.

Although the *Metro Lights* Court did not address the underlying zoning issue, the *World Wide Rush* Court did, and the same logic applies.  Here, the record confirms that the City's street furniture violates a slew of underlying zoning restrictions, including the prohibition on placing general advertising signs in residential zoning districts (Planning Code § 606(a)(3)), within 100 feet of a school or 200 feet of a park (Planning Code § 608.2), along designated scenic streets (Planning Code § 608.6), and within various special sign districts.  *See generally* Paul Declaration, ¶¶ 4-15.  The *World Wide Rush* Court, applying *Greater New Orleans* and *Metro Lights*, correctly held that a City's failure to follow its own underlying zoning rules is similarly fatal under the "narrow tailoring" prong of *Central Hudson*.  2008 WL 2477440, at *15-*16.

---

the very least, because "esthetic judgments are necessarily subjective, defying objective evaluation," they "must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose."  *Metromedia*, 453 U.S. at 510 (plurality opinion); *id.* at 530-33 (Brennan, J., concurring).

CASE NO. C07-6067 (JSW)
MOTION FOR PRELIM. INJ.

Finally, although Plaintiff expects that the City will attempt to rely on *Metromedia v. City of San Diego*, 453 U.S. 490 (1981), nothing in that case rescues the City's woefully underinclusive scheme at issue here.  Although the plurality in *Metromedia* relied on legislative judgments in evaluating whether the challenged ordinance furthered traffic safety and aesthetic goals, it expressly pointed out that there was *no evidence* in that case contradicting those judgments.  *Id.* at 509 (plurality opinion) ("There is nothing here to suggest that these judgments are unreasonable.").  Because *Metromedia* was not confronted with and did not consider the basic underinclusiveness argument underpinning the theory of this case, *Metromedia* plainly does not control, and *Greater New Orleans*, *Rubin*, *Metro Lights*, and *World Wide Rush* plainly do.[10]

For all of these reasons, the City's scheme fails the fourth prong of *Central Hudson*.[11]

### D.     Courts Must Be Particularly Skeptical of Regulatory Schemes Through Which the Government Discriminates In Favor of Its Own Speech

Even leaving the underinclusiveness cases aside, the law is clear that a regulatory regime that systematically favors government speech over commercial speech violates the First Amendment.  The Supreme Court has long stressed the need for heightened judicial oversight when the government's own "self-interest is at stake."  *U.S. Trust Co. of New York v. New Jersey*,

---

[10]  Notably, the only *holding* of *Metromedia* is that the challenged scheme was *un*constitutional. Justice White's four-Justice plurality, while espousing the view that legislative judgments generally deserve deference, agreed with Justices Brennan and Blackmun that the scheme at issue should nonetheless be struck down.

[11]  Numerous courts have recognized that the third and fourth prongs of the *Central Hudson* test are, in essence, flip sides of the same coin.  *E.g.*, *Greater New Orleans*, 527 U.S. at 188 (observing that "[t]he fourth part of the test compliments the direct-advancement inquiry of the third"); *Metro Lights*, 488 F. Supp. 2d at 942 (same).  The underinclusiveness of the City's scheme therefore is relevant and fatal under the third *Central Hudson* prong as well:  because the City has blanketed its streetscape with thousands of street furniture general advertising signs that are at least as problematic as Fuel's panel signs allegedly are, the City is not directly or materially advancing its traffic safety or aesthetic goals.

431 U.S. 1, 26 (1977) (in dispute over whether Contract Clause barred state's modification of its own financial obligations, Court declined to defer to state's own assessment of whether statute was reasonable and necessary); *U.S. v. Winstar Corp.*, 518 U.S. 839, 896-98 (1996) (courts must be "more suspect" of the government's invocation of the Sovereign Acts Doctrine where there is a higher level of government self-interest); *see also Energy Reserves Group, Inc. v. Kansas Power & Light*, 459 U.S. 400, 412-13 & n.14 (1983).

Applying this concept in the commercial speech context, the Court in *Nichols Media Group v. Town of Babylon*, 365 F. Supp. 2d 295 (E.D.N.Y. 2005), struck down a portion of a billboard ordinance that exempted all signs "erected and maintained by or at the direction of any governmental body, organization, agency or corporation." *Id.* at 301. The Court found this favoring of the government's speech over private speech unconstitutional. "By freeing governmental signs from the reach of the Ordinances, the Towns have created an impermissible distinction that favors the Towns' speech over that of other speakers." *Id.* at 316. The Court acknowledged that "narrowly tailored exemptions" could be permissible, but a sweeping license to the government to erect the very signs it would prohibit for others – much like the regulatory scheme here – could not pass constitutional muster. *Id.* at 317; *see also Lamar Advertising of Penn, LLC, v. Orchard Park*, No. 01-CV-556A(M), 2008 WL 781865, at *17 (W.D.N.Y. 2008) (observing that "the Town's practice of exempting all properties owned or operated by Erie County from its Ordinance raises the inference that the Town is impermissibly favoring government speech over other speech"); *North Olmstead Chamber of Commerce v. City of North Olmstead*, 86 F. Supp. 2d 755, 773-75 (N.D. Ohio 2000) (ordinance banning pole signs failed to materially further City's interests in safety and aesthetics by reason of exemption for government pole signs).

### E.    Other Legal Theories

In addition to its core *Metro Lights* theory, Plaintiff has pled two other compelling legal theories.

First, the practical effect of the City's complete ban on new off-site advertising signs on private property is that the City has set the stage for reserving for itself a monopoly over outdoor advertising in San Francisco.  Although a modicum of pre-2002 general advertising signs are currently legal, those signs have been reduced to so-called "non-conforming use" status, such that they may remain as they are, where they are, but may not be substantially altered or rebuilt.  The effect of this scheme is that the number of general advertising signs that the City does not control will steadily decrease over time, ultimately resulting in a total monopoly for the City.  As the Ninth Circuit has held, such sweeping control by the government over a channel of communication is unconstitutional because it raises the prospect that the government, as the exclusive media provider, will censor advertising based on the content of the speaker's message. *See Preferred Communications v. City of Los Angeles*, 754 F.2d 1396 (9th Cir. 1985).[12]

Second, the City's restrictions on Fuel's panel signs – both the post-2002 ban and the pre-2002 underlying zoning restrictions – are unconstitutional for the additional reason that they fail to provide the necessary exceptions for non-commercial speech.  *See Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 905-07 (9th Cir. 2007); *Desert Outdoor Advertising, Inc. v. City of Moreno Valley*, 103 F.3d 814, 819-21 (9th Cir. 1996); *National Advertising Co. v. City of Orange*, 861 F.2d 246, 248-49 (9th Cir. 1988).

---

[12]   One need not speculate about whether the City will use its burgeoning monopoly power to impose content-based restrictions on off-site advertising because it already has.  Under the Shelter Agreement, the City has imposed various content-based restrictions on street furniture advertising, including prohibiting political advertising and the advertising of firearms, alcohol, or tobacco products.  *See* Shelter Agreement ¶ 10.1 & Exh. J.

Plaintiff intends to develop these theories and to rely on them, if necessary, on summary judgment. At this juncture, however, Plaintiff's *Metro Lights* theory provides this Court with more than ample basis for granting the interim relief Plaintiff seeks.

## II.    PLAINTIFF HAS ESTABLISHED A LIKELIHOOD OF IRREPARABLE HARM

The Ninth Circuit has repeatedly held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury for purposes of the issuance of a preliminary injunction." *Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005); *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 973 (9th Cir. 2002) (holding that "the fact that a case raises serious First Amendment questions compels a finding that there exists the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [the plaintiff's] favor"); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (presumption of irreparable injury is particularly strong in cases involving infringement on First Amendment freedoms).

Given (1) this presumption; (2) the overwhelming strength of Fuel's legal claim under the case law; (3) the accompanying declarations of Michael Freedman and various Fuel lessors detailing the nature of the irreparable business harm with which Fuel has been threatened; and (4) the fact that the City presumably will argue at trial that Fuel's money damages claims are too speculative and difficult to quantify, a preliminary injunction should be granted.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that Plaintiff's motion for a preliminary injunction should be granted.

Date:  July 18, 2008

LAW OFFICE OF PAUL E. FISHER

_____/s/_____
By:  PAUL E. FISHER, State Bar No. 125309
The Law Office of Paul E. Fisher
537 Newport Center Dr., #289
Newport Beach, CA 92660
Telephone: (949) 675-5619
Facsimile:  (949) 675-5641

ERIC HECKER (admitted *pro hac vice*)
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Telephone: (212) 763-5000
Facsimile:  (212) 763-5001

ATTORNEYS FOR PLAINTIFF
METRO FUEL LLC