PAUL E. FISHER, State Bar No. 125309
The Law Office of Paul E. Fisher
537 Newport Center Dr., #289
Newport Beach, CA 92660
Telephone: (949) 675-5619
Facsimile: (949) 675-5641

ERIC HECKER (admitted *pro hac vice*)
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Telephone: (212) 763-5000
Facsimile: (212) 763-5001

ATTORNEYS FOR PLAINTIFF
METRO FUEL LLC

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| METRO FUEL LLC, a Delaware limited liability company,<br><br>        Plaintiff,<br>vs.<br><br>CITY OF SAN FRANCISCO, a municipal corporation, COUNTY OF SAN FRANCISCO, a subdivision of the State of California, CITY AND COUNTY OF SAN FRANCISCO, a chartered California city and county,<br><br>        Defendants. | Case No. 3:07-CV-6067 (JSW)<br><br>The Hon. Jeffrey S. White<br><br>**DECLARATION OF ERIC HECKER IN SUPPORT OF THE MOTION FOR A PRELIMINARY INJUNCTION** |

        ERIC HECKER declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

        1.      I am a partner at Emery Celli Brinckerhoff & Abady LLP, and I have been admitted *pro hac vice* and have appeared in this action to serve as co-counsel

1

to Plaintiff Metro Fuel LLC ("Fuel"), together with the Law Office of Paul Fisher. I submit this declaration in support of Plaintiff's Motion for a Preliminary Injunction.

2. The San Francisco Planning Code contains a variety of significant restrictions on the ability of outdoor advertising companies to place general advertising signs in the City of San Francisco (the "City"). Generally speaking, and as discussed more fully in Plaintiff's accompanying Memorandum of Law, all general advertising signs erected after March 5, 2002 are completely banned, Planning Code § 611, and pre-existing general advertising signs are subject to stringent district-based zoning restrictions, Planning Code §§ 605-608.

3. The City, however, has carved out for itself canyon-sized exemptions from these restrictions. Through the enactment of amendments to the San Francisco Planning Code, the City has granted itself a broad exemption for its street furniture advertising programs, exempting its bus shelters, triangular commercial kiosks, so-called "public service kiosks," and newsracks from the zoning restrictions that otherwise would apply to general advertising signs on those structures. (The zoning exemption for the City's bus shelters and commercial kiosks has been codified in section 603(j) of the Planning Code; the exemption for its public service kiosks has been codified in section 603(m) of the Planning Code; and the exemption for its newsracks has been codified in section 603(n) of the Planning Code.)

4. As demonstrated below, the City has granted its hand-picked franchisees the right to construct street furniture and place general advertising signs on those structures. These franchises confirm unmistakably that the City's alleged objectives in enacting the regulations – protecting "traffic safety" and "aesthetics" – are

empty pretexts. The reality is that the City did not hesitate to sell those purported concerns on the open market in order to generate revenue.

### A. Bus Shelters

5.  On December 10, 2007, the City entered into a 15-year agreement (with an additional 5-year option) with Clear Channel Outdoor, Inc. ("Clear Channel") to rebuild and replace all of the City's existing transit shelters and associated commercial kiosks, and to construct hundreds of additional bus shelters and commercial kiosks (the "Shelter Agreement"). A true and correct copy of the Shelter Agreement is attached hereto as Exhibit A.

6.  When the City entered into the Shelter Agreement with Clear Channel in December 2007, there were a total of 1,063 existing bus shelters that had been installed and maintained under a previous agreement with CBS Outdoor Inc. Shelter Agreement ¶ 1.19, Exhs. B1, B2. Of these 1,063 existing bus shelters, 697 displayed commercial general advertising signs. *Id.* Pursuant to the Shelter Agreement, Clear Channel became obligated not only to replace these 1,063 existing bus shelters, but also to build at least 37 and as many as 437 new bus shelters, such that there will be a total of between 1,100 and 1,500 bus shelters when construction is complete. *Id.* ¶¶ 4.1.1, 4.1.2. Of these 1,100 to 1,500 bus shelters, two thirds of them – upwards of 1,000 – will display commercial general advertising signs. *Id.* ¶ 4.1.2.

7.  Each bus shelter contains two panel signs displaying commercial advertising. These bus shelter advertising signs are remarkably similar to Fuel's panel signs. The bus shelter signs are six feet high and four feet wide, just like Fuel's panel

signs. *Id.* ¶ 1.29. And they are internally illuminated, just like Fuel's panel signs. *Id.* ¶ 6.2.

8. True and correct copies of photographs fairly and accurately depicting a variety of these bus shelters are attached hereto as Exhibit B.

9. In addition to the bus shelter signs, the Shelter Agreement also entitles Clear Channel to install and operate up to 150 so-called "commercial kiosks" along the City's sidewalks. Shelter Agreement ¶ 4.1.2. These kiosks are three-sided structures (therefore also known as "triangle kiosks") that literally serve no purpose other than to serve as a vehicle to display three commercial advertising panels. *Id.* ¶¶ 1.26, 6.3.

10. True and correct copies of photographs fairly and accurately depicting a variety of these triangular commercial kiosks are attached hereto as Exhibit C.

11. The City retained the right to display its own messages, free of charge, on any bus shelter or commercial kiosk advertising panels that Clear Channel cannot sell. *Id.* ¶ 5.3.1.

12. The City stands to profit handsomely from the Shelter Agreement. Clear Channel made an upfront payment of $5 million to the City, and is required to pay the City ongoing base fees of $965,000.00 per year. Shelter Agreement ¶¶ 7.1(a), 7.1(b)(i)-(iii).

13. In addition to this initial payment and ongoing base fees, Clear Channel is required to pay the City the greater of (i) 55% of Clear Channel's gross advertising revenues or (i) an escalating scale of "minimum annual guarantees." In the first year of the Shelter Agreement, the minimum annual guarantee is about $7 million, escalating to about $18 million in year 15. *Id.* ¶ 7.1(b)(iv). All in all, the City is guaranteed to collect *in excess of $300 million* under the Shelter Agreement, and perhaps a great deal more depending upon advertising revenue. *Id.*

14. Not surprisingly, the City required Clear Channel to agree to use its "best efforts" to "maximize advertising revenues through the sale of advertising space," and guaranteed Clear Channel that it would not allow any other advertising companies to place advertising signs on the City's sidewalks within 60 feet of Clear Channel's bus shelters and commercial kiosks. *Id.* ¶¶ 2.2, 6.1.

**B.    "Public Service Kiosks"**

15. On August 2, 1994, the City entered into a 20-year agreement (the "Public Toilet Agreement") with JCDecaux United Street Furniture ("JCDecaux") to construct both automated public toilets and so-called "public service kiosks." A true and correct copy of the Public Toilet Agreement is attached hereto as Exhibit D.

16. The basic *quid pro quo* under the Public Toilet Agreements is that JCDecaux agreed to pay for the cost of constructing of up to 50 automated public toilets on the City's sidewalks, in exchange for which JCDecaux received the right to install up to 225 so-called "public service kiosks" bearing commercial advertising signs on the

City's sidewalks (at a ratio of 4.5 advertising kiosks for each toilet). Public Toilet Agreement ¶¶ 1.08, 2.04, 3.04.

17. The term "public service kiosk" is a misnomer, for these structures are nothing other than giant commercial advertising pillars. Standing between 14 and 18 feet tall, each of these free-standing circular kiosks bears two enormous, illuminated general advertising sign panels measuring up to 52 square feet each (up to 12 feet high and 5 feet wide). *Id.* ¶¶ 1.01(N), 4.02, App. D. (In other words, each of the two advertising panels is well more than *double* the size of Fuel's panel signs.) The only "public service" offered by these kiosks is that they contain a third panel on which the City is entitled to display its own messages or to offer various services. *Id.* ¶¶ 4.03(B), 5.10.

18. As part of its deal with JCDecaux, the City has promised not to authorize any other advertising company to place any advertising signs on any free-standing structures (other than bus shelters) anywhere in the Downtown area, or anywhere within a 300-foot radius of any JCDecaux public service kiosk. *Id.* ¶ 1.08.

19. True and correct copies of photographs fairly and accurately depicting a variety of these kiosks are attached hereto as Exhibit E.

20. As with the Shelter Agreement, the Public Toilet Agreement provides for substantial cash payments from JCDecaux to the City. JCDecaux pays the City a base fee of at least $25,000.00 per year for each public toilet it has installed, escalating with the cost of inflation. Public Toilet Agreement ¶ 1.10. In addition, JCDecaux pays the City between 5% and 7% of its gross advertising revenues (provided

that such revenues exceed certain threshold amounts). *Id.* ¶ 1.25 (added by Third Amendment, ¶ 4).

### C. Newsracks

21. In 2002, the City entered into a 20-year agreement (the "Newsrack Agreement") with Clear Channel Adshel, Inc. to construct pedestal-mounted newsracks. Pursuant to the Newsrack Agreement, Clear Channel will construct up to 1,000 newsracks, up to 485 of which will bear advertising signs. A true and correct copy of the Newsrack Agreement is attached hereto as Exhibit F.

22. The Clear Channel newsracks bearing advertising signs each contain a single advertising panel measuring 18 square feet. Newsrack Agreement ¶ 6.2. These advertising panels are illuminated, and they are placed on the rear of the newsrack structures facing the street. *Id.* ¶¶ 6.1(a), 6.2. The newsracks bearing advertising signs are to be located in the so-called "Advertising Zone" – the northeastern quadrant of the City east of Polk Street and north of AT&T Park. *Id.* ¶ 1.1(b).

23. True and correct copies of photographs fairly and accurately depicting a variety of these newsracks are attached hereto as Exhibit G.

### D. Airport Advertising

24. The City also has contracted with Clear Channel to install and maintain a slew of general advertising signs at the San Francisco International Airport. A true and correct copy of the airport advertising lease with amendments (the "Airport Lease") is attached hereto as Exhibit H.

25.     Although these City-sanctioned general advertising signs do not directly implicate traffic safety or aesthetics (because they are located inside), they further underscore the extent to which the City tolerates – indeed, encourages – out-of-home advertising that generates revenue for its coffers.

26.     Under its Airport Lease with Clear Channel, the City receives minimum annual guaranteed payments in excess of $4 million per year. Airport Lease, Amendment No. 1, ¶ 2.3 (and Attachment 2).

### E.     Lamp Post Banner Ads

27.     In addition to advertisements on bus shelters, triangle kiosks, public service kiosks, newsracks, and at the airport, the City also allows advertising banners to be placed on City-owned utility poles throughout San Francisco. S.F. Public Works Code § 184.78.

28.     Advertising banners are permitted to be 18 square feet – 36 inches wide and 72 inches tall. *Id.* § 184.78(g)(3). They are cantilevered from lamp posts such that they hang directly over active roadways. In theory, these advertising banners are supposed to promote City-sponsored, City-funded, or City-wide special events. However, up to 15% of the total area of the banner may be used to advertise commercial sponsorship. *Id.* § 184.78(g)(1).

29.     The City expressly found it important to allow the widespread dissemination of these advertising banners because of "the significant economic benefits that the City gains from tourism" and "the significant economic benefits that the City gains from the events held at the City's convention facilities." *Id.* § 174.78(a)(2), (a)(3).

      30.    Photographs of a variety of these lamp post advertising banners are attached hereto as Exhibit I.

# # #

      31.    I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 18, 2008
       New York, New York

_____
ERIC HECKER