

**Municipal Transportation Agency**
Board of Directors & Parking Authority

 

San Francisco Municipal Transportation Agency

TRANSIT SHELTER ADVERTISING AGREEMENT

Date: _____

**Municipal Transportation Agency**
Board of Directors & Parking Authority

MUNI
San Francisco
Municipal Railway

DPT
San Francisco
Department of
Parking and Traffic

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 1.1. | ADA | 1 |
| 1.2. | Alternative Shelter | 1 |
| 1.3. | Agreement | 1 |
| 1.4. | Annual Financial Report | 1 |
| 1.5. | Arts Commission | 1 |
| 1.6. | Associated Equipment | 1 |
| 1.7. | Bicycle-Sharing Program | 1 |
| 1.8. | Carryover Contract | 2 |
| 1.9. | City | 2 |
| 1.10. | Commercial | 2 |
| 1.11. | Consumer Price Index, CPI | 2 |
| 1.12. | Days | 2 |
| 1.13. | Design | 2 |
| 1.14. | Design Approval Date | 2 |
| 1.15. | DPW | 2 |
| 1.16. | Effective Date | 2 |
| 1.17. | E-Line | 2 |
| 1.18. | Executive Director/CEO | 2 |
| 1.19. | Existing | 2 |
| 1.20. | Fiscal Year | 2 |
| 1.21. | F-Line | 2 |
| 1.22. | Graffiti | 2 |
| 1.23. | Gross Revenues | 3 |
| 1.24. | High-Level Boarding Platform | 3 |
| 1.25. | Historic Shelters | 3 |
| 1.26. | Kiosk | 3 |
| 1.27. | Low-Level Boarding Platform | 3 |

**Municipal Transportation Agency**
Board of Directors & Parking Authority

 

| | | |
|---|---|---|
| 1.28. | MAG; Minimum Annual Guarantee | 3 |
| 1.29. | Maximum Ad Panel Size | 3 |
| 1.30. | New | 3 |
| 1.31. | Noncommercial | 3 |
| 1.32. | Outage | 3 |
| 1.33. | Port | 3 |
| 1.34. | Proposal | 3 |
| 1.35. | Public Entity Shelters | 3 |
| 1.36. | Public Right(s)-of-Way | 3 |
| 1.37. | Records | 3 |
| 1.38. | Request for Proposals, RFP | 4 |
| 1.39. | San Francisco Municipal Transportation Agency; SFMTA | 4 |
| 1.40. | SFMTA-Constructed Shelters | 4 |
| 1.41. | Shelter, Transit Shelter | 4 |
| 1.42. | Signal Control Cover | 4 |
| 1.43. | Small Business Enterprise; SBE | 4 |
| 1.44. | Station Canopies | 4 |
| 1.45. | Structures | 4 |
| 1.46. | T-Line | 4 |
| 1.47. | Time and Materials | 4 |
| 1.48. | Transit Stop Poles | 4 |
| 1.49. | Unavoidable Delay | 4 |
| 1.50. | Union Square/Tenderloin Area | 5 |
| 2. | GRANT OF ADVERTISING RIGHTS AND PRIVILEGES | 5 |
| 2.1. | Rights Granted | 5 |
| 2.1.1 | SFMTA to Contractor | 5 |
| 2.1.2 | License | 5 |
| 2.1.3 | Distance from other Advertising | 5 |
| 2.1.4 | Port to Contractor | 5 |
| 2.2. | Rights Retained/Limitations on Contractor's Rights | 5 |
| 2.2.1 | Advertising | 5 |

**Municipal Transportation Agency**
Board of Directors & Parking Authority



2.2.2    Advertising Space Subject to Change ......................................................... 5

2.2.3    Transportation Priority ................................................................................. 6

2.2.4    Use of Structures ........................................................................................... 6

2.2.5    No Damage to City Property ......................................................................... 6

2.2.6    Nuisances ....................................................................................................... 6

2.3.    Carryover Contracts ............................................................................................. 6

2.3.1    Beginning of Term ........................................................................................ 6

2.3.2    End of Term ................................................................................................... 6

3.    OWNERSHIP OF STRUCTURES ..................................................................................... 6

4.    INSTALLATION REQUIRED ........................................................................................... 7

4.1.    General ................................................................................................................... 7

4.1.1    Shelters and Kiosks ....................................................................................... 7

4.1.2    Number of Commercial and Noncommercial Shelters and Kiosks ............ 7

4.1.3    Transit Stop Poles ......................................................................................... 7

4.1.4    Signal Control Covers ................................................................................... 7

4.2.    Locations ............................................................................................................... 7

4.2.1    General ........................................................................................................... 7

4.2.2    Port Locations ............................................................................................... 8

4.2.3    Removal or Relocation of Shelters and Kiosks .......................................... 8

        (a)    City Request .................................................................................... 8

        (b)    Removal and Relocation Costs for City Requests ......................... 8

        (c)    Contractor Request ......................................................................... 8

        (d)    Time for Relocation ......................................................................... 8

5.    NONCOMMERCIAL DISPLAY ........................................................................................ 8

5.1.    Transit Information ............................................................................................... 8

5.2.    Port Campaign ...................................................................................................... 8

5.3.    Unsold Space ......................................................................................................... 8

5.3.1    City's Use of Unsold Space .......................................................................... 8

5.4.    Contractor's Use of Unsold Space ....................................................................... 9

5.5.    Installation of Displays for City ........................................................................... 9

6.    COMMERCIAL ADVERTISING DISPLAYS ................................................................... 9

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

| | | |
|---|---|---|
| 6.1. | Contractor's Best Efforts | 9 |
| 6.2. | Commercial Shelters (including F-Line and E-Line Shelters) | 9 |
| 6.3. | Kiosks | 9 |
| 6.4. | Stonestown Station | 9 |
| 6.5. | Municipal Railway Metro Extension Platforms | 9 |
| 6.6. | T-Line Platforms | 10 |
| 6.7. | Experimental Advertising. | 10 |
| 7. | PAYMENTS | 10 |
| 7.1. | Payments by Contractor to City | 10 |
| 7.1.1 | General | 10 |
| | (a) One-Time Payment | 10 |
| | (b) Total Required Payments | 10 |
| | (i) Administrative Payments | 10 |
| | (ii) Payments for Art Commission | 10 |
| | (iii) Marketing Support | 10 |
| | (iv) MAG | 10 |
| | (c) Revenue Share | 12 |
| 7.2. | Late Payments | 12 |
| 7.3. | Deduction for Decrease in Commercial Structures Below Minimum | 12 |
| 8. | DESIGN AND CONSTRUCTION | 13 |
| 8.1. | Designs | 13 |
| | (a) New Master Designs | 13 |
| | (b) City's Additional Design Option | 13 |
| | (c) Alternative Shelter Designs | 13 |
| | (d) Design Approval | 14 |
| 8.1.2 | Minimum Shelter and Kiosk Design Specifications | 14 |
| 8.1.3 | Construction and Materials Specifications | 15 |
| 8.1.4 | LED Equipment | 16 |
| | (a) Existing LED Installations | 16 |
| | (b) Installation and Maintenance | 16 |
| | (c) Damage to LED Equipment and Shelters | 16 |

**Municipal Transportation Agency**
Board of Directors & Parking Authority

| | | |
|---|---|---|
| 8.2. | Permits | 16 |
| | 8.2.1 Permits | 17 |
| | 8.2.2 Applications for Permits in First Year | 17 |
| 8.3. | Demolition | 17 |
| 8.4. | Construction | 17 |
| | 8.4.1 Schedule | 17 |
| | 8.4.2 Commencing Work | 17 |
| | 8.4.3 Hours | 17 |
| | 8.4.4 Placement | 17 |
| | 8.4.5 Construction Sites | 17 |
| | 8.4.6 Quality Control/Quality Assurance | 17 |
| | 8.4.7 Power to Shelters and Kiosks | 17 |
| 9. | MAINTENANCE AND REPAIR | 18 |
| 9.1. | General | 18 |
| 9.2. | Complaint/Report Decal | 18 |
| 9.3. | Maintenance Schedule | 18 |
| 9.4. | Inspection and Clean-up | 18 |
| | 9.4.1 Union Square/Tenderloin Area Shelters | 18 |
| | 9.4.2 High-Level, E-Line and F-Line Boarding Platforms | 18 |
| 9.5. | Repair and Replacement | 19 |
| | 9.5.1 Transit Shelters; Kiosks | 19 |
| | 9.5.2 High-Level and Low-Level Boarding Platforms on E-Line and F-Line | 19 |
| | 9.5.3 Low-Level Boarding Platforms (other than E-Line and F-Line) | 19 |
| 9.6. | Remedies for Failure to Maintain or Repair | 19 |
| | 9.6.1 City May Repair | 19 |
| 9.7. | Inventory, Maintenance and Complaint Database System (IMCDS) | 19 |
| 9.8. | IMCDS Review and Approval | 20 |
| | 9.8.1 Inventory Records | 20 |
| | 9.8.2 Maintenance/Repair Records | 20 |
| | 9.8.3 Complaint/Report Records | 20 |
| | 9.8.4 3-1-1 Interface | 20 |

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

|  |  | 9.8.5 | Technical Requirements | 20 |
|  |  | (a) | Application Requirements | 20 |
|  |  | (b) | IMCDS Maintenance and Upgrades | 20 |
|  |  | (c) | Security | 21 |
|  |  | (d) | Outages | 21 |
|  |  | 9.8.6 | Ownership | 21 |
|  |  | 9.8.7 | Disaster Planning | 21 |
|  |  | 9.8.8 | Public IMCDS Application | 21 |
|  | 9.9. | | Quality Assurance/Quality Control Plan | 21 |
| 10. | | | APPROVAL OF ADVERTISING MATERIAL | 21 |
|  | 10.1. | | General | 21 |
|  | 10.2. | | Decals | 22 |
| 11. | | | REPORTING REQUIREMENTS; AUDITS | 22 |
|  | 11.1. | | Annual Financial Statement | 22 |
|  | 11.2. | | Annual Financial Report | 22 |
|  | 11.3. | | Audits; Inspection of Records | 22 |
|  |  | 11.3.1 | Records | 22 |
|  |  | 11.3.2 | City's Right to Inspect and Copy | 22 |
|  |  | 11.3.3 | Audit | 23 |
|  |  | (a) | Findings of Nonperformance | 23 |
| 12. | | | INSURANCE; INDEMNIFICATION | 23 |
|  | 12.1. | | Insurance | 23 |
|  |  | 12.1.1 | Required Coverages | 23 |
|  |  | 12.1.2 | Endorsements | 23 |
|  |  | 12.1.3 | Notice | 24 |
|  |  | 12.1.4 | Claims-Made Coverage | 24 |
|  |  | 12.1.5 | General Aggregate Limit | 24 |
|  |  | 12.1.6 | Lapse of Coverage | 24 |
|  |  | 12.1.7 | Condition Precedent | 24 |
|  |  | 12.1.8 | Liability of Contractor | 24 |
|  | 12.2. | | Indemnification | 24 |

**Municipal Transportation Agency**
Board of Directors & Parking Authority

 

13.    SECURITY DEPOSITS ................................................................................. 25
   13.1.   Performance Bond ............................................................................. 25
       13.1.1 Amount of Bond ........................................................................ 25
       13.1.2 Sureties .................................................................................. 26
   13.2.   Letter of Credit ................................................................................ 26
       13.2.1 Requirements .......................................................................... 26
       13.2.2 Financial Institution ................................................................. 26
       13.2.3 Extensions of Agreement .......................................................... 26
       13.2.4 Demand on Letter of Credit ....................................................... 26
       13.2.5 Expiration or Termination ......................................................... 27
       13.2.6 Return of Letter of Credit ......................................................... 27
       13.2.7 Excessive Demand ................................................................... 27
14.    LIQUIDATED DAMAGES ........................................................................... 28
   14.1.   General ......................................................................................... 28
       14.1.1 Maintenance Breaches .............................................................. 28
       14.1.2 Construction Schedule Breaches ................................................ 28
       14.1.3 Annual Report ......................................................................... 29
       14.1.4 Failure to Remove Shelters and Kiosks ........................................ 29
       14.1.5 Failure to Cure Audit Deficiencies .............................................. 29
   14.2.   Failure to Comply with Advertising Policy ............................................ 29
   14.3.   Failure to Pay Liquidated Damages ..................................................... 29
15.    TERM; OPTIONS TO EXTEND ................................................................... 29
   15.1.   Term and Extension of Term .............................................................. 29
   15.2.   Option to Extend ............................................................................. 29
16.    TERMINATION ....................................................................................... 29
   16.1.   Termination for Convenience ............................................................ 29
       16.1.1 Options on Expiration or Termination for Convenience ................... 30
           (a)     Removal of Shelters and Kiosks ......................................... 30
           (b)     Transfer of Title ........................................................... 30
   16.2.   Default of Contractor ...................................................................... 30
       16.2.1 Termination ............................................................................ 30

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

| | | |
|---|---|---|
| 16.2.2 | Valuation of Property | 31 |
| 16.2.3 | Port's Remedies | 31 |
| 16.2.4 | Actual Damages | 31 |
| 16.2.5 | Non-exclusive Remedies | 31 |
| 16.3. | Protection of City Property | 31 |
| 16.4. | Relocation and Termination; Waiver of Rights | 31 |
| 16.5. | Survival | 32 |
| 16.6. | Cooperation | 32 |
| 17. | SMALL BUSINESS PARTICIPATION; EMPLOYMENT REQUIREMENTS | 32 |
| 17.1. | SBE GOAL | 32 |
| 17.1.1 | Commitment | 32 |
| 17.1.2 | Nature of SBE Participation | 32 |
| 17.1.3 | Function | 32 |
| 17.1.4 | Determining the Amount of SBE Participation | 33 |
| | (a) SBE Prime Contractor | 33 |
| | (b) SBE Subcontractor | 33 |
| | (c) SBE Joint Venture Partner | 33 |
| | (d) Other SBEs | 33 |
| | (e) Materials or Supplies | 33 |
| 17.1.5 | Substitution of Subcontractor and Suppliers | 33 |
| 17.1.6 | Addition of Subcontractors and Suppliers | 34 |
| 17.1.7 | Reporting Requirements | 34 |
| 17.1.8 | Enforcement | 34 |
| 17.2. | Employment Requirements | 34 |
| 17.2.1 | Reporting Requirements | 34 |
| 17.2.2 | Enforcement | 34 |
| 18. | REQUIRING MINIMUM COMPENSATION FOR COVERED EMPLOYEES | 35 |
| 19. | REQUIRING HEALTH BENEFITS FOR COVERED EMPLOYEES | 36 |
| 20. | OTHER OPTIONS | 37 |
| 20.1. | Bicycle-Sharing Program | 37 |
| 20.2. | Canopies over Subway Entrances | 37 |



**Municipal Transportation Agency**
Board of Directors & Parking Authority



21.  MISCELLANEOUS CONTRACT PROVISIONS ................................................ 38

   21.1.  San Francisco Office ............................................................... 38

   21.2.  Qualified Personnel ............................................................... 38

   21.3.  Subcontractors ...................................................................... 38

   21.4.  Notices ................................................................................... 38

   21.5.  Bankruptcy or Reorganization Proceedings ......................... 39

   21.6.  Non-Waiver of Rights ........................................................... 39

   21.7.  Assignment ............................................................................ 39

   21.8.  Successors ............................................................................. 39

   21.9.  Taxes ...................................................................................... 39

      21.9.1  Payment of Taxes ...................................................... 39

      21.9.2  Possessory Interest .................................................... 39

   21.10.  Legal Relationship ............................................................... 40

   21.11.  Conflict of Interest ............................................................... 40

   21.12.  Agreement Made in California; Venue ................................. 40

   21.13.  Section Headings .................................................................. 40

   21.14.  MacBride Principles--Northern Ireland ............................... 40

   21.15.  Nondiscrimination; Penalties ............................................... 40

      21.15.1Contractor Will Not Discriminate ............................ 40

      21.15.2Subcontracts ............................................................. 41

      21.15.3Nondiscrimination in Benefits .................................. 41

      21.15.4Condition to Contract ............................................... 41

      21.15.5Incorporation of Administrative Code Provisions by Reference ......................... 41

   21.16.  Compliance with Americans with Disabilities Act .............. 41

   21.17.  Resource Conservation ......................................................... 41

   21.18.  Sunshine Ordinance .............................................................. 41

   21.19.  Proprietary or Confidential Information ............................... 42

      21.19.1City Information ........................................................ 42

      21.19.2Contractor Information .............................................. 42

   21.20.  Preservative-Treated Wood Containing Arsenic .................. 42

   21.21.  Prohibition on Political Activity with City Funds ................ 42

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

| | | |
|---|---|---|
| 21.22. | Limitations on Contributions | 43 |
| 21.23. | Protection of Private Information | 43 |
| 21.24. | Extent of Agreement | 43 |
| 21.25. | Amendments | 43 |
| 21.26. | Attorneys' Fees | 43 |
| 21.27. | Tropical Hardwood and Virgin Redwood Ban | 43 |
| 21.28. | Compliance With Laws | 43 |
| 21.29. | Prevailing Wages | 44 |
| | 21.29.1 Compliance with Laws | 44 |
| | 21.29.2 Payroll Records | 44 |
| 21.30. | No Third Party Beneficiaries | 44 |
| 21.31. | Severability | 44 |
| 21.32. | Precedence | 44 |
| 21.33. | Biannual Meetings | 44 |
| 21.34. | Submitting False Claims; Monetary Penalties | 44 |
| 21.35. | Disputes | 45 |
| 22. | First Source Hiring Program | 45 |
| 22.1. | Incorporation of Administrative Code Provisions by Reference | 45 |
| 22.2. | First Source Hiring Agreement | 45 |
| 22.3. | Hiring Decisions | 46 |
| 22.4. | Exceptions | 46 |
| 22.5. | Liquidated Damages | 47 |
| 22.6. | Subcontracts | 48 |

## EXHIBITS

| | |
|---|---|
| Exhibit A | List of SFMTA Historic Shelters (All Non-Commercial) |
| Exhibit B-1 | List of Shelters and Kiosks by Number |
| Exhibit B-2 | List of Shelters and Kiosks (Alphabetical) |
| Exhibit C | Municipal Railway Metro Extension High Level Boarding Platform and E-Line Low-Level Boarding Platforms |
| Exhibit D | List of Low-Level & High Level Platforms Under Port Jurisdiction |
| Exhibit E | Map of E-Line Low-Level Boarding Platforms and Third Street T-Line High Level Boarding Platforms |

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

| Exhibit F | List of Low Level Platforms |
|---|---|
| Exhibit G | Stonestown High Level Boarding Platform |
| Exhibit H | Contractor's Maintenance and Repair Duties |
| Exhibit I | DPW Order No. 117,159 |
| Exhibit J | Policy Governing Advertising on MTA Property, effective January 16, 2007 |
| Exhibit K | Map of F-Line |
| Exhibit L | NextBus Specifications |
| Exhibit M | San Francisco GIS Data License Agreement |
| Exhibit N | SFMTA SBE Form No. 4 Subcontractor Participation Declaration, and SFMTA SBE Form No. 5 Small Business Enterprise Acknowledgment Declaration |
| Exhibit O | Map of Zone 1 |

 
**Municipal Transportation Agency**
Board of Directors & Parking Authority

# TRANSIT SHELTER ADVERTISING AGREEMENT

This Agreement is made and entered into this 10th day of December, 2007, by and between the City and County of San Francisco ("City"), by and through its Municipal Transportation Agency ("SFMTA") and by and through its San Francisco Port Commission ("Port"), and Clear Channel Outdoor, Inc., a Delaware corporation ("Contractor").

## RECITALS

A.    SFMTA operates a municipal transportation system known as the San Francisco Municipal Railway and governs the operations of the San Francisco Department of Parking and Traffic.

B.    SFMTA desires to enter into a Transit Shelter Advertising Agreement for the benefit of San Francisco transit passengers and City residents, for the placement, maintenance and repair of Structures on public property that may carry advertising.

C.    After a competitive solicitation, SFMTA has awarded this Transit Shelter Maintenance and Advertising Agreement to Clear Channel Outdoor, Inc.

D.    Contractor represents and warrants that it is qualified to perform the services required by City as set forth under this Agreement;

NOW, THEREFORE, the parties have agreed to the following terms and conditions:

1. **DEFINITIONS.**  The terms used in this Agreement will have the following meanings:

   1.1.    **ADA.**  The Americans With Disabilities Act of 1990, as amended, including all relevant regulations adopted by the U.S. Department of Justice and the U.S. Department of Transportation.

   1.2.    **Alternative Shelter.**  A Shelter designed to provide, at a minimum, seating and rider information, for locations where conditions will not accommodate a Shelter meeting the requirements of Section 8.1.2.

   1.3.    **Agreement.**  This Transit Shelter Advertising Agreement and all referenced Exhibits to this Transit Shelter Advertising Agreement, which are incorporated by reference as though fully set forth herein.

   1.4.    **Annual Financial Report.**  The report required to be submitted under Section 11.2.

   1.5.    **Arts Commission.**  The San Francisco Arts Commission, the City Commission with responsibility for approving the designs for public Structures and the design and location of works of art placed upon or removed from City property, and for promoting art and artists in San Francisco neighborhoods pursuant to the authority granted in San Francisco Charter Section 5.103.

   1.6.    **Associated Equipment.**  All spare parts in Contractor's possession for the maintenance and repair of Structures.

   1.7.    **Bicycle-Sharing Program.**  A program to be implemented by Contractor pursuant to Section 20.1, as further described in Contractor's Proposal, which program shall include the provision of bicycles, bicycle racks, and related equipment and services.

**Municipal Transportation Agency**
Board of Directors & Parking Authority



**1.8.   Carryover Contract.** Any advertising contract that is assigned to Contractor by City as of the Effective Date of this Agreement until the expiration of the original term of the advertising contract, and any advertising contract entered into by Contractor with an expiration date later than the termination of this Agreement.

**1.9.   City.** The City and County of San Francisco, a municipal corporation. The rights of City in this Agreement inure to the benefit of the City and County of San Francisco and all of its constituent departments. However, except as otherwise expressly provided herein, the powers and duties to be exercised by City pursuant to this Agreement shall be exercised by SFMTA by and through the Executive Director/CEO.

**1.10.   Commercial.** When used to describe any Structure, "Commercial" refers to the authority granted under this Agreement and applicable law to display advertising.

**1.11.   Consumer Price Index, CPI.** Consumer Price Index distributed by the Bureau of Labor Statistics (BLS) for the Consolidated Metropolitan Statistical Area (CMSA) covering San Francisco - Oakland - San Jose.

**1.12.   Days.** Unless otherwise specified, all references to the term "Days" refer to calendar days.

**1.13.   Design.** A detailed representation of the architectural and artistic features for a set of related Structures as requested by the City.

**1.14.   Design Approval Date.** The date that the Arts Commission or, if required, the Port, whichever is later, has approved Designs submitted by Contractor pursuant to Section 8.1(a).

**1.15.   Department of Public Works, DPW.** The San Francisco Department of Public Works.

**1.16.   Effective Date.** December 10, 2007.

**1.17.   E-Line.** The future streetcar line from Fisherman's Wharf to Mission Bay, and as it may be renamed, extended or changed.

**1.18.   Executive Director/CEO.** The Executive Director and Chief Executive Officer of the SFMTA, or his or her designee.

**1.19.   Existing.** When used to describe any Shelter or Kiosk, "Existing" refers to a Shelter or Kiosk that was owned by CBS Outdoor, Inc. prior to the Effective Date of this Agreement, as listed in Exhibits B1 and B2.

**1.20.   Fiscal Year.** July 1 through June 30.

**1.21.   F-Line.** The streetcar line going from Castro Street to Fisherman's Wharf, as illustrated in the map attached as Exhibit K, and as it may be renamed, extended or changed.

**1.22.   Graffiti.** Any inscription, word, figure, marking or design that is affixed, marked, etched, scratched, drawn or painted on any building, Structure, fixture or other improvement, whether permanent or temporary, including by way of example only and without limitation, Shelters, Kiosks, signs, banners, billboards and fencing surrounding construction sites, whether public or private, without the consent of the owner of the property or the owner's authorized agent, and which is visible from the public right-of-way. "Graffiti" does not include: (1) any sign or banner that is authorized by, and in compliance with, the applicable requirements of the San Francisco Public Works Code, the San Francisco Planning Code or the San Francisco Building Code; or (2) any mural or other painting or marking on the property that is protected as a work of fine art under the

 **Municipal Transportation Agency**
Board of Directors & Parking Authority



California Art Preservation Act (California Civil Code Sections 987 et seq.) or as a work of visual art under the Federal Visual Artists Rights Act of 1990 (17 U.S.C. §§ 101 et seq.).

    **1.23.    Gross Revenues.**  Total amounts received annually by Contractor in connection with the rights granted and duties performed under this Agreement less: (a) verified advertising agency commissions actually paid by Contractor or deducted by an advertising agency from advertising revenues payable to Contractor; and (b) sales commissions paid by Contractor to its employees amounting to three percent of revenues received by Contractor or receivable in connection with advertising sales under this Agreement.

    **1.24.    High-Level Boarding Platform.**  The boarding platforms supplying level boarding directly into light rail vehicles without the necessity of a ramp or lift.  As of the Effective Date of this Agreement, High-Level Boarding Platforms serve the Stonestown, Folsom Street, Brannan Street, King and 2nd Streets, Caltrain Station, and T-Line transit stops.

    **1.25.    Historic Shelters.**  Those Shelters owned by SFMTA with an architecturally significant design as listed in Exhibit A.

    **1.26.    Kiosk.**  A Structure containing no more than three display panels.

    **1.27.    Low-Level Boarding Platform.**  The boarding platforms in the street right-of-way that are not High-Level Boarding Platforms.  As of the Effective Date of this Agreement, Low-Level Boarding Platforms serve the E-Line, F-Line, and parts of the J-Line, K-Line, L-Line, M-Line, and N-Line as described in Exhibit F.

    **1.28.    MAG or Alternate MAG.**   The minimum annual guarantee or alternate minimum annual guarantee payment required by Section 7.1.1(b)(iv) of the Agreement.

    **1.29.    Maximum Ad Panel Size.**  Twenty-four square feet (24ft$^2$) in area, and no greater than six feet (6') in height or four feet (4') in width.

    **1.30.    New.** When used to describe any Structure, "New" refers to a Structure that is constructed or installed under the terms of this Agreement.

    **1.31.    Noncommercial.** When used to describe any Structure or a display that is part of a Structure, "Noncommercial" refers to a Structure that is not permitted to contain commercial advertising under this Agreement.

    **1.32.    Outage.**  Any period of time during which the IMCDS, required by Section 9.7, is not fully operational in accordance with the requirements of this Agreement or is not accessible to the SFMTA or the public.

    **1.33.    Port.**  The Port of San Francisco, a department of the City, acting through its Executive Director, its Port Commission, or their respective designees.

    **1.34.    Proposal.**  The proposal submitted by Contractor in response to the City's Request for Proposals, dated April 23, 2007, as such proposal was amended on April 26, 2007 and May 4, 2007.

    **1.35.    Public Entity Shelters.**  Shelters within the geographic boundaries of the City but owned by a public entity other than the City.

    **1.36.    Public Right(s)-of-Way.**  The area across, along, beneath, in, on, over, under, upon, and within the dedicated public alleys, boulevards, courts, lanes, roads, sidewalks, spaces, streets, and ways within the geographic boundaries of the City.

    **1.37.    Records.**  All documents created, received or maintained by Contractor in connection with performance under this Agreement, including, but not limited to, books, accounts, invoices,

**Municipal Transportation Agency**
Board of Directors & Parking Authority



quarantine restrictions; acts of terrorism; inability of Contractor to procure labor to the extent that such inability is not caused by disputes related to collective bargaining; inability of Contractor to procure material; fuel shortage; freight embargo; accident; priorities or privileges established for the manufacture, assembly or allotment of materials by order, decree, or otherwise of the United States or by any department, bureau, commission, committee, agent or administrator of any legally constituted public authority; the prevention by the City of Contractor from commencing or prosecuting any of its duties under the Agreement; inability of Contractor to obtain applicable permits and licenses from relevant governmental authorities; or failure of public utility service or internet service outside the control of Contractor.

**1.50.** **Union Square/Tenderloin Area.** The area of the City bounded by Market Street, Sutter Street, Polk Street, and Grant Avenue.

## 2. GRANT OF ADVERTISING RIGHTS AND PRIVILEGES

### 2.1. Rights Granted

**2.1.1.** **SFMTA to Contractor.** During the term of this Agreement, and subject to the requirements of this Agreement and applicable laws, SFMTA grants to Contractor the exclusive right to place print advertising on Transit Shelters and Kiosks governed by this Agreement (a) on the City's Public Rights-of-Way outside the jurisdiction of the Port; and (b) on any Public Right-of-Way that is serviced by a public transit line under an arrangement between the SFMTA and another public entity.

**2.1.2.** **License.** In conjunction with the rights granted in this Section 2, and subject to all provisions of this Agreement and applicable law, the City grants Contractor a license to install Commercial Structures on the Public Rights-of-Way.

**2.2.** **Distance from other Advertising.** City shall not enter into any contract or agreement, including any amendment to any existing agreement, granting to any third party any right to place advertising larger than eighteen (18) square feet on any free-standing structure on the Public Rights-of-Way (except buildings of at least 250 square feet of floor area) within a 60-foot radius from any Shelter or Kiosk; provided, however, that nothing in this section shall limit the display of public service announcements on behalf of any non-profit, public, educational, or charitable organization. This restriction shall not apply to any free-standing structure that has been constructed prior to the Effective Date of this Agreement.

**2.3.** **Port to Contractor.** Port grants to Contractor the exclusive right to place print advertising on Structures on City property within Port jurisdiction during the term of this Agreement, subject to the terms and conditions of this Agreement.

**2.4.** **Rights Retained/Limitations on Contractor's Rights.**

**2.4.1.** **Advertising.** Contractor acknowledges that City retains and reserves all advertising rights that are not specifically granted by this Agreement. Except as otherwise provided in this Agreement, the rights retained and reserved by City include, but are not limited to, the right to sell or contract to sell advertising on SFMTA property, and the right to license or otherwise provide for the use of any trade name, trade mark, or other identifying device or symbol used, owned or registered by City.

**2.4.2.** **Advertising Space Subject to Change.** Contractor acknowledges and agrees that the space available for advertising on Structures may vary from time to time for various reasons.

**Municipal Transportation Agency**
Board of Directors & Parking Authority



**2.4.3.   Transportation Priority.** Contractor acknowledges and agrees that advertising, and the grant of advertising rights provided for in this Agreement, are incidental to the SFMTA's transportation business, which may undergo changes affecting the advertising rights granted. Except as provided in Section 7.3, SFMTA will have no liability to Contractor for any change in its routes, in the number of transit vehicles operated by it, in ridership, or for any other change affecting the level or scope of advertising authorized by SFMTA.

**2.4.4.   Use of Structures.** Contractor may not use the Structures for any purpose other than those expressly provided in this Agreement.

**2.4.5.   No Damage to City Property.** Contractor and its subcontractors may not damage City property. If in the course of its activities under the Agreement Contractor or any of its employees or subcontractors damages any property belonging to City, Contractor shall compensate the City for the full extent of its losses resulting from the damage. At City's option, City may require Contractor to repair any such damage.

**2.4.6.   Nuisances.** Contractor shall conduct its activities under this Agreement in a manner that does not constitute waste, nuisance or unreasonable annoyance (including, without limitation, emission of objectionable odors, noises or lights) to City, or to the public.

**2.5.   Carryover Contracts**

**2.5.1.   Beginning of Term.** As of the Effective Date of this Agreement, SFMTA will transfer to Contractor the rights to all Carryover Contracts it has acquired from CBS Outdoor, Inc., along with copies of those Contracts. Following such transfer, Contractor shall pay to CBS Outdoor, Inc., when and as received from the advertisers, 20% of the gross income received from such Carryover Contracts for a period of no greater than 180 Days following the Effective Date of this Agreement. Contractor agrees that CBS Outdoor, Inc. is a third party beneficiary with a right to enforce against Contractor only the payment obligation imposed by this Section 2.3.1.

**2.5.2.   End of Term.** Contractor shall not enter any contracts related to performance under this Agreement that extend beyond the termination date of this Agreement without written approval from the City. Contractor shall immediately assign and transfer, and does assign and transfer, to SFMTA any Carryover Contract in effect upon expiration of this Agreement, and such Carryover Contracts thereupon shall become the property of SFMTA. Following such transfer, City shall pay Contractor when and as received from advertisers 20% of the gross income received from such Carryover Contracts for a period of no greater than 180 Days following expiration of this Agreement. City shall not be responsible for payment to Contractor of Contractor's portion of the gross income after City assigns the Carryover Contracts to a nominee provided that the nominee makes Contractor a third party beneficiary with a right to enforce the payment obligation against the nominee. Contractor agrees that the existence of any Carryover Contract will not in any way extend the term of this Agreement. Contractor agrees that it will use its best efforts in good faith to enter into advertising contracts and maximize revenues until the final day of the Agreement.

## 3.   OWNERSHIP OF STRUCTURES.

Structures governed by this Agreement will be the property of City except that Kiosks and Shelters that are not SFMTA-constructed Shelters shall be the property of Contractor and ownership of equipment installed under the Bicycle-Sharing Program will be governed by the amendment to this Agreement reflecting the City's exercise of the option set forth in Section 20.1. Title to any Associated Equipment, and to the Shelters and Kiosks listed on <u>Exhibit B-1</u>, will be transferred to Contractor as of the Effective Date of this Agreement. Public Entity Shelters shall remain the property of the relevant public entity or its successor.

**Municipal Transportation Agency**
Board of Directors & Parking Authority



## 4. INSTALLATION REQUIRED

**4.1. General.** In consideration for the exclusive advertising rights granted in Section 2.1, above, Contractor shall design, install, repair and maintain Structures as set forth below.

**4.1.1. Shelters and Kiosks.** Except as otherwise authorized in writing by the City, all Existing Shelters and Existing Kiosks shall be replaced with New Shelters and New Kiosks no later than six years from the Effective Date. Contractor shall install at least five New Shelters within 12 months from the Design Approval Date. In addition, the City may require Contractor to install New Shelters and Kiosks up to the limits established in Section 4.1.2.

**4.1.2. Number of Commercial and Noncommercial Shelters and Kiosks.** Contractor shall maintain a minimum of 1,100 and a maximum of 1,500 Shelters and a minimum of 39 and a maximum of 150 Commercial Kiosks or Commercial Signal Control Covers at all times through the term of this Agreement, not including SFMTA-constructed Shelters. Upon completion of construction, in accordance with any approved construction schedule required by Section 8.4.1, there shall be one Noncommercial Structure for every two Commercial Structures, not including Shelters on High-Level Boarding Platforms.

**4.1.3. Transit Stop Poles.** In accordance with its Proposal and the approved construction schedule, and at no cost to City, Contractor shall install 3,000 Transit Stop Poles with attached signs at transit stops where there are no Shelters within seven years from the date on which the Design receives final approval from the Arts Commission. Contractor shall be responsible for removing existing Transit Stop Poles at locations where they are to be replaced. City will designate those stops where the Transit Stop Poles are to be installed and what information will be contained in the sign attached to each Transit Stop Poles. Contractor shall be responsible for obtaining any required permits to install or remove the Transit Stop Poles. SFMTA will pay the Contractor on a Time and Materials basis for (a) any maintenance and repair of Transit Stop Poles that the SFMTA requests and (b) procurement and installation of any additional Transit Stop Poles it requests over 3,000. Contractor, at its own cost, shall replace and dispose of any Transit Stop Poles that are damaged too severely to be repaired provided that it has not installed the 3,000 required Transit Stop Poles. Such replacement shall be credited towards the Contractor's 3,000 Transit Stop Pole commitment.

**4.1.4. Signal Control Covers.** Within one year of any City request, Contractor shall construct and install a Signal Control Cover at any location up to a total of 1,500 Signal Control Covers. Contractor shall be responsible for all construction and installation costs for each Commercial Signal Control Cover and for one additional Noncommercial Signal Control Cover for every Commercial Signal Control Cover, provided that Contractor shall have the right to determine the location of any and all Commercial Signal Control Covers from a list of potential locations provided by the SFMTA. SFMTA will pay the Contractor on a Time and Materials basis for (a) any additional Noncommercial Signal Control Covers it requires, and (b) any maintenance and repair of Noncommercial Signal Control Covers that SFMTA requests, which amounts may be deducted from the MAG payments. Upon approval by the City, Contractor may access and use any electrical connections situated within any Signal Control Cover for Contractor's electrical power needs.

**4.2. Locations**

**4.2.1. General.** Except as otherwise provided in connection with Shelters and Kiosks on Port property, the SFMTA has sole discretion to designate the locations of all Structures, including which sites are available for advertising. SFMTA does not guarantee any specific site for any particular Structure. SFMTA will cooperate with Contractor in determining siting. If Contractor finds a site to be unsuitable or economically infeasible, Contractor may appeal to the SFMTA for site abandonment and site substitution.



4.2.2. **Port Locations.** The Port has sole discretion to approve locations recommended by the SFMTA on property under its jurisdiction, including which sites will be available for advertising. Contractor shall maintain one Noncommercial Shelters for every two Commercial Shelters maintained on Port property. Locations already approved by the Port are listed in Exhibits C and D.

4.2.3. **Removal or Relocation of Shelters and Kiosks.**

(a) **City Request.** City will have the right to require Contractor, at Contractor's sole cost, to remove or relocate any Shelter or Kiosk because of private development, public works projects, public convenience, improved accessibility, City public transit route or stop changes or repeated vandalism. In the event of removal of a Shelter or Kiosk that is requested by the Port pursuant to this Section 4.2.3, the Port will endeavor to identify a suitable alternative location.

(b) **Removal and Relocation Costs for City Requests.** Contractor will bear the full cost of removal and relocation of a maximum of six percent of the total number of Shelters and Kiosks per year, including all necessary sidewalk and curb repairs, and all required permit costs. City will bear all costs of additional removal and relocation requests over six percent of Shelters or Kiosks so long as Contractor is not in default of this Agreement. In the event that a Shelter and Kiosk requires relocation because private development has affected its use, City will use good faith efforts to require developers to pay the costs associated with such relocation.

(c) **Contractor Request.** Contractor may request permission from City to relocate a Structure, at Contractor's expense, if the Installation has been repeatedly vandalized or damaged. Approval of any such request shall be in the sole discretion of the City.

(d) **Time for Relocation.** All removals or relocations of Shelters or Kiosks must commence within five business days of notification by SFMTA to Contractor unless otherwise authorized by SFMTA or the Port's Executive Director through SFMTA, as applicable. Contractor may not relocate or remove a Structure without prior written permission of the SFMTA, or the Port's Executive Director through SFMTA, as applicable, or their respective designees. Contractor is responsible for obtaining all required City permits to relocate a Shelter or Kiosk.

# 5. NONCOMMERCIAL DISPLAY

5.1. **Transit Information.** SFMTA reserves the right to place transit information, including maps, schedules, and service bulletins, on every Structure. SFMTA will provide transit information materials to Contractor, and Contractor shall display such transit information at no cost to SFMTA. SFMTA may not sell such space to advertisers either directly or through any intermediary.

5.2. **Port Campaign.** At least twice a year and subject to the request of the Port, Contractor shall design and furnish, at its sole cost, at least 30 posters as a public service and information campaign, promoting the Port, its tenants and special events. Contractor shall install the posters on available space in SFMTA and Bay Area advertising shelters on which Contractor has a contractual right to place advertising; however, the majority of the posters will be placed on Shelters and Kiosks located in the City. Each campaign will last for at least four weeks. All Designs will be subject to prior Port approval, and Contractor will consult with the Port as to potential available display space. The posters supplied for the Port campaigns will be in addition to any Port public service or information posters placed on Port property pursuant to subsection 5.3.1.

5.3. **Unsold Space**

5.3.1. **City's Use of Unsold Space.** By the first day of each month, Contractor shall provide a projection of all unsold advertising space on Shelters and Kiosks anticipated over the next

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

60 Days to SFMTA and the Port, Shelters and Kiosks in an electronic format. Notwithstanding the provisions of Section 2 of this Agreement, the City has the first option to use, for a minimum of 14 Days, any advertising space, at no charge to the City and for any public purpose, that has not been sold by Contractor. The City will be responsible for providing all printed posters ready for posting by Contractor. The Port, with respect to Shelters and Kiosks on Port property, and the SFMTA with respect to all other Shelters and Kiosks, shall notify Contractor of the City's intention to use the unsold advertising space at least 30 Days prior to the date on which the City's use would begin. If Contractor is unable to deliver said space for any reason after being notified of the City's intention to use unsold advertising space, and if the printed materials are time sensitive and cannot be reused, Contractor shall reimburse the City for all printing and design costs expended in anticipation of the City's use of that advertising space.

     **5.4.    Contractor's Use of Unsold Space.**  To the extent that the City does not exercise its option to use unsold advertising space in accordance with Section 5.3.1, Contractor may use, at its sole cost and expense, available unsold advertising space: 1) for its own advertisements and promotion designed to increase the sale of advertising space, or 2) to display public service announcements provided by non-profit public, educational, and charitable organizations.

     **5.5.    Installation of Displays for City.**  Contractor shall install transit information and other displays requested by City within two business days unless the urgency of the situation requires that the displays be installed within a shorter period of time

## 6. COMMERCIAL ADVERTISING DISPLAYS

     **6.1.    Contractor's Best Efforts.**  In the exercise of the rights granted by this Agreement, Contractor shall use its best efforts, from the Effective Date through the termination or expiration of this Agreement, to maximize advertising revenues through the sale of advertising space to third parties.

     **6.2.    Commercial Shelters (including F-Line and E-Line Shelters.**  Except as otherwise provided below, City authorizes Contractor to use the "downstream" side wall (furthest from approaching transit vehicles) or the back panel of any Commercial Shelter to display advertising material. Except as otherwise provided below, no Commercial Shelter can contain advertisements on more than one wall, and no advertisement may exceed the Maximum Ad Panel Size. Unless authorized in advance by City in writing, in no case may Contractor display advertising on the "upstream" end wall closest to the approaching transit vehicle. Any advertising or other material contained in a panel shall be back-lit.

     **6.3.    Kiosks.**  Subject to all applicable law and approval by any City department with jurisdiction over the matter, Contractor may display advertising on any Kiosk.

     **6.4.    Stonestown Station.**  Notwithstanding the limitations of Section 6.2, with respect to the Stonestown Station only, Contractor may display advertising on the west-facing sides of eight double-sided display cases on the platform, each four feet by six feet (4'x6') in dimension. Contractor may display public service announcements on two of the east-facing sides of the eight display cases. Contractor shall display only materials provided by the City or public service announcements on the six remaining east-facing sides. City shall have exclusive use of three additional display cases at least two feet by three feet (2' x 3'). The displays under this Section shall be consistent with the photograph of the Stonestown Station attached as Exhibit G.

     **6.5.    Municipal Railway Metro Extension Platforms.**  Contractor may display advertising on both sides of each double-sided freestanding display case located on each Municipal Railway Metro Extension High-Level Platform along the South Embarcadero and King Street, from

**Municipal Transportation Agency**
Board of Directors & Parking Authority



Folsom to 4th and King Streets.  The number of display cases on each platform is as shown on <u>Exhibit C</u>.

**6.6.    T-Line Platforms.** On each of the High Level Boarding Platforms serving T-Line transit stops, one two-sided display case shall be reserved solely for materials furnished by the SFMTA or Arts Commission and installed by Contractor within two Days of receipt.  Contractor may display advertising in all remaining panels.

**6.7.    Experimental Advertising..** Notwithstanding any other provision of this Agreement, Contractor may propose experimental advertisements on a limited basis.  Contractor may implement experimental advertisements with the prior written approval of the SFMTA after a public hearing before the SFMTA Board of Directors, subject to all conditions stated in the approval.

# 7.  PAYMENTS

## 7.1. Payments by Contractor to City

**7.1.1.    General.** During the term of this Agreement, Contractor shall pay to City the sums set forth below, without any deduction or offset whatsoever except as provided under subsection (b)(iv) of this section 7.1.1.  Payments shall be made electronically in accordance with wiring or other remittance instructions provided in writing by City.

**(a) One-Time Payment.** Contractor shall pay SFMTA a one-time payment of $5,000,000.00 no later than 30 Days before the Effective Date.

**(b) Total Required Payments.**

**(i)    Administrative Payments.** No later than 30 Days after the Effective Date and no later than September 1 of each year thereafter during the term of the Agreement, Contractor shall pay SFMTA a minimum of $500,000.00 ("base rate"), as escalated each year by the percentage change in the most recently published 12 month average CPI.  The first payment following the Effective Date shall be prorated according to the number of months of performance under this Agreement in the then current Fiscal Year.

**(ii)    Payments for Art Commission.** No later than 30 Days after the Effective Date and no later than September 1 of each year thereafter during the term of the Agreement, Contractor shall pay a minimum of $265,000.00 to support the Arts Commission, as escalated each year by the percentage change in the most recently published 12 month average CPI.  The first payment following the Effective Date shall be prorated according to the number of months of performance under this Agreement in the then current Fiscal Year.

**(iii)    Marketing Support.** No later than 30 Days after the Effective Date and no later than September 1 each year thereafter during the term of the Agreement, Contractor shall contribute $200,000.00 to the SFMTA, as escalated each year by the percentage change in the most recently published 12 month average CPI.  The first payment following the Effective Date shall be prorated according to the number of months of performance under this Agreement in the then current Fiscal Year.

**(iv)    MAG.** Based on the minimum Gross Revenues in the previous Fiscal Year, Contractor shall pay to the SFMTA either the MAG amount or Alternate MAG amount set forth in Table 1 below.  Contractor shall pay the applicable MAG amount unless the Gross Revenues in the previous fiscal year meet or exceed the amounts set forth in Table 1.  The MAG or Alternate MAG amount shall be paid in 12 equal installments due on the first business day of each month subject to any offset that may be approved in writing by SFMTA in accordance with

**Municipal Transportation Agency**
Board of Directors & Parking Authority

  

Section 9.4.1 and 9.5.3 and subject to any approved inventory deduction applicable under Section 7.3. In any Fiscal Year in which this Agreement is effective for less than 12 months, the MAG amount shall be prorated according to the number of months of performance in the Fiscal Year, and payment shall be due in and for any month in which Contractor holds title to Shelters and Kiosks for 15 or more Days. MAG or Alternate MAG payments made during the months of July and August shall be adjusted with the September MAG or Alternate MAG payment as may be required according to the findings of the Annual Financial Report. During Fiscal Year 2007-2008, Contractor shall pay the MAG amount and shall make the first MAG payment by December 17, 2007.

**Table 1: MAG Amounts and Revenue Share Percentage**

| Fiscal Year | MAG | Minimum Gross Revenues in Previous Fiscal Year | Alternate MAG | Revenue Share |
|---|---|---|---|---|
| 2007-08 | $6,909,000.00 | $21,000,000.00 | $10,318,000.00 | 55% |
| 2008-09 | $7,614,000.00 | $23,000,000.00 | $11,553,000.00 | 55% |
| 2009-10 | $8,232,000.00 | $25,000,000.00 | $12,607,000.00 | 55% |
| 2010-11 | $8,644,000.00 | $27,000,000.00 | $13,237,000.00 | 55% |
| 2011-12 | $9,076,000.00 | $29,000,000.00 | $13,899,000.00 | 55% |
| 2012-13 | $11,812,000.00 | $31,000,000.00 | $14,595,000.00 | 55% |
| 2013-14 | $12,339,000.00 | $33,000,000.00 | $15,324,000.00 | 55% |
| 2014-15 | $12,893,000.00 | $35,000,000.00 | $16,090,000.00 | 55% |
| 2015-16 | $13,474,000.00 | $34,000,000.00 | $16,895,000.00 | 55% |
| 2016-17 | $14,084,000.00 | $36,000,000.00 | $17,739,000.00 | 55% |
| 2017-18 | $15,577,000.00 | $38,000,000.00 | $18,626,000.00 | 55% |
| 2018-19 | $16,293,000.00 | $41,000,000.00 | $19,558,000.00 | 55% |
| 2019-20 | $17,044,000.00 | $42,000,000.00 | $20,536,000.00 | 55% |
| 2020-21 | $17,834,000.00 | $44,000,000.00 | $21,563,000.00 | 55% |
| 2021-22 | $18,661,000.00 | $46,000,000.00 | $22,640,000.00 | 55% |
| 2022-23* | $21,082,000.00* | $48,000,000.00* | $24,637,000.00* | 57%* |
| 2023-24* | $22,073,000.00* | $50,000,000.00* | $25,869,000.00* | 57%* |
| 2024-25* | $23,114,000.00* | $53,000,000.00* | $27,162,000.00* | 57%* |
| 2025-26* | $24,207,000.00* | $56,000,000.00* | $28,521,000.00* | 57%* |
| 2026-27* | $25,353,000.00* | $59,000,000.00* | $29,946,000.00* | 57%* |
| Total | $306,315,000.00 | | $381,315,000.00 | |
| | | | | |
| *Assumes the option is exercised to extend the term | | | | |



(c) **Revenue Share.** By September 1 of each year, Contractor shall provide the SFMTA with documentation of its Gross Revenues and Total Required Payments for the previous Fiscal Year as part of the Annual Financial Report due under Section 11.2. Contractor shall apply the revenue share percentage designated in Table 1 above to the Gross Revenues for the previous Fiscal Year to determine the SFMTA's "Annual Revenue Share." If the Annual Revenue Share exceeds the Total Required Payments made to the SFMTA pursuant to subsection (b) of this Section (as they may be pro-rated for any partial Fiscal Year or offset pursuant to Sections 7.3, 9.4.1 or 9.5.3), Contractor shall pay the SFMTA any difference between the Total Required Payments made and the Annual Revenue Share by September 1. In the event this Agreement terminates for any reason before the completion of a Fiscal Year, Contractor shall submit the documentation required by this subsection and any final payment required by this subsection within 60 Days of termination.

**7.2.     Late Payments.** Payments from Contractor that are not paid when due will bear interest compounded daily from and after the date said payment was due until the date paid at the prime rate plus three percent. Acceptance of a late payment by SFMTA will not constitute a waiver of Contractor's default with respect to the overdue amount, nor prevent SFMTA from exercising any of the other rights and remedies granted under this Agreement or by law. SFMTA shall have no responsibility to notify Contractor of payments not received by the due dates.

**7.2.1.     Minimum Inventory Deduction.** If the inventory of sites approved by the City for Commercial Structures falls below 337 in Zone 1 (as illustrated in Exhibit O) or 433 in Zone 2 (any area not in Zone 1) for more than 90 Days, Contractor shall be entitled to decrease monthly MAG or Alternate MAG payments due after such an occurrence according to the following process: After Contractor notifies the SFMTA of any decrease, the SFMTA will have 30 Days to find substitute location(s) in the same Zone for the Commercial Structure(s) that have been decreased or, if no appropriate locations are found, to confirm the inventory count and the deduction from the MAG or Alternate MAG. If the SFMTA identifies substitute locations, Contractor shall submit permit applications for such locations to the appropriate permitting authorities. To the extent permits are granted for the substitute locations, Contractor shall not be entitled to a MAG or Alternate MAG deduction. To the extent permits are denied for the substitute locations, the Contractor shall notify the SFMTA, and beginning the month following the denial, be entitled to deduct from the required MAG or Alternate MAG amount the amount set forth in Table 2 for each approved Commercial Structure site below the minimum within Zone 1 or Zone 2. Beginning the month immediately following any increase in the inventory of sites approved by the City for Commercial Structures, the monthly MAG or Alternate MAG payment shall be increased by the applicable amount set forth in Table 2. For purposes of determining the inventory of sites approved for Commercial Structures, any two advertising panels on a free-standing Structure shall constitute a site approved for a Commercial Structure, so that, for example, a High Level Platform containing four two-sided advertising panels shall constitute a site approved for four Commercial Structures.



**Municipal Transportation Agency**
Board of Directors & Parking Authority

 

Table 2:  MAG/Alternate MAG Inventory Deductions

| Fiscal Year | Minimum Commercial Structures in Zone 1 | Minimum Commercial Structures in Zone 2 | MAG Deduction Per Commercial Structure Site in Zone 1 | MAG Deduction Per Commercial Structure Site in Zone 2 | Alternate MAG Deduction Per Commercial Structure Site in Zone 1 | Alternate MAG Deduction Per Commercial Structure Site in Zone 2 |
|---|---|---|---|---|---|---|
| 2007-8 | 337 | 433 | $ 1,375 | $ 509 | $ 1,946 | $ 721 |
| 2008-9 | 337 | 433 | $ 1,498 | $ 555 | $ 2,158 | $ 799 |
| 2009-10 | 337 | 433 | $ 1,607 | $ 595 | $ 2,339 | $ 867 |
| 2010-11 | 337 | 433 | $ 1,681 | $ 623 | $ 2,450 | $ 908 |
| 2011-12 | 337 | 433 | $ 1,758 | $ 651 | $ 2,566 | $ 951 |
| 2012-13 | 337 | 433 | $ 2,222 | $ 823 | $ 2,688 | $ 996 |
| 2013-14 | 337 | 433 | $ 2,316 | $ 858 | $ 2,816 | $ 1,043 |
| 2014-15 | 337 | 433 | $ 2,415 | $ 895 | $ 2,950 | $ 1,093 |
| 2015-16 | 337 | 433 | $ 2,518 | $ 933 | $ 3,091 | $ 1,145 |
| 2016-17 | 337 | 433 | $ 2,626 | $ 973 | $ 3,239 | $ 1,200 |
| 2017-18 | 337 | 433 | $ 2,883 | $ 1,068 | $ 3,394 | $ 1,257 |
| 2018-19 | 337 | 433 | $ 3,009 | $ 1,115 | $ 3,556 | $ 1,318 |
| 2019-20 | 337 | 433 | $ 3,142 | $ 1,164 | $ 3,727 | $ 1,381 |
| 2020-21 | 337 | 433 | $ 3,281 | $ 1,216 | $ 3,906 | $ 1,447 |
| 2021-22 | 337 | 433 | $ 3,427 | $ 1,269 | $ 4,093 | $ 1,516 |
| 2022-23* | 337* | 433* | $ 3,784* | $ 1,402* | $ 4,379* | $ 1,622* |
| 2023-24* | 337* | 433* | $ 3,957* | $ 1,466* | $ 4,593* | $ 1,702* |
| 2024-25* | 337* | 433* | $ 4,140* | $ 1,534* | $ 4,818* | $ 1,785* |
| 2025-26* | 337* | 433* | $ 4,331* | $ 1,604* | $ 5,053* | $ 1,872* |
| 2026-27* | 337* | 433* | $ 4,531* | $ 1,679* | $ 5,300* | $ 1,964* |

*Assumes option is exercised to extend term

## 8.  DESIGN AND CONSTRUCTION

### 8.1.  Designs.

(a) **New Master Designs**.  On or before the Effective Date, but no later than three months after the Effective Date, Contractor shall provide up to six new Designs.  For purposes of Contractor's construction obligations under Section 4.1, City may choose from among any Designs submitted by Contractor, including those submitted with its Proposal and those submitted under this Section 8.1 as any of these Designs may be modified at the request of City.

(b) **City's Additional Design Option**.  During the term of the Agreement, City may require Contractor to create up to six additional Designs; provided, however, that City's entitlement to additional Designs is not intended to require Contractor, during the term of this Agreement, to replace all New Shelters and Kiosks that have replaced Existing Shelters and Kiosks.

(c) **Alternative Shelter Designs**.  In addition to the Designs required by subsections (a) and (b), Contractor shall provide at least one Alternative Shelter Design.

**Municipal Transportation Agency**
Board of Directors & Parking Authority



(d) **Design Approval.** Designs must be approved by SFMTA, the Arts Commission, the Port, the Recreation and Park Department, and any other department with jurisdiction. The SFMTA may, in its sole discretion, waive or modify the minimum design specifications set forth in Section 8.1.2 for Alternative Shelters. Contractor shall work with all relevant City departments with jurisdiction over Designs to finalize Designs recommended by the SFMTA.

**8.1.2. Minimum Shelter and Kiosk Design Specifications.**

(a) Shelters must:

(i) provide a height clearance of six feet eight inches (6'8") at its lowest point, and contain a sloped or curved roof with minimum one-eighth inch (1/8") per foot slope.

(ii) have a minimum of two wall panels or equivalent protection.

(iii) face toward curb to the extent feasible and offer see-through visibility from at least three directions.

(iv) be adaptable for narrow sidewalks between ten feet (10') wide and seven feet, six inches (7'6") wide, and for Low-level Boarding Platforms as narrow as five feet six inches (5'6"). This requirement does not apply to Lower Market Street Shelters and Low-Level Platform Shelters.

(v) be adaptable for sidewalk grades up to 15%.

(vi) be approximately twelve to sixteen feet (12'- 16') long and adaptable for expansion.

(vii) be available in a smaller, eight foot to nine foot (8'-9') size where deemed appropriate by City.

(viii) provide front and rear walk-through and complement existing street furnishings at Market Street locations from the Ferry Building turnaround through Gough Street.

(ix) comply with all applicable laws affecting access by persons with disabilities, including, but not limited to, the Americans with Disabilities Act (ADA) and Section 810.3 of the Americans With Disabilities Act-Architectural Barriers Act (ADA-ABA) Accessibility Guidelines (see: www.access-board.gov/ada-aba/final.htm). Shelters must have a clear floor area of thirty-two inches (32") by forty-eight inches (48") entirely within the perimeter of the Shelter for greater ease of use by wheelchair users. Each Shelter must be placed so that the clear floor area is connected by an accessible route (compliant with ADA regulations) in no case less than thirty-six inches (36") wide, to a transit stop landing area measuring a minimum of eight feet (8') long by five feet (5') wide that is free of obstructions that would impede a wheelchair user boarding or alighting from an accessible vehicle.

(x) have individualized or other seating that is removable and which discourages lying down, accommodates a minimum of three people in twelve foot (12')- or longer Shelters, and a minimum of two people in eight foot (8') Shelters. This requirement does not apply to Low-Level Platform Shelters.

(xi) be illuminated at night from dusk to dawn, providing the Shelter with a minimum of five foot candles of light, measured at a height of five feet (5'). unless excepted from this requirement by City. The Shelter must not be so illuminated as to be hazardous to passing vehicle operators, and should be directed away from residential dwellings.

**Municipal Transportation Agency**
Board of Directors & Parking Authority



(xii)     contain vandal-resistant lighting fixtures.

(xiii)     have a roof drainage system that drains water through access points to sidewalk level.

(xiv)     be designed to prevent pooling of water on the Shelter roof and floor.

(xv)     have no more than one two-sided or flared, back-lit advertising panel designed to accommodate a poster no larger than four feet (4') wide by six feet (6') high, which panel will be secured by screw- or key-locking metal doors. This requirement only applies to conventional sidewalk Shelters (see Exhibits B1 & B2), where permitted by City Planning Code. The ad panel must be located on the downstream side of the Shelter, the back panel, or the sidewalk area immediately adjacent to the downstream side of the Shelter so that on-coming transit vehicles are visible.

(xvi)     identify the service company and provide the name, address, telephone number, and e-mail address of Contractor in a manner acceptable to City;

(xvii)     contain a secure, illuminated panel for transit information designed to hold system route map(s) and schedule information. Each panel must be two-sided and at least three feet (3') wide by four feet (4') tall. This panel shall not impede access to the Shelter for riders with disabilities and should be designed so that the information it contains is accessible to all riders. This requirement does not apply to Low-level Boarding Platforms.

(xviii)     provide SFMTA logos and route numbers on a fascia or other surface (all transit information graphics will be developed by the SFMTA).

(xix)     provide , at a location specified by City, a pushbutton-activated audio output for visual information display, such as NextMUNI, Push-to-Talk technology or an approved equivalent, to provide NextMUNI information in an audio format for the visually impaired (see Section 8.1.4 below).

(xx)     provide "no smoking" decals (or approved equivalent) in Shelters to implement Section 1009.22 of the San Francisco Health Code

(xxi)     include a solar-powered LED bus stop beacon, as described in the Proposal, or as otherwise approved by SFMTA and other City departments with jurisdiction.

### 8.1.3.   Construction and Materials Specifications:

Materials must be chosen for durability and ability to withstand Graffiti, vandalism, weathering, corrosion, and other abuse. Contractor must employ the most technologically advanced materials available to deter or withstand Graffiti.

(a) Transportation information panels must be of a sufficient thickness and durability to be resistant to vandalism and able to maintain transparency.

(b) Materials and Design must conform to all applicable Public Works and Electrical Codes, including applicable seismic safety requirements.

(c) Shelters and Kiosks must be able to withstand 15 P.S.F. wind pressure and 30 P.S.F. loading pressure for live loads.

(d) Shelter Designs must be developed and materials employed which maintain Shelter durability but discourage people from using Shelter roofs for parade viewing and from using Shelter seating for lying down.

Municipal Transportation Agency
Board of Directors & Parking Authority

 

(e) Foundation must be secure but allow for Shelter or Kiosk removal.

(f) Shelters and Kiosks must use recycled-content and sustainable materials to the extent feasible.

(g) Shelters and Kiosks may not contain PVC building materials.

### 8.1.4.   LED Equipment.

(a) **Existing LED Installations.**  Under a contract between the City and NextBus Inc., NextBus has installed Global Positioning System (GPS) technology at Shelters and boarding platforms in order to provide transit passengers with "real time" transit information using LED signage ("LED Equipment").  Prior to the Effective Date, NextBus will have installed LED equipment at approximately 464 locations, including Existing Shelters and High-Level and/or Low-Level Boarding Platforms.  After the completion of such installation, the LED Equipment will be owned by the SFMTA.  Contractor shall permit the SFMTA or its contractor to install, remove, reinstall, repair and maintain the LED Equipment, as required, throughout the term of this Agreement.

(b) **Installation and Maintenance.** Contractor shall remove LED Equipment from Existing Shelters as needed in order to reinstall it in New Shelters, provided that Contractor's removal schedule shall be included in a construction schedule to be approved by City under Section **8.4.1.**  Contractor shall exercise all due care to preserve LED Equipment on any Existing Shelter being removed by Contractor under the terms of this Agreement and shall store such LED Equipment with the same care it exercises for its own property.  Contractor shall ensure that each Shelter (and, where requested, Kiosk) has sufficient wiring capacity, power connections, and sign shell holder or brackets to accommodate the installation of LED Equipment at a height and location approved by the SFMTA, and according to the specifications attached as Exhibit L.  In addition, Contractor shall install LED Equipment in each New Shelter (and, where requested, each New Kiosk) according to City specifications.  Contractor will provide cleaning, Graffiti-removal and other basic maintenance of the LED Equipment consistent with its maintenance duties under this Agreement.  If in the course of its routine inspections and maintenance Contractor observes that the LED Equipment is not functioning, Contractor shall report this problem to SFMTA within 24 hours of such observation.

(c) **Damage to LED Equipment and Shelters.**  Contractor will be responsible for any damages to the LED Equipment that is caused by its installation and maintenance activities.  City will not be responsible for the condition of the LED Equipment or any damage to the Shelters resulting from the LED Equipment.  Contractor shall not be responsible for any damage to the LED Equipment that does not result from its installation and maintenance activities.  Except as otherwise expressly provided herein, after satisfactory completion of installation of the LED Equipment, Contractor shall not be responsible for the functionality of the LED Equipment.

### 8.2.    Permits.  With the exception of any required encroachment permits from the California Department of Transportation (Caltrans), Contractor shall be responsible for obtaining, at its sole cost, all required permits and approvals from City departments or other public entities before commencing construction for any Structures, as well as any encroachment permits required from private property owners.  Contractor shall be responsible for complying with all City, state, and federal laws, regulations and other requirements applicable to its construction activities.  Contractor shall be responsible for obtaining any permits from Caltrans that may be required to perform repairs and maintenance on Structures.  Contractor must obtain all applicable permits before proceeding with such Shelter or Kiosk construction.  Replacement of Public Entity Shelters shall be subject to the permitting requirements of the relevant public entity.

**Municipal Transportation Agency**
Board of Directors & Parking Authority

MUNI San Francisco Municipal Railway    DPT San Francisco Department of Parking and Traffic

    **8.2.1.    Permits.** Notwithstanding any other provision of the San Francisco Municipal Code, permitting requirements for installing Structures authorized by this Agreement shall be established in DPW Order No. 177,160, attached as Exhibit I to this Agreement. For installation of Structures on Port property, the requirements and fees stated in the Port's applicable encroachment permit or building permit shall apply. Permit fees for installing Structures, if required by City outside the Port's jurisdictional boundaries, shall not exceed $350.00 per Structure.

    **8.2.2.    Applications for Permits in First Year.** Contractor shall submit complete applications for all required permits in connection with at least 440 Shelter sites within 12 months after the Design Approval Date.

    **8.3.    Demolition.** Any demolition performed under this Agreement should be in compliance with the City's Construction and Waste Management guidelines, to the extent feasible.

    **8.4.    Construction.**

    **8.4.1.    Schedule.** Construction of all Structures shall be performed in accordance with a construction schedule that Contractor shall submit to City for approval within 30 Days of written request from City. Contractor shall modify its construction schedule as requested by City upon 30 Days' written notice. The construction schedule with respect to New Shelters shall consider at least the following criteria: volume of passenger boardings from each Shelter, efficiency of construction, and distribution of New Shelters throughout the regions of the City.

    **8.4.2.    Commencing Work.** Contractor shall begin construction within 30 Days after obtaining all required permits with respect to a Shelter or Kiosk.

    **8.4.3.    Hours.** Except for emergency maintenance and repairs, or unless expressly authorized by City, Contractor must not conduct construction activities between the hours of 6 am to 9 am and from 4 pm to 7 pm.

    **8.4.4.    Placement.** Structures must be placed so as to comply with all applicable City, state and federal laws and City placement guidelines.

    **8.4.5.    Construction Sites.** Within 24 hours of completing any Shelter or Kiosk installation, Contractor must remove all excess materials and restore the work area to its pre-installation condition.

    **8.4.6.    Quality Control/Quality Assurance.** Contractor shall provide adequate staffing to maintain quality control and quality assurance during construction of the Shelters and Kiosks.

    **8.4.7.    Power to Shelters and Kiosks.** Contractor will bear the full responsibility, including all costs, of furnishing, installing and maintaining any required electrical service to each Structure authorized under this Agreement. To the extent feasible, Contractor must incorporate solar power into Structures that have electrical components. To the extent necessary, Contractor will be responsible for contracting with Pacific Gas & Electric Company ("PG&E") for required electricity. If obtaining service directly from PG&E, Contractor will be responsible for obtaining an agreement from PG&E to allow unmetered electrical service. Contractor may use City owned street lighting circuits and conduits, including the nearest available connection, to obtain power for a Structure where reasonably available and on terms approved by the San Francisco Public Utilities Commission ("SFPUC"). The rates charged by the SFPUC for electrical service will be the then-current rates approved by the SFPUC for commercial users. All electrical service lines at the site of each Structure must be underground and must originate from the point-of-service designated by the SFPUC or by PG&E.



**Municipal Transportation Agency**
Board of Directors & Parking Authority

## 9. MAINTENANCE AND REPAIR

**9.1.    General.** Contractor shall maintain and repair each Shelter, Kiosk High-Level and Low-Level Boarding Platform in accordance and with the standards of this Agreement, regardless of its ownership. A list of Low-Level Boarding Platforms is attached as <u>Exhibit F</u>.

**9.2.    Complaint/Report Decal.** Contractor shall install a decal on each Shelter and each Kiosk indicating that a member of the public may call 3-1-1 to report any complaint about the status of the Shelter or Kiosk. The design of the decal and the location of the decal on the Shelter or Kiosk will be subject to the prior approval of City. Each decal must provide unique identifying information for the Shelter or Kiosk for the purpose of easy identification of the Shelter or Kiosk that is the subject of a complaint or report. Current Decals shall be replaced as needed to ensure accuracy and readability.

**9.3.    Maintenance Schedule.** Contractor shall comply with the maintenance standards set forth in the Agreement and, except as otherwise provided in this Agreement with respect to Transit Stop Poles and Noncommercial Signal Control Covers, be responsible for maintaining Structures in "like new" condition throughout the term of the Agreement, including refurbishing, reconditioning, and, if necessary, replacing Contractor-provided Structures that cannot be readily rehabilitated with normal maintenance. In addition to providing real-time access to maintenance documentation through the IMCDS as required under Section 9.8.5, Contractor shall provide any additional maintenance reports requested by City.

**9.4.    Inspection and Clean-up.** Except as otherwise provided in this Section 9.4, Contractor must inspect each Shelter and Kiosk at least twice per week, except Shelters and Kiosks on Market Street, which shall be inspected at least three times per week. Contractor shall make more frequent inspections if conditions warrant. In the course of each inspection of a Shelter or Kiosk, Contractor shall remove all Graffiti, stickers, posters, litter, dust, dirt, and weeds from each Shelter or Kiosk, and from a five-foot radius surrounding the Shelter or Kiosk, exclusive of private property and rail right-of-way. Contractor shall provide City with a monthly narrative summary of inspection and clean up operations, documenting all Shelter and Kiosk inspections and identifying problem areas and corrective actions taken. The monthly report required by this Section shall include the fabrication and installation costs for all Shelters and Kiosks installed in the previous month as well as all maintenance and repair costs.

**9.4.1.    Union Square/Tenderloin Area Shelters.** In addition to the level of service required under Section 9.4, City may elect for Contractor to perform maintenance of the Shelters in the Union/Square Tenderloin Area three times a week instead of twice a week. In that event, the annual incremental cost for such maintenance will be $3,500.00 per Shelter during the first year of the Agreement, as adjusted by the CPI annually thereafter. Upon submission of monthly documentation satisfactory to the City, Contractor may deduct any such costs for extra maintenance of the Union Square/Tenderloin Area Shelters from Contractor's MAG payment submitted under Section 7.1.1(b)(iv).

**9.4.2.    High-Level, E-Line and F-Line Boarding Platforms.** With respect to all High-Level Boarding Platforms and E-Line and F-Line Low-Level Boarding Platforms, Contractor shall perform all maintenance duties set forth in <u>Exhibit H</u>. Notwithstanding the requirements of Section 9.4, Contractor will make daily inspections of all such Boarding Platforms and shall, as needed: pick-up trash, remove Graffiti, clean and wash each boarding platform; inspect LED signs and lighting fixtures, and replace defective lights.

 **Municipal Transportation Agency**
Board of Directors & Parking Authority



**9.5.    Repair and Replacement.**

**9.5.1.    Transit Shelters; Kiosks.**  Except as otherwise provided in this Section 9.5, within 48 hours of discovery by Contractor, or notification by the public or by City, Contractor shall repair any damage, including, but not limited to, damage from vandalism or Graffiti, found on or around the Shelter or Kiosk, exclusive of other street furniture not covered by this Agreement and private property.  Contractor shall repair, replace or remove, as appropriate, any damage to a Shelter or Kiosk that is of a hazardous nature (e.g., broken glass, light sources that need replacing) within 24 hours of discovery or notification, or as needed.  Contractor also shall maintain the pavement within a five-foot radius of each Shelter or Kiosk, repairing any damage that may have occurred during repair, removal or replacement of any Shelter or Kiosk.  If the Shelter or Kiosk is destroyed, Contractor shall remove the Shelter or Kiosk remains within 24 hours of notification and replace the Shelter or Kiosk within 15 Days.  In conjunction with such removal, Contractor agrees, at its own expense, to restore the affected sidewalk, median boarding island or curb area to a safe, finished condition.

**9.5.2.    High-Level and Low-Level Boarding Platforms on E-Line and F-Line.**  Contractor's repair duties with respect to all High-Level and E-Line and F-Line Low-Level Boarding Platforms are set forth in Exhibit H.  Contractor's repair and replacement obligations regarding the High-Level Boarding Platforms, and the E-Line and F-Line Shelters (if constructed and owned by SFMTA) will be limited to repairs and/or replacements necessitated by vandalism or intentional damage or destruction; unless Contractor owns the Shelters, Contractor will have no obligation to repair or replace Platform or Shelter components on such Shelters solely as a result of construction defects, normal wear and tear, accidents or acts of God.  Contractor will report any such damage to the Maintenance Division of SFMTA within 24 hours of discovery in written format with a copy to the Real Estate Division of SFMTA.  Notwithstanding the above, if City requires Contractor to perform any repairs to High-Level Boarding Platforms, E-Line, or F-Line Low-Level Boarding Platforms that are not set forth in Exhibit H, Contractor shall perform said repairs.  If using its own employees, Contractor shall charge on a Time And Material basis.

**9.5.3.    Low-Level Boarding Platforms (other than E-Line and F-Line).**  Contractor will perform maintenance and repair of all Low-Level Boarding Platforms (with or without Shelters) on Exhibit F, that are not E-Line or F-Line boarding platforms, for an annual cost of $300,000.  Such cost does not include maintenance and repair of Shelters on Low-Level Boarding Platforms, which must be performed without additional cost to the City.  Upon submission of monthly documentation satisfactory to the City, Contractor may deduct any actual costs for extra maintenance of the Low Level Boarding Platforms from Contractor's MAG payment submitted under Section 7.1.1(b)(iv).

**9.6.    Remedies for Failure to Maintain or Repair.**

**9.6.1.    City May Repair.**  In the event that Contractor fails to repair, maintain or relocate Shelters or Kiosks within the time specified by SFMTA or Port, SFMTA or Port may, in their sole discretion, cause the repair, maintenance, removal or relocation of said Shelter(s) or Kiosks.  Contractor shall pay SFMTA or Port for their actual costs, including overhead costs, within 10 Days following receipt by Contractor of an invoice for such costs.

**9.7.    Inventory, Maintenance and Complaint Database System (IMCDS).**  Contractor shall create and maintain throughout the term of the Agreement an Inventory, Maintenance and Complaint Database System (IMCDS), as set forth in further detail below, for documenting: (a) the location, design, and features of each Structure; (b) all inspection, cleaning and maintenance activities required to be performed under Section 9, and (c) any complaints about or reports of required maintenance and repairs, as well as the status of each complaint or report.

**Municipal Transportation Agency**
Board of Directors & Parking Authority



**9.8.     IMCDS Review and Approval.** Within 60 Days after the Effective Date, Contractor shall submit for City approval complete documentation of its proposed IMCDS, including the database structure and fields, the reports available from the system, disaster planning information required by Section 9.8.7, and the end-user interface and access as it will be available to City staff and as it will be available to members of the public. Within 60 Days after City approval, Contractor shall implement the system with full functionality in accordance with the approved IMCDS design.

**9.8.1.     Inventory Records.** Contractor shall enter into the database, on a daily basis, (a) the location, zone designation under Section 7.3, type, design, and features of each installed Structure; (b) all proposed sites for the location of a Structure, including status information about each site (including rejected sites); (c) any sites from which Structures have been removed or relocated; and (d) permitting status information.

**9.8.2.     Maintenance/Repair Records.** Contractor shall enter into the database, on a daily basis, all maintenance information required by City.

**9.8.3.     Complaint/Report Records.** Contractor shall receive complaints and requests for service 24 hours a day, 365 Days a year and, except as provided in this Section, must enter into the database, on a daily basis, (a) all complaints and reports, including reports submitted by City, by date and time received; (b) the date, time and substance of any subsequent communications with the complainant; and (c) the date and nature of any maintenance and/or repair actions undertaken to respond to the complaint or report.

**9.8.4.     3-1-1 Interface.**

(a) Within 60 Days after a request from City, Contractor must provide an automated mechanism for Contractor to receive and enter into the IMCDS all complaints regarding Structures received by the City's 3-1-1 center and by e-mail 24 hours a day, 365 Days a year.

(b) Within 90 Days after City's request but no sooner than 90 Days after City approval of the database structure and end-user interface design of the IMCDS, Contractor shall provide an interface to enable 3-1-1 operators receiving a complaint regarding a Structure to both enter complaint data directly into the IMCDS and to have real-time access to information from the IMCDS regarding Structures.

**9.8.5.     Technical Requirements.**

(a) **Application Requirements.** The data on the IMCDS must be available to designated SFMTA staff through the internet 24 hours a day. Contractor will be responsible for maintaining SFMTA's internet access to the database through a website. All reports from the IMCDS shall be available for downloading by SFMTA staff in an open architecture format, such as .xls, .csv, .txt, or .xml format. The IMCDS shall be a relational database management system and must have GIS mapping capabilities to display all IMCDS records. The mapping function must include the location of each Structure, the street centerline, and every City public transit stop and route, and an image of each Structure except Transit Stop Poles. Each Shelter shall be identified and linked to a transit stop by a stop identification number assigned by SFMTA. Upon Contractor's execution of a standard City GIS licensing agreement, attached as <u>Exhibit M</u>, the SFMTA will supply basemap data (centerlines, stops, routes, etc.) as shapefiles. Contractor shall update the GIS basemap data at least quarterly.

(b) **IMCDS Maintenance and Upgrades.** Contractor shall backup the IMCDS system every Day but shall not conduct any backup or maintenance activities between the hours of 8 am and 10 pm Pacific Standard Time seven days a week. Contractor and SFMTA shall meet on an annual basis to review and discuss enhancements to the IMCDS; Contractor shall provide annually any two system and two reporting enhancements requested by the SFMTA at no cost to the City.



**Municipal Transportation Agency**
Board of Directors & Parking Authority

 

In such an event, Contractor shall provide a written explanation to the City for the asserted technical infeasibility. Contractor shall provide to City upgrades to the IMCDS to make it comparable to any similar database system implemented for another client within 60 Days of such implementation. Contractor shall obtain written approval from the City before making any modifications to the IMCDS that affect the use of the IMCDS by the City or the public.

      **(c) Security.** Except as provided in Section 9.8.5 below, Contractor shall ensure that all information in the IMCDS is secure and that no other entity will have access to information required to be provided under this Agreement without written authorization from the City. Contractor shall provide to SFMTA username(s) and password(s) for secure access to the IMCDS. Contractor shall replace and/or block any username(s) and password(s) if requested by City within four hours. Contractor shall provide any new requested username(s) and passwords within two Days. There shall be no limit to the number of username(s) and password(s). Username(s) and password(s) shall be created based on the following access/security levels: full access; access to GIS and inventory information only; access to complaint information only; access to maintenance and service information only; access to GIS and inventory and maintenance and service information; access to complaint and maintenance information; access to GIS and inventory and complaint access only. SFMTA may request additional security levels, which Contractor will implement within 10 Days.

      **(d) Outages.** Contractor shall document any Outages and shall provide a monthly report documenting all Outages no later than the fifth day of each calendar month. In no case shall the IMCDS be less than fully operational for a total of more than 240 minutes in any calendar month.

      **9.8.6. Ownership.** The data contained within the system shall be the property of the City. Contractor shall secure for City all required licenses to use the IMCDS and to provide all software, hardware and licenses that may be necessary for the City to make use of the IMCDS data for at least three years after termination of this Agreement.

      **9.8.7. Disaster Planning.** Contractor shall use disaster planning best practices to ensure that IMCDS data can be recovered within a reasonable period of time after a disaster affecting IMCDS utilization. Contractor shall submit a copy of its disaster planning protocol to the City in connection with the approval of database under Section 9.3.

      **9.8.8. Public IMCDS Application.** The Contractor shall provide a mechanism for the public to access the website containing the IMCDS information. The publicly accessible application shall include the location of each Structure, street centerlines, City public transit stops and routes, images of Structures and any other information requested by City.

      **9.9. Quality Assurance/Quality Control Plan.** Contractor shall provide City with a quality assurance and quality control plan addressing the performance of all duties under Section 9 of this Agreement in connection with the approval of database under Section 9.3 and shall comply with the approved plan throughout the term of this Agreement.

# 10. APPROVAL OF ADVERTISING MATERIAL

      **10.1. General.** The SFMTA Board of Directors has adopted an Advertising Policy that prohibits certain types of advertisements. SFMTA's Advertising Policy is attached as <u>Exhibit J</u> to this Agreement. Contractor shall comply with the advertising standards set forth in this Policy and any amendments to the Policy that are adopted by the SFMTA Board of Directors during the term of this Agreement. Upon written demand by SFMTA, or the Port (for advertising under Port jurisdiction), Contractor shall remove within two Days or sooner any advertisements that are in violation of SFMTA's Advertising Policy. For multiple instances of failure to comply with the

Municipal Transportation Agency

Board of Directors & Parking Authority



SFMTA's Advertising Policy, Contractor will be subject to liquidated damages, as provided in Section 14.2.

**10.2.    Decals.** Contractor shall install a decal (or approved equivalent) on each Commercial Shelter and on each Kiosk that reads: "The views expressed in this advertisement do not necessarily reflect the views of the San Francisco Municipal Transportation Agency." Contractor will provide the decals and SFMTA will determine the locations on the panels where the decals are to be placed. With regard to advertising posters located on property under Port jurisdiction, Contractor shall provide and install decals on each Commercial Shelter that read: "The views expressed in this advertisement do not necessarily reflect the views of the San Francisco Municipal Transportation Agency or the Port of San Francisco."

## 11. REPORTING REQUIREMENTS; AUDITS

**11.1.    Annual Financial Statement.** On or before the first day of the third calendar month following the close of Contractor's fiscal year, Contractor shall submit to City three copies of Contractor's annual financial statement prepared by an independent public accountant.

**11.2.    Annual Financial Report.**

**11.2.1.** Contractor shall submit to City the following information by September 1 for the City's prior Fiscal Year:

(a) The number of Kiosks and Shelters installed, relocated or removed and associated costs of fabrication, installation, removal or relocation;

(b) The purchase of Associated Equipment and related costs;

(c) The total number of advertising contracts entered into;

(d) The name(s) of each advertising agency, the term of the contract, the type of advertisement and the number of Shelters and Kiosks in which the advertising will be displayed under the contract.

**11.2.2.** By September 1 for the City's prior Fiscal Year, Contractor shall make available at its place of business in San Francisco or the surrounding area for inspection by City of the following information:

(a) The total revenues, earnings before income tax, depreciation, amortization and profit from Shelter and Kiosk maintenance and advertising operations, both on a cash and accrual basis.

(b) Comparable financial information and statistics relating to Contractor's advertising contracts with other public or transit agencies in the Bay Area or other large metropolitan areas.

**11.3.    Audits; Inspection of Records.**

**11.3.1.    Records.** Contractor shall maintain all Records in accordance with generally accepted accounting principles. All Records shall be maintained throughout the term of this Agreement at Contractor's San Francisco office and shall be maintained for five years following termination or expiration of this Agreement in a safe and secure location within the San Francisco Bay Area.

**11.3.2.    City's Right to Inspect and Copy.** Any duly authorized agent of City shall have the right to examine and/or copy all Records at any time during normal business hours,

provided that Contractor shall be allowed at least 48 hours after City identifies Records it wishes to copy to mark any such Records as confidential or proprietary in accordance with Section 21.19.2. Records created or maintained in an electronic format shall be available to the City and its agents for examination and/or copying in an electronic format.

**11.3.3. Audits.** Contractor will cooperate fully with the performance by City or its agents of Contract Performance and Operations Audits. A Contract Performance Audit may examine any and all aspects of the Contractor's obligations under this Agreement. An Operations Audit may examine the quality and effectiveness of Contractor's organizational Structure, internal controls, financial reporting and business practices. City may require each type of audit no more than once per calendar year. City shall provide Contractor with 15 Days' notice of any audit to be performed under this Section. The State of California or any federal agency having an interest in the subject matter of this Agreement will have the same rights conferred upon City by this Section.

**(a) Findings of Nonperformance.** In the event that any audit conducted pursuant to Section 11 results in a determination that Contractor has failed to perform any material term of this Agreement, City will issue a written Finding of Nonperformance to Contractor. Such Finding of Nonperformance will include a calculation of liquidated damages for Contractor's failure to perform, using the measure of Liquidated Damages specified in Section 14. The Finding of Nonperformance shall also include a reasonable period of time for Contractor to cure any listed performance failures that are subject to liquidated damages pursuant to Sections 14.1.3, 14.1.4 or 14.1.5. Contractor's failure to cure may result in a notice of default pursuant to Section 16. Liquidated damages may not be assessed in a Finding of Nonperformance for any incident for which liquidated damages have already been assessed pursuant to Section 14. Any failure of City to list any violation of the terms of this Agreement in the Finding of Nonperformance shall not constitute a waiver of the City's right to impose any other right or remedy that it has under this Agreement or applicable law with respect to that violation.

## 12. INSURANCE; INDEMNIFICATION

**12.1. Insurance.**

**12.1.1. Required Coverages.** Without in any way limiting Contractor's liability pursuant to the "Indemnification" Section of this Agreement, Contractor must maintain in force, during the full term of the Agreement, insurance in the following amounts and coverages:

**(a)** Workers' Compensation, in statutory amounts, with Employers' Liability Limits not less than $1,000,000.00 each accident; and

**(b)** Commercial General Liability Insurance with limits not less than $10,000,000.00 each occurrence Combined Single Limit for Bodily Injury and Property Damage, including Contractual Liability, Personal Injury, Products and Completed Operations; and

**(c)** Commercial Automobile Liability Insurance with limits not less than $2,000,000.00 each occurrence Combined Single Limit for Bodily Injury and Property Damage, including Owned, Non-Owned and Hired auto coverage, as applicable.

**(d)** Professional liability insurance with limits not less than $1,000,000.00 each claim with respect to negligent acts, errors or omissions in connection with professional services to be provided under this Agreement.

**12.1.2. Endorsements.** For Commercial General Liability and Commercial Automobile Liability Insurance policies, Contractor must provide endorsements, prior to the

**Municipal Transportation Agency**
Board of Directors & Parking Authority



Effective Date and annually thereafter on the anniversary of the Effective Date, in a form approved by both SFMTA and the Port that provide the following:

(a) Name as Additional Insureds the City and County of San Francisco, the SFMTA, the Port, and their Officers, Agents, and Employees.

(b) That such policies are primary insurance to any other insurance available to the Additional Insureds, with respect to any claims arising out of the obligations of Contractor under this Agreement, and that insurance applies separately to each insured against whom claim is made or suit is brought.

**12.1.3. Notice.** All policies must provide thirty Days' advance written notice to City of cancellation for any reason whatsoever mailed to the following address:

San Francisco Municipal Transportation Agency
Real Estate Section
One South Van Ness Ave. 7th floor
San Francisco, CA 94103

With a copy to:

San Francisco Municipal Transportation Agency
Contracts and Procurements Section
One South Van Ness Ave. 7th floor
San Francisco, CA 94103

**12.1.4. Claims-Made Coverage.** Should any of the required insurance be provided under a claims-made form, Contractor shall maintain such coverage continuously throughout the term of this Agreement and, without lapse, for a period of three years beyond the expiration of this Agreement, to the effect that, should occurrences during the contract term give rise to claims made after expiration of the Agreement, such claims must be covered by such claims-made policies.

**12.1.5. General Aggregate Limit.** Should any of the required insurance be provided under a form of coverage that includes a general annual aggregate limit or provides that claims investigation or legal defense costs be included in such general annual aggregate limit, such general annual aggregate limit will be double the occurrence or claims limits specified above.

**12.1.6. Lapse of Coverage.** Should any required insurance lapse during the term of this Agreement, Contractor's failure to reinstate such insurance and maintain such insurance will constitute a material breach of this Agreement. If insurance is not reinstated, City may, at its sole option, terminate this Agreement effective on the date of such lapse of insurance.

**12.1.7. Condition Precedent.** Before commencing any operations under this Agreement, Contractor must furnish to City certificates of insurance, and additional insured policy endorsements with insurers with ratings comparable to A-, VIII or higher, that are authorized to do business in the State of California, and that are satisfactory to City in form evidencing all coverages set forth above.

**12.1.8. Liability of Contractor.** Approval of the insurance by City will not relieve or decrease the liability of Contractor hereunder.

**12.2. Indemnification.** Contractor shall indemnify and save harmless City and its officers, agents and employees from, and, if requested, shall defend them against any and all loss, cost, damage, injury, liability, and claims thereof for injury to or death of a person, including employees of

 

**Municipal Transportation Agency**
Board of Directors & Parking Authority

Contractor or loss of or damage to property, arising directly or indirectly from Contractor's acts or omissions with respect to its performance of this Agreement, including, but not limited to, the use of Contractor's facilities or equipment provided by City or others, regardless of the negligence of, and regardless of whether liability without fault is imposed or sought to be imposed on City, except to the extent that such indemnity is void or otherwise unenforceable under applicable law in effect on or validly retroactive to the date of this Agreement, and except where such loss, damage, injury, liability or claim is the result of the active negligence or willful misconduct of City, its officers, agents, or employees, and is not contributed to by any act of, or by any omission to perform some duty imposed by law or agreement on Contractor, its subcontractors or either's agent or employee. The foregoing indemnity shall include, without limitation, reasonable fees of attorneys, consultants and experts and related costs and City's costs of investigating any claims against the City.

In addition to Contractor's obligation to indemnify City, Contractor specifically acknowledges and agrees that it has an immediate and independent obligation to defend City from any claim which actually or potentially falls within this indemnification provision, even if the allegations are or may be groundless, false or fraudulent, which obligation arises at the time such claim is tendered to Contractor by City and continues at all times thereafter.

As to any intellectual property that Contractor provides to the City in the performance of this Agreement, Contractor agrees to indemnify and hold City harmless from all loss and liability, including attorneys' fees, court costs and all other litigation expenses for any infringement of the patent rights, copyright, trade secret or any other proprietary right or trademark, and all other intellectual property claims of any person or persons, arising as a consequence of the use by City of the intellectual property supplied by the Contractor, or any of its officers or agents.

As to any intellectual property that City provides to Contractor in materials Contractor is required to post under this Agreement, City agrees to indemnify and hold Contractor harmless from all loss and liability, including attorneys' fees, court costs and all other litigation expenses for any infringement of the patent rights, copyright, trade secret or any other proprietary right or trademark, and all other intellectual property claims of any person or persons, arising as a consequence of the required posting by Contractor of intellectual property supplied by the City or any of its officers or employees.

**13.    SECURITY DEPOSITS.**

    **13.1.    Performance Bond.**

        **13.1.1. Amount of Bond.** Contractor agrees that within five Days after notification from the SFMTA that the all required City agencies have approved this Agreement, Contractor will deliver to the City a performance bond, which may be renewable annually, in the amount of $10,000,000.00 to guarantee Contractor's performance obligations under this Agreement. If Contractor fails to deliver the initial performance bond within five Days, or fails to notify City annually of the renewal of the bond within five Days before each anniversary of the Effective Date, City will be entitled to cancel this Agreement. Contractor shall maintain the performance bond during the term of this Agreement. In the event this Agreement is assigned, as provided for in Section 20.8, City will return or release the performance bond not later than the effective date of the assignment, provided that the assignee has delivered to City an equivalent performance bond, as determined by City. In the event that the City exercises its option to extend this Agreement as provided in Section 15.2, then the performance bond must be re-issued in the amount of $20,000,000.00 for the duration of the extension of the term of this Agreement, and throughout the performance of Contractor's obligations under Section 16.2.2, if that option is exercised by City. Notwithstanding anything to the contrary herein, in no event shall Surety's aggregate liability exceed

the penal sum of any bond amount. Notwithstanding anything to the contrary herein, in no event shall Surety's aggregate liability exceed the penal sum of the applicable bond amount; provided, however, that this limitation shall not affect Contractor's liability under this Agreement.

**13.1.2. Sureties.** Bonding entities on the performance bond must be legally authorized to engage in the business of furnishing performance bonds in the State of California. All bonding entities must be satisfactory to City. During the period covered by the Agreement, if any of the sureties upon the bond become insolvent or, in the opinion of the City, unable to pay promptly the amount of such bond to the extent to which the surety might be liable, Contractor, within 30 Days after notice given by the City to Contractor, must by supplemental bond or otherwise, substitute another and sufficient surety approved by City in place of the surety becoming insolvent or unable to pay. If Contractor fails within such 30 Day period to substitute another and sufficient surety, City may deem Contractor to be in default in the performance of its obligations hereunder and upon the said bond. The City, in addition to any and all other remedies, may terminate the Agreement or bring any proper suit or proceeding against moneys then due or which thereafter may become due to Contractor under the Agreement. The amount for which the surety will have justified on the bond and the moneys so deducted will be held by SFMTA as collateral for the performance of the conditions of the bond.

**13.2.    Letter of Credit.**

**13.2.1.  Requirements.** In addition to the performance bond, within 14 Days after receiving notification of approval of the Agreement, Contractor shall provide to City and maintain, throughout the term of this Agreement or until all of its obligations under the Agreement have been completely performed, whichever is later, a confirmed, clean, irrevocable letter of credit in favor of the City and County of San Francisco, a municipal corporation, in the amount of $2,000,000.00. Subject to Section 13.2.2, the letter of credit must have an original term of one year, with automatic renewals of the full $2,000,000.00 amount throughout the term of the Agreement and throughout the performance of Contractor's obligations under Section 16.2.1, if that option is exercised by City. If Contractor fails to deliver the letter of credit as required, City will be entitled to cancel this Agreement. The letter of credit must provide that payment of its entire face amount, or any portion thereof, will be made to City upon presentation of a written demand to the bank signed by the Executive Director/CEO on behalf of the City and County of San Francisco.

**13.2.2.  Financial Institution..** The letter of credit must be issued on a form and issued by a financial institution acceptable to the City in its sole discretion, which financial institution must (a) be a bank or trust company doing business and having an office in the City and County of San Francisco, (b) have a combined capital and surplus of at least $25,000,000.00, and (c) be subject to supervision or examination by federal or state authority and with at least a Moody's A rating.

**13.2.3.  Extensions of Agreement.** Should the City exercise the option to extend the Agreement as provided in Section 15.2, Contractor shall increase the letter of credit to $6,000,000.00 for the term of the option and throughout the performance of Contractor's obligations under Section 16.2.2, if that option is exercised by City.

**13.2.4.  Demand on Letter of Credit.** The letter of credit will constitute a security deposit guaranteeing faithful performance by Contractor of all terms, covenants, and conditions of this Agreement, including all monetary obligations set forth herein. If Contractor defaults with respect to any provision of this Agreement, SFMTA may make a demand under the letter of credit for all or any portion thereof to compensate City for any loss or damage that they may have incurred by reason of Contractor's default, negligence, breach or dishonesty. Such loss or damage may include without limitation any damage to or restoration of City property or property that is required

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

to be constructed, maintained or repaired pursuant to this Agreement, payments to City, and claims for liquidated damages; provided, however, that City will present its written demand to said bank for payment under said letter of credit only after City first has made its demand for payment directly to Contractor, and five full Days have elapsed without Contractor having made payment to City. Should the City terminate this Agreement due to a breach by Contractor, the City shall have the right to draw from the letter of credit those amounts necessary to pay any fees or other financial obligations under the Agreement and perform the services described in this Agreement until such time as the City procures another contractor and the agreement between the City and that contractor becomes effective. City need not terminate this Agreement in order to receive compensation for its damages. If any portion of the letter of credit is so used or applied by City, Contractor, within 10 business days after written demand by City, shall reinstate the letter of credit to its original amount; Contractor's failure to do so will be a material breach of this Agreement.

13.2.5. **Expiration or Termination.** The letter of credit must provide for 60 Days notice to City in the event of non-extension of the letter of credit; in that event, Contractor shall replace the letter of credit at least 10 business Days prior to its expiration. In the event the City receives notice from the issuer of the letter of credit that the letter of credit will be terminated, not renewed or will otherwise be allowed to expire for any reason during the period from the commencement of the term of this Agreement to 90 Days after the expiration or termination of this Agreement, or the conclusion of all of Contractor's obligations under the Agreement, whichever occurs last, and Contractor fails to provide the City with a replacement letter of credit (in a form and issued by a financial institution acceptable to the City) within 10 Days following the City's receipt of such notice, such occurrence shall be an event of default, and, in addition to any other remedies the City may have due to such default (including the right to terminate this Agreement), the City shall be entitled to draw down the entire amount of the letter of credit (or any portion thereof) and hold such funds in an account with the City Treasurer in the form of cash guarantying Contractor's obligations under this Agreement under the terms of this Section 13. In such event, the cash shall accrue interest to the Contractor at a rate equal to the average yield of Treasury Notes with one-year maturity, as determined by the Treasurer. In the event the letter of credit is converted into cash pursuant to this paragraph, upon termination of this Agreement, Contractor shall be entitled to a full refund of the cash (less any demands made thereon by the City) within 90 Days of the termination date, including interest accrued through the termination date.

13.2.6. **Return of Letter of Credit.** The letter of credit will be returned within 90 Days after the end of the term of this Agreement, as defined in Section 15.1, provided that Contractor has faithfully performed throughout the life of the Agreement, Contractor has completed its obligations under the Agreement, there are no pending claims involving Contractor's performance under the Agreement and no outstanding disagreement about any material aspect of the provisions of this Agreement. In the event this Agreement is assigned, as provided for in Section 18.8, City will return or release the letter of credit not later than the effective date of the assignment, provided that the assignee has delivered to the City an equivalent letter of credit, as determined by City.

13.2.7. **Excessive Demand.** If City receives any payments from the aforementioned bank under the letter of credit by reason of having made a wrongful or excessive demand for payment, City will return to Contractor the amount by which City's total receipts from Contractor and from the bank under the letter of credit exceeds the amount to which City is rightfully entitled, together with interest thereon at the legal rate of interest, but City will not otherwise be liable to Contractor for any damages or penalties.

**Municipal Transportation Agency**

Board of Directors & Parking Authority



## 14. LIQUIDATED DAMAGES

**14.1.   General.**  Contractor acknowledges that its failure to perform certain obligations under this Agreement during the respective time limits imposed will cause City to incur inconvenience not contemplated under this Agreement, which cost and inconvenience will constitute damage to City, the City and the public, and that the exact amount of such damage will be extremely difficult or impractical to fix.  City and Contractor agree that the amounts described as liquidated damages in this Agreement are not penalties, but represent a fair and reasonable estimate of the costs that the City will incur by reason of Contractor's failure to perform, and are fair compensation to City for its losses.  Failure by City to impose liquidated damages for specified violations will not be a waiver of the right to enforce this Section, nor will it constitute a waiver of any other right of City under this Agreement, including, but not limited to, Contractor's obligation to City to pay any overdue amounts or perform any services required under this Agreement, and City's rights to assess liquidated damages as a result of a Finding of Nonperformance issued pursuant to Section 11.  For purposes of this Section, written notice by City of a violation will constitute enforcement even though City may not assess liquidated damages at the time of such initial written notice of violation.  In the event that Contractor demonstrates that an Unavoidable Delay has actually extended the time required to complete a task, the City will not impose liquidated damages for the duration of the Unavoidable Delay.

**14.1.1.  Maintenance Breaches.**  City may assess liquidated damages for the following breaches of the maintenance and repair provisions of this Agreement:

**(a)** Failure to perform maintenance or repair work to a Shelter or Kiosk in accordance with the requirements of this Agreement within 24 hours of notification:  $1,000.00 per occurrence per Day until the violation is remedied.  The date of notification will be the earliest date of notification, as determined from records of notices received by Contractor under Section 9.5.1 of this Agreement.

**(b)** Failure to perform maintenance or repair work to a Shelter or Kiosk in accordance with the requirements of this Agreement within 48 hours of notification:  $500.00 per occurrence per Day until the violation is remedied.  The date of notification will be the earliest date of notification, as determined from records of notices received by Contractor under Section 9.5.1 of this Agreement.

**(c)** Failure to perform graffiti removal work in accordance with the requirements of this Agreement within 48 hours of notification, as described in Section 9.5 of this Agreement:  $500.00 per occurrence per Day until the violation is remedied.  The date of notification will be the earliest date of notification, as determined from records of notices received by Contractor under Section 9.7 of this Agreement.

**(d)** Outages of the maintenance database described in Section 11.2 for more than two hours per calendar month between the hours of 8 am to 10 pm seven days per week:  $500.00 for each Day or fraction of a Day of the Outage until the database has been restored to full functionality.

**14.1.2.  Construction Schedule Breaches.**  City may assess liquidated damages for Contractor's failure to timely submit a required construction schedule or comply with the approved construction schedule, as required under Section 8.4.1 of this Agreement, subject to any amendments to the schedule approved by the City:  $1,000.00 a Day (i) for each Day of delay in submission of a



**Municipal Transportation Agency**
Board of Directors & Parking Authority



required construction schedule and (ii) for each Shelter, Kiosk or bus stop pole that is not completed by the date specified in the approved construction schedule.

**14.1.3. Annual Report.** Contractor's failure to submit its Annual Financial Report with all required information, will subject Contractor to liquidated damages in the amount of $500.00 for each Day the report is late continuing until the report has been submitted with all required information.

**14.1.4. Failure to Remove Shelters and Kiosks.** In the event that Contractor fails to remove a Shelter or Kiosk within the time specified by City, which may not be less than 48 hours, City may impose liquidated damages under Section 14 in the amount of $300.00 per Day or fraction of a Day, until the Shelter or Kiosk has been removed. City may, at its sole discretion, cause removal of said Shelter or Kiosk and apply that portion of Contractor's cost for such work. Contractor shall pay City any costs not applied to the letter of credit within 10 Days following receipt of City's invoice.

**14.1.5. Failure to Cure Audit Deficiencies.** In the event that Contractor fails to cure an audit deficiency within the time periods imposed by the City under Section 11.3.3(a), City may impose liquidated damages not to exceed $500.00 per Day per deficiency until the deficiency is cured to the satisfaction of the City.

**14.2. Failure to Comply with Advertising Policy.** In the event that Contractor fails to comply with the SFMTA's Advertising Policy, as required in Section 10.1, the City may impose liquidated damages. For purposes of this Section, a "violation" is a failure to comply in the context of a single advertisement. For each violation during the term of the Agreement, City may impose liquidated damages in the amount of $5,000.00 per Day if the Contractor fails to cure the violation within two Days.

**14.3. Failure to Pay Liquidated Damages.** Contractor agrees that if it fails to remit liquidated damages amounts assessed by City under this Section 14 or under any other section of this Agreement, City may deduct such damages from Contractor's letter of credit provided under Section 13.2 above. Contractor shall restore the letter of credit to its full amount in accordance with Section 13.2.4. This provision shall also apply to any penalties assessed for violation of prevailing wage requirements under Administrative Code Section 6.22(E) and (F) or Administrative Code Section 21.25-1, as set forth in Section 21.29 below.

## 15. TERM; OPTIONS TO EXTEND

**15.1. Term and Extension of Term.** This Agreement will commence on December 10, 2007. This Agreement will terminate on December 7, 2022, unless sooner terminated as provided in this Agreement.

**15.2. Option to Extend.** At the sole option of City, the Agreement may be extended for one five-year term. City will notify Contractor of its intent to exercise the option no later than 90 Days prior to the expiration of the term of the Agreement, as the term may be amended.

## 16. TERMINATION

**16.1. Termination for Convenience.** City has the option, in its sole discretion, to terminate this Agreement, at any time during the term hereof, for convenience and without cause. City may exercise this option by giving Contractor a written Notice of Termination specifying the date that termination will become effective (Termination Date") at least 90 Days in advance of the



Termination Date. Upon receipt of the Notice of Termination, Contractor shall commence and perform, with diligence, all actions necessary on the part of Contractor to effect the termination of this Agreement on the date specified by City and to minimize the liability of Contractor and City to third parties as a result of termination. All such actions shall be subject to the prior approval of City.

    **16.1.1. Options on Expiration or Termination for Convenience.** No later than 90 Days prior to the termination of this Agreement by expiration of its term or pursuant to Section 16.1, City will, without limiting other available rights and remedies, have the right to elect between the options set forth below. The exercise by City of any of the options set forth in this Section 16.1 will not be deemed a waiver of its right to exercise any other option provided herein.

    **(a) Removal of Shelters and Kiosks.** Direct Contractor, at Contractor's own expense, to remove Transit Shelters and Kiosks and restore the respective sidewalks and curbs to a condition acceptable to the City within one year of the termination date of this Agreement. If Contractor fails to do so, upon expiration of the year, title to all Structures and Associated Equipment belonging to Contractor will automatically transfer to City, free and clear of any encumbrances, without the need for execution of any further documentation of such transfer. Should City wish to remove any remaining Shelters or Kiosks and restore the sidewalks and curbs to their proper condition, the City may bill Contractor for the cost of the work or recover the cost from Contractor's letter of credit or performance bond. Contractor's maintenance and repair obligations under Section 9, including City's remedies under Sections 9.10 and 14, and Contractor's obligation to maintain its performance bond and letter of credit under Section 13 shall survive termination of this Agreement until Contractor demonstrates satisfactory completion of its removal obligations under this Section; or

    **(b) Transfer of Title.** Direct Contractor, immediately upon receipt from the City of the purchase price as set forth in this Section, to execute all required documents to transfer to the City title to all Shelters, Kiosks, and Associated Equipment free and clear of all encumbrances. The purchase price will be based on the depreciated value of the then-existing Shelters, Kiosks and Associated Equipment. The depreciated value will be determined by calculating 100% of the cost of fabricating and installing the Shelters and Kiosks, as documented in the Annual Financial Reports provided by Contractor pursuant to Section 11.2 and as audited under the authority of Section 11.3.3, less depreciation on a straight line basis from the date of installation, using an annual depreciation rate of 10%. The depreciated value of any remaining Existing Structures owned by Contractor will be determined by City in accordance with the depreciation methodology contained in the appraisal report provided to the City dated November 22, 2006 ("Appraisal Report"). The starting value of the Existing Structures as of the Effective Date will be the value accorded to them in the Appraisal Report.

    **16.2. Default of Contractor.** In the event that Contractor fails to carry out any material term, covenant, condition, or promise herein set forth, the City, without limiting its rights and remedies, may elect among, the following remedies:

    **16.2.1. Termination.** City may give Contractor 30 Days written Notice of Default of this Agreement. If Contractor does not cure the default within 30 Days of the date of the Notice of Default, City may terminate this Agreement in whole or in part by sending a Notice of Termination to Contractor. In the event of termination of the entire Agreement for Contractor's default, the parties agree that City's actual damages in connection with maintaining and repairing Structures would be impracticable and extremely difficult to fix, and that City will be entitled to the immediate payment of the full amount of the letter of credit provided in Section 13.2 as liquidated damages. The provision of liquidated damages for the City's costs to maintain and repair Structures will not impair the City's entitlement to actual damages for other consequences of Contractor's default.



**Municipal Transportation Agency**
Board of Directors & Parking Authority

 

**16.2.2. Valuation of Property.** Upon termination following a default, the City may direct Contractor, immediately upon receipt of payment from the City, to execute all required documents to transfer to the City title to all Shelters, Kiosks, and Associated Equipment free and clear of all encumbrances. The purchase price will be based on the depreciated value of the then existing Shelters, Kiosks and Associated Equipment. If the termination occurs within five years of the Effective Date, the depreciated value will be determined by calculating 25% of the cost of fabricating and installing the Shelters and Kiosks, as documented in the Annual Financial Reports provided by Contractor under Section 11.2 and as audited under the authority of Section 11.3.3, less depreciation on a straight line basis from the date of installation, using an annual depreciation rate of 10%. If the termination occurs more than five years after the Effective Date, the depreciated value will be determined by calculating 50% of the cost of fabricating and installing the Shelters and Kiosks, as documented in the Annual Financial Report provided by Contractor under Section 11.2 and as audited under the authority of Section 11.3.3, less depreciation on a straight line basis from the date of installation, using an annual depreciation rate of 10%. The depreciated value of any Existing Shelters and Kiosks will be determined by the City as stated in Section 16.1.1(b). In addition, Contractor shall assign to the City all outstanding advertising contracts as of the date of termination.

**16.2.3. Port's Remedies.** In the event that Contractor fails to carry out any term, covenant, condition or promise of this Agreement with respect to Shelters or Kiosks located on Port property, Port will so notify Contractor and SFMTA in writing. In the event Contractor fails to cure the default with 30 Days of Port's written notice, then Port, without limiting any of SFMTA's remedies set forth above, may (i) terminate Contractor's right to place print advertising on Shelters or Kiosks on property within Port jurisdiction, (ii) terminate Contractor's duty to install Shelters or Kiosks on such property, and (iii) may require Contractor to remove any Shelters and Kiosks located on such Port property in accordance with the provisions of Section 16.1(a) or (iv) may seek damages in accordance with the provisions of Section 16.2.4. With respect to SFMTA-owned Shelters located on Port property, Port may seek damages in accordance with the provisions of Section 16.2.4. Notwithstanding the foregoing, Port may only seek termination of Contractor's advertising rights on Port property with concurrence of the SFMTA and has no power to terminate the Agreement in its entirety.

**16.2.4. Actual Damages.** In the event that City elects not to terminate the Agreement after serving a Notice of Default of this Agreement, City will be entitled to recover from Contractor any loss or damage that City may have incurred by reason of Contractor's default.

**16.2.5. Non-exclusive Remedies.** The exercise of the remedies provided for in this Section will be cumulative and will in no way affect any other remedy available under the law to City.

**16.3. Protection of City Property.** Upon receiving a Notice of Termination from City, Contractor shall take such action as may be necessary, or as the City may direct, for the protection and preservation of any property related to this Agreement which is in the possession of Contractor and in which City has or may acquire an interest.

**16.4. Relocation and Termination; Waiver of Rights.** Contractor acknowledges that this Agreement includes provisions granting to City, subject to certain terms and conditions, the right to order the removal and relocation of a limited number of Structures and, subject to certain terms and conditions, the right to terminate the Agreement and upon such termination to order the removal of all Shelters and Kiosks. Contractor fully waives, releases and relinquishes forever any and all claims, demands, rights and causes of action that it may have against the City under the Outdoor Advertising Act (Business and Professions Code, §§ 5200, et seq.), any amendments thereto or other future laws, for any compensation from City not otherwise provided for herein, including the



payment of just compensation, as defined in the eminent domain law (Title 7, commencing with Section 1230.010, of Part 3 of the Code of Civil Procedure), in the event City lawfully exercises any such rights in accordance with the provisions of this Agreement.

**16.5.  Survival.** Section 16 and the following Sections of this Agreement shall survive termination or expiration of this Agreement: 1.3 ["Agreement"], 1.8 ["Carryover Contract"], 1.9 ["City"], 1.23 ["Gross Revenues"], 1.28 ["MAG"], 1.33 ["Port"], 1.34 ["Proposal"], 1.36-1.38 ["Records", "RFP", "SFMTA"], 1.48 ["Unavoidable Delay"], 2.3 [Carryover Contracts], 3 [Ownership of Structures], 4.2.3 (b) and (d) [Removal or Relocation of Kiosks and Shelters-Costs and Time for Relocation], 7.1(b)(iv) [MAG], 7.1(c) [Revenue Share], 7.2 [Late Payments], 9.8.6 [Ownership (of data in IMCDS)], 11.3.1 [Records], 11.3.2 [City's Right to Inspect and Copy], 12.1.4 [Claims-Made (Insurance) Coverage], 12.2 [Indemnification], 13 [Security Deposits (Performance Bond and Letter of Credit)], 14 [Liquidated Damages], 21.4 [Notices], 21.5 [Bankruptcy or Reorganization Proceedings], 21.6 [Non-Waiver of Rights], 21.9 [Taxes], 21.19 [Proprietary or Confidential Information], 21.23 [Protection of Private Information], 21.26 [Attorney's Fees], 21.34 [Submitting False Claims.

**16.6.  Cooperation.** In the event of termination of this Agreement for any reason, Contractor shall cooperate fully in any transition of the contract to a new vendor. In the event that the City elects to acquire title to Shelters, Kiosks, and Associated Equipment, and upon request by City, Contractor shall provide City with complete records related to the installation, design, construction, maintenance, relocation and/or removal of each individual Shelter and Kiosk.

# 17. SMALL BUSINESS PARTICIPATION; EMPLOYMENT REQUIREMENTS

**17.1.  SBE GOAL.** In accordance with the mutual commitment of the parties to encourage the use of Small Business Enterprises (SBE) in performing work or supplying materials and services under this Agreement, Contractor shall comply with SBE goals as follows:

**17.1.1.  Commitment.** To the extent that Contractor procures supplies or services in connection with this Agreement, or subcontracts or joint ventures work under this Agreement, Contractor agrees to achieve an SBE participation goal ("SBE Goal") of at least 15% of the total dollar amount of said purchasing, subcontracting or joint venturing. Contractor further shall encourage advertisers and advertising agencies to utilize SBEs. Information pertaining to SBEs is available at the following: S.F. Human Rights Commission's website at www.sfhrc.org for the City's Local Business Enterprise Directory, the California Unified Certification Program (CUCP) federally certified Disadvantaged Business Enterprise database at http://www.dot.ca.gov/ucp/GetLicenseForm.do; and the State of California certified small business database at http://www.pd.dgs.ca.gov/smbus/default.htm. Contractor may also obtain information from the Contract Compliance Office ("CCO") of the SFMTA, at One South Van Ness Ave., 3rd floor, San Francisco, CA  94103, Phone: 415- 701-4443.

**17.1.2.  Nature of SBE Participation.** SBE participation includes contracts with SBEs for any goods or services specifically required for the completion of the SBE Work. An SBE may participate as a prime contractor, subcontractor, joint venture partner with a prime contractor, or a supplier of materials or equipment to fulfill the SBE goal for the SBE Work.

**17.1.3.  Function.** An SBE must perform a commercially useful function, i.e., must be responsible for the execution of a distinct element of work and must carry out its responsibility by actually performing, managing and supervising the work. However, an SBE may contract out a portion of the work if it is considered to be a normal industry practice. If an SBE subcontracts a significantly greater portion of the work of the contract than would be expected on the basis of



**Municipal Transportation Agency**
Board of Directors & Parking Authority

normal industry practices, the SBE shall be presumed not to be performing a commercially useful function.

**17.1.4. Determining the Amount of SBE Participation.** Within 30 Days of the Effective Date, the Contractor shall submit to the CCO a projection of the total dollar value of subcontracting opportunities over the term of the Agreement, along with a projection of the dollar amount of overall SBE participation. With its projection, Contractor shall specify the names of SBE contractors it anticipates using to fulfill its SBE Goal. The Contractor shall meet with the CCO on a quarterly basis to review and update the projection of subcontracting and make any revisions necessary to achieve the SBE Goal. The CCO shall make the final determination as to the level of SBE participation that may be counted toward fulfilling the SBE Goal.

**(a) SBE Prime Contractor.** Count the entire dollar amount of the work performed or services provided by the SBE's own forces, including the cost of materials and supplies obtained for the work and the reasonable fees and commissions charged for the services. Do not count any work subcontracted to another firm as SBE participation by the SBE Prime Contractor.

**(b) SBE Subcontractor.** Count the entire amount of the work performed or services provided by the SBE's own forces, including the cost of materials and supplies obtained for the work (except for materials and supplies purchased or leased from the Prime Consultant or supplier) and reasonable fees and commissions charged for the services. Do not count any work subcontracted by an SBE subcontractor to another firm as SBE participation by said SBE subcontractor. If the work has been subcontracted to another SBE, it will be counted as SBE participation by that other SBE.

**(c) SBE Joint Venture Partner.** Count the portion of the work that is performed solely by the SBE's forces or if the work is not clearly delineated between the SBE and the joint venture partner, count the portion of the work equal to the SBE's percentage of ownership interest in the joint venture.

**(d) Other SBEs.** Count the entire amount of fees or commissions charged for assistance in procuring or delivering materials and supplies when purchased from an SBE that is not a manufacturer or Regular Dealer. Do not count the cost of the materials and supplies.

**(e) Materials or Supplies.** Count expenditures with SBEs for materials or supplies toward SBE goals as follows:

**(i)** If the materials or supplies are obtained from an SBE Manufacturer, count 100% of the cost of the materials or supplies toward SBE goals.

**(ii)** For purposes of this paragraph (e)1(i), an SBE Manufacturer is a firm that operates or maintains a factory or establishment that produces, on the premises, the materials, supplies, articles, or equipment required under the contract and of the general character described by the specifications.

**(iii)** If the materials or supplies are purchased from an SBE Regular Dealer, count 60% of the cost of the materials or supplies toward SBE goals.

**(iv)** For purposes of this Section, a Regular Dealer is a firm that owns, operates, or maintains a store, warehouse, or other establishment in which the materials, supplies, articles or equipment of the general character described by the specifications and required under the contract are bought, kept in stock, and regularly sold or leased to the public in the usual course of business.

**17.1.5. Substitution of Subcontractor and Suppliers.** The Contractor may not terminate an SBE subcontractor or supplier for convenience and then perform the work with its



own forces unless the Contractor first reviews the reasons for such decision with the CCO and receives the approval of the CCO. The CCO's approval may not be unreasonably withheld. In other situations, the Contractor must make good faith efforts to substitute another SBE for an original SBE subcontractor or supplier when the original SBE subcontractor or supplier is terminated or fails to complete the work on the contract. The Contractor will notify SFMTA in writing of any request to substitute an SBE subcontractor or supplier and provide the CCO with any documentation requested to support the substitution. The CCO must approve the request in writing in order for the substitution to be valid. The substitution may also have to be approved by the SFMTA Board of Directors.

    **17.1.6. Addition of Subcontractors and Suppliers.** The Contractor shall notify the CCO prior to any addition of an SBE or non-SBE subcontractor or supplier to the Agreement and submit MTA Form No. 4 (Subcontractor Participation Declaration) from each new subcontractor or supplier. Any new SBE subcontractor or supplier approved by the CCO also must submit an MTA Form No. 5. MTA Form No. 4 and MTA Form No. 5 are attached as Exhibit N.

    **17.1.7. Reporting Requirements.** The Contractor will submit to the CCO copies of all signed subcontractor and supplier agreements or purchase orders within 10 Days of their execution. The Contractor shall maintain records of all SBE participation in the performance of the contract, including subcontracts entered into with certified SBEs and all materials purchased from certified SBEs. The Contractor shall submit SBE participation reports to City on a quarterly basis, or as otherwise directed by City. The reports shall identify the name and address of each SBE performing work on the project, and show the total dollar amount requested for payment and the total dollar amount actually paid to each SBE. Within 30 Days of completion of the subcontract or purchase order, or as otherwise directed by the CCO, the Contractor will submit a final summary SBE report to the CCO.

    **17.1.8. Enforcement.** In order to establish its SBE program at the earliest possible date, Contractor shall designate an employee or consultant to act as a coordinator of Contractor's SBE obligations. Contractor's failure to make a good faith effort, as determined by the CCO, to attain and maintain the SBE goals set forth above will constitute a material breach of contract and in the event said breach is not cured within 60 Days from receipt of written notice of said breach, City will be entitled to have and elect among any of the remedies set forth in Section 16.3.

    **17.2. Employment Requirements.** Contractor shall make good faith efforts to eradicate and prevent barriers to equal opportunity. The Contractor shall use the services of CityBuild in the Mayor's Office of Economic and Workforce Development and Young Community Developers (or other community-based organization approved by the City) to broaden the pool of qualified candidates to include minorities and women for employment by Contractor and its subcontractors.

    **17.2.1. Reporting Requirements.** The Contractor will maintain Records on its labor force, including a record of all new hires, promotions, terminations and referral sources. The Contractor shall submit quarterly reports updating the information set forth above in a format to be developed by Contractor and the CCO. The Contractor shall require its construction subcontractors to submit monthly workforce reports and weekly submission of certified payroll reports.

    **17.2.2. Enforcement.** Consultant's failure to demonstrate good faith efforts in with respect to recruiting, hiring and promoting qualified workers will constitute a material breach of contract and in the event said breach is not cured within 60 Days from receipt of written notice of said breach, City will be entitled to have and elect among any of the remedies set forth in Section 16.3.

**Municipal Transportation Agency**
Board of Directors & Parking Authority



## 18. REQUIRING MINIMUM COMPENSATION FOR COVERED EMPLOYEES

**18.1.** Notwithstanding any exemptions in the MCO that may preclude application of the MCO to this Contract, Contractor agrees to comply fully with and be bound by all of the provisions of the Minimum Compensation Ordinance (MCO), as set forth in San Francisco Administrative Code Chapter 12P (Chapter 12P), including the remedies provided, and implementing guidelines and rules. The provisions of Chapter 12P are incorporated herein by reference and made a part of this Agreement as though fully set forth. The text of the MCO is available on the web at www.sfgov.org/olse/mco. A partial listing of some of Contractor's obligations under the MCO are set forth in this Section. Contractor is required to comply with all the provisions of the MCO, irrespective of the listing of obligations in this Section. As used in this Section, MCO includes all amendments to the MCO as of the Effective Date of the Agreement.

**18.2.** The MCO requires Contractor to pay Contractor's employees a minimum hourly gross compensation wage rate and to provide minimum compensated and uncompensated time off. The minimum wage rate may change from year to year and Contractor is obligated to keep informed of the then-current requirements. Any subcontract entered into by Contractor shall require the subcontractor to comply with the requirements of the MCO and shall contain contractual obligations substantially the same as those set forth in this Section. It is Contractor's obligation to ensure that any subcontractors of any tier under this Agreement comply with the requirements of the MCO. If any subcontractor under this Agreement fails to comply, City may pursue any of the remedies set forth in this Section against Contractor.

**18.3.** Contractor shall not take adverse action or otherwise discriminate against an employee or other person for the exercise or attempted exercise of rights under the MCO. Such actions, if taken within 90 days of the exercise or attempted exercise of such rights, will be rebuttably presumed to be retaliation prohibited by the MCO.

**18.4.** Contractor shall maintain employee and payroll records as required by the MCO. If Contractor fails to do so, it shall be presumed that the Contractor paid no more than the minimum wage required under State law.

**18.5.** The City is authorized to inspect Contractor's job sites and conduct interviews with employees and conduct audits of Contractor.

**18.6.** Contractor's commitment to provide the Minimum Compensation a material element of the City's consideration for this Agreement. The City in its sole discretion shall determine whether such a breach has occurred. The City and the public will suffer actual damage that will be impractical or extremely difficult to determine if the Contractor fails to comply with these requirements. Contractor agrees that the sums set forth in Section 12P.6.1 of the MCO as liquidated damages are not a penalty, but are reasonable estimates of the loss that the City and the public will incur for Contractor's noncompliance. The procedures governing the assessment of liquidated damages shall be those set forth in Section 12P.6.2 of Chapter 12P.

**18.7.** Contractor understands and agrees that if it fails to comply with the requirements of the MCO, the City shall have the right to pursue any rights or remedies available under Chapter 12P (including liquidated damages), under the terms of the contract, and under applicable law. If, within 30 days after receiving written notice of a breach of this Agreement for violating the MCO, Contractor fails to cure such breach or, if such breach cannot reasonably be cured within such period of 30 days, Contractor fails to commence efforts to cure within such period, or thereafter fails diligently to pursue such cure to completion, the City shall have the right to pursue the following rights or remedies and any rights or remedies available under applicable law:

**Municipal Transportation Agency**
Board of Directors & Parking Authority



**18.8.**    Contractor represents and warrants that it is not an entity that was set up, or is being used, for the purpose of evading the intent of the MCO.

**18.9.**    If Contractor is exempt from the MCO when this Agreement is executed because the cumulative amount of agreements with this department for the fiscal year is less than $25,000, but Contractor later enters into an agreement or agreements that cause contractor to exceed that amount in a fiscal year, Contractor shall thereafter be required to comply with the MCO under this Agreement. This obligation arises on the effective date of the agreement that causes the cumulative amount of agreements between the Contractor and this department to exceed $25,000 in the fiscal year.

## 19. REQUIRING HEALTH BENEFITS FOR COVERED EMPLOYEES

**19.1.**    Notwithstanding any exemptions in the HCAO that may preclude application of the HCAO to this Agreement, Contractor shall comply fully with and be bound by all of the provisions of the Health Care Accountability Ordinance (HCAO), as set forth in San Francisco Administrative Code Chapter 12Q, including the remedies provided, and implementing regulations, as the same may be amended from time to time. The provisions of Chapter 12Q are incorporated by reference and made a part of this Agreement as though fully set forth herein. The text of the HCAO is available on the web at www.sfgov.org/olse. Capitalized terms used in this Section and not defined in this Agreement shall have the meanings assigned to such terms in Chapter 12Q.

**19.1.1.**    For each Covered Employee, Contractor shall provide the appropriate health benefit set forth in Section 12Q.3 of the HCAO. If Contractor chooses to offer the health plan option, such health plan shall meet the minimum standards set forth by the San Francisco Health Commission.

**19.1.2.**    Notwithstanding the above, if the Contractor is a small business as defined in Section 12Q.3(e) of the HCAO, it shall have no obligation to comply with part (a) above.

**19.1.3.**    Contractor's failure to comply with the HCAO shall constitute a material breach of this agreement. City shall notify Contractor if such a breach has occurred. If, within 30 Days after receiving City's written notice of a breach of this Agreement for violating the HCAO, Contractor fails to cure such breach or, if such breach cannot reasonably be cured within such period of 30 Days, Contractor fails to commence efforts to cure within such period, or thereafter fails diligently to pursue such cure to completion, City shall have the right to pursue the remedies set forth in 12Q.5.1 and 12Q.5(f)(1-6). Each of these remedies shall be exercisable individually or in combination with any other rights or remedies available to City.

**19.1.4.**    Any Subcontract entered into by Contractor shall require the Subcontractor to comply with the requirements of the HCAO and shall contain contractual obligations substantially the same as those set forth in this Section. Contractor shall notify City's Office of Contract Administration when it enters into such a Subcontract and shall certify to the Office of Contract Administration that it has notified the Subcontractor of the obligations under the HCAO and has imposed the requirements of the HCAO on Subcontractor through the Subcontract. Each Contractor shall be responsible for its Subcontractors' compliance with this Chapter. If a Subcontractor fails to comply, the City may pursue the remedies set forth in this Section against Contractor based on the Subcontractor's failure to comply, provided that City has first provided Contractor with notice and an opportunity to obtain a cure of the violation.

**19.1.5.**    Contractor shall not discharge, reduce in compensation, or otherwise discriminate against any employee for notifying City with regard to Contractor's noncompliance or anticipated noncompliance with the requirements of the HCAO, for opposing any practice proscribed

**Municipal Transportation Agency**
Board of Directors & Parking Authority



by the HCAO, for participating in proceedings related to the HCAO, or for seeking to assert or enforce any rights under the HCAO by any lawful means.

**19.1.6.** Contractor represents and warrants that it is not an entity that was set up, or is being used, for the purpose of evading the intent of the HCAO.

**19.1.7.** Contractor shall maintain employee and payroll records in compliance with the California Labor Code and Industrial Welfare Commission orders, including the number of hours each employee has worked on the City Contract.

**19.1.8.** Contractor shall keep itself informed of the current requirements of the HCAO.

**19.1.9.** Contractor shall provide reports to the City in accordance with any reporting standards promulgated by the City under the HCAO, including reports on Subcontractors and Subtenants, as applicable.

**19.1.10.** Contractor shall provide City with access to records pertaining to compliance with HCAO after receiving a written request from City to do so and being provided at least ten business days to respond.

**19.1.11.** Contractor shall allow City to inspect Contractor's job sites and have access to Contractor's employees in order to monitor and determine compliance with HCAO.

**19.1.12.** City may conduct random audits of Contractor to ascertain its compliance with HCAO. Contractor shall cooperate with City when it conducts such audits.

**19.1.13.** If Contractor is exempt from the HCAO when this Agreement is executed because its amount is less than $25,000.00 ($50,000.00 for nonprofits), but Contractor later enters into an agreement or agreements that cause Contractor's aggregate amount of all agreements with City to reach $75,000.00, all the agreements shall be thereafter subject to the HCAO. This obligation arises on the effective date of the agreement that causes the cumulative amount of agreements between Contractor and the City to be equal to or greater than $75,000.00 in the fiscal year.

## 20. OTHER OPTIONS.

**20.1. Bicycle-Sharing Program.** After completion of environmental review of the City's Bicycle Plan, City, in its sole discretion, may exercise an option to negotiate in good faith for Contractor to implement, on an exclusive basis, a bicycle-sharing program to make bicycles available at selected transit stops through a pre-paid option similar to car-sharing business models. Such a bicycle-sharing program shall not have the effect of reducing any of the payments due to the SFMTA under Section 7 of this Agreement. Should the parties reach agreement, the agreement shall be reflected in an amendment to this Agreement, which will be subject to approval by the SFMTA Board and Board of Supervisors. If the parties fail to reach agreement on an amendment within 180 Days of the exercise of the option to negotiate (unless such time is extended by the SFMTA), the City shall have no further obligation to negotiate with Contractor for implementation of a bicycle-sharing program.

**20.2. Canopies over Subway Entrances.** During the term of this Agreement, City may exercise an option to negotiate in good faith for Contractor to design, install and maintain canopies over entrances to one or more subway stations in San Francisco. Should the parties reach agreement, the agreement shall be reflected in an amendment to this Agreement, which will be subject to approval by the SFMTA Board and Board of Supervisors. Exercise of such an option will also be subject to the approval and participation of the San Francisco Bay Area Rapid Transit District. If the

**Municipal Transportation Agency**

Board of Directors & Parking Authority



parties fail to reach agreement on an amendment within 180 Days of the exercise of the option to negotiate (unless such time is extended by the SFMTA), the City shall have no further obligation to negotiate with Contractor for design and installation of canopies.

## 21. MISCELLANEOUS CONTRACT PROVISIONS

**21.1.    San Francisco Office.**  Contractor shall maintain a fully staffed business office within the City and County of San Francisco in order to facilitate coordination between City and Contractor.

**21.2.    Qualified Personnel.**  This Agreement shall be performed only by competent personnel under the supervision of and in the employment of Contractor.  Contractor will comply with City's reasonable requests regarding assignment of personnel, but all personnel, including those assigned at City's request, must be supervised by Contractor.  Contractor shall commit adequate resources to complete the project within the deadlines specified in this Agreement, and shall meet the staffing commitments made in its Proposal.

**21.3.    Subcontractors.**  City grants Contractor the authority to hire such subcontractors as Contractor deems necessary to fulfill the requirements detailed in this agreement, provided:

**21.3.1.**  No substitution of a subcontractor that is certified as an SBE may be made at any time without the written consent of City; and

**21.3.2.**  If an SBE subcontractor is unable to perform successfully and is to be replaced, Contractor will be required to make good faith efforts to replace the original SBE subcontractor with another SBE subcontractor.

**21.4.    Notices.**  Unless otherwise indicated elsewhere in this Agreement, all written communications sent by the parties may be by electronic mail, with a copy by U.S. mail or by fax, and shall be addressed as indicated below.  The City will designate electronic mail addresses. Contractor shall provide the SFMTA with a copy of any notice or other communication it provides to any other City department or public entity in connection with its activities under this Agreement. Notices to the SFMTA shall be addressed by first class mail or facsimile as follows:

To City:          San Francisco Municipal Transportation Agency
                  Real Estate Division
                  One South Van Ness Ave. 7th floor
                  San Francisco, California 94103
                  Fax: (415) 701-4341

with a copy to:
                  San Francisco Municipal Transportation Agency
                  Attn: Contracts and Procurements
                  One South Van Ness Ave. 7th floor
                  San Francisco, California 94103

To Contractor:    Clear Channel Outdoor
                  President/General Manager
                  555 12th Street, Suite 950
                  Oakland, CA 94607
                  Fax: (510) 834-9410