# LEASE AGREEMENT

# FOR THE

# AIRPORT ADVERTISING PROGRAM

## AT

# SAN FRANCISCO INTERNATIONAL AIRPORT

by and between

**Transportation Media**
**Division of Eller Media Company,**
**A Corporation organized under the laws of the**
**State of Delaware**

as Tenant

and

# CITY AND COUNTY OF SAN FRANCISCO
# ACTING BY AND THROUGH ITS AIRPORT COMMISSION,
as landlord

Mayor Willie L. Brown, Jr.

**AIRPORT COMMISSION**
Hon. Henry E. Berman, President
Hon. Larry Mazzola, Vice President
Hon. Michael S. Strunsky
Hon. Linda S. Crayton
Hon. Caryl Ito

John L. Martin
Airport Director
December 2000
Lease No. 00-0408

# TABLE OF CONTENTS

MAJOR LEASE TERM SUMMARY ............................................................................ i

1.  PREMISES ............................................................................................................ 1
    1.1   Extent of Leasehold ................................................................................ 2
    1.2   Relocation, Expansion, Contraction, City's Termination Right ............ 3
    1.3   Remeasurement of Premises .................................................................. 3
    1.4   Changes to Airport ................................................................................. 4
    1.5   Common Areas ....................................................................................... 4
2.  TERM .................................................................................................................... 4
    2.1   Commencement and Expiration .............................................................. 5
    2.2   City's Right to Extend Term .................................................................. 5
    2.3   Holding Over .......................................................................................... 5
3.  USE AND OPERATION ....................................................................................... 5
    3.1   Permitted Use ......................................................................................... 5
    3.2   No Exclusivity ........................................................................................ 5
    3.3   Operation of Business ............................................................................ 5
    3.4   Operational Standards ............................................................................ 6
    3.5   Use of Premises ...................................................................................... 6
    3.6   Hours of Operation ................................................................................. 6
    3.7   References to Airport ............................................................................. 6
    3.8   Other Operational Requirements ........................................................... 7
    3.9   Prohibited Activities .............................................................................. 8
    3.10  Audit of Operations ............................................................................... 8
    3.11  Representative of Tenant ........................................................................ 8
    3.12  Investigation Reports ............................................................................. 8
    3.13  Compliance with Laws ........................................................................... 8
    3.14  Fuel System ............................................................................................ 9
4.  RENT .................................................................................................................... 9
    4.1   Definitions .............................................................................................. 9
    4.2   Adjustments to Minimum Annual Guarantee ........................................ 10
    4.3   Monthly Rent Payments ......................................................................... 10
    4.4   Sales Reports .......................................................................................... 10
    4.5   Annual Report and Adjustment .............................................................. 11
    4.6   Books and Records; Audit Rights .......................................................... 12
    4.7   Other Reports and Submissions ............................................................. 12
    4.8   Additional Rent ...................................................................................... 12
    4.9   Prepay Rent ............................................................................................ 12
    4.10  Nature of Lease ......................................................................................
    4.11  Lease Initiation Fee ...............................................................................
5.  ASSIGNMENT OR SUBLETTING ..................................................................... 13
    5.1   No Assignment ....................................................................................... 13
    5.2   Changes in Tenant .................................................................................. 13
    5.3   No Release .............................................................................................. 13
    5.4   Subleasing in General ............................................................................ 14
    5.5   Acceptance of Rent ................................................................................ 14
    5.6   Waiver .................................................................................................... 14
6.  TAXES, ASSESSMENTS AND LIENS ............................................................... 14
    6.1   Taxes ...................................................................................................... 14
    6.2   Other Liens ............................................................................................. 14
7.  INVESTMENTS; ALTERATIONS ...................................................................... 15
    7.1   City's Approval Rights ........................................................................... 15
    7.2   Structures and Fixtures .......................................................................... 16
    7.3   Notice and Permits ................................................................................. 16
    7.4   Title to Alterations ................................................................................. 16
    7.5   Effect of Alterations on Airport ............................................................ 16

8. UTILITIES .................................................................................................... 16
    8.1    Services Provided ................................................................................ 16
    8.2    Utility Costs ........................................................................................ 16
    8.3    Shared Telecommunications Services ................................................ 17
    8.4    Waiver of Damages ............................................................................ 
9. MAINTENANCE AND REPAIR ................................................................... 17
    9.1    "As-Is" Condition ............................................................................... 17
    9.2    Tenant's Maintenance Obligations ..................................................... 18
10. SIGNS AND ADVERTISING ....................................................................... 18
11. WAIVER; INDEMNITY; INSURANCE ......................................................... 18
    11.1    Waiver ................................................................................................ 18
    11.2    Indemnity ........................................................................................... 18
    11.3    Losses ................................................................................................. 18
    11.4    Notice ................................................................................................. 19
    11.5    Insurance ............................................................................................ 19
    11.6    Form of Policies ................................................................................. 20
    11.7    Delivery of Policies or Certificates .................................................... 20
    11.8    Subrogation ........................................................................................
12. DEPOSIT ..................................................................................................... 20
    12.1    Form of Deposit ................................................................................. 20
    12.2    Use of Deposit ................................................................................... 20
    12.3    Other Agreements .............................................................................. 21
13. DAMAGE OR DESTRUCTION ................................................................... 21
    13.1    Partial Destruction of Premises ......................................................... 21
    13.2    Total Destruction of Premises ........................................................... 22
    13.3    Partial Destruction of Terminal Building ........................................... 22
    13.4    Damage Near End of the Term ........................................................... 22
    13.5    No Abatement of Rent; Tenant's Remedies ....................................... 22
14. DEFAULT; REMEDIES ............................................................................... 22
    14.1    Event of Default ................................................................................. 23
    14.2    Statutory Notices ................................................................................ 24
    14.3    Remedies ............................................................................................ 25
    14.4    City's Right to Perform ...................................................................... 26
    14.5    Rights Related to Termination ............................................................ 26
    14.6    Cumulative Rights .............................................................................. 26
    14.7    Prepayment ........................................................................................ 26
    14.8    Fines .................................................................................................. 27
    14.9    City Lien ............................................................................................ 27
    14.10    Commencement of Legal Actions ...................................................... 27
    14.11    Waiver of Notice ................................................................................ 27
15. SURRENDER ...............................................................................................
16. HAZARDOUS MATERIALS ........................................................................ 28
    16.1    Definitions .......................................................................................... 28
    16.2    Tenant's Covenants ............................................................................ 28
    16.3    Environmental Indemnity ................................................................... 29
    16.4    Environmental Audit .......................................................................... 29
    16.5    Closure Permit ...................................................................................
17. EMINENT DOMAIN .................................................................................... 29
    17.1    Definitions .......................................................................................... 29
    17.2    General ............................................................................................... 29
    17.3    Total Taking; Automatic Termination ................................................ 29
    17.4    Partial Taking; Election to Terminate ................................................ 29
    17.5    Tenant Monetary Obligations; Award ................................................ 30
    17.6    Partial Taking; Continuation of Lease ............................................... 30
    17.7    Temporary Takings ............................................................................ 30

18. CITY AND OTHER GOVERNMENTAL PROVISIONS

18.1    MacBride Principles – Northern Ireland ................................................ 30
18.2    Charter .................................................................................................... 31
18.3    Tropical Hardwood and Virgin Redwood Ban ........................................ 31
18.4    No Representations ................................................................................. 31
18.5    Effect of City Approvals ......................................................................... 31
18.6    Limitation on Damages .......................................................................... 31
18.7    Sponsor's Assurance Agreement ........................................................... 31
18.8    Federal Nondiscrimination Regulations ................................................ 32
18.9    Federal Affirmative Action Regulations ............................................... 32
18.10   City's Nondiscrimination Ordinance ...................................................... 33
18.11   Conflict of Interest ................................................................................. 33
18.12   Prevailing Wages ................................................................................... 33
18.13   Declaration Regarding Airport Private Roads ....................................... 33
18.14   No Relocation Assistance; Waiver of Claims ......................................... 33
18.15   Drug-Free Workplace ............................................................................. 34
18.16   Compliance with Americans With Disabilities Act ................................. 34
18.17   Sunshine Ordinance ............................................................................... 34
18.18   Tenant's Utilization of MBE/WBE/LBE ................................................. 34
18.19   Pesticide Prohibition .............................................................................. 35
18.20   First Source Hiring Ordinance .............................................................. 35
18.21   Resource Efficiency Ordinance .............................................................. 35
18.22   Labor Peace/Card Check Rule ............................................................... 35

19. GENERAL PROVISIONS ................................................................................... 35

19.1    Notices ................................................................................................... 36
19.2    No Implied Waiver ................................................................................. 36
19.3    Entire Agreement .................................................................................. 36
19.4    Amendments .......................................................................................... 36
19.5    Interpretation of Lease ......................................................................... 36
19.6    Successors and Assigns .......................................................................... 37
19.7    No Third-Party Beneficiaries ................................................................ 37
19.8    No Joint Venture ................................................................................... 37
19.9    Brokers .................................................................................................. 37
19.10   Severability ............................................................................................ 37
19.11   Governing Law ....................................................................................... 37
19.12   Attorneys' Fees ...................................................................................... 37
19.13   Cumulative Remedies ............................................................................ 37
19.14   Time of Essence ..................................................................................... 37
19.15   Reservations by City .............................................................................. 38
19.16   Survival ................................................................................................. 38
19.17   Quiet Enjoyment and Title .................................................................... 38
19.18   No Right of Redemption ........................................................................ 38
19.19   Accord and Satisfaction ......................................................................... 39
19.20   Joint and Several Liability ..................................................................... 39
19.21   Estoppel Statements .............................................................................. 39
19.22   Authority ............................................................................................... 39
19.23   Consents ................................................................................................. 39
19.24   Counterparts .......................................................................................... 39
19.25   Lease to be Signed ................................................................................. 39

Signature Page .................................................................................................. 40
List of Exhibits .................................................................................................. 41

# LEASE AGREEMENT
## FOR THE
## AIRPORT ADVERTISING PROGRAM
## AT SAN FRANCISCO INTERNATIONAL AIRPORT

## MAJOR LEASE TERM SUMMARY

For the convenience of Tenant and City (as such terms are defined below), this Major Lease Term Summary (this "**Summary**") summarizes certain terms of this Lease (as defined below). This Summary is not intended to be a detailed or complete description of this Lease, and reference must be made to the other Sections below for the particulars of this Lease. In the event of any inconsistency between the terms of this Summary and any other provision of this Lease, such other provision shall prevail. Capitalized terms used elsewhere in this Lease and not defined elsewhere shall have the meanings given them in this Summary.

**Effective Date:** _____ APR 2 0 2001 _____, 2001

**Tenant:** Transportation Media,
Division of Eller Media Company
A corporation organized under the laws of the state of Delaware.

**Tenant's Notice Address:** 710 North Dearborn
Chicago, IL 60610
Att'n: Sam Hart, Manager – Airport Relations
Fax No. (312) 642 - 7378
Tel. No. (312) 475 - 3500.

**City:** The City and County of San Francisco, a municipal corporation, acting by and through its Airport Commission.

**City's Notice Address:** San Francisco International Airport
International Terminal, 5th Floor
P.O. Box 8097
San Francisco, CA 94128
Att'n: Airport Director
Fax No. (650) 821-5005
Tel. No. (650) 821-5000

**Premises:**
(§ 1) Limited areas within Airport parking structures, parking elevator cores, transit stations, shuttle bus interiors, non-terminal bus shelters, connector tunnels, including parking area connector tunnels, the rental car center, and, as to silent monitors, International Terminal Hold Rooms, and other areas as described in more detail in *Exhibit A*.

**Term:**
(§ 2) Five (5) years, with **three (3)** one-year options exercisable at the Airport Commission's sole option, commencing on the Commencement Date.

| | |
|---|---|
| **Commencement Date:** (§ 2.1) | The earlier of: (a) the date on which any Advertising Equipment is installed; and (b) April 1, 2001. |
| | APR 1 2001 _____ (actual date to be inserted upon determination) |
| **Expiration Date:** (§ 2) | 11:59 p.m. on the day before the **fifth (5th)** anniversary of the Commencement Date. |
| | MAR 3 1 2006 _____ (actual date to be inserted upon determination) |
| **Permitted Use:** (§ 3) | On a non-exclusive basis, Tenant shall install, manage, operate, maintain and display commercial advertising using various media types as generally found in airports and approved by the Director (the "**Advertising Equipment**"). |
| | All Advertising Equipment and content must be approved by the Director before being installed in each location. All advertising content must satisfy the requirements of the Airport's Advertising Standards Policy, which is described in more detail in *Exhibit B*, as the same may be amended from time to time. |
| **Base Rent:** (§ 4) | Per Lease Year (as defined below), the *higher* of: (1) the Minimum Annual Guarantee; and (2) 70% of Gross Receipts achieved with respect to such Lease Year. |
| **Lease Initiation Fee:** (§ 4) | **Four Million and Fifty Thousand Dollars ($4,050,000)** |
| **Lease Year:** (§ 2, 4) | The period commencing on the Commencement Date and terminating on the day before the first MAG Adjustment Date (as defined below), and each subsequent 12-month period, commencing on each MAG Adjustment Date and expiring on the day before the subsequent MAG Adjustment Date, or expiring on the Expiration Date, as the case may be. |
| **Minimum Annual Guarantee:** (§ 4) | **Four Million and Fifty Thousand Dollars ($4,050,000)** (the "**Initial MAG**"), subject to adjustments as described below. |
| **MAG Adjustment Date:** (§ 4) | The first anniversary of the Commencement Date, or the first day of the first calendar month following such anniversary if the Commencement Date does not fall on the first day of a calendar month, and each anniversary of such adjustment date thereafter. |
| | APR 1 2001 _____ (actual date to be inserted upon determination) |

**Rent:**
(§ 4)

Base Rent, together with all other amounts owing by Tenant to City hereunder.

**Deposit Amount:**
(§ 12)

_____ **Two Million Twenty- Five Thousand**

**Dollars ($_____2,025,000)** (subject to adjustment).

**Advertising Improvements and Investments:**
(§ 7)

Tenant shall comply with Airport Architectural Standards and processes for approval. Further, Tenant shall provide, install and maintain the Advertising Equipment at its sole cost and expense.

**Resolution:**

**Number 00-0408**, approved by the Airport Commission on **November 21, 2000**

**Initial Tenant Representative:**
(§ 3.11)

**Sam Hart, Manager – Airport Relations**
**Tel. No. (312) 475 - 3500**

**Exhibits:**

Exhibit A – Description of Premises, Diagrams and Pictures
Exhibit B – Airport Advertising Standards
Exhibit C – Form of Commencement Date Acknowledgement
Exhibit D – Construction Period Operation
Exhibit E – Initial Improvements
Exhibit F – Deposit Form

All such exhibits are incorporated into this Lease and made a part hereof.

Initial of Authorized Representative of City _____

Initial of Authorized Representative of Tenant _____

# LEASE AGREEMENT
## FOR THE
## AIRPORT ADVERTISING PROGRAM
## AT SAN FRANCISCO INTERNATIONAL AIRPORT

THIS LEASE AGREEMENT (this "**Lease**"), dated as of the Effective Date, is entered into by and between Tenant, and the City and County of San Francisco, a municipal corporation ("**City**"), acting by and through its Airport Commission ("**Commission**"). This Lease is made with reference to the following facts:

A. City owns the San Francisco International Airport (the "**Airport**") located in the County of San Mateo, State of California, which Airport is operated by and through the Commission, the chief executive officer of which is the Airport Director ("**Director**"). The Airport's "**Terminal Building Complex**" is currently comprised of a North Terminal Building, a Central Terminal Building, and a South Terminal Building, together with connecting concourses, piers, boarding areas and extensions thereof, and satellite buildings now or hereafter constructed. The Central Terminal Building is currently being used for international departures and arrivals. Tenant acknowledges that, from time to time, the Airport undergoes certain construction and renovation projects, and is currently undergoing a master plan expansion program (the "**Master Plan Expansion**"). The Master Plan Expansion includes the construction of a new international terminal (the "**New IT**" or the "**Terminal Building**"). Tenant also acknowledges that the Airport is undergoing a North Terminal Hub/Thumb Expansion, of which the leased premises are affected. Unless otherwise specified, the term "**Airport**", the "**Terminal Building Complex**", or the "**New IT**" as used herein shall mean the Airport, the Terminal Building Complex, or the New IT, respectively, as the same may be expanded, contracted, improved, modified, renovated, or changed in any way, including by the addition of the New IT, together with the land underlying such improvements, and all buildings and improvements thereon and thereto. Unless otherwise specified below, references to the "**City**" shall mean the City, acting by and through its Airport Commission.

B. Tenant desires to provide and operate the service described in the Permitted Use at the Airport, and City has determined that such service would be an accommodation and convenience for airline passengers and the public using the Terminal Building Complex.

C. Following a competitive process, pursuant to Section 2A.173 of the San Francisco Administrative Code, the Commission has determined that Tenant is the highest or best responsible bidder or proposer. Pursuant to the Resolution, Commission has authorized the execution of this Lease by City.

Accordingly, Tenant and City agree as follows:

## 1. PREMISES

1.1 <u>Extent of Leasehold</u>.  On the terms, conditions, and covenants in this Lease, City hereby leases to Tenant and Tenant hereby leases from City, the Premises. In addition, Tenant shall possess the non-exclusive right of ingress and egress to and from the Premises as may be necessary on areas designated by Director, subject to Airport Rules and Regulations, as amended from time to time (as amended, the "**Airport Rules**"), provided that Tenant's exercise of such right shall not impede or interfere unduly with the operation of the Airport by City, its tenants,

customers, and other authorized occupants.   Tenant shall not place or install any racks, stands or other display of merchandise or trade fixtures in any Airport property outside the Premises, without the express prior consent of Director.

     1.2    <u>Relocation, Expansion, Contraction; City's Termination Right.</u>  At any time and from time to time during the Term, City may require that (i) Tenant relocate some or all Advertising Equipment, and surrender all or part of the Premises accordingly (such change to the Premises referred to as a "**Required Relocation**"), and/or (ii) Tenant remove or add Advertising Equipment and contract or expand the Premises accordingly (such change to the Premises referred to as a "**Premises Change**") on the terms set forth in this Section 1.2.  City shall give notice (the "**Change Notice**") setting forth a description of the Required Relocation or the Premises Change, as applicable, the effective date thereof (the "**Date**"), and with respect to a Required Relocation, a description of reasonably comparable replacement locations.  All such Required Relocations and Premises Changes can be accomplished by Airport Director without formal amendment of this Lease.

    (a)  <u>Required Relocation.</u>

      (i)  <u>Notice.</u>  With respect to a Required Relocation, Tenant shall have the right to comment on the proposed replacement locations by giving notice to City within thirty (30) days after receipt of the Change Notice; <u>however</u>, Tenant shall have no approval rights with respect to such replacement locations, and in no event will Tenant have the right to terminate or modify this Lease in the event of any Required Relocation.  On the Date, Tenant shall remove the Advertising Equipment from the original location, surrender the original location in the condition required by this Lease, install replacement Advertising Equipment or media in the replacement premises, and relocate to the replacement premises.  All installation shall be subject to the requirements of Section 7 [Investments; Alterations] hereof.

      (ii)  <u>Maximum Reimbursement.</u>  Prior to such relocation, Tenant shall provide to City a budget for the actual out-of-pocket costs associated with the Required Relocation, which shall not include any "downtime" costs, administrative costs, or costs of new Advertising Equipment or media.  Based on such budget, City shall specify a "Maximum Reimbursement Amount."  Following the relocation, and once City has approved the work, Tenant must submit to City copies of paid invoices showing the costs actually paid by Tenant for the relocation and lien releases from all contractors, subcontractors, and materialmen entitled to payment in connection with such relocation.  Following its review and approval of these submissions, City will reimburse Tenant for all reasonable costs of relocation; <u>provided</u> that in no event will City be required to reimburse Tenant for more than the Maximum Reimbursement Amount and further provided that City may, in City's sole discretion, make such reimbursement by issuing Tenant a rent credit.  In no event will City be obligated to pay or reimburse Tenant for any other costs or expenses, including business interruption costs.

    (b)  <u>Premises Change.</u>

      (i)  <u>Additional Advertising Locations.</u>  With respect to a Premises Change involving the addition of advertising locations, Tenant shall have the right to comment on the proposed new locations by giving notice to City within two (2) days after receipt of the Change Notice; <u>however</u>, Tenant shall have no right to terminate or modify the Lease

– 2 –

in the event of any Premises Change. With regard to a Premises Change involving the addition of advertising locations, on the Date, Tenant shall install new Advertising Equipment/Media in the specified new locations, subject to the requirements of Section 7 [Investments; Alterations] hereof. All such installations shall be performed at Tenant's sole cost and expense. In the event of any Premises Change involving the addition of advertising locations, the Minimum Annual Guarantee will be increased to reflect the number and nature of additional locations.

(ii) <u>Reductions in Number of Advertising Locations.</u> With regard to a Premises Change involving the removal of advertising locations, Tenant shall surrender the location in the condition required by this Lease on the Date. Tenant shall have no comment rights or right to terminate or modify the Lease, nor will Tenant be entitled to any reimbursement for the cost of any such surrender(s). In the event of any Premises Change involving the removal of advertising locations, the Minimum Annual Guarantee will be decreased to reflect the number and nature of reduced locations. Without limiting the generality of the foregoing, Tenant acknowledges that Boarding Area "B", Boarding area "D", and existing Boarding Area "A" may close during the Term, and the number of advertising locations and Minimum Annual Guarantee will be reduced accordingly.

(iii) <u>Addition of Special Advertising Locations or New Medium.</u> Notwithstanding anything to the contrary herein, in the event there is a Premises Change which involves (A) an additional advertising location in an area not covered by the original Premises (such as the terminals), or (B) an advertising medium not offered under the original program, without limiting City's right to approve or disapprove such additional location(s) or mediums, the MAG shall be adjusted as negotiated by Tenant and City at that time.

(c) <u>City's Termination Right.</u> Without limiting City's rights in this Section 1.2, notwithstanding anything to the contrary herein, City shall have the right to terminate this Lease early, in the sole and absolute discretion of the Director, and as provided in this Section 1.2(c). Such early termination shall be accomplished by giving Tenant 30 days prior written notice of City's intent to exercise the right of early termination. In the event of such early termination, City shall reimburse Tenant an amount equal to the unamortized portion of Tenant's out-of-pocket costs incurred in connection with the purchase and installation of the Advertising Equipment, amortized over a five (5) year period.

1.3    <u>Remeasurement of Premises.</u> At any time and from time to time, Director may cause City to conduct a space audit pursuant to which City remeasures the Premises using the Airport's then-current measurement specifications. At Director's request, Tenant and City shall enter into an amendment of this Lease reflecting the results of such remeasurement.

1.4    <u>Changes to Airport.</u> Tenant acknowledges and agrees that (a) City shall have the right at all times to change, alter, expand, and contract the Airport, including the Terminal Building Complex; (b) City has made no representations, warranties, or covenants to Tenant regarding the design, construction, pedestrian traffic, or views of the Airport or the Premises. Without limiting the generality of the foregoing, Tenant acknowledges and agrees that the Airport (i) is currently undergoing, and may from time to time hereafter undergo, renovation, construction, and other Airport modifications; and (ii) may from time to time adopt rules and regulations relating to security and other operational concerns that may affect Tenant's business. Such construction and renovation programs might involve barricading, materials storage, noise,

– 3 –

the presence of workers and equipment, rearrangement, utility interruptions, and other inconveniences normally associated with construction and renovation. Although City will use reasonable efforts to minimize the effect of the Master Plan Expansion and other Airport changes on Tenant's business, Tenant acknowledges that such activity may have some effect on concession operations located at the Airport. At any time and from time to time, City may, without the consent of Tenant, and without affecting Tenant's obligations under this Lease, at City's sole discretion, (a) change the shape, size, location, number and extent of the improvements in any portion of the Airport, including without limitation the concourses, piers, boarding areas, concession areas and security areas located within the Terminal Building, (b) build additional stories above or below the Airport buildings, including of the Terminal Building, (c) eliminate or relocate public entrances to the Premises so long as there is at all times one public entrance to the Premises, (d) construct multi-level, elevated or subterranean parking facilities and (e) expand or contract the Airport, including redefining the Airport boundaries so as to include additional lands within the Airport or exclude lands from the Airport or both. Without limiting waivers set forth elsewhere in this Lease, Tenant hereby waives all claims against City and releases City from all Losses (as defined below) that Tenant suffers or incurs arising out of or in connection with any changes to the Airport or any portion of the Airport and Tenant further agrees that Tenant will not be entitled to any rent abatement or any other rent relief in connection with any changes to the Airport or any portion of the Airport.

     1.5   <u>Common Areas</u>. The term "**common areas**" means all areas and facilities located within the Airport that are designated by City from time to time for the general use and convenience of the tenants of the Airport and other occupants of the airport, and airline passengers and other visitors to the Airport such as concourses, sidewalks, elevators, escalators, moving walkways, parking areas and facilities, restrooms, pedestrian entrances, driveways, loading zones and roadways. City may, in its sole discretion, and without any liability to Tenant (a) change the common areas, (b) increase or decrease the common areas (including the conversion of common areas to leaseable areas and the conversion of leasable areas to common areas), and (c) impose parking charges. City will, in its sole discretion, maintain the common areas, establish and enforce Airport Rules concerning the common areas, close temporarily portions of the common areas for maintenance purposes, and make changes to the common areas including changes in the location of security check points, driveways, entrances, exits, parking spaces, parking areas, and the direction of the flow of traffic. City reserves the right to make additional Airport Rules affecting the Airport throughout the Term, including the requirement that Tenant participate in a parking validation program.

## 2.    TERM

     2.1   <u>Commencement and Expiration</u>.  The Term shall commence on the Commencement Date and expire on the Expiration Date, unless terminated prior thereto as provided herein.  If for any reason, City cannot deliver possession of the Premises to Tenant on the Commencement Date, this Lease shall remain in effect, City shall not be subject to any liability, and such failure shall not extend the Term hereof.  After the Commencement Date has occurred, upon Director's request, Tenant will execute a written acknowledgment of the Commencement Date in the form attached as *Exhibit C*.  In the event Tenant fails to execute and return promptly such acknowledgment to City, the dates described therein shall be deemed conclusive.

2.2    <u>City's Right to Extend Term.</u>  City shall have **three one-year** options to extend the term, on the terms and conditions of this Section 2.2 (the **"First Extension Option,"** the **"Second Extension Option"** and the **"Third Extension Option"**, and together, the **"Extension Options"**).  As to each Extension Option exercised by the City, the Term shall be extended by one year.  To exercise an Extension Option, the City must give notice (an **"Exercise Notice"**) to Tenant on or before the date that is **thirty (30)** days prior to the Expiration Date (as the same may be extended by an Extension Option).  In no event will City be required to exercise an Extension Option.

2.3    <u>Holding Over.</u>  If, without objection by City, Tenant holds possession of the Premises after the Expiration Date, Tenant shall become a tenant from month to month, upon the terms of this Lease except that, at City's option, the Minimum Annual Guarantee shall be double the then prevailing Minimum Annual Guarantee.  No such holdover shall be deemed to operate as a renewal or extension of the Term.  Such month-to-month tenancy may be terminated by City or Tenant by giving thirty (30) days' notice of termination to the other at any time.  Tenant shall have no rights to renew or extend the Term of this Lease.

# 3.    USE AND OPERATION

3.1    <u>Permitted Use.</u>  Tenant shall use the Premises for the Permitted Use and for no other purpose.  In the event Tenant desires to use the Premises for any purpose other than the Permitted Use, Tenant may submit a request to Director.  Director may, in his/her sole and absolute discretion approve or deny such request.  Any such decision shall be binding on Tenant.

3.2    <u>No Exclusivity.</u>  Tenant acknowledges and agrees that Tenant has no exclusive rights to conduct the business of the Permitted Use and that City may arrange with others for similar activities at the Airport.

3.3    <u>Operation of Business.</u>  Subject to the terms of this Lease, Tenant will operate Tenant's business in the Premises so as to maximize Gross Receipts and service to the traveling public and in accordance with the requirements set forth on *Exhibit B.*  Without limiting the generality of the foregoing, Tenant shall (a) conduct the business in a first-class, businesslike, safe, efficient, courteous and accommodating manner; and (b) employ sufficient and experienced staff.  In the event Director shall give notice to Tenant that any of the foregoing covenants (a) - (b) are not being satisfied, Tenant shall immediately discontinue or remedy the objectionable practice.  In addition, Tenant shall render the following public services: make reasonable change, give directions, and assist the public generally.  Tenant shall take all reasonable measures in every proper manner to maintain, develop, and increase the business conducted by it.  Tenant will not divert or cause to be diverted any business from the Airport.

3.4    <u>Operational Standards.</u>

(a)    <u>Installation of Advertising.</u>  Tenant shall install new Advertising Equipment within seventy-two (72) hours after approval thereof by the Director.

(b)    <u>Inspection and Cleaning.</u>  Tenant shall visually inspect and clean each panel and piece of Advertising Equipment daily in order to maintain a polished and professional appearance.

(c)    <u>Repair of Advertising Equipment.</u>  Tenant shall repair or replace damaged Advertising Equipment within twenty-four (24) hours following notice thereof by Airport on a weekday or the next Monday following any weekend.

(d)    <u>Removal of Advertising Content.</u>  Tenant shall remove any expired, or non-revenue producing advertisements within seventy-two (72) hours beyond the expiration or termination of revenue; provided that, consistent with Tenant's intention to maximize revenues hereunder, Tenant may from time to time display out-of-date or public service announcement or other non-revenue producing advertising as Tenant deems necessary to maintain the appearance of the Premises as an active commercial advertising medium.

(e)    <u>Occupancy Rates.</u>  Tenant shall use reasonable commercial efforts to have at least seventy-five percent (75%) of all Advertising Equipment in all locations occupied. Within ten (10) business days after the Effective Date, Tenant shall provide to the Director a written plan for achieving this goal.

(f)    <u>Maximization of Revenue.</u> Tenant shall use reasonable commercial efforts to maintain an average minimum monthly advertising rate equal to or exceeding $2,500 per month per advertisement using advertising other than Lodging, Transportation and Attraction Boards.

(g)    <u>Rate Cards.</u>  Prior to installation of any advertising media, Tenant shall submit to the Airport Director a schedule ("**Rate Card**") showing the rates and commission Tenant intends to charge an advertiser, and such Rate Card, and any modifications thereto, shall be subject to Director's prior approval.  Tenant shall not install any advertising prior to obtaining such approval and thereafter shall not deviate from the rates shown on the approved Rate Card.

(h)    <u>Technology.</u>  Within ten (10) business days after the Effective Date, Tenant shall provide to the Director a written description of the technology it intends to use with respect to the Advertising Equipment.

3.5    <u>Use of Premises.</u>  All Advertising Equipment and advertising content is subject to the Director's prior approval and must satisfy the requirements of the Airport's Advertising Standards Policy, as the same may be amended from time to time.  Any advertising that does not satisfy such policy shall be subject to removal and replacement upon notification of the Director as set forth in *Exhibit B*.  Alternatively, tenant may provide to the Director, on a monthly basis, a written report of all advertising placed within the prior month.  Such reports will include photographs or other suitable reproductions of the advertising displayed.  Tenant will remove, at its cost, within 24 hours of any notice or direction given by the Director, either based on the monthly reports or on observation by the Director, any advertising displayed by Tenant that the Director determines does not comply with the standards set forth in Airport's Advertising Standards Policy.  Without limiting the provisions of Section 7, all Advertising Equipment is subject to the approval of the Airport's Design Review Committee.

3.6    <u>Hours of Operation.</u>  Tenant will carry on its business diligently and continuously in the Premises and will keep the Advertising Program functioning for business twenty-four (24) consecutive hours each day seven (7) days per week, including holidays.  Director may, from time to time, change such required hours of operation. Tenant may not vacate or abandon the Premises at any time during the Term. In the event any Advertising Equipment fails to perform

its function or is otherwise in need of repair, Tenant shall replace the Advertising Equipment within 24 hours when feasible.

3.7    References to Airport.  Tenant shall not, without the prior written consent of Director, reference City or the Airport for any purpose other than the address of the business to be conducted by Tenant in the Premises, nor will Tenant do or permit anything in connection with Tenant's business or advertising which in the judgment of City may reflect unfavorably on City or the Airport, or confuse or mislead the public as to the relationship between City and Tenant.

3.8    Other Operational Requirements.

(a) Tenant must keep the Advertising Equipment suitably illuminated at all times.

(b) Except as provided herein, Tenant shall not take any action or permit any other party to take an action to remove or deface or otherwise interfere with an advertisement without first notifying the advertiser and the Director and obtaining the advertiser's consent.  In the event advertisements are defaced or vandalized, the space provider shall provide written notice to the City and the advertiser and shall allow the advertiser the option of replacing the defaced or vandalized material.  Any request by Tenant to remove or alter any advertising must be in writing and shall be a public record.

(c) Tenant acknowledges that the operational requirements of the Airport as an airport facility, including without limitation security requirements, are of paramount importance. Tenant acknowledges and agrees that it must conduct its business in a manner that does not conflict with the operational requirements of the Airport as an airport facility and that fully accommodates those requirements. Without limiting other waivers herein, Tenant waives all claims for any Losses arising out of or connected to the operation of the Airport as an airport facility. Without limitation on the foregoing, Tenant must:

(i)     comply with the Airport Rules;

(ii)    cause all deliveries and dispatches of merchandise, supplies, fixtures, equipment and furniture to be made and conveyed to or from the Premises by means and during hours established by Director in Director's sole discretion.  City has no responsibility regarding the delivery or dispatch of Tenant's merchandise, supplies, fixtures, equipment and furniture.  Tenant may not at any time park its trucks or other delivery vehicles in common areas; and

(iii)   not park within the parking areas of the Airport except in those areas, if any, designated by City pursuant to permits obtained from the Airport's Permit Bureau. Nothing herein shall imply that Tenant shall be able to secure any on-Airport parking privileges.

3.9    Prohibited Activities.  Without limiting any other provision herein, Tenant shall not, without the prior written consent of Director: (a) advertise any distress, fire, bankruptcy, liquidation, relocation, closing, or going-out-of-business sales; (b) use or permit the use on the Premises of any pinball machines, videogames, or other devices or equipment for amusement or recreation, or any vending machines, newspaper racks, pay telephones, or other coin, token, or credit card-operated devices; (c) cause or permit anything to be done, in or about the Premises, or bring or keep anything thereon which might (i) increase in any way the rate of fire insurance on

–7–

Airport Advertising Program Lease

the Terminal Building Complex or any of its contents; (ii) create a nuisance; or (iii) in any way obstruct or interfere with the rights of others in the Terminal Building Complex or injure or annoy them; (d) commit or suffer to be committed any waste upon the Premises; (e) use, or allow the Premises to be used, for any improper, immoral, unlawful or objectionable purpose; (f) place any loads upon the floor, walls or ceiling which endanger the structure or obstruct the sidewalk, passageways, stairways or escalators, in front of, within, or adjacent to the Terminal Building Complex; (g) use any advertising or promotional medium that advertises itself in the required Advertising Equipment; (h) distribute handbills or circulars to Airport patrons or to cars in the parking lots, or engage in any other advertising in the Airport which is not permissible outside of the Tenants normal Airport Advertising Agreement ; (i) engage in any activity on the Airport outside the Premises for the recruitment or solicitation of business; or (j) do or permit to be done anything in any way tending to injure the reputation of City or appearance of the Airport.

3.10    Audit of Operations.  At any time and from time to time, City may conduct an audit of Tenant's operations at the Airport (in addition to City's right to audit pursuant to Section 4.7 [Books and Records; Audit Rights] hereof) to confirm that such operations comply with the requirements set forth herein.  Tenant shall cooperate with such audit.  In the event such audit shows that Tenant is not complying with such requirements, without limiting City's ability to call a default hereunder, City may require that Tenant reimburse City for the costs of such audit.  Tenant shall promptly remedy any noncompliance shown in any such audit.

3.11    Representative of Tenant. Tenant shall appoint at least one qualified representative authorized to represent and act for it in matters pertaining to its operation, and shall keep Director informed in writing of the identity of each such person.  The initial person so designated is the Initial Tenant Representative.

3.12    Investigation Reports.  Tenant shall, if required by Director, employ, at its own cost and expense, an investigative organization approved by Director for the purpose of making investigations and observations and preparing a written report of the carrying out of any pricing policies, revenue control, and operational techniques being used on the Premises.  Tenant shall cause such investigation and observation to be made at such reasonable times and in the manner directed by Director, and the investigator shall deliver forthwith to Director a true and complete written copy of any such reports made to Tenant.

3.13    Compliance with Laws.  Tenant shall promptly, at its sole expense, cause the Premises (including any permitted Alterations (as defined below)), and Tenant's use of the Premises and operations therein, to comply at all times with all present and future federal, state and local laws, as the same may be amended from time to time, whether foreseen or unforeseen, ordinary as well as extraordinary, including all laws relating to (a) health and safety; (b) disabled access, including the Americans with Disabilities Act, 42 U.S.C.S. Sections 12101 et. seq. and Title 24 of the California Code of Regulations (collectively "ADA"); (c) Hazardous Materials (as defined below); (d) fire sprinkler, seismic retrofit, and other building code requirements; and (e) with respect to duty free activities, customs, duties, and other regulations of U.S. Customs (collectively "Laws"), the Airport's Tenant Improvement Guide, including the Tenant Design Criteria, as amended from time to time (as amended, the "Airport's TI Guide"), and the Airport Rules.  The parties acknowledge and agree that Tenant's obligation to comply with all Laws, the Airport's TI Guide, and the Airport Rules, is a material part of the bargained for consideration under this Lease.  Notwithstanding the foregoing, this Section 3.13 shall not impose on Tenant any liability to make any structural alterations to the Terminal's roof, foundation, bearing and exterior walls and subflooring; or heating, ventilating, air conditioning, plumbing, electrical, fire

protection, life safety, security and other mechanical, electrical and communications systems of the Terminal (collectively "**Building Systems**"), except to the extent the same is (x) installed by Tenant pursuant to Section 8 [Utilities], or otherwise, or (y) necessitated by Tenant's Alterations or by any act or omission of Tenant or any Tenant Entity (as defined below).

    3.14   Fuel System. Tenant acknowledges that City has granted, or may in the future grant, to a party the sole and exclusive right to operate a fuel system on the Airport. In such event, Tenant acknowledges and agrees that, to the extent it desires to receive distribution of jet fuel on Airport premises, it must receive such distribution from such party, on the terms and conditions established by such party. In no event will Tenant have any right to operate a competing fuel system at the Airport.

## 4.   RENT

    4.1   Definitions. For purposes of this Lease, the following capitalized terms shall have the following meanings:

        (a) "**Gross Receipts**" means the gross amount received by Tenant from the advertiser or media buyer without deduction of any overhead expense incurred by Tenant; provided, however, that gross receipts shall be reduced by (i) any state or local tax imposed upon gross receipts or gross revenue (as opposed to net profits), including, without limitation, sales or gross receipts tax, (ii) commissions paid to advertising agencies or other media buyers on behalf of advertisers, and (iii) telephone charges paid by Tenant on Lodging, Transportation and Attraction Boards.

        (b) "**Consumer Price Index**" means that index published by the United States Department of Labor, Bureau of Labor Statistics known as "All Urban Consumers." In the event such index is discontinued, then "**Consumer Price Index**" shall mean an index chosen by Director which is, in Director's reasonable judgement, comparable to the index specified above.

        (c) "**MAG Adjustment Date**" means the first anniversary of the Commencement Date, or the first day of the first calendar month following such anniversary if the Commencement Date does not fall on the first day of calendar month, and each anniversary of such adjustment date thereafter.

        (d) "**Base Index**" means the most recent Consumer Price Index published immediately prior to the Commencement Date.

        (e) "**Comparison Index**" means the most recent Consumer Price Index published immediately prior to each MAG Adjustment Date.

        (f) "**Enplanements**" means the total number of passengers boarding airline carriers.

        (g) "**Base Year Enplanements**" means the total Enplanements for the twelve month period preceding the Commencement Date.

        (h) "**Comparison Year Enplanements**" means the total Enplanements for the twelve month period preceding each MAG Adjustment Date.

    4.2    <u>Adjustments to Minimum Annual Guarantee</u>.  On each MAG Adjustment Date, the Minimum Annual Guarantee will be adjusted, as follows:  if (a) the Comparison Index shall exceed the Base Index, <u>and</u> (b) Comparison Year Enplanements equal or exceed Base Year Enplanements, then the Minimum Annual Guarantee with respect to the upcoming Lease Year shall be increased to equal the following amount:

$$\text{Initial MAG} \quad \text{x} \quad \frac{\text{Comparison Index}}{\text{Base Index}}$$

If (i) the Comparison Index shall exceed the Base Index, <u>and</u> (ii) Comparison Year Enplanements are less than Base Year Enplanements, then the Minimum Annual Guarantee with respect to the upcoming Lease Year shall be increased to equal the following amount:

$$\text{Initial MAG} \quad \text{x} \quad \frac{\text{Comparison Index}}{\text{Base Index}} \quad \text{x} \quad \frac{\text{Comparison Year Enplanements}}{\text{Base Year Enplanements}}$$

Notwithstanding anything to the contrary herein, in no event will the Minimum Annual Guarantee for any Lease Year of the Term be lower than the Minimum Annual Guarantee with respect to the prior Lease Year.

    4.3    <u>Rent Payments</u>.  Subject to Section 4.11, below, Tenant shall pay, as rent for the Premises, estimated monthly Base Rent in advance on or before the first (1st) day of each calendar month of the Term as set forth below:

    (a) On or before the Commencement Date and the first (1st) day of each calendar month thereafter, Tenant shall pay the current monthly Minimum Annual Guarantee.

    (b) On or before the twentieth (20th) day of each calendar month, concurrently with its submission of the Sales Reports described below covering the prior calendar month, Tenant shall pay to City the deficiency, if any, between the Base Rent payable by Tenant with respect to such prior calendar month  (based on the Gross Receipts achieved with respect to such prior month), and the amount actually paid by Tenant pursuant to the foregoing subsection (a) with respect to such month.

    (c) All payments hereunder shall be paid at the office of Director, or at such other place as City may from time to time designate in writing.

    (d) All Rent shall be paid in lawful money of the United States, free from all claims, demands, setoffs, or counterclaims of any kind.

    (e) Any Rent not paid when due shall be subject to a service charge equal to the lesser of the rate of one and one-half percent (1½%) per month, and the maximum rate permitted by law.  Acceptance of any service charge shall not constitute a waiver of Tenant's default on the overdue amount or prevent City from exercising any of the other rights and remedies available to City.

    4.4    <u>Sales Reports</u>.  On or before the twentieth (20th) day of each calendar month, Tenant shall submit to City a report (the "**Sales Report**") showing all Gross Receipts achieved with respect to the prior month and copies of all contracts submitted with the sales report.  Such report must be certified as being true and correct by Tenant and shall otherwise be in form and

substance satisfactory to Director.  As described below, City shall have the right, in addition to all other rights herein, to impose a fine in the event Tenant shall fail to submit such Sales Report timely.

   4.5    Annual Report and Adjustment.  Within ninety (90) days after the end of each Lease Year, Tenant shall submit to Director an unqualified year-end financial report certified by a Certified Public Accountant showing Gross Receipts achieved with respect to the prior Lease Year.  If such report shows that the total Base Rent actually paid by Tenant with respect the prior calendar year was less than the Base Rent payable with respect to such year, then Tenant shall immediately pay to City such deficiency.  If such report shows that the Base Rent actually paid by Tenant with respect to such prior Lease Year exceeded the Base Rent payable with respect to such year, then such excess shall be applied as a rent credit to amounts next coming due.  Notwithstanding anything to the contrary herein, in no event will the Base Rent payable to City be less than the Minimum Annual Guarantee.  In addition, Tenant shall submit to City such other financial or other reports as Director may reasonably require.

   4.6    Books and Records; Audit Rights.

       (a) Tenant shall maintain for a period of five (5) years after the Expiration Date, or, in the event of a claim by City, until such claim of City for payments hereunder shall have been fully ascertained, fixed and paid, separate and accurate daily records of Gross Receipts, whether for cash, credit, or otherwise.  Tenant must require each subtenant, concessionaire, licensee, and assignee to maintain the same records.  All such books and records shall be kept in accordance with "generally accepted accounting principles", consistently applied, showing in detail all business done or transacted in, on, about or from or pertaining to the Premises, and Tenant shall enter all receipts arising from such business in regular books of account, and all entries in any such records or books shall be made at or about the time the transactions respectively occur.  The books and source documents to be kept by Tenant must include records of inventories and receipts of merchandise, daily receipts from all sales and other pertinent original sales records and records of any other transactions conducted in or from the Premises by all persons or entities conducting business in or from the Premises.  Pertinent original sales records include: (i) cash register tapes, including tapes from temporary registers, (ii) serially pre-numbered sales slips, (iii) the original records of all mail and telephone orders at and to the Premises, (iv) settlement report sheets of transactions with subtenants, concessionaires, licensees and assignees, (v) original records indicating that merchandise returned by customers was purchased at the Premises by such customers, (vi) memorandum receipts or other records of merchandise taken out on approval, (vii) detailed original records or any exclusions or deductions from Gross Revenues, (viii) sales tax records, and (ix) all other sales records, if any, that would normally be examined by an independent accountant pursuant to generally accepted auditing standards in performing an audit of Gross Receipts.  Tenant must keep the required books, source documents and records of Gross Receipts available for inspection by City and its agents and employees at the Premises or at another location within the continental United States at all times during regular business hours.  In addition, Tenant shall maintain monthly and annual reports of Gross Revenues derived from its operation under this Lease, using a form and method as is directed by Director.  Such forms and methods shall be employed by Tenant throughout the Term.  Upon Director's written request, Tenant shall make available immediately to City and/or its auditors any and all books, records and accounts pertaining to its operations under this Lease.  The intent and purpose of the provisions of this section are that Tenant shall keep and maintain records which will enable City and City's Controller to ascertain, determine and audit, if so

desired by City, clearly and accurately, Gross Revenues achieved, and the adequacy of the form and method of Tenant's reporting thereof.

      (b) Should any examination, inspection, and audit of Tenant's books and records by City disclose an underpayment by Tenant of the total Base Rent due, Tenant shall promptly pay to City such deficiency, and if such deficiency exceeds two percent (2%) of the total Base Rent due, Tenant shall also promptly reimburse City for all costs incurred in the conduct of such examination, inspection, and audit. Further, should any examination, inspection, and audit of Tenant's books and records by City disclose an underpayment by Tenant of the total Base Rent due and such deficiency exceeds five percent (5%) of the total Base Rent due, City shall have the right to terminate this Lease. In the event that City deems it necessary to utilize the services of legal counsel in connection with collecting the reimbursement for such examination, inspection, and audit, then Tenant shall reimburse City for reasonable attorneys' fees and litigation expenses as part of the aforementioned costs incurred.

      4.7   <u>Other Reports and Submissions</u>. Tenant shall furnish City with such other financial or statistical reports as Director from time to time may reasonably require. Upon request by Director, Tenant shall furnish to City copies of its quarterly California sales and use tax returns covering the Premises operations as well as that pertinent portion of both the California and Federal income tax returns and possessory interest tax returns on the Premises operations at the time of filing, and any amendments thereto. Tenant shall also furnish City with all copies of current advertiser contracts. All copies of such returns and contracts must be certified as exact copies of the original documents. Tenant and all subtenants (to the extent permitted) shall also promptly notify Director of and furnish to City copies of any audit reports covering this facility conducted by the California Franchise Tax Board or the Board of Equalization.

      4.8   <u>Additional Rent</u>. Tenant shall pay to City any and all charges and other amounts under this Lease as additional rent, at the same place where Base Rent is payable. City shall have the same remedies for a default in the payment of any such additional charges as for a default in the payment of Base Rent.

      4.9   <u>Prepay Rent</u>. Notwithstanding anything to the contrary herein, in the event Tenant shall fail to pay any Rent when due hereunder, Director shall have the right to require Tenant to pay estimated monthly Rent (including Base Rent, utility charges, and all other amounts) one (1) month in advance of when such payment would otherwise be due. Such prepayment would be based on the highest monthly Rent previously due from Tenant. Such right shall be exercised by a notice from Director to Tenant, which notice may be given any time after such default by Tenant, regardless of whether the same is cured by Tenant.

      4.10   <u>Nature of Lease</u>. Under no circumstances will City be expected or required to make any payment of any kind with respect to Tenant's use or occupancy of the Premises, except as may be otherwise expressly set forth herein. Except as may be specifically and expressly provided otherwise in this Lease, no occurrence or situation arising during the Term, nor any present or future Law, whether foreseen or unforeseen, shall relieve Tenant from its liability to pay all of the sums required by this Lease, or relieve Tenant from any of its other obligations under this Lease, or give Tenant the right to terminate this Lease in whole or in part. Tenant waives any rights now or hereafter conferred upon it by any existing or future Law to terminate this Lease or to receive any abatement, diminution, reduction, or suspension of payment of such sums, on account of any such occurrence or situation. Except as otherwise expressly provided

– 12 –

herein, this Lease shall continue in full force and effect, and the obligations of Tenant hereunder shall not be released, discharged or otherwise affected, by reason of: (a) any damage to or destruction of the Premises or any portion thereof or any improvements thereon, or any taking thereof in eminent domain; (b) any restriction or prevention of or interference with any use of the Premises or the improvements or any part thereof; (c) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other proceeding relating to City, Tenant or any constituent partner of Tenant or any sublessee, licensee or concessionaire or any action taken with respect to this Lease by a trustee or receiver, or by any court, in any proceeding; (d) any claim that Tenant or any other person has or might have against City; (e) any failure on the part of City to perform or comply with any of the terms hereof or of any other agreement with Tenant or any other person; (f) any failure on the part of any sublessee, licensee, concessionaire, or other person to perform or comply with any of the terms of any sublease or other agreement between Tenant and any such person; (g) any termination of any sublease, license or concession, whether voluntary or by operation of law; or (h) any other occurrence whatsoever, whether similar or dissimilar to the foregoing in each case whether or not Tenant shall have notice or knowledge of any of the foregoing. The obligations of Tenant hereunder shall be separate and independent covenants and agreements. Tenant hereby waives to the full extent permitted by applicable law, all rights now or hereafter conferred by statute, including without limitation the provisions of Civil Code Sections 1932 and 1933, to quit, terminate or surrender this Lease or the Premises or any part thereof, or to any abatement, suspension, deferment, diminution or reduction of any rent hereunder.

4.11    Lease Initiation Fee.  Notwithstanding anything to the contrary herein, with respect to the first Lease Year, Tenant shall not be obligated to pay any Base Rent.  Instead, Tenant shall make payments to the City as described in this Section 4.11.  On or before the Commencement Date, Tenant shall pay City the Lease Initiation Fee.  If during the first Lease Year, a Sales Report shows that cumulative Gross Receipts achieved to date exceed $5,785,714, then Tenant shall pay to City, concurrently with the submission of such Sales Report, a payment equal to 70% of the amount by which the cumulative Gross Receipts exceed $5,785,714. Thereafter through the first month of the following Lease Year, concurrently with its submission of each Sales Report for the prior month, Tenant shall pay to City 70% of the Gross Receipts achieved with respect to the prior month.  If the annual report described in Section 4.5 for the first Lease Year shows that the amounts paid to City pursuant to this Section 4.11 total less than the greater of the Lease Initiation Fee and 70% of all Gross Receipts achieved in the first Lease Year (the "**First Year Payment Obligation**"), then Tenant shall immediately pay to City such deficiency.  If such annual report shows that the amounts paid to City pursuant to this Section 4.11 are greater than the First Year Payment Obligation, then such excess shall be paid to Tenant within thirty (30) days.

# 5.    ASSIGNMENT OR SUBLETTING

5.1    No Assignment.  Tenant shall not assign, sublet, encumber, or otherwise transfer, whether voluntary or involuntary or by operation of law, the Premises or any part thereof, or any interest herein, without City's prior written consent, which consent, unless otherwise expressly provided herein, may be granted or denied in City's sole and absolute discretion (the term "**Transfer**" shall mean any such assignment, subletting, encumbrance, or transfer).  Any Transfer made without City's consent shall constitute a default hereunder and shall be voidable at City's election.

5.2 <u>Changes in Tenant</u>. The merger of Tenant with any other entity or the transfer of any controlling ownership interest in Tenant, or the assignment or transfer of a substantial portion of the assets of Tenant, whether or not located on the Premises, shall constitute a Transfer. Without limiting the generality of the foregoing, if Tenant is a partnership, a withdrawal or change, voluntary, involuntary or by operation of law of the partner or partners owning fifty-one percent (51%) or more of the partnership, or the dissolution of the partnership, or the sale or transfer of at least fifty-one percent (51%) of the value of the assets of Tenant, shall be deemed a Transfer. If Tenant is a corporation or limited liability company, any dissolution, merger, consolidation or other reorganization of Tenant, or the sale or other transfer of a controlling percentage of the capital stock or membership interests of Tenant, or the sale or transfer of at least fifty-one percent (51%) of the value of the assets of Tenant, shall be deemed a Transfer. The phrase "**controlling percentage**" means the ownership of, and the right to vote, stock or interests possessing at least fifty-one percent (51%) of the total combined voting power of all classes of Tenant's capital stock or interests issued, outstanding and entitled to vote for the election of directors. Without limiting the restrictions on asset transfers, this paragraph shall not apply to stock or limited liability company interest transfers of corporations or limited liability companies the stock or interests of which is traded through an exchange or over the counter.

5.3 <u>No Release</u>. In no event will City's consent to a Transfer be deemed to be a release of Tenant as primary obligor hereunder.

5.4 <u>Subleasing in General</u>. Without limiting City's discretion in approving or disapproving a proposed Transfer, the following shall apply: (a) Prior to negotiating a sublease agreement, Tenant must submit to City a sublease proposal for City's approval, which approval may be granted or withheld in City's absolute and sole discretion; (b) Every sublease must be in form approved by City; (c) Each and every covenant, condition or obligation imposed upon Tenant by this Lease and each and every right, remedy or benefit afforded City by this Lease will not be impaired or diminished as a result of any sublease agreement; (d) Tenant assigns to City all rent and other payments due from all subtenants under any sublease agreements; provided however, Tenant is hereby granted a license to collect rents and other payments due from subtenants under their sublease agreements until the occurrence of an Event of Default, regardless of whether a notice of that default has been given by City. At any time, at Director's option, City may notify a subtenant of this assignment and upon such notice the subtenant will pay its rent other payments directly to City. City will credit Tenant with any rent received by City under such assignment, but the acceptance of any payment on account of rent from any subtenants as a result of an Event of Default will in no manner whatsoever serve to release Tenant from any liability under this Lease. No payment of rent or any other payment by a subtenant directly to City or other acceptance of such payments by City, regardless of the circumstances or reasons therefor, will in any manner whatsoever be deemed an attornment by the subtenants to City in the absence of either a specific written agreement signed by City to such an effect.

5.5 <u>Acceptance of Rent</u>. The acceptance of rent by City from any person or entity does not constitute a waiver by City of any provision of this Lease or a consent to any Transfer. City's consent to one Transfer will not be deemed to be a consent to any subsequent Transfer. If Tenant defaults in the performance of any of the terms of this Lease, City may proceed directly against the transferor (or if there has been more than one Transfer, then each transferor) without necessity of exhausting remedies against Tenant. City may consent to subsequent Transfers or amendments or modifications to this Lease with transferees, without notifying transferor (or if there has been more than one Transfer, then each transferor) and without obtaining its or their

– 14 –

consent thereto and such action shall not relieve any transferor of liability under this Lease as amended.

5.6    Waiver. Tenant waives the provisions of Civil Code Section 1995.310 with respect to remedies available to Tenant should City fail to consent to a Transfer.

# 6.    TAXES, ASSESSMENTS AND LIENS

6.1    Taxes.

(a) Tenant recognizes and understands that this Lease may create a possessory interest subject to property taxation and that Tenant may be subject to the payment of property taxes levied on such interest. Tenant further recognizes and understands that any Transfer permitted under this Lease and any exercise of any option to renew or other extension of this Lease may constitute a change in ownership for purposes of property taxation and therefore may result in a revaluation of any possessory interest created hereunder. Tenant shall pay all taxes of any kind, including possessory interest taxes, that may be lawfully assessed on the leasehold interest hereby created and to pay all other taxes, excises, licenses, permit charges and assessments based on Tenant's usage of the Premises, all of which shall be paid when the same become due and payable and before delinquency.

(b) Tenant shall report any Transfer, or any renewal or extension hereof, to the County of San Mateo Assessor within sixty (60) days after such Transfer transaction, or renewal or extension. Tenant further agrees to provide such other information as may be requested by the City to enable the City to comply with any reporting requirements under applicable law with respect to possessory interests.

6.2    Other Liens. Tenant shall not permit or suffer any liens to be imposed upon the Terminal Building Complex or any part thereof, including without limitation, mechanics', materialmen's and tax liens, as a result of its activities without promptly discharging the same. Notwithstanding the foregoing, Tenant may in good faith contest any such lien if Tenant provides a bond in an amount and form acceptable to City in order to clear the record of any such liens. Tenant shall assume the defense of and indemnify and hold harmless City against any and all liens and charges of any and every nature and kind which may at any time be established against said premises and improvements, or any part thereof, as a consequence of any act or omission of Tenant or as a consequence of the existence of Tenant's interest under this Lease.

# 7.    INVESTMENTS; ALTERATIONS

7.1    City's Approval Rights. Tenant shall not make or suffer to be made any alterations, additions, or improvements to the Premises or any part thereof or attach any fixtures or equipment thereto, including the Initial Improvements (collectively, "**Alterations**") without City's prior written consent. Without limiting the generality of the foregoing, the initial layout and design of all Alterations shall conform to Commission's established architectural design scheme for the Terminal Building Complex and the provisions of Airport's TI Guide. Prior to the construction of any Alterations (including the Initial Improvements), Tenant shall submit detailed plans and specifications to the Airport's Design Review Committee for approval. Tenant shall include with its plans and specifications schematic renderings of the public concession area, materials, a color board(s) and a detailed layout of the overall merchandising plan. All decisions by the Airport's Design Review Committee shall be made subject to the

– 15 –

approval of the Airport Commission. City's approval rights will extend to and include architectural and aesthetic matters and City reserves the right to reject any designs submitted and to require Tenant to resubmit designs and layout proposals until they meet City's approval. The Rent Commencement Date shall not be extended if City elects to reject any designs or layout proposals submitted. In the event of disapproval by City of any portion of the plans and specifications, Tenant will promptly submit necessary modifications and revisions thereof. No changes or alterations will be made in said plans or specifications after approval by City. City agrees to act within a reasonable period of time upon such plans and specifications and upon requests for approval of changes or alterations in said plans or specifications. One copy of plans for all improvements or subsequent changes therein or alterations thereof will, within fifteen (15) days after approval thereof by City, be signed by Tenant and deposited with City as an official record thereof. All Alterations shall be effected through the use of contractors approved by City who shall furnish to City upon demand such completion bonds and labor and material bonds as City may require so as to assure completion of the Alterations on a lien-free basis. Without limiting the requirements set forth above, Tenant acknowledges and agrees that Tenant may be required to obtain approvals for any desired Alterations from the Airport's Quality Control Department.

7.2    <u>Structures and Fixtures</u>. Tenant shall, at its sole cost and expense, design, erect, construct and install all displays, fixtures, furnishings, carpeting, decorations, finishings, equipment, counters, or other necessary Alterations for its operation under this Lease. All construction shall be in conformity with the latest edition of the Airport TI Guide, the Airport Design Review Committee (DRC) and in conformity with the approved plans and specifications submitted by Tenant, and shall meet all applicable local building codes and ordinances as well as all other Laws. Tenant shall submit complete plans and specifications to Director, and prior to the commencing any construction work, obtain Director's written approval of said plans and specifications. Tenant shall make no change or alteration in the plans and specifications without prior written approval of Director. Nothing herein contained shall be construed to delay or otherwise affect the Commencement Date.

7.3    <u>Notice and Permits</u>. Tenant shall give written notice to Director not less than seven (7) days prior to the commencement of any work in construction, alteration or repairs of the Premises, in order that City may post appropriate notices of non-responsibility, and agrees that such notices may remain posted until the acceptance of such work by City. Tenant shall obtain, and pay all fees for all permits required by the City or other legal jurisdictions, for improvements that it is required to construct or install, and it shall furnish copies of all such permits to City prior to the commencement of any work.

7.4    <u>Title to Alterations</u>. Title to all Alterations of such a nature as cannot be removed without substantial damage to the Terminal, including all Advertising Equipment, carpeting, decorations, finishings, and counters, shall vest in City on the Expiration Date. All other equipment of such nature as to constitute trade fixtures shall remain the property of Tenant. On the Expiration Date, Tenant may remove said trade fixtures or Director may require that Tenant remove same at Tenant's expense. Prior to the Commencement Date, Tenant shall submit to Director a proposed list of such trade fixtures; said list may be subsequently amended during the term of this Lease to reflect any changes in said trade fixtures. Tenant agrees and understands that "**fixture**" is defined as a thing affixed to premises that is bolted, nailed, screwed, cemented and/or plastered. For the purpose of this Lease, fixtures shall include slat wall, counters and the like, attached to the physical structure of the premises in any matter whatsoever. On the

– 16 –

Expiration Date, all fixtures, other than those deemed trade fixtures by City, shall become the property of City. Tenant shall be liable to City for City's costs for storing, removing and disposing of any alterations of Tenant's personal property, and of restoration of the Premises. Notwithstanding anything to the contrary herein, title to the Advertising Equipment shall vest in City on the Expiration Date.

    7.5    Effect of Alterations on Airport. If and to the extent that Tenant's activities or proposed Alterations trigger an obligation or requirement on the part of City to make changes to the Airport premises (including ADA requirements), Tenant shall indemnify, defend, and hold harmless City from and against any and all Losses arising out of such activities or Alterations.

## 8.    UTILITIES

    8.1    Services Provided. City shall provide in the Terminal Building Complex the following utility services: reasonable amounts of water, electricity, telephone, sewage outlets, heating, ventilation, and air conditioning, to a point determined by the Director. All extensions of the facilities requested by Tenant for said utility services from said points shall be at the sole cost and expense of Tenant. In the event of any change desired by Tenant as to said points of supply by City, the expense of making such changes or alterations shall be at the sole cost of Tenant.

    8.2    Utility Costs. Tenant shall pay the whole cost for all utility services as invoiced to Tenant by City and for such other special services which it may require in the Premises, and Tenant hereby expressly waives the right to contest any utility rates.

    8.3    Shared Telecommunications Services. Tenant acknowledges that City has implemented or may in the future implement a shared telecommunications service program ("STS Program") to provide telecommunications services. The STS Program may involve City's provision of telephone, telefacscimile, local access, long distance service, internet, intranet, and other computer and telecommunications services. In such event, at City's option, Tenant shall participate in the STS Program by engaging City or its agent to provide such services at Tenant's expense, provided that the charges for such services are generally competitive. All payments for STS Services shall be due and payable when invoiced by City.

    8.4    Waiver of Damages. Tenant hereby expressly waives any and all claims for damages arising or resulting from failures or interruptions of utility services to the Premises, including electricity, gas, water, plumbing, sewage, telephone, telecommunications, heat, ventilation, air conditioning, or for the failure or interruption of any public or passenger conveniences. Without limiting the generality of the foregoing, Tenant shall have no rights to abate Rent or terminate this Lease in the event of any interruption or failure of utility services.

## 9.    MAINTENANCE AND REPAIR

    9.1    "As-Is" Condition. TENANT SPECIFICALLY ACKNOWLEDGES AND AGREES THAT CITY IS LEASING THE PREMISES TO TENANT ON AS "AS IS WITH ALL FAULTS" BASIS AND THAT TENANT IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM CITY OR ITS AGENTS, AS TO ANY MATTERS CONCERNING THE PREMISES, INCLUDING: (i) the quality, nature, adequacy and physical condition and aspects of the Premises, including, but not limited to, landscaping, utility systems, (ii) the quality, nature,

adequacy, and physical condition of soils, geology and any groundwater, (iii) the existence, quality, nature, adequacy and physical condition of utilities serving the Premises, (iv) the development potential of the Premises, and the Premise's use, habitability, merchantability, or fitness, suitability, value or adequacy of the Premises for any particular purpose, (v) the zoning or other legal status of the Premises or any other public or private restrictions on use of the Premises, (vi) the compliance of the Premises or its operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity, (vii) the presence of Hazardous Materials on, under or about the Premises or the adjoining or neighboring property, (viii) the quality of any labor and materials used in any improvements on the real property, (ix) the condition of title to the Premises, and (x) the agreements affecting the Premises, including covenants, conditions, restrictions, ground leases, and other matters or documents of record or of which Tenant has knowledge.

9.2    <u>Tenant's Maintenance Obligations</u>.  Tenant, at all times during the Term and at Tenant's sole cost and expense, shall keep the Premises and every part thereof, including the Advertising Equipment/Media, in good condition and repair, and in compliance with applicable Laws, including the replacement of any facility of City used by Tenant which requires replacement by reason of Tenant's use thereof, excepting (a) ordinary wear and tear, and (b) damage due to casualty with respect to which the provisions of Section 13 [Damage or Destruction] shall apply. Tenant hereby waives all rights to make repairs at the expense of City or in lieu thereof to vacate the Premises as provided by California Civil Code Section 1941 and 1942 or any other law, statute or ordinance now or hereafter in effect. In addition, if it becomes reasonably necessary during the term of this Lease, as determined by Director, Tenant will, at its own expense, redecorate and paint fixtures and the interior of the Premises and improvements, and replace fixtures, worn carpeting, curtains, blinds, drapes, or other furnishings. Tenant shall be solely liable for the facade of the Premises from the Terminal common face thereof, all windows and display areas therein, and as provided below in Section 14.4 [City's Right to Perform], in the event Tenant fails to perform its maintenance and repair obligations hereunder, City shall have the right to do so, at Tenant's expense. Tenant shall on a daily basis be on site to walk the Premises to inspect the Advertising Equipment and shall also be "on call" between the hours of 5:00 p.m. and 8:00 a.m.

## 10. SIGNS AND ADVERTISING

Without express written consent of Director, Tenant shall not display any self-advertising, promotional, or informational pamphlets, circulars, brochures or similar materials.

## 11. WAIVER; INDEMNITY; INSURANCE

11.1    <u>Waiver</u>. Tenant, on behalf of itself and its assigns, waives its rights to recover from and releases and discharges City and all City Entities and their respective heirs, successors, personal representatives and assigns, from any and all Losses whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of or in any way connected with (a) the physical or environmental condition of the Premises or any law or regulation applicable thereto, (b) any damage that may be suffered or sustained by Tenant or any person whosoever may at any time be using or occupying or visiting the Premises, or in or about the Airport, or (c) any act or omission (whether negligent, non-negligent or otherwise) of Tenant or any Tenant Entity, whether or not such Losses shall be caused in part by any act, omission or negligence of

any of City, Commission, its members, or any officers, agents, and employees of each of them, and their successors and assigns (each, a "**City Entity**"), except if caused by the sole gross negligence or willful misconduct of City. In connection with the foregoing waiver, Tenant expressly waives the benefit of Section 1542 of the California Civil Code, which provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR EXPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN TO HIM MUST HAVE MATERIALLY AFFECTED THE SETTLEMENT WITH THE DEBTOR."

11.2    <u>Indemnity</u>. In addition to, and not in limitation of the foregoing, Tenant shall forever indemnify, defend, hold and save City and each City Entity free and harmless of, from and against any and all Losses caused in whole or in part by or arising out of (a) any act or omission of Tenant or any Tenant Entity, (b) Tenant's use of the Premises or operations at the Airport, or (c) any default by Tenant or any Tenant Entity hereunder, whether or not Losses shall be caused in part by any act, omission or negligence of City or any City Entity. The foregoing indemnity shall not extend to any Loss caused by the sole gross negligence or willful misconduct of City.

11.3    <u>Losses</u>. For purposes hereof "**Losses**" shall mean any and all losses, liabilities, judgments, suits, claims, damages, costs and expenses (including reasonable attorneys' fees, investigation costs, remediation costs, and court costs), of any kind or nature.

11.4    <u>Notice</u>. Without limiting the foregoing waiver and indemnity, each party hereto shall give to the other prompt and timely written notice of any Loss coming to its knowledge which in any way, directly or indirectly, contingently or otherwise, affects or might affect either, and each shall have the right to participate in the defense of the same to the extent of its own interest.

11.5    <u>Insurance</u>. Tenant shall procure and maintain during the Term the following insurance:

(a) Workers' Compensation Insurance with Employer's Liability limits not less than $1,000,000 each accident.

(b) Comprehensive General Liability Insurance with limits not less than $1,000,000 each occurrence Combined Single Limit for Bodily Injury and Property Damage, including Contractual Liability, Personal Injury, Products Liability and Completed Operations Coverages.

(c) Comprehensive Automobile Liability Insurance with limits not less than $2,000,000 each occurrence Combined Single Limit for Bodily Injury and Property Damage, including Employer's non-ownership liability and hired auto coverages.

(d) Property Insurance on an all risk form covering all Premises tenant improvements, fixtures, and equipment insuring against the perils of fire, lightning, extended coverage perils, vandalism and malicious mischief in the demised premises in an amount equal to the full replacement value of tenant improvements, fixtures and equipment.

(e) Business Interruption Insurance insuring that the Base Rent will be paid to City for a period of at least one (1) year if Tenant is unable to operate its business at the Premises

due to a risk required to be insured against by Tenant hereunder. Said insurance shall also cover business interruptions due to failures or interruptions in telecommunications services, strikes, employee lockouts, riots, or other civil commotion. To calculate Base Rent during any such interruption of business, the Gross Revenues for the 12-month period immediately preceding the incident causing the business interruption shall be used.

11.6    Form of Policies. All insurance required by Tenant hereunder shall be pursuant to policies in form and substance and issued by companies satisfactory to City and City's City Attorney. City may, upon reasonable notice and reasonable grounds increase or change the required insurance hereunder, in which event Tenant shall obtain such required insurance. Without limiting the generality of the foregoing, all Comprehensive General Liability Insurance, Comprehensive Automobile Liability Insurance, and Property Insurance policies shall be endorsed to provide the following:

(a) Name as additional insured the City and County of San Francisco, the Airport Commission and its members, and all of the officers, agents, and employees of each of them (collectively, "**Additional Insureds**");

(b) That such policies are primary insurance to any other insurance available to the Additional Insureds, with respect to any claims arising out of this Lease, and that insurance applies separately to each insured against whom claim is made or suit is brought.

(c) That the insurance company shall give thirty (30) days prior written notice to City of cancellation, non-renewal or reduction in coverage or limits, delivered to City at City Address.

11.7    Delivery of Policies or Certificates. On or before the Commencement Date, Tenant shall provide to City copies of its insurance policies or certificates thereof evidencing the above insurance.

11.8    Subrogation. Notwithstanding anything to the contrary herein, Tenant waives any right of recovery against City for any loss or damage to the extent the same is required to be covered by Tenant's insurance hereunder. Tenant shall obtain from its insurer, if possible, a waiver of subrogation the insurer may have against City or any City Entity in connection with any Loss covered by Tenant's property insurance policy.

# 12.    DEPOSIT

12.1    Form of Deposit. Within ten (10) days after the Effective Date, Tenant will deliver to Director a security deposit (the "**Deposit**") in the Deposit Amount. Such Deposit shall be in the form of (a) a surety bond payable to City, naming City as obligee, in the form attached as *Exhibit F-1*, and otherwise in form satisfactory to City's City Attorney, and issued by a surety company satisfactory to Director, or a (b) letter of credit naming City as beneficiary, in the form attached as *Exhibit F-2*, and otherwise in form satisfactory to City's City Attorney, issued by a bank satisfactory to Director. Such bond or letter of credit shall be renewed annually and increased annually such that at all times, the Deposit is equal to one-half (½) the then current Minimum Annual Guarantee, all at Tenant's cost. Such bond or letter of credit shall be kept in full force and effect during the Term to ensure the faithful performance by Tenant of all covenants, terms, and conditions of this Lease, including payment of Rent. The sum designated as the "Deposit" is and will remain the sole and separate property of City until actually repaid to

Tenant (or at City's option, the last assignee (if any) of Tenant's interest hereunder), said sum not being earned by Tenant until all provisions precedent for its payment to Tenant have been fulfilled. Tenant shall cause the surety company or bank issuing such bond or letter of credit to give Director notice in writing by registered mail at least forty-five (45) days prior to the expiration date of such bond or letter of credit of its intention not to renew said bond or letter of credit.

      12.2   <u>Use of Deposit</u>. If Tenant fails to pay Rent or otherwise defaults with respect to any provision of this Lease, City may use, apply or retain all or any portion of the Deposit for the payment of Rent or other charge in default or for the payment of any other sum to which City may become obligated by reason of Tenant's default or to compensate City for any loss or damage which City may suffer thereby. If City so uses or applies all or any portion of the Deposit, Tenant, within ten (10) days after demand therefor, shall deposit other security acceptable to Director with City in an amount sufficient to restore the Deposit to the full amount thereof, and Tenant's failure to do so shall be a breach of this Lease. In the event the bonding company or bank declines to renew or elects to cancel the bond or letter of credit comprising the Deposit, Tenant shall, at least fifteen (15) days prior to the expiration or cancellation date, replace such bond or letter of credit with another bond or letter of credit. If Tenant fails to do so, City may, without notice to Tenant, draw on the entirety of the Deposit and hold the proceeds thereof as security hereunder. City shall not be required to keep the Deposit separate from its general accounts. If Tenant performs all of Tenant's obligations hereunder, the Deposit, or so much thereof as has not theretofore been applied by City, shall be returned, without payment of interest or other increment for its use, to Tenant (or, at City's option, to the last assignee, if any, of Tenant's interest hereunder) at the expiration of the Term, and after Tenant has vacated the Premises. No trust relationship is created herein between City and Tenant with respect to the Deposit.

      12.3   <u>Other Agreements</u>. If Tenant defaults with respect to any provision of any other agreement between City and Tenant, including the Other Agreements, City may use, apply or retain all or any portion of the Deposit for payment of any sum owing to City or to which City may become obligated by reason of Tenant's default or to compensate City for any loss or damage which City may suffer thereby. Likewise, if Tenant defaults with respect to any provision under this Lease, City may use, apply, or retain all or any portion of any deposit provided under any other agreement between City and Tenant, including the Other Agreements, for payment of any sum owing to City or to which City may become obligated by reason of Tenant's default or to compensate City for any loss or damage which City may suffer thereby. In the event the Deposit or any other deposit is so used, Tenant shall deposit other security acceptable to Director with City in an amount sufficient to restore the Deposit to the full amount thereof.

# 13.   DAMAGE OR DESTRUCTION

      13.1   <u>Partial Destruction of the Premises</u>.

      (a) In the event the improvements on the Premises are damaged by any casualty which is required to be insured against pursuant to this Lease, then Tenant shall repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect.

      (b) In the event such improvements are damaged by any casualty not covered under an insurance policy required to be maintained pursuant to this Lease, then City may, at

Airport Advertising Program Lease

City's option, either (i) repair such damage as soon as reasonably possible at City's expense, in which event this Lease shall continue in full force and effect, or (ii) give written notice to Tenant within sixty (60) days after the date of occurrence of such damage of City's intention to terminate this Lease. Such termination shall be effective as of the date specified in such notice.

(c) Notwithstanding the foregoing, if such damage is caused by an act or omission to act of Tenant or a Tenant Entity, then Tenant shall repair such damage, promptly at its sole cost and expense.

(d) In the event City elects to terminate this Lease pursuant to this Section 14.1, Tenant shall have the right within ten (10) days after receipt of the required notice to notify City of Tenant's intention to repair such damage at Tenant's expense, without reimbursement from City, in which event this Lease shall continue in full force and effect and Tenant shall proceed to make such repairs as soon as reasonably possible. If Tenant does not give such notice within the ten (10) day period, this Lease shall be terminated as of the date specified in City's notice. City shall not be required to repair any injury or damage by fire or other cause, or to make any restoration or replacement of any paneling, decorations, office fixtures, partitions, railings, ceilings, floor covering, equipment, machinery or fixtures or any other improvements or property installed in the Premises by Tenant or at the direct or indirect expense of Tenant. Tenant shall be required to restore or replace same in the event of damage.

13.2    Total Destruction of Premises.  If the improvements on the Premises are totally destroyed during the Term from any cause whether or not covered by the insurance required herein (including any destruction required by any authorized public authority), this Lease shall automatically terminate as of the date of such total destruction.

13.3    Partial Destruction of Terminal Building.  If fifty percent (50%) or more of the Terminal Building shall be damaged or destroyed by an insured risk, or if fifteen percent (15%) or more of the Terminal Building shall be damaged or destroyed by an uninsured risk, notwithstanding that the Premises may be unaffected thereby, each of City and Tenant may elect to terminate this Lease by giving notice to the other within ninety (90) days from the date of occurrence of such damage or destruction, in which event the Term of this Lease shall expire on a mutually agreed upon date and Tenant shall thereupon surrender the Premises to City as required hereunder.

13.4    Damage Near End of the Term.  If during the last year of the Term the improvements on the Premises are partially destroyed or damaged, City may at City's option terminate this Lease as of the date of occurrence of such damage by giving written notice to Tenant of City's election to do so within thirty (30) days after the date of occurrence of such damage. In the event City elects to terminate this Lease pursuant hereto, Tenant shall have the right within ten (10) days after receipt of the required notice to notify City in writing of Tenant's intention to repair such damage at Tenant's expense, without reimbursement from City, in which event this Lease shall continue in full force and effect and Tenant shall proceed to make such repairs as soon as reasonably possible.

13.5    No Abatement of Rent; Tenant's Remedies.

(a) If the Premises are partially destroyed or damaged, Tenant shall have no claim against City for any damage suffered by reason of any such damage, destruction, repair or

– 22 –

Airport Advertising Program Lease

restoration. Tenant waives California Civil Code Sections 1932(2) and 1933(4) providing for termination of hiring upon destruction of the thing hired.

(b) In no event will Tenant be entitled to an abatement of Rent resulting from any damage, destruction, repair, or restoration described herein.

## 14.    DEFAULT; REMEDIES

14.1    Event of Default. The occurrence of any one or more of the following events shall constitute a breach of this Lease and an "**Event of Default**" hereunder:

(a) Tenant shall fail duly and punctually to pay Rent, or to make any other payment required hereunder, when due to City, and such failure shall continue beyond the date specified in a written notice of such default from Director, which date shall be no earlier than the third (3rd) day after the effective date of such notice. Notwithstanding the foregoing, in the event there occurs two (2) defaults in the payment of Rent or other payment during the Term, thereafter Tenant shall not be entitled to, and City shall have no obligation to give, notice of any further defaults in the payment of Rent or other payment. In such event, there shall be deemed to occur an "**Event of Default**" immediately upon Tenant's failure to duly and punctually pay Rent or other payment hereunder; or

(b) Tenant shall become insolvent, or shall take the benefit of any present or future insolvency statute, or shall make a general assignment for the benefit of creditors, or file a voluntary petition in bankruptcy, or a petition or answer seeking an arrangement for its reorganization, or the readjustment of its indebtedness under the federal bankruptcy laws, or under any other law or statute of the United States or of any state thereof, or consent to the appointment of a receiver, trustee, or liquidator of any or substantially all of its property; or

(c) A petition under any part of the federal bankruptcy laws, or an action under any present or future insolvency law or statute, shall be filed against Tenant and shall not be dismissed within thirty (30) days after the filing thereof; or

(d) There shall occur a Transfer without the prior approval of the City; or

(e) Tenant shall voluntarily abandon, desert or vacate the Premises; or

(f) Any lien shall be filed against the Premises as a result of any act or omission of Tenant, and shall not be discharged or contested by Tenant in good faith by proper legal proceedings within twenty (20) days after receipt of notice thereof by Tenant; or

(g) Tenant shall fail to provide the Deposit within ten (10) days after the Effective Date or shall fail to maintain in full such Deposit at all times during the term of this Lease, and such failure shall continue for a period of more than three (3) days after delivery by Director of written notice of such breach or default; or

(h) Tenant shall fail to obtain and maintain the insurance required hereunder, or provide copies of the policies or certificates to City as required herein; or

(i) Tenant shall fail to keep, perform and observe each and every other promise, covenant and agreement set forth in this Lease, and such failure shall continue for a period of

more than three (3) days after delivery by Director of a written notice of such failure (the "**First Notice**"); or if satisfaction of such obligation requires activity over a period of time, if Tenant fails to commence the cure of such failure within three (3) days after receipt of the First Notice, or thereafter fails to diligently prosecute such cure, or fails to actually cause such cure within one hundred twenty (120) days after the giving of the First Notice; or

(j) Tenant shall use or give its permission to any person to use any portion of Airport or the Terminal Buildings used by Tenant under this Lease for any illegal purpose, or any purpose not approved by Director; or

(k) There shall occur a default under any other agreement between Tenant and City, including the Other Agreements, if any, and such default is not cured as may be provided in such agreement; provided, however, that nothing herein shall be deemed to imply that Tenant shall be entitled to additional notice or cure rights with respect to such default other than as may be provided in such other agreement.

14.2    <u>Statutory Notices</u>. Notwithstanding anything to the contrary in this Section 15, any written notice, other than as specifically set forth in this Section 15, required by any statute or law now or hereafter in force is hereby waived by Tenant to the fullest extent available under law. Any notice given by City pursuant to Section 15.1 may be the notice required or permitted pursuant to Section 1161 <u>et seq</u>. of the California Code of Civil Procedure or successor statutes, and the provisions of this Lease will not require the giving of a notice in addition to the statutory notice to terminate this Lease and Tenant's right to possession of the Premises. The periods specified in Section 15.1 within which Tenant is permitted to cure any default following notice from City will run concurrently with any cure period provided by applicable laws.

14.3    <u>Remedies</u>. Upon the occurrence and during the continuance of an Event of Default, City shall have the following rights and remedies in addition to all other rights and remedies available to City at law or in equity:

(a) City shall have the rights and remedies provided by California Civil Code Section 1951.2 (damages on termination for breach), including the right to terminate Tenant's right to possession of the Premises.   In the event this Lease is so terminated, City may recover from Tenant the following damages:

(i)    The "**worth at the time of the award**" of the unpaid Rent earned to the time of termination hereunder; and

(ii)    The "**worth at the time of the award**" of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; and

(iii)    The "**worth at the time of the award**" of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; and

(iv)    Any other amount necessary to compensate City for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom.

For purposes of the foregoing, the "**worth at the time of award**" of the amounts referred to in clauses (i) and (ii) above is computed by allowing interest at the lower of 18% per annum and the highest rate legally permitted under applicable law. The "**worth at the time of award**" of the amount referred to in clause (iii) above is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus 1% (one percent). Notwithstanding any other provisions hereof, any efforts by City to mitigate damages caused by Tenant's breach of this Lease shall not constitute a waiver of City's right to recover damages hereunder and shall not affect the right of City to indemnification pursuant to the provisions of Section 12 [Waiver; Indemnity; Insurance] hereof. For purposes of calculating City's damages comprising Base Rent based on Gross Revenues, that amount will be computed by determining the highest Base Rent accruing in any Lease Year during the immediately preceding three Lease Years or such shorter period if the Term prior to termination was less than three Lease Years. Tenant agrees that Tenant's obligations under this Lease, including the payment of Base Rent, are independent covenants and are not conditioned on the covenants or warranties of City.

(b) City shall have the right and remedy described in California Civil Code Section 1951.4. City may elect not to terminate this Lease and let this Lease continue, in which case City may enforce all its rights and remedies under this Lease, including the right to recover Rent as it becomes due under this Lease. Acts of maintenance or preservation or efforts to relet the Premises or the appointment of a receiver upon the initiative of City to protect City's interest under this Lease shall not constitute a termination of Tenant's right to possession.

(c) City shall have the right and power, as attorney in fact for Tenant, to enter and to sublet the Premises, to collect rents from all subtenants and to provide or arrange for the provision of all services and fulfill all obligations of Tenant (as permitted in accordance with the terms of this Lease) and City is hereby authorized on behalf of Tenant, but shall have absolutely no obligation, to provide such services and fulfill such obligations and to incur all such expenses and costs as City deems necessary in connection therewith. Tenant shall be liable immediately to City for all costs and expenses City incurs in collecting such rents and arranging for or providing such services or fulfilling such obligations. City is hereby authorized, but not obligated, to relet the Premises or any part thereof on behalf of Tenant, to incur such expenses as may be necessary to effect a relet and make said relet for such term or terms, upon such conditions and at such rental as City in its sole discretion may deem proper. Tenant shall be liable immediately to City for all reasonable costs City incurs in reletting the Premises required by the reletting, and other costs. If City relets the Premises or any portion thereof, such reletting shall not relieve Tenant of any obligation hereunder, except that City shall apply the rent or other proceeds actually collected by it as a result of such reletting against any amounts due from Tenant hereunder to the extent that such rent or other proceeds compensate City for the nonperformance of any obligation of Tenant hereunder. Such payments by Tenant shall be due at such times as are provided elsewhere in this Lease, and City need not wait until the termination of this Lease, by expiration of the Term hereof or otherwise, to recover them by legal action or in any other manner. City may execute any lease made pursuant hereto in its own name, and the lessee thereunder shall be under no obligation to see to the application by City of any rent or other proceeds, nor shall Tenant have any right to collect any such rent or other proceeds. City shall not by any reentry or other act be deemed to have accepted any surrender by Tenant of the Premises or Tenant's interest therein, or be deemed to have otherwise terminated this Lease, or to have relieved Tenant of any obligation hereunder, unless City shall have given Tenant express written notice of City's election to do so as set forth herein.

– 25 –

Airport Advertising Program Lease