UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
---------------------------------------------------------------------x
METRO FUEL LLC, a Delaware limited
liability company,                                          No. C07-6067 JSW

        Plaintiff,

vs.

CITY OF SAN FRANCISCO, a municipal corporation,
COUNTY OF SAN FRANCISCO, a subdivision of the
State of California, CITY AND COUNTY OF SAN
FRANCISCO, a chartered California city and county.

        Defendants.

---------------------------------------------------------------------x

## DECLARATION OF MICHAEL A. FREEDMAN

        MICHAEL A. FREEDMAN declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

        1.    I am the Chief Executive Officer of Fuel Outdoor Holdings, LLC, the parent of the plaintiff in this case, Metro Fuel LLC ("Fuel"). I submit this declaration in support of Fuel's motion for a preliminary injunction.

        2.    Fuel entered the panel sign business in San Francisco by acquiring substantially all of the assets of Metro Lights, LLC ("Metro Lights") on or about August 24, 2006. Prior to Fuel's acquisition of Metro Lights, Fuel did not operate any panel signs in San Francisco.

        3.    Fuel operates 164 panel signs in San Francisco. Fuel's panel signs are internally illuminated advertising signs measuring approximately 69 inches tall by approximately 48 inches wide, although several of Fuel's panel signs are somewhat smaller. Notably, at least

15 of Fuel's panel signs are located indoors where they are not visible from the street.

4. Fuel's signs generally are situated in one of several ways: they are affixed to the exterior of mixed use commercial properties; they are located in parking lots, either affixed to an adjacent building or mounted on a pole; they are placed on the inside of a parking garage near the door to the garage; or they are placed in the lobbies of office buildings. Fuel typically rents space from the landlord in exchange for the right to place a panel sign on or inside of the property. Most of Fuel's panel signs do not project from the building line onto the adjacent sidewalk, and the few that do project do so only by a few inches.

5. Attached hereto as Exhibit A are true and correct color photographs accurately portraying a variety of Fuel's panel signs as they are situated in the San Francsico streetscape. The first three photos depict Fuel panels signs that are mounted on poles placed on two parking lots and one gas station. The second three photos depict Fuel panel signs that are affixed to the exterior of buildings. The final two photos depict Fuel panel signs that are located on the inside of public parking garages.

6. Fuel's panel signs are made available to national and local advertisers on an "all comers" basis in a fashion similar to newspaper, magazine, and broadcast advertising. Fuel's panel signs may be used to display a variety of commercial and noncommercial messages, including political, religious, charitable, and public service messages.

7. Fuel's panel signs compete directly with the street furniture advertising signs – primarily bus shelters, kiosks, and newrsacks – with which the City has blanketed its sidewalks in recent years. Fuel sells advertising space on its panel signs to many of the very same advertisers that are contracting with the City's franchisees to place the very same advertising copy on the City's street furniture. Indeed, with thousands of street furniture signs in

play, the City of San Francisco is not just Fuel's regulator. It is, through its franchisees, by far Fuel's biggest competitor in the marketplace.

8.  I have been informed that the City of San Francisco (the "City") has issued Notices of Violation against dozens of Fuel's panel sign lessors, claiming that Fuel's panel signs have not been issued permits pursuant to section 604 of the San Francisco Planning Code (the "Code"), have not been registered with the San Francisco Planning Department (the "Planning Department") pursuant to section 604.2 of the Code, and/or otherwise violate the limitations on general advertising signs imposed by the Code.

9.  With respect to obtaining permits, Fuel did attempt to obtain permits for its San Francisco panel signs after it acquired Metro Lights in late 2006. Fuel hired an experienced permit expeditor, Jeremy Paul of Quickdraw Permit Consulting, to do so, and incurred considerable expense compiling and attempting to submit various permit applications. However, the Planning Department refused even to accept for filing – let alone meaningfully consider – Fuel's permit applications, despite repeated attempts by Fuel to file its permit applications with the Planning Department. According to officials staffing its Public Information Counter, the Planning Department apparently is not accepting permit applications for any new general advertising signs, presumably because the City believes that all new general advertising signs were banned by the passage of Proposition G in 2002.

10. For this reason, Fuel has not registered its advertising sign inventory with the Planning Department as contemplated by section 604.2 of the Code. Section 604.2(d) purports to require a duly authorized officer of Fuel to swear, under penalty of perjury, that all of the signs in Fuel's inventory have been issued all required by the Planning Department. Fuel cannot do this, because, as discussed above, the City refuses even to consider issuing advertising

sign permits for Fuel's signs. Because the City has refused to process Fuel's sign permit applications, Fuel cannot certify that it has obtained all necessary permits as section 604.2(d) purports to require. Once the City processes Fuel's applications and issues permits or otherwise confirms that Fuel's panel signs are compliant with all constitutional rules, Fuel will promptly register its sign inventory with the Planning Department.

11.    Fuel has already suffered very substantial harm from the City's campaign to enforce its unconstitutional advertising sign rules against Fuel and its lessors, and, absent immediate injunctive relief from this Court, such harm likely will become irreparable. The harm that Fuel has suffered and will continue to suffer falls into two basic categories: impeding Fuel's relationships with its lessors, and impeding Fuel's relationships with its advertisers.

12.    First, the City's enforcement tactics have caused widespread and growing unrest among Fuel's lessors. As described in greater detail in the accompanying declarations submitted by various Fuel lessors, many lessors have grown extremely and increasingly agitated by the escalating fines that the City has purported to impose on them. These lessors, many of whom are small business owners lacking substantial financial resources, are afraid of the liens that the City has threatened to place on their properties, and are concerned about what would happen to them if Fuel failed to indemnify them as it has promised to do in some cases. They also have serious concerns about these notices of violation compromising their ability to obtain other permits necessary for the operation of their businesses. As these declarations demonstrate, many of these lessors have threatened to remove Fuel's panel signs from the properties – notwithstanding their lease agreements – if this Court does not issue an injunction imminently, and at least two lessors (Devandra Patel and Stephanie Fonseca) have already done so. Needless to say, it would spell disaster for Fuel if its lessors began to remove their panel signs en masse.

13.     Indeed, one lessor, John Yuen, recently went so far as to *sue* Fuel in Superior Court, alleging that Fuel has not done enough to "seek the[] expeditious resolution" of the violations issued by the City for the Fuel panel sign located on his property. A true and correct copy of Mr. Yuen's June 9, 2008 summons and complaint against Fuel is attached hereto as Exhibit B.

14.     In addition to threatening Fuel's revenue stream flowing from its existing panel signs, the City's enforcement campaign has compromised and, until enjoined, will continue to compromise Fuel's efforts to develop locations for new panel signs going forward. Many prospective lessors who otherwise would be willing to do business with Fuel are, understandably, hesitant to erect panel signs on their properties when they know that the City is actively issuing notices of violations to Fuel's lessors – and threatening to place liens on their properties – based on what the City claims are violations of the its unconstitutional rules. There currently are numerous Fuel lessors who have expressed interest in leasing Fuel space for panel signs on other properties that the own or operate, but not until Fuel has obtained an injunction confirming that the City's regulatory scheme is unenforceable.

15.     Similarly, the City's enforcement campaign has dampened Fuel's ability to maximize revenues from advertisers. Like prospective lessors, some advertisers are hesitant to place advertising on panel signs that the City has unfairly branded as "illegal." For example, I recently was informed by the person who runs one of the largest media buying firms in the country that Fuel's competitors have been complaining to the buying community that Fuel operates a substantial amount of "illegal" signage, and that such aspersions were having an effect on advertising buyers. Because Fuel's signs are substantially similar (and in many cases essentially identical) to the City's signs, and because Fuel competes head to head for advertisers

with the City's franchisees, even the slightest suggestion that Fuel's signs are improper substantially impacts Fuel's ability to compete with the City.

16. For all of these reasons, Fuel respectfully submits that the City should be enjoined from enforcing its advertising sign restrictions against Fuel unless and until it enacts a neutral scheme that applies equally to all advertising signs, including the City's own signs that enable it to derive tens of millions of dollars per year in advertising revenue.

17. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 18, 2008
Westport, CT

_____
MICHAEL A. FREEDMAN