1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  KRISTEN A. JENSEN, State Bar #130196
   THOMAS S. LAKRITZ, State Bar #161234
3  VICTORIA WONG, State Bar #214289
   Deputy City Attorneys
4  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
5  San Francisco, California 94102
   Telephone:     (415) 554-6547
6  Facsimile:     (415) 554-4747
   E-Mail:        tom.lakritz@sfgov.org
7
8  Attorneys for Defendant
   CITY AND COUNTY OF SAN FRANCISCO
9

10                 UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12

13  METRO FUEL LLC, a Delaware limited          Case No. C07-6067 JSW
    liability company,
14                                              **DEFENDANT CITY AND COUNTY OF**
                      Plaintiff,                **SAN FRANCISCO'S NOTICE OF**
15                                              **MOTION, MOTION AND**
             vs.                                **MEMORANDUM OF POINTS AND**
16                                              **AUTHORITIES IN SUPPORT OF**
    CITY OF SAN FRANCISCO, a municipal          **MOTION FOR JUDGMENT ON THE**
17  corporation, COUNTY OF SAN                  **PLEADINGS**
    FRANCISCO, a subdivision of the State
18  of California, CITY AND COUNTY OF           **Fed. R. Civ. P. 12(c)**
    SAN FRANCISCO, a chartered California
19  city and county and DOE 1 through DOE       Hearing Date:    November 14, 2008
    10,                                         Time:            9:00 a.m.
20                                              Place:           Courtroom 2, 17th Floor
                      Defendants.
21                                              Trial Date:      October 26, 2009

22

23

24

25

26

27

28

## TABLE OF CONTENTS

NOTICE AND MOTION ......................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................2

SUMMARY OF ARGUMENT ............................................................................................2

BACKGROUND .....................................................................................................................3

    I.      SAN FRANCISCO'S REGULATION OF SIGNS AND ADVERTISING ............3

          A.      San Francisco Planning Code Article 6 .................................................3

          B.      San Francisco's Ban On New General Advertising Signs ...........................4

          C.      Future Limits On General Advertising Signs ................................................5

    II.     SAN FRANCISCO'S STREET FURNITURE ......................................................6

          A.      All Street Furniture is Reviewed for Safety and Aesthetics .......................6

                1.      All Street Furniture in the Public Rights-of-Way is Reviewed by the Department of Public Works....................................6

                2.      All Street Furniture in the Public Right-of-Way Must be Approved by the City's Arts Commission .......................................7

DISCUSSION ..........................................................................................................................8

    I.      LEGAL STANDARD..............................................................................................8

    II.     OFFSITE GENERAL ADVERTISING, AS COMMERCIAL SPEECH, IS AFFORDED ONLY LIMITED FIRST AMENDMENT PROTECTION .............8

    III.    METRO FUEL'S "UNDERINCLUSIVE THEORY" DOES NOT APPLY TO BILLBOARD REGULATION ...........................................................................11

    IV.    SAN FRANCISCO'S REGULATION OF GENERAL ADVERTISING DOES NOT VIOLATE THE FIRST AMENDMENT .....................................................13

          A.      Section 611 Implements Substantial Governmental Interests ...................13

          B.      Section 611 Directly And Materially Advances San Francisco's Substantial Governmental Interests ..........................................................14

                1.      Safety ...............................................................................................14

                 2.      Preserving San Francisco's Unique Character ...............................15

           C.      Section 611 Is No More Extensive Than Necessary..................................15

    V.     THIS COURT MUST GIVE PRECLUSIVE EFFECT TO THE UNCHALLENGED FACTUAL AND LEGAL DETERMINATIONS MADE IN THE ADMINISTRATIVE PROCEEDINGS AGAINST METRO FUEL'S SIGNS ...................................................................................................................16

    VI.    BECAUSE METRO FUEL'S SIGNS ARE ILLEGAL FOR REASONS NOT CHALLENGED IN THE FIRST AMENDED COMPLAINT, METRO FUEL LACKS STANDING TO PURSUE THIS ACTION ...........................................20

CONCLUSION.....................................................................................................................20

# TABLE OF AUTHORITIES

**State Cases**

*Abelleira v. District Court of Appeal*
  17 Cal.2d 280 (1941) .................................................................................17

*Briggs v. City of Rolling Hills Estates*
  40 Cal.App.4th 637 (1995) .......................................................................18

*City and County of San Francisco v. Ang*
  97 Cal.App.3d 673 (1979) .........................................................................18

*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.*
  35 Cal.4th 1072 (2005) ..............................................................................17

*Johnson v. City of Loma Linda*
  24 Cal.4th 61 (2000) ..................................................................................17

*Knickerbocker v. City of Stockton*
  199 Cal.App.3d 235 (1988) .......................................................................18

*Swartzendruber v. City of San Diego*
  3 Cal.App.4th 896 (1992) ..........................................................................19

*Takahashi v. Board of Education*
  202 Cal.App.3d 1464 (1988) .....................................................................19

**State Statutes & Codes**

Code of Civil Procedure
  Section 1094.5 ..................................................................................17, 18, 19
  Section 1094.6, subdivision (b) ..................................................................17

**Federal Cases**

*44 Liquormart, Inc. v. Rhode Island*
  517 U.S. 484 (1996) ....................................................................................11

*Ackerley Communications of the Northwest Inc. v. Krochalis*
  108 F.3d 1095 (9th Cir. 1997) ...............................................2, 10, 11, 12, 14

*Ballen v. City of Redmond*
  466 F.3d 736 (9th Cir. 2006) .....................................................................12

*Berman v. Parker*
  348 U.S. 26 (1954) ......................................................................................13

*Board of Trustees of State University of New York v. Fox*
  492 U.S. 469 (1989) ......................................................................................8

*Carlo v. City of Chino*
  105 F.3d 493 (9th Cir. 1997) .....................................................................12

*Central Hudson Gas & Electric Corp. v. Public Service Comm'n*
   447 U.S. 557 (1980)........................................................................................8, 9, 13, 14, 15

*City of Cincinnati v. Discovery Network, Inc.*
   507 U.S. 410 (1993)...........................................................................................................2, 11

*Clear Channel Outdoor, Inc. v. City of Los Angeles*
   340 F.3d 810 (9th Cir. 2003) ................................................................................................10

*Communications of the Northwest Inc. v. Krochalis*
   108 F.3d 1095 (9th Cir. 1997) .........................................................................................2, 11

*Desert Outdoor Advertising, Inc. v. The City of Moreno Valley*
   103 F.3d 814 (9th Cir. 1996) .................................................................................................13

*Edenfield v. Fane*
   507 U.S. 761 (1993) ................................................................................................................11

*Get Outdoors II, LLC v. City of San Diego*
   506 F.3d 886 (9th Cir. 2007) .........................................................................................2, 20

*Greater New Orleans Broadcasting Ass'n, Inc. v. United States*
   527 U.S. 173 (1999)...........................................................................................................2, 11

*Hal Roach Studios, Inc. v. Richard Feiner and Co.*
   896 F.2d 1542 (9th Cir. 1990) ................................................................................................8

*Kovacs v. Cooper*
   336 U.S. 77 (1949) ..................................................................................................................11

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1992) ................................................................................................................20

*McGlinchy v. Shell Chemical Co.*
   845 F.2d 802 (9th Cir. 1988) ..................................................................................................8

*Members of City Council of the City of Los Angeles v. Taxpayers for Vincent*
   466 U.S. 789 (1984)...........................................................................................................10, 13

*Metro Lights, L.L.C. v. City of Los Angeles*
   488 F. Supp. 2d 927 (C.D. Cal. 2006) ...........................................................................12, 14

*Metromedia v. City of San Diego*
   453 U.S. 490 (1981) ......................................................................................................... passim

*Miller v. County of Santa Cruz*
   39 F.3d 1030 (9th Cir. 1994) .......................................................................................2, 16, 17, 20

*Ohralik v. Ohio State Bar Ass'n*
   436 U.S. 447 (1978) ..................................................................................................................8

*Outdoor Sys., Inc. v. City of Mesa*
    997 F.2d 604 (9th Cir. 1993) .................................................................11

*Penn Central Transportation Co. v. New York City*
    438 U.S. 104 (1978) .................................................................13

*Railway Express Agency, Inc. v. New York*
    336 U.S. 106 (1949).................................................................13, 14

*Rodriguez de Quijas v. Shearson/American Express, Inc.*
    490 U.S. 477 (1989) .................................................................12

*Rubin v. Coors Brewing Co.*
    514 U.S. 476 (1995).................................................................2, 11, 12

*United States v. Utah Construction & Mining Co.*
    384 U.S. 394 (1966).................................................................16, 17

*University of Tennessee v. Elliot*
    478 U.S. 788 (1986) .................................................................16

*Village of Belle Terre v. Boraas*
    416 U.S. 1 (1974) .................................................................13

*World Wide Rush, LLC v. City of Los Angeles*
    --- F.Supp.2d ----(C.D. Cal. 2006) .................................................................12

*Young v. American Mini Theatres, Inc.*
    427 U.S. 71 (1976) .................................................................13

**Federal Statutes**

42 United States Code
    Section 1983 .................................................................16, 18

Federal Rule of Civil Procedure
    Rule 12(b)(6).................................................................8
    Rule 12(c) .................................................................8

Title 28 United States Code
    Section 1738 .................................................................16

**San Francisco Statutes, Codes & Ordinances**

San Francisco Charter
    Section 5.103 .................................................................7

San Francisco Charter
    Article V (2006).................................................................7

San Francisco, California, Planning Code

Article 6 ...................................................................................................................3
Section 601 ............................................................................................................3, 5
Section 602.3 (2007)...............................................................................................3
Section 602.7 ..........................................................................................................4
Section 610(d)(1)B ..................................................................................................18
Section 611 ........................................................................................... passim
Section 611(b)......................................................................................................4, 6

**Other References**

Proposition G ....................................................................................................2, 4, 5, 13
Proposition K ....................................................................................................................5

# NOTICE AND MOTION

Defendant the City and County of San Francisco, sued herein as the City of San Francisco, County of San Francisco, and City and County of San Francisco (collectively, "the City" or "San Francisco") hereby moves for judgment on the pleadings, because these First Amended Complaint fails to state a claim.  This motion is made pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, as is based upon the below Memorandum of Points and Authorities and the Request for Judicial Notice filed concurrently herewith.

This motion will be heard on Friday, November 14, 2008, at 9:00 a.m., before the Honorable Jeffrey S. White in Courtroom 17 at the United States District Court, San Francisco Division, 450 Golden Gate Avenue, San Francisco, CA 94102.


Dated:  August 29, 2008                    Respectfully submitted,

                                           DENNIS J. HERRERA
                                           City Attorney
                                           KRISTEN A. JENSEN
                                           THOMAS S. LAKRITZ
                                           VICTORIA WONG
                                           Deputy City Attorneys


                                 By:_____/S/_____.
                                           THOMAS S. LAKRITZ

                                           Attorneys for Defendant CITY AND COUNTY OF
                                           SAN FRANCISCO

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## SUMMARY OF ARGUMENT

3

4

5

6

7

8

For over 40 years, the City and County of San Francisco ("the City") has regulated signs and billboards in San Francisco.  In 2002, the almost 80% of the voters approved Proposition G, which prohibits all new general advertising signs as a March 5, 2002.  Proposition G was premised on the need to control the visual clutter and blight caused by the proliferation of billboards in San Francisco. In addition, Proposition G sought to protect the interest of pedestrians and drivers by removing visual clutter in the public right of way.

9

10

11

12

13

14

15

16

17

18

Metro Fuel LLC ("Metro Fuel") seeks to invalidate Proposition G alleging it violates the First and Fourteenth Amendments.  San Francisco Planning Code section 611 is not invalid simply because it prohibits Metro Fuel's business.  Metro Fuel's entire case based upon its reading of *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173 (1999); *Rubin v. Coors Brewing Co*., 514 U.S. 476 (1995); and *City of Cincinnati v. Discovery Network, Inc*., 507 U.S. 410, 420 (1993). But the Ninth Circuit has unequivocally rejected this theory's application to a content-neutral billboard regulation, such as that presented here.  *Ackerley Communications of the Northwest Inc. v. Krochalis*, 108 F.3d 1095, 1099-1100 (9th Cir. 1997).  Furthermore, San Francisco's regulatory scheme, which limits advertisements on street furniture, easily satisfies the test articulated in *Metromedia v. City of San Diego,* 453 U.S. 490 (1981).

19

20

21

22

23

Metro Fuel's claims also fail because this Court is bound to adopt the factual and legal findings included in the notices of violation issued by the City, because neither Metro Fuel nor the underlying property owners pursued administrative or state judicial review of those notices of violation.  *Miller v. County of Santa Cruz* 39 F.3d 1030, 1032 (9th Cir. 1994)  Because the notices of violation are now final, the legality of those signs cannot be challenged in this action.

24

25

26

27

Moreover, as a result of the illegality of the signs identified in the notices of violation, Metro Fuel cannot obtain the redress it seeks here, and the Court need reach Metro Fuel's challenge to San Francisco's ban on new general advertising signs.  *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 891 (9th Cir. 2007)).

28

The Court should grant San Francisco's motion without leave to amend.

**BACKGROUND**

I.    **SAN FRANCISCO'S REGULATION OF SIGNS AND ADVERTISING**

      **A.**    **San Francisco Planning Code Article 6**

      For over 40 years, San Francisco has regulated signs and billboards in the City.  In 1965, the City enacted San Francisco Planning Code, Article 6 to regulate and control signs and billboards in San Francisco.  S.F., Cal., Planning Code art. 6 (2007).[1]  The purpose of San Francisco's regulations is to enhance the character, dignity, and aesthetics of San Francisco, and to promote the public health, safety, and welfare by reducing visual distractions to pedestrians and motorists:

> it is the further purpose of this Article 6 to safeguard and enhance property values in residential, commercial and industrial areas; to protect public investment in and the character and dignity of public buildings, open spaces and thoroughfares; to protect the distinctive appearance of San Francisco which is produced by its unique geography, topography, street patterns, skyline and architectural features; to provide an environment which will promote the development of business in the City; to encourage sound practices and lessen the objectionable effects of competition in respect to size and placement of signs; to aid in the attraction of tourists and other visitors who are so important to the economy of the City and County; to reduce hazards to motorists and pedestrians traveling on the public way; and thereby promote the public health, safety and welfare.

*Id.* at § 601.

      Like many cities, San Francisco follows the dictates of *Metromedia* and regulates signs based on the onsite and offsite distinction.  In San Francisco, onsite signs are designated as "business signs" and offsite signs are designated "general advertising signs."  A "business sign" is defined as:  "A sign which directs attention to a business, commodity, service, industry or other activity which is sold, offered, or conducted, other than incidentally, on the premises upon which such sign is located, or to which it is affixed."  S.F., Cal., Planning Code § 602.3 (2007).  A "general advertising sign" is defined as

> A sign, legally erected prior to the effective date of Section 611 of this Code, which directs attention to a business, commodity, industry or other activity which is sold, offered or conducted elsewhere than on the premises upon which sign is located, or to which it is affixed, and which is sold, offered or conducted on such premises only incidentally if at all.

---

[1]    S.F., Cal., Planning Code art. 6 (2007) is attached as Exhibit A to San Francisco's Request for Judicial Notice.

1 *Id.* at § 602.7.

2 **B.**    **San Francisco's Ban On New General Advertising Signs**

3 In 2002, members of the Board of Supervisors ("the Board") sought to prohibit new general

4 advertising signs as of March 5, 2002, and they placed Proposition G on the ballot.  *See* San

5 Francisco, Cal., Voter Information Pamphlet And Sample Ballot, Consolidated Primary Election,

6 March 5, 2002 ("Proposition G").[2]  While imposing a ban on new general advertising signs,

7 Proposition G expressly stated that "Nothing in this ordinance shall be construe to prohibit the

8 placement of signs . . . in the public right of way as permitted by local law."  *Id.* at p. 102 (codified at

9 S.F., Cal., Planning Code § 611(b).)  Moreover, consistent with constitutional limits, Proposition G

10 expressly stated that it was "not intended to regulate non-commercial speech."  *Id.* at § 1(n)

11 (uncodified findings).  The following findings were made when Proposition G was adopted:

12 ### ***Preserving the City's Unique Character***

13 (a)    General advertising is currently in, adjacent to, and visible from public and historically significant civic spaces including parks, public plazas, historic buildings and the waterfront.

15 (b)    City officials have received complaints from the public about the proliferation of general advertising signs in the City, about the commercialization of the City's public space, the increased size of vinyl signs which cover entire sides of buildings, as well as about general advertising signs placed on architecturally and historically significant buildings, all of which affect the quality of life in San Francisco, adding blight and clutter.

18 (c)    The City currently contains an ample supply of legally permitted general advertising signs.

19 (d)    The number of general advertising signs is increasing all over the City. Many areas of the City are saturated with general advertising signs.  In these areas the general advertisings signs are obtrusive, out of scale, and contribute to visual pollution and blight.  As population, traffic and building trends grow and shift within the City, it is difficult to assess which areas of the City will be inundated with general advertising signs next.

22 (e)    Tourism, San Francisco's largest revenue generating industry, benefits from the preservation of the City's unique character, architecture and vistas. As general advertising signs become more and more a part of the City's landscape, its distinctive appearance is hidden and the character that tourists visit the City to experience is lost.

25 ### ***Safety***

---

26 [2]    San Francisco, Cal., Voter Information Pamphlet And Sample Ballot, Consolidated Primary Election, March 5, 2002 ("Proposition G") is attached as Exhibit B to San Francisco's Request for Judicial Notice.

(f)     City officials and the public have expressed concern over the impact of the increasing volume of general advertising signs on traffic and pedestrian safety.

(g)     Signs identifying local services and businesses are often blocked or obscured by general advertising signs, a practice that confuses and distracts the public from finding those services and businesses.

(h)     Planning Code Section 601 identifies the need to reduce hazards such as signs which can distract motorists and pedestrians traveling on the public right of way and increase the potential for accidents, especially in congested parts of the City.

*Id.* at § 1 (a-h) (uncodified findings).

Proposition G passed with almost 80% of the vote. *See* San Francisco, Cal., Consolidated Primary Election Results, March 5, 2002, Proposition G.[3]

### C.     Future Limits On General Advertising Signs

San Francisco is considering taking the next incremental step in addressing the issues created by the proliferation of general advertising signs in San Francisco. In 2007, members of the Board sought to limit new general advertising signs on street furniture, and they placed Proposition K on the ballot. *See* San Francisco, Cal., Voter Information Pamphlet And Sample Ballot, Consolidated Primary Election, November 6, 2007 ("Proposition K").[4] Proposition K declared that it would be the policy of San Francisco that "there shall be no increase in the number of general advertising signs on street furniture on the public right-of-way, including, but not limited to, transit shelters, kiosks, benches and newspaper racks, over the number authorized by City law and City contracts as of July 1, 2007." Proposition K passed with almost 62% of the vote. *See* San Francisco, Cal., Consolidated Primary Election Results, November 6, 2007, Proposition K.[5] The Board is currently considering

---

[3]     San Francisco, Cal., Consolidated Primary Election Results, March 5, 2002, Proposition G is attached as Exhibit C to the City's Request for Judicial Notice.

[4]     San Francisco, Cal., Voter Information Pamphlet And Sample Ballot, Consolidated Primary Election, November 6, 2007 ("Proposition K") is attached as Exhibit E to San Francisco's Request for Judicial Notice.

[5]     San Francisco, Cal., Consolidated Primary Election Results, November 6, 2007, Proposition K is attached as Exhibit F to the City's Request for Judicial Notice.

1   legislation that would implement the policy the voters approved by passing Proposition K.  On May

2   13, 2008, Supervisor McGoldrick introduced an ordinance that would codify Proposition K.[6]

3   **II.    SAN FRANCISCO'S STREET FURNITURE**

4          San Francisco has a comprehensive regulatory scheme to advance its twin goals of safety and

5   esthetics with respect to items, including advertising on street furniture, placed in the public right of

6   way.  Section 611 expressly provides that general advertising signs are allowed on street furniture

7   only "as permitted by local law."  S.F., Cal. Planning Code §611(b).  San Francisco has enacted

8   ordinances and adopted policies severely limiting the placement and number of general advertising

9   signs allowed on street furniture.  All street furniture is subject to an administrative review for safety

10  and aesthetics and a public review process allowing residents and neighbors to comment on proposed

11  locations for the various types of street furniture.

12         **A.    All Street Furniture is Reviewed for Safety and Aesthetics**

13              **1.    All Street Furniture in the Public Rights-of-Way is Reviewed by the Department of Public Works**

14         The San Francisco Department of Public Works (DPW) has adopted the following Orders and

15  Guidelines governing the safe design and placement of street furniture in the public right-of-way:

16         • Amended Order No. 177,159 -- Transit Shelters, Signal Control Covers and Kiosks in

17              the Public Rights-Of-Way.  One of the purposes of Amended Order No. 177,159 is "to

18              ensure that the installation of such structures in the Public Rights-of-Way will not

19              impeded travel, inconvenience property owners, unnecessarily interfere with views or

20              create visual blight."[7]

21         • Order Nos. 163, 368 and 169,739 – Placement of Public Service Kiosks on City

22              Streets and Public Property.  These Orders state, among other things, that "public

23

24

25          [6]     San Francisco, Cal. Legislative File No. 080658 (introduced May 13, 2008) is attached
26  as Exhibit G to the City's Request for Judicial Notice.

            [7]     City and County of San Francisco, Department of Public Works, Amended Order No.
27  177,159 (Sept. 26, 2007) is attached as Exhibit H to San Francisco's Request for Judicial Notice.

28

service kiosks shall not be installed where placement would significantly impede the flow of pedestrian traffic."[8]

- Order No. 163, 369 – Placement of Public Toilets on City Streets and Public Property. Two of the purposes of Order No. 163,369 are to ensure that public toilets do "not obstruct any traffic sign or traffic signal" or "significantly impede the flow of pedestrian traffic."[9]

- Guidelines Regarding Regulation of News Racks – Implementing Article 5.4, section 184.12, of the San Francisco Public Works Code and governing the placement of fixed pedestal units in San Francisco.[10]

**2.    All Street Furniture in the Public Right-of-Way Must be Approved by the City's Arts Commission**

Under section 5.103 of the San Francisco Charter, the San Francisco Arts Commission ("Arts Commission") must "approve the designs for all public structures," including transit shelters, public toilets and public service kiosks and fixed pedestal newsracks in San Francisco.[11]  The Arts Commission in comprised of fifteen members.  *Id.*  "Eleven members shall be practicing arts professionals including two architects, a landscape architect, and representatives of the performing, visual, literary and media arts; and four members shall be lay members."  *Id*  The Arts Commission has implemented Submission Guidelines for the review and approval of the design of structures on public property.[12]

---

[8]    City and County of San Francisco, Department of Public Works, Amended Order Nos. 163,368 (Sept. 8, 193) and 169,739  (May 5, 1996) are attached as Exhibit I to San Francisco's Request for Judicial Notice.

[9]    City and County of San Francisco, Department of Public Works, Amended Order No. 163,369 (Sept. 8, 1993) is attached as Exhibit J to San Francisco's Request for Judicial Notice.

[10]    City and County of San Francisco, Department of Public Works, Guidelines Regarding Regulation of News Racks (Nov. 2, 2005) is attached as Exhibit K to San Francisco's Request for Judicial Notice.

[11]    San Francisco, Cal., Charter, art. V (2006) is attached as Exhibit L to San Francisco's Request for Judicial Notice.

[12]    City and County of San Francisco, San Francisco Arts Commission Civic Design Review Submission Guidelines are attached as Exhibit M to San Francisco's Request for Judicial Notice (http://www.sfartscommission.org/CDR/forms/Guidelines.pdf) (visited August 25, 2008).

**DISCUSSION**

**I.    LEGAL STANDARD**

"Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law."  *Hal Roach Studios, Inc. v. Richard Feiner and Co.,* 896 F.2d 1542, 1550 (9th Cir. 1990).

When Federal Rule of Civil Procedure 12(c) is used to raise the defense of failure to state a claim upon which relief can be granted, the standard governing the Rule 12(c) motion is the same for that governing a Rule 12(b)(6) motion.  *McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 810 (9th Cir. 1988).  As a result, a 12(c) motion for failure to state a claim should be granted, "if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations."  *Id.* (quotation and citation omitted).  The Court must take the non-moving party's factual allegations as true and must construe those allegations in the light most favorable to the non-moving party.  *Id.*

**II.    OFFSITE GENERAL ADVERTISING, AS COMMERCIAL SPEECH, IS AFFORDED ONLY LIMITED FIRST AMENDMENT PROTECTION**

Because this case presents a First Amendment challenge in the context of general advertising signs (billboards) – a discreet form of communication governed by its own line of judicial precedent that is largely ignored by Metro Fuel in favor of cases of limited or no applicability – the Court should view Metro Fuel's challenge with skepticism.

The Supreme Court has said that commercial speech is entitled to limited First Amendment protection:  "Our jurisprudence has emphasized that 'commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,' and is subject to "modes of regulation that might be impermissible in the realm of noncommercial expression."  *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 477 (1989) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)).  "The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation."  *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 562-563 (1980) (internal citation omitted).

In *Central Hudson*, the Court developed a four-part analysis to determine whether a particular kind of commercial speech can be banned or regulated:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at p. 566.

Applying the four-part *Central Hudson* test to review a ban on offsite advertising, the Court has held that offsite advertising and billboards are a subset of commercial speech and must be analyzed differently from other forms of commercial speech. *See Metromedia v. City of San Diego,* 453 U.S. 490 (1981). *Metromedia* involved a San Diego ordinance that allowed "onsite" commercial signs but prohibited "[offsite] commercial . . .and noncommercial communications using fixed-structure signs," that is, billboards.[13] *Id.* at 496. The San Diego ordinance contained twelve exceptions, and one of the exceptions stated that the ordinance did not apply to "[b]ench signs located at designated public transit bus stops; provided, however, that such signs shall have any necessary permits." *Id.* at 496, n.3. After the California Supreme Court upheld the ordinance under the federal and California Constitutions, seven Justices of the U.S. Supreme Court, applying the commercial speech test set forth in *Central Hudson,* held that the ordinance's restrictions on commercial speech did not violate the First Amendment. *See id.* at 508-512 (plurality opinion); *id*. at 541 (Stevens, J. (joining plurality as to commercial speech)); *id*. at 555-69 (Burger, J. (finding ordinance entirely constitutional)); *id*. at 569 (Rehnquist, J. (same).)

The *Metromedia* Court held, first, that there was no "substantial doubt" that the measure's two stated purposes–"to eliminate hazards to pedestrians and motorists brought about by distracting sign displays" and "to preserve and improve the appearance of the City"–are "substantial governmental

---

[13] An "onsite" sign was defined as one that designated the premise on which the sign was located or the name of its owner or occupant, or that advertised goods produced or services rendered at that location. Conversely, an "offsite" sign was one that "advertis[ed] goods or services produced or offered elsewhere." *Metromedia*, 453 U.S. at 494, 503.

1   goals." *Id.* at 493, 507-08.  Second, the Court held that the prohibition on commercial billboards

2   directly advanced the city's safety and aesthetic interests, even though the city had relied only on its

3   "legislative judgment that billboards are traffic hazards" and cause aesthetic blight.  *Id*. at 508-510.

4   Finally, the Court held that the ordinance was no broader than necessary to serve the city's interests.

5   As it explained, "[i]f the city has a sufficient basis for believing that billboards are traffic hazards and

6   are unattractive, then obviously the most direct and perhaps the only effective approach to solving the

7   problems they create is to prohibit them."  *Id*. at 508.

8       The *Metromedia* Court also held that the law did not violate the First Amendment even

9   though it allowed onsite commercial billboards but prohibited "identical billboards, equally

10  distracting and unattractive," that displayed offsite messages.  *Id*. at 511.  The fact that the city "has

11  obviously chosen to value one kind of commercial speech – onsite advertising – more than another

12  kind of commercial speech – offsite advertising," was legally permissible.  *Id*. at 512.  As the Court

13  explained:  "The ordinance reflects a decision by the city that the former interest, but not the latter, is

14  stronger than the city's interests in traffic safety and esthetics.  The city has decided that in a limited

15  instance – onsite commercial advertising – its interests should yield.  We do not reject that judgment."

16  *Id*.

17      Moreover, "the prohibition of offsite advertising is directly related to the stated objectives of

18  traffic safety and esthetics.  This is not altered by the fact that the ordinance is underinclusive because

19  it permits onsite advertising."  *Id*. at 511.  And "the city may believe that offsite advertising, with its

20  periodically changing content, presents a more acute problem than does onsite advertising."  *Id*.

21      The Court reaffirmed *Metromedia* in *Members of City Council of the City of Los Angeles v.

22  Taxpayers for Vincent,* 466 U.S. 789, 807, (1984).  *Metromedia,* therefore, remains the controlling

23  Supreme Court case analyzing the ability of cities to regulate outdoor advertising in order to further

24  public safety and aesthetics.

25      The Ninth Circuit has expressly upheld total bans on billboards or an on-site/off-site

26  distinction based upon *Metromedia.  See, e.g., Clear Channel Outdoor, Inc. v. City of Los Angeles,*

27  340 F.3d 810, 814 (9th Cir. 2003); *Ackerley Communications of the Northwest Inc. v. Krochalis*, 108

28

F.3d 1095, 1099-1100 (9th Cir. 1997); *Outdoor Sys., Inc. v. City of Mesa*, 997 F.2d 604, 610 (9th Cir. 1993).

### III.     METRO FUEL'S "UNDERINCLUSIVE THEORY" DOES NOT APPLY TO BILLBOARD REGULATION

Metro Fuel's entire case is premised on what it claims is "an unbroken line of Supreme Court cases confirming that a regulatory scheme restricting speech cannot stand if it is pierced by exceptions that substantially undermine its purported rationale." Metro Fuel's theory is based upon its reading of *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173 (1999); *Rubin v. Coors Brewing Co*., 514 U.S. 476 (1995); and *City of Cincinnati v. Discovery Network, Inc*., 507 U.S. 410, 420 (1993). Metro Fuel's reliance on these cases is misplaced.

The Supreme Court has never applied this "underinclusive theory" to a content-neutral billboard regulation. Indeed, Justice White's opinion for the Court in *Metromedia* explained that "[e]ach method of communicating ideas is 'a law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers' of each method. We deal here with the law of billoards." *Metromedia*, 453 U.S. at 501 (quoting *Kovacs v. Cooper*, 336 U.S. 77, 97 (1949). As noted above, seven Justices held that San Diego's ban was constitutional even though it was substantially underinclusive. *Id*. at 508-12.

Moreover, the Ninth Circuit has unequivocally rejected this theory's application to a content-neutral billboard regulation, such as that presented here. In *Ackerley*, 108 F.3d 1095, the Ninth Circuit held that Seattle's regulation limiting the construction and relocation of billboards was constitutional under *Metromedia* as a matter of law, even though Seattle had no detailed proof that the billboard regulation advanced the city's interest in traffic safety and esthetics. In attacking Seattle's regulation, the plaintiff in *Ackerley* argued "that since *Metromedia*, the Court has imposed a greater evidentiary burden on a municipality trying to justify a restriction on commercial speech, see, e.g., *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996); *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995); *Edenfield v. Fane*, 507 U.S. 761 (1993); and *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993)." *Id*. at 1097-1098 (parallel citations omitted). The Ninth Circuit rejected the

argument, noting that the Supreme Court itself has never said that these cases undermine its holding in *Metromedia*.  *Id.* at 1099.  The Ninth Circuit explained that *Metromedia* is still binding law:

> [W]here a Supreme Court precedent has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to the Supreme Court 'the prerogative of overruling its own decisions.'  *Carlo v. City of Chino*, 105 F.3d 493, 499 (9th Cir. 1997) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

*Id.*  (parallel citations omitted.)  Rejecting the applicability of the "underinclusive theory" to billboard regulations, the Ninth Circuit held "that *Metromedia* continues to control regulation of billboards." *Id.*

Like the Supreme Court, the Ninth Circuit continues to recognize the distinction between the regulation of billboards and other forms of commercial speech.  In *Ballen v. City of Redmond*, 466 F.3d 736 (9th Cir. 2006), the Ninth Circuit reviewed the validity of the City of Redmond's prohibition on the use of portable signs as a permissible restriction on commercial speech.  *Id.* at 740.  The Ninth Circuit concluded that *Metromedia* did not control because the City of Redmond's prohibition did not involve the regulation of billboards.  "This distinction is significant because billboards are fixed, permanent structures that are more intrusive to community aesthetics than portable sandwich boards. The externalities of billboards include perdurable visual pollution that pervades a substantial volume of our eyesight and grows into an uningnorable part of our cultural landscape."  *Id.* at 744.

Metro Fuel relies extensively on *Metro Lights, L.L.C. v. City of Los Angeles,* 488 F. Supp. 2d 927 (C.D. Cal. 2006), *appeal docketed*, No. 07-55179 (9th Cir. Feb. 1, 2007), and *World Wide Rush, LLC v. City of Los Angeles*, --- F.Supp.2d ----(C.D. Cal. 2006), 2008 WL 2477440, *appeal docketed*, No. 08-56062  (9th Cir. Jun. 26, 2008) to support this case.  Metro Fuel's reliance on *Metro Lights* and *World Wide Rush* fails.  First, both cases are on appeal to the Ninth Circuit, a fact that Metro Fuel fails to mention in its brief.  Second, neither case acknowledged that *Ackerley* is controlling precedent in the Ninth Circuit on this issue and that *Metromedia* is the controlling Supreme Court precedent on the regulation of billboards.

1

**IV.    SAN FRANCISCO'S REGULATION OF GENERAL ADVERTISING DOES NOT VIOLATE THE FIRST AMENDMENT**

2

**A.    Section 611 Implements Substantial Governmental Interests**

3    Section 611 implements San Francisco's substantial governmental interests of protecting

4    pedestrians and motorists and preserving San Francisco's unique character.  As the Court stated in

5    *Metromedia*, 453 U.S. at 507-508:

6
7
8
9

> Nor can there by substantial doubt that the twin goals that the ordinance seeks
> to further-traffic safety and the appearance of the city-are substantial
> governmental goals.  It is far too late to contend otherwise with respect to
> either traffic safety, *Railway Express Agency, Inc. v. New York*, 336 U.S. 106
> (1949) or esthetics, see *Penn Central Transportation Co. v. New York City,* 438
> U.S. 104 (1978); *Village of Belle Terre v. Boraas,* 416 U.S. 1 (1974); *Berman
> v. Parker,* 348 U.S. 26 (1954)

10    In *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S.

11    at 806-807, the Supreme Court reaffirmed *Metromedia* and held that aesthetic interests were

12    substantial enough to justify a ban on billboards:

13
14
15
16

> We reaffirm the conclusion of the majority in *Metromedia*.  The problem
> addressed by this ordinance-the visual assault on the citizens of Los Angeles
> presented by an accumulation of signs posted on public property-constitutes a
> significant evil within the City's power to prohibit.  "[T]he city's interest in
> attempting to preserve [or improve] the quality of urban life is one that must be
> accorded high respect."  *Young v. American Mini Theatres, Inc.* 427 U.S. 71
> (1976) (plurality opinion).

17    The Ninth Circuit likewise has stated:

18
19
20
21
22

> Insofar as billboards are concerned, the burden on the City of meeting the first
> prong of the *Central Hudson* test is not a great one.  Had the City enacted the
> ordinance with a clear statement of purpose indicating the City's interest in
> eliminating the hazards posed by billboards to pedestrians and motorists and in
> preserving and improving its appearance, the City would have demonstrated
> that the ordinance sought to implement substantial governmental interests, and
> would thus have satisfied the first prong of the *Central Hudson* test.  *See
> Metromedia*, 453 U.S. at 493, 507-10.

23    *Desert Outdoor Advertising, Inc. v. The City of Moreno Valley*, 103 F.3d 814, 819, n.2 (9th Cir. 1996).

24    Here, when the voters enacted Proposition G they stated that the purpose was to preserve San

25    Francisco unique character and to reduce hazards to motorists and pedestrians associated with the

26    proliferation of billboards and general advertising signs.  RJN, Exh B.  Section 611, therefore,

27    implements substantial governmental interests as a matter of law.  *Desert Outdoor Advertising*, 103

28    F.3d at 819, n.2.

**B.    Section 611 Directly And Materially Advances San Francisco's Substantial Governmental Interests**

As a matter of law Section 611 directly and materially advances San Francisco' substantial governmental interests.  As stated above, the Ninth Circuit has rejected the underinclusive theory's application to billboard regulation.  *Ackerley*, 108 F.3d at 1099.

**1.    Safety**

As a matter of law, Section 611 directly and materially advances San Francisco's substantial governmental interest in stopping the proliferation of general advertising signs in order to protect pedestrians and motorists.  In *Metromedia*, the Court concluded that San Diego's ban on off-site general advertising signs while allowing identical on-site general advertising signs passed the third prong of the *Central Hudson* test.

> Noting that "[b]illboards are intended to, and undoubtedly do, divert a driver's attention from the roadway," *ibid.*, and that whether the "distracting effect contributes to traffic accidents invokes an issue of continuing controversy," *ibid.,* the California Supreme Court agreed with many other courts that a legislative judgment that billboards are traffic hazards is not manifestly unreasonable and should not be set aside.  We likewise hesitate to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety."  There is nothing here to suggest that these judgments are unreasonable.  As we said in a different context, *Railway Express Agency, Inc. v. New York, supra,* at 109:
>
> "We would be trespassing on one of the most intensely local and specialized of all municipal problems if we held that this regulation has no relation to the traffic problem of New York City.  It is the judgment of the local authorities that it does have such a relation.  And nothing has been advanced which shows that to be palpably false."

*Metromedia*, 453 U.S. at 508-509 (emphasis added).

The Ninth Circuit has held that under *Metromedia*, cities are not required to provide "detailed proof that the billboard regulation will in fact advance the city's interests" in traffic safety and esthetics.  *Ackerley,* 108 F.3d at 1099-1100.

The *Metro Lights* court held that Los Angeles' regulatory scheme[14] did not directly advance its goal of traffic safety because "the City's Street Furniture Program gives the City's contractor an

_____

[14]    Los Angeles, Cal., Municipal Code, div. 62 (1996) is attached as Exhibit W to San Francisco's Request for Judicial Notice.

exclusive right to place thousands of off-site signs next to traffic lanes *in every area of the City where a transit shelter, kiosk or 'amenity' is located." Metro Lights,* 488 F. Supp. 2d at 943 (emphasis added).

San Francisco's regulatory scheme differs in these important ways:  (1) San Francisco limits the number of advertising allowed on street furniture; (2) San Francisco limits the areas of the City in which advertising can be placed on street furniture; (3) all street furniture is reviewed and approved for pedestrian and motorists safety; and (4) San Francisco requires that all street furniture be regularly inspected, cleaned and maintained.

### 2.      Preserving San Francisco's Unique Character

The *Metromedia* Court also found as a matter of law that San Diego's ban on offsite general advertising signs directly and materially advanced its aesthetics goal:

> We reach a similar result with respect to the second asserted justification for the ordinance-advancement of the city's esthetic interests.  It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an "esthetic harm."  San Diego, like many States and other municipalities, has chosen to minimize the presence of such structures.  Such esthetic judgments are necessarily subjective, defying objective evaluation, and for that reason must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose.  But there is no claim in this case that San Diego has as an ulterior motive the suppression of speech, and the judgment involved here is not so unusual as to raise suspicions in itself.

*Metromedia*, 453 U.S. at 510.

San Francisco's regulatory scheme easily satisfies this test.  As with safety concerns, San Francisco addresses aesthetics concerns by requiring all street furniture placed on the public right-of -ay to be approved by the San Francisco Arts Commission.

### C.      Section 611 Is No More Extensive Than Necessary

*Central Hudson's* final prong requires that a commercial speech regulation be no more extensive than necessary to serve the government's ends.  *Central Hudson*, 447 U.S. at 566.  In *Metromedia*, the Court held that a ban on commercial offsite billboards easily meets this requirement, since "[i]f the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them."  *Metromedia*, 453 U.S. at 508.

1    Here, Section 611 meets this test.  San Francisco has implemented a comprehensive

2    regulatory scheme that goes not farther than necessary to address the evil caused by the proliferation

3    of offsite advertising.  Indeed, San Francisco has an amply supply of general advertising signs and

4    there is no suggestion that the supply is inadequate.

5    **V.    THIS COURT MUST GIVE PRECLUSIVE EFFECT TO THE UNCHALLENGED**
     **FACTUAL AND LEGAL DETERMINATIONS MADE IN THE ADMINISTRATIVE**

6    **PROCEEDINGS AGAINST METRO FUEL'S SIGNS**

7    The Court must give preclusive effect to the unchallenged 29 Notices of Violation ("NOV")

8    issued by the Planning Department (attached as Exhibit T to San Francisco's Request for Judicial

9    Notice) and the NOV and Order of Abatement issued by the Department of Building Inspection

10   (attached as Exhibit U to San Francisco's Request for Judicial Notice).  These NOVs were issued

11   because the Planning Department and Department of Building Inspection investigated and determined

12   that these signs had been installed without a permit.  Because Metro Fuel failed to challenge the

13   NOVs administratively and judicially, this Court must give preclusive effect to the factual

14   determinations and legal conclusions of these NOVs-these signs violate the Planning and Building

15   Codes.

16   Title 28 U.S.C. section 1738 requires federal courts to give the same preclusive effect to state

17   court judgments, as they would be given in the state in which they were rendered.  *Miller v. County of*

18   *Santa Cruz* 39 F.3d 1030, 1032 (9th Cir. 1994).  Section 1738 does not govern cases involving

19   unreviewed decisions of a state administrative hearing board or commission.  *Id.*  Nonetheless, as a

20   matter of federal common law, federal courts give preclusive effect to the findings of state

21   administrative tribunals in subsequent actions under 42 U.S.C. section 1983.  *Id.*  In *Miller,* the Ninth

22   Circuit stated that *University of Tennessee v. Elliot,* 478 U.S. 788 (1986),

23        requires [federal courts] to give preclusive effect, at a minimum, to the
          factfinding of state administrative tribunals.  We have gone farther, however,
24        and held that 'the federal common law rules of preclusion described in *Elliot*
          extend to state administrative adjudications of legal as well as factual issues,
25        even if unreviewed, so long as the state proceeding satisfies the requirements
          of fairness outlined in [*United States v. Utah Construction & Mining Co.*, 384
26        U.S. 394 (1966)]."

27   *Id.* at 1032-1033 (citation omitted).

28

The fairness requirements of *Utah Construction* are:  (1) that the administrative agency act in a judicial capacity, (2) that the agency resolve disputed issues of fact properly before it, and (3) that the parties have an adequate opportunity to litigate.  384 U.S. at 422.  The threshold inquiry "is whether a state administrative proceeding was conducted with sufficient safeguards 'to be equated with a state court judgment.'"  *Miller,* 39 F.3d at 1033.  "A federal court should ordinarily give preclusive effect when the state court would do so."  *Id.*  This is so even in cases of unreviewed state agency determinations.  *Id.*  Because California has adopted the standards articulated in *Utah Construction,* the only question a federal court must answer is "whether the administrative hearing met the requirements of California law such that a California court would have accorded the determination preclusive effect."  *Id.*  There is no question that a California court would give preclusive effect to the unreviewed notices of violation from the Planning Department and Department of Building Inspection.

In order to challenge a decision of an administrative agency in California, one must demonstrate that he has exhausted all available administrative procedures – including all available administrative appeals of an agency's decision.  *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* 35 Cal.4th 1072, 1080 (2005).  "In brief, the rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act."  *Abelleira v. District Court of Appeal* 17 Cal.2d 280, 292 (1941).  In addition to exhausting administrative remedies, a plaintiff must also exhaust judicial remedies.  "[J]udicial review of any decision of a local agency . . . may be had pursuant to Code of Civil Procedure section 1094.5, only if the petition for writ of mandate pursuant to such section is filed . . . not later than the 90th day following the date on which the decision becomes final."  Code Civ. Proc. § 1094.6, subd. (b).  The California Supreme Court has held that "unless a party to a quasi-judicial proceeding challenges the agency's adverse findings made in that proceeding, by means of a mandate action in superior court, those findings are binding in later civil actions."  *Johnson v. City of Loma Linda* 24 Cal.4th 61, 69-70 (2000).  "Exhaustion of judicial remedies . . . is necessary to avoid giving binding effect to the administrative agency's decision, because the decision has achieved finality due to the aggrieved party's failure to pursue the exclusive

*judicial* remedy for reviewing administrative action." *Id.*; *see also City and County of San Francisco v. Ang* 97 Cal.App.3d 673, 677 – 679 (1979).

Here, in order to pursue judicial consideration of the NOV's issued by the Planning Department, the City's Planning Code required the sign owners to seek reconsideration of the NOV's by an administrative law judge.  S.F. Planning Code § 610(d)(1)B.  No such request for reconsideration was filed, and thus no administrative review of the Planning Department NOVs ever occurred.  As a result, the sign owners are now precluded from seeking judicial relief in the form of a state court writ or administrative mandamus pursuant to Cove of Civil Procedure §1094.5.  They cannot simply circumvent these requirements by seeking redress from this Court.  Similarly, the DBI NOV was the subject of an administrative appeal and resulted in the issuance of an Order of Abatement.  As in the case of the Planning Department NOVs, the failure of the sign owners or Metro Fuel to seek judicial review of the Order of Abatement, the factual and legal determinations made by the DBI Director are binding and preclusive for purposes of this case.

In *Briggs v. City of Rolling Hills Estates,* 40 Cal.App.4th 637 (1995) , a homeowner sued after the issuance of a building permit was conditioned on the removal of an existing deck.  *Id.* at 640.  The trial court granted summary judgment in favor of the city finding the homeowner's 42 U.S.C. § 1983 cause of action was precluded by the failure to challenge the city's action directly by administrative mandamus.  *Id.*  After analyzing and discussing state and federal law, the Court of Appeals affirmed.  The Court of Appeal observed the homeowner

> never sought to set aside the city's decision by petitioning for a writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5.  Plaintiffs could and should have sought judicial review of the city's decision by administrative mandamus; if the condition to which plaintiffs objected was improperly imposed, it could have been vacated pursuant to section 1094.5.  Plaintiffs completely bypassed the proper procedure and instead sought damages and injunctive relief by this independent action.

*Id.* at 645.  The Court of Appeal went on to state that the failure to pursue administrative and judicial relief estopped the homeowner from relitigating the same issues, even in a 42 U.S.C. § 1983 cause of action.  *Id.* at 645 - 648.  The Court of Appeal, citing *Knickerbocker v. City of Stockton*  199 Cal.App.3d 235 (1988) explained the rule:

> [T]his rule is not the doctrine of "failure to exhaust administrative remedies."  Rather it is a form of res judicata, of giving collateral estoppel effect to the administrative agency's

1    decision, because that decision has achieved finality due to the aggrieved party's failure
to pursue the exclusive *judicial* remedy for reviewing administrative action.

2

*Id.* at pp. 645 - 646.

3

In *Swartzendruber v. City of San Diego* 3 Cal.App.4th 896 (1992), the Court affirmed the

4

application of res judicata to Swartzendruber's federal civil rights claim, because she failed to seek

5

administrative mandamus review of San Diego's Civil Service Commission's determination upholding

6

her termination:

7
                    There can be no justification for plaintiff's position that she should be
8                   permitted to fail to assert at the administrative hearing constitutional and civil
                    rights violations as reasons that made her termination wrongful, fail to prevail
9                   on the writ without attempting to urge or to bring before the court those
                    reasons, and then be allowed to recover damages in this consolidated action
10                  that resulted from termination of her employment alleged to be wrongful based
                    on those reasons.

11

*Id.* at 909 [quoting *Takahashi v. Board of Education* 202 Cal.App.3d 1464, 1485 (1988)].

12

As these cases make clear, in order to bring its First Amendment claim premised on the

13

legality of its signs, Metro Fuel must exhaust its administrative and judicial remedies challenging

14

those decisions. Having failed to do so, Metro Fuel is now barred from bringing its claims in this

15

Court. Metro Fuel cannot argue that its claims under the First Amendment vindicate a different

16

primary right that would addressed in a writ of mandate proceedings under Code of Civil Proceedings

17

section 1094.5 challenging the notices of violation or order of abatement. In fact, the California

18

Court of Appeal rejected this same argument in *Swartzendruber*. Casting a claim in "constitutional

19

terms" does not make it a different primary right.

20
                    In alleging her federal civil rights were violated (fifth cause of action),
21                  Swartzendruber alleged she was discharged in violation of her constitutional
                    rights of due process and free speech by being terminated without cause,
22                  without giving her an opportunity to express legitimate concerns about safety,
                    without providing meaningful safety training opportunities and without
23                  providing progressive discipline pursuant to City's own procedural manual.
                    *Inasmuch as the primary right at stake was her right to continued employment*
24                  *and the harm suffered was loss of that employment, her fifth cause of action*
                    *does not present a separate injury from that litigated before the Commission.*
25                  *Swartzendruber has merely restated her cause of action for wrongful*
                    *termination in constitutional terms.*

26

*Id.* at p. 908.

27

28

1      Because California court would give preclusive effects to the unchallenged NOVs and Order

2  of Abatement, this court must do so.  *Miller,* 39 F.3d at 1033.

3  **VI.    BECAUSE METRO FUEL'S SIGNS ARE ILLEGAL FOR REASONS NOT CHALLENGED IN THE FIRST AMENDED COMPLAINT, METRO FUEL LACKS STANDING TO PURSUE THIS ACTION**

4

5      "The 'irreducible minimum' of standing under Article III of the Constitution is (1) an injury in

6  fact, which is 'actual, concrete, and particularized'; (2) a casual connection between that injury and the

7  defendant's conduct; and (3) a likelihood that the injury can be redressed by a favorable decision of

8  the court."  *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 891 (quoting *Lujan v.*

9  *Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).  Each of these elements is "an indispensable

10 part of the plaintiff's case" and "must be supported in the same way as any other matter on which the

11 plaintiff bears the burden of proof."  *Lujan,* 504 U.S. at 561.

12      As set forth above, the Planning Department and the Department of Building Inspection have

13 issued NOVs, which Metro Fuel did not contest.  Those NOVs found, as a factual and legal matter,

14 Metro Fuel's signs are in violation of various sections of the San Francisco Planning Code.  Thus,

15 even if this Court were to agree with Metro Fuel on its challenge to Section 611, this Court could not

16 redress Metro Fuel's alleged injury.  Metro Fuel's signs have already been determined to be illegal.

17 Therefore, Metro Fuel lacks standing to pursue its challenge to Section 611.  *Get Outdoors II, LLC v.*

18 *City of San Diego*, 560 F.3d at 891.

19                               **CONCLUSION**

20      Because Metro Fuel's claims fails as a matter of law, it is not entitled to declaratory relief,

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28

NOTICE, MOTION AND MPA ISO MJP.                    20                    n:\land\li2008\080804\00506389.doc
USDC No. C07-6067 JSW

1   injunctive relief or damages.  Accordingly, the Court should grant the City's motion for judgment on

2   the pleadings and enter judgment in the City's favor.

3

4   Dated:  August 29, 2008                    Respectfully submitted,

5                                              DENNIS J. HERRERA
                                               City Attorney
6                                              KRISTEN A. JENSEN
                                               THOMAS S. LAKRITZ
7                                              VICTORIA WONG
                                               Deputy City Attorneys
8

9
                                        By:_____/s/_____.
10                                             THOMAS S. LAKRITZ

11                                             Attorneys for Defendant CITY AND COUNTY OF
                                               SAN FRANCISCO
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28