1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  KRISTEN A. JENSEN, State Bar #130196
   THOMAS S. LAKRITZ, State Bar #161234
3  VICTORIA WONG, State Bar #214289
   Deputy City Attorneys
4  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
5  San Francisco, California 94102
   Telephone:    (415) 554-6547
6  Facsimile:    (415) 554-4747
   E-Mail:    tom.lakritz@sfgov.org
7
8  Attorneys for Defendant
   CITY AND COUNTY OF SAN FRANCISCO
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12

13  METRO FUEL LLC, a Delaware limited        Case No. C07-6067 JSW
    liability company,
14                                            **DEFENDANT CITY AND COUNTY OF**
                Plaintiff,                     **SAN FRANCISCO'S OPPOSITION TO**
15                                            **PLAINTIFF METRO FUEL'S MOTION**
          vs.                                 **FOR A PRELIMINARY INJUNCTION**
16
    CITY OF SAN FRANCISCO, a municipal         Hearing Date:     November 14, 2008
17  corporation, COUNTY OF SAN                 Time:             9:00 a.m.
    FRANCISCO, a subdivision of the State      Place:            Courtroom 2, 17th Floor
18  of California, CITY AND COUNTY OF
    SAN FRANCISCO, a chartered California      Trial Date:       October 26, 2009
19  city and county and DOE 1 through DOE
    10,
20
                Defendants.
21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

SUMMARY OF ARGUMENT .................................................................................1

BACKGROUND .................................................................................................2

    I.      SAN FRANCISCO'S REGULATION OF SIGNS AND ADVERTISING ...........2

          A.     San Francisco Planning Code Article 6 ........................................2

          B.     San Francisco's Ban On New General Advertising Signs ..........................2

          C.     San Francisco's General Advertising Sign Inventory Requirements ..........4

          D.     Future Limits On General Advertising Signs ................................4

          E.     San Francisco Has An Ample Supply Of General Advertising Signs ........5

    II.     SAN FRANCISCO'S STREET FURNITURE ..........................................5

          A.     All Street Furniture is Reviewed for Safety and Aesthetics ......................6

               1.     All Street Furniture in the Public Rights-of-Way is Reviewed by the Department of Public Works....................................6

               2.     All Street Furniture in the Public Right-of-Way Must be Approved by the City's Arts Commission ......................6

          B.     Transit Shelters ......................................................7

          C.     Automatic Public Toilets and Public Service Kiosks ................................8

          D.     Fixed Pedestal Newsracks......................................9

    III.    METRO FUEL'S BUSINESS .................................................11

DISCUSSION ..............................................................................13

    I.      LEGAL STANDARD...................................................13

    II.     OFFSITE GENERAL ADVERTISING, AS COMMERCIAL SPEECH, IS AFFORDED ONLY LIMITED FIRST AMENDMENT PROTECTION ............13

    III.    METRO FUEL'S "UNDERINCLUSIVE THEORY" DOES NOT APPLY TO BILLBOARD REGULATION.................................................16

    IV.    SAN FRANCISCO'S REGULATION OF GENERAL ADVERTISING DOES NOT VIOLATE THE FIRST AMENDMENT ................................18

          A.     Metro Fuel Has Failed To Establish That The Advertising On Its Signs Is Protected By The First Amendment......................................18

          B.     Section 611 Implements Substantial Governmental Interests ...................19

          C.     Section 611 Directly And Materially Advances San Francisco's Substantial Governmental Interests ..........................................20

               1.     Safety ..........................................................20

               2.     Preserving San Francisco's Unique Character ..............................21

          D.     Section 611 Is No More Extensive Than Necessary..................................22

V.   THIS COURT MUST GIVE PRECLUSIVE EFFECT TO THE UNCHALLENGED FACTUAL AND LEGAL DETERMINATIONS MADE IN THE ADMINISTRATIVE PROCEEDINGS AGAINST METRO FUEL'S SIGNS ..................................................................................................22

VI.   BECAUSE METRO FUEL'S SIGNS ARE ILLEGAL FOR REASONS NOT CHALLENGED IN THE FIRST AMENDED COMPLAINT, METRO FUEL LACKS STANDING TO PURSUE THIS ACTION ...........................................25

CONCLUSION..........................................................................................................26

# TABLE OF AUTHORITIES

**State Cases**

*Abelleira v. District Court of Appeal*
  17 Cal.2d 280 (1941) ................................................................................23

*Briggs v. City of Rolling Hills Estates*
  40 Cal.App.4th 637 (1995) ........................................................................24

*City and County of San Francisco v. Ang*
  97 Cal.App.3d 673 (1979) ..........................................................................24

*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.*
  35 Cal.4th 1072 (2005) ..............................................................................23

*Johnson v. City of Loma Linda*
  24 Cal.4th 61 (2000) ..................................................................................24

*Swartzendruber v. City of San Diego*
  3 Cal.App.4th 896 (1992) ..........................................................................25

**State Statutes & Codes**

Code of Civil Procedure
  Section 1094.5 ..............................................................................23, 24, 25
  Section 1094.6, subdivision (b) ..................................................................23

**Federal Cases**

*44 Liquormart, Inc. v. Rhode Island*
  517 U.S. 484 (1996).....................................................................................17

*Ackerley Communications of the Northwest Inc. v. Krochalis*
  108 F.3d 1095 (9th Cir. 1997) ............................................................. passim

*American Passage Media Corp. v. Cass Communications, Inc.*
  750 F.2d 1470 (9th Cir. 1985) ...................................................................13

*Associated Gen. Contractors of Calif., Inc.  v. Coalition for Economic Equity*
  950 F.2d 1401 (9th Cir.1991) .....................................................................13

*Ballen v. City of Redmond*
  466 F.3d 736 (9th Cir. 2006) ......................................................................17

*Berman v. Parker*
  348 U.S. 26 (1954)......................................................................................19

*Big Country Foods, Inc. v. Board of Education*
  868 F.2d 1085 (9th Cir. 1989) ...................................................................13

*Board of Trustees of State University of New York v. Fox*
  492 U.S. 469 (1989).....................................................................................14

*Central Hudson Gas & Electric Corp. v. Public Service Comm'n*
447 U.S. 557 (1980)..................................................................14, 18, 19, 20, 22

*City of Cincinnati v. Discovery Network, Inc.*
507 U.S. 410 (1993)..............................................................................1, 16, 17

*Desert Outdoor Advertising, Inc. v. The City of Moreno Valley*
103 F.3d 814 (9th Cir. 1996) ..............................................................19, 20

*Edenfield v. Fane*
507 U.S. 761 (1993)..........................................................................................17

*Get Outdoors II, LLC v. City of San Diego*
506 F.3d 886 (9th Cir. 2007) ......................................................................26

*Greater New Orleans Broadcasting Ass'n, Inc. v. United States*
527 U.S. 173 (1999)......................................................................................1, 16

*Kovacs v. Cooper*
336 U.S. 77 (1949)..........................................................................................16

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992)........................................................................................26

*Mazurek v. Armstrong*
520 U.S. 968 (1977)........................................................................................13

*Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*
466 U.S. 789 (1984)................................................................................1, 16, 19

*Metro Lights, L.L.C. v. City of Los Angeles*
488 F. Supp. 2d 927 (C.D. Cal. 2006) .................................................18, 21

*Metromedia v. City of San Diego*
453 U.S. 490 (1981).............................................................................. passim

*Miller v. County of Santa Cruz*
39 F.3d 1030 (9th Cir. 1994) ...............................................................22, 23, 25

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*
762 F.2d 1374 (9th Cir. 1985) ....................................................................13

*Ohralik v. Ohio State Bar Ass'n*
436 U.S. 447 (1978)........................................................................................14

*Outdoor Sys., Inc. v. City of Mesa*
997 F.2d 604 (9th Cir. 1993) ......................................................................16

*Penn Central Transportation Co. v. New York City*
438 U.S. 104 (1978)........................................................................................19

*Railway Express Agency, Inc. v. New York*
    336 U.S. 106 (1949)...................................................................19, 20

*Rubin v. Coors Brewing Co.*
    514 U.S. 476 (1995)...........................................................1, 16, 17, 18

*Sammartano v. First Judicial District Court*
    303 F.3d 959 (9th Cir. 2002) ...............................................................13

*Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co.*
    240 F.3d 832 (9th Cir.2001) ...............................................................13

*United States v. Utah Construction & Mining Co.*
    384 U.S. 394 (1966)............................................................................23

*University of Tennessee v. Elliot*
    478 U.S. 788 (1986)............................................................................22

*Village of Belle Terre v. Boraas*
    416 U.S. 1 (1974)...............................................................................19

*World Wide Rush, LLC v. City of Los Angeles*
    --- F.Supp.2d ----(C.D. Cal. 2006)......................................................18

*Young v. American Mini Theatres, Inc.*
    427 U.S. 71 (1976)............................................................................19

**Federal Statutes**

42 United States Code
    Section 1983 ................................................................................24, 25

Title 28 United States Code
    Section 1738 .....................................................................................22

**San Francisco Statutes, Codes & Ordinances**

San Francisco Charter
    Article V (2006)..................................................................................6
    Section 5.102 ......................................................................................6

San Francisco Planning Code
    Article 6 .........................................................................................2, 26
    Article 6 (2007)...................................................................................2
    Section 227(k)....................................................................................26
    Section 601 ......................................................................................2, 3
    Section 602.3 (2007)............................................................................2
    Section 602.7 ......................................................................................2
    Section 603(j)...................................................................................7, 9
    Section 604(h)....................................................................................5
    Section 604.2 ......................................................................................4

Section 604.2(c) (2007) ..................................................................4
Section 606(a)(3) ........................................................................26
Section 607.1(e) ........................................................................26
Section 607.2(e) ........................................................................26
Section 607.3(c)(3) ....................................................................26
Section 608.10(b) ......................................................................26
Section 608.5 ............................................................................26
Section 610(d)(1)B ....................................................................24
Section 611 ........................................................................ passim
Section 611(b) .......................................................................2, 5
Section 710 ...............................................................................26
Section 710.30 ..........................................................................26
Section 711.30 ..........................................................................26
Section 721 ...............................................................................26
Section 721.30 ..........................................................................26
Section 723.30 ..........................................................................26
Section 815 ...............................................................................26
Section 815.76 ..........................................................................26
Section 1111.7(a) ......................................................................26

San Francisco Public Works Code
Article 5.4 ..................................................................................9
Article 5.4, Section 184.12 .........................................................6
Section 184.12 ......................................................................9, 10
Section 184.12(f)(3)(A)(i) ..........................................................9

San Francisco, California, Ordinance 140-06
Section 1 (d) ...............................................................................4
Section 1 (a-h) ............................................................................3
Section 1(n) ................................................................................3
Section 5 .....................................................................................4

**Other References**

Miami Zoning Ordinance
Article 4 ...................................................................................12
Article 10 .................................................................................12

Proposition G .....................................................................2, 4, 20

Proposition K ..............................................................................4

1

**SUMMARY OF ARGUMENT**

San Francisco Planning Code section 611 is not invalid simply because it prohibits Metro Fuel's business.  Nor can it be overturned because the regulation of commercial speech implicates the First Amendment.  "[T]o say that the ordinance presents a First Amendment issue is not necessarily to say that it constitutes a First Amendment violation."  *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).  The Supreme Court has held that offsite advertising and billboards are a subset of commercial speech and must be analyzed differently from other forms of commercial speech.  *See Metromedia v. City of San Diego,* 453 U.S. 490 (1981).

Metro Fuel's motion, and its entire case, is premised on what it claims is "an unbroken line of Supreme Court cases confirming that a regulatory scheme restricting speech cannot stand if it is pierced by exceptions that substantially undermine its purported rationale."  MPA at p.1.  Metro Fuel's theory is based upon its reading of *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173 (1999); *Rubin v. Coors Brewing Co*., 514 U.S. 476 (1995); and *City of Cincinnati v. Discovery Network, Inc*., 507 U.S. 410, 420 (1993).  But the Ninth Circuit has unequivocally rejected this theory's application to a content-neutral billboard regulation, such as that presented here.  *See Ackerley Communications of the Northwest Inc. v. Krochalis*, 108 F.3d 1095, 1099-1100 (9th Cir. 1997).

Moreover, Metro Fuel lacks standing to assert its claims in this case.  Each of Metro Fuel's signs identified in its moving papers violates San Francisco law relating to general advertising for reasons not challenged in this case.  As a result of the illegality of its only identified signs, Metro Fuel cannot obtain the redress it seeks here, and the Court need never even reach the First Amendment claims addressed above.

Metro Fuel's claims also fail because this Court is bound to adopt the factual and legal findings included in the notices of violation issued by the City, because neither Metro Fuel nor the underlying property owners pursued the administrative or state judicial review of those notices.  Because the notices of violation are now final, the legality of those signs cannot be challenged in this action.

**BACKGROUND**

I.    **SAN FRANCISCO'S REGULATION OF SIGNS AND ADVERTISING**

    A.    **San Francisco Planning Code Article 6**

For over 40 years, San Francisco has regulated signs and billboards in the City.  In 1965, the City enacted San Francisco Planning Code, Article 6 to regulate and control signs and billboards in San Francisco.  S.F., Cal., Planning Code art. 6 (2007).[1]  The purpose of San Francisco's regulations is to enhance the character, dignity, and aesthetics of San Francisco, and to promote the public health, safety, and welfare by reducing visual distractions to pedestrians and motorists.  *Id.* at § 601.

Like many cities, San Francisco follows the dictates of *Metromedia* and regulates signs based on the onsite and offsite distinction.  In San Francisco, onsite signs are designated as "business signs" and offsite signs are designated "general advertising signs."  A "business sign" is defined as:  "A sign which directs attention to a business, commodity, service, industry or other activity which is sold, offered, or conducted, other than incidentally, on the premises upon which such sign is located, or to which it is affixed."  S.F., Cal., Planning Code § 602.3 (2007).  A "general advertising sign" is a sign "which directs attention to a business, commodity, industry or other activity which is sold, offered or conducted elsewhere."  *Id.* at § 602.7.

    B.    **San Francisco's Ban On New General Advertising Signs**

In 2002, members of the Board of Supervisors ("the Board") sought to prohibit new general advertising signs as of March 5, 2002, and they placed Proposition G on the ballot.  *See* San Francisco, Cal., Voter Information Pamphlet And Sample Ballot, Consolidated Primary Election, March 5, 2002 ("Proposition G").[2]  While imposing a ban on new general advertising signs, Proposition G expressly stated that "Nothing in this ordinance shall be construed to prohibit the placement of signs . . . in the public right of way as permitted by local law."  *Id.* at p. 102 (codified at S.F., Cal., Planning Code § 611(b).)  Moreover, consistent with constitutional limits, Proposition G

---

    [1]    S.F., Cal., Planning Code art. 6 (2007) is attached as Exhibit A to San Francisco's Request for Judicial Notice.

    [2]    San Francisco, Cal., Voter Information Pamphlet And Sample Ballot, Consolidated Primary Election, March 5, 2002 ("Proposition G") is attached as Exhibit B to San Francisco's Request for Judicial Notice.

expressly stated that it was "not intended to regulate non-commercial speech." *Id.* at § 1(n)

(uncodified findings). The following findings were made when Proposition G was adopted:

### *Preserving the City's Unique Character*

(a)      General advertising is currently in, adjacent to, and visible from public and historically significant civic spaces including parks, public plazas, historic buildings and the waterfront.

(b)      City officials have received complaints from the public about the proliferation of general advertising signs in the City, about the commercialization of the City's public space, the increased size of vinyl signs which cover entire sides of buildings, as well as about general advertising signs placed on architecturally and historically significant buildings, all of which affect the quality of life in San Francisco, adding blight and clutter.

(c)      The City currently contains an ample supply of legally permitted general advertising signs.

(d)      The number of general advertising signs is increasing all over the City. Many areas of the City are saturated with general advertising signs. In these areas the general advertisings signs are obtrusive, out of scale, and contribute to visual pollution and blight. As population, traffic and building trends grow and shift within the City, it is difficult to assess which areas of the City will be inundated with general advertising signs next.

(e)      Tourism, San Francisco's largest revenue generating industry, benefits from the preservation of the City's unique character, architecture and vistas. As general advertising signs become more and more a part of the City's landscape, its distinctive appearance is hidden and the character that tourists visit the City to experience is lost.

### *Safety*

(f)      City officials and the public have expressed concern over the impact of the increasing volume of general advertising signs on traffic and pedestrian safety.

(g)      Signs identifying local services and businesses are often blocked or obscured by general advertising signs, a practice that confuses and distracts the public from finding those services and businesses.

(h)      Planning Code Section 601 identifies the need to reduce hazards such as signs which can distract motorists and pedestrians traveling on the public right of way and increase the potential for accidents, especially in congested parts of the City.

*Id.* at § 1 (a-h) (uncodified findings).

Proposition G passed with almost 80% of the vote. *See* San Francisco, Cal., Consolidated

Primary Election Results, March 5, 2002, Proposition G.[3]

---

[3]      San Francisco, Cal., Consolidated Primary Election Results, March 5, 2002, Proposition G is attached as Exhibit C to the City's Request for Judicial Notice.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## C.    San Francisco's General Advertising Sign Inventory Requirements

In 2006, the Board wanted to provide a mechanism "to further Proposition G's overall objectives of enhancing [San Francisco]'s livability and quality of life by reducing the proliferation of general advertising signs in [San Francisco] and the resulting clutter, blight, and other problems described in Proposition G."  San Francisco, Cal., Ordinance 140-06, Section 1 (d) (June 20, 2006).[4] To accomplish this, the Board added Planning Code section 604.2, which requires any general advertising company to submit a current, accurate, and complete inventory of its general advertising signs.  General advertising sign companies are required to provide detailed information for each general advertising sign.  S.F., Cal., Ordinance 140-06, Section 5 (June 20, 2006) (codified at San Francisco, Cal., Planning Code § 604.2(c) (2007).

In order to implement and enforce Section 611, the San Francisco Planning Department has undertaken an exhaustive program to develop an inventory and map all general advertising signs in San Francisco.  Declaration of Jonathan L. Purvis ("Purvis Decl."), ¶¶ 5-17, 20; Declaration of Kimberly J. Durandet ("Durandet Decl."), ¶¶ 5-10; Declaration of Ember K. Crouch, ("Crouch Decl.") ¶¶ 4-6.

## D.    Future Limits On General Advertising Signs

San Francisco is considering taking the next incremental step in addressing the issues created by the proliferation of general advertising signs in San Francisco.  In 2007, members of the Board sought to limit new general advertising signs on street furniture, and they placed Proposition K on the ballot.  *See* San Francisco, Cal., Voter Information Pamphlet And Sample Ballot, Consolidated Primary Election, November 6, 2007 ("Proposition K").[5]  Proposition K declared that it would be the policy of San Francisco that "there shall be no increase in the number of general advertising signs on street furniture on the public right-of-way, including, but not limited to, transit shelters, kiosks, benches and newspaper racks, over the number authorized by City law and City contracts as of July 1,

---

[4]    San Francisco, Cal., Ordinance 140-06 (June 20, 2006) is attached as Exhibit D to the City's Request for Judicial Notice.

[5]    San Francisco, Cal., Voter Information Pamphlet And Sample Ballot, Consolidated Primary Election, November 6, 2007 ("Proposition K") is attached as Exhibit E to San Francisco's Request for Judicial Notice.

2007."  Proposition K passed with almost 62% of the vote.  *See* San Francisco, Cal., Consolidated Primary Election Results, November 6, 2007, Proposition K.[6]  The Board is currently considering legislation that would implement the policy the voters approved by passing Proposition K.  On May 13, 2008, Supervisor McGoldrick introduced an ordinance that would codify Proposition K.[7]

### E.    San Francisco Has An Ample Supply Of General Advertising Signs

Notwithstanding San Francisco's ban on new offsite general advertising signs, San Francisco currently contains an ample supply of general advertising signs.  There are at least 27 companies that currently own general advertising signs in San Francisco.  Declaration of Jonathan Purvis ("Purvis Decl.), ¶ 6.  More importantly, there are at least 1,511 general advertising signs currently in San Francisco's inventory of general advertising signs.  *Id.* at ¶ 17.

Despite the ban on new billboards, the number of general advertising signs will likely remain constant.  That is because, under San Francisco Planning Code section 604(h), lawfully existing general advertising signs may be maintained and repaired.  Purvis. Decl. § 18.  Indeed, according to the General Advertising Sign Program Coordinator for the Planning Department, no individual or entity has filed or has been required to file a permit application to remove a general advertising sign because the sign had reached "the end of its normal life."  Purvis Decl., ¶ 19.

## II.    SAN FRANCISCO'S STREET FURNITURE

San Francisco has a comprehensive regulatory scheme to advance its twin goals of safety and esthetics with respect to items, including advertising on street furniture, placed in the public right of way.  Section 611 expressly provides that general advertising signs are allowed on street furniture only "as permitted by local law."  S.F., Cal. Planning Code §611(b).  San Francisco has enacted ordinances and adopted policies severely limiting the placement and number of general advertising signs allowed on street furniture.  All street furniture is subject to an administrative review for safety

---

[6]      San Francisco, Cal., Consolidated Primary Election Results, November 6, 2007, Proposition K is attached as Exhibit F to the City's Request for Judicial Notice.

[7]      San Francisco, Cal. Legislative File No. 080658 (introduced May 13, 2008) is attached as Exhibit G to the City's Request for Judicial Notice.

1    and aesthetics and a public review process allowing residents and neighbors to comment on proposed

2    locations for the various types of street furniture.

3        **A.      All Street Furniture is Reviewed for Safety and Aesthetics**

4            **1.      All Street Furniture in the Public Rights-of-Way is Reviewed by the Department of Public Works**

5        The San Francisco Department of Public Works (DPW) has adopted the following Orders and

6    Guidelines governing the safe design and placement of street furniture in the public right-of-way:

7        • Amended Order No. 177,159"[8]

8        • Order Nos. 163, 368 and 169,739"[9]

9        • Order No. 163, 369"[10]

10       • Guidelines Regarding Regulation of News Racks – Implementing Article 5.4, section

11          184.12, of the San Francisco Public Works Code and governing the placement of fixed

12          pedestal units in San Francisco.[11]

13           **2.      All Street Furniture in the Public Right-of-Way Must be Approved by the City's Arts Commission**

14

15       Under section 5.103 of the San Francisco Charter, the San Francisco Arts Commission ("Arts

16   Commission") must "approve the designs for all public structures," including transit shelters, public

17   toilets and public service kiosks and fixed pedestal newsracks in San Francisco.[12]  The Arts

18   Commission in comprised of fifteen members.  *Id.*  "Eleven members shall be practicing arts

19   professionals including two architects, a landscape architect, and representatives of the performing,

20

21       [8]     City and County of San Francisco, Department of Public Works, Amended Order No. 177,159 (Sept. 26, 2007) is attached as Exhibit H to San Francisco's Request for Judicial Notice.

22       [9]     City and County of San Francisco, Department of Public Works, Amended Order Nos. 163,368 (Sept. 8, 193) and 169,739  (May 5, 1996) are attached as Exhibit I to San Francisco's Request for Judicial Notice.

23

24       [10]    City and County of San Francisco, Department of Public Works, Amended Order No. 163,369 (Sept. 8, 1993) is attached as Exhibit J to San Francisco's Request for Judicial Notice.

25       [11]    City and County of San Francisco, Department of Public Works, Guidelines Regarding Regulation of News Racks (Nov. 2, 2005) is attached as Exhibit K to San Francisco's Request for Judicial Notice.

26

27       [12]    San Francisco, Cal., Charter, art. V (2006) is attached as Exhibit L to San Francisco's Request for Judicial Notice.

28

1  visual, literary and media arts; and four members shall be lay members." *Id*  The Arts Commission

2  has implemented Submission Guidelines for the review and approval of the design of structures on

3  public property.[13]  As set forth below, the Arts Commission has approved the design for the transit

4  shelters, automatic public toilets and public service kiosks, and the fixed pedestal newsracks.

5      **B.**    **Transit Shelters**

6      San Francisco has allowed advertising on some transit shelters since 1987.  Declaration of

7  Kerstin F. Magary ("Magary Decl."), ¶ 3.  Although advertising is permitted on certain transit

8  shelters, San Francisco severely limits-by size and location-the amount of advertising permitted on its

9  transit shelters.

10      San Francisco Planning Code section 603(j) limits the placement of advertising on transit

11  shelters.  The first paragraph of section 603(j) limits the areas of San Francisco where advertising can

12  be placed on transit shelters and the size of the advertising that is allowed.  The second paragraph of

13  section 603(j) specifically prohibits the placement of advertising on transit shelters in certain areas of

14  San Francisco.

15      San Francisco has also entered into agreements that limit the number and locations of transit

16  shelters that can display advertising.  Magary Decl., ¶¶ 3, 4; Exhs. A, B; Declaration of Gail R. Stein

17  ("Stein Decl."), ¶ 11; Exh. A.  Under San Francisco's previous Advertising Transit Shelter Agreement

18  with CBS Outdoor, San Francisco had 1063 transit shelters.  Magary Decl., ¶ 6.  Of those 1063 transit

19  shelters, advertising was allowed on up to 697 transit shelters and prohibited on 366 shelters.  *Id.*

20  Although CBS Outdoor was allowed to construct up to 1,250 transit shelters, it did not achieve that

21  number.  Magary Decl., ¶ 6.  Instead, DPW denied CBS Outdoor's permit applications for hundreds

22  of proposed locations due to objections and protests from adjoining property owners and/or

23  neighbors.  Magary Decl., ¶ 7.  Under the CBS Outdoor agreement, the ratio of commercial to non-

24  commercial transit shelters was limited at 2 to 1.  Magary Decl., ¶ 8.  For those shelters where

25  advertising was allowed, the agreement limited where on the shelteradvertising could be placed.

---

26       [13]    City and County of San Francisco, San Francisco Arts Commission Civic Design

27  Review Submission Guidelines are attached as Exhibit M to San Francisco's Request for Judicial
    Notice (http://www.sfartscommission.org/CDR/forms/Guidelines.pdf) (visited August 25, 2008).

28

Magary Decl., ¶¶ 9, 10.  Since March 2002, DPW has only issued four permits to install new transit shelters in the public right-of-way.  Declaration of Dan McKenna ("McKenna Decl."), ¶ 27; Exh. D.  Of those four transit shelters, three-T1567, T1568 and T1570-were installed as non-commercial shelters.  McKenna Decl., ¶ 27; Exh. D; Stein Decl., ¶ 11; Exh. A.

The San Francisco Municipal Transit Agency ("SFMTA") recently entered into an agreement with Clear Channel Outdoor that took the place of the CBS Outdoor agreement.  Stein Decl., ¶¶ 8-11.  Under the SFMTA's new Transit Shelter Advertising Agreement, Clear Channel Outdoor is required to maintain a minimum of 1100 transit shelters and is allowed to maintain up to 1500 transit shelters, and a minimum of 39 and a maximum of 150 Commercial Kiosks.  Stein Decl., ¶ 13.  The ratio of commercial to non-commercial transit shelters remains limited at 2 to 1.  Stein Decl., ¶ 14.  In addition, Clear Channel Outdoor is prohibited from placing advertisements on more than one wall of any transit shelter.  Stein Decl., ¶ 15.  Finally, under the agreement, SFMTA retained the right to designate the locations of all transit shelters and kiosks.  Stein Decl., ¶ 17.  After a lengthy review process, the Arts Commission recently approved the design of the new transit shelters.  Stein Decl., ¶¶ 29-35.[14]

### C.    Automatic Public Toilets and Public Service Kiosks

On August 2, 1994, the City entered into an agreement with JCDecaux "to establish an Automatic Public Toilet Program for the benefit of the residents and visitors to the City and County of San Francisco."  McKenna Decl., ¶ 6; Exh. A.  Under this agreement, the City designated the initial 27 locations of the automatic public toilets.  McKenna Decl., ¶ 9.  There are currently 25 Automatic Public Toilets in San Francisco, all of which were permitted and installed before March 5, 2002.  McKenna Decl., ¶ 12.  Advertising is not permitted on any of the Automatic Public Toilets.  McKenna Decl., ¶ 11.

---

[14]    San Francisco Arts Commission, Civic Design Review Committee, Minutes (Sept. 17, 2007); (Oct. 15, 2007); (Feb. 25, 2008); and (June 16, 2008) are attached as Exhibits N, O, P and Q, respectively.  San Francisco Arts Commission, Minutes (Dec. 3, 2007) are attached as Exhibit R.

In return for allowing JCDecaux to install and maintain Automatic Public Toilets in San Francisco, JCDecaux obtained the right to install and maintain Public Service Kiosks.[15]  McKenna Decl., ¶ 13.  The agreement limited the placement of Public Service Kiosks to the "Downtown Area," which was defined as "the geographic area of the CITY bounded on the south by the southerly line of Folsom Street, on the west by the westerly line of Van Ness Avenue extended north to the San Francisco Bay, and on the north and east by the shoreline of the San Francisco Bay."  McKenna Decl., ¶ 14; Exh. A.  There are currently 112 Public Service Kiosks in San Francisco and most are currently located in the Downtown Area.  McKenna Decl., ¶ 16.  Almost all of the Public Service Kiosks currently in San Francisco were permitted and installed before March 5, 2002.  McKenna Decl., ¶ 17.  Only two Public Service Kiosks-Castro/18[th] Streets and Market/Church Streets-have been permitted and installed since March 5, 2002.  McKenna Decl., ¶ 17; Exh. B.

### D.    Fixed Pedestal Newsracks

Planning Code section 603(j) restricts the placement of advertising placed on fixed pedestal newsrack units in accordance with Public Works Code section 184.12 [16]

Public Works Code section 184.12(f)(3)(A)(i) limits the placement of fixed pedestal newsracks to "areas of the City which have one or more of the following:  extensive public transit service, usage, and/or facilities; large concentrations of freestanding newsracks; or large numbers of pedestrians."  Under the City's Pedestal-Mounted Newsrack Agreement advertising may only be placed on fixed pedestal units in the "Advertising Zone," which is defined as

> the geographic area of the City bounded on the south by the southerly line of Berry Street (including the sidewalk located along the south side of Berry Street) on the west by the westerly line of Polk Street (including the sidewalk located on the west side of Polk Street) extended north to the San Francisco Bay.[17]

---

[15]    Section 1.01 (M) of the Automatic Public Toilet and Public Service Kiosk Agreement defined "Public Service Kiosks as having two advertising panels and either a newsstand alcove or a public service informational panel.  McKenna Decl., ¶ 13; Exh. A.

[16]    San Francisco, Cal., Public Works Code art. 5.4 (2007) is attached as Exhibit S to San Francisco's Request for Judicial Notice.

[17]    In the Pedestal-Mounted Newsrack Agreement, the City agreed that if state law changed to allow fixed pedestal units on Van Ness Avenue, then the western border would be changed to the westerly line of Van Ness Avenue (including the sidewalk on the west side of Van (continued on next page)

The Board enacted Public Works Code section 184.12 regulating fixed pedestal newsracks. The Board made the following findings when it enacted section 184.12:

(1)     The City and County of San Francisco has a substantial interest in promoting the public health, safety, welfare and convenience of its citizens and visitors by ensuring that public streets, public sidewalks and public rights-of-ways are not unreasonably obstructed by newsracks and that newsracks are properly maintained.

(2)     In recent years, the proliferation of newsracks on City streets, and particularly poorly maintained or abandoned freestanding newsracks, have contributed to the congestion of public sidewalks, impeded the flow of pedestrian and vehicular traffic, interfered with the use of streets, public sidewalks and public rights-of-ways, presented hazards to persons and property, contributed to the litter problems of public sidewalks, and resulted in visual blight.

(3)     The City and County of San Francisco has a substantial interest in preserving and protecting its unique visual and aesthetic qualities . . . To that end, . . . the City must take steps to reduce the visual blight, the inconvenience and the hazards associated with unlimited numbers of designs of newsracks, poorly maintained newsracks and the virtually unrestricted placement of newsracks on public streets, public sidewalks and public rights-of-way.

In 2002, the City entered into a Pedestal-Mounted Newsrack Agreement with Clear Channel Adshel "to replace the unsightly clutter of an estimated many thousands of single publication newsracks with 1000 pedestal-mounted multi-publication newsracks."  McKenna Decl., ¶ 20; Exh. C. Under section 3.1(a) of this agreement, Clear Channel Adshel is required to "install, operate and maintain, on public property up to 1,000 Fixed Pedestal Units in Fixed Pedestal Zones."  McKenna Decl., ¶ 21; Exh. C.  At least 485 of those Fixed Pedestal Units were allowed to be placed in the "Advertising Zone."  McKenna Decl., ¶¶ 21; 25 Exh. C

On October 20, 2003, the San Francisco Arts Commission, Civic Design Review Committee gave final approval to Clear Channel's design for the Fixed Pedestal Newsracks.  McKenna Decl., ¶ 24.  These Fixed Pedestal Units improve the aesthetics of San Francisco streets.  *See* Declaration of Grace Moore, ¶¶ 5-6; Exh. A.

---

(footnote continued from previous page)
Ness Avenue).  McKenna Decl., ¶ 20, Exh. C.  Sometime in 2002, California enacted legislation that allowed the City to authorize the placement of Pedestal-Mounted Newsracks on Van Ness Avenue. McKenna Decl., ¶ 25.

1

### III.    METRO FUEL'S BUSINESS

2          Metro Fuel LLC ("Metro Fuel") is a company owned by Fuel Outdoor Holdings, LLC ("Fuel

3   Outdoor").  Declaration of Michael A. Freedman ("Freedman Decl."), ¶ 1.  Metro Fuel entered the

4   San Francisco market by acquiring the assets of Metro Lights, LLC ("Metro Lights") in August, 2006.

5   Freedman Decl., ¶ 2.  Metro Fuel claims to operate 164 "panel signs" in San Francisco.  Freedman

6   Decl., ¶ 3.  According to Fuel Outdoor's website[18]:  "Metro Lights Panels are illuminated 6'x 4'

7   displays that reach drivers and pedestrians in a variety of environments. . . .Saturate a neighborhood

8   or 'road block' key areas to reach commuters twice daily."  Metro Fuel concedes, as it must, that none

9   of its 164 signs are legally permitted.  Freedman Decl., ¶¶ 9, 10.

10          While Metro Fuel claims to operate 164 "panel signs" in San Francisco, it has failed to

11   produce evidence to substantiate this claim.  Instead, it appears that Metro Fuel is not content to wait

12   for a ruling from this court as to the legality of its existing signs, but continues to install general

13   advertising signs (also without permits) in violation of Section 611.  Declaration of Daniel A. Sider

14   ("Sider Decl."), ¶¶ 5-10; Exh. A; Crouch Decl., ¶¶ 7-8; Exh. A.  As part of the inventory process, the

15   Planning Department has identified many illegal signs, which it believes are owned or operated by

16   Metro Fuel.  Purvis Decl., ¶ 21.  To date, the Planning Department has issued 29 notices of violation

17   for the illegal signs.  Purvis Decl., ¶ 21; Request for Judicial Notice, Exh. T.  In addition, the

18   Department of Building Inspection ("DBI") has issued a notice of violation and an Order of

19   Abatement for Metro Fuel's sign at 360 5th Street.  Request for Judicial Notice, Exh. T.

20          Although it has refused to disclose the locations of all of its signs, Metro Fuel has submitted

21   the declarations of seven individuals establishing the existence of seven signs in San Francisco.

22       •   360 5th Street (Declaration of Michael T. Fetterman, ¶ 2)

23       •   100 2nd Street (Declaration of Devendra Patel, ¶ 2)

24       •   376 Castro Street (Declaration of Naz Auto Service (Nazir Javaid), ¶ 2.)

25       •   1398 California Street (Declaration of Cable Car Cleaners (Stephanie Fonseca), ¶ 2)

26   _____

27       [18]    *See* http://www.fueloutdoor.com/ (follow"enter" hyperlink; then follow "Products"
hyperlink; then follow "Metro Lights Panels" hyperlink; then follow "San Francisco" hyperlink)
(visited August 25, 2008).

28

OPPOSITION TO MOTION FOR PRELIM. INJ.                    11                    n:\land\li2008\080804\00506359.doc
USDC No. C07-6067 JSW

- 701 10th Avenue (Declaration of Denhards Market (Anton Haleth), ¶ 2.)
- 1700 Polk Street (Declaration of Polk & Clay Liquor (Jennifer Lenh), ¶ 2)
- 1485 Bush Street (Declaration of Vijay Patel, ¶ 2.)

The Planning Department has issued notices of violations for all of these signs.  Request for Judicial Notice, Exh. T.  Moreover, Planning Department staff has determined that all of these signs violate other sections of the Planning Code and would not be allowed, even if Section 611 had not been enacted.  Durandet Decl., ¶¶ 12-18.

In addition, Mr. Freedman attached eight pictures to his declaration of "a variety of [Metro] Fuel's signs as they are situated in the San Francisco streetscape."  Freedman Decl., ¶ 5, Exh. A.  Mr. Freedman did not give the locations of these signs.  Planning Department staff has reviewed these pictures and has identified the locations for each of these signs:  (1) 110 Franklin Street; (2) 168 Eddy Street; (3) 376 Castro Street; (4) 3100 California Street; (5) 1343 Polk Street; (6) 1900 Market Street; (7) 75 Howard Street; and (8) 3420 Taylor Street.  Durandet Decl., ¶¶ 20-27.  Planning Department staff has further determined that all of these signs violate other sections of the Planning Code and would not be allowed, even if Section 611 had not been enacted.  Durandet Decl., ¶¶ 19-26.

Interestingly, Mr. Freedman failed to mention in his declaration that one of Fuel Outdoor's companies was recently awarded a 20-year contract to provide transit shelters in Miami, Florida.  Fuel Outdoor's website boasts[19] that "Fuel currently has Bus Shelters throughout the City of Miami, covering the most in demand neighborhoods in the burgeoning market."  What is interesting about this is that Miami, like San Francisco, has a ban on general advertising signs, with an exception that allows them to be placed in the public right-or-way.[20]

---

[19]     *See* http://www.fueloutdoor.com/ (follow "enter" hyperlink; then follow "Products" hyperlink; then follow "Panel Advertising" hyperlink; then follow "Bus Shelters" hyperlink; then follow "Miami" hyperlink) (visited August 25, 2008).

[20]     Article 10 of the Miami Zoning Ordinance is attached as Exhibit V to San Francisco's Request for Judicial Notice.  Section 10.1.3. provides that "[t]hese regulations apply to all signs, except those signs located in the public right-of-way, within the City whether or not a permit or other approval is required, unless otherwise specifically regulated."  Section 10.4.5 provides that "[e]xcept as otherwise provided in Articles 4 and 10 and/or the City Code, or, pursuant to this subsection, no new freestanding 'Outdoor advertising signs,' as defined above shall be allowed."

**DISCUSSION**

**I.    LEGAL STANDARD**

"It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1977) (citation omitted) (emphasis in original). A preliminary injunction is only warranted if the moving party establishes either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party. *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co.*, 240 F.3d 832, 839-840 (9th Cir.2001). "'These formulations are not different tests, but represent two points on a sliding scale in which the degree of irreparable harm increases as likelihood of success on the merits decreases.'" *Associated Gen. Contractors of Calif., Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1410 (9th Cir.1991) (quoting *Big Country Foods, Inc. v. Board of Education,* 868 F.2d 1085, 1088 (9th Cir. 1989)). Under either formulation, the party seeking a preliminary injunction always must establish that a significant threat of irreparable harm exists. *American Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985). If the moving party fails to demonstrate irreparable harm, a court need not reach the issue of likelihood of success on the merits. *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1376 (9th Cir. 1985). In addition, in the Ninth Circuit, a court must also consider the public interest when it assesses the propriety of issuing an injunction. *Sammartano v. First Judicial District Court*, 303 F.3d 959, 973 (9th Cir. 2002).

As set forth below, Metro Fuel failed to carry its burden of persuasion to establish that it is entitled to a preliminary injunction.

**II.    OFFSITE GENERAL ADVERTISING, AS COMMERCIAL SPEECH, IS AFFORDED ONLY LIMITED FIRST AMENDMENT PROTECTION**

Because this case presents a First Amendment challenge in the context of general advertising signs (billboards) – a discrete form of communication governed by its own line of judicial precedent that is largely ignored by Metro Fuel in favor of cases of limited or no applicability – the Court should view Metro Fuel's challenge with skepticism.

1    Metro Fuel argues that commercial advertising enjoys "robust" First Amendment protection.

2  Memorandum of Points in Authorities in Support of Motion for a Preliminary Injunction ("MPA") at

3  pp. 12-14.  While it is unclear what Metro Fuel means by "robust," it is clear what the Supreme Court

4  has said about the level of First Amendment protection commercial speech is entitled to:  "Our

5  jurisprudence has emphasized that 'commercial speech [enjoys] a limited measure of protection,

6  commensurate with its subordinate position in the scale of First Amendment values,' and is subject to

7  "modes of regulation that might be impermissible in the realm of noncommercial expression." *Board*

8  *of Trustees of State University of New York v. Fox*, 492 U.S. 469, 477 (1989) (quoting *Ohralik v.*

9  *Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)).  "The Constitution therefore accords a lesser

10  protection to commercial speech than to other constitutionally guaranteed expression.  The protection

11  available for particular commercial expression turns on the nature both of the expression and of the

12  governmental interests served by its regulation."  *Central Hudson Gas & Electric Corp. v. Public*

13  *Service Comm'n*, 447 U.S. 557, 562-563 (1980) (internal citation omitted).

14    In *Central Hudson*, the Court developed a four-part analysis to determine whether a particular

15  kind of commercial speech can be banned or regulated:

16    At the outset, we must determine whether the expression is protected by the
    First Amendment.  For commercial speech to come within that provision, it at
17    least must concern lawful activity and not be misleading.  Next, we ask
    whether the asserted governmental interest is substantial.  If both inquiries
18    yield positive answers, we must determine whether the regulation directly
    advances the governmental interest asserted, and whether it is not more
19    extensive than is necessary to serve that interest.

20  *Id.* at p. 566.

21    Applying the four-part *Central Hudson* test to review a ban on offsite advertising, the Court

22  has held that offsite advertising and billboards are a subset of commercial speech and must be

23  analyzed differently from other forms of commercial speech.  *See Metromedia v. City of San Diego,*

24  453 U.S. 490 (1981).  *Metromedia* involved a San Diego ordinance that allowed "onsite" commercial

25  signs but prohibited "[offsite] commercial . . .and noncommercial communications using fixed-

26  structure signs," that is, billboards.  *Id.* at 496.  The San Diego ordinance contained twelve

27  exceptions, and one of the exceptions stated that the ordinance did not apply to "[b]ench signs located

28  at designated public transit bus stops; provided, however, that such signs shall have any necessary

1    permits." *Id.* at 496, n.3.  After the California Supreme Court upheld the ordinance under the federal

2    and California Constitutions, seven Justices of the U.S. Supreme Court, applying the commercial

3    speech test set forth in *Central Hudson,* held that the ordinance's restrictions on commercial speech

4    did not violate the First Amendment.  *See id.* at 508-512 (plurality opinion); *id.* at 541 (Stevens, J.

5    (joining plurality as to commercial speech)); *id.* at 555-69 (Burger, J. (finding ordinance entirely

6    constitutional)); *id.* at 569 (Rehnquist, J. (same).)

7         The *Metromedia* Court held, first, that there was no "substantial doubt" that the measure's two

8    stated purposes–"to eliminate hazards to pedestrians and motorists brought about by distracting sign

9    displays" and "to preserve and improve the appearance of the City"–are "substantial governmental

10    goals." *Id.* at 493, 507-08.  Second, the Court held that the prohibition on commercial billboards

11    directly advanced the city's safety and aesthetic interests, even though the city had relied only on its

12    "legislative judgment that billboards are traffic hazards" and cause aesthetic blight.  *Id.* at 508-510.

13    Finally, the Court held that the ordinance was no broader than necessary to serve the city's interests.

14    As it explained, "[i]f the city has a sufficient basis for believing that billboards are traffic hazards and

15    are unattractive, then obviously the most direct and perhaps the only effective approach to solving the

16    problems they create is to prohibit them."  *Id.* at 508.

17         The *Metromedia* Court also held that the law did not violate the First Amendment even

18    though it allowed onsite commercial billboards but prohibited "identical billboards, equally

19    distracting and unattractive," that displayed offsite messages.  *Id.* at 511.  The fact that the city "has

20    obviously chosen to value one kind of commercial speech – onsite advertising – more than another

21    kind of commercial speech – offsite advertising," was legally permissible.  *Id.* at 512.  As the Court

22    explained:  "The ordinance reflects a decision by the city that the former interest, but not the latter, is

23    stronger than the city's interests in traffic safety and esthetics.  The city has decided that in a limited

24    instance – onsite commercial advertising – its interests should yield.  We do not reject that judgment."

25    *Id*.

26         Moreover, "the prohibition of offsite advertising is directly related to the stated objectives of

27    traffic safety and esthetics.  This is not altered by the fact that the ordinance is underinclusive because

28

OPPOSITION TO MOTION FOR PRELIM. INJ.                    15                    n:\land\li2008\080804\00506359.doc
USDC No. C07-6067 JSW

1    it permits onsite advertising." *Id.* at 511. And "the city may believe that offsite advertising, with its

2    periodically changing content, presents a more acute problem than does onsite advertising." *Id*.

3        The Court reaffirmed *Metromedia* in *Members of City Council of the City of Los Angeles v.*

4    *Taxpayers for Vincent,* 466 U.S. 789, 807, (1984). *Metromedia,* therefore, remains the controlling

5    Supreme Court case analyzing the ability of cities to regulate outdoor advertising in order to further

6    public safety and aesthetics.

7        The Ninth Circuit has expressly upheld total bans on billboards or an on-site/off-site

8    distinction based upon *Metromedia*. *See, e.g., Clear Channel Outdoor, Inc. v. City of Los Angeles,*

9    340 F.3d 810, 814 (9th Cir. 2003); *Ackerley Communications of the Northwest Inc. v. Krochalis*, 108

10   F.3d 1095, 1099-1100 (9th Cir. 1997); *Outdoor Sys., Inc. v. City of Mesa*, 997 F.2d 604, 610 (9th Cir.

11   1993).

12   **III.    METRO FUEL'S "UNDERINCLUSIVE THEORY" DOES NOT APPLY TO
            BILLBOARD REGULATION**

13

14       Metro Fuel's motion, and its entire case, is premised on what it claims is "an unbroken line of

15   Supreme Court cases confirming that a regulatory scheme restricting speech cannot stand if it is

16   pierced by exceptions that substantially undermine its purported rationale." MPA at p.1. Metro

17   Fuel's theory is based upon its reading of *Greater New Orleans Broadcasting Ass'n, Inc. v. United*

18   *States*, 527 U.S. 173 (1999); *Rubin v. Coors Brewing Co*., 514 U.S. 476 (1995); and *City of*

19   *Cincinnati v. Discovery Network, Inc*., 507 U.S. 410, 420 (1993). Metro Fuel's reliance on these

     cases is misplaced.

20

21       The Supreme Court has never applied this "underinclusive theory" to a content-neutral

22   billboard regulation. Indeed, Justice White's opinion for the Court in *Metromedia* explained that

23   "[e]ach method of communicating ideas is 'a law unto itself' and that law must reflect the 'differing

24   natures, values, abuses and dangers' of each method. We deal here with the law of billoards."

25   *Metromedia*, 453 U.S. at 501 (quoting *Kovacs v. Cooper*, 336 U.S. 77, 97 (1949). As noted above,

26   seven Justices held that San Diego's ban was constitutional even though it was substantially

27   underinclusive. *Id.* at 508-12.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Moreover, the Ninth Circuit has unequivocally rejected the underinclusive theory's application to a content-neutral billboard regulation, such as that presented here.  In *Ackerley*, 108 F.3d 1095, the Ninth Circuit held that Seattle's regulation limiting the construction and relocation of billboards was constitutional under *Metromedia* as a matter of law, even though Seattle had no detailed proof that the billboard regulation advanced the city's interest in traffic safety and esthetics.  In attacking Seattle's regulation, the plaintiff in *Ackerley* argued "that since *Metromedia*, the Court has imposed a greater evidentiary burden on a municipality trying to justify a restriction on commercial speech, see, e.g., *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996); *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995); *Edenfield v. Fane*, 507 U.S. 761 (1993); and *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993)."  *Id.* at 1097-1098 (parallel citations omitted).  The Ninth Circuit rejected the argument, noting that the Supreme Court itself has never said that these cases undermine its holding in *Metromedia*.  *Id.* at 1099.  The Ninth Circuit explained that *Metromedia* is still binding law:

> [W]here a Supreme Court precedent has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to the Supreme Court 'the prerogative of overruling its own decisions.'

*Id.* (citations omitted).  Rejecting the applicability of the "underinclusiveness theory" to billboard regulations, the Ninth Circuit held "that *Metromedia* continues to control regulation of billboards." *Id.*

Like the Supreme Court, the Ninth Circuit continues to recognize the distinction between the regulation of billboards and other forms of commercial speech.  In *Ballen v. City of Redmond*, 466 F.3d 736 (9th Cir. 2006), the Ninth Circuit reviewed the validity of the City of Redmond's prohibition on the use of portable signs as a restriction on commercial speech.  *Id.* at 740.  The Ninth Circuit concluded that *Metromedia* did not control because the City of Redmond's prohibition did not involve the regulation of billboards.  "This distinction is significant because billboards are fixed, permanent structures that are more intrusive to community aesthetics than portable sandwich boards.  The externalities of billboards include perdurable visual pollution that pervades a substantial volume of our eyesight and grows into an uningnorable part of our cultural landscape." *Id.* at 744.

1     Metro Fuel relies extensively on *Metro Lights, L.L.C. v. City of Los Angeles,* 488 F. Supp. 2d

2     927 (C.D. Cal. 2006), *appeal docketed*, No. 07-55179 (9th Cir. Feb. 1, 2007), and *World Wide Rush,*

3     *LLC v. City of Los Angeles,* --- F.Supp.2d ----(C.D. Cal. 2006), 2008 WL 2477440, *appeal docketed*,

4     No. 08-56062  (9th Cir. Jun. 26, 2008) to support its motion for a preliminary injunction in this case.

5     Indeed, Metro Fuel argues that *Metro Lights* and *World Wide Rush* "factually are squarely on point"

6     and apply the "underinclusive theory" articulated in *Greater New Orleans*, *Rubin*, and *Discovery*

7     *Network*.  *Id.*

8     etro Fuel's reliance on *Metro Lights* and *World Wide Rush* fails for at least three reasons.

9     First, both cases are on appeal to the Ninth Circuit, a fact that Metro Fuel fails to mention in its brief.

10    Second, neither case acknowledged that *Ackerley* is controlling precedent in the Ninth Circuit on this

11    issue and that *Metromedia* is the controlling Supreme Court precedent on the regulation of billboards.

12    Third, as set forth below, San Francisco's comprehensive regulatory scheme is factually distinct from

13    the ordinances challenged in *Metro Lights* and *World Wide Rush*.

14    **IV.    SAN FRANCISCO'S REGULATION OF GENERAL ADVERTISING DOES NOT
             VIOLATE THE FIRST AMENDMENT**

15        **A.    Metro Fuel Has Failed To Establish That The Advertising On Its Signs Is
                 Protected By The First Amendment**

16

17        Without citation or factual support, Metro Fuel contends that San Francisco "does not and

18    cannot contend that the advertisements on [Metro Fuel]'s signs concern unlawful activities or are

19    misleading."  MPA at 14.  San Francisco has never conceded this point.  More importantly, Metro

20    Fuel failed to meet its burden of proof with respect to this preliminary injunction motion by failing to

21    introduce any *evidence* with its moving papers establishing that the advertisements placed on all of

22    Metro Fuel's signs concern lawful activity or are truthful.  Metro Fuel submitted a declaration of

23    Michael A. Freedman, which states that Metro Fuel's signs "are made available to national and local

24    advertisers" and that they "may be used to display . . . " advertising.  Freedman Decl., ¶ 6.  But Metro

25    Fuel failed to offer evidence that the advertisements actually placed all of on Metro Fuel's signs

26    concern lawful activity or are truthful.

27        The Supreme Court has held numerous times that commercial speech related to illegal activity

28    or that is likely to deceive the public may be banned.  *See, e.g., Central Hudson,* 447 U.S. at 563-564.

Thus, Metro Fuel failed to establish that the advertisements placed on all of Metro Fuel signs are entitled to First Amendment protections.  Because Metro Fuel failed to establish that the advertisements placed on Metro Fuel signs are entitled to First Amendment protections and , therefore, is not entitled to a preliminary injunction.  *See Clear Channel Outdoor,* 340 F.3d at 817 (vacating district court's preliminary injunction because sign company "offered no specific evidence" establishing entitlement to a preliminary injunction.)

**B.     Section 611 Implements Substantial Governmental Interests**

Section 611 implements San Francisco's substantial governmental interests of protecting pedestrians and motorists and preserving San Francisco's unique character.  As the Court stated in *Metromedia*, 453 U.S. at 507-508:

> Nor can there by substantial doubt that the twin goals that the ordinance seeks to further-traffic safety and the appearance of the city-are substantial governmental goals.  It is far too late to contend otherwise with respect to either traffic safety, *Railway Express Agency, Inc. v. New York,* 336 U.S. 106 (1949) or esthetics, see *Penn Central Transportation Co. v. New York City,* 438 U.S. 104 (1978); *Village of Belle Terre v. Boraas,* 416 U.S. 1 (1974); *Berman v. Parker,* 348 U.S. 26 (1954)

In *Taxpayers for Vincent*, 466 U.S. at 806-807, the Supreme Court reaffirmed *Metromedia* and held that aesthetic interests were substantial enough to justify a ban on billboards:

> We reaffirm the conclusion of the majority in *Metromedia*.  The problem addressed by this ordinance-the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property-constitutes a significant evil within the City's power to prohibit.  "[T]he city's interest in attempting to preserve [or improve] the quality of urban life is one that must be accorded high respect."  *Young v. American Mini Theatres, Inc.* 427 U.S. 71 (1976)  (plurality opinion).

The Ninth Circuit likewise has stated:

> Insofar as billboards are concerned, the burden on the City of meeting the first prong of the *Central Hudson* test is not a great one.  Had the City enacted the ordinance with a clear statement of purpose indicating the City's interest in eliminating the hazards posed by billboards to pedestrians and motorists and in preserving and improving its appearance, the City would have demonstrated that the ordinance sought to implement substantial governmental interests, and would thus have satisfied the first prong of the *Central Hudson* test.  *See Metromedia*, 453 U.S. at 493, 507-10.

*Desert Outdoor Advertising, Inc. v. The City of Moreno Valley*, 103 F.3d 814, 819 n.2 (9th Cir. 1996).

Here, when the voters enacted Proposition G they stated that the purpose was to preserve San Francisco unique character and to reduce hazards to motorists and pedestrians associated with the proliferation of billboards and general advertising signs.  RJN, Exh B.  Section 611, therefore, implements substantial governmental interests as a matter of law.  *Desert Outdoor Advertising*, 103 F.3d at 819 n.2.

C.    **Section 611 Directly And Materially Advances San Francisco's Substantial Governmental Interests**

Metro Fuel contends that Section 611 fails the third prong of the *Central Hudson* test because the City failed to "perform any studies" "regarding whether advertising signs truly pose a threat to traffic safety or meaningfully affect the aesthetics of the streetscape."  MPA at 17.  As a matter of law and of fact, this argument fails.  As stated above, the Ninth Circuit has rejected the underinclusive theory's application to billboard regulation.  *Ackerley*, 108 F.3d at 1099.

1.    **Safety**

As a matter of law, Section 611 directly and materially advances San Francisco's substantial governmental interest in stopping the proliferation of general advertising signs in order to protect pedestrians and motorists.  In *Metromedia*, the Court concluded that San Diego's ban on off-site general advertising signs while allowing identical on-site general advertising signs passed the third prong of the *Central Hudson* test.

> Noting that "[b]illboards are intended to, and undoubtedly do, divert a driver's attention from the roadway," *ibid.*, and that whether the "distracting effect contributes to traffic accidents invokes an issue of continuing controversy," *ibid.,* the California Supreme Court agreed with many other courts that a legislative judgment that billboards are traffic hazards is not manifestly unreasonable and should not be set aside.  We likewise hesitate to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety."  There is nothing here to suggest that these judgments are unreasonable.  As we said in a different context, *Railway Express Agency, Inc. v. New York, supra,* at 109:
>
> "We would be trespassing on one of the most intensely local and specialized of all municipal problems if we held that this regulation has no relation to the traffic problem of New York City.  It is the judgment of the local authorities that it does have such a relation.  And nothing has been advanced which <u>shows</u> that to be palpably false."

1    *Metromedia*, 453 U.S. at 508-509 (emphasis added).  The Ninth Circuit has held that under

2    *Metromedia*, cities are not required to provide "detailed proof that the billboard regulation will in fact

3    advance the city's interests" in traffic safety and esthetics.  *Ackerley*, 108 F.3d at 1099-1100.

4        The *Metro Lights* court held that Los Angeles' regulatory scheme[21] did not directly advance

5    its goal of traffic safety because "the City's Street Furniture Program gives the City's contractor an

6    exclusive right to place thousands of off-site signs next to traffic lanes *in every area of the City where*

7    *a transit shelter, kiosk or 'amenity' is located."  Metro Lights,* 488 F. Supp. 2d at 943 (emphasis

8    added).

9        San Francisco's regulatory scheme differs in these important ways:  (1) San Francisco limits

10    the number of advertising allowed on street furniture; (2) San Francisco limits the areas of the City in

11    which advertising can be placed on street furniture; (3) all street furniture is reviewed and approved

12    for pedestrian and motorists safety; and (4) San Francisco requires that all street furniture be regularly

13    inspected, cleaned and maintained.

### 2.    Preserving San Francisco's Unique Character

15        The *Metromedia* Court also found as a matter of law that San Diego's ban on offsite general

16    advertising signs directly and materially advanced its aesthetics goal:

> We reach a similar result with respect to the second asserted justification for
> the ordinance-advancement of the city's esthetic interests.  It is not speculative
> to recognize that billboards by their very nature, wherever located and however
> constructed, can be perceived as an "esthetic harm."  San Diego, like many
> States and other municipalities, has chosen to minimize the presence of such
> structures.  Such esthetic judgments are necessarily subjective, defying
> objective evaluation, and for that reason must be carefully scrutinized to
> determine if they are only a public rationalization of an impermissible purpose.
> But there is no claim in this case that San Diego has as an ulterior motive the
> suppression of speech, and the judgment involved here is not so unusual as to
> raise suspicions in itself.

23    *Metromedia*, 453 U.S. at 510.

---

27    [21]    Los Angeles, Cal., Municipal Code, div. 62 (1996) is attached as Exhibit W to San
Francisco's Request for Judicial Notice.

San Francisco's regulatory scheme easily satisfies this test.  As with safety concerns, San Francisco addresses aesthetics concerns by requiring all street furniture placed on the public right-of - ay to be approved by the San Francisco Arts Commission.

**D.      Section 611 Is No More Extensive Than Necessary**

*Central Hudson's* final prong requires that a commercial speech regulation be no more extensive than necessary to serve the government's ends.  *Central Hudson*, 447 U.S. at 566.  In *Metromedia*, the Court held that a ban on commercial offsite billboards easily meets this requirement, since "[i]f the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them."  *Metromedia*, 453 U.S. at 508.

Here, Section 611 meets this test.  San Francisco has implemented a comprehensive regulatory scheme that goes no further than necessary to address the evil caused by the proliferation of offsite advertising.  Indeed, San Francisco has an amply supply of general advertising signs and there is no suggestion that the supply is inadequate.

**V.      THIS COURT MUST GIVE PRECLUSIVE EFFECT TO THE UNCHALLENGED FACTUAL AND LEGAL DETERMINATIONS MADE IN THE ADMINISTRATIVE PROCEEDINGS AGAINST METRO FUEL'S SIGNS**

The Court must give preclusive effect to the unchallenged 29 Notices of Violation ("NOV") issued by the Planning Department (attached as Exhibit T to San Francisco's Request for Judicial Notice) and the NOV and Order of Abatement issued by the Department of Building Inspection (attached as Exhibit U to San Francisco's Request for Judicial Notice).  These NOVs were issued because the Planning Department and Department of Building Inspection investigated and determined that these signs had been installed without a permit.  Because Metro Fuel failed to challenge the NOVs administratively and judicially, the factual determinations and legal conclusions of these NOVs-these signs violate the Planning and Building Codes are now final.

Title 28 U.S.C. section 1738 requires federal courts to give the same preclusive effect to state court judgments, as they would be given in the state in which they were rendered.  *Miller v. County of Santa Cruz* 39 F.3d 1030, 1032 (9th Cir. 1994).  In *Miller*, the Ninth Circuit stated that *University of Tennessee v. Elliot*, 478 U.S. 788 (1986),

1

2

> requires [federal courts] to give preclusive effect, at a minimum, to the factfinding of state administrative tribunals.  We have gone farther, however, and held that 'the federal common law rules of preclusion described in *Elliot* extend to state administrative adjudications of legal as well as factual issues, even if unreviewed, so long as the state proceeding satisfies the requirements of fairness outlined in [*United States v. Utah Construction & Mining Co.*, 384 U.S. 394 (1966)].''

3

4

5

*Id.* at 1032-1033 (citation omitted).

6   The fairness requirements of *Utah Construction* are:  (1) that the administrative agency act in

7   a judicial capacity, (2) that the agency resolve disputed issues of fact properly before it, and (3) that

8   the parties have an adequate opportunity to litigate.  384 U.S. at 422.  The threshold inquiry "is

9   whether a state administrative proceeding was conducted with sufficient safeguards 'to be equated

10  with a state court judgment.'"  *Miller,* 39 F.3d at 1033.  "A federal court should ordinarily give

11  preclusive effect when the state court would do so."  *Id.*  This is so even in cases of unreviewed state

12  agency determinations.  *Id.*  Because California has adopted the standards articulated in *Utah*

13  *Construction,* the only question a federal court must answer is "whether the administrative hearing

14  met the requirements of California law such that a California court would have accorded the

15  determination preclusive effect."  *Id.*  There is no question that a California court would give

16  preclusive effect to the unreviewed notices of violation from the Planning Department and

17  Department of Building Inspection.

18  In order to challenge a decision of an administrative agency in California, one must

19  demonstrate that he has exhausted all available administrative procedures – including all available

20  administrative appeals of an agency's decision.  *Coachella Valley Mosquito & Vector Control Dist. v.*

21  *California Public Employment Relations Bd.* 35 Cal.4th 1072, 1080 (2005).  "In brief, the rule is that

22  where an administrative remedy is provided by statute, relief must be sought from the administrative

23  body and this remedy exhausted before the courts will act."  *Abelleira v. District Court of Appeal* 17

24  Cal.2d 280, 292 (1941).  In addition to exhausting administrative remedies, a plaintiff must also

25  exhaust judicial remedies.  "[J]udicial review of any decision of a local agency . . . may be had

26  pursuant to Code of Civil Procedure section 1094.5, only if the petition for writ of mandate pursuant

27  to such section is filed . . . not later than the 90th day following the date on which the decision

28  becomes final."  Code Civ. Proc. § 1094.6, subd. (b).  The California Supreme Court has held that

"unless a party to a quasi-judicial proceeding challenges the agency's adverse findings made in that proceeding, by means of a mandate action in superior court, those findings are binding in later civil actions." *Johnson v. City of Loma Linda,* 24 Cal.4th 61, 69-70 (2000). "Exhaustion of judicial remedies . . . is necessary to avoid giving binding effect to the administrative agency's decision, because the decision has achieved finality due to the aggrieved party's failure to pursue the exclusive *judicial* remedy for reviewing administrative action." *Id.*; *see also City and County of San Francisco v. Ang,* 97 Cal.App.3d 673, 677 – 679 (1979).

Here, in order to pursue judicial consideration of the NOV's issued by the Planning Department, the City's Planning Code required the sign owners to seek reconsideration of the NOV's by an administrative law judge. S.F. Planning Code § 610(d)(1)B. No such request for reconsideration was filed, and thus no administrative review of the Planning Department NOVs ever occurred. As a result, the sign owners are now precluded from seeking judicial relief in the form of a state court writ or administrative mandamus pursuant to Cove of Civil Procedure §1094.5. They cannot simply circumvent these requirements by seeking redress from this Court. Similarly, the DBI NOV was the subject of an administrative appeal and resulted in the issuance of an Order of Abatement. As in the case of the Planning Department NOVs, because neither the owners nor Metro Fuel sought judicial review of the Order of Abatement, the factual and legal determinations made by the DBI Director are binding and preclusive for purposes of this case.

In *Briggs v. City of Rolling Hills Estates,* 40 Cal.App.4th 637 (1995) , a homeowner sued after the issuance of a building permit was conditioned on the removal of an existing deck. *Id.* at 640. The trial court granted summary judgment in favor of the city finding the homeowner's 42 U.S.C. § 1983 cause of action was precluded by the failure to challenge the city's action directly by administrative mandamus. *Id.* After analyzing and discussing state and federal law, the Court of Appeals affirmed. The Court of Appeal observed the homeowner

> never sought to set aside the city's decision by petitioning for a writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5. Plaintiffs could and should have sought judicial review of the city's decision by administrative mandamus; if the condition to which plaintiffs objected was improperly imposed, it could have been vacated pursuant to section 1094.5. Plaintiffs completely bypassed the proper procedure and instead sought damages and injunctive relief by this independent action.

*Id.* at 645.  The Court of Appeal went on to state that the failure to pursue administrative and judicial relief estopped the homeowner from relitigating the same issues, even in a 42 U.S.C. § 1983 cause of action.  *Id.* at 645 - 648.  The Court of Appeal, explained the rule:

> [T]his rule is not the doctrine of "failure to exhaust administrative remedies."  Rather it is a form of res judicata, of giving collateral estoppel effect to the administrative agency's decision, because that decision has achieved finality due to the aggrieved party's failure to pursue the exclusive *judicial* remedy for reviewing administrative action.

*Id.* at pp. 645 – 646; *see also Swartzendruber v. City of San Diego* 3 Cal.App.4th 896, 909 (1992).

As these cases make clear, in order to bring its First Amendment claim premised on the legality of its signs, Metro Fuel must exhaust its administrative and judicial remedies challenging those decisions.  Having failed to do so, Metro Fuel is now barred from bringing its claims in this Court. Metro Fuel cannot argue that its claims under the First Amendment vindicate a different primary right that would addressed in a writ of mandate proceedings under Code of Civil Proceedings section 1094.5 challenging the notices of violation or order of abatement.  In fact, the California Court of Appeal rejected this same argument in *Swartzendruber*.  Casting a claim in "constitutional terms" does not make it a different primary right.

> In alleging her federal civil rights were violated (fifth cause of action), Swartzendruber alleged she was discharged in violation of her constitutional rights of due process and free speech by being terminated without cause, without giving her an opportunity to express legitimate concerns about safety, without providing meaningful safety training opportunities and without providing progressive discipline pursuant to City's own procedural manual. *Inasmuch as the primary right at stake was her right to continued employment and the harm suffered was loss of that employment, her fifth cause of action does not present a separate injury from that litigated before the Commission. Swartzendruber has merely restated her cause of action for wrongful termination in constitutional terms.*

*Id.* at p. 908.

Because California court would give preclusive effects to the unchallenged NOVs and Order of Abatement, this court must do so.  *Miller,* 39 F.3d at 1033.

## VI.    BECAUSE METRO FUEL'S SIGNS ARE ILLEGAL FOR REASONS NOT CHALLENGED IN THE FIRST AMENDED COMPLAINT, METRO FUEL LACKS STANDING TO PURSUE THIS ACTION

A review of Metro Fuel's First Amended Complaint and its moving papers for this motion makes clear that it is only challenging San Francisco's ban on new general advertising signs.  While

Metro Fuel defines San Francisco's "Sign Ordinance" as Article 6 of the Planning Code, Metro Fuel only attacks Section 611.  But Metro Fuel lacks standing to challenge Section 611, because the 14 signs identified in Metro Fuel's moving papers violate other sections of the Planning Code not put at issue in its First Amended Complaint or in are motion for preliminary injunction.

"The 'irreducible minimum' of standing under Article III of the Constitution is (1) an injury in fact, which is 'actual, concrete, and particularized'; (2) a casual connection between that injury and the defendant's conduct; and (3) a likelihood that the injury can be redressed by a favorable decision of the court."  *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 891 (9th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).  Each of these elements is "an indispensable part of the plaintiff's case" and "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof."  *Lujan,* 504 U.S. at 561.

As set forth above, the Planning Department and the Department of Building Inspection have issued NOVs, which Metro Fuel did not contest.  Moreover, Metro Fuel's signs violate numerous sections of the Planning Code:  227(k); 606(a)(3); 607.1(e); 607.2(e); 607.3(c)(3); 608.5; 608.10(b); 710; 710.30; 711.30; 721; 721.30; 723.30; 815; 815.76; and 1111.7(a).  Durandet Decl. ¶¶ 12- 16.  Accordingly, even if the Court were to enjoin the City's enforcement of Section 611, Metro Fuel's signs would still be illegal.  Therefore, Metro Fuel lacks standing to pursue its challenge to Section 611.  *Get Outdoors II, LLC v. City of San Diego*, 560 F.3d at 891.

## CONCLUSION

For the reasons stated above, Metro Fuel's motion for a preliminary injunction should be denied.

Dated:  August 29, 2008                       Respectfully submitted,
                                              DENNIS J. HERRERA
                                              City Attorney
                                              KRISTEN A. JENSEN
                                              THOMAS S. LAKRITZ
                                              VICTORIA WONG
                                              Deputy City Attorneys

                                       By:_____/s/_____.
                                              THOMAS S. LAKRITZ
                                              Attorneys for Defendant CITY AND COUNTY OF
                                              SAN FRANCISCO