# EXHIBIT C

COURT OF APPEAL, FIRST APPELLATE DISTRICT
350 MCALLISTER STREET
SAN FRANCISCO, CA 94102
DIVISION 5

# FILED

San Francisco County Superior Court

FEB 06 2008

GORDON PARK-LI, Clerk

BY _____ Deputy Clerk

Office of the County Clerk
San Francisco County Superior Court  -  Main
Attention: Civil Appeals
400 McAllister Street, 1st Floor
San Francisco, CA 94102

MICHAEL NADELMAN,
Plaintiff and Respondent,
v.
JEREMY PAUL,
Defendant and Appellant.

A114284
San Francisco County No. 402263

## * * REMITTITUR * *

        I, Diana Herbert, Clerk of the Court of Appeal of the State of California, for the First Appellate
District, do hereby certify that the attached is a true and correct copy of the original opinion or decision
entered in the above-entitled cause on December 06, 2007 and that this opinion has now become final.

___Appellant _✓_Respondent to recover costs
___Each party to bear own costs
___Costs are not awarded in this proceeding
___See decision for costs determination

        Witness my hand and the Seal of the Court affixed at my office this     FEB – 5 2008

Very truly yours,
Diana Herbert
Clerk of the Court

Deputy Clerk

P.O. Report:                    ___
Marsden Transcript:       ___
Boxed Transcripts:         ___
Exhibits:                         ___
None of the above:         ___

rem1



### San Francisco Superior Courts
Information Technology Group

## Document Scanning Lead Sheet
Feb-07-2008  2:37 pm

Case Number: CGC-01-402263

Filing Date: Feb-06-2008 2:07

Juke Box: 001    Image: 02019636

REMITTITUR

## MICHAEL NADELMAN VS. HI TECHDESIGNS

001C02019636

**Instructions:**
Please place this sheet on top of the document to be scanned.

Filed 12/6/07

**COPY**

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FIVE

**FILED**

DEC 0 6 2007

Court on Appeal - First App. Dist.
DIANA HERBERT

By_____
DEPUTY

MICHAEL NADELMAN et al.,

      Plaintiffs and Respondents,

v.

JEREMY PAUL,

      Defendant and Appellant.

A114284

(San Francisco County
Super. Ct. No. 402263)

      Appellant Jeremy Paul individually and doing business as Quickdraw Permit Consulting (Appellant) appeals a judgment holding him liable for design and construction errors in a home improvement project. As to his liability, he argues the trial court erred by finding he breached a duty to supervise construction of the project, engaged in intentional misrepresentation, violated the Consumer Legal Remedies Act (CLRA, Civ. Code, § 1750 et seq.), conspired to evade licensing laws, and violated Business and Professions Code section 17200. As to the damages award, he argues the court erred by refusing to apply collateral estoppel to a finding in a default judgment and failed to make appropriate adjustments to the compensatory damages award. We affirm.

### BACKGROUND

      Michael and Aminta Nadelman own a three-story home in Pacifica, California. In 1991, the house had a small rear deck extending from the third floor and overlooking the ocean. The Nadelmans wanted to expand the deck and add a sunroom.

1

## Contract with Leonard Paul

Michael Nadelman (Nadelman) responded to a newspaper advertisement for sunrooms placed by Hi Tech Designs, Inc. Leonard Paul answered his call and they discussed the proposed deck project. On about March 7, 1992, Nadelman and Leonard Paul met and signed a construction contract. Leonard Paul told Nadelman he was with Hi Tech Designs and that his company would design and build the deck. Hi Tech Designs' name was on the contract, which provided for the extension of the Nadelmans' existing deck and the installation of a prefabricated sunroom for a total cost of $11,990. Paul told Nadelman that building permits would cost extra and the contract provided, "Customer will pay for all permit cost [¶] Jeremy [Appellant] and fees."

The contract did not list a contractor's license number. In fact, Leonard Paul's contractor's license number was printed on the contract, but the number was covered with a gold seal. Nadelman called the Contractors State License Board to confirm the validity of the license number that appeared on the Hi Tech Designs advertisement, number 588674. The board confirmed the number was valid, but Nadelman did not ask who held the license. At the time, neither Leonard Paul nor Hi Tech Designs held a valid license. License number 588674 belonged to The Installation Department. Although The Installation Department's license was valid in March 1992, it was cancelled on July 23, 1992, before the Nadelman construction was finally approved.

## Design and Permit Application

Leonard Paul told Nadelman to contact Appellant regarding the design. He said Appellant would be responsible for both "the design and the overseeing that the sunroom and the deck would be constructed to [Nadelman's] liking."

Within a few days of signing the contract, the Nadelmans decided they wanted a larger deck. Nadelman called Appellant, who agreed to revise the design.

Appellant understood he had a verbal contract with Nadelman to provide services in a competent, professional manner. Appellant was not a licensed contractor or architect. When asked at trial about the design and permitting process, he testified, "I

2

don't know anything about safety." When asked about problems that subsequently developed with the deck construction, he testified that he was not qualified to comment on design or construction defects.[1]

Appellant instructed his employee Connie Dean to take measurements of the Nadelman property. Dean, who was neither a licensed engineer nor an architect, inaccurately measured the distance from the back of the house to a retaining wall behind (west of) the house. This mismeasurement was incorporated into the Quickdraw design plan.[2] Appellant hired civil engineer Monte Stott to perform structural calculations to ensure that the design complied with industry standards. In making those calculations, Stott relied on the site measurements depicted on the Quickdraw design plan.

Appellant applied for a building permit from the City of Pacifica. In the space on the application for the name of the architect, he wrote "For Contact — Jeremy" and provided his phone number. The permit was issued April 27, 1992.

Quickdraw sent Nadelman a $619.50 bill dated March 30, 1992 for "measuring, drafting, plans submitted"; a $375 bill dated April 3, 1992 for "Engineering services: field inspection [¶] framing/plan/attachments [¶] structural calculations"; and a $232 bill dated April 27, 1992 for consultation with the building inspector, permit issuance and fees to the City of Pacifica. Nadelman paid these bills.

Construction

On May 9, 1992, a construction crew from The Installation Department arrived at the Nadelman residence to begin construction. They brought with them a new written contract for Nadelman to sign, which incorporated the design changes he had discussed with Appellant. The new contract identified the seller as The Installation Department and did not mention Hi Tech Designs. The crew said they were there to do the work the

---

[1]    In a trial brief, Appellant's attorney represented that Appellant was "not a designer and would have difficulty designing a deck from a Lincoln Log set."

[2]    Appellant Jeremy Paul did business as Quickdraw Permit Consulting, a sole proprietorship.

3

Nadelmans had asked for and Nadelman understood that he was still engaged with Leonard Paul, Appellant Quickdraw and Hi Tech Designs for the construction of the deck. Nadelman signed the contract and the workers began construction. The Quickdraw design plan was posted at the construction site.

The measurement error in the Quickdraw design plan regarding the location of the retaining wall caused several problems during construction. The design plan placed the location of a retaining wall 21 feet six inches west of the house, whereas the actual distance was 20 feet three inches. The plan showed the support post and pier (underground concrete foundation) for the deck positioned three feet six inches east of the retaining wall, a safe distance. If the retaining wall had been shown in its actual location on the Quickdraw plan, the support pier would have been too close to the retaining wall, where it would exert an unsafe force on the wall and threaten the stability of the entire Nadelman house.

When the builder started construction, he began by installing the support pier three feet six inches from the retaining wall, as shown on the Quickdraw plan. The builder measured from the actual location of the retaining wall rather than the erroneous location shown on the Quickdraw plan and thus placed the support post and pier closer to the house than depicted on the plan. Three problems followed from this relocation of the support post and pier.

First, in its new location the support post and pier did not directly support the weight of the sunroom. On the Quickdraw plan, the support post and pier were located directly under the western wall of the sunroom. When the support post and pier were relocated due to the error in the location of the retaining wall on the Quickdraw plan, they were moved to a position under the interior of the sunroom, one foot four inches east of its western wall. The relocation caused the weight of the sunroom to rest on the overhang portion of the deck (the portion extending outward from the support post) rather than directly over the support post and pier. The new configuration of the deck and support post and pier was unsafe.

4

Second, the deck and sunroom actually built for the Nadelmans were smaller than the deck and sunroom promised by Appellant. Because of the measurement error, there was less space between the house and the retaining wall, where the deck and sunroom were to be constructed, than was shown on the Quickdraw plan. The contractor shortened the deck and sunroom. On the Quickdraw plan, the extended deck was 16 feet six inches deep. As built, the deck was 15 feet six inches deep. On the Quickdraw plan, the sunroom reached 10 feet six inches onto the extended deck. As built, the sunroom reached eight feet six inches onto the deck.

Third, the ratio of the back span and overhang portions of the cantilever deck became unsafe. On the Quickdraw plan, the length of the deck from the house to the support post (the back span) was 10 feet six inches, and the length of the deck from the support post outward (the overhang) was six feet. The ratio of the back span (10 feet six inches) to the overhang (six feet) was about three to two, which was appropriate. As a result of the relocation of the support post and pier and the shortening of the deck, the back span was seven feet two inches and the overhang was eight feet four inches, a ratio of less than one to one, which was unsafe. This configuration violated Uniform Building Code requirements.

In addition to the measurement error regarding the location of the retaining wall, the Quickdraw plan failed to specify the use of pressure-treated wood or redwood for all components of the deck exposed to the marine environment of Pacifica. John Richards, an expert witness called by the plaintiff, testified that "[t]he designer is in control of the materials and specifications for the project."

<u>Building Inspection and Project Approval</u>

After construction was completed, the City building inspector notified Nadelman that he would not approve the project. Nadelman called Appellant, who said he would take care of it. Appellant told Nadelman the deck was safe ("not a problem"), the inspector was overly strict, and his engineer would contact the City and, if necessary, pull rank on the inspector.

Appellant inaccurately informed Stott, the civil engineer, that the deck as built had an eight foot backspan and an eight foot overhang. Relying on this information, Stott performed structural calculations and determined that the deck was safe. In an August 9, 1992 letter to the City of Pacifica Bureau of Building Inspection, he wrote that the increase of the overhang from six to eight feet was acceptable under the building code. Appellant did not tell Stott that the overhang cantilever was more than eight feet, that the back span was less than eight feet, or that the western wall of the sunroom extended beyond the location of the support post and pier. Had Stott known these material facts, he would not have concluded the deck complied with Uniform Building Code requirements and he would not have written his letter. After receiving Stott's letter, the City approved the project. On August 20, Appellant faxed Nadelman a copy of Stott's letter and Nadelman understood that "everything was acceptable and going the way it had been planned."

## Nadelman's Discovery of Problems with Deck

In June 2001, Nadelman consulted a contractor about building a deck and sunroom underneath the deck and sunroom built by Hi Tech Designs. The contractor inspected the site and informed Nadelman that the design and construction of the upper deck was faulty because the wood was not pressure treated and the cantilever structure was unsafe, among other reasons.

On Thanksgiving Day in 2001, Nadelman's foot went through the floor of the sunroom on the extended deck. Had he fallen through, he would have dropped 18 feet. Parts of the flooring and other areas of the deck had rotted away because they were built with untreated wood. Nadelman consulted a carpenter, who advised him that the deck would not be safe unless the deck's flooring was removed and replaced. Nadelman paid more than $22,000 for the work. At the time, he did not know there was a design defect that required the entire deck structure to be removed and replaced.

The following year, structural engineer John Richards advised Nadelman that the deck and sunroom were unsafe and had to be completely replaced. He told the

Nadelmans the deck was not safe to use. The estimated cost to remove and replace the deck structure and sunroom was almost $73,000 in November 2003 and almost $75,000 in August 2004.

## Filing of Lawsuit and Pretrial Litigation

The Nadelmans filed suit December 11, 2001 against Leonard Paul and Hi Tech Designs; Jeremy Paul and Quickdraw Permit Consulting; The Installation Department and its partners, David Schmidt and Jack Milford Koch; and Monte Stott. They alleged causes of action for breach of contract, negligent construction, professional negligence, false advertising, violation of the CLRA (Civ. Code, § 1750 et seq.), violation of Business and Professions Code section 17200, and intentional misrepresentation.[3]

Defendants Koch and The Installation Department did not answer the complaint. The trial court held a default hearing and on December 1, 2003 entered judgment against these defendants in the amount of $192,284.97. In February 2004, the Nadelmans settled with Leonard Paul for $10,000, and settled with Monte Stott for $9,250.

The claims against Appellant were tried before Judge Diane Elan Wick in August 2004. In March 2005, the court issued a proposed statement of decision. The court took additional evidence on Appellant's wealth with respect to a punitive damages award and issued a final statement of decision in January 2006.

## Statement of Decision

The trial court made adverse credibility findings as to Appellant, Leonard Paul and Jack Koch. The court found that there was an implied contract between Appellant and the Nadelmans that required Appellant to design the project, obtain necessary building permits, and supervise construction of the project consistent with applicable building codes and industry standards of good workmanship. Appellant was not licensed or

---

[3]    The Nadelmans also asserted claims on surety bonds against Indemnity Company of California and American Contractors Indemnity Company. Those claims are not relevant to the issues raised in this appeal.

qualified to design the deck project or to oversee the work of civil engineer Stott and he intentionally misrepresented to the City of Pacifica and the Nadelmans that he was qualified to do so. He failed to properly design the project because he incorporated inaccurate measurements into the design and failed to specify use of appropriate building materials. He failed to adequately supervise construction of the project and he failed to take appropriate steps to address the safety concerns raised by the as-built dimensions of the deck. He intentionally misrepresented the dimensions of the as-built deck to civil engineer Stott, causing him to inaccurately vouch for the deck's safety. He sent Stott's letter to Nadelman, falsely representing that the as-built deck was safe. Finally, he conspired with Leonard Paul to evade California licensing laws.

The court found Appellant liable for breach of implied contract; negligent construction; violation of the CLRA; and intentional misrepresentation. His conduct as to each of these causes of action was a substantial factor causing the Nadelmans to receive a deck with a drastically shortened lifespan that could catastrophically fail at any time. Monetary damages to compensate for this harm were the costs of building a safe structure that would withstand the marine environment of Pacifica. The court awarded $100,000 in compensatory damages.

The court also found that Appellant violated Business and Professions Code section 17200. The trial court ordered $1,226.50 in restitution, the amount of the fees Nadelman paid to Jeremy Paul.

The court found by clear and convincing evidence that Appellant acted with malice and oppression in committing intentional misrepresentation and violating the CLRA and awarded $109,049 in punitive damages.

## DISCUSSION

In a case tried without a jury, the trial judge is the sole arbiter of all conflicts in the evidence and the sole judge of the credibility of the witnesses. (*Davis v. Kahn* (1970) 7 Cal.App.3d 868, 874.) The judge is free to disbelieve witnesses even though they are uncontradicted if there is any rational ground for doing so. (*Ibid.*) When the sufficiency

of evidence is contested on appeal, it will be assumed that the judge resolved every factual conflict in favor of the prevailing party and drew every reasonable inference in favor of that party. (*Ibid.*) The sole question on appeal is "whether there is any substantial evidence, direct or indirect, contradicted or uncontradicted, which will support the finding." (*Ibid.*)

I.   *Liability Issues*

A.   *Breach of Implied Contract*

Appellant argues that the trial court erred by finding he had a duty to supervise construction of the project. Specifically, he argues the trial court erred by finding he had a duty to ensure that the contractors did competent work.

The trial court found that Appellant "failed to adequately supervise the contractors and sub-contractors on the job." But it also made a specific finding that Appellant "failed to take steps to correct the integrity and safety of the project by correcting the problems caused by the support pier being misplaced, and he provided a smaller sunroom than that provided on the May 9, 1992 contract between plaintiffs and The Installation Department." This narrower finding is sufficient basis for the court's conclusion that Appellant is liable for errors that occurred during and following construction. Contrary to Appellant's insinuation, the court did not hold Appellant liable for incompetent construction work that was unrelated to errors in the design plan. For example, Appellant contends the Quickdraw plan specified proper building materials, but the contractors deviated from the plan and used incorrect materials. The court found that because the Quickdraw design failed to specify the use of pressure-treated wood or redwood for *all* components of the deck, the design was defective for a deck built in the marine environment of Pacifica. The court also found that the misplacement of the support pier was caused by the measurement error in the Quickdraw plan and that the resulting unsafe configuration of the deck was not identified or corrected for nine years because of Appellant's deficient or fraudulent response to the building inspector's

9

concerns.  Appellant's liability for those errors was based on his own conduct, not any failure to supervise the quality of the contractors' work.

We affirm the trial court finding of liability for breach of contract, because there is substantial evidence that Appellant assumed a contractual responsibility, not only to competently design the deck, but also to oversee the project and respond to design-related problems that arose during construction and that he breached that duty.

The trial court found that the terms of the implied contract between Appellant and Nadelman were formed by their conversations, Appellant's invoices and Nadelman's payment of those invoices, and Appellant's conduct with respect to the project. (*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 850 [mutual assent to form a contract may be manifested by writing, spoken words, or conduct].)  Conflicting evidence was presented at trial regarding the formation and terms of the implied contract.  We review the court findings for substantial evidence. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.)

The trial court found that Appellant's statements and conduct constituted a promise to design the deck and to oversee its construction insofar as design-related problems arose.  Leonard Paul told Nadelman that Appellant would both design the deck and, in Nadelman's words, "oversee[] that the sunroom and the deck would be constructed to [Nadelman's] liking."  When Nadelman first spoke to Appellant, he was familiar with the project and he immediately agreed to incorporate Nadelman's requested changes into the design.  There is substantial evidence from which the court could infer that Leonard Paul had told Appellant about the project and explained he would be responsible for the design and design oversight.  The court could reasonably construe Appellant's statements to Nadelman as an agreement to these terms.

In addition, Appellant's subsequent conduct was consistent with his assuming both design and oversight responsibility.  Leonard Paul testified that he had no role in the project after procuring the initial contract.  Appellant measured the construction site, prepared the design, hired an engineer to perform structural calculations, applied for and obtained a building permit, and billed Nadelman for all of these tasks.  The next contact

10

Nadelman had with the project was the arrival of the construction crew at his residence. The crew arrived with a contract that incorporated the changes Nadelman had communicated to Appellant and the Quickdraw plan was posted at the job site. From this evidence, the court reasonably could infer that Appellant had initiated the commencement of construction.

It is noteworthy that when a problem arose with the construction, Appellant agreed to "take care of it." He provided civil engineer Stott with measurements of the as-built deck and induced him to write a letter to the City stating that the deck as built was safe. Jack Koch of The Installation Department testified it was his general practice, when working with Leonard Paul and Appellant, to contact Quickdraw if a design-related problem arose on a construction site. He would not make changes to a design without instructions from Quickdraw. This evidence supported a finding that Appellant understood his responsibilities to encompass oversight, including responsibility for design-related problems that arose during construction.

Appellant contends that the trial court finding was based solely on his having prepared the Quickdraw design plan. He cites case law holding that a civil engineer is not liable for construction errors solely because he signed a design plan and he argues the holding should apply to him as well. (*Wynner v. Buxton* (1979) 97 Cal.App.3d 166, 176.) As explained, the finding is based on statements and conduct by Appellant beyond his preparation of the design plan.

Appellant argues that there was evidence that his agreement to perform services for Nadelman was limited to tasks necessary to secure building permits from the city. However, much of this evidence consists of his own testimony, which the court found lacking in credibility. The court was entitled to disregard it. (*Davis v. Kahn, supra,* 7 Cal.App.3d at p. 874 [the factfinder is free to disbelieve witness even though uncontradicted if there is any rational ground for doing so].) Appellant also cites the fact that he never billed Nadelman for construction supervision and his testimony that he never visited the job site. This evidence, even if credited, is not inconsistent with Appellant's having assumed responsibility for responding to design-related problems that

11

arose during construction. Again, our task on appellate review is limited to determining whether there is any substantial evidence that will support the trial court's finding. (*Ibid.*) We have concluded that the court finding is supported by substantial evidence.

### B.    *Intentional Misrepresentation*

In his challenge to the punitive damages award, Appellant argues that the trial court finding that he engaged in intentional misrepresentation is not supported by substantial evidence. We disagree.

"One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." (Civ. Code, § 1709.) Intentional misrepresentation or deceit is either " 1. The *suggestion*, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; [¶] 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, [¶] 4. A promise, made without any intention of performing it." (Civ. Code, § 1710, emphasis added.)

By his conduct with Nadelman, Appellant suggested that he was qualified to do the work when he knew he was not. By his own admission at trial, he was not qualified. He testified that he was not a licensed architect or a licensed contractor and that he knew nothing about safe construction design. The court could reasonably infer that Appellant misrepresented his qualifications to induce Nadelman to hire him as the designer. Under the circumstances, Nadelman reasonably relied on Appellant's suggestion that he was qualified and Nadelman's reliance caused him to receive a defective deck. Substantial evidence supports the court findings that, when he entered into the contract with Nadelman, Appellant intentionally misrepresented that he was qualified to design the deck.

Alternatively, Appellant's misrepresentation can be understood as actionable nondisclosure. Nondisclosure of material facts is tortious if, as relevant here,

representations by the defendant are misleading due to the nondisclosure or the nondisclosed facts are known or accessible only to defendant, who knows they are not known to or reasonably accessible to the plaintiff. (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 346-347.)

There is substantial evidence supporting the court findings that Appellant made three other misrepresentations when he entered into the contract with Nadelman: (1) that the deck would be constructed in a safe, workmanlike manner; (2) that the deck would be approved by the City of Pacifica; and (3) that the size of the deck would be as orally promised to Nadelman. (Civ. Code, § 1710.) Because Appellant lacked the qualification necessary to design a safe deck, he had no reasonable ground to believe that the deck project would be approved by the city as complying with building codes, and he had no reasonable ground to believe that a deck and sunroom of the size requested by Nadelman could be safely constructed within the actual dimensions of the Nadelman property.

Substantial evidence supports the court finding that, after entering into the contract, Appellant misrepresented that the deck as constructed complied with building codes and industry standards. The court found that Appellant caused Stott to write a letter to the city vouching for the safety of the deck as constructed, without disclosing material facts that would have altered Stott's opinion, including the accurate dimensions of the as-built deck. At trial, Appellant insisted that the general contractor provided the dimensions of the as-built deck, but he had no specific recollection of that fact or of how the dimensions were communicated to Stott. Stott testified that Appellant gave him the dimensions. The court credited Stott's testimony and concluded that Appellant provided the dimensions without reasonable ground for believing they were accurate.

### C.    *Consumer Legal Remedies Act*

Appellant argues the court erred in finding he violated the CLRA, because the court relied on findings that Appellant committed unfair acts during the execution of the construction contract. He argues the statute only prohibits wrongful acts in the inducement of a contract.

The Consumer Legal Remedies Act prohibits certain "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction *intended to result or which results in* the sale or lease of goods or services to any consumer." (Civ. Code, § 1770, subd. (a), emphasis added.) Appellant argues the italicized phrase limits the scope of the statute to acts that induce consumers to enter into contracts for the sale or lease of goods or services.

We need not resolve this question of statutory interpretation because the court found that Appellant committed unfair acts that induced Nadelman to enter into his contract with Appellant. The court found the implied contract between Nadelman and Appellant was formed by a course of statements and conduct that commenced with Leonard Paul's statement to Nadelman that Appellant would be responsible for designing the project and overseeing its construction. Contract formation continued with Nadelman's conversation with Appellant, Appellant's sending invoices to Nadelman, and Nadelman's payment of those invoices. During that course of conduct, Appellant misrepresented that he was qualified to design the wooden deck on the Nadelmans' three-story house. The trial court specifically cited this misrepresentation as a violation of the CLRA. As noted previously, the trial court found that Appellant made three other intentional misrepresentations while entering into the contract with Nadelman: that the deck would be constructed in a safe and workmanlike manner; that the deck would be approved by the city; and that the size of the deck would be as promised. These findings, which are supported by substantial evidence, support CLRA liability under Civil Code section 1770, subdivision (a)(2), (3) and (5).[4]

---

[4]    Because we affirm the trial court's finding of liability under the CLRA for intentional misrepresentation, we need not address Appellant's arguments regarding his liability under Business and Professions Code section 17200. We also need not address Appellant's argument regarding his liability under the CLRA and Business and Professions Code section 17200 for conspiracy. Finally, we need not address Appellant's challenge to the trial court's decision to reserve its evidentiary rulings until after the presentation of evidence, because the only specific evidentiary ruling Appellant

II.    *Damages Issues*

    A.    *Collateral Estoppel Effect of Default Judgment*

Appellant argues the trial court should have given collateral estoppel effect to its finding in the default judgment against Koch and The Installation Department that the cost to correct and repair the defective deck project was $85,054.03.

This argument is forfeited because Appellant did not raise it in the trial court. (*Ward v. Taggart* (1959) 51 Cal.2d 736, 742.) Appellant argued at trial that the default judgment precluded imposition of *liability* on him because the court had found at the default hearing against other defendants that Nadelman's injuries were caused by the defaulting defendant's unlicensed performance. He did not argue that the default judgment precluded a compensatory damage award against him greater than that imposed on the defaulting defendants, or that the court was bound by the amount of damages awarded to Nadelman in the default judgment.

In any event, Appellant has not shown that the issue decided in the default proceeding (the present value of the Nadelmans' damages as of December 1, 2003) was the identical issue decided at the bench trial (the present value of the Nadelmans' damages as of January 2006). (See *Smith v. ExxonMobil Oil Corp.* (2007) 153 Cal.App.4th 1407, 1414 [for collateral estoppel to apply, issue decided in prior adjudication must be identical to issue sought to be relitigated].)

    B.    *Damages Attributable to Physical Condition of Nadelman Property*

Appellant argues that the compensatory damage award was excessive because it included costs attributable to the physical conditions of the Nadelman property. Specifically, he argues that the expense of providing "adequate deck support without causing damage to the existing retaining wall" would have been incurred even if

---

challenges, the admission of the Leider testimony, is related to the Business and Professions Code section 17200 cause of action.

Quickdraw had accurately measured the job site at the outset. That expense, he argues, should not have been included in the compensatory damage award.

Appellant fails to provide evidentiary support for his argument. Nor does he cite evidence that the cost of building the support pier would have been greater had the project been properly designed from the outset.

Appellant's authority is easily distinguishable. In *Gagne v. Bertran* (1954) 43 Cal.2d 481, the plaintiff relied on the defendant's negligent representations about the soil conditions before purchasing real property. (*Id.* at pp. 484-485, 488.) The actual condition of the soil caused the plaintiff to incur unanticipated costs of construction when he developed the property for profit. (*Id.* at p. 485.) The Supreme Court held that the proper measure of damages in that property sale case was the difference between the amount the plaintiff paid for the property and the actual value of the property given the actual condition of the soil. (*Id.* at pp. 490-491.) Because the plaintiff did not prove that he paid more than the property was actually worth, he could not recover damages from the defendant. (*Id.* at pp. 491-492.) Here, in contrast, Appellant caused Nadelman to pay for the construction of an unsafe and ultimately unusable deck and sunroom. In order to remedy this harm, the deck and sunroom needed to be removed and rebuilt. The court awarded Nadelman the cost of that removal and reconstruction.

C.    *Other Challenges to Compensatory Damages Award*

Appellant argues the compensatory damages award should be reduced by an amount representing the value of the Nadelmans' use of the deck and sunroom for nine years before they learned it was defective. This argument is forfeited because Appellant fails to support it with reasoned legal argument. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115-1116.) His reliance on *Addiego v. Hill* which addresses the proper calculation of damages when a court orders the remedy of specific performance, is inapt. (*Addiego v. Hill* (1971) 17 Cal.App.3d 453, 461.)

Appellant argues the compensatory damages award should be reduced by the amount the Nadelmans received in the settlements with Leonard Paul and Stott. This

16

argument is forfeited because it was not raised in the trial court. (*Ward v. Taggart, supra,* 51 Cal.2d at p. 742.) Even assuming the argument raises a pure question of law, we exercise our discretion not to address it because it does not involve an important question of public interest or public policy. (*Resolution Trust Corp. v. Winslow* (1992) 9 Cal.App.4th 1799, 1810.)

Finally, Appellant argues he should not have been held liable for the $22,290 Nadelman spent to repair the deck after he discovered the dry rot problem in 2001. We disagree.

First, Appellant argues he was not responsible for the builder's failure to use redwood and pressure treated wood on the deck. He argues his design plan appropriately required redwood for the exterior portions of the deck and untreated wood for the plywood subflooring. However, two experts testified at trial that the design should have specified that *all* of the wood in the construction be redwood or pressure-treated wood. Moreover, the trial court found Appellant was responsible for construction oversight (ensuring compliance with the design plan including the material specifications) in addition to the design itself and we have concluded that finding was supported by substantial evidence.

Second, Appellant argues Nadelman failed to mitigate his damages by investing more than $22,000 in deck repairs when the deck actually needed to be removed and completely replaced. Appellant has forfeited this argument because he cites no supporting legal authority. (*Guthrey v. State of California, supra,* 63 Cal.App.4th at pp. 1115-1116.) In any event, Nadelman persuasively argues that he was unaware of the need for a complete replacement until the summer of 2002 and that he needed to take immediate steps to remedy the unsafe condition of the deck, which presented a life and safety threat to his family and guests.

D.     *Challenges to Punitive Damages Award*

Appellant challenges the punitive damages award on two grounds, both of which are rendered moot by our holdings. First, he argues the award must be reconsidered if

this court modifies the compensatory damages award, because the punitive damages amount is determined in part in relation to the compensatory award.  We have not modified the compensatory damages award.  Second, Appellant argues the award must be reversed because the trial court erred in finding him liable for intentional misrepresentation and CLRA violations, the bases for awarding punitive damages.  We have concluded the trial court did not err in finding him liable for these causes of action.

## DISPOSITION

The judgment is affirmed.

18