# EXHIBIT D-1

Court of Appeals Case No. 07-55207 and 07-55179

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

ORIGINAL

METRO LIGHTS, L.L.C.,

*Plaintiff/Cross-Appellant/Appellee*

v.

CITY OF LOS ANGELES,

*Defendant/Appellant/Cross-Appellee.*

*RECEIVED*
*CATHY A. CATTERSON, CLERK*
*U.S. COURT OF APPEALS*

AUG 13 2008

FILED 8/13/08
DOCKETED 8/14/08    LA

Appeal from the United States District Court for the Central District of California
in Case No. CV 04-1037 (GAF) (Ex), Judge Gary A. Feess

**MOTION OF *AMICUS CURIAE* CBS-DECAUX, L.L.C., FOR LEAVE TO
FILE SUPPLEMENTAL BRIEF TO REMEDY MISLEADING
STATEMENTS BY METRO LIGHTS**

Laura W. Brill
Richard M. Simon
IRELL & MANELLA LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067
Telephone: (310) 277-1010

Attorney for *Amicus Curiae*,
CBS Decaux, L.L.C.

August 12, 2008

1912182

Amicus curiae CBS Decaux, L.L.C. ("CBS Decaux") respectfully moves this Court for leave to file a supplemental brief to remedy misleading statements made by Metro Lights and its "expert" witness in this case.

CBS Decaux makes this motion on the ground that CBS Decaux has recently learned that statements of a purported expert witness relied upon extensively by Respondent Metro Lights, L.L.C. ("Metro Lights") are materially misleading, and Mr. Paul Fisher, counsel for Metro Lights, had reason to know that the statements were misleading no later than December 2007. Counsel for Metro Lights, however, failed to correct the witness's statements or statements in Metro Lights's brief that relied on the misleading statements and described them in a manner that was even more untruthful.

The misleading statements concern the views of Metro Lights' "expert" witness William Kunzman, regarding issues of traffic safety. A critical part of Metro Lights' Opening and Responsive Brief ("Opposition Brief") focuses on the issue of traffic safety and argues that bus shelter signs are more of a traffic hazard than Metro Lights signs on private property. Metro Lights' Opposition Brief relies extensively on a declaration of Mr. Kunzman. Opp. Br. at 9-10, 23, 30. Mr. Kunzman's declaration states that he was retained by Metro Lights "to conduct an inspection of signs to determine whether they may constitute a traffic hazard." (Metro Lights' Supplemental Excerpts of Record ("AER"), Tab 13, at 538, ¶ 4. Mr. Kunzman goes on to state that he determined that bus shelters were closer to

traffic lanes than signs owned by Metro Lights. *Id.* ¶ 6. He then states that "Bus shelter signs are more visible and logically more distracting for the same size sign with the same message." *Id.* ¶ 7; *id.* ¶ 8 ("the bus shelter signs in my study were more visible and more of a potential distraction than any of the outdoor media signs included in my study.").

These statements about "distraction," were grossly misleading, as Mr. Fisher, counsel for Metro Lights had reason to know no later than December 2007. On that date, Mr. Kunzman wrote a letter to Mr. Fisher in connection with another case challenging the City's sign regulations. In that letter, Mr. Kunzman made very clear that he a unique personal definition for the word "distraction," and to Mr. Kunzman, the label "distraction" does not correlate with traffic safety.

In 2007, Mr. Kunzman had this to say to Mr. Fisher about driver distraction:

- "To merely label something as a 'distraction' is not meaningful." Exhibit A to the Declaration of Laura Brill ("Brill Decl.") at 10 (Kunzman letter at 9).

- "Anything that a driver might look at while driving, other than the road ahead, is a distraction." Ex. A at 2 (Kunzman letter at 1).

- "Drivers look around as they drive, whether it is looking at a building or a tree or clouds in the sky. The distinction needs to

be made between a typical distraction and a significant distraction." *Id.* at 10 (Kunzman letter at 9).

- "[M]ost driver distractions are not significant, and do not lead to traffic accidents. *Id.* at 3 (Kunzman letter at 2).

Mr. Kunzman's 2007 letter also put Mr. Fisher on notice that the methodology that Mr. Kunzman had used in his "analysis" in this case was flawed beyond repair. In particular, Mr. Kunzman's opinion in this case was based on a traffic engineering rule of thumb that is meant to ensure that signs are safe and legible by placing them close enough to the road that they will be seen. Ex. A at 8 (Kunzman letter at 7) ("the eye easily sees anything within approximately a 15 degree vision cone. . . . In Traffic Engineering, signs are designed so that when in approximately a 15 degree vision cone, the sign can be read."). There is no basis to infer from this rule of thumb that bus shelter signs are more unsafe than Metro Lights signs because the former are closer to traffic lanes. Indeed, the opposite is true. Metro Lights signs, because they are at a greater angle from the roadway, are more likely to draw a driver's eyes off the road than bus shelter signs that are less likely to draw a driver's attention away from the road. As Mr. Kunzman told Mr. Fisher in 2007, when a driver's attention is diverted away from the road by an occurrence or object outside the 15 foot cone, accidents can result. *Id.* at 3 (Kunzman letter at 2) ("We are all familiar with the rubber necking that occurs when there is an accident. One driver is looking at the accident and

runs into the back of the care ahead which might have unexpectedly stopped.").

Mr. Fisher filed Mr. Kunzman's December 2007 letter in another action on May 5, 2008,[1] but failed to bring it to the attention of this Court during oral argument here on June 4, 2008, despite Metro Lights' substantial reliance on Mr. Kunzman's 2004 declaration in its Opposition Brief and oral argument.[2] Opp. Brief at 9-10, 23, 30.

Federal Rule of Appellate Procedure 29(e) gives this Court discretion to permit the late filing of an amicus brief. Good cause exists here to permit such late filing due to Mr. Fisher's failure to correct or clarify the misleading statements in Mr. Kunzman's declaration, which statements Metro Lights relied upon in a manner that perpetuated and enhanced, rather than ended the confusion.

Counsel for CBS Decaux contacted counsel for the parties on August 12, 2008. The City of Los Angeles takes no position on the filing of this motion. Counsel for Metro Lights has not responded as of the date of this filing.

_____

[1] See Document No. 69-3 in *World Wide Rush v. City of Los Angeles*, Central District of California, Case No. 2:07-cv-00238-ABC-JWJ.

[2] Professor Laurence Tribe presented oral argument on behalf of Metro Lights. CBS Decaux has no reason to believe and does not allege that Professor Tribe was aware of the matters set forth this in this motion or the accompanying brief at the time of oral argument or at any time prior to August 12, 2008, when CBS Decaux brought these matters to his attention in connection with seeking consent of Metro Lights to the filing of this motion.

## BACKGROUND

Respondent Metro Lights LLC ("Metro Lights") has constructed hundreds of signs on private commercial and industrial property in the City of Los Angeles without seeking or obtaining permits from the City of Los Angeles.

Metro Lights sued the City of Los Angeles alleging that the City's "Street Furniture Agreement" with amicus curiae CBS Decaux LLC ("CBS Decaux") renders the City's restrictions of "off-site signs" on private property invalid under the First Amendment based on the Supreme Court's commercial speech line of cases. The Street Furniture Agreement provides for the construction of maintenance of bus shelters, public toilets, and other "street furniture" with advertising displays within the public right of way.

Critical to Summit's constitutional claim and argument before this Court was Summit's contention that bus shelters interfere with traffic safety because of their proximity to traffic lanes, whereas Metro Lights' signs placed farther away from traffic lanes do not. The only evidence in the record in support of this contention was a declaration by Mr. William Kunzman, who Metro Lights describes as a traffic safety expert.

Mr. Kunzman states in his 2004 declaration in this case that he was retained by Metro Lights "to conduct an inspection of signs to determine whether they may constitute a traffic hazard." AER, Tab 13, p. 538, ¶ 4. Mr. Kunzman goes on to state that he determined that bus shelters were

closer to traffic lanes than signs owned by Metro Lights. *Id.* ¶ 6. He then states that "Bus shelter signs are more visible and logically more distracting for the same size sign with the same message." *Id.* ¶ 7; *id.* ¶ 8 ("the bus shelter signs in my study were more visible and more of a potential distraction than any of the outdoor media signs included in my study."). Mr. Kunzman's declaration, taken as a whole, gave the impression that Mr. Kunzman's use of the term "distraction" was material to traffic safety.

Metro Lights made precisely such an argument to this Court in its Opposition Brief, and based this argument on Mr. Kunzman's declaration. In its brief before this Court, filed in September 14, 2007, Metro Lights, through its attorney Paul Fisher, argued that Mr. Kunzman's declaration showed that "many of the signs that the City allows on public property under the [Street Furniture] Agreement actually pose a greater threat to traffic safety than Metro Lights' off-site signs because many allowed signs are only inches away from the roadway, while Metro Lights' signs are located much further away from the roadway on private property." Opp. Br. at 23. Metro Lights went on to argue that in Mr. Kunzman's opinion, "the city's bus shelter signs are 'more distracting for the same size sign with the same message' than those signs owned and operated by the City." *Id.* Metro Lights also claimed that in Mr. Kunzman's view bus shelter signs "constitute a greater hazard, because they are closer to lanes of traffic and more directly within the line of sight of motorists." Opp. Br. at 24-25; *see also* Opp. Br. at

30 (relying on Mr. Kunzman and describing bus shelter sign as "a greater traffic hazard than any Metro Lights sign").

On December 21, 2007, Mr. Kunzman wrote to Mr. Fisher in connection with another lawsuit challenging the City's sign regulations. In that letter, Mr. Kunzman made clear that his use of the term "distraction" was not material to traffic safety. Indeed, his 2007 letter demonstrates that Mr. Kunzman's opinion does not support an argument that bus shelter signs are more of a traffic hazard than Metro Lights signs.

In particular, Mr. Kunzman's 2007 letter states that in his view, the term "'distraction,' is not meaningful." He clarified just how meaningless he felt the term was and that a "distraction" was in no way synonymous with the term traffic hazard. "Anything that a driver might look at while driving, other than the road ahead, is a distraction." Ex. A at 2 (Kunzman letter at 1). "Drivers look around as they drive, whether it is looking at a building or a tree or clouds in the sky. The distinction needs to be made between a typical distraction and a significant distraction." *Id.* at 10 (Kunzman letter at 9). "[M]ost driver distractions are not significant, and do not lead to traffic accidents. *Id.* at 3 (Kunzman letter at 2).

Mr. Kunzman's 2007 letter also placed Mr. Fisher on notice that the methodology that Mr. Kunzman had used in his "analysis" in this case was flawed beyond repair. In particular, Mr. Kunzma's opinion in this case was based on a traffic engineering rule of thumb that is meant to ensure that

signs are safe and legible by placing them close enough to the road that they will be seen. Ex. A at 8 (Kunzman letter at 7) ("the eye easily sees anything within approximately a 15 degree vision cone. . . . In Traffic Engineering, signs are designed so that when in approximately a 15 degree vision cone, the sign can be read."). There is no basis to infer from this rule of thumb that bus shelter signs are more unsafe than Metro Lights signs because the former are closer to traffic lanes. Indeed, the opposite is true. Bus shelter signs will be more likely to be visible to a driver without looking away from the road, whereas Metro Lights signs, because they are at greater angle from the roadway are less likely to be seen without a driver looking away from the road. As Mr. Kunzman told Mr. Fisher in 2007, when a driver's attention is diverted away from the road by an occurrence or object outside the 15 foot cone, accidents can result. *Id.* at 3 (Kunzman letter at 2) ("We are all familiar with the rubber necking that occurs when there is an accident. One driver is looking at the accident and runs into the back of the care ahead which might have unexpectedly stopped.").

Mr. Kunzman's letter to Mr. Fisher is dated December 2007. Mr. Fisher filed that letter in the United States District Court for the Central District of California in connection with another action on May 5, 2008. *See* n. 1, *supra.* Oral argument occurred in this case on June 4, 2008. Yet Mr. Fisher failed to bring these issues to the Court's attention, despite Metro

Lights' substantial reliance on Mr. Kunzman's 2004 declaration in its

Opposition Brief and argument.  Opp. Brief at 9-10, 23, 30.

One of CBS Decaux's members, CBS Outdoor Inc. ("CBS Outdoor"),

first learned of Mr. Kunzman's December 2007 opinion on June 25, 2008,

when another attorney filed it in a separate action, *Summit Media LLC v.

City of Los Angeles*, No. 07-2649 RSWL (C.D. Cal. filed Apr. 20, 2007).

The Summit case includes a challenge to City sign regulations that is

somewhat similar to the challenge launched by Metro Lights.  CBS Outdoor

intervened in the *Summit* case in order, among other things, to protect the

Street Furniture Agreement.

In a deposition in the *Summit* case on July 22, 2008, Mr. Kunzman

confirmed that he had used the concept of driver distraction in the same way

in the 2004 and 2007 declarations.  Brill Decl. Ex. B (transcript of the July

22, 2008 Deposition of William Kunzman) at 18 (Depo. 20-21).  In other

words, that his reference to "distraction" in 2004 was "not meaningful."  *Id.*

at 29 (Depo. at 62-63); *see also id.* at 48 (Depo. at 140-41) (buildings and

palm trees are a "distraction" under his definition).

He also provided additional testimony demonstrating that his 2004

declaration cannot be credited, that bus shelters contribute to traffic safety

and are an important public good, that advertising signs on bus shelters can

enhance the visibility of bus stops, and many other facts that contradict

Metro Lights' position in this case. The following is a sample of Mr. Kunzman's testimony as it relates to his work for Metro Lights:

- Bus stops are harder to see without bus shelters; advertisement on the bus shelters can make the shelters themselves more visible. *Id.* at 44-45 (Depo. at 123-126);

- Observing bus behavior is part of driving; making predictions about what will happen on the road is part of driving; bus shelters "obviously" help some drivers know when a bus is going to stop. *Id.* at 37, 49 (Depo. at 94, 143-44).

- Public transit is safer than riding in individual cars. *Id.* at 22 (Depo. at 37);

- Bus shelters help to increase transit ridership. *Id.* at 22 (Depo. at 36-37); *see also id.* at 49 (Depo. at 145) (convenience; place to sit; shelter from rain, wind, and sun; reduce traffic congestion); *id.* at 24 (Depo. at 43) (amenity for public transit).

- Bus shelters are usually privately constructed and financed; bus companies, including L.A. County MTA, seldom take enough money into the fare box to cover costs. *Id.* at 50 (Depo. at 146-47).

- There is no evidence anywhere that signs on bus shelters cause accidents. *Id.* at 28 (Depo. at 58);

- He has no expertise in numerous subjects that are relevant to determining whether signs placed at a greater angle away from traffic lanes are more hazardous to driving than signs within a driver's line of vision. *Id.* at 25-26 (Depo. at 47-51);

- Rear-enders can occur when a driver turns his or her head to the side. *Id.* at 27 (Depo. at 56-57). In order to see a sign outside of a driver's 15 degree "vision cone," it is more likely that the driver will have to turn his or her head. *Id.* at 36 (Depo. at 92).

- His review of signs in connection with his 2004 declaration in this case was limited to a review of 4 or 5 bus shelter signs; he does not know whether these are representative of bus shelter signs in general, and the four or five locations were suggested to him by counsel for Metro Lights. *Id.* at 32-33 (Depo. at 74, 76, 81);

- In traffic engineering, the concept of the 15 degree vision cone upon which he relies in his 2004 declaration, is used to ensure legibility to an average driver. Seeing a sign within the 15 degree cone does not mean the sign is unsafe. If you see an object as you are looking ahead, you can still have your eyes safely on the road. *Id.* at 26, 27, 36, 50, 51 (Depo. at 51, 55, 93, 149-153).

- No data supports using the methodology in his 2004 declaration in this case as a basis for making an assessment of traffic safety. *Id.* at 35, 36, 50, 51 (Depo. at 89-91, 149-150); *see also id.* at 42 (Depo. at 115-116) ("I'll avoid the question. . . "). In contrast, other studies using actual traffic accidents to measure traffic safety use valid approaches. *Id.* at 30-31 (Depo. at 69-70).

- The Metro Lights signs that he reviewed for his 2004 declaration are within the 15 degree cone of vision at 140 feet. Mr. Kunzman did not determine whether such signs would be legible to an average driver at that distance and has no records demonstrating that this is the case. The lettering on a Metro Lights sign would look larger if a driver was closer and turned his or head to see the sign. He has no data on whether drivers in fact turn their heads to see signs outside the 15 degree vision cone. *Id.* at 36-38 (Depo. at 93-94, 96-98, 100-101).

- In preparing his 2004 declaration, he did <u>not</u> do any of the following: (1) assess whether drivers look at bus shelter signs while moving or while stopped; (2) collect data on how long drivers look at these signs; (3) collect data on whether drivers have to turn their heads to the side to see bus shelter signs or Metro Lights signs; (4) study traffic safety or traffic flow at bus

stops with or without shelters; (5) study traffic safety or traffic flow at bus stops with or without advertising. *Id.* at 34-35 (Depo. at 84-87);

- There is a correlation between a driver turning his or her head to the side and traffic accidents. *Id.* at 37 (Depo. at 95-96).

- A small scale sign on a business is often used to identify the business to passersby. Drivers know to look for a sign on a building itself if they are looking for the business. If a small-scale sign that is affixed to a business displays an off-site message, it could create confusion for drivers looking to locate the business, and such confusion could affect traffic safety. *Id.* at 39-41 (Depo. at 104-106, 109-110).

- A bus shelter can provide seating from which a person can read smaller advertising messages. A Metro Lights sign has no such seating. *Id.* at 43 (Depo. at 120-121).

## ARGUMENT

Federal Rule of Appellate Procedure 29(e) sets forth criteria for the filing of amicus briefs. Ordinarily, an amicus curiae must file its brief not later than seven days after the principal brief of the party supported is filed. A court, however "may grant leave for later filing, specifying the time within which an opposing party may answer." Fed. R. App. P. 29(e).

Here, there is good cause to permit the filing of the proposed supplemental amicus brief that is being lodged with this motion in order to remedy misleading statements made to this Court. In particular, attorneys have a duty of candor when practicing before this Court. That duty includes the obligation to correct misleading statements in briefs. *Moser v. Bret Harte Union High School District*, 366 F. Supp. 2d 944, 986 (E.D. Cal. 2005) ("Defendant's statement that because the briefs were already submitted to the Court it made no effort to correct any misstatements contained in the briefs, is an abdication of the duty of candor any party owes the court.").

Here, Mr. Fisher knew at the time of oral argument before this Court that the expert witness upon whom Metro Lights relied for an opinion on driver safety, and who opined on driver "distraction," regards the term "distraction" as "not meaningful" from the perspective of traffic safety. A supplemental memorandum is necessary to ensure that this Court is not left with the mistaken impression that Mr. Kunzman has provided a valid opinion that CBS Decaux signs are more dangerous than Metro Lights signs.

In addition, the statements in Mr. Kunzman's 2007 letter to Mr. Fisher make clear that looking off to the side of a road can be far more distracting than viewing an object or incident occurring within the line of vision, the classic example of rubber necking. This point, which Mr. Fisher also did not bring to the Court's attention, undermines the conclusions in Mr. Kunzman's

2004 declaration and demonstrates that the district court erred in granting summary judgment in favor of Metro Lights. The deposition of Mr. Kunzman has confirmed his actual views on signage and traffic safety and should be brought to the Court's attention as it provides additional bases to disregard Mr. Kunzman's declaration as a factor favoring Metro Lights in this case.

## CONCLUSION

For the foregoing reasons, CBS Decaux respectfully requests that this Court grant it leave to file the concurrently submitted Supplemental Brief to remedy misleading statements made to the Court by Metro Lights.

Dated:  August 12, 2008          IRELL & MANELLA LLP

By: _____
          Laura W. Brill
          Richard M. Simon
          Attorneys for CBS Decaux

## DECLARATION OF LAURA W. BRILL

I, Laura W. Brill, declare as follows:

1.      I am an attorney at the law firm of Irell & Manella LLP, counsel of record for Amicus Curiae CBS Decaux in this matter. I am a member in good standing of the State Bar of California and have been admitted to practice before this Court. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      In addition to representing CBS Decaux in this matter, I represent one of its members, CBS Outdoor Inc. ("CBS Outdoor") in the matter of *Summit Media LLC v. City of Los Angeles*, No. 07-2649 RSWL (C.D. Cal. filed Apr. 20, 2007). The *Summit* case includes a challenge to City sign regulations somewhat similar to the challenge launched by Metro Lights. CBS Outdoor intervened in the *Summit* case in order, among other things, to protect the Street Furniture Agreement.

3.      Through my involvement in the *Summit* case, I learned that William Kunzman, had in December 2007 prepared an expert opinion letter for Paul Fisher, counsel for Metro Lights, in connection with another case. I first learned of Mr. Kunzman's December 2007 opinion on June 25, 2008, when another attorney filed it the *Summit* action. A copy of the December 2007 letter from William Kunzman to Paul Fisher is attached hereto as Exhibit A. CBS Outdoor conducted the deposition of William Kunzman in the *Summit* case on July 22, 2008. Attached hereto as Exhibit B is a true and correct copy of the condensed version of the transcript of that deposition, as well as relevant deposition exhibits.

Executed on August 12, 2008, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Laura W. Brill

DECLARATION OF LAURA BRILL

# Exhibit A



December 21, 2007

Mr. Paul E. Fisher
Attorney at Law
Law Offices of Paul E. Fisher, P.C.
1851 East First Street, 12th Floor
Santa Ana, CA 92705

Dear Mr. Fisher:

## PURPOSE

This report discusses the traffic distraction of signs, and whether that distraction leads to what is legally defined as a Dangerous Condition.

Sign ordinances are being written by governmental agencies which limit the size of signs or how close the signs can be to a freeway or roadway based on the assumption that signs too big or too close to a are a Dangerous Condition because they are a significant distraction.

Specifically, in the City of Los Angeles there is a sign ordinance which prohibits billboard signs within 2000 feet of a freeway.

This report addresses the sign ordinance from a traffic engineering and traffic safety point of view.

## THE WORD "DISTRACTION"

The dictionary defines *distraction* as something that diverts attention.  In driving a vehicle, one can divide all time into two categories.  The amount of time the driver spends looking directly at the roadway, and the amount of time spent looking elsewhere at a distraction.

If one were to study drivers and every fraction of a second classify whether the driver's eyes were on the road or looking at a distraction, it is clear that a

1111 Town & Country Road, Suite 34 # Orange, CA 92868-4667
Telephone: (714) 973-8383 # Facsimile: (714) 973-8821 8383 # Toll Free: (877) 1220
E-mail: mail @ traffic-engineer.com # Web: www.traffic-engineer.com

sizeable portion of a driver's time is spent looking at things other than the roadway.

The driver of a vehicle typically scans what is in front of the car to keep the vehicle in the roadway lane. As time permits, the driver will also look at things along the journey which are not directly relevant to driving. The driver will look at things of interest such as at a mountain, or a building, or a sunset, or a forest of trees, or the ocean, or another vehicle. The driver looks elsewhere from the roadway when there is a couple of seconds of time available to glance away from the roadway safely.

Most drivers at the end of a drive are able to tell someone how tall the buildings were, and whether the homes were apartments or single family, whether there were large trees or no trees, whether the sky had a lot of clouds, and whether the development was new or old.

Driver's can and routinely do look at things besides the roadway for a couple of seconds, and they do it safely. We all do it every time we drive.

Anything that a driver might look at while driving, other than the road ahead, is a distraction.

So the issue is not solely whether a sign is a distraction, because everything that a driver looks at is a distraction when he is not looking at the roadway.

The issue from a Traffic Engineering point of view is whether the sign distraction leads to a Dangerous Condition.

## CONCEPT OF SIGNIFICANT DISTRACTION

The concept of a significant distraction needs to be used in relation to classifying distractions. A significant distraction is one that leads to traffic accidents. An insignificant distraction is one that cannot be shown to lead to traffic accidents.

In driving, some distractions are significant and lead to traffic accidents. We are all familiar with the rubber necking that occurs when there is an accident. One driver is looking at the accident and runs into the back of the car ahead which might have unexpectedly stopped.

However, most driver distractions are not significant, and do not lead to traffic accidents.

2

## RESEARCH ON DRIVER DISTRACTION BY BILLBOARDS

Two research studies have been done on driver distraction, and both concluded that billboard signs are not a factor in traffic accidents. Billboard signs, of the type studied, are not a significant distraction.

## RESEARCH ON DRIVER DISTRACTION - STUDY ONE

There has been one prestigious study done on driver distraction.

The impetus for the study was the use of cell phones and their distraction to drivers and hence a possible safety issue.

That 2001 study is entitled, *The Role of Driver Distraction in Traffic Crashes*. It was done by the highly regarded University of North Carolina Highway Safety Research Center, and was funded by the AAA Foundation for Traffic Safety. The authors are as follows: Jane C. Stuts, Ph.D.; Donald W. Reinfurt, Ph.D.; Loren Staplin, Ph.D.; and Eric A. Rodgman, B.S.

The University of North Carolina maintains what it calls the National Accident Sampling System Crashworthiness Data System. The University samples nationwide traffic accident reports and computerizes their contents including narrative. For the driver distraction study, 5 years of data was used.

Using the accident data, including key word searches of the narratives, the study on page 9 made the following conclusion regarding "Driver Attention Status" when the accident occurred:

| | |
|---|---|
| 1. Attentive | 48.6 percent |
| 2. Distracted | 8.3 percent |
| 3. Looked but didn't see | 5.4 percent |
| 4. Sleepy or fell asleep | 1.8 percent |
| 5. Unknown / no driver | 35.9 percent |
| Total | 100.0 percent |

Using the accident data, including key word searches in the traffic collision report narratives, the study on page 11 made the following conclusion regarding "**Distracted**" drivers when the accident occurred:

3

8

Brill Declaration Ex. A

-4-

1. Eating or Drinking        29.4 percent

2. Adjusting radio / cassette / cd    11.4 percent

3. Other occupant         10.9 percent

4. Moving object in vehicle     4.3 percent

5. Other device / object      2.9 percent     [1]

6. Vehicle / climate controls    2.8 percent

7. Eating / drinking        1.7 percent

8. Using / dialing cell phone    1.5 percent

9. Smoking related         0.9 percent

10. Other distraction       25.6 percent    [2]

11. Unknown distraction     8.6 percent

Total - 100.0 percent

[1]     This category included reaching for something on floor, reaching for something in back seat, seat belt related, putting on make-up, rolling down window, throwing away trash, and using data terminal per pages 26 and 27 of the study.

[2]    This category was defined as follows per page 27 of the study:

      a.     Medical problem

      b.     Looking outside vehicle (in rear view mirror, at traffic, at road signs, in store window, for gas station, for parking space, for business, etc.)

      c.     Looking inside vehicle

      d.     Reaching for object

      e.     Other (sun glare, sneezed, tired, sleepy, child playing with controls, intoxicated, depressed, etc.)     "

9

The study listed the results of key word searches on page 30 and 31. In total 33 key words were searched including the word BILLBOARD, and 4,522 times key words were found in the narrative portion of the accident reports sampled. Of those key words, there were 5 instances of the word BILLBOARD used in the traffic accident report's narrative. In all 5 instances, the vehicle actually hit the BILLBOARD. The BILLBOARD was never cited as a distraction.

## RESEARCH ON DRIVER DISTRACTION - STUDY TWO

The second study on driver distraction is a before and after study and specifically related to large freeway billboard signs.

The study is entitled *An Independent Analysis of the Impact of Outdoor Advertisement (Billboards) Upon Traffic Safety*.

The study was prepared by Pamela K. Anderson; The Anderson Group, Inc.; November 15, 2001.

The study selected a two mile stretch of Freeway I-215 in Colton and San Bernardino, California. In that stretch 6 large illuminated billboard signs (each measuring approximately 14 feet by 48 feet) were constructed very close to each other in the median of the freeway per Page 4 of the study.

It was also near a freeway to freeway interchange where Freeway I-215 interchanges with Freeway I-10. The signs were constructed in early 1997 per page 4 of the study.

Caltrans Traffic Operations Department was cooperative and provided accident data and accident rates (accidents per million vehicle miles of travel) for the 2.00 mile stretch of Freeway I-215 for the years 1991 to 2000.

What the study found was that there was no increase in traffic accident rate after the signs were installed, and that in no case were the billboards cited as a primary collision factor in the accident reports per page 9 of the study.

The accident data and accident rate data were separated to within 1/2 mile of the signs (a 1.00 mile stretch of freeway) and to within 1 mile of the signs (a 2.00 mile stretch of the freeway), with the thought being that within 1/2 mile of the signs there may be a significant distraction by the presence of the large illuminated billboard signs, and within 1 mile of the signs there would be an area not influenced by the large signs.

When the data were stratified this way, there was actually a higher accident rate for the 2.00 mile stretch of freeway than for the 1.00 mile stretch of freeway. It

Brill Declaration Ex. A
-6-

was concluded that congestion caused the difference since there was spots of routine congestion included in the 2.00 mile stretch of freeway.

## DIFFERENT TYPES OF SIGNS

Just because something is a distraction to a driver, does not mean it is a Dangerous Condition.

The distraction of a billboard sign increases as certain characteristics in a sign change.

From a Traffic Engineering and highway safety point of view, signs can be classified by the following characteristics:

Relative Size in Driver's Eye

Location Relative to Roadway

Complexity of Message

Static Message or Changeable Message

Each of these will be discussed below.

**Relative Size In Driver's Eye**

When the relative size of a sign in a driver's eye increases, then the potential for distraction increases. The relative size of the sign in the driver's eye is directly related to the distance from the eye. When the distance is doubled, the sign's vertical height on the driver's eye retina is half as big.

This can be proven graphically by making a drawing as follows:

Draw a 4 inch long horizontal line.

At the mid-point draw a 1 inch high vertical line starting on the horizontal line and ending above the horizontal line.

At the right end of the horizontal line draw a 2 inch high vertical line similar to the way the 1 inch vertical line was drawn.

Now draw a line of sight (a straight line) from the left end of the horizontal line through the top end of the 1 inch and 2 inch vertical lines.

6

Brill Declaration Ex. A
-7-

It can be seen that the 1 inch tall vertical line looks the same size as the 2 inch tall vertical line that is twice as far from the eye.

For purpose of discussion assume a sign is square. A 6 foot by 6 foot sign (36 square feet) at 20 feet from the driver's eye looks as big as a 12 foot by 12 foot sign (144 square feet) at 40 feet.

A 12 foot by 12 foot sign (144 square feet) at 40 feet from the driver's eye looks as big as a 24 foot by 24 foot sign (576 square feet) at 80 feet.

A 24 foot by 24 foot sign (576 square feet) at 80 feet from the driver's eye looks as big as a 48 foot by 48 foot sign (2304 square feet) at 160 feet.

Thus, a 6 foot square sign at 20 feet looks as big as a 12 foot square sign at 40 feet, which looks as big as a 24 foot square sign at 80 feet, which looks as big as a 48 foot square sign at 160 feet.

### Location Relative to Roadway

The location of the sign with respect to the driver looking straight ahead affects the likelihood of the driver looking at the sign. As the likelihood of the driver looking at the sign increases, so does the distraction potential.

There is a concept called "vision cone." The eye easily sees anything within approximately a 15 degree vision cone. That means if the eye is looking straight ahead, the driver is likely to see anything from 0 to 15 degrees from straight ahead. In Traffic Engineering, signs are designed so that when in approximately a 15 degree vision cone, the sign can be read. The size of the lettering on a sign is adjusted so that when the sign is within approximately 15 degrees to straight ahead, the driver can read the message.

If a sign is in the vision cone, but the message is too small to read, then the sign is ignored until it can be read. If it can only be read when it is outside the vision cone, then it has less distraction because drivers will tend to pay no attention to the message.

### Complexity of Message

A message can be thought of as having "bits" of information. And each bit of information takes time for the eye and mind to comprehend. The distraction of a sign increases as the complexity of the message increases, because it takes longer to read the sign.

7

A simple sign consisting of grass, a cow standing in the grass, and the message "DRINK MILK," might be thought of as having few bits of information. A driver can easily see and comprehend the message in very little time.

On the other hand, a sign with 10 animals pictured and a message such "ANIMAL PARK 10 MILES, TURN LEFT ON HIGHWAY 123, OPEN DAILY 8 AM TO 6 PM, WWW.ANIMALS.COM," has several times the number of bits of information as the DRINK MILK sign.

It would takes several times as long for a driver to read the ANIMAL PARK sign as the DRINK MILK sign.

A sign which showed a picture of a candidate with a message such as VOTE FOR SMITH, 99th CONGRETIONAL DISTRICT, HE WILL NOT RAISE TAXES," is between the ANIMAL PARK and DRINK MILK sign in complexity of message.

### Static Message or Changeable Message

If a sign is static and has one message, and the sign carries that message for several weeks, then a driver will absorb the sign message as he drives by the sign on an as-time-permits basis.

On the other hand, if a sign electronically displays or flashes more than one message as a driver is passing the sign, the driver is much more likely to be looking intently over a long period of time to see what other message might be displayed. The situation is worsened if the message is a current event which changes hourly such as sports scores, stock market or economic news, or headline news. A driver wants to see all of the information which might take many seconds to display when there are multiple messages being flashed. Messages are flashed not more frequently than every 4 seconds.

And, the situation has a higher potential of distracting a driver if the sign is playing movie clips 3 or 4 seconds long, or is continuously scrolling. The driver may try to see what the clip or clips are showing by looking at it continuously for the duration of the clip.

Therefore, changeable message signs, particularly current event electronic messages, are a higher distraction.

### FREEWAY VERSUS SURFACE STREET SIGNS

The City of Los Angeles sign ordinance bans off-site signs within 2000 feet of any freeway, if the sign is designed to be viewed primarily from the freeways. There is no similar prohibition regarding off-site signs designed to be viewed primarily from surface streets.

However, it should be noted that surface streets have a higher accident rate than do freeways, and to single out freeways to ban signs for safety reasons is a fallacious argument. On surface streets there are many more things for drivers to contend with, such as pedestrians, traffic signals and stop signs, cross traffic, on-street parking, passenger drop-off and pick-up, changing speed limits, bus stops, intersections, driveways, schools, fire stations, crosswalks, and bicycles.

## CONCLUSIONS

1. Not all driving distractions are significant distractions.

2. To merely label something as a "distraction" is not meaningful. Everything at which a driver may look away from the roadway is a distraction. Drivers look around as they drive, whether it is looking at a building or a tree or clouds in the sky. The distinction needs to be made between a typical distraction and a significant distraction.

3. How much distraction is caused by a sign is a function of how big the sign is in the driver's retina, not how big the sign is in square feet. A sign close up such as a bus shelter sign placed just 18 inches from curb face generally is bigger in the driver's retina than a large sign 200 or 300 feet away. Likewise, a sign on the back of a bus will loom very large in a driver's retina when the driver is just a few car lengths behind the bus. There are numerous CBS Decaux signs located on sidewalks throughout the city that fall in this category of signs. Although the CBS Decaux signs are much smaller than standardized billboards, measuring only approximately 4' x 6', the fact that they are maintained sometimes within feet or inches of lanes of traffic make them as significant a traffic hazard as much larger signs maintained further from traffic lanes.

4. In the City of Los Angeles there are numerous signs on the back of buses and on the sides of bus stop shelters which are larger in the retina of a driver than large billboard signs placed a significant distance from the driver. There are even signs placed on City of Los Angeles property within a couple of feet of the curb face which are similar in size to bus stop shelter signs, but for which there is no bus stop. The apparent purpose of these signs is advertisement revenue for the City of Los Angeles. Some of these signs have actually impacted motorist's line of sight vision at intersections.

5. There are signs which are primarily viewed by freeway drivers on or near Los Angles facilities such as the Los Angeles Convention Center, the Staples Center, and Nokia Theatre. These signs are much less than 2,000 feet from a freeway. The author sees no difference, in terms of traffic safety, in these signs which have a static message and the prohibited signs. However, not all of these signs are static. Some of the signs near the Convention Center, Staples Center, and Nokia Theatre have changeable flashing electronic messages. These

changeable signs are far more distracting, and perhaps are a significant distraction, than the static message signs. It may be that changeable message signs with messages flashing every 4 or 5 seconds are a traffic safety problem. At the Staples Center, there are two large electronic flashing structures, each containing several signs directed at freeway traffic. Four of the electronic signs appear to change approximately every five seconds and eight appear to change every 30 seconds.

6. How much distraction is caused by a sign is a function of how complex the sign's message is. A simple DRINK MILK sign has less distraction than a complex sign with directions, hours open, telephone number, web address, driving directions, and multiple graphical images.

7. How much distraction is caused by a sign is a function of whether the sign is static (one message), or has changeable or flashing electronic messages, or is animated such as the large flat screen television signs. Animated or changeable flashing electronic signs are a far greater distraction than a static sign.

8. For static signs without animation or an electronic changeable message, there is no evidence that they cause a significant distraction which leads to traffic accidents. The research on the subject is impressive. The most comprehensive study was determining if cell phones are a significant distraction, and a by-product of the study showed that billboards are not a significant distraction and are not a traffic hazard. A before and after study showed that installing 6 large illuminated signs in the median of a freeway had no effect on the accident rate and was not cited as a distraction which caused a traffic accident.

9. The City of Los Angeles has presented no evidence of traffic safety problems associated with billboard signs, and apparently has admitted that they have no such evidence. There is no evidence that a study was made by the City of Los Angeles to establish a traffic safety basis for the sign ordinance.

10. There is a legal definition of what a Dangerous Condition is. There has to be a link between some characteristic or situation and traffic accidents or traffic accident severity for there to be a Dangerous Condition. It is not enough to guess or imagine that there is a mere possibility of a connection between some characteristic or situation and traffic accidents. There needs to be either (1) statistical evidence, or (2) evidence where there are cases where a particular situation is cited as the cause of traffic accidents.

11. In the case of billboards, there is no statistical evidence that they cause a significant distraction which contributes to traffic accidents, and therefore makes a freeway billboard sign a Dangerous Condition. There also is no evidence that looking at a billboard sign was what caused a traffic accident.

12.  In the State of California, and in the City of Los Angeles, a city does not own, maintain, or operate the freeways.  Caltrans owns, maintains, operates, and is responsible for the traffic safety of the freeways.  There is no evidence that Caltrans has determined that billboard signs are a Dangerous Condition. In fact, Caltrans specifically permits billboards to be constructed adjacent to freeways.

13.  There is no evidence that the City of Los Angeles sign ordinance prohibiting billboard signs within 2,000 feet of a freeway will result in improved traffic safety.

It has been a pleasure preparing this informational report for you.  If there are any questions, or if we can be of further assistance, please do not hesitate to call.

Respectfully submitted,

**KUNZMAN ASSOCIATES**

*William Kunzman*

William Kunzman, P.E.
Principal
Professional Registration
Expiration Date 3-31-2008

4098

11

16

Brill Declaration Ex. A
-12-