# EXHIBIT D-2

# Exhibit B

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4    SUMMIT MEDIA LLC, a           )
      California limited            )
 5    lability company,            )
                                    )
 6                                  )
             Plaintiff,             )
 7                                  )
             VS.                    )  CV 07-02649 RSWL (AJWx)
 8                                  )
      CITY OF LOS ANGELES,          )
 9    a California charter          )
      city, and LOS ANGELES         )
10    DEPARTMENT OF                 )
      BUILDING AND SAFETY,          )
11                                  )
             Defendants.            )
12    _____)
      SUMMIT MEDIA LLC, a           )
13    California limited            )
      liability corporation,        )
14                                  )
             Plaintiff,             )
15                                  )
             VS.                    )
16                                  )
      CBS OUTDOOR INC, a            )
17    Delaware corporation;         )
      CLEAR CHANNEL OUTDOOR,        )
18    INC., a Delaware              )
      corporation,                  )
19                                  )
         Defendants-Intervenors.)
20    _____)

21
            VIDEOTAPED DEPOSITION OF WILLIAM KUNZMAN
22
                          TAKEN ON
23
                 TUESDAY, JULY 22, 2008
24

25    Reported by:  SHANDA LEVINE, CSR No. 10094
```

1

**Page 2**

1    Videotaped deposition of WILLIAM KUNZMAN,
2  taken on behalf of CBS OUTDOOR, INC., at 1800 Avenue
3  of the Stars, Suite 900, Los Angeles, California,
4  commencing at 10:18 a.m., Tuesday, July 22, 2008,
5  before SHANDA LEVINE, CSR No. 10094.
6
7  APPEARANCES:
8  FOR SUMMIT MEDIA, LLC:
9      LAW OFFICES OF GARY S. MOBLEY
10     BY: GARY S. MOBLEY, ESQ.
11     620 Newport Center Drive
12     Suite 280
13     Newport Beach, California  92660
14     (949) 955-1010
15
16  FOR CBS OUTDOOR, INC.:
17     IRELL & MANELLA LLP
18     BY: LAURA W. BRILL, ESQ.
19         RICHARD SIMON, ESQ.
20     1800 Avenue of the Stars
21     Suite 900
22     Los Angeles, California  90067-4276
23     (310) 277-1010
24
25

**Page 3**

1  APPEARANCES (CONTINUED)
2
3  FOR THE CITY OF LOS ANGELES AND THE LOS ANGELES
   DEPARTMENT OF BUILDING AND SAFETY:
4
        OFFICE OF THE CITY ATTORNEY
5
        BY: MICHAEL J. BOSTROM,
6           DEPUTY CITY ATTORNEY
7       200 North Main Street
8       700 City Hall East
9       Los Angeles, California 90012
10      (213) 978-8106
11
12
13
14
15  ALSO PRESENT: Jemal Judkins, Videographer
16
...
25

**Page 4**

I N D E X

WITNESS    EXAMINATION    PAGE
WILLIAM KUNZMAN   (BY MS. BRILL)    7

E X H I B I T S

NO.    PAGE    DESCRIPTION

Exhibit 6    13    July 15, 2008 letter to William Kunzman from Gary S. Mobley

Exhibit 7    21    July 18, 2008 fax to William Kunzman from Gary S. Mobley, with attachments

Exhibit 8    21    Xerox copies of photographs in black and white

Exhibit 9    23    December 21, 2007 letter to Paul E. Fisher from William Kunzman

Exhibit 10    25    Declaration of William Kunzman in Support of Motion for Preliminary Injunction

Exhibit 11    27    July 1, 2008 letter to William Kunzman from Laura Brill, with attachments

Exhibit 12    27    Document labeled "Exhibit D." Second page titled "An Independent Analysis of the Impact of Outdoor Advertising (Billboards) Upon Traffic Safety"

**Page 5**

I N D E X (CONTINUED)

E X H I B I T S

NO.    PAGE    DESCRIPTION

Exhibit 13    68    Document Labeled "Exhibit C." Second page titled "Role of Driver Distraction in Traffic Crashes"

Exhibit 14    82    Declaration of William Kunzman Submitted in Support of Motion for Partial Summary Judgement

Exhibit 15    112    Color Xerox of photo

Exhibit 16    118    Color Xerox of photo

Exhibit 17    123    Color Xerox of photo

Exhibit 18    125    Color Xerox of photo

**Page 6**

```
1      LOS ANGELES, CALIFORNIA, TUESDAY, JULY 22, 2008
2            10:18 A.M.
3
4      THE VIDEOGRAPHER: Here begins Volume
5   Number 1, videotape number 1 in the deposition of
6   William Kunzman in the matter of Summit Media versus
7   the City of Los Angeles in the United States
8   District Court for the Central District of
9   California. The case number is CV 07-02649 RSWL
10  (AJWx). Today's date is July 22nd, 2008. The time
11  on the video monitor is 10:18.
12      The video operator today is Jemal Judkins,
13  a notary public, contracted by Merrill Legal
14  Solutions at 20750 Ventura Boulevard, Suite 205,
15  Woodland Hills, California.
16      This video deposition is taking place at
17  1800 Avenue of the Stars in Los Angeles and was
18  noticed by Laura Brill of Irell & Manella.
19      Counsel, please voice identify yourselves
20  and state whom you represent.
21      MS. BRILL: Laura Brill, CBS Outdoor.
22      MR. SIMON: Richard Simon, CBS Outdoor.
23      MR. BOSTROM: Michael Bostrom, City of Los
24  Angeles.
25      MR. MOBLEY: Gary Mobley, plaintiff, Summit
```

**Page 7**

```
1   Media.
2       THE VIDEOGRAPHER: The court reporter today
3   is Shanda Levine of Merrill Legal Solutions.
4       Would the reporter please swear in the
5   witness.
6
7           WILLIAM KUNZMAN,
8   having been first duly sworn, was
9   examined and testified as follows:
10
11      THE VIDEOGRAPHER: Please begin.
12
13           EXAMINATION
14  BY MS. BRILL:
15      Q. Mr. Kunzman, good morning. We met just
16  before we went on the record with the camera. My
17  name is Laura Brill. I'm with Irell & Manella and I
18  represent CBS Outdoor.
19      MR. MOBLEY: Excuse -- excuse me, Counsel.
20  Before we begin, I know we had discussions before
21  the deposition and you had taken the position that
22  you were refusing to pay Mr. Kunzman his customary
23  expert fees for this deposition.
24      Have you reconsidered that position?
25      MS. BRILL: We have -- are we -- what I had
```

**Page 8**

```
1   written to you in a letter was that we were studying
2   your contentions and that I thought it would be --
3   if everybody -- if we reached an agreement that
4   everybody pay their own expert fees, that would work
5   out well, and I don't think you ever got back to me
6   about that.
7       Is that -- are you willing to agree that
8   each side will pay their own expert witness fees?
9       MR. MOBLEY: Not at this point because
10  you're just -- you're examining this expert. At --
11  at this point, I'm not prepared to agree to that.
12      MS. BRILL: Okay. So we are reserving our
13  rights that this is -- we don't have to -- we
14  shouldn't be required to pay for this. And
15  obviously if we do pay for this, it should be
16  reciprocal in all cases.
17      And that being said, I don't want to hold
18  up the deposition, so I do have a check for
19  Mr. Kunzman in the amount that you requested.
20      MR. MOBLEY: Very well. Thank you.
21  BY MS. BRILL:
22      Q. Mr. Kunzman, could you say and spell your
23  name for the record?
24      A. Yes.
25      William Kunzman, K-u-n-z-m-a-n.
```

**Page 9**

```
1       Q. And you understand that you're under oath
2   and have the obligation to tell the truth?
3       A. Yes.
4       Q. Have you been deposed before?
5       A. Yes.
6       Q. About how many times?
7       A. Probably about 50 times.
8       Q. Okay. And generally in connection with
9   what types of cases?
10      A. Primarily highway accidents, highway
11  accident cases.
12      Q. Have you ever been deposed -- well, strike
13  that.
14      So you under- -- you understand generally
15  the deposition process?
16      A. Yes.
17      Q. And in those traffic accident cases, you
18  were deposed as an expert witness generally?
19      A. Yes.
20      Q. So we can take -- just as probably has been
21  done in your other depositions, we can take breaks
22  here today.
23      If you don't understand something that I'm
24  asking, ask for clarification. If you don't hear
25  the question, I'm happy to repeat it.
```

10:21:45 1    We want your -- we don't want you to
10:21:47 2 speculate or guess. You are here as an expert so
10:21:50 3 you're -- we want to find out your opinions and the
10:21:54 4 basis for your opinions.
10:21:55 5    Do you understand all that?
10:21:56 6    A. Yes.
10:21:59 7    Q. Is there anything that would interfere with
10:22:02 8 your ability to give truthful testimony today?
10:22:04 9    A. No.
10:22:05 10    Q. Mr. Kunzman, are you aware of a company
10:22:07 11 called Summit Media?
10:22:08 12    A. Yes.
10:22:09 13    Q. What's your understanding about the nature
10:22:10 14 of that company? ----
10:22:13 15    A. They're in the -- in the sign business.
10:22:14 16 That's about it. I don't know very much about the
10:22:16 17 company.
10:22:17 18    Q. Are you aware that there's a lawsuit in
10:22:21 19 which Summit Media has sued the City of Los Angeles
10:22:23 20 raising various constitutional challenges to the
10:22:25 21 City's sign regulations?
10:22:27 22    A. Yes.
10:22:28 23    Q. When did you first hear of that case?
10:22:32 24    A. Oh, I'm not sure. I believe near the end
10:22:38 25 of last year in 2007, I believe this one was. May

10

10:22:43 1 have been before that. 2-- sometime in 2007.
10:22:46 2    Q. And how did you first hear of the case?
10:22:51 3    A. Paul Fisher called me and said he had a
10:22:54 4 case. That's basically how I heard about it.
10:22:58 5    Q. That's how you heard about the Summit case,
10:23:00 6 from Paul Fisher, or are you talking about the
10:23:04 7 Worldwide Rush case?
10:23:05 8    A. I'm talking about that case. Actually, let
10:23:08 9 me back up.
10:23:10 10    The -- Gary Mobley called and just said
10:23:12 11 there's a case coming, a case pending, yeah. And I
10:23:15 12 don't know when that was. It's been several months.
10:23:19 13    Q. Before you got a subpoena from me?
10:23:21 14    A. Yes.
10:23:25 15    Q. And did Mr. Mobley retain you at that time
10:23:28 16 or did Summit Media retain you at that time?
10:23:30 17    A. Not at that time.
10:23:30 18    Q. When did -- are you now retained by Summit
10:23:32 19 Media?
10:23:32 20    A. Yes. Yes, I am.
10:23:33 21    Q. One of the rules of the deposition I forgot
10:23:35 22 to mention is we -- we each have to try not to talk
10:23:37 23 over each other. So try and -- I'll try to wait for
10:23:42 24 you to finish your answers. You try to wait for me
10:23:46 25 to finish the questions. Okay?

11

10:23:46 1    A. That's fine.
10:23:49 2    Q. Okay. When did you become retained by
10:23:49 3 Summit Media?
10:23:53 4    A. Within the last -- during July of '08.
10:24:04 5    Q. And is Mr. Mobley representing you here
10:24:05 6 today?
10:24:05 7    A. I guess that would be true, yes.
10:24:07 8    Q. Do -- do you have a copy of your retention
10:24:09 9 agreement with Mr. Mobley?
10:24:10 10    A. Not -- well --
10:24:11 11    Q. Or with Summit?
10:24:13 12    A. I have a copy of -- at this point, it's
10:24:17 13 just -- it's just a letter from him stating they
10:24:22 14 wanted to retain me, basically.
10:24:25 15    Q. And did you sign that agreement?
10:24:27 16    A. No. Not --
10:24:29 17    Q. But you're in the process of finalizing the
10:24:31 18 terms of your retention?
10:24:32 19    A. Yes.
10:24:34 20    Q. How -- can I -- is that letter something
10:24:37 21 that I can -- can I have this?
10:24:41 22    MR. MOBLEY: I have no -- yeah, I have no
10:24:41 23 objection to him producing that. I might indicate
10:24:44 24 for the record that the witness located some
10:24:50 25 additional documents that may come within the scope

12

10:24:53 1 of your document request. I was not aware of those,
10:24:55 2 but he's brought them here today.
10:24:56 3    MS. BRILL: Okay. So we can -- we can get
10:24:59 4 into that.
10:25:01 5    Can we mark this as Exhibit 6, please.
10:25:03 6    (The document referred to was
10:25:03 7    marked for identification by the
10:25:03 8    C.S.R. as Exhibit 6 and attached to
10:25:15 9    this deposition.)
10:25:15 10    BY MS. BRILL:
10:25:16 11    Q. Mr. Kunzman, the letter we've just marked
10:25:18 12 as Exhibit 6 is a three-page letter from Mr. Mobley
10:25:22 13 to you dated July 15, 2008 and the "re:" line says
10:25:27 14 "Summit Media versus City of Los Angeles" and it
10:25:30 15 appears to set out the terms of your retention.
10:25:30 16    Is that right?
10:25:30 17    A. Yes.
10:25:38 18    Q. And the letter sets out compensation that
10:25:43 19 you would receive.
10:25:43 20    Is that right?
10:25:43 21    A. Yes.
10:25:46 22    Q. And that -- is that compensation accurate
10:25:49 23 for what Summit agreed to pay you for your time?
10:25:56 24    MR. MOBLEY: Objection. It
10:25:56 25 mischaracterizes the document. The agreement is not

13

10:25:58 1 with Summit. It's on behalf of Summit, but it's not
10:26:01 2 with Summit.
10:26:01 3 BY MS. BRILL:
10:26:03 4     Q. So is that -- is the compensation accurate
10:26:06 5 for what Mr. Mobley agreed to pay you on behalf of
10:26:09 6 Summit?
10:26:09 7     A. Yes. That's a refundable deposit and
10:26:13 8 it's -- it's -- so there may be additional funds
10:26:16 9 required, so that's to start the case, yes.
10:26:29 10     Q. And notwithstanding the fact that you
10:26:32 11 haven't signed Exhibit 6 yet, you still consider
10:26:35 12 yourself to be retained on behalf of Summit,
10:26:35 13 correct?
10:26:35 14     A. Yes.
10:26:45 15     Q. Did you meet with anybody to prepare for
10:26:47 16 your deposition today?
10:26:48 17     A. I just talked with Gary for literally about
10:26:51 18 five minutes down in the lobby today.
10:26:53 19     Q. And no other preparation?
10:26:56 20     A. Other than getting material, no.
10:27:00 21     Q. Did you speak with anybody else about the
10:27:02 22 fact that you were going to be deposed?
10:27:03 23     A. No.
10:27:14 24     Q. Did you, separately from meetings or -- or
10:27:16 25 discussions, did you review any documents yourself
14

10:27:19 1 in preparing for today?
10:27:22 2     A. Only materials that I had produced. My
10:27:25 3 materials.
10:27:26 4     Q. And what -- what materials did you review?
10:27:28 5     A. The -- oh, well, there's two -- there's a
10:27:35 6 declaration which was -- it's dated August 30th,
10:27:38 7 '04. I looked at that. Which is not -- doesn't
10:27:41 8 have anything to do with this case in particular.
10:27:43 9     And then I looked at my report dated
10:27:48 10 December 21st, 2007, which I believe is -- is one
10:27:54 11 that you've -- you looked at before. One you have.
10:27:57 12     The -- the pictures I sent or you have a
10:28:02 13 copy I believe on a CD, I -- I played those pictures
10:28:06 14 out just to make sure I had a copy with me. And
10:28:10 15 that's -- so those are the documents.
10:28:14 16     There's -- that's your subpoena, of course.
10:28:18 17 I looked at the -- the -- the motion for preliminary
10:28:29 18 judge-- injunction. Document dated January 28th,
10:28:32 19 2007. And I believe that date's wrong. I think
10:28:35 20 it's 2008. I believe it is. I'm not sure, to be
10:28:46 21 honest.
10:28:46 22     Q. That's the -- I think that's the Worldwide
10:28:46 23 Rush --
10:28:46 24     A. Yes.
10:28:49 25     Q. -- preliminary injunction motion, correct?
15

10:28:52 1     A. It seems to me it was this year, not last
10:28:54 2 year. Six months ago versus 18 months ago. But I
10:28:57 3 could be wrong.
10:28:57 4     Q. I see. Okay.
10:29:04 5     The -- the August 30th, 2004 document that
10:29:07 6 you referred to, that was in the Metro Lights case?
10:29:09 7     A. Yes.
10:29:11 8     Q. And the December 21st, 2007 document, that
10:29:15 9 was in the Worldwide Rush case?
10:29:19 10     A. Yes.
10:29:19 11     Q. And both of those -- the -- the Metro
10:29:21 12 Lights case and Worldwide Rush were both lawsuits
10:29:23 13 against the City of Los Angeles, correct?
10:29:23 14     A. Yes.
10:29:26 15     Q. Challenging certain aspects of the sign
10:29:28 16 regulations?
10:29:28 17     A. Yes.
10:29:31 18     Q. Can I have those documents that you
10:29:32 19 referred to?
10:29:33 20     A. Sure.
10:29:38 21     And there's one other document that I found
10:29:40 22 which I referred to which is a -- a document
10:29:44 23 prepared by Pamela Anderson called "An Independent
10:29:47 24 Analysis of the Impact of Outdoor Advertising
10:30:02 25 (Billboards) Upon Traffic" --
16

10:30:02 1     THE REPORTER: "Advertising" what?
10:29:47 2     THE WITNESS: "An Independent Analysis of
10:30:00 3 the Impact of Outdoor Advertising (Billboards) Upon
10:30:04 4 Traffic Safety."
10:30:07 5     So that's what I have here.
10:30:08 6 BY MS. BRILL:
10:30:08 7     Q. Who is Pamela Anderson?
10:30:09 8     A. She's a -- another consultant to -- I'm not
10:30:12 9 sure. I can't characterize who she is, exactly.
10:30:16 10     Q. Okay. Do -- you referred before to the
10:30:22 11 subpoena that I sent you.
10:30:25 12     A. Yes.
10:30:25 13     Q. Did you do a thorough search of your
10:30:29 14 documents to determine whether you had other
10:30:29 15 documents that responded to the categories
10:30:29 16 identified there?
10:30:29 17     A. Yes. I looked -- I looked -- somehow the
10:30:32 18 file itself is missing. I looked into my computer
10:30:35 19 and I played off everything that's on the computer,
10:30:38 20 which you already had; some of which you already
10:30:42 21 had. And I went on and played off the 2004
10:30:45 22 document, which you did not mention, but had to do
10:30:49 23 with signs, so I thought well, I should -- I -- I
10:30:52 24 suppose I could have put that in the subpoena, but
10:30:55 25 brought it today just for -- in case you wanted to
17

MERRILL LEGAL SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

Brill Declaration Ex. B
-17-

```
10:30:58  1   see it.
10:30:59  2      Q. Okay.
10:30:59  3      A. So --
10:31:00  4      Q. And did you locate any of the underlying
10:31:04  5   materials that you considered, either in preparing
10:31:08  6   your December 21st, 2007 report or your August 30th,
10:31:13  7   2004 report?
10:31:14  8         MR. MOBLEY: I'll object that that's
10:31:16  9   compound.
10:31:17 10         You can go ahead and answer it.
10:31:18 11         MS. BRILL: I'll -- I'll break it down.
10:31:19 12      Q. Did you locate any of the underlying
10:31:21 13   materials that you considered in preparing your
10:31:24 14   December 21st, 2007 report?
10:31:28 15      A. Yes. The --
10:31:31 16      Q. Was that the photographs?
10:31:31 17      A. Well, photographs, and the Pamela Anderson
10:31:34 18   document there, which --
10:31:37 19      Q. Okay.
10:31:37 20      A. So that also.
10:31:37 21      Q. And anything else?
10:31:38 22      A. That's -- that's all I located, yeah.
10:31:40 23      Q. And did you locate -- other than the
10:31:42 24   photographs, did you locate any of the underlying
10:31:44 25   materials that you considered in preparing your
                                                              18
```

```
10:31:47  1   August 30th, 2004 report?
10:31:49  2      A. There really isn't any. I mean, I -- I got
10:31:53  3   an assignment and I did it. So there's not a --
10:31:56  4   there's not underlying materials. There are none.
10:31:59  5      Q. Okay. Were the photographs taken in
10:32:01  6   connection with the 2004 report or the 2007 report?
10:32:04  7      A. As I recall, they were primarily the 2004
10:32:09  8   report, but there are some that I think ended up in
10:32:12  9   the 2007 report and I'm not sure. I didn't dig
10:32:14 10   through my files for that purpose.
10:32:15 11      Q. Okay. Did you rely in part on your 2004
10:32:19 12   report in preparing your 2007 report?
10:32:21 13      A. Probably not. And the concepts are the
10:32:25 14   same. You know, distraction and drivers driving and
10:32:28 15   looking at signs. That -- those concepts are the
10:32:31 16   same.
10:32:32 17         But it isn't like I relied on the 2004
10:32:36 18   report to prepare the 2007 report. No.
10:32:38 19      Q. Okay. But the concept of driver
10:32:42 20   distraction, the way you discuss it in the 2007 is
10:32:44 21   the same as the way you were discussing it in 2004?
10:32:47 22         MR. MOBLEY: I -- I'll object. Document
10:32:48 23   speaks for itself.
10:32:49 24         You can go ahead and answer.
10:32:51 25         THE WITNESS: The -- the emphasis on the
                                                              19
```

```
10:32:55  1   2004 report was city street signs, signs on the city
10:32:59  2   streets.
10:33:00  3         The 2007 document was more on freeway
10:33:04  4   signs. The impact for freeway driver.
10:33:07  5         So the -- the driver that was being
10:33:08  6   addressed is different in both -- in those two
10:33:11  7   cases. One is the city streets and one is the
10:33:14  8   freeways.
10:33:14  9   BY MS. BRILL:
10:33:17 10      Q. But the concept -- you were using the
10:33:18 11   concept of driver distraction the same in the two
10:33:21 12   reports?
10:33:22 13      A. Yeah, yeah. To some degree, yes.
10:33:26 14      Q. Were you using them differently in the two
10:33:29 15   reports?
10:33:29 16      A. Well, there -- I -- I explored them
10:33:30 17   differently. I -- the reports aren't exactly the
10:33:36 18   same. They aren't -- they aren't on exact same
10:33:38 19   principles and -- so there -- there's differences,
10:33:44 20   yeah. The concept is the same.
10:33:45 21      Q. The concept of driver distraction?
10:33:47 22      A. Yeah.
10:33:48 23      Q. And the definition of driver distraction,
10:33:55 24   was it the same in both reports?
10:33:56 25      A. I think so, yes. I -- yes, for sure. I'm
                                                              20
```

```
10:34:00  1   not even sure I used the word "driver distraction"
10:34:02  2   in the 2004 report. I probably did. But --
10:34:07  3         MS. BRILL: Okay. So let's just mark these
10:34:09  4   documents.
10:34:13  5         Exhibit 7 is a deposition notice
10:34:21  6   rescheduling your deposition for today's date. And
10:34:28  7   a letter to Mr. Mobley regarding that.
10:34:28  8         (The document referred to was
10:34:28  9   marked for identification by the
10:34:28 10   C.S.R. as Exhibit 7 and attached to
10:34:52 11   this deposition.)
10:34:52 12         MS. BRILL: Exhibit 8 are --
10:34:55 13      Q. Can you just verify Exhibit 8 are the
10:34:58 14   photographs that you -- that you -- we've been
10:35:00 15   mentioning before?
10:35:01 16      A. Yes, they are.
         17         (The document referred to was
         18         marked for identification by the
         19         C.S.R. as Exhibit 8 and attached to
         20         this deposition.)
         21         THE REPORTER: Do you want me to mark the
         22   envelope, that manila folder or the --
         23         MS. BRILL: Why don't we use a clip and
         24   just mark the photographs.
         25         THE REPORTER: Okay.
                                                              21
```

10:35:19 1    MS. BRILL: Goes with that folder.
10:35:19 2    MR. BOSTROM: Can I ask for a
10:35:20 3  clarification? Those photographs, are those for the
10:35:22 4  2007 report or for the '04 report?
10:35:26 5    THE WITNESS: Definitely for the '04
10:35:27 6  report. And I think some of them for the '07 report
10:35:30 7  also.
10:35:30 8    MR. MOBLEY: May I see those photographs
10:35:31 9  after you've marked them?
10:35:42 10    MS. BRILL: Exhibit 10 is the letter from
10:35:44 11  you to Mr. --
10:35:45 12    THE REPORTER: 9.
10:35:46 13    MS. BRILL: I'm sorry, 9. Do you want to
10:35:48 14  take a minute?
10:35:49 15    MR. MOBLEY: No, I just hate to make an
10:35:51 16  objection, but I would like the court reporter to
10:35:53 17  remark the -- the exhibit tag onto a more -- a less
10:35:59 18  obtrusive part of the exhibit.
10:36:00 19    THE REPORTER: Okay. Can I have it back?
20    MR. MOBLEY: Sure.
21    MS. BRILL: Where would you like it?
22    MR. MOBLEY: Just --
23    THE REPORTER: You want -- you want it
24  here?
25    MR. MOBLEY: How about the lower --
22

10:37:12 1    A. Yes.
10:37:12 2    Q. Are there any opinions stated in that 2007
10:37:15 3  report that you are not offering on behalf of
10:37:20 4  Summit?
10:37:20 5    MR. MOBLEY: Objection. He's not offering
10:37:22 6  anything at all. That's an improper question. I'm
10:37:24 7  not -- and I guess vague and ambiguous. I don't
10:37:27 8  understand it.
10:37:27 9    MS. BRILL: Okay.
10:37:28 10    Q. Are you -- were you retained by Summit
10:37:31 11  Media to offer an opinion in the litigation between
10:37:35 12  Summit and the City of Los Angeles?
10:37:38 13    A. I presume. The -- the retention is -- is
10:37:41 14  not preceded or the -- you know, I haven't done a
10:37:45 15  lot of work, so that -- so at this point I'm not
10:37:49 16  sure what I'm going to be saying.
10:37:50 17    This is -- I'm not sure what report will be
10:37:53 18  prepared and maybe this -- or be presented. It may
10:37:58 19  be this report. It may be a different report. It
10:38:00 20  may be this report modified.
10:38:02 21    I -- I'm -- I haven't written a report yet.
10:38:07 22    Q. Okay. After you were retained or -- or you
10:38:11 23  began retention discussions with Mr. Mobley, have
10:38:15 24  you modified any of the opinions stated in that 2007
10:38:18 25  report?
24

1    MS. BRILL: Why don't we stick it below
2  that, below like right down there.
3    MR. MOBLEY: That's fine. Thanks. Then
10:36:24 4  I'd like to see it. Excuse me. I'm sorry.
10:36:24 5    MS. BRILL: Okay. Exhibit 9 we'll mark as
10:36:27 6  the -- or the letter from you to Mr. Paul Fisher
10:36:30 7  dated December 21st, 2007 we'll mark as Exhibit 9.
10:36:30 8    (The document referred to was
10:36:30 9    marked for identification by the
10:36:30 10    C.S.R. as Exhibit 9 and attached to
10:36:43 11    this deposition.)
10:36:43 12  BY MS. BRILL:
10:36:43 13    Q. Can you verify that's the report you
10:36:45 14  provided to Mr. Fisher in connection with the
10:36:47 15  Worldwide Rush case?
10:36:53 16    A. It is. And there may be exhibits missing.
10:36:54 17  There are some exhibits missing.
10:36:55 18    Q. Okay. Before --
10:36:59 19    A. I don't believe there's exhibits in this
10:37:00 20  one. The other one has the exhibits and -- some of
10:37:04 21  which are missing.
10:37:04 22    Q. Are there any opinions stated in that
10:37:08 23  2007 -- we'll call it the 2007 report. Okay?
10:37:11 24    A. (Witness nods.)
10:37:12 25    Q. "Yes"?
23

10:38:19 1    A. No. The -- the report -- both reports,
10:38:23 2  I'll say as far as I'm concerned, stand and are both
10:38:27 3  valid.
10:38:27 4    If -- you know, clearly circumstances or,
10:38:33 5  you know, signs or particular locations or whatever
10:38:36 6  that might come up which might have a -- a different
10:38:38 7  angle or slant, if you want to call it that, and I
10:38:41 8  may combine, modify or independently change the two
10:38:45 9  reports. It depends on the situation, exactly
10:38:48 10  what -- what the issue is.
10:38:49 11    Q. But sitting here today, you're not aware of
10:38:52 12  any opinions that you offered in 2007 that you want
10:38:54 13  to revise now?
10:38:55 14    A. No. I think they're both valid. Or this
10:38:58 15  one and the 2004 report, both -- both are valid.
10:39:01 16    MS. BRILL: Exhibit 10, let's mark as --
10:39:07 17  it's entitled "Declaration of William Kunzman In
10:39:07 18  Support of Motion For Preliminary Injunction" and
10:39:09 19  the caption refers to the case Metro Lights LLC
10:39:11 20  versus City of Los Angeles.
10:39:11 21    (The document referred to was
10:39:13 22    marked for identification by the
10:39:13 23    C.S.R. as Exhibit 10 and attached
10:39:15 24    to this deposition.)
10:39:15 25  BY MS. BRILL:
25

```
10:39:15  1      Q. Can you verify this is a declaration that
10:39:17  2   you submitted in connection with that case? I guess
10:39:19  3   let's let the reporter mark it first as Exhibit 10.
10:39:32  4      A. Yes, now this one here -- this refers --
10:39:33  5   excuse me --
10:39:33  6      Q. First, let's just -- first, that is the
10:39:35  7   declaration that you submitted in the Metro Lights
10:39:37  8   case?
10:39:37  9      A. Well, yes. Except there are some -- some
10:39:39 10   photographs missing.
10:39:39 11      Q. Okay.
10:39:41 12      A. So this -- this is the -- this is the
10:39:43 13   exhibit. The photographs, somehow I think they're
10:39:48 14   in the file that has now disappeared.
10:39:51 15      So everything is here that I could play out
10:39:52 16   in the computer very easily. The photographs
10:39:57 17   themselves are not here. So that's the answer.
10:40:12 18      Q. Okay. This Exhibit 11 we'll mark as a
10:40:15 19   letter from me to you dated July 1st, 2008 attaching
10:40:21 20   a subpoena.
10:40:22 21      Is that -- I'm sorry, we got to get it
10:40:24 22   marked and then I'll ask you to verify that's the
10:40:26 23   subpoena and letter you received.
10:40:26 24          (The document referred to was
10:40:26 25          marked for identification by the
                                                    26
```

```
10:40:26  1          C.S.R. as Exhibit 11 and attached
10:40:38  2          to this deposition.)
10:40:38  3      THE WITNESS: Yes, this is the subpoena
10:40:39  4   that I received.
10:40:39  5   BY MS. BRILL:
10:41:13  6      Q. This is Exhibit 12 we'll mark, which is the
10:41:18  7   Pamela Anderson report that you referred to.
10:41:20  8          (The document referred to was
10:41:20  9          marked for identification by the
10:41:20 10          C.S.R. as Exhibit 12 and attached
10:41:22 11          to this deposition.)
10:41:22 12      THE WITNESS: Yes.
10:41:23 13      MR. MOBLEY: Just a -- just a question
10:41:24 14   before we mark this. If I can ask the witness,
10:41:27 15   is -- do you have other copies of that?
10:41:29 16      THE WITNESS: No. I want --
10:41:31 17      MR. MOBLEY: Is that the original?
10:41:31 18      THE WITNESS: This is my original. I would
10:41:33 19   like -- you may copy it today, but I would like the
10:41:35 20   original back today.
10:41:36 21      MR. MOBLEY: Do you have any objection if
10:41:37 22   we mark a copy?
10:41:40 23      MS. BRILL: Yeah, I think we have a copy.
10:41:56 24   Oh, this is -- yeah. Yeah, this is it, this is it.
10:41:56 25   Yeah.
                                                    27
```

```
10:42:13  1      Q. Can you -- can you take a look at that
10:42:16  2   document, which has "Exhibit D" on it, and it's been
10:42:18  3   marked by the court reporter as Exhibit 12 and
10:42:21  4   verify that it's a copy of what you found, which was
10:42:24  5   the Pamela K. Anderson report dated November 15,
10:42:29  6   2001?
10:42:30  7      A. Yes. I haven't reviewed every single page,
10:42:33  8   but it appears to be the same document.
10:42:34  9      Q. And that was an exhibit to your December
10:42:39 10   2007 report?
10:42:39 11      A. I -- I -- It may have been.
10:42:39 12      Q. Okay.
10:42:46 13      A. I think it was, yes.
10:42:48 14      Q. And are-you -- is it your testimony
10:43:11 15   that you're not, to your knowledge, in possession of
10:43:13 16   any other documents that are responsive to any of
10:43:16 17   the other categories in the subpoena?
10:43:18 18      A. That's correct.
10:43:19 19      Q. Okay. And you checked electronic files and
10:43:21 20   hard copy files?
10:43:22 21      A. I -- yes, I did.
10:43:26 22      Q. Sir, could you describe for me your
10:43:28 23   education -- educational background, beginning with
10:43:31 24   higher education?
10:43:32 25      A. Yes.
                                                    28
```

```
10:43:34  1      I went to UCLA, have a bachelor's degree
10:43:37  2   from there in engineering, 1967.
10:43:40  3      I went to Yale University and did a -- a
10:43:45  4   one-year program. Well, one-semester year program.
10:43:48  5   I'm sorry, two semesters, one academic year. Ten
10:43:51  6   classes. It did not result in a master's degree.
10:43:54  7   They didn't -- they don't bestow that on this
10:43:58  8   particular program. I completed that program. They
10:44:00  9   call it a certificate in traffic engineering.
10:44:04 10      I worked for the Federal Highway
10:44:07 11   Administration and went through an 18-month training
10:44:09 12   program with them. And that's my education.
10:44:14 13      Q. What was the FHA training program like?
10:44:19 14      A. FHWA. Federal Highway Administration.
10:44:22 15      Q. Oh, thank you. FHWA?
10:44:25 16      A. FHA, something else.
10:44:25 17      Q. Federal highway.
10:44:27 18      A. The -- the -- I'm sorry, what was the
10:44:30 19   question?
10:44:30 20      Q. What was the -- what was the train- -- what
10:44:32 21   did the training concern?
10:44:34 22      A. The -- well, it was partly classroom and
10:44:37 23   partly in-field assignments. But it was strictly
10:44:41 24   training. It wasn't necessarily a -- a work, -you
10:44:44 25   know, a work output was not the objective. It was
                                                    29
```

8

```
10:44:49  1   to train, train how the Federal Highway
10:44:52  2   Administration, you know, views highways and
10:44:55  3   operation and planning and design and all aspects of
10:44:59  4   administration.
10:44:59  5      Q. Mostly from a safety perspective or from
10:45:02  6   other perspectives?
10:45:04  7      A. From all perspectives, yeah. Plain
10:45:06  8   building the highways and operating them, all the
10:45:09  9   way through. Building -- well, designing -- well,
10:45:11 10   actually it starts with right-of-way acquisition,
10:45:14 11   design, build, operate.
10:45:17 12      Q. Can you describe for me generally what's in
10:45:19 13   the scope of -- what the field of traffic
10:45:21 14   engineering entails?
10:45:23 15      A. Yes. Let's start with engineering.
10:45:27 16      Engineering is the art of applying
10:45:30 17   scientific principles to solving I'll say an
10:45:34 18   ordinary everyday problem. That's what engineering
10:45:37 19   is.
10:45:37 20      In the case of traffic engineering, it's
10:45:42 21   easier to define the goals.
10:45:44 22      The goals and objective for traffic
10:45:46 23   engineering is safe, expeditious movement of people
10:45:49 24   and goods. And sometimes you'll hear the word --
10:45:56 25   sometimes you hear the word "economie" put in there,
                                                          30
```

```
10:45:58  1   so it's safe expeditious and economic movement of
10:46:01  2   people and goods. That's the goals of traffic
10:46:03  3   engineering.
10:46:05  4      The tools that we use are signs, signals,
10:46:10  5   crosswalks, guardrails. I think I said traffic
10:46:16  6   signals. If I didn't, traffic signals. That's our
10:46:19  7   tools.
10:46:19  8      And the objective is -- primary objective
10:46:24  9   is safe operation of the streets. Someone said that
10:46:28 10   we're involved with everything above the blacktop,
10:46:32 11   including paint, black and white line. I think it
10:46:37 12   actually goes -- it's a pretty simplistic view, but
10:46:39 13   it's -- It's pretty accurate. We actually call it
10:46:42 14   street furniture, which I know is a term in this --
10:46:44 15   this case.
10:46:44 16      Street furniture is things that we put in,
10:46:47 17   which would be signs and signals and guardrails,
10:46:51 18   crosswalks, that kind of stuff. That's a pretty
10:46:58 19   good definition.
10:47:00 20      MR. MOBLEY: May we take a short break to
10:47:02 21   let the court reporter reseat herself?
10:47:05 22      THE REPORTER: Thank you.
10:47:05 23      THE VIDEOGRAPHER: Off the record. The
10:47:07 24   time is 10:47.
10:47:49 25      (Brief recess.)
                                                          31
```

```
10:48:07  1      THE VIDEOGRAPHER: Back on the record. The
10:48:08  2   time is 10:48.
10:48:13  3      THE WITNESS: If I could add maybe one more
10:48:15  4   sentence to the last answer. The term "engineering
10:48:18  5   judgment" comes into use quite a bit. Some things
10:48:21  6   are black and white. There's, you know, thou-shall-
10:48:26  7   and thou-shalt-not-type of -- of things in the
10:48:29  8   literature and regulations and this kind of stuff,
10:48:32  9   but most of the time there is no clear-cut -- you
10:48:36 10   know, clear-cut regulation or, you know, mandatory
10:48:40 11   requirement.
10:48:41 12      And engineering judgment gets involved.
10:48:43 13   That's -- that's a key issue in a lot of traffic
10:48:44 14   issues.
10:48:47 15   BY MS. BRILL: --
10:48:49 16      Q. You referred before to street furniture.
10:48:51 17      Does that include bus shelters in your
10:48:58 18   experience?
10:48:59 19      A. I'd say yes. Anything that's -- generally,
10:49:00 20   anything in the public right-of way I think would be
10:49:05 21   considered street furniture, even -- even including
10:49:05 22   sidewalks, where you have trees, you know, in what
10:49:12 23   they call the parkway, which is the area between the
10:49:14 24   right-of-way line and the curb face is what they
10:49:16 25   call the parkway. Sometimes it has grass, sometimes
                                                          32
```

```
10:49:19  1   it has grass and sidewalks, sometimes it just has a
10:49:21  2   sidewalk, sometimes it's dirt, sometimes there's
10:49:25  3   vegetation, trees, whatever in there, and including
10:49:28  4   what's out in the median, too. You sometimes have
10:49:31  5   landscaped medians or raised medians; not always
10:49:34  6   raised.
10:49:35  7      Q. So the focus of the traffic engineer is on
10:49:37  8   the public rights-of-way?
10:49:38  9      A. Yeah, in general. I'm sure there's
10:49:40 10   exceptions, but generally we're concerned only about
10:49:42 11   the right-of-way, what's in the right-of-way.
10:49:44 12      Q. Are public toilets also within the scope of
10:49:47 13   street furniture?
10:49:48 14      A. I would say if it's in the right-of-way
10:49:50 15   it's -- it's -- yeah, I would say yes.
10:49:53 16      Q. And in your -- in your educational
10:49:56 17   background or with -- with the -- either in school
10:49:59 18   or with the Federal Highway Administration, did you
10:50:02 19   discuss unique aspects of the public rights-of-way?
10:50:12 20      A. I'm sure they did. It's -- It's been a few
10:50:12 21   years. 40 years to be -- to be more precise. I'm
10:50:17 22   sure they did. You know, unique things happen, com
10:50:19 23   up. You know, it's not all standard, so at least
10:50:23 24   indirectly. I'm not sure they said, now, these are
10:50:25 25   unique features, let's send them off, but I'm
                                                          33
```

10:50:29 1   Indirectly.
10:50:30 2     Q. In -- in your understanding, why do traffic
10:50:32 3   engineers focus on the public rights-of-way?
10:50:34 4     A. Well, actually, -- actually, I should amend
10:50:39 5   that answer.
10:50:40 6     The -- from a City's point of view, or from
10:50:42 7   a governmental agency's point of view, the
10:50:45 8   right-of-way, what's within the right-of-way is
10:50:48 9   what's at issue.
10:50:49 10    But, for instance, if my -- my firm is
10:50:52 11  hired to do a traffic study for a -- say a shopping
10:50:54 12  center, we're also concerned about -- about what's
10:50:57 13  within the shopping center. The aisles, the -- the
10:50:59 14  crosswalks, the -- the size of the parking spaces.
10:51:04 15  All of that stuff, which is private property.
10:51:07 16    So from that point of view, yes, we're
10:51:10 17  involved with private property, too. But from a
10:51:11 18  governmental agency point of view, it's generally
10:51:13 19  just what's in the right-of-way.
10:51:18 20    Q. Okay. And do you have an understanding of
10:51:18 21  why the governmental agencies focus on what's in the
10:51:22 22  right-of-way for -- for purposes of traffic
10:51:24 23  engineering?
10:51:25 24    MR. MOBLEY: Objection. Calls for
10:51:31 25  speculation.
                                                    34

10:51:31 1     THE WITNESS: The -- generally that's
10:51:33 2   what -- that's what they control. But there are
10:51:35 3   times when other aspects outside of the right-of-way
10:51:40 4   are -- are addressed. Particularly of variances and
10:51:43 5   that type of stuff. You know, anything that's going
10:51:45 6   to be done with a piece of land, regardless -- well,
10:51:48 7   not regardless of who owns it, but private land or
10:51:51 8   public land generally receives or requires an
10:51:54 9   approval by, say, the City, by a government agency.
10:51:58 10    Sometimes that's -- it's under zoning and
10:52:05 11  it's under, well, the general plan, it's under
10:52:07 12  zoning, and then within those purviews, you have --
10:52:10 13  you have the code. You have the parking code. You
10:52:12 14  have the zoning code. You have various code
10:52:15 15  sections.
10:52:16 16    And those involve off -- involve private
10:52:21 17  property, off-public property.
10:52:26 18    I guess I answered the question.
10:52:27 19    Q. Okay. And those cities generally have
10:52:31 20  different regulations affecting the public
10:52:34 21  rights-of-way versus private property, correct?
10:52:38 22    A. Yes. I don't know if you mean different
10:52:39 23  between cities or different -- they're just
10:52:41 24  different because part of it's city and part of it's
10:52:45 25  private land. Different in both cases.
                                                    35

10:52:47 1     Generally the cities are relatively
10:52:49 2   consistent from one city to the next.
10:52:53 3     Q. In treating public rights-of-way
10:52:55 4   differently from private property?
10:52:56 5     A. Well, yeah. That would always be the case.
10:52:59 6   But even within cities they're -- they're -- most
10:53:03 7   cities tend to do roughly the same thing, roughly
10:53:07 8   the same requirements. They differ, but roughly the
10:53:11 9   same requirements.
10:53:11 10    Q. As one another?
10:53:12 11    A. Uh-huh, yeah. Similarities.
10:53:16 12    Q. Okay. Did you study -- in your educational
10:53:29 13  background, did you study public transportation?
10:53:31 14    A. Yes. Yes.
10:53:33 15    Q. What was the focus of that study?
10:53:35 16    A. Well, just -- there is such a thing --
10:53:39 17  there's -- it's what -- one of the things was
10:53:42 18  like -- what we call mobile splits, how many people
10:53:46 19  ride public transit, how do you predict that, how
10:53:48 20  would you increase that, what are the factors
10:53:52 21  that -- that determine whether a person rides a bus,
10:53:56 22  say, or rides a -- you know, a subway versus drive
10:53:59 23  his own -- his own cars.
10:54:02 24    So those are -- in fact, that's something
10:54:04 25  that's pretty -- always a topic that's, you know, on
                                                    36

10:54:08 1   our minds and today with the -- the gas prices,
10:54:14 2   it -- you know, nearly $5 a gallon, we're seeing
10:54:17 3   increased public transit usage.
10:54:19 4     So it's always of interest to us, how do
10:54:21 5   you get more people to -- to use public transit.
10:54:24 6     Q. And does the availability of bus shelters
10:54:28 7   contribute to getting people to ride buses rather
10:54:31 8   than take private cars?
10:54:33 9     MR. MOBLEY: Objection. Incomplete
10:54:35 10  hypothetical. Calls for speculation.
10:54:37 11    THE WITNESS: The amenities of any type
10:54:43 12  presumably help. I mean, one -- one bus shelter in
10:54:46 13  all of the city in L.A. is not going to make much
10:54:50 14  difference, but bus shelters are going to help in
10:54:52 15  general, so --
10:54:53 16  BY MS. BRILL:
10:54:59 17    Q. Have you ever studied the relative traffic
10:55:01 18  safety of individual cars versus bus transportation?
10:55:06 19    A. Not directly. I've seen the statistics.
10:55:14 20  Yeah, generally the public transit is safer. Safer
10:55:18 21  meaning less -- less accidents, less persons injured
10:55:21 22  or killed per, you know, million vehicle miles of
10:55:24 23  travel.
10:55:26 24    Q. Tell me about your work experience since
10:55:29 25  you graduated or since you got your certificate from
                                                    37

**Page 38**

10:55:33 1   Yale.

10:55:35 2   A. The -- well, my -- well, actually, let me

10:55:43 3   talk about the bigger jobs and not the summer jobs

10:55:46 4   and stuff. Actually, I'll try to talk about them

10:55:49 5   all if I remember them.

10:55:50 6   I worked for the County of Los Angeles,

10:55:54 7   traffic engineering section for a summer job for

10:55:57 8   like three months. That was between going from UCLA

10:56:01 9   to Yale. The break between the two.

10:56:04 10   After working at Yale, I mean, going to

10:56:08 11   school at Yale, I had another brief summer job,

10:56:13 12   Wilbur Smith & Associates.

10:56:14 13   After that, I went to work for the Federal

10:56:21 14   Highway Administration for three years.

10:56:22 15   After that, I worked for the County of

10:56:25 16   Riverside. These are all as a traffic engineer.

10:56:28 17   County of Riverside.

10:56:31 18   After that, I worked for a consulting firm,

10:56:36 19   Lampman Associates.

10:56:37 20   After that, I worked for another

10:56:39 21   consulting -- no, I worked for the City of Irvine as

10:56:42 22   the first traffic person, transportation person they

10:56:45 23   had in the city.

10:56:46 24   After that I worked for a consultant,

10:56:52 25   Weston Pringle & Associates which formerly it was

**Page 39**

10:56:54 1   Crommelin-Pringle & Associates -- actually it was

10:56:57 2   Crommelin-Pringle & Associates when I went to work

10:56:59 3   and then it became Weston Pringle & Associates.

10:57:03 4   Same job but two different names. After that I

10:57:06 5   became self-employed.

10:57:06 6   Q. That was beginning?

10:57:07 7   A. Self-employment was '76.

10:57:11 8   Q. And that's when you started your consulting

10:57:13 9   firm?

10:57:13 10   A. Yes.

10:57:16 11   Q. In -- in any of these government or other

10:57:21 12   jobs before you started your own business, did you

10:57:24 13   work on public transportation issues?

10:57:27 14   A. Yes. The -- coming to mind, City of Irvine

10:57:37 15   I worked on some public transportation issues. In

10:57:40 16   fact, I was kind of the City's manager of the bus

10:57:42 17   system. They had a little summer bus program. Try

10:57:46 18   to keep the kids -- give them something to do, so

10:57:48 19   they circled between the villages and picked up --

10:57:50 20   like on an hourly schedule, picked up the kids or

10:57:53 21   anybody else and would take them to a shopping

10:57:55 22   center or something like that. So I've actually

10:57:59 23   managed the bus system. Limited, but I did it.

10:58:02 24   Then working for -- I believe it was when I

10:58:15 25   worked for Weston Pringle, Weston Pringle &

**Page 40**

10:58:19 1   Associates. There was -- I did a multimodal study,

10:58:22 2   which is quite interesting. How many people -- this

10:58:24 3   was for UCI, University California Irvine -- how

10:58:27 4   many people would walk -- mode -- all the modes

10:58:30 5   consist of walking, bicycling, and they were doing a

10:58:35 6   little campus shuttle, a bus that circled around the

10:58:39 7   campus. The campus shuttle, the -- riding public

10:58:43 8   transportation, you know, and then driving the car.

10:58:47 9   So I guess that's five modes. And the

10:58:50 10   question was how many people would ride the shuttle;

10:58:54 11   predict the amount of time -- or the amount of

10:58:55 12   people that would ride the shuttle if they drove a

10:58:57 13   shuttle around campus.

10:59:01 14   So I did that, which is obviously quite

10:59:03 15   involved with public transportation. And those come

10:59:08 16   to mind. There's probably others.

10:59:08 17   Q. Okay.

10:59:09 18   A. Those are the bigger ones.

10:59:11 19   Q. In your -- in your work in Irvine managing

10:59:14 20   the bus system, were there bus shelters that were

10:59:18 21   part of that bus system?

10:59:23 22   A. Not part of that bus system. As I -- well,

10:59:24 23   I do recall directly also within the city was --

10:59:29 24   were bus shelters. The Orange County Transit

10:59:32 25   District, OCTD, Orange County Transit District which

**Page 41**

10:59:35 1   the bus company for -- that's what they called it

10:59:38 2   back then for Orange County, they did have bus

10:59:41 3   shelters. The re- -- recall discussions and so forth

10:59:45 4   on those -- on those bus shelters.

10:59:47 5   Q. Were you involved in siting the bus

10:59:49 6   shelters?

10:59:49 7   A. I don't -- I don't think so. I don't

10:59:53 8   remember. I don't recall.

10:59:59 9   Q. But generally, traffic engineers are

11:00:00 10   involved in make determinations about where bus

11:00:02 11   stops will be?

11:00:03 12   A. Yes.

11:00:04 13   Q. Okay. And where bus shelters will be?

11:00:06 14   A. Yes.

11:00:08 15   Q. Okay.

11:00:08 16   A. As I recall, the -- the OCTD would say we'd

11:00:14 17   like stops here, here and here, you know, coming say

11:00:16 18   down Culver, Culver Drive. And it was up to the

11:00:18 19   City to say okay or no. So I -- I believe that's

11:00:21 20   how it happened. So I didn't site them directly,

11:00:23 21   but probably said, yeah, that looks like a good

11:00:26 22   place.

11:00:26 23   Q. And did those bus shelters have

11:00:29 24   advertising?

11:00:29 25   A. I believe some of them did. And -- and

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

Brill Declaration Ex. B
-23-

11:00:32 1  that was an issue, I'll say that was kind of an
11:00:35 2  issue of -- of whether they should, where it should
11:00:42 3  be on the -- on the bus shelter, should it be on
11:00:45 4  the -- perpendicular to the street or just on the
11:00:47 5  back, should it be for the benefit of the rider of
11:00:50 6  the bus versus the person driving by in a car. I
11:00:52 7  say "benefit," should be aimed at those two.
11:00:58 8      Q. And you remember where the advertising was
11:01:00 9  placed?
11:01:00 10     A. I -- I believe it ended up perpendicular to
11:01:05 11 the -- to the street. And I believe I raised an
11:01:09 12 issue or said, you know, this is a distraction to
11:01:12 13 the driver.
11:01:14 14     This -- OCTD basically said, well, the --
11:01:17 15 you know, these bus shelters get paid for by -- you
11:01:20 16 know, they're -- private companies put the bus
11:01:26 17 shelters on the street. Doesn't cost us a penny.
11:01:30 18 Basically speaking, doesn't cost anything. And the
11:01:34 19 City said we're going to have bus shelters.
11:01:34 20     THE REPORTER: The City what?
11:01:34 21     THE WITNESS: More for less said they're
11:01:35 22 going to have bus shelters.
11:01:37 23     And I don't remember the formal procedures,
11:01:39 24 but it was -- that was not my decision. I just,
11:01:44 25 I'll put them -- where do you want to put them now?

                                                            42

11:01:45 1  BY MS. BRILL:
11:01:45 2      Q. And as you -- when you were at Irvine, did
11:01:50 3  you ever come to hear of any traffic accidents
11:01:53 4  caused by those bus shelters?
11:01:55 5      A. I don't recall. I don't -- I don't believe
11:01:57 6  so. But I don't recall.
11:02:03 7      Q. Was it your understanding that the bus
11:02:04 8  shelters there would have not been feasible in the
11:02:08 9  absence of an advertising support?
11:02:11 10     MR. MOBLEY: Objection. Lack of
11:02:13 11 foundation. Calls for speculation.
11:02:17 12     THE WITNESS: I believe it was presented to
11:02:19 13 me the other way around, that we wouldn't -- the
11:02:22 14 City, -the City would not have them if it wasn't for
11:02:26 15 someone else paying for them. Someone else is
11:02:28 16 paying for them so, therefore, the City would accept
11:02:31 17 them. I believe that was the way it was basically
11:02:37 18 presented to me.
11:02:37 19 BY MS. BRILL:
11:02:38 20     Q. But the City regarded the bus shelters as
11:02:40 21 an amenity for public transit, correct?
11:02:43 22     MR. MOBLEY: Objection. Calls for
11:02:45 23 speculation. Lack of foundation.
11:02:46 24     THE WITNESS: I believe that would be
11:02:47 25 correct.

                                                            43

11:02:47 1  BY MS. BRILL:
11:02:55 2      Q. Now in your consulting work you do traffic
11:03:00 3  studies, traffic analyses, correct?
11:03:00 4      A. Yes.
11:03:04 5      Q. What's the difference between a traffic
11:03:06 6  study and a traffic analysis?
11:03:07 7      A. Just the name. Difference between a house
11:03:09 8  and a home. They're both kind of the same thing.
11:03:12 9      A -- they're the same thing.
11:03:14 10     Q. Can you describe generally the types of
11:03:19 11 consulting work that you do once -- or began to do
11:03:22 12 once you started your own company?
11:03:24 13     A. Well, a lot of -- you know, probably dozens
11:03:27 14 of different types, but generally the -- the biggest
11:03:32 15 component, the primary one which is way over half is
11:03:36 16 what we call traffic impact study or analysis.
11:03:41 17     And traffic impact analysis is generally
11:03:45 18 for new development or revitalization of an existing
11:03:48 19 development. And the typical questions you're
11:03:53 20 trying to answer is are the streets big enough to
11:03:56 21 handle it and what kind of traffic control is needed
11:03:59 22 at the intersections, signals, stop signs. And
11:04:05 23 often additional lanes is an issue. Should we put
11:04:08 24 in a double left-turn pocket, say, where there's
11:04:10 25 currently a single left-turn pocket.

                                                            44

11:04:12 1      And that -- those issues are generally
11:04:18 2  what's the most important or what's looked at the
11:04:22 3  most.
11:04:22 4      But like I said, there's a lot of other
11:04:26 5  studies, a lot of -- you know, there's -- there's
11:04:28 6  just a lot of other studies, lot of miscellaneous
11:04:32 7  studies besides those.
11:04:37 8      Q. Has any of your consulting work focused on
11:04:41 9  public transportation?
11:04:51 10     A. I don't recall a single job where -- where
11:04:54 11 public transportation was the focus.
11:04:55 12     Q. Okay.
11:05:00 13     A. I might add we've done 4,200 jobs, so
11:05:03 14 sometimes I forget one of those jobs. Over 40 years
11:05:07 15 or over -- yeah, over 30 -- I'm sorry, over 32
11:05:11 16 years.
11:05:11 17     Q. Okay.
11:05:12 18     A. So self-employed for 32 years and we've
11:05:15 19 done 4,200 jobs, so --
11:05:18 20     Q. Going back to your work at UCI where you --
11:05:22 21 what year was that?
11:05:26 22     A. That would have been early -- no, I mean,
11:05:31 23 late '70s, like '70 -- '76 to 1980, 1976 to 1980,
11:05:37 24 somewhere in that range. And I had several jobs and
11:05:40 25 did -- besides the -- the -- the people mover -- or

                                                            45

MERRILL LEGAL SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

Brill Declaration Ex. B
-24-

11:05:46  1    not the people mover, but the — the shuttle bus, I
11:05:50  2    did several other jobs.
11:05:52  3         Q. And was there any discussion in connection
11:05:54  4    with your work at U- -- UCI about whether bus
11:05:57  5    shelters might enhance ridership of the shuttles?
11:06:02  6         A. I don't believe so. No. The -- there — I
11:06:06  7    don't know if you've been to UCI. There's a
11:06:08  8    nice-looking pedestrian overcrossing that crosses
11:06:10  9    the campus. I prepared the study on that. And one
11:06:15 10    of the — one of the purposes or one of the benefits
11:06:29 11    of that -- that pedestrian overpass, Campus is kind
11:06:35 12    of a big street there and there's commercial on one
11:06:38 13    side and UCI is on the other side, so there's a lot
11:06:41 14    of interaction pedestrian-wise between the two.
11:06:44 15         And the bus stops, there are some bus
11:06:47 16    stops, of course, depending on which direction you
11:06:49 17    want to go on campus. So one of the benefits of the
11:06:53 18    pedestrian overcrossing was to get pedestrians who
11:06:56 19    wanted to ride the bus on the other side of the
11:06:58 20    street.
11:06:58 21         So that was a benefit. So to that extent,
11:07:03 22    public transportation I guess was involved, but
11:07:05 23    that's the only one I recall.
11:07:09 24         Q. Do you recall how much you were paid for
11:07:10 25    your expert witness work in the Metro Lights case?

                                                             46

11:07:14  1         A. I don't.
11:07:20  2         Q. How about for your -- for the Worldwide
11:07:22  3    Rush case?
11:07:22  4         A. I — it was either 5,000 or 7,500. I can't
11:07:30  5    remember which. It's one of those two.
11:07:32  6         Q. And were those amounts pursuant to about
11:07:35  7    approximately the same rates that you're charging
11:07:38  8    Mr. Mobley?
11:07:38  9         A. Yes.
11:07:45 10         Q. Were you the only person in your firm who
11:07:48 11    worked on those cases?
11:07:50 12         A. Yes.
11:07:53 13         Q. Have you been an expert in any other cases
11:07:55 14    in which the constitutionality of a sign regulation
11:07:59 15    was at issue?
11:08:04 16         A. I don't believe so. The — those two
11:08:13 17    cases — those two cases in particular come to mind.
11:08:19 18    And that's it. Don't recall anything else.
11:08:33 19         Q. So based on your work experience, you
11:08:35 20    consider yourself to be an expert in traffic
11:08:37 21    engineering?
11:08:38 22         A. Yes.
11:08:39 23         Q. But you're not an architect, correct?
11:08:41 24         A. No, I'm not an architect.
11:08:42 25         Q. You're not an urban planner?

                                                             47

11:08:45  1         A. No. We do a lot of transportation
11:08:50  2    planning, which is getting close, but an urban
11:08:50  3    planner, per se, no.
11:08:51  4         Q. When you say "transportation planning,"
11:08:53  5    you're not referring to mass transit, correct?
11:08:55  6         A. Well, there — there's a subtle distinction
11:08:59  7    between traffic engineering and transportation
11:09:02  8    planning.
11:09:05  9         Traffic engineering normally is considered
11:09:05 10    more of the day-to-day operation of a facility.
11:09:08 11         Transportation planning is normally looking
11:09:13 12    into the future, you know, 20 years out, 30 years
11:09:15 13    out and trying to determine what's needed, what's
11:09:18 14    going to be needed in 30 years to — to operate the
11:09:20 15    streets.
11:09:23 16         And what we do intermixes a lot between
11:09:27 17    traffic engineering and transportation planning.
11:09:30 18         Anything in the future is transportation
11:09:33 19    planning. Anything today is traffic engineering.
11:09:35 20    So —
11:09:37 21         Q. Okay. And so when you do your
11:09:39 22    transportation planning work, does that involve mass
11:09:44 23    transit?
11:09:45 24         A. Indirectly. Well, to some degree. But
11:09:55 25    not — not — typically not very directly.

                                                             48

11:09:58  1    Typically, if there's a bus route we may mention
11:10:02  2    there's a bus route that passes by the site. Or —
11:10:06  3    or sometimes we get into, -you know, we review a
11:10:15  4    plan that has a bus stop on the plan and we look at
11:10:21  5    it and say, okay, it looks like a logical place.
11:10:23  6         Bus stops are typically the far side of an
11:10:26  7    intersection. That's your best place. So if we see
11:10:29  8    a bus stop on the far side, we consider that's a
11:10:32  9    reasonable place to put it.
11:10:33 10         Q. But you don't get into deciding where the
11:10:36 11    bus route should be?
11:10:37 12         A. Almost — let's say no. There may be a
11:10:41 13    couple exceptions, but no.
11:10:42 14         Q. And you don't get into details about where
11:10:45 15    bus shelters should be or whether bus shelters
11:10:48 16    should be provided?
11:10:49 17         A. No.
11:10:50 18         Q. And you're typically not the person who
11:10:52 19    would say where the bus -- in the first instance,
11:10:55 20    where the bus stops should be, correct?
11:10:59 21         A. That's correct in the — in the first
11:10:59 22    instance, yeah, we — we would not be the right
11:11:02 23    person.
11:11:04 24         Q. And you don't have expertise in visual
11:11:07 25    design, correct?

                                                             49

11:11:07 1    A. That's correct.
11:11:08 2    Q. And you're not — you're not an expert in
11:11:11 3  mass transit, correct?
11:11:12 4    A. No, I wouldn't hold myself out as that.
11:11:15 5    Q. Or public finance?
11:11:16 6    A. No.
11:11:18 7    Q. Or the outdoor advertising business?
11:11:20 8    A. No.
11:11:21 9    Q. Or cognitive processing?
11:11:23 10   A. Well, okay. And that's human factors.
11:11:28 11      You've got to realize, there's an overlap
11:11:31 12 between traffic engineering and — and human
11:11:36 13 factors.
11:11:36 14      If — you know, a Venn diagram, there's two
11:11:41 15 circles, but they sort of overlap and cover a little
11:11:43 16 bit of the same territory. That's the way it is.
11:11:45 17      So there are certain things that we do that
11:11:48 18 they also do or they do and we also do.
11:11:51 19      So — so to say I'm an expert on human
11:11:55 20 factors, no. To say I am involved with those issues
11:11:58 21 sometimes, that would — well, I am involved with
11:12:01 22 those issues sometimes.
11:12:04 23   Q. Are you an expert on the science of
11:12:06 24 processing visual information?
11:12:08 25   A. No.

50

11:12:10 1    Q. Are you an expert in the limbic system?
11:12:13 2    A. In the what?
11:12:14 3    Q. The limbic system?
11:12:15 4    A. No.
11:12:16 5    Q. The operation of the cerebral cortex?
11:12:18 6    A. No.
11:12:19 7    Q. No?
11:12:21 8      Are you an expert on peripheral vision?
11:12:23 9    A. No, I — and — and I'm not an expert on
11:12:27 10 peripheral vision, but in traffic engineering
11:12:30 11 there's — we come up with what they call a cone of
11:12:36 12 vision which can best — best be explained as if you
11:12:40 13 were to, so to speak, put a pencil looking straight
11:12:43 14 ahead out of one of your eyes or, you know, straight
11:12:45 15 out of — looking straight ahead, you see everything
11:12:47 16 that's straight ahead, and you see everything —
11:12:49 17 there's a cone, what we call a cone of vision.
11:12:51 18      And the cone is often defined as 15 degrees
11:12:54 19 from straight ahead. So if you were to — I always
11:12:57 20 think of it as a megaphone. If you had a megaphone
11:12:59 21 and you're looking through it, you've got the — you
11:13:02 22 know it — it expands out as you look forward.
11:13:05 23      So the cone of vision is basically — looks
11:13:08 24 a little bit like a megaphone, but it's a
11:13:11 25 straight-ahead line. And you go out 15 degrees from

51

11:13:14 1  the straight-ahead line and that's what drivers
11:13:16 2  typically can be expected to see and recognize and
11:13:20 3  process, if you want to call it that.
11:13:22 4      So peripheral vision, you know, I'm not
11:13:25 5  going to say I'm an expert in that. But we use this
11:13:30 6  cone of vision. That's a central consideration that
11:13:33 7  we have as traffic engineers.
11:13:35 8      THE VIDEOGRAPHER: Ms. Brill, can we go off
11:13:37 9  the record for one second? -
11:13:38 10     MS. BRILL: Yes.
11:13:39 11     THE VIDEOGRAPHER: Off the record at 11:13.
11:14:10 12     (Pause in proceedings.)
11:14:11 13     THE VIDEOGRAPHER: Back on the record at
11:14:12 14 11:14.
11:14:12 15     MS. BRILL: Thank you.
11:14:13 16   Q. So, Mr. Kunzman, just before we went off
11:14:15 17 the record to deal with some sound issues, you were
11:14:17 18 discussing this vision cone, correct?
11:14:22 19   A. Yes. So, and — and you asked if I was an
11:14:24 20 expert in peripheral vision and I said, well, no,
11:14:27 21 but that part of vision.
11:14:30 22      Peripheral vision means what do you see way
11:14:31 23 out here, roughly 90 degrees from your eye. That —
11:14:34 24 that — that's not what we deal with, but we do deal
11:14:37 25 with a cone of vision, which is pretty close to

52

11:14:42 1  that — that same issue, at least.
11:14:43 2    Q. And, in general, if something is outside
11:14:45 3  this 15- — 15-degree cone, does that mean the
11:14:49 4  driver would turn his or her head in order to see
11:14:52 5  it?
11:14:52 6    A. Let me not answer that directly and answer
11:14:55 7  it a whole different way.
11:14:56 8      In — in traffic engineering, when it comes
11:15:00 9  to like signs, and I'm talking about directional
11:15:02 10 signs, we consider that a driver should be able to
11:15:05 11 read the sign in a 15-degree cone. In other words,
11:15:08 12 when they're looking 15 degrees off of straight
11:15:14 13 ahead, they should be able to read the sign.
11:15:16 14      In other words, the letters, the size of
11:15:18 15 the letters on the directional sign say — need to
11:15:20 16 be large enough so that an average driver, when far
11:15:24 17 enough back so that the sign is within 15 degrees,
11:15:28 18 the person can read it.
11:15:29 19      In other words, they shouldn't have to
11:15:31 20 drive, let's say, virtually up to it and look at,
11:15:35 21 you know, a fairly sharp angle to read the sign.
11:15:38 22 That — that's just — that's not how you do — do a
11:15:39 23 sign.
11:15:40 24      So in the 15 degrees, it's — there's no
11:15:43 25 scientific basis that just says this is how you have

53

11:15:46 1   to do it, 16 degrees doesn't work and 14 degrees --
11:15:50 2   It's -- It's custom and practice. That's kind of
11:15:53 3   the way it's been done for a long time. And It's --
11:15:57 4   it's considered the way you normally do it. So
11:16:00 5   that -- that's what it is.
11:16:03 6       Q. And so is it the case that the farther you
11:16:05 7   have to turn your head to see a sign, the more
11:16:11 8   likely it is to cause accidents?
11:16:13 9       A. I -- I wouldn't say for sure that that's
11:16:17 10  the case. But the point is, what you see, what
11:16:22 11  you're -- what you're likely to see, what your eye
11:16:25 12  is likely to see and you're likely to process is
11:16:29 13  things within roughly a 15-degree cone.
11:16:32 14      Now, of course, you can look, you may see
11:16:34 15  things off to the side, but if you're just driving
11:16:38 16  down the street without particularly looking for
11:16:40 17  anything, you normally see what's in a 15-degree
11:16:42 18  cone, and what's outside of there you're not as
11:16:45 19  likely to see and not -- you know, you almost have
11:16:49 20  to consciously try to see something outside that
11:16:52 21  cone. That's how it's used.
11:16:54 22      Q. And if you're turning -- if a driver is
11:16:57 23  turning his or her head to the side to see something
11:17:00 24  outside the cone, does that mean they're looking
11:17:02 25  away from the action on the roadway?

                    54

11:17:05 1       MR. MOBLEY: Objection. Vague and
11:17:07 2   ambiguous. And incomplete hypothetical.
11:17:11 3       THE WITNESS: It -- if the ultimate
11:17:14 4   question is are signs dangerous, in my opinion
11:17:17 5   they're not. They're -- they're not such a
11:17:19 6   distraction that they're -- they're, per se,
11:17:25 7   dangerous on the one hand.
11:17:29 8       On the other hand they are a distraction,
11:17:31 9   but I think everything -- a driver's driving down
11:17:34 10  the street, in essence, everything is a distraction,
11:17:36 11  whether it's driving down Avenue of the Stars and
11:17:38 12  looking at a, whatever, 20-story building, or you
11:17:43 13  know, admiring the flowers in the -- you know,
11:17:47 14  the -- in the median or whatever, it's still a
11:17:49 15  little bit of a distraction.
11:17:51 16      And we all obviously have -- we all
11:17:53 17  obviously see things besides the center line of the
11:17:56 18  road in front of us. I mean, clearly. If we only
11:17:58 19  look at the road, we're probably bad drivers.
11:18:00 20  You're scanning. Your eyes are scanning right to
11:18:04 21  left, usually not up and down, but conceivably up
11:18:08 22  and down, but you're looking for the car that's
11:18:10 23  coming out of the driveway that looks like he may
11:18:12 24  not stop, doing those kinds of things.
11:18:14 25      So -- so to say that any kind of a

                    55

11:18:19 1   distraction is -- is dangerous or is more dangerous
11:18:22 2   than another kind of distraction -- and I'm using
11:18:26 3   the word "distraction." You got to have some kind
11:18:28 4   of a word that says if it's something you don't have
11:18:30 5   to look at and you look at, then, you know,
11:18:33 6   that's -- so I chose the word "distraction."
11:18:36 7       So there's minor distractions. You look at
11:18:39 8   the flowers, but your eye's pretty much straight
11:18:42 9   ahead and you're -- you're -- you know, you're
11:18:44 10  seeing what's ahead of you as you drive.
11:18:47 11      In addition to the cone, you have the --
11:18:51 12  I'm going to call it target value. And "target"
11:18:55 13  meaning if it's a -- you know, it's one flower or
11:18:59 14  something that's a lot less target than if it's --
11:19:02 15  if it's very large, if it fills up a big percentage
11:19:05 16  of your cone of vision.
11:19:06 17      The bigger the target, of course, the more
11:19:09 18  likely you're going to look and see it and perhaps
11:19:13 19  be distracted. So there's that aspect.
11:19:20 20      You can ask the next question. I'm not
11:19:22 21  sure I answered that one real well, but --
11:19:22 22  BY MS. BRILL:
11:19:38 23      Q. Do you have an opinion whether turning your
11:19:39 24  head to the side away from traffic is -- has an
11:19:43 25  impact on traffic safety?

                    56

11:19:45 1       MR. MOBLEY: Objection. Incomplete
11:19:47 2   hypothetical. And calls -- is vague and ambiguous.
11:19:52 3       THE WITNESS: Is -- is -- okay. There's
11:19:57 4   little evidence anywhere that signs, looking at a
11:20:02 5   sign causes accidents. There's -- there's -- as far
11:20:07 6   as I'm concerned, there's no evidence.
11:20:08 7       So if you're -- if you're looking, casually
11:20:13 8   looking at something of, I'll say low interest, I
11:20:21 9   don't think those cause accidents.
11:20:22 10      Now, if it's a traffic accident, for
11:20:25 11  instance, you're passing and there's somebody laid
11:20:27 12  out on the ground and, you know, people are tending
11:20:30 13  to -- to, of course, gawk at the -- the -- this
11:20:35 14  person, this accident, and then they tend to have
11:20:37 15  rear-ends, rear-end accidents. There's no question
11:20:41 16  that that also happens.
11:20:42 17      So it's -- it's like degree. If it's a
11:20:45 18  person all bloody on the side of the road, that's a
11:20:49 19  different situation than a -- a sign that's
11:20:51 20  advertising whatever, you know, some pretty
11:20:56 21  innocuous topic.
11:21:00 22      So there -- there's a difference there. In
11:21:02 23  one case having a major distraction, a highly
11:21:06 24  attention-grabbing distraction off to the side of
11:21:12 25  the road, yeah, would cause accidents, but I don't

                    57

MERRILL LEGAL SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

Brill Declaration Ex. B
-27-

```
11:21:14  1    think of signs as being that type of a distraction.
11:21:14  2    BY MS. BRILL:
11:21:26  3       Q. So you said there's little evidence
11:21:28  4    anywhere that signs cause -- cause accidents.
11:21:31  5       That -- that's true for signs on bus
11:21:33  6    shelters, correct?
11:21:36  7       A. I -- I would say yes on that, too. Yeah.
11:21:38  8    And I say "little evidence" -- I -- I can find no
11:21:41  9    evidence. There's -- yeah, no evidence whatsoever.
11:21:53 10       MS. BRILL: Should we take a short break?
11:21:55 11       MR. MOBLEY: Sure.
11:21:56 12       THE VIDEOGRAPHER: Off the record. The
11:21:57 13    time is 11:22.
11:31:00 14       (Brief recess.)  ----
11:31:01 15       THE VIDEOGRAPHER: Back on the record. The
11:31:46 16    time is 11:31.
11:31:46 17    BY MS. BRILL:
11:31:52 18       Q. Mr. Kunzman, could you take a look at what
11:31:54 19    we previously marked as Exhibit 9, which is the --
11:31:57 20    your 2007 report that we were discussing earlier.
11:32:04 21       A. Okay.
11:32:06 22       Q. If you refer to the first page of your
11:32:11 23    report and you talk about the concept of
11:32:14 24    distraction, which I think you were just discussing
11:32:16 25    before we went off the break, and you say there:
                                                            58
```

```
11:32:21  1           "In driving a vehicle one can
11:32:23  2        divide all time into two
11:32:25  3        categories. The amount of time the
11:32:26  4        driver spends looking directly at
11:32:28  5        the roadway and the amount of time
11:32:30  6        spent looking elsewhere as a
11:32:32  7        distraction."
11:32:33  8        Do you see that?
11:32:33  9       A. Yes.
11:32:33 10       Q. And then it -- in the next paragraph you
11:32:40 11    say:
11:32:40 12           "If one were to study drivers
11:32:42 13        and every fraction of a second
11:32:45 14        classify whether the driver's eyes
11:32:49 15        were on the road or looking at a
11:32:51 16        distraction, it is clear that a
11:32:53 17        sizable portion of the driver's
11:32:54 18        time is spent looking at things
11:32:57 19        other than a roadway."
11:32:58 20       A. Yes, I see that.
11:32:59 21       Q. Do you see that?
11:32:59 22       And so is it fair to say that when you
11:33:02 23    refer to the concept of driving, driver distraction,
11:33:06 24    you're talking about the times when a driver is
11:33:08 25    placing his or her eyes at a location other than the
                                                            59
```

```
11:33:10  1    roadway?
11:33:11  2       A. Yeah, that's -- yes. That's the way I
11:33:14  3    defined it for the purpose of this -- this report.
11:33:20  4    Maybe the word "distraction" can be questioned, but
11:33:27  5    it -- clearly you can divide the time into two
11:33:29  6    pieces, two halves, two parts. I say one is a
11:33:31  7    distraction, one is, you know, on-task viewing of
11:33:34  8    the road. So it's an arbitrary definition, but
11:33:37  9    that's how I defined it and then just used that
11:33:39 10    definition.
11:33:41 11       Q. Okay. And then if you can look at your
11:33:45 12    report from the -- your declaration in the
11:33:50 13    preliminary injunction in the Metro Lights case,
11:33:52 14    that was Exhibit 10. And you -- you refer there
11:34:03 15    to -- well, if you look, for example, at page 3,
11:34:06 16    line 16, you use the word "potential distraction."
11:34:12 17       Do you see that?
11:34:12 18       A. Yes.
11:34:15 19       Q. Okay. And were you using the word
11:34:19 20    "distraction" there in the same way?
11:34:20 21       A. Yes, I think so.
11:34:22 22       Q. And then if you look at that same page,
11:34:45 23    page 3, line 5, you talk about -- you use the word
11:34:49 24    "logically," the phrase "logically more
11:34:52 25    distracting."
                                                            60
```

```
11:34:52  1       Did you also have the same definition of
11:34:54  2    "distracting" there?
11:34:55  3       A. Yes.
11:34:57  4       Q. Going back to your December 2007 report,
11:35:08  5    you have -- you have a "Conclusion" section toward
11:35:14  6    the end, page -- page 9 of the report.
11:35:24  7       A. Okay.
11:35:27  8       Q. And you -- your first conclusion is:
11:35:29  9           "Not all driving
11:35:30 10        distractions are significant
11:35:32 11        distractions."
11:35:33 12        Can you explain that concept to me?
11:35:34 13       A. Yes.
11:35:36 14       And I think the -- I believe I tried to
11:35:44 15    define a significant distraction versus a routine
11:35:50 16    distraction.
11:35:50 17       On page 2 of that same report it says
11:35:53 18    "concept of significant distraction." The concept
11:35:55 19    of a significant distraction needs to be used in --
11:35:58 20    in relation to classifying distraction.
11:36:01 21       So I said all distractions can be put in
11:36:05 22    two categories. One is -- as a significant
11:36:08 23    distraction, one is a -- I mean, a casual
11:36:11 24    distraction, if you want to use that.
11:36:13 25    "Insignificant" is the word I used.
                                                            61
```

Brill Declaration Ex. B

-28-

11:36:14 1    So I said a significant distraction is one
11:36:17 2  that leads to traffic accidents. And that's the --
11:36:20 3  the bloody -- the accident with whatever, somebody
11:36:24 4  lying on the ground.
11:36:25 5    And insignificant distraction is one that
11:36:27 6  cannot be shown to lead to traffic accidents. In
11:36:30 7  other words, you casually look at a sign or a tree
11:36:35 8  or a building or whatever. And those would be
11:36:38 9  insignificant distractions.
11:36:39 10    Q.  Okay.
11:36:40 11    A.  You look at them as you have time. As
11:36:42 12  you're driving, if there's nobody ahead of you for a
11:36:46 13  thousand feet and, you know, there's a beautiful
11:36:48 14  lake over on the side, you look at the lake, but you
11:36:52 15  don't have to look at the lake. You're not drawn to
11:36:55 16  it.
11:36:56 17    Where, you know, in the case of an
11:36:57 18  accident, I guess we -- we tend to look at them
11:37:01 19  whether we should or not. It's just the way some
11:37:04 20  people drive.
11:37:07 21    Q.  Then going down to conclusion 2 of your
11:37:09 22  report on page 9 you say:
11:37:10 23    "To merely label something
11:37:12 24    as a distraction is not
11:37:13 25    meaningful."

62

11:37:13 1    Do you agree with that statement?
11:37:16 2    A.  Well, yes, I do. Maybe the choice of words
11:37:21 3  is -- I think my meaning -- I'm saying a distraction
11:37:27 4  is what everything is. But I think my point is, is
11:37:29 5  just to say something is a distraction, you have to
11:37:31 6  fine-tune it. You have to slice it and dice it, so
11:37:36 7  to speak, a little finer than that, because some
11:37:40 8  distractions are insignificant; others are
11:37:42 9  significant.
11:37:42 10    Q.  And signs fall in with the insignificant
11:37:45 11  distraction?
11:37:46 12    A.  Yes, that's -- that's the way I would
11:37:49 13  classify them, yes.
11:37:57 14    Q.  And that includes bus shelter signs,
11:37:57 15  correct?
11:37:57 16    A.  Yes.
11:38:04 17    Q.  And signs on kiosks in the public
11:38:05 18  right-of-way?
11:38:06 19    A.  Yeah, the -- yes.
11:38:08 20    Q.  Okay. All right.
11:38:15 21    Now, you -- turn to pages 3 through 6 of
11:38:17 22  your 2007 report. You -- I'm sorry, before we get
11:38:21 23  there I wanted to ask one other distinction.
11:38:23 24    You refer on page 10, in conclusion 10, to
11:38:26 25  the concept of a dangerous condition.

63

11:38:26 1    Do you see that?
11:38:26 2    A.  Yes.
11:38:34 3    Q.  I'd like to understand the -- is a
11:38:38 4  dangerous condition the same thing as a significant
11:38:43 5  distraction or is there -- is there a difference
11:38:47 6  there?
11:38:47 7    A.  I probably would hesitate to -- to say
11:38:50 8  all -- all -- all significant distractions are
11:38:53 9  dangerous conditions. I suppose it depends on the
11:38:56 10  situation, you know, how many cars are in front of
11:39:00 11  you and the speed and some of those things. So I --
11:39:04 12  I wouldn't want to go quite that far.
11:39:06 13    Q.  Were you referring to "dangerous condition"
11:39:08 14  here as something more extreme than a significant
11:39:11 15  distraction?    --
11:39:11 16    A.  I -- I was -- I was trying to use the legal
11:39:14 17  term "dangerous condition," which is, you know,
11:39:17 18  pretty -- it's not -- well, as you know. But you
11:39:22 19  can't just say, well, that looks like a dangerous
11:39:24 20  condition to me. I mean, it's got to have more than
11:39:26 21  just, gee, I can imagine that might somehow,
11:39:30 22  somewhere, once cause, you know, a near miss or
11:39:35 23  whatever. It's got to be more than that.
11:39:37 24    You have to have a history. A
11:39:40 25  demonstrable -- I think there's like eight sections

64

11:39:42 1  of the definition of "dangerous condition," but one
11:39:44 2  of them just doesn't meet standards.
11:39:48 3    You know, if a design standard has been --
11:39:51 4  has not been met and it's reasonable to assume that
11:39:54 5  not meeting that design standard's going to lead to
11:39:57 6  an accident, that -- that alone is -- is a dangerous
11:39:59 7  condition.
11:40:00 8    The notice which, you know, how many
11:40:04 9  accidents have there been or how many -- how many
11:40:08 10  reports where someone calls in and says, I think the
11:40:11 11  street -- I think the street is a dangerous
11:40:17 12  condition because of the stop sign at -- you know,
11:40:17 13  at so-and-so street, you can hardly see it, those
11:40:19 14  kinds of things are all -- that's notice.
11:40:21 15    So to have a dangerous condition, you need
11:40:24 16  notice, which can be either accident or someone
11:40:26 17  calling in. And just because someone calls in
11:40:31 18  doesn't mean you have notice. But at least there's
11:40:34 19  notice that something might be wrong. It needs to
11:40:36 20  be investigated. And there's like eight different
11:40:40 21  ways you can have a dangerous condition.
11:40:40 22    So I was trying to just bring up there's
11:40:45 23  the legal definition of a dangerous condition and
11:40:47 24  that's why -- that's why I -- I used those words.
11:40:49 25    Q.  I see.

65

11:40:50 1    A. I didn't try to link it to significant
11:40:53 2  distraction.
11:40:55 3    Q. Okay. So something could be a significant
11:40:56 4  distraction, but still not rise to the level of a
11:40:59 5  dangerous condition?
11:40:59 6    A. Yeah. I think if the nearest car is a
11:41:02 7  thousand feet in front of you and it's a straight
11:41:04 8  road and it's -- you know, you're going a reasonable
11:41:07 9  speed and there's a significant distraction, you
11:41:11 10  know, and you look, I think that doesn't mean it's a
11:41:17 11  dangerous condition at that moment.
11:41:17 12    But the same situation except put a bunch
11:41:18 13  of cars, stop-and-go traffic and perhaps the driver
11:41:21 14  going a little bit too quick to begin with, well,
11:41:24 15  then you have a dangerous condition.
11:41:25 16    Q. So where you say this is a legal
11:41:29 17  definition, is that from a -- from the Code of
11:41:31 18  Public Works or where -- what -- what -- what area
11:41:35 19  of law do you find that definition?
11:41:39 20    A. Oh, I guess it's what, the Civil Code, I
11:41:42 21  believe. But I didn't necessarily pull the code out
11:41:44 22  and say, okay, here's -- here's the eight possible
11:41:47 23  ways, you know, 830-point whatever it is. I didn't
11:41:50 24  do that.
11:41:50 25    But on the other hand, I try to
66

11:41:52 1  distinguish. There is -- there is a legal concept
11:41:55 2  of what a dangerous condition is.
11:41:57 3    Q. But is it a term that applies to traffic in
11:42:00 4  particular as opposed to --
11:42:02 5    A. No, I don't -- no, it's -- as far as I
11:42:03 6  know, it applies to any -- any situation. Just not
11:42:10 7  traffic, no. It's -- it's whether it's -- it
11:42:12 8  applies across the board to a lot of conditions.
11:42:22 9    Q. Okay. So going back to the question I
11:42:25 10  began earlier, you refer in this 2007 report on
11:42:31 11  pages 3 to 6 to certain studies that showed no
11:42:37 12  statistical correlation between the presence of
11:42:42 13  certain signs and traffic accidents.
11:42:42 14    Is that correct?
11:42:45 15    A. Yes.
11:42:45 16    Q. And that was -- one of those studies was
11:42:46 17  the Anderson study?
11:43:03 18    A. Yes.
11:43:03 19    MS. BRILL: 12?
11:43:03 20    THE REPORTER: 13.
11:43:04 21    MS. BRILL: Ask the court reporter to mark
11:43:05 22  this as Exhibit 13, please.
11:43:07 23    MR. MOBLEY: Is that the Anderson study? I
11:43:08 24  think it's been marked.
11:43:09 25    MS. BRILL: No, this is the AAA study.
67

11:43:09 1    MR. MOBLEY: Okay.
11:43:11 2    MS. BRILL: This is the other study.
11:43:20 3    (The document referred to was
11:43:20 4    marked for identification by the
11:43:20 5    C.S.R. as Exhibit 13 and attached
11:43:21 6    to this deposition.)
11:43:21 7  BY MS. BRILL:
11:43:30 9    Q. Can you take a look at Exhibit 13 which is
11:43:34 10  titled "The Role of Driver Distraction in Traffic
11:43:38 11  Crashes" dated May 2001?
11:43:40 12    A. Yes. I've looked at it and that is the
11:43:43 13  study I believe I referred to.
11:43:43 14    Q. This AAA study?
11:43:45 15    A. Yes, the AAA study. Looks like it's
11:43:47 16  complete to me.
11:43:48 17    Q. Okay. Did you review the AAA study in
11:43:56 18  detail?
11:43:56 19    A. Yes.
11:43:57 20    Q. And did you review the Anderson study in
11:43:59 21  detail?
11:43:59 22    A. Yes.
11:44:00 23    Q. And did you find the methodology of those
11:44:03 24  studies to be correct with respect to determining
11:44:07 25  whether something was unsafe?
11:44:10    A. The -- I believe the methodologies were
68

11:44:17 1  valid. Yeah, if you wanted to spend a billion
11:44:20 2  dollars, you could undoubtedly improve upon either
11:44:23 3  of them, but I think they -- they presented their
11:44:25 4  case -- or they presented their evidence, their
11:44:28 5  basis of their opinions and -- and to me, quite
11:44:32 6  convincingly showed that there's really no -- no
11:44:37 7  link where you can say, well, signs are causing
11:44:42 8  accidents. I don't think either study concluded
11:44:44 9  signs -- well, they both concluded signs are
11:44:48 10  basically not a significant factor.
11:44:49 11    Q. And they reviewed actual traffic accident
11:44:53 12  data, correct?
11:44:54 13    A. Yes.
11:44:55 14    Q. And they reviewed that -- that data over
11:44:58 15  long periods of time, correct?
11:44:58 16    A. Yes.
11:45:01 17    Q. And the amount of data they reviewed was
11:45:06 18  statistically significant?
11:45:07 19    A. Oh, I believe so, yes. It was a lot of
11:45:09 20  data.
11:45:09 21    Q. That enabled them to draw conclusions that
11:45:13 22  were not speculative, correct?
11:45:15 23    A. That's my opinion.
11:45:16 24    Q. When did you first become aware of these
11:45:18 25  studies?
69

Brill Declaration Ex. B
-30-

```
11:45:19  1        A. Probably in -- the Anderson study I know is
11:45:23  2   back in 2004. At least I believe that's when I saw
11:45:26  3   it first for that 2004 report.
11:45:29  4        The AAA one, I don't think I had it in
11:45:37  5   2004. I believe it was closer to 2007. I don't
11:45:43  6   recall when exactly.
11:45:43  7        Q. Do you disagree with anything in the
11:45:45  8   methodology that they used?
11:45:46  9        MR. MOBLEY: Objection. Are you asking
11:45:47 10   every -- every statement in both of these documents?
11:45:51 11   That's pretty general.
11:45:52 12        MS. BRILL: No, I was asking the
11:45:53 13   methodology, the general approach --
11:45:53 14        MR. MOBLEY: Okay.
11:45:55 15        MS. BRILL: -- that they took to the
11:45:56 16   analysis that they were doing.
11:45:59 17        THE WITNESS: I think the -- the -- the
11:46:01 18   general methodology and the general approach they
11:46:04 19   took were valid approaches, yeah. I didn't see
11:46:08 20   anything I had problems with.
11:46:08 21   BY MS. BRILL:
11:46:09 22        Q. Okay.
11:46:10 23        A. You know, in general.
11:46:19 24        Q. And so you don't consider the large signs
11:46:20 25   that were studied in -- in these reports to be
                                                          70
```

```
11:46:24  1   traffic hazards, correct?
11:46:26  2        A. There's no evidence they are.
11:46:32  3        Q. So I'd like you to look at page 9 of your
11:46:34  4   2007 report. And conclusion 3 you say in there
11:46:42  5   that -- you refer to CBS Decaux signs and you say
11:46:42  6   that they are:
11:46:50  7        "As significant a traffic
11:46:52  8        hazard as much larger signs
11:46:54  9        maintained further from traffic
11:46:56 10        lanes."
11:46:56 11        Do you see that?
11:46:56 12        A. Yes.
11:46:57 13        Q. But that doesn't mean that you've concluded
11:46:59 14   that the CBS Decaux signs are actually traffic
11:47:06 15   hazards, correct?
11:47:07 16        A. That -- yes, that's -- that's correct. I
11:47:08 17   don't consider them hazards. But if you were to try
11:47:10 18   to somehow rank the distraction potential, whatever
11:47:16 19   you might want to call it, if you were to try to
11:47:17 20   rank it, the -- the signs very close to the street
11:47:20 21   would have a bigger distraction factor than signs
11:47:24 22   further away, based on the cone -- the cone concept,
11:47:29 23   cone of -- cone of vision concept and the -- the
11:47:37 24   apparent size in the -- in the retina, the apparent
11:47:41 25   size of an object. You know, a hand looks really
                                                          71
```

```
11:47:45  1   big if it's three inches from my eye, but, of
11:47:48  2   course, if I look at somebody's hand, you know,
11:47:49  3   across the street, it looks very small. It's the
11:47:52  4   same object.
11:47:52  5        So the same concept applies. You have a
11:47:54  6   very large sign, but far away, and that has less
11:47:57  7   target in your -- in your retina than does a -- a
11:48:01  8   smaller sign up closer. That's what I'm trying to
11:48:04  9   get at.
11:48:05 10        MS. BRILL: So I'm going to move to strike
11:48:08 11   everything after "I don't consider them hazards" as
11:48:11 12   nonresponsive.
11:48:12 13        Q. Let me get back to my question.
11:48:14 14        When -- what you testified earlier that the
11:48:18 15   large signs in -- in the AAA study, in the AAA
11:48:23 16   report and the Anderson report, you didn't regard
11:48:26 17   them as traffic hazards, correct?
11:48:28 18        A. Yes, that's correct.
11:48:29 19        Q. Okay. And then -- so when you say in your
11:48:31 20   report that the CBS Decaux signs are as significant
11:48:38 21   a traffic hazard as much larger signs, you don't
11:48:40 22   mean to say that you've concluded that the CBS
11:48:44 23   Decaux signs are traffic hazards, correct?
11:48:46 24        A. That is correct. I do not consider them
11:48:48 25   traffic hazards.
                                                          72
```

```
11:48:49  1        Q. In this paragraph 3 on page 9 you refer to
11:49:06  2   much larger signs.
11:49:07  3        Were you speaking there of specific larger
11:49:10  4   signs?
11:49:16  5        A. No, just the -- the general concept of a
11:49:18  6   much larger sign.
11:49:19  7        Q. And when you referred previously to -- so
11:49:31  8   you haven't ever compared the relative traffic
11:49:35  9   safety of any particular CBS Decaux sign to any
11:49:38 10   particular much larger sign.
11:49:40 11        Is that correct?
11:49:44 12        A. It's probably correct. I'm not sure that's
11:49:45 13   true. If -- if I did it's in the -- it's in the
11:49:47 14   2004 report and I'm not sure if I did that there or
11:49:51 15   not.
11:50:19 16        Q. And when -- when you're talking about CBS
11:50:24 17   Decaux signs in this paragraph 3, are you talking
11:50:26 18   about particular locations?
11:50:27 19        A. Yes, to the extent of the ones that -- you
11:50:33 20   know, that are -- that are on the streets in -- in
11:50:38 21   the city of Los Angeles, referring to them as a -- a
11:50:40 22   group, yes. I'm not referring to them in some other
11:50:44 23   city, no.
11:50:45 24        Q. But are you referring to a particular
11:50:46 25   location or -- or --
                                                          73
```

11:50:51 1    A. Not — I'm referring to the — the — call
11:50:56 2  it a concept of where they're placed, and — and
11:50:58 3  there's many — many examples of where they have
11:51:02 4  been replaced or — maybe not many, but several
11:51:05 5  examples.
11:51:06 6    So I'm referring to them in — in the
11:51:09 7  general — the general sign that's — that's seen
11:51:15 8  in — in those locations, the billboards — I mean,
11:51:18 9  the bus stops and the kiosks and the — I guess,
11:51:21 10  restrooms.
11:51:23 11    Q. Have you surveyed all of the CBS Decaux bus
11:51:28 12  shelter stops?
11:51:29 13    A. Probably not.
11:51:30 14    Q. Do you know approximately how many you've
11:51:32 15  looked at?
11:51:33 16    A. I've looked at a few. I — probably four
11:51:36 17  or five or that range. I don't know how many there
11:51:40 18  are. And there probably is more now than there was
11:51:44 19  then. So I didn't survey them all. Didn't attempt
11:51:48 20  to.
11:51:48 21    Q. Do you have any — do you consider
11:51:50 22  review — looking at four to five to be a
11:51:53 23  statistically significant sample?
11:51:55 24    MR. MOBLEY: Objection. Vague and
11:51:57 25  ambiguous. Incomplete hypothetical. Sample of

74

11:52:01 1  what?
11:52:01 2  BY MS. BRILL:
11:52:04 3    Q. Sample of CBS Decaux signs.
11:52:08 4    MR. MOBLEY: Again, object that it's an
11:52:10 5  incomplete hypothetical. Vague and ambiguous.
11:52:12 6    THE WITNESS: If the — if the four or five
11:52:13 7  were representative of typical CBS signs, then —
11:52:19 8  then, you know, then I suppose a sample is — is —
11:52:23 9  is representative.
11:52:23 10    If I happen to have seen only a few signs
11:52:26 11  that were non-representative, then that's fine. But
11:52:29 12  as far as the ones I saw, there — you know, I
11:52:35 13  just — as far as the ones I saw, that's what I saw.
11:52:37 14  They're close to the curb face. And when you
11:52:41 15  compare those signs to a sign further away from the
11:52:44 16  curb face, you know, hundreds of feet away, there's
11:52:47 17  a difference. There's a difference in the — the
11:52:51 18  target valve in the eye.
11:52:53 19    Again, your hand held this far from your
11:52:54 20  face versus a bigger object held much further away
11:52:58 21  is still impacting the — your retina, the size of
11:53:01 22  the image on your retina. The target on your retina
11:53:06 23  is the same. It could be the same, or in the case
11:53:08 24  of the — the bus shelter signs that I looked at,
11:53:11 25  they were actually larger. Larger image than —

75

11:53:13 1  than the signs further away. That was my
11:53:16 2  conclusion.
11:53:19 3    Q. Did you do anything to determine whether
11:53:21 4  the four or five bus shelter signs that you looked
11:53:24 5  at were representative of CBS Decaux signs
11:53:29 6  throughout the city?
11:53:33 7    MR. MOBLEY: Objection. Vague and
11:53:33 8  ambiguous as to the term "representative."
11:53:33 9    THE WITNESS: I — I sampled — no, I won't
11:53:38 10  say I — I attempted to determine if this is the —
11:53:41 11  no, I did not attempt to establish that these were
11:53:46 12  exactly representative of all signs, CBS signs in
11:53:50 13  the city. I did not do that.
11:53:50 14  BY MS. BRILL: —
11:53:52 15    Q. Now, you were speaking just now of the
11:53:54 16  impact on the retina of a bus shelter sign when the
11:53:59 17  driver's fairly close to it compared to a much
11:54:03 18  larger sign farther away.
11:54:05 19    Do you recall that?
11:54:05 20    A. Yes.
11:54:05 21    Q. And as you approach the much larger sign
11:54:07 22  and get within the same distance of it as you were
11:54:10 23  to a bus shelter, that larger sign would have a
11:54:13 24  larger impact on the retina, correct?
11:54:15 25    A. Well —

76

11:54:15 1    MR. MOBLEY: Objection. Calls for
11:54:18 2  speculation.
11:54:18 3    THE WITNESS: Yeah, and at some point
11:54:21 4  you've got to — you've got to define how you're
11:54:24 5  going to measure them. And — and I said, okay,
11:54:27 6  what's the 15-degree — when you're within the
11:54:30 7  15-degree cone, how — how big does the sign look to
11:54:34 8  your — your eye at that point. That's how I did
11:54:37 9  it.
11:54:37 10    So I used the 15 degrees, and then said how
11:54:40 11  big at 15 degrees. When it's right on that
11:54:45 12  15-degree boundary, how big does that sign look then
11:54:48 13  compared to another sign at 15 degrees but that's —
11:54:50 14  you know, further away, substantially further away
11:54:54 15  from the curb. That's how I did it.
11:55:00 16  BY MS. BRILL:
11:55:00 17    Q. That was — and was that a — this is —
11:55:02 18  you're talking now about 2004?
11:55:03 19    A. Yes.
11:55:04 20    Q. And did you update that survey, that survey
11:55:07 21  that you did in 2007?
11:55:09 22    A. No.
11:55:10 23    Q. Have you updated it any time after 2004?
11:55:14 24    A. No.
11:55:15 25    Q. And that — did that survey include large

77

20

11:55:18 1   signs or just size -- signs that were the same size
11:55:25 2   as the bus shelter signs?
11:55:27 3       A. They --
11:55:27 4       Q. I think it's attached as an attachment to
11:55:30 5   Exhibit 10.
11:55:46 6       A. Yes. So on -- on table 1, basically I
11:55:48 7   found seven outdoor media signs and nearby bus
11:55:54 8   shelters roughly at the same place and just -- just
11:55:57 9   paired them that way is how I did it.
11:56:00 10      Q. What did you -- what did you mean here by
11:56:02 11  the term "outdoor media sign"?
11:56:04 12      A. I guess, the -- well, these would be --
11:56:11 13  these would be, call it private signs versus street
11:56:15 14  furniture signs or versus the bus stop signs. Signs
11:56:18 15  that were on, say, adjacent buildings or on posts
11:56:21 16  near a building. That type of thing is what I used.
11:56:24 17      Q. And -- and were they the signs that Metro
11:56:27 18  Lights owned?
11:56:28 19      A. I -- I'm not sure. I don't recall that.
11:56:31 20  It may have been. I don't recall.
11:56:34 21      Q. But the -- they were approximately 67
11:56:38 22  inches by 45 inches as reflected here?
11:56:42 23      A. Yes.
11:56:44 24      Q. Okay. So these were not large-scale
11:56:47 25  billboards?

78

11:56:48 1       A. That's correct.
11:56:50 2       Q. And those are the same signs that you
11:56:52 3   looked at when you -- if you get to table 2 of that
11:56:55 4   exhibit? Those are the same signs?
11:56:57 5       A. Yes. Same -- well, the same -- yes.
11:57:00 6       Q. So in 2004, you didn't compare bus shelter
11:57:03 7   signs to large billboards, correct?
11:57:03 8       A. No.
11:57:06 9       Q. And you didn't do that in 2007?
11:57:09 10      A. That's correct.
11:57:09 11      Q. Okay. And you haven't done that since?
11:57:12 12      A. I haven't done it since. That's correct.
11:57:13 13      Q. Okay. Have you ever collected any data to
11:57:43 14  determine whether bus shelters in L.A. are more or
11:57:46 15  less distracting than the large billboards in the
11:57:50 16  Anderson or AAA study?
11:57:52 17      A. I have not personally collected data, no.
11:57:57 18      Q. Okay. And do you know of any data on that
11:58:01 19  topic?
11:58:01 20      A. I -- I don't.
11:58:03 21      Q. Do you have any opinion on that topic?
11:58:04 22      A. Well, it comes -- sort of my -- my theme
11:58:09 23  here today is -- is a sign that's -- a smaller sign
11:58:14 24  up close to a street is -- is -- has more target
11:58:17 25  value on the eye than a large sign further away can

79

11:58:21 1   have.
11:58:21 2       If you use the 15 degree criteria, as to
11:58:25 3   when you look at something or when your eye sees it,
11:58:32 4   you know, the conclusion is -- is just because a
11:58:34 5   sign is large and far away doesn't mean it's --
11:58:37 6   it's -- it's more distracting than a sign up closer.
11:58:40 7       Q. But you've never made any studies to
11:58:42 8   determine how large a billboard is when it's within
11:58:47 9   the 15-degree cone of vision, correct?
11:58:50 10      A. That's correct.
11:59:06 11      Q. Is -- is the data that you collected on
11:59:09 12  signs in 2004, did you attach all of that material
11:59:14 13  to your 2004 report?
11:59:17 14      A. The -- yes. The -- I believe, yes.
11:59:23 15      Q. That's -- the 2004 report is Exhibit 10.
11:59:28 16      A. What -- what's missing at this point --
11:59:30 17  missing as far as in my files is the photographs.
11:59:35 18  And so I'm not quite sure what you asked, your
11:59:40 19  question, but the photographs is missing, but the
11:59:42 20  rest of it is here, the tables, which really show --
11:59:48 21  you know, the tables pretty well speak for
11:59:49 22  themselves. The summarize. The photographs is --
11:59:52 23  is just another -- background information, but the
11:59:54 24  tables is really what I --
11:59:58 25      Q. Who took the photographs?

80

12:00:00 1       A. I did. I took the photographs and prepared
12:00:00 2   the tables.
12:00:00 3       Q. And how did you decide what to photograph?
12:00:04 4       A. That -- the list of signs or the locations
12:00:06 5   was suggested to me by -- by Paul Fisher. And I
12:00:11 6   believe it was a relatively -- well, let's just say
12:00:16 7   he suggested them.
12:00:19 8       Q. And you went with his suggestions?
12:00:21 9       A. Yes.
12:00:25 10      Q. And he was counsel for Metro Lights?
12:00:26 11      A. I believe so.
12:00:35 12      Q. And you didn't collect any additional data
12:00:36 13  in preparing your 2007 report?
12:00:41 14      A. As far as measurements, no. No.
12:00:48 15      Q. Did you collect any other data other than
12:00:52 16  measurements?
12:00:53 17      A. No, just -- I saw the signs, but I didn't
12:00:56 18  try to measure them. Pretty hard to measure those
12:00:58 19  signs. It's not an easy task and how far they
12:01:01 20  are -- they are away from where you are.
12:01:54 21      Q. Okay. Let's go to your Metro Lights
12:01:59 22  report, Exhibit 10, I believe.
12:02:03 23      A. Yes, Exhibit 10.
12:02:06 24      Q. Your declaration there.
12:02:09 25      MR. MOBLEY: Counsel, excuse me, do you

81

Brill Declaration Ex. B
-33-

12:02:09  1    have copies of that exhibit?
12:02:11  2        MS. BRILL: Yes, yeah.
12:02:13  3        MR. MOBLEY: If I could get that, as well
12:02:17  4    as the Pamela Anderson report, number 12.
12:02:23  5        MS. BRILL: Sure.
12:02:23  6        MR. MOBLEY: Thanks.
12:02:25  7        MS. BRILL: Actually, let's — why don't we
12:02:26  8    remark it as a new exhibit because I think we may
12:02:28  9    have the --
12:02:47  10       (Pause in proceedings.)
12:03:07  11       MS. BRILL: Let's — let's mark this as
12:03:12  12   Exhibit 14, please.
12:03:13  13       (The document referred to was
12:03:13  14       marked for identification by the
12:03:13  15       C.S.R. as Exhibit 14 and attached
12:03:28  16       to this deposition.)
12:03:28  17   BY MS. BRILL --
12:03:28  18       Q. So Exhibit -- Exhibit 14 -- yeah,
12:03:31  19   Exhibit 14 is -- has two caption pages. First it
12:03:35  20   says "Declaration of William Kunzman, Submitted in
12:03:38  21   Support of Motion for Partial Summary Judgment."
12:03:40  22   And then behind that it says "Declaration of William
12:03:43  23   Kunzman in Support of Motion for Preliminary
12:03:53  24   Injunction."
12:03:53  25       Do you see that?

                                                              82

12:03:53  1        A. Yes.
12:03:53  2        Q. Were you aware that your original
12:03:53  3    declaration on the preliminary injunction motion was
12:03:53  4    being submitted again to the Court in support of a
12:03:54  5    motion for partial summary judgment?
12:03:56  6        A. Yes, I -- I believe I was aware of that.
12:04:00  7        Q. And this -- are these the photographs that
12:04:02  8    start at Exhibit D?
12:04:05  9        A. Yes.
12:04:05  10       Q. D and E that you took?
12:04:07  11       A. Yes.
12:04:08  12       Q. Okay. And those are the ones suggested by
12:04:18  13   Mr. Fisher?
12:04:18  14       A. The locations were, yes.
12:04:33  15       Q. Now looking at paragraph 5 of your -- of
12:04:38  16   this declaration, page 2?
12:04:39  17       A. Okay.
12:04:43  18       Q. It says:
12:04:44  19          "In order to determine the
12:04:45  20       relative effect on traffic safety
12:04:48  21       of the Metro Lights sign and the
12:04:49  22       adjacent bus shelter, I measured
12:04:51  23       the distance of each sign from the
12:04:54  24       curb side to the adjacent lines of
12:04:56  25       traffic."

                                                              83

12:04:58  1        Do you see that?
12:04:58  2        A. Yes. "Lanes of traffic."
12:05:00  3        Q. So does this refresh your recollection that
12:05:02  4    the -- the -- what you referred to as outdoor media
12:05:08  5    signs were all Metro Lights signs?
12:05:10  6        A. Yes, it does.
12:05:18  7        Q. In preparing this 2004 report, did you do
12:05:20  8    anything else to determine the relative effect on
12:05:22  9    traffic safety of the Metro-Lights signs and the
12:05:24  10   adjacent bus shelters?
12:05:26  11       MR. MOBLEY: I'm sorry, anything other
12:05:27  12   than?
12:05:27  13       MS. BRILL: Other than measuring the
12:05:29  14   distance of each sign from the curb side and
12:05:34  15   adjacent lanes of traffic.
12:05:35  16       THE WITNESS: And photographing the signs
12:05:38  17   and preparing tables 1 and 2. Those -- that's --
12:05:39  18   those -- that's all I did, yes.
12:05:39  19   BY MS. BRILL:
12:05:41  20       Q. You didn't collect any other data?
12:05:42  21       A. No.
12:05:46  22       Q. Have you done so since that time?
12:05:48  23       A. No.
12:05:51  24       Q. Did you collect -- so you didn't collect
12:05:53  25   data on whether drivers tend to look at bus shelter

                                                              84

12:05:55  1    signs while they're moving versus while they're
12:05:58  2    stopped at a stoplight, correct?
12:05:58  3        A. No.
12:06:00  4        Q. Have you done so since that time?
12:06:01  5        A. No.
12:06:06  6        Q. Other than your own data, did you look at
12:06:08  7    anyone else's data on that topic?
12:06:10  8        A. No.
12:06:12  9        Q. And have you ever done so?
12:06:13  10       A. No. Not -- not with this purpose in mind.
12:06:19  11   I -- I don't recall ever seeing any data on that. I
12:06:22  12   don't think I've seen data on that.
12:06:24  13       Q. And did you collect -- back in 2004, did
12:06:27  14   you collect any data on whether drivers tend to look
12:06:31  15   at the Metro Lights signs while they're moving
12:06:37  16   versus while they're stopped at a stoplight?
12:06:39  17       A. No.
12:06:39  18       Q. And have you done that since that time?
12:06:41  19       A. No.
12:06:47  20       Q. Back in 2004, did you collect any data on
12:06:49  21   how much time the driver spent looking at each bus
12:06:52  22   shelter sign?
12:06:52  23       A. No.
12:06:53  24       Q. Have you done that since that time?
12:06:55  25       A. No.

                                                              85

22

12:06:56  1    Q. Are you aware of any data on that topic?
12:06:58  2    A. No.
12:07:04  3    Q. Did you collect any data on how much time
12:07:07  4  drivers spent looking at any non-bus shelter signs?
12:07:10  5    A. No.
12:07:11  6    Q. And are you aware of any data on that
12:07:13  7  topic?
12:07:13  8    A. No, I'm not.
12:07:17  9    Q. Did you collect any data on whether drivers
12:07:19 10  were able to see the bus shelter signs while looking
12:07:23 11  straight ahead and attending to traffic?
12:07:26 12    A. No.
12:07:30 13    Q. And have you done so since that time?
12:07:31 14    A. No, I have not.
12:07:32 15    Q. Did you collect any data on whether drivers
12:07:35 16  were able to see the outdoor media signs, the
12:07:39 17  non-bus shelter signs, without moving their heads to
12:07:42 18  the side?
12:07:42 19    A. No.
12:07:43 20    Q. Have you done so since that time?
12:07:48 21    A. Basically moving their heads, I'm using the
12:07:48 22  15-degree cone as my basis, but no, I have not
12:07:51 23  collected that data beyond what I just said.
12:07:52 24    Q. Did you collect any data on traffic
12:07:54 25  accidents at these locations?

                                                    86

12:07:55  1    A. No, I did not.
12:07:58  2    Q. Have you made any study of -- of traffic
12:08:02  3  flow at bus stops with bus shelters versus bus stops
12:08:07  4  without bus shelters?
12:08:08  5    A. No.
12:08:13  6    Q. Have you ever done so?
12:08:14  7    A. No.
12:08:14  8    Q. Have you ever made a study of traffic
12:08:15  9  safety at bus stops with bus shelters versus bus
12:08:19 10  stops without bus shelters?
12:08:20 11    A. No.
12:08:23 12    Q. And have you ever made a study of traffic
12:08:27 13  safety or traffic flow at bus stops with advertising
12:08:30 14  versus bus stops without advertising?
12:08:32 15    A. No.
12:08:38 16    Q. Have you ever made any study of whether
12:08:39 17  drivers look at bus shelters more if they have
12:08:42 18  advertising on them than when they do not?
12:08:44 19    A. No, I've not studied that.
12:08:48 20    Q. How did you come up with the methodology of
12:08:50 21  measuring distance from traffic lanes that you used
12:08:56 22  in the -- in preparing your Metro Lights report?
12:08:58 23    A. Well, as I've said before, I -- I used the
12:09:03 24  15-degree cone. It turns out if you don't have --
12:09:06 25  if you don't make a definition of when you see a

                                                    87

12:09:09  1  sign and when you don't, you know, you've got -- If
12:09:13  2  you don't come up with a definition of when you see
12:09:15  3  a sign or when you don't, you don't have a
12:09:18  4  meaningful study.
12:09:19  5      You've got to somehow define, okay, this is
12:09:22  6  when you -- this is the point at which you see a
12:09:24  7  sign and -- and, of course, the sign grows in your
12:09:27  8  eye as you get closer to it.
12:09:29  9      So you have to come up with some common
12:09:32 10  definition kind of a yardstick. If you don't have a
12:09:34 11  yardstick, it's pretty hard to measure things.
12:09:36 12      So that was my yardstick, the 15-degree
12:09:39 13  cone. And then I -- pardon me -- I backed in --
12:09:43 14  backed in from that concept of where -- you know,
12:09:47 15  how -- well, I backed into the fact that that's when
12:09:52 16  you saw the sign.
12:09:53 17      And as I said, you saw it when it was at
12:09:57 18  the 15-degree cone boundary.
12:09:58 19    Q. So you measured when you see the sign?
12:10:01 20    A. Well, mathematically. If one sign is -- is
12:10:06 21  30 feet from the road and another sign is two feet
12:10:08 22  from the road, the -- the cone of when you see the
12:10:12 23  sign, when it hits the 15-degree point, is going to
12:10:16 24  be larger on, say, the sign two feet from the
12:10:18 25  roadway than the one 30 feet from the roadway.

                                                    88

12:10:21  1      So I didn't measure when you saw it. I
12:10:23  2  measured the distance and then said, okay, if you
12:10:25  3  use the 15-degree cone, this is how
12:10:29  4  big the sign looks and also when presumably you
12:10:31  5  would be seeing it.
12:10:32  6    Q. On page 2 of your 2004 report you say you
12:10:36  7  were retained to conduct an inspection of signs to
12:10:41  8  determine whether they may constitute a traffic
12:10:43  9  hazard.
12:10:44 10      Do you see that?
12:10:44 11    A. Yes. Which -- which line are you on?
12:10:46 12    Q. Lines 2 to 3.
12:10:46 13    A. Yes.
12:10:49 14    Q. Okay. Are you aware of any studies that --
12:10:55 15  how -- so how -- are you aware of any studies that
12:10:57 16  indicate that measuring the distance between the
12:11:02 17  sign and the lanes of traffic is -- correlates with
12:11:09 18  a sign being a traffic hazard?
12:11:10 19    A. No. This -- this -- this is kind of
12:11:14 20  ground-breaking stuff here in the sense that I'm not
12:11:17 21  sure if anybody had ever done this type of -- of
12:11:20 22  analysis before.
12:11:22 23      So when I determined a methodology, I --
12:11:26 24  you know, I determined pretty quickly you'd have to
12:11:29 25  make some definition of when you see a sign. I

                                                    89

MERRILL  LEGAL  SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

Brill Declaration Ex. B
-35-

12:11:31 1  chose the 15-degree cone. You could have used 20
12:11:35 2  degrees or some other degree, but 15 is -- happens
12:11:37 3  to be one traffic people use for signs, you know,
12:11:43 4  directional signs.
12:11:43 5      And once you pick your measurement, once
12:11:46 6  you define your yardstick, then everything else
12:11:49 7  mathematically basically falls into place.
12:11:51 8      Q. And are you aware of any studies that
12:11:54 9  support the notion that -- that that yardstick that
12:11:57 10 you chose correlates with traffic accidents?
12:12:00 11     A. The -- no. Not -- not with traffic
12:12:05 12 accidents.
12:12:06 13     Q. With traffic -- okay. Thank you.
12:12:08 14     A. About to answer the wrong question.
12:12:09 15     Q. Thank you.
12:12:10 16     Okay. And so what -- what led you to
12:12:24 17 believe that it correlates with traffic accidents or
12:12:26 18 traffic safety?
12:12:28 19     MR. MOBLEY: Which -- which -- objection.
12:12:30 20 Compound. Which term do you want to use?
12:12:36 21     MS. BRILL: Yeah. Let -- let me go back.
12:12:38 22 Thank you for the clarification.
12:12:39 23     Q. Are you aware of any studies that support
12:12:41 24 the notion that the yardstick that you chose
12:12:43 25 correlates with traffic safety?

90

12:12:48 1      A. No. And I -- and I didn't choose that
12:12:50 2  yardstick for that reason. It was just defining
12:12:53 3  when -- when something is seen by the eye is how
12:12:56 4  I -- that's why I used the 15 degrees.
12:12:58 5      Q. Okay. And something can be -- something
12:13:01 6  outside of the 15 degrees can be seen by the eye if
12:13:04 7  the driver turns his or her head, correct?
12:13:04 8      A. Yes.
12:13:07 9      Q. Okay. And that's more distracting than if
12:13:10 10 the same object is seen within the 15-degree cone,
12:13:10 11 correct?
12:13:14 12     MR. MOBLEY: Objection. Incomplete
12:13:17 13 hypothetical.
12:13:17 14     THE WITNESS: I would say no. That -- that
12:13:21 15 is not necessarily true. I don't think it's true.
12:13:24 16 I think it's just less likely to be seen for a
12:13:27 17 driver, any given particular driver or any
12:13:29 18 particular driver to -- to look and see it.
12:13:29 19 BY MS. BRILL:
12:13:32 20     Q. Is there -- I'm sorry. Did you --
12:13:34 21     A. If -- if -- if the sign is way off to the
12:13:36 22 side and can hardly be seen without turning your
12:13:39 23 head to -- to see it, probably isn't noticed by most
12:13:43 24 drivers.
12:13:43 25     Q. Is there any data on that?

91

12:13:46 1      A. I would -- I would say yes to the extent
12:13:51 2  that, as I said, the custom and practice in traffic
12:13:55 3  engineering is keep your signs within 15 degrees,
12:13:58 4  your road signs, so they'll be seen. And if you --
12:14:02 5  the -- another half of that same thought process is
12:14:05 6  if -- if the signs are too small to read within 15
12:14:09 7  degrees or hard to -- they're not going to be
12:14:11 8  noticed. And so sort of one goes with the other.
12:14:16 9      If you see it, you see it. If -- If you
12:14:20 10 don't, if you violate the 15-degree cone principle,
12:14:23 11 it's less likely to be seen or less likely to be
12:14:27 12 read in the case of a road sign.
12:14:28 13     Q. Sorry to interrupt. I didn't mean to. Did
12:14:31 14 you finish your answer?
12:14:32 15     A. Yes.
12:14:33 16     Q. In order to see a sign that's outside the
12:14:35 17 15-degree cone, you'll have to turn
12:14:37 18 your head away from traffic, correct?
12:14:37 19     A. Yes.
12:14:54 20     Q. So you said most drivers won't see a sign
12:14:56 21 if it's outside of the 15-degree cone, correct?
12:15:03 22     A. Yeah, I think, you know, the word "most"
12:15:04 23 probably has to be -- have a few asterisks after it.
12:15:08 24 More drivers -- more drivers will see a sign if it's
12:15:10 25 within the 15-degree cone. And where the 50th

92

12:15:13 1  percentile line is, half the drivers will see it and
12:15:17 2  half the -- half the drivers will not see a sign,
12:15:21 3  you know, depending on the cone angle, I don't know
12:15:23 4  where that angle is. Maybe 20 degrees, maybe 12
12:15:26 5  degrees. I don't know. But clearly more drivers
12:15:30 6  look at a sign if it's -- if it's closer to the
12:15:32 7  center of their vision than if it's off to the side.
12:15:36 8      Q. But -- but that -- that -- looking, seeing
12:15:37 9  the sign within the 15-foot {sic} cone within
12:15:40 10 traffic engineering is not unsafe, correct?
12:15:44 11     A. Yes, I would say that's correct.
12:15:46 12     15 degrees, not 15 feet.
12:15:48 13     Q. Oh, I'm sorry, 15 degrees. Thank you.
12:15:50 14     A. Yes.
12:15:50 15     Q. And seeing it outside the 15 degrees can be
12:15:52 16 unsafe, correct?
12:15:53 17     A. I would say in the case with a sign, no.
12:15:58 18 People just -- they're not going to see the sign.
12:15:59 19 They just would miss the sign. They wouldn't enjoy
12:16:02 20 the benefits of seeing the sign. It would be more
12:16:05 21 of it than -- than everybody is going to read every
12:16:08 22 sign, and even if they've got to squint and it's --
12:16:10 23 they look at 45 degrees, I don't think that's the
12:16:12 24 way we operate. We just -- that -- I don't think
12:16:15 25 it's more unsafe if it's out. They just don't see

93