# EXHIBIT D-3

12:16:20 1   It.
12:16:21 2   Q. And -- but you don't have any data on that
12:16:23 3   point?
12:16:23 4   A. No.
12:16:25 5   Q. Correct? No, you don't?
12:16:26 6   A. No, I do not have data on that point.
12:16:30 7   Q. And you're not aware of any?
12:16:33 8   A. No.
12:16:41 9   Q. Do bus shelters help drivers know when a
12:16:44 10  bus is going to stop?
12:16:48 11      MR. MOBLEY: Objection. Calls for
12:16:50 12  speculation.
12:16:50 13      THE WITNESS: I would -- I would say no.
12:16:55 14  If you're right behind a bus, you probably don't see
12:16:58 15  the bus shelter until the bus stops. If you're ten
12:17:01 16  cars back, I don't think it makes any difference.
12:17:04 17      So I'm not sure is it a benefit or -- of a
12:17:07 18  bus shelter warning a driver, look, a bus is going
12:17:10 19  to stop here? I'm not sure there's -- makes much
12:17:12 20  difference.
12:17:12 21  BY MS. BRILL:
12:17:13 22  Q. Are you not sure one way or another?
12:17:15 23  A. No, I'm not sure. Some cases it's
12:17:17 24  obviously going to help some, but I would think most
12:17:20 25  of the time it's -- you know, probably the blinker

                                                              94

12:17:23 1   on the bus or something like that or the brake light
12:17:25 2   and he's slowing down when traffic is moving is
12:17:27 3   probably a whole lot more of an indicator to a
12:17:32 4   driver that the bus is going to stop than if there's
12:17:34 5   a bus shelter sitting there.
12:17:36 6   Q. But it could help some drivers in some
12:17:38 7   situation?
12:17:38 8       MR. MOBLEY: Objection. Calls for
12:17:42 9   speculation.
12:17:42 10      THE WITNESS: I believe it would help
12:17:44 11  sometimes.
12:17:58 12  BY MS. BRILL:
12:17:58 13  Q. Can you turn back to your Worldwide Rush
12:18:01 14  report that we were looking at, Exhibit 9, to this
12:18:11 15  one.
12:18:11 16  A. Sorry.
12:18:22 17  Q. You refer at page 2 of that report, at this
12:18:32 18  point you've mentioned several times about the
12:18:34 19  rubbernecking driver who looks off to the side of
12:18:37 20  the road as a factor causing accidents.
12:18:37 21  A. Yes.
12:18:48 22  Q. And do you agree that turning your head to
12:18:51 23  the side of the road for extended periods correlates
12:18:53 24  with traffic accidents?
12:18:54 25  A. Well, it -- it's logical that it -- there's

                                                              95

12:19:00 1   some correlation, yes. But I think what you're
12:19:05 2   looking at is probably the bigger factor. If
12:19:08 3   it's -- I'll call it a mundane sign that's really of
12:19:12 4   not much interest to most people, they're not going
12:19:14 5   to be studying that sign very much.
12:19:16 6       But on the other hand, if it's something of
12:19:20 7   high interest, you know, visually somehow, then
12:19:24 8   you're going to spend more time and probably
12:19:24 9   increase the chances of an accident.
12:19:25 10  Q. But -- and you don't know how long people
12:19:26 11  tend to spend looking at signs?
12:19:28 12  A. No.
12:19:33 13  Q. But it's generally considered more unsafe
12:19:35 14  to drive while you're looking to the side of the
12:19:37 15  road than looking straight ahead, correct?
12:19:40 16      MR. MOBLEY: Objection. Incomplete
12:19:42 17  hypothetical.
12:19:42 18      THE WITNESS: I think -- on a general --
12:19:44 19  everything else being equal, sure.
12:19:44 20  BY MS. BRILL:
12:20:06 21  Q. And you didn't analyze as to any Metro
12:20:08 22  Lights sign whether it's necessary to turn your head
12:20:10 23  to see the sign at a point where it would be
12:20:16 24  legible, correct?
12:20:16 25  A. The ones I saw in general could be -- I

                                                              96

12:20:20 1   believe could be viewed or could be read in a -- in
12:20:24 2   a 15-degree cone. So from that point of view, they
12:20:28 3   could be viewed.
12:20:29 4       Now, you could also read them if you turned
12:20:31 5   your head, you know. The letters would be bigger.
12:20:34 6   The message would be bigger if you turned your head
12:20:38 7   Q. So did you -- turning back -- let's turn
12:20:41 8   back to the Exhibit 14, your Metro Lights report.
12:20:47 9   A. Okay.
12:20:51 10  Q. And if you could turn to table 2.
12:20:54 11  A. Okay.
12:20:58 12  Q. You say -- you have a conclusion section at
12:20:59 13  the bottom where you say:
12:21:03 14      "For the average outdoor
12:21:04 15      media sign it is within the
12:21:06 16      15-degrees of drivers'
12:21:09 17      straight-ahead line of sight at 140
12:21:11 18      or more feet back from the sign."
12:21:17 19      Do you see that? Toward the middle.
12:21:18 20  A. Okay.
12:21:18 21      "The average outdoor media
12:21:19 22      sign it is within 15 degrees of
12:21:21 23      drivers' straight-ahead line of
12:21:22 24      sight at 140 or more feet back from
12:21:25 25      the sign."

                                                              97

Brill Declaration Ex. B
-37-

**Page 98**

```
12:21:25  1    Yes, I do see that.
12:21:27  2    Q. Did you deter-- did you determine whether
12:21:30  3  the outdoor media signs that you were looking at
12:21:32  4  were legible at 140 feet or more back from the sign?
12:21:37  5    A. As I recall, they were. I -- I you
12:21:41  6  know, what I can read, of course, may be different
12:21:43  7  from someone else, but it appeared that way. I
12:21:46  8  didn't do a scientific evaluation of how large the
12:21:50  9  smallest letter was, and some of this stuff, because
12:21:54 10  sometimes there's words or something that may not be
12:21:56 11  really part of the message.
12:21:57 12    So I did not attempt to determine if it was
12:22:02 13  legible, you know, by all people at a certain point
12:22:07 14  in time. I didn't do that, no.
12:22:09 15    Q. What do you mean by "a scientific
12:22:11 16  evaluation of how large the smallest letter was"?
12:22:14 17  Is there -- is there some methodology that's
12:22:16 18  standard practice in determining legibility of
12:22:19 19  signs?
12:22:20 20    A. There -- well, I'm not sure about the
12:22:22 21  outdoor media industry, but as far as traffic signs,
12:22:25 22  directional signs, yes. There's a -- the height of
12:22:29 23  the letter is a function of how far back you want
12:22:32 24  to -- to have the sign seen. So larger letters, of
12:22:37 25  course, can be seen further back.
```

**Page 99**

```
12:22:38  1    So a freeway sign, for instance, you know,
12:22:41  2  a big sign that tells you where the next off-ramp
12:22:44  3  is, those letters are pretty big compared to say a
12:22:46  4  sign on -- just saying -- a rural road saying just
12:22:50  5  turn this way to go -- turn to the right to go to,
12:22:53  6  you know, city A, B, C. There's a difference in
12:22:57  7  size, and clearly that's why there's a difference in
12:22:59  8  size.
12:22:59  9    So there is a standard.
12:23:01 10    Q. And what -- what is that standard?
12:23:03 11    A. You know, I don't recall exactly how it
12:23:05 12  works. But it's -- it's -- inches is a -- feet --
12:23:09 13  there -- there's a table or a concept where you look
12:23:11 14  at how many feet back do you want the sign to be
12:23:14 15  seen, which is a function of your 15-degree cone,
12:23:17 16  and then how large the letters have to be.
12:23:19 17    And there's a concept of speed. So you --
12:23:23 18  you want to be able to have the driver see the sign
12:23:28 19  early enough to -- to -- to recognize, oh,
12:23:32 20  that's where I want to turn or -- you know, so
12:23:35 21  there's -- it's a function of speed and -- speed and
12:23:40 22  distance from the road.
12:23:41 23    And -- but it's -- it's a simple table. It
12:23:45 24  just says 60 miles per hour, X inches is how big the
12:23:49 25  letters need to be, basically.
```

**Page 100**

```
12:23:50  1    Q. And you didn't perform -- you didn't refer
12:23:52  2  to that table or perform that analysis in preparing
12:23:54  3  your 2004 report?
12:23:57  4    A. No. And -- and you got to realize that the
12:24:01  5  signs -- I mean, there's different styles of letters
12:24:04  6  and there's different stroke weights, stroke widths,
12:24:11  7  capitals versus smalls. All those things get into
12:24:14  8  the equation.
12:24:15  9    The -- the bigbway signs are for the
12:24:16 10  typical highway lettering, you know, style, and it
12:24:21 11  would change if you -- if you had a -- oh, a script
12:24:24 12  letter or something like that, you know, something
12:24:26 13  little harder to read. So it would change. And I
12:24:29 14  don't think you can -- well, I didn't do it.
12:24:32 15    Q. Did you make any records to show that
12:24:35 16  you -- that each of the signs was -- was or was not
12:24:40 17  legible at 140 feet?
12:24:42 18    A. I -- I did not for -- I took the
12:24:45 19  photographs with the idea that, you know, there it
12:24:48 20  is documented, what I looked at. And in my view
12:24:52 21  they could be seen pretty well at 140 feet.
12:24:58 22    Q. Were the -- were the photographs taken at
12:24:58 23  140 feet?
12:25:00 24    A. No. Not exactly.
12:25:00 25    Q. Closer?
```

**Page 101**

```
12:25:01  1    A. They were just taken. No. They were --
12:25:03  2  basically tried to get -- line them up and take
12:25:06  3  them. I didn't pace off 140 feet and say, okay,
12:25:09  4  here I am. I did not do that.
12:25:11  5    Q. Do you recall approximately where you were
12:25:12  6  in relation to when you took the pictures?
12:25:14  7    A. No, I -- I -- no. I mean, I -- I could
12:25:17  8  recreate the photos. It's pretty easy to walk out
12:25:20  9  there and using parallel -- parallax, I guess they
12:25:24 10  call it, which is where one -- one object is in
12:25:27 11  relation to another, you can -- I can usually get
12:25:29 12  within a five-foot circle where I took a photograph
12:25:32 13  just by using parallax within the photo that you're
12:25:37 14  looking at. So I could recreate them, but I haven't
12:25:39 15  done it.
12:25:40 16    MS. BRILL: We're about to run out of
12:25:42 17  videotape. Let's go off the record.
12:25:43 18    THE VIDEOGRAPHER: This marks the end of
12:25:46 19  Videotape Number 1 in the deposition of William
12:25:47 20  Kunzman. The time on the video monitor is 12:26.
12:39:07 21    (At 12:26 p.m., the deposition
         22    of WILLIAM KUNZMAN was adjourned
         23    for noon recess.)
         24  ///
         25  ///
```

MERRILL LEGAL SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
Brill Declaration Ex. B
-38-

**Page 102**

13:28:57 1  (At 1:29 p.m. the deposition
2  of WILLIAM KUNZMAN was reconvened.)
13:28:57 3
13:28:57 4  THE VIDEOGRAPHER: We're back for the
13:29:04 5  afternoon. This marks the beginning of videotape
13:29:07 6  number 2 in the deposition of William Kunzman. Time
13:29:11 7  on the video monitor is 1:29.
13:29:11 8
13:29:11 9  EXAMINATION (CONTINUED)
13:29:11 10  BY MS. BRILL:
13:29:16 11  Q. Hi, sir.
13:29:17 12  Could you turn, please, to your 2007 report
13:29:22 13  that we were discussing, and turn to page 6:
13:29:28 14  You -- you refer there to -- you say:
13:29:32 15  "From a traffic engineering
13:29:33 16  and highway safety point of view,
13:29:36 17  signs can be classified by the
13:29:39 18  following characteristics."
13:29:40 19  And then you list, among others, relative
13:29:44 20  size in the driver's eye, location relative to
13:29:48 21  the -- to the roadway, and the complexity of the
13:29:50 22  message.
13:29:51 23  Do you see that?
13:29:51 24  A. Yes.
13:29:52 25  MR. MOBLEY: Actually there's a fourth

**Page 103**

13:29:54 1  item.
13:29:54 2  MS. BRILL: Right. I'm going to get to
13:29:56 3  that.
13:29:56 4  Q. Where did that list come from?
13:29:57 5  A. I -- I wrote that. I mean, I -- I'm the
13:29:59 6  author of that.
13:30:01 7  Q. Okay. And did -- are there any other
13:30:03 8  factors that are omitted from this list?
13:30:09 9  A. Well, under "complexity of message" I
13:30:12 10  suppose you could also include type of message.
13:30:13 11  Q. Meaning?
13:30:15 12  A. Oh, the -- some -- some messages are maybe
13:30:18 13  a little more salacious than others.
13:30:26 14  Q. Okay. Any other factors?
13:30:31 15  A. No. That come to mind, no.
13:30:35 16  Q. And what about whether a sign -- whether
13:30:37 17  something is predictable or unpredictable? Would
13:30:39 18  that generally contribute to safety?
13:30:43 19  MR. MOBLEY: Objection. Vague and
13:30:45 20  ambiguous.
13:30:45 21  THE WITNESS: Well, you know, yes, and I --
13:30:47 22  and I'm thinking specifically of, say, a changeable
13:30:51 23  message sign, and let's say, it's -- it's flashing
13:30:55 24  ball scores, just as an example, baseball scores or
13:30:59 25  something like that. I think that is unpredictable

**Page 104**

13:31:02 1  if somebody wants to see if the Dodgers won or
13:31:04 2  whatever, so I think maybe that would be -- the
13:31:07 3  predictability in that sense would be an issue.
13:31:22 4  Q. And what do you mean when you refer to the
13:31:24 5  complexity of a message in your list?
13:31:26 6  A. I'm thinking of -- I'll call it bits, bits
13:31:30 7  of information.
13:31:31 8  Some signs, let's say they have a phone
13:31:36 9  number and they have an address and they have a --
13:31:38 10  you know, several bits of information, three or four
13:31:41 11  pictures, something like that, versus, say, a very
13:31:46 12  simple sign with just, say, one simple picture and
13:31:49 13  say, a very simple message. That's what I'm
13:31:52 14  thinking of there.
13:31:54 15  Q. Okay. And what about confusing messages?
13:31:55 16  A. Well, yeah, I suppose if it's confusing it
13:32:00 17  wouldn't help, on the one hand. But on the other
13:32:02 18  hand, I'm -- I'm thinking that if it's confusing,
13:32:06 19  most people are going to, "I don't know what that
13:32:08 20  meant." Just not even worry about it. I don't
13:32:10 21  think anybody's going to spend much time trying to
13:32:13 22  decipher the hidden meaning or something. And most
13:32:16 23  signs are pretty well-written. Been tested.
13:32:19 24  Q. Is one of the functions of a small scale
13:32:23 25  sign on a business typically to identify the

**Page 105**

13:32:25 1  business to passers-by?
13:32:26 2  MR. MOBLEY: Objection. Incomplete
13:32:29 3  hypothetical. And vague and ambiguous.
13:32:34 4  THE WITNESS: I -- I would -- I --I think
13:32:35 5  it depends on a lot of other factors. I really do.
13:32:35 6  BY MS. BRILL:
13:32:39 7  Q. Are small-scale signs often used on
13:32:41 8  businesses to identify the business to passers-by?
13:32:44 9  A. Well, if you're thinking of a sign
13:32:46 10  literally on the business, certainly, yeah.
13:32:48 11  Q. And do you have an opinion about whether
13:32:51 12  drivers in Los Angeles expect that businesses will
13:32:53 13  generally have relatively small-scale signs located
13:32:56 14  on them that say what the business is?
13:32:58 15  MR. MOBLEY: Objection. Vague and
13:33:00 16  ambiguous as to "relatively small-scale."
13:33:04 17  THE WITNESS: Yes. And there's -- you
13:33:05 18  know, there's the -- maybe current sign ordinances
13:33:09 19  would allow -- would allow, say, relatively small
13:33:10 20  sign, but historically, you know, backing up 20 or
13:33:16 21  30 years, there are some businesses that have some
13:33:19 22  huge signs out in front.
13:33:22 23  I -- I don't -- I don't think you can say
13:33:25 24  that a small business is going to have a small-scale
13:33:25 25  sign. I don't think that -- that applies. It may

MERRILL LEGAL SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

Brill Declaration Ex. B
-39-

```
13:33:28  1   today, but if you were to drive down the street, I
13:33:31  2   think you're going to see some big signs. If you
13:33:34  3   think of Hollywood Boulevard or some of those kind
13:33:37  4   of places, there's big signs.
13:33:38  5       Q. And if you see -- my question was
13:33:42  6   whether -- when -- if a driver in L.A. sees a
13:33:45  7   small-scale sign on a business, directly on the
13:33:48  8   business, does that driver typically think that the
13:33:51  9   sign is going to be associated with or say something
13:33:54 10   about that business?
13:33:56 11       MR. MOBLEY: Objection. Calls for
13:33:59 12   speculation.
13:33:59 13       THE WITNESS: If -- yeah, if it's clearly
13:34:02 14   a -- an advertiser, a name on a building or
13:34:05 15   something, that -- then they expect that. But there
13:34:07 16   are signs which, of course, are on a building that
13:34:10 17   have nothing to do with the business in that
13:34:12 18   building.
13:34:12 19   BY MS. BRILL:
13:34:13 20       Q. And drivers know to look for signs if
13:34:15 21   they're trying to locate a business, signs on the
13:34:18 22   business itself?
13:34:18 23       A. Yes. That's true.
13:34:21 24       Q. Okay. And they can be confused if they
13:34:23 25   expect to see a sign that's identifying a business,
                                                          106
```

```
13:34:26  1   but that's actually identifying something else?
13:34:31  2       MR. MOBLEY: Objection. Calls for
13:34:35  3   speculation.
13:34:35  4       THE WITNESS: The -- well, they can be
13:34:35  5   confused. Anybody can be confused on any issue, but
13:34:38  6   I think the -- the -- the bigger signs I've seen
13:34:41  7   that don't apply to that particular business, I
13:34:43  8   think are pretty clear they're advertising something
13:34:45  9   else.
13:34:45 10   BY MS. BRILL:
13:34:46 11       Q. I'm talking about small signs, small signs
13:34:48 12   directly on a business.
13:34:51 13       MR. MOBLEY: And what's the question?
13:34:51 14   BY MS. BRILL:
13:34:52 15       Q. So a small sign directly on a business,
13:34:54 16   could that be confusing to a passerby trying to
13:34:58 17   locate a business -- a particular business?
13:35:00 18       MR. MOBLEY: And again, objection. Calls
13:35:02 19   for speculation. And incomplete hypothetical.
13:35:05 20       THE WITNESS: I -- I just have to say it
13:35:06 21   depends. You know, I -- there's no clear definitive
13:35:10 22   answer.
13:35:10 23   BY MS. BRILL:
13:35:11 24       Q. And it might take them longer to find the
13:35:14 25   business if there's a sign related to something else
                                                          107
```

```
13:35:16  1   on that business?
13:35:17  2       MR. MOBLEY: Again, objection. Calls for
13:35:19  3   speculation.
13:35:19  4       THE WITNESS: The -- the signs that I'm
13:35:24  5   thinking of, the large -- well, even small signs --
13:35:27  6   well, generally small signs that are not related to
13:35:29  7   the business aren't on the building. But if they
13:35:33  8   were, I think that it's pretty clear they're not --
13:35:36  9   they're -- what they're advertising, advertising --
13:35:40 10   if they're advertising cigarettes, for instance,
13:35:42 11   it's clear they're not made in that building. I
13:35:45 12   think those are self-apparent, generally, I would
13:35:47 13   think.
13:35:52 14       Q. In your experience with traffic safety, do
13:35:54 15   drivers typically slow down when they're trying to
13:35:57 16   locate a business on the side of the road as they
13:36:00 17   try to find where the business is?
13:36:01 18       MR. MOBLEY: Objection. Incomplete
13:36:03 19   hypothetical.
13:36:03 20       THE WITNESS: I -- some drivers do.
13:36:10 21   Probably most people have been there before, know
13:36:12 22   where it is. So to say generally they slow down, I
13:36:16 23   don't think it's probably accurate.
13:36:18 24   BY MS. BRILL:
13:36:18 25       Q. And if a driver is trying to find a
                                                          108
```

```
13:36:19  1   location where he or she has never been, do they
13:36:22  2   often slow down a bit as they're looking for a sign
13:36:24  3   on the -- on the business to locate that -- to
13:36:27  4   locate that place?
13:36:29  5       MR. MOBLEY: Objection. Calls for
13:36:30  6   speculation. And incomplete hypothetical.
13:36:32  7       THE WITNESS: Sometimes they would, yes.
13:36:34  8   BY MS. BRILL:
13:36:35  9       Q. And if they see a small-scale sign on the
13:36:38 10   business that would typically be associated with a
13:36:41 11   business location sign, might that cause them to
13:36:44 12   slow down further?
13:36:45 13       MR. MOBLEY: Same objections and also vague
13:36:47 14   and ambiguous.
13:36:47 15       THE WITNESS: I'm not sure about the
13:36:49 16   further. Sometimes they slow down to find a
13:36:53 17   business. I think I'd stop at that point.
13:36:56 18   BY MS. BRILL:
13:36:56 19       Q. And if the business has a sign unrelated to
13:36:59 20   the activity of the business, but that was the same
13:37:01 21   size as a typical on-site sign, could that be
13:37:05 22   confusing?
13:37:06 23       MR. MOBLEY: Objection. Speculation and
13:37:08 24   incomplete hypothetical.
13:37:09 25       THE WITNESS: It could be. I think
                                                          109
```

28

13:37:14 1  generally there's -- it's not.
13:37:14 2  BY MS. BRILL:
13:37:15 3      Q. And that could have an impact on traffic,
13:37:16 4  correct?
13:37:19 5      MR. MOBLEY: Same objections.
13:37:19 6      THE WITNESS: It could. But it's not a
13:37:23 7  foregone conclusion.
13:37:23 8  BY MS. BRILL:
13:37:25 9      Q. Is there any data on that?
13:37:26 10     A. No. Just you asked my opinion.
13:37:29 11     Q. And your -- and what's your opinion based
13:37:34 12 on?
13:37:36 13     A. Based on my being in this business for, you
13:37:39 14 know, 40 years and, you know, observing a lot of
13:37:44 15 people, a lot of drivers doing a lot of things. So
13:37:47 16 that's -- it's based on -- it's called engineering
13:37:51 17 experience, professional experience.
13:37:53 18     Q. But a typical billboard that's a larger
13:38:03 19 scale sign, drivers typically would know that that
13:38:05 20 doesn't identify -- necessarily identify the
13:38:09 21 business where that sign is, correct?
13:38:11 22     MR. MOBLEY: Same objections.
13:38:14 23     THE WITNESS: The -- yeah, generally
13:38:16 24 they're -- well, they're going to look at the sign
13:38:18 25 and read it, quote, read it, glance at it and, you
110

13:38:23 1  know, make an evaluation, is that talking about what
13:38:25 2  this business is on this particular site or is it
13:38:28 3  just a regular sign advertising something not to do
13:38:30 4  with that building? I think they'll make that
13:38:32 5  decision pretty quickly.
13:38:32 6  BY MS. BRILL:
13:38:41 7      Q. One of the factors you mentioned was the
13:38:42 8  relative size in the driver's eye, correct?
13:38:44 9      A. Yes.
13:38:46 10     Q. Let's say for -- for a -- if a -- what's --
13:38:52 11 do you know what the size is of a typical bus
13:38:54 12 shelter sign?
13:38:55 13     A. Well, I believe they're -- let's just say
13:39:04 14 historically I have known. At the moment I may not
13:39:07 15 know.
13:39:08 16     They vary some. I'm not sure. I think 67
13:39:15 17 by 45 is close, but I think I've also seen them down
13:39:18 18 around 3 feet wide.
13:39:20 19     Q. 67 by 45, that's inches?
13:39:22 20     A. Yes. Yeah. Yes, inches.
13:39:26 21     Q. And have you done any -- have you -- have
13:39:30 22 you collected any data on what the -- the distance
13:39:36 23 that would be comparable for a larger sign or how a
13:39:40 24 larger sign -- how much farther away a larger sign
13:39:43 25 would be to be comparable in terms of the impact on
111

13:39:46 1  the driver's eye?
13:39:47 2      A. I -- it's -- it's not a question of
13:39:49 3  collecting data. It's a question of -- of making
13:39:52 4  some assumptions, you know, 15-degree cone, and
13:39:56 5  doing a mathematical calculation that -- that --
13:39:59 6  that would show the size on the retina.
13:40:14 7      MS. BRILL: Okay. Let's take a look at one
13:40:18 8  example. Mark that as Exhibit 15, please.
13:40:22 9      (The document referred to was
           10     marked for identification by the
           11     C.S.R. as Exhibit 15 and attached
           12     to this deposition.)
           13     THE REPORTER: You want the sticker down
           14 here?
13:40:45 15     MR. MOBLEY: That's fine.
13:40:45 16     MS. BRILL: Exhibit 15 is a photograph of a
13:40:47 17 street scape.
13:40:48 18     Q. Is that Sunset Boulevard?
13:40:49 19     A. Yes, I believe it is.
13:40:55 20     Q. Yeah. And this is from the CD that -- that
13:40:58 21 you produced?
13:40:58 22     A. Yes, I believe it is one of the ones. I
13:41:00 23 can double-check that. Yes.
13:41:03 24     Q. So you took this picture back in 2004?
13:41:09 25     A. I believe so.
112

13:41:09 1      Q. And so there's no question there that --
13:41:09 2  you see there's a Summit media billboard there to
13:41:12 3  the right?
13:41:12 4      A. Okay.
13:41:14 5      Q. Do you see that?
13:41:14 6      A. Yes.
13:41:15 7      Q. And there's no question that that sign has
13:41:17 8  a bigger impact on the driver's retina than the bus
13:41:21 9  shelter ad below, correct?
13:41:24 10     A. From this exact position, that's correct.
13:41:27 11     Q. And then if you went farther back, that
13:41:29 12 would still be correct, right?
13:41:31 13     A. It would be correct for a while, but once
13:41:32 14 you get back to the cone, the 15-degree cone, it --
13:41:36 15 not necessarily correct. It's not necessarily
13:41:38 16 correct.
13:41:38 17     Q. Would you have to move forwards or
13:41:40 18 backwards here to get to the -- to get to that cone?
13:41:43 19     A. Well, in the case of the -- the small --
13:41:46 20 the bus stop shelter sign, I suspect you would move
13:41:49 21 forwards. And just -- just sort of estimating
13:41:53 22 rough -- a crude estimate, maybe halfway on that
13:41:56 23 driveway there would probably be around 15 degrees
13:41:58 24 on the bus stop sign.
13:42:01 25     And on the -- the Summit Media sign you
113

13:42:04 1  would have to move backwards, you know, a distance.
13:42:09 2  I'm not sure how far. But --
13:42:10 3     Q.  You're saying -- you're saying the Summit
13:42:12 4  Media sign here is not within the 15-degree cone?
13:42:15 5     A.  No, I don't believe so.
13:42:16 6     Q.  And how do you know that?  You didn't make
13:42:18 7  any measurements of that at the time, did you?
13:42:20 8     A.  No.  No, you would have to calculate it.
13:42:23 9     Q.  Okay.  And you have not done that, correct?
13:42:24 10     A.  That's correct.
13:42:25 11     Q.  And sitting here today, you can't tell
13:42:27 12  that, can you?
13:42:28 13     A.  That's correct.
13:42:32 14     Q.  And if you moved backwards from the place
13:42:38 15  where this is taken, the -- the bus shelter sign
13:42:40 16  would still be within the 15-degree cone, correct?
13:42:43 17     A.  Within it.  Now, back to definitions, I --
13:42:46 18  I've said assuming it's at the 15-degree cone mark.
13:42:50 19  That's where I've -- I've chosen to compare the
13:42:53 20  sides -- size.
13:42:55 21     So you would put the bus stop shelter sign
13:42:58 22  at the -- at the boundary, the 15-degree cone, and
13:43:01 23  see how big that is in the retina, calculate it out,
13:43:05 24  and then you'd move backwards and determine
13:43:11 25  Summit -- the Summit Media sign where -- how far

114

13:43:14 1  back that would be in -- in -- and also how much --
13:43:18 2  how big it would appear in the retina.  You know,
13:43:21 3  the size image it would be on the retina.  That's
13:43:24 4  how you'd do it.
13:43:25 5     Q.  So that edge of the cone, though, signs are
13:43:28 6  visible within the cone for periods not only when
13:43:32 7  they're just at the edge of that 15-degree cone,
13:43:32 8  correct?
13:43:35 9     A.  That's absolutely correct.  The -- but like
13:43:37 10  I said, you have to make a definition somewhere.
13:43:39 11     Q.  And why did you pick that one?
13:43:41 12     A.  Well, I picked 15 degrees, as I said
13:43:44 13  before, because that's -- I'll call it custom and
13:43:46 14  practice of traffic engineering, that's the 15
13:43:49 15  degrees.  And -- and if you don't -- well, if you
13:43:53 16  don't pick some criteria, you know, you're just --
13:43:57 17  you're really not -- you got to have a criteria, you
13:44:01 18  got to have a yardstick.  That's the yardstick I
13:44:04 19  used.
13:44:04 20     Q.  So you -- but is there any -- is there any
13:44:06 21  study that says that that particular yardstick
13:44:08 22  correlates to traffic safety?
13:44:11 23     A.  No.
13:44:11 24     Q.  And did you have any reason for believing
13:44:16 25  that it would?

115

13:44:17 1     A.  The -- do I have a reason to believe it
13:44:22 2  would?  My point -- okay.  I'll avoid the question
13:44:29 3  and just say my point is how big is the -- is
13:44:30 4  the image in the retina of, let's say, two different
13:44:34 5  sign locations.  One larger, but further away and
13:44:38 6  one smaller, but up closer to the curb.  That was my
13:44:41 7  purpose.  It was not to say, well, one is -- is --
13:44:45 8  is dangerous, a dangerous condition, and the other
13:44:47 9  is not.
13:44:48 10     I -- I've pretty well stated that I don't
13:44:51 11  believe either sign is -- is dangerous, a dangerous
13:44:56 12  condition.  I believe both of them are safe.
13:44:57 13     Q.  Okay.  And so let's say we were 100 yards
13:45:01 14  further back than the picture here is taken.
13:45:05 15     A.  Okay.
13:45:06 16     Q.  And both signs are within the 15-degree
13:45:08 17  cone, correct?
13:45:08 18     A.  Yes.
13:45:10 19     Q.  The Summit Media sign will be much larger
13:45:13 20  in the retina than this bus shelter sign, correct?
13:45:17 21     A.  That's correct.
13:45:17 22     Q.  Okay.  And that will be true, at least
13:45:20 23  until one of those signs falls out of your 15-degree
13:45:24 24  cone, correct?
13:45:27 25     A.  That -- well, I -- why don't you say that

116

13:45:29 1  again, please.  Repeat it.
13:45:30 2     Q.  That will be true, at least until one of
13:45:33 3  the signs falls out of the 15-degree cone, correct?
13:45:38 4     A.  The fact that one would look bigger than
13:45:40 5  the other?
13:45:40 6     Q.  Yes.
13:45:43 7     A.  Yes.  As long as the -- as -- well, the
13:45:45 8  last one to fall out of the 15-degree cone is going
13:45:48 9  to be the bus stop shelter sign, at least in this
13:45:50 10  case.
13:45:51 11     So I suppose when one of them falls out,
13:45:54 12  then the other one -- the bigger one falls out,
13:45:59 13  then, of course, the smaller one starts looking
13:46:01 14  bigger and eventually it looks as big as the big
13:46:07 15  one.
13:46:07 16     So I think that's responsive.  I don't
13:46:07 17  know.
13:46:10 18     Q.  So for a split second when the -- when the
13:46:11 19  larger sign is fallen out of the cone, the remaining
13:46:14 20  sign is bigger?
13:46:16 21     A.  Oh, it grows.  It would grow in size until
13:46:18 22  it falls out of the cone.
13:46:31 23     MS. BRILL:  Can you mark this one as
13:46:32 24  Exhibit 16, please?
13:46:32 25     (The document referred to was

117

MERRILL  LEGAL  SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

Brill Declaration Ex. B

13;46:32  1          marked for identification by the
13:46:32  2          C.S.R. as Exhibit 16 and attached
13:46:48  3          to this deposition.)
13:46:48  4  BY MS. BRILL:
13:46:48  5      Q. Is this also one -- is Exhibit 16 also one
13:46:50  6  of the pictures that you took back in 2004?
13:46:52  7      A. I believe it is, yes.
13:46:54  8      Q. And this is a sign -- the picture shows a
13:46:59  9  Third Street intersection with a -- an L.A. Rocking
13:47:03 10  Chair store and a bus shelter and then another
13:47:10 11  sign -- few other signs along with that?
13:47:11 12      A. Yes.
13:47:12 13      Q. Okay. Do you know -- did you study whether
13:47:27 14  any drivers would mistake -- see that sign on the
13:47:30 15  yellow wall there, the yellow brick wall there with
13:47:34 16  a sign on it that says -- what does it say,
13:47:36 17  "Black" -- "Black Book"?
13:47:37 18      A. I see the sign. I guess that's what it
13:47:42 19  says, yes.
13:47:42 20      Q. Did you ever survey any drivers to see
13:47:45 21  whether they would be confused about whether that
13:47:47 22  sign was something associated with the business
13:47:54 23  located there?
13:47:54 24      A. Well, no, I didn't. But I think this one's
13:47:58 25  pretty self-evident that the rocking chair store and
                                                                118

13:48:03  1  Black Book, or whatever that sign says, is two
13:48:05  2  different things. I mean, that's pretty obvious.
13:48:09  3  And you might -- you might even add the same sign is
13:48:11  4  also on the bus shelter there. The exact same sign,
13:48:14  5  It appears.
13:48:15  6      Q. So it becomes obvious when you read the
13:48:17  7  sign, but not just by looking at the structure,
13:48:17  8  correct?
13:48:21  9      A. Yes. That's correct, yes.
13:48:23 10      Q. And here the -- there's some signs for a
13:48:26 11  Pets Only and a cleaners and a printer, correct?
13:48:26 12      A. Yes.
13:48:34 13      Q. And when you're -- at the angle that this
13:48:37 14  picture was taken, do you know whether the -- the
13:48:39 15  sign against the yellow wall was within the 15 foot
13:48:42 16  [sic] cone?
13:48:42 17      A. I -- I don't.
13:48:44 18      Q. And in order to see that sign, a driver
13:48:46 19  might have to look to the right away from traffic?
13:48:50 20      MR. MOBLEY: Objection. Incomplete
13:48:56 21  hypothetical.
13:48:56 22      THE WITNESS: The -- well, seeing any sign,
13:48:59 23  the driver might look away from traffic, yes.
13:49:05 24  BY MS. BRILL:
13:49:06 25      Q. And the angle -- because that sign is
                                                                119

13:49:08  1  farther away from the street than the bus shelter
13:49:10  2  sign, the person might have to look at a more
13:49:12  3  extreme angle in order to read the message on that
13:49:16  4  sign?
13:49:17  5      MR. MOBLEY: Objection. Vague as to the
13:49:18  6  term "extreme."
13:49:21  7      THE WITNESS: They may, and this is -- this
13:49:22  8  particular sign here is a good example. There lots
13:49:24  9  of little typing at the bottom, lots of words at the
13:49:26 10  bottom. I don't know what they say, but I -- you
13:49:28 11  know, maybe a disclaimer or something.
13:49:30 12      But those words, you know, I'm not sure you
13:49:32 13  could hardly read them anywhere, unless you're
13:49:35 14  sitting right beside the sign. You know, for
13:49:38 15  instance, if you're parked there by the newspaper
13:49:40 16  rack, maybe you could read the one -- read the one
13:49:41 17  on the bus shelter, but here's an example where it's
13:49:44 18  pretty hard to classify that this sign's readable
13:49:47 19  from a certain location.
13:49:49 20      The number of -- the size of letters
13:49:52 21  just -- you know, looking at it and estimating,
13:49:54 22  there's like four or five sizes of letters on that
13:49:56 23  particular sign.
13:49:57 24      The "Black Book" is fairly large and -- but
13:50:00 25  then the other letters, you can't read them in this
                                                                120

13:50:02  1  picture anyway. At least I can't. And some of
13:50:08  2  those words are very small.
13:50:10  3  BY MS. BRILL:
13:50:10  4      Q. And the people sitting at the bus shelter,
13:50:12  5  though, could read them on the bus shelter?
13:50:13  6      A. They could, yes.
13:50:14  7      Q. And there's no place comparable to sit in
13:50:17  8  the shade next to the sign that's on the business,
13:50:17  9  correct?
13:50:17 10      MR. MOBLEY: I'm sorry, what was the
13:50:27 11  question? Can I have that read back.
13:50:27 12      (The reporter read the record
13:50:27 13  as follows:
13:50:14 14      "QUESTION: And there's no
13:50:15 15  place comparable to sit in
13:50:17 16  shade next to the sign that's on
13:50:19 17  the business, correct?")
13:50:29 18      MR. MOBLEY: I'll object that it's vague
13:50:30 19  and ambiguous.
13:50:30 20      THE WITNESS: In this case, there is no
13:50:32 21  place -- well, arguably there's no easy place to sit
13:50:37 22  and read -- and see the sign in the shade. I
13:50:39 23  suppose the shade of that sign, the "310 South"
13:50:41 24  sign, I suppose you could sit there somewhere and be
13:50:45 25  in the shade, but it would be easier to sit in the
                                                                121

MERRILL  LEGAL  SOLUTIONS
800-826-0277  818-593-2300  Fax 818-593-2301  www.merrillcorp.com

Brill Declaration Ex. B
-43-

13:50:47  1  shade on the bus bench, that's for sure.
13:50:50  2  BY MS. BRILL:
13:50:51  3      Q. And if that bus shelter wasn't there, the
13:50:59  4  only way to identify that as a bus stop would be
13:51:02  5  that little pole sign with the letter M on top.
13:51:02  6      Is that right?
13:51:08  7      A. No, I would say that's not right.  The bus
13:51:10  8  stop shelter could be there without the sign.
13:51:17  9  There's no reason that the bus stop shelter has to
13:51:19 10  have that sign.
13:51:20 11      Q. The question was, if the bus shelter wasn't
13:51:22 12  there, the only way to identify that as a bus stop
13:51:25 13  would be that little pole sign with the letter M on
13:51:27 14  top, correct?
13:51:28 15      A. My answer is no, that's not correct.
13:51:30 16      Q. Why not?
13:51:31 17      A. Because if the bus shelter itself was there
13:51:33 18  without the sign, for example, then you'd have the
13:51:36 19  bus shelter plus the sign on the pole to identify it
13:51:39 20  as a bus stop.
13:51:40 21      Q. What's the difference between the answer
13:51:42 22  you gave that caused you not to say "yes" to my --
13:51:45 23  my question?
13:51:46 24      A. I'm not sure.
13:51:46 25      Q. Okay.
                                                        122

13:51:48  1      A. I'm not sure.
13:51:49  2      Q. The question -- the question --
13:51:50  3      A. Lot of questions.
13:51:51  4      Q. The question -- I'm not trying to be
13:51:53  5  tricky.
13:51:55  6      The question was, if the bus shelter wasn't
13:51:57  7  there, the only way to identify that as a bus stop
13:52:02  8  would be the little pole sign with the M on top?
13:52:05  9      A. That's true in the absence of a bus, yes.
13:52:07 10  In the absence of knowledge about the area or
13:52:10 11  something.
13:52:10 12      Q. And that's harder to see than a bus stop
13:52:13 13  with a bus shelter, correct?
13:52:14 14      A. Yes.
13:52:17 15      Q. And that white sign there on the bus
13:52:20 16  shelter makes the shelter, as a whole, more
13:52:23 17  prominent, correct?
13:52:24 18      A. Probably does, yes.
13:52:31 19      MS. BRILL:  Would you mark this as
13:52:33 20  Exhibit -- Exhibit 17, please.
13:52:33 21          (The document referred to was
13:52:33 22          marked for identification by the
13:52:33 23          C.S.R. as Exhibit 17 and attached
13:52:47 24          to this deposition.)
13:52:47 25  BY MS. BRILL:
                                                        123

13:52:48  1      Q. Exhibit 17 is also a -- an image taken from
13:52:51  2  your -- the CD that Mr. Mobley produced, and it has
13:52:56  3  a street sign on the side that says "Redondo
13:53:00  4  Boulevard."
13:53:00  5      Do you recognize this as one of the
13:53:02  6  pictures that you took?
13:53:03  7      A. Yes. I believe I took that picture, yes.
13:53:10  8      Q. And again, it would be difficult to
13:53:11  9  see the -- there's a bus stop -- let me go back a
13:53:14 10  second. Sorry. Strike that.
13:53:15 11      There's a bus stop there that has the word
13:53:17 12  "Olympic" on it.
13:53:19 13      Do you see that toward the right-hand side?
13:53:21 14      A. I do see that.---
13:53:22 15      Q. And that bus stop would be pretty hard to
13:53:24 16  see without that bus shelter there, correct?
13:53:27 17      A. Yeah, probably would be, yes.
13:53:29 18      Q. And that woman standing there wouldn't have
13:53:31 19  any shade to stand in, correct?
13:53:33 20      A. That's -- that's correct. She chose to use
13:53:36 21  the shade, yes.
13:53:37 22      Q. Was this a hot day when you were taking
13:53:39 23  these pictures?
13:53:40 24      A. I think so.  Seemed like -- I don't
13:53:42 25  remember.  But I think so.  It was a bright day. I
                                                        124

13:53:44  1  know that.
13:53:56  2      MS. BRILL:  Can you mark this one as
13:53:57  3  Exhibit 18.
13:53:57  4          (The document referred to was
13:53:57  5          marked for identification by the
13:53:57  6          C.S.R. as Exhibit 18 and attached
13:53:57  7          to this deposition.)
13:53:57  8  BY MS. BRILL:
13:54:10  9      Q. Before we go --
13:54:10 10      THE REPORTER:  Thank you.
13:54:10 11  BY MS. BRILL:
13:54:11 12      Q. Before we go on to -- to 18, we mentioned
13:54:12 13  that it was a hot day.  So that person there waiting
13:54:15 14  for the bus is able to stay cooler on a side -- on
13:54:17 15  account of the bus shelter?
13:54:20 16      A. Well, it looks like she's not standing in
13:54:22 17  the bus -- the shade, but --
13:54:23 18      Q. Well, she's half in, half out, right?
13:54:25 19      A. Half in, half out.  Yeah, presumably shade
13:54:29 20  is going to keep you cooler.  That's pretty obvious.
13:54:31 21  It would help.
13:54:32 22      Q. Turning to Exhibit 18.  This is another --
13:54:37 23  which the court reporter has just marked.
13:54:37 24      A. Yeah, I see it.  Okay.
13:54:53 25      Q. Is this another photograph that you had
                                                        125

MERRILL    LEGAL    SOLUTIONS
800-826-0277    818-593-2300    Fax 818-593-2301    www.merrillcorp.com
Brill Declaration Ex. B
-44-

13:54:54 1 taken back in 2004?
13:54:55 2     A. Yes.
13:54:56 3     Q. And we -- it's somewhere along Sixth
13:55:03 4 Street, correct?
13:55:05 5     A. Looks like it's probably not on Sixth
13:55:08 6 Street. It's on a cross street.
13:55:10 7     Q. Do you know what the street is?
13:55:12 8     A. I think I could check and tell you.
13:55:52 9       At the moment I'm not able to tell you
13:55:55 10 exactly where that picture is.
13:55:57 11     Q. We'll refer to it as the Sixth Street sign,
13:56:00 12 okay? Or the Sixth Street photograph?
13:56:01 13     A. Yes.
13:56:02 14     Q. And this one has a bus shelter and a kiosk
13:56:06 15 right next to it.
13:56:06 16       Is that right?
13:56:06 17     A. Yes.
13:56:13 18     Q. And again, it would be harder to see this
13:56:15 19 bus stop if it weren't for the shelter and the kiosk
13:56:18 20 right there, correct?
13:56:24 21     MR. MOBLEY: I'm sorry, can I have the
13:56:24 22 question read back, again.
13:56:24 23       (The reporter read the record
13:56:24 24       as follows:
13:56:14 25       "QUESTION: It would be
                                          126

13:56:14 1 harder to see this bus stop if it
13:56:16 2 weren't for the shelter and the
13:56:17 3 kiosk right there, correct?")
13:56:31 4     THE WITNESS: Yes is the answer.
13:56:31 5 BY MS. BRILL:
13:56:52 6     Q. And then on that list we -- you also --
13:56:57 7 that list we were referring to back in your
13:57:00 8 declaration, we also -- you also mentioned
13:57:04 9 changeable messages.
13:57:04 10     A. Yes.
13:57:08 11     Q. Do you recall that?
13:57:08 12     A. Yes.
13:57:09 13     Q. Have you done any studies yourself about
13:57:10 14 changeable messages versus messages that do not
13:57:15 15 change?
13:57:17 16     A. The -- I have observed the -- the
13:57:20 17 changeable message signs in various situations.
13:57:26 18     Q. What changeable message signs are you
13:57:28 19 talking about?
13:57:28 20     A. Well, changeable message signs, I've seen
13:57:31 21 them on the back of buses, I've seen them on top of
13:57:34 22 taxis. Not necessarily in L.A., but I've seen them
13:57:36 23 on buses. I've seen them on taxis. Of course, I've
13:57:39 24 seen them, you know, on -- on signs themselves that
13:57:42 25 are not on bus stops or on taxis, on buses or taxis.
                                          127

13:57:42 1 Pardon me.
13:57:49 2       And -- and the changeable message sign,
13:57:51 3 sometimes it's just, let's say, advertising a movie
13:57:54 4 and just shows a couple, three scenes out of a
13:57:56 5 movie.
13:57:57 6     Q. You're talking about animated signs with
13:57:59 7 motions?
13:57:59 8     A. Okay. If you want to call it that. I'm
13:58:01 9 just saying anything that changes.
13:58:03 10     Q. Well, I'm asking you what your -- I'm --
13:58:05 11     A. Yeah. I'm saying anything that changes.
13:58:08 12 If it's not static, if the image changes, whether
13:58:11 13 it's words or whether it's pictures -- so I'm
13:58:17 14 starting to lose track of the question. What is the
13:58:19 15 question?
13:58:19 16       --
13:58:19 17     Q. The question is whether you had done any
13:58:25 18 studies about changeable messages versus messages
13:58:27 19 that do not change?
13:58:28 20     A. I have observed -- not as a study, but as a
13:58:32 21 traffic engineer being concerned with these kind of
13:58:35 22 issues, I've observed that and have -- have noticed
13:58:39 23 that some changeable message signs do cause a -- a
13:58:46 24 distraction. I'm not sure I'll call it a
13:58:47 25 significant distraction, but pretty significant
                                          128

13:58:53 1       And the ones that come to mind is the one I
13:58:55 2 mentioned earlier, ball scores. I mean, a lot of
13:58:58 3 people, a lot of guys, you know, they want to see
13:59:00 4 what the score was. And when you had a changeable
13:59:12 5 message sign kind of scrolling across, you know,
13:59:12 6 showing the -- you know, the Dodgers' score and then
13:59:12 7 somebody else's score, well, you know, you're
13:59:12 8 tempted, or some people, guys -- guys in this case
13:59:15 9 are tempted to read that.
13:59:16 10       And likewise, if you got some -- something
13:59:18 11 going with, you know, movies playing or something
13:59:21 12 like that, people will -- you know, they're tempted
13:59:24 13 to -- to look at those things and -- and look at it
13:59:28 14 to try to catch the last part of that message or the
13:59:30 15 next message as it comes along.
13:59:32 16       So I find those -- those signs are much
13:59:35 17 more distracting than a static sign, static message
13:59:39 18 sign.
13:59:40 19     MS. BRILL: Okay. So I'm going to move to
13:59:41 20 strike the portion of that answer after "not as a
13:59:45 21 study." So the question was -- as nonresponsive.
13:59:49 22     Q. The question was whether you have done any
13:59:51 23 studies about changeable messages versus messages
13:59:55 24 that do not change.
13:59:56 25       Is the answer to that question "no"?
                                          129

MERRILL LEGAL SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

Brill Declaration Ex. B
-45-

13:59:58 1    A. No. The answer's yes. And I would -- I
14:00:00 2   would debate the word "study." I don't have to be
14:00:03 3   paid, I don't have to make notes, write a report to
14:00:07 4   conduct a study. There's informal studies.
14:00:10 5        I would say I've done an informal study on
14:00:12 6   my own trying to -- you know, using engineering
14:00:15 7   judgment, trying to fine-tune my engineering
14:00:18 8   judgement to see if -- if I think those signs are
14:00:21 9   distracting.
14:00:22 10      And I find they're much more distracting
14:00:24 11  than a static message, because a static message, you
14:00:29 12  glance at it and you know what it says. And if
14:00:31 13  you're further interested in the message, you glance
14:00:33 14  at it again once-in a-while when you sort of have a
14:00:36 15  chance. You're not -- your eyes aren't needed to
14:00:38 16  drive down the road. So you glance at it and you
14:00:40 17  also know if you -- if it's your home-to-work route,
14:00:44 18  you know you'll see it tomorrow if you don't see it
14:00:46 19  today.
14:00:46 20      But in the case of changeable message
14:00:49 21  signs, it's changing. The content is changing maybe
14:00:52 22  even hourly. So it's more distracting.
14:01:03 23      Q. And you're using the word "distracting"
14:01:05 24  there in the same sense that you used it in your
14:01:06 25  2007 report and your 2004 report?

                                                      130

14:01:09 1    A. Yes.
14:01:10 2    Q. Okay. And have you -- have you made any
14:01:17 3   notes regarding changeable messages?
14:01:21 4    A. No. I've -- I've just stated that I've --
14:01:24 5   whenever I see a changeable message sign, I look at
14:01:27 6   it and observe from a -- you know, an interest, a
14:01:31 7   kind of knowledge point of view, I observe what it
14:01:34 8   is. And how -- you know, I -- sometimes I'll look
14:01:36 9   and see if other people are looking at it.
14:01:38 10      And in the case of the ballpark score I
14:01:41 11  mentioned, I mean, I saw people just rubbernecking
14:01:44 12  trying to figure out what that -- that message was.
14:01:46 13      Q. Have you taken -- have you attempted to do
14:01:48 14  a scientific analysis on changeable messages?
14:01:52 15      A. I want to say yes. I would classify what I
14:01:57 16  did as scientific to some degree.
14:01:57 17      Q. And what was it --
14:01:59 18      A. It was statistically -- statistic and
14:02:03 19  all -- you know, statistically significant,
14:02:05 20  confidence and intervals and all that? No. But I
14:02:07 21  think to say that people look at changeable message
14:02:09 22  signs longer and harder and more intently than they
14:02:12 23  do a static sign, I think is -- I -- I'm
14:02:15 24  convinced that's the case and would be happy to do a
14:02:19 25  study to prove it.

                                                      131

14:02:23 1    Q. And you haven't reviewed any literature on
14:02:25 2   that topic, correct?
14:02:26 3    A. No, I haven't.
14:02:32 4    Q. And you haven't written on that topic,
14:02:32 5   correct?
14:02:34 6    A. Not -- no, not -- no, I have not. I have
14:02:36 7   not prepared a report.
14:02:37 8    Q. And did -- in making these observations,
14:02:40 9   were they at a single location or various locations
14:02:43 10  wherever you happened to be at the time?
14:02:44 11      A. Various locations, various points in time.
14:02:47 12  Every time I see a changeable message sign I -- you
14:02:50 13  know, I -- I look. I observe. I say how
14:02:53 14  distracting -- pardon me -- how distracting is that
14:02:56 15  sign? And just do a -- you know, a common sense
14:02:59 16  evaluation.
14:03:01 17      Q. But you haven't taken any measures of that?
14:03:03 18      A. How would you measure that? I just asked
14:03:06 19  you that question. What are you going to do? I
14:03:09 20  mean, if people -- it's distracting to a typical
14:03:12 21  person.
14:03:12 22      I'm pretty typical. And if I want to see
14:03:15 23  what the ball score is, I'm going to try to figure
14:03:18 24  it out as I'm driving. Who else won the other game
14:03:21 25  Kind of looking, trying to drive and look, because

                                                      132

14:03:23 1   you -- those scores are coming up every -- you know
14:03:26 2   like -- as I recall the one I saw that I'm thinking
14:03:31 3   of was running -- it was kind of running across
14:03:33 4   the -- the screen and -- and so maybe the score was
14:03:37 5   up -- up on the screen only probably less than two
14:03:42 6   seconds, you know, a second and a half.
14:03:44 7        And so if you didn't look in that second
14:03:46 8   and a half and recognize the characters, you know,
14:03:49 9   the -- the -- the letters being formed by a -- a
14:03:56 10  light matrix, which are harder to read than just
14:03:56 11  regular text. So I -- you know, so I've looked at
14:03:59 12  them and -- and very specifically tried to determine
14:04:02 13  how -- how distracting is that.
14:04:07 14      And my conclusion was it's pretty
14:04:09 15  distracting if you want to see what's on that --
14:04:11 16  what the score is or whatever else.
14:04:12 17      And also, I didn't say it, a lot of them
14:04:15 18  have like latest breaking news. And -- and today,
14:04:20 19  you know, with all of the -- you know, the election
14:04:23 20  and all of the other things that are -- election and
14:04:25 21  the price of oil at, you know, 4.50 a gallon and
14:04:29 22  crude oil at 135 or whatever it is today and, you
14:04:33 23  know, Iran and Iraq, and Obama is over in Iran I
14:04:38 24  think today -- I mean, I'm sorry, in Iraq I think
14:04:40 25  today, you know, all of these factors, you know.

                                                      133

34

14:04:43 1    And they're scrolling the -- the latest
14:04:46 2 greatest news, you know, "Obama says," or whatever.
14:04:49 3 And you're kind of perhaps interested in what's
14:04:51 4 going on. Or you know, oil -- oil is up. How much
14:04:55 5 is it up?
14:04:56 6    So I think they're -- they're distracting
14:04:58 7 because people are going to look at them. I would
14:05:00 8 look at them. I'm not a big sports fan, but I -- I
14:05:03 9 am a news junky, so I probably would look at the
14:05:06 10 news one ahead of the -- the sports one.
14:05:08 11    Q. Okay. So you're talking primarily about
14:05:11 12 the scrolling types of signs there, right?
14:05:13 13    A. Yes.
14:05:14 14    MR. MOBLEY: Objection. Vague and
14:05:18 15 ambiguous.
14:05:18 16    THE WITNESS: Well, I'm classifying it as
14:05:22 17 if it's a changeable message, it has the potential
14:05:24 18 for the person, the driver, let's talk about, to be
14:05:28 19 interested in whatever that message might be.
14:05:32 20    And in some cases, it's just a movie or
14:05:34 21 something, which I personally wouldn't be looking at
14:05:37 22 too much, but some people do. That's what they want
14:05:38 23 to know about is the latest movie.
14:05:38 24 BY MS. BRILL:
14:05:41 25    Q. But when you're just talking about news

134

14:05:43 1 scores and ball scores, you're talking there about
14:05:46 2 primarily the scrolling messages, correct?
14:05:49 3    A. Yes. Or, you know -- and let's talk about
14:05:52 4 say a -- if you're driving by Anaheim Stadium or
14:05:55 5 Dodger Stadium or somewhere where there's a message
14:05:58 6 sign up there that says, you know, Angels play
14:06:02 7 whoever tonight, you know, 7:00 o'clock, seats
14:06:04 8 available, those are the kind of things people would
14:06:07 9 look at. And those messages do change. So it's not
14:06:10 10 just a scrolling. In that case, it's a large sign.
14:06:41 11    Q. I want to turn to conclusion 4 of your 2007
14:06:43 12 report.
14:06:59 13    At the bottom of that paragraph you say --
14:07:02 14 I believe you're talking about bus shelter signs and
14:07:04 15 you say:
14:07:04 16    "Some of these signs have
14:07:05 17    actually impacted motorists' line
14:07:07 18    of site vision at intersections."
14:07:09 19    Do you see that?
14:07:09 20    A. Yes.
14:07:09 21    Q. What signs are you talking about there?
14:07:16 22    A. The -- I believe I was talking about -- I
14:07:19 23 think there's a picture here somewhere. There's
14:07:26 24 a -- well, it happens in more than one place.
14:07:29 25    Any time you have a bus stop, particularly

135

14:07:33 1 if it's a near-sided bus stop -- not all bus stops
14:07:36 2 are far-sided. Some of them are near-sided -- they
14:07:36 3 start to impact the ability to see the cross street.
14:07:41 4    "Near-side" meaning it's before you get to
14:07:42 5 the intersection. "Far-side" meaning it's after you
14:07:46 6 pass through the intersection, that's where the bus
14:07:46 7 stop is.
14:07:48 8    I think in any -- any case where the bus
14:07:50 9 stop shelter is near-side, then it, to some degree,
14:07:54 10 blocks your view of cross traffic.
14:07:56 11    Also, if the -- if there's a -- it's like a
14:08:01 12 driveway. So there's a driveway, you have a bus --
14:08:04 13 a kiosk or a bus stop shelter sign, and there's a
14:08:04 14 nearby driveway, it's possible that it -- it makes
14:08:12 15 it more difficult for a driver coming out of a
14:08:14 16 driveway to -- to see to the right or to the left or
14:08:18 17 both.
14:08:18 18    Q. And did you make any determination about
14:08:20 19 whether any particular location was dangerous as a
14:08:20 20 result of that placement?
14:08:25 21    A. No. I -- I don't believe they're
14:08:28 22 dangerous. It just makes it more difficult to see.
14:08:30 23    Q. And you didn't -- you didn't report any
14:08:31 24 concerns about that to the City, correct?
14:08:34 25    A. I believe that's correct.

136

14:08:35 1    Q. And you didn't report anything about that
14:08:37 2 to CBS Decaux, correct?
14:08:39 3    A. No, I didn't report anything to CBS.
14:08:42 4    Q. You didn't report any concerns about those
14:08:44 5 signs to anyone, right?
14:08:45 6    A. I've not communicated with CBS.
14:08:47 7    Q. You didn't report about any of those
14:08:49 8 locations to anybody in terms of any concerns about
14:08:51 9 safety, correct?
14:08:53 10    A. That's correct.
14:09:11 11    Q. Now, just getting back to the question of
14:09:20 12 changeable messages for a second, you -- you say in
14:09:23 13 your report, at the top of page 10, talking about
14:09:30 14 changeable signs, that they are perhaps a
14:09:33 15 significant distraction.
14:09:35 16    Do you see that? That's at the very top of
14:09:36 17 page 10.
14:09:36 18    A. Yes. I'm -- I'm -- I'm saying they're --
14:09:57 19 they're, you know, are slice and -- we've run out of
14:10:00 20 words, significant, insignificant, maybe
14:10:04 21 significant, but the large flashing signs that I'm
14:10:06 22 referring to here, they're pretty -- they -- they
14:10:12 23 get your attention, and some people more than
14:10:16 24 others.
14:10:16 25    And I would say maybe they are a

137

MERRILL LEGAL SOLUTIONS
800-826-0277  818-593-2300  Fax 818-593-2301  www.merrillcorp.com

Brill Declaration Ex. B
-47-

```
14:10:20  1   distraction, significant distraction.
14:10:20  2       Q. But you haven't reached a conclusion about
14:10:20  3   that? You're saying perhaps, maybe. You have not
14:10:23  4   reached a conclusion about that, correct?
14:10:25  5       A. Well, I -- I think we're -- we're now
14:10:28  6   mincing, slicing and dicing the words.
14:10:31  7       I'm saying I think at least in some cases
14:10:33  8   they probably are a significant distraction. Not to
14:10:37  9   every driver, obviously. Most drivers could care
14:10:40 10   less what that sign says.
14:10:42 11       But some drivers are looking at it and it's
14:10:45 12   pretty eye-catching. Those things at night,
14:10:48 13   particularly, they're very, very bright. They're --
14:10:51 14   they're very bright. And very -- people look at
14:10:56 15   them.
14:10:58 16       Q. People look at them.
14:10:59 17       So -- but have you studied any correlation
14:11:03 18   between changeable messages and traffic accidents?
14:11:05 19       A. No.
14:11:07 20       Q. Do you know of any correlation between
14:11:08 21   changeable messages and traffic accidents?
14:11:10 22       A. Not that's been proven.
14:11:25 23       Q. You used the word "flash" in your last
14:11:27 24   answer.
14:11:27 25       What do you mean when you used the word
                                                          138
```

```
14:11:29  1   "flash"?
14:11:29  2       A. Well, I -- I guess -- what I would mean is
14:11:37  3   it changes from one -- one image to another. I
14:11:40  4   suppose "flash" is not maybe a perfect word, but it
14:11:44  5   flashes out a message. I mean, it's not a flash
14:11:48  6   meaning one tenth of a second, but it goes from one
14:11:50  7   message to another and it sort of flashes a message.
14:11:54  8   I think it's a proper word. But I would maybe
14:11:58  9   retract it if you wanted to object to the word
14:12:01 10   "flash."
14:12:01 11       Q. Well, are you aware there's a state law
14:12:03 12   definition of the word "flash"?
14:12:05 13       A. Well, no, I'm not aware of it necessarily
14:12:09 14   in this sense.
14:12:10 15       Q. And you weren't using the word "flash"
14:12:12 16   under -- as a -- in that meaning, correct?
14:12:15 17       A. Yes, I would say I was not using that word
14:12:17 18   in that meaning.
14:12:19 19       Q. You just meant anything that changes?
14:12:21 20       A. Yeah.
14:12:59 21       Q. So I want to return to your definition of
14:13:01 22   "distraction" where paragraph 2 you say everything
14:13:06 23   which a driver may -- may look away from the
14:13:10 24   roadway -- everything -- excuse me. Let me start
14:13:12 25   again.
                                                          139
```

```
14:13:12  1       You say in your conclusion 2 at page 9 of
14:13:15  2   your 2007 report:
14:13:17  3       "Everything at which a driver
14:13:18  4       may look away from the roadway is a
14:13:22  5       distraction."
14:13:22  6       Right?
14:13:25  7       A. That's what I said. And I hopefully
14:13:27  8   defined it adequately on page 2 of that same report
14:13:31  9   where I -- I basically said-if you're not looking at
14:13:34 10   the road, then you're looking at something. It is a
14:13:36 11   distraction one way or another. Distraction comes
14:13:39 12   in, you know, all shades of -- of gray, from very
14:13:43 13   little -- from no distraction, where you just glance
14:13:46 14   away, to, you know, very intense distraction where
14:13:50 15   you're almost forced to look at it.
14:13:53 16       Q. So in Exhibit 18, the building that's
14:13:57 17   there, that's a distraction because you're looking
14:14:00 18   away from the roadway?
14:14:02 19       A. Yes. If you can come up with a better word
14:14:06 20   you want to substitute for "distraction," I'll
14:14:10 21   concur, just not -- but it's -- it's a word that I
14:14:22 22   picked that I thought captured the essence of what
14:14:16 23   we were dealing with.
14:14:17 24       Q. And -- and in Exhibit 15, those palm trees
14:14:19 25   are a distraction?
                                                          140
```

```
14:14:20  1       A. Yes. Anything that keeps you from looking
14:14:23  2   exactly at the road is a distraction. And I think
14:14:26  3   the better driver -- the best driver, better
14:14:29  4   drivers, you know, their eyes -- you should scan.
14:14:32  5   You know, your eyes should be scanning right to
14:14:34  6   left, and to some degree up and down, and you should
14:14:37  7   be monitoring. You're monitoring the situation. Is
14:14:40  8   there a car coming that may not stop? Or in the
14:14:45  9   case of a signal, you know, you actually have to
14:14:47 10   look up a little bit from the road to see a traffic
14:14:47 11   signal.
14:14:51 12       So I think a good driver is scanning. And
14:14:53 13   to start saying, well, if you look at the signal
14:14:55 14   it's not a distraction, but if he looks at the bus
14:14:57 15   stop, it is. He's looking elsewhere besides the
14:15:02 16   center of the road routinely. Eyes should be going
14:15:06 17   everywhere when you're driving.
14:15:07 18       Q. So looking at a stop sign, in your
14:15:09 19   definition, that would be a -- looking at a
14:15:11 20   distraction?
14:15:11 21       A. I would say no. I mean, there's --
14:15:13 22   there's -- maybe it should say if -- if you're
14:15:19 23   looking at only things that are totally involved in
14:15:22 24   the process of driving a car, which would include
14:15:26 25   traffic signals and stop signs and curve signs and
                                                          141
```

36

**Page 142**

```
14:15:30  1   those things, that I don't think I'd call it a
14:15:31  2   distraction. That's just monitoring your driving.
14:15:36  3   Monitoring the road and driving accordingly.
14:15:40  4        But anything else that's non-essential for
14:15:42  5   driving, looking at the price of gas on the gas
14:15:44  6   station or whatever, I -- I just said, okay, that's
14:15:47  7   a distraction. One way or another it's taking your
14:15:50  8   eye off of the driving task and putting it -- you
14:15:54  9   know, doing something else. And we all do it every
14:15:57 10   day, obviously. Probably every second almost that
14:15:59 11   you drive, every five seconds I'm sure we've got a
14:16:03 12   distraction in our eyes.
14:16:05 13        Q. And observing a bus shelter is part of the
14:16:09 14   driving task, correct?
14:16:12 15        A. I don't know -- I wouldn't say so. I --
14:16:12 16   it -- no. I -- I would say that you monitor the
14:16:16 17   traffic ahead of you. If there's a bus there and he
14:16:19 18   has got his blinkers on or something, he or she has
14:16:23 19   their blinkers on you, realize the bus might stop.
14:16:28 20   And any car might stop for whatever reason in front
14:16:30 21   of you.
14:16:31 22        You're monitor- -- monitoring this traffic,
14:16:32 23   including the bus ahead of you. I don't think the
14:16:34 24   bus stop shelter becomes your primary cue that, oh
14:16:37 25   my gosh, there's a bus stop coming up and I better
                                                    142
```

**Page 143**

```
14:16:40  1   be ready to stop because the bus may stop. If
14:16:43  2   there's no bus in sight, clearly the bus stop
14:16:46  3   doesn't mean too much.
14:16:46  4        Q. Are you saying bus -- bus behavior and bus
14:16:50  5   stops are unrelated to the process of driving?
14:16:53  6        MR. MOBLEY: Objection. That's compound.
14:16:57  7        THE WITNESS: I'm not sure I -- no, I would
14:16:59  8   not say -- if I said that, I didn't mean to imply
14:17:02  9   that.
14:17:02 10   BY MS. BRILL:
14:17:04 11        Q. Is bus behavior unrelated to the process of
14:17:07 12   driving?
14:17:07 13        A. Observing what a bus is doing? Yes, that's
14:17:10 14   part of driving.
14:17:10 15        Q. Okay. And is observing a bus stop where a
14:17:13 16   bus may pull over part of driving?
14:17:15 17        MR. MOBLEY: Objection. That's an
14:17:16 18   incomplete hypothetical.
14:17:17 19        THE WITNESS: I would say that's a very
14:17:20 20   secondary task compared to monitoring the bus. If I
14:17:23 21   was driving, I would be worrying about the bus and
14:17:26 22   not worrying about the bus stop shelter. And if I
14:17:29 23   see a bus at a bus stop shelter, maybe I say, oh,
14:17:32 24   maybe he's going to stop.
14:17:33 25        But, you know, not every bus stop has a bus
                                                    143
```

**Page 144**

```
14:17:36  1   stop shelter. I don't know what the ratio is, but I
14:17:40  2   strongly suspect that most bus stops don't have bus
14:17:43  3   stop shelters. And so you'd better be ready to stop
14:17:44  4   or react if the bus stops, you know, whether there's
14:17:49  5   a bus stop shelter or not.
14:17:50  6        So I don't think of the bus stop as being a
14:17:53  7   major visual cue used by a driver to monitor if the
14:17:57  8   bus is going to stop in front of him. I just don't
14:18:00  9   think that's true.
14:18:27 10        Q. So, in any event, referring back to what
14:18:29 11   you said earlier, you regard scanning your
14:18:31 12   surroundings in general as part of the driving task,
14:18:31 13   correct?
14:18:35 14        A. Yes, absolutely.
14:18:35 15        Q. Okay.   ---
14:18:37 16        A. Important part.
14:18:40 17        Q. And making predictions about what's going
14:18:41 18   to happen up the road is part of the driving task,
14:18:41 19   correct?
14:18:45 20        A. I'd -- I'd buy that, yes.
14:18:53 21        Q. Have you ever ridden a bus in Southern
14:18:55 22   California?
14:18:55 23        A. Yes.
14:18:56 24        Q. Have you ever waited for a bus at a stop
14:18:58 25   with a shelter?
                                                    144
```

**Page 145**

```
14:18:58  1        A. Yes.
14:19:00  2        Q. Have you waited for a bus at a stop without
14:19:01  3   a shelter?
14:19:02  4        A. Yes.
14:19:03  5        Q. And bus shelters are a convenience for bus
14:19:06  6   drivers [sic], correct?
14:19:07  7        MR. MOBLEY: Objection. Calls for
14:19:10  8   speculation.
14:19:10  9        THE WITNESS: I think you said "bus
14:19:12 10   drivers." You meant bus riders?
14:19:12 11   BY MS. BRILL:
14:19:15 12        Q. Bus riders, excuse me. Thank you.
14:19:18 13        A. Are bus shelters a convenience for bus
14:19:20 14   riders? Yes.
14:19:21 15        Q. And they provide shelter from rain and wind
14:19:23 16   and sun?
14:19:24 17        A. Yes.
14:19:24 18        Q. And they provide a place to sit while
14:19:26 19   waiting for a bus, correct?
14:19:28 20        A. Sometimes, yes.
14:19:29 21        Q. And they promote bus ridership, correct?
14:19:32 22        A. Probably, yes.
14:19:32 23        Q. And they help reduce traffic congestion,
14:19:32 24   correct?
14:19:36 25        A. Yeah, that's -- yes, that's correct.
                                                    145
```

MERRILL LEGAL SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

**Brill Declaration Ex. B**
-49-

14:19:37 1    Q. And energy consumption?

14:19:39 2    A. Well, that's debatable, but in general,
14:19:44 3  yes. If the bus is pretty full, you reduce energy.
14:19:46 4  If you're on empty buses, it's questionable whether
14:19:49 5  you're reducing energy consumption or not.

14:19:49 6    Q. And air --

14:19:52 7    A. A lot of buses are running empty, too.

14:19:55 8    Q. And bus -- bus shelters help reduce air
14:19:59 9  pollutants?

14:20:01 10    MR. MOBLEY: Objection. Calls for
14:20:01 11  speculation. Beyond the scope of his expertise.

14:20:03 12    THE WITNESS: I would not
14:20:07 13  conclude that that's necessarily true. Buses make a
14:20:11 14  lot more particulates, diesel buses, than cars do.
14:20:16 15  And so you're not necessarily saving air pollution
14:20:20 16  if the bus isn't pretty full.

14:20:20 17  BY MS. BRILL:

14:20:22 18    Q. And bus shelters are usually privately
14:20:25 19  constructed and financed, correct?

14:20:28 20    MR. MOBLEY: Objection. Calls for
14:20:34 21  speculation.

14:20:34 22    THE WITNESS: I believe that is correct.

14:20:34 23  BY MS. BRILL:

14:20:35 24    Q. And publicly-owned bus companies seldom
14:20:39 25  take enough money into the fare box to cover costs,

146

14:20:39 1  correct?

14:20:42 2    MR. MOBLEY: Objection. Calls for
14:20:43 3  speculation. Beyond his field of expertise.

14:20:44 4    THE WITNESS: That's -- that is correct.
14:20:46 5  Very few bus companies make money.

14:20:46 6  BY MS. BRILL:

14:20:50 7    Q. And that's certainly true in Los Angeles,
14:20:51 8  correct?

14:20:52 9    MR. MOBLEY: Same objections.

14:20:52 10    THE WITNESS: Maybe Santa Monica bus may
14:20:55 11  make money. They used to make money. Actually,
14:20:57 12  Santa Monica bus lines. MTA does not.

14:20:57 13  BY MS. BRILL:

14:21:02 14    Q. And are you aware that the L.A. MTA runs
14:21:05 15  buses with compressed national -- natural gas?

14:21:08 16    MR. MOBLEY: Objection. Calls for
14:21:10 17  speculation. Lack of foundation. Beyond his field
14:21:12 18  of expertise.

14:21:13 19    THE WITNESS: Well, they -- they do now.
14:21:16 20  They -- there's -- there's a transition, they're
14:21:20 21  transitioning over. I don't know if there's any
14:21:22 22  diesels left or not, but I suspect there are.

14:21:22 23  BY MS. BRILL:

14:21:37 24    Q. You referred to the field of engineering as
14:21:38 25  a science, correct?

147

14:21:41 1    A. Yes. It's the art of applying scientific
14:21:44 2  principles to solving, I'll call it an everyday
14:21:59 3  problem, everyday ordinary problem. So it's the art
14:21:59 4  of applying a scientific principle.

14:21:59 5    Q. Is a basic principle of engineering that,
14:21:59 6  in order to draw conclusions, you have to have
14:21:59 7  adequate data?

14:21:59 8    A. No. That's -- that's false. I mean, if
14:22:03 9  there's printed text, you know, if there's printed
14:22:05 10  material that you know has been relied upon by a lot
14:22:10 11  of people for, I think that's adequate. I don't
14:22:13 12  have to have the data or collect the data. So I
14:22:16 13  wouldn't have to do that.

14:22:17 14    And back to the 15-degree cone, I'm not
14:22:20 15  sure there ever was any data collected. I think
14:22:22 16  it's just custom and practice.

14:22:38 17    Q. In -- in traffic engineering, you used the
14:22:40 18  concept of the 15-degree cone looking at something
14:22:43 19  at precisely the point when it would disappear from
14:22:46 20  the cone, correct?

14:22:46 21    A. Yes.

14:22:47 22    Q. Is that -- is that practice used in traffic
14:22:49 23  engineering?

14:22:51 24    A. I would say yes. Now, this is -- this --
14:22:54 25  you know, dealing with media signs, whatever you

148

14:22:58 1  want to call these, is -- is not something that's
14:23:03 2  routinely dealt with and analyzed in the traffic
14:23:06 3  engineering circles. So that part of the -- that
14:23:09 4  part is -- is -- it would -- we're breaking new
14:23:14 5  territory here. But the fact that a 15-degree cone
14:23:17 6  is used in the concept of signs has definitely been
14:23:22 7  around for many decades.

14:23:23 8    Q. I'm talking about your choice of using this
14:23:26 9  edge of the cone in the point at which something
14:23:29 10  disappears from the cone.

14:23:29 11    How is that used in ordinary traffic
14:23:32 12  engineering?

14:23:33 13    A. Well, like I said before, that's -- that's
14:23:36 14  the point they assume the driver's eye sees, and
14:23:40 15  they want the sign legible in the 15-degree cone.

14:23:44 16    Q. But not just -- I'm asking -- your -- your
14:23:46 17  study looked at the point at which -- relative sizes
14:23:50 18  at the point where something disappears from the
14:23:53 19  edge of the cone, correct?

14:23:53 20    A. Yes.

14:23:54 21    Q. So where is that used in traffic
14:23:56 22  engineering, other than in your report?

14:23:59 23    A. I -- I would say this is a relatively new
14:24:04 24  or unique approach. This is -- this is breaking
14:24:07 25  some new ground. I'm not aware of anybody else

149

38

```
14:24:10  1   that's done these kind of studies. I pretty well
14:24:13  2   stated my assumptions. I made these assumptions and
14:24:16  3   this is -- here is my basis, here is my assumptions,
14:24:19  4   here's my hypothetical, here's my -- my results and
14:24:22  5   answer. I think I've been pretty clear on that.
14:24:25  6         MS. BRILL: Let's take a little break and
14:24:27  7   maybe we'll be done soon.
14:24:29  8         THE VIDEOGRAPHER: Let's go off the record.
14:24:30  9   The time is 2:24.
14:29:42 10         (Brief recess.)
14:29:42 11         THE VIDEOGRAPHER: Back on the record. The
14:29:45 12   time is 2:29.
14:29:45 13   BY MS. BRILL:
14:29:49 14     Q. Mr. Kunzman, we'll try to finish up
14:29:53 15   quickly.
14:29:53 16         I'd like you to look at Exhibit 18, which
14:29:55 17   is one of those photographs we were looking at
14:29:57 18   before.
14:29:58 19         Do you see that?
14:29:58 20     A. Yes.
14:29:59 21     Q. Okay. In your -- in the way you used the
14:30:01 22   15-foot cone, it's correct, is it not, that the bus
14:30:05 23   shelter sign would fall out of the cone of the
14:30:11 24   15-- I'm sorry, did I say "15-foot"? The
14:30:14 25   15-degree cone.
                                                        150
```

```
14:30:14  1         The bus shelter sign would fall out of the
14:30:16  2   15 degrees before that little square or rectangle
14:30:21  3   that shows where the bus -- the bus routes, the
14:30:24  4   numbers of the bus routes?
14:30:25  5         Is that correct?
14:30:25  6     A. That is correct, yes.
14:30:26  7     Q. So at that point, the bus route number sign
14:30:28  8   would be larger than the -- the bus shelter ad in
14:30:33  9   the cone?
14:30:34 10     A. Well, if you discounted the -- the ad, the
14:30:39 11   bus shelter ad, if you discounted that, then clearly
14:30:42 12   the biggest sign would be the -- the bus schedule
14:30:45 13   sign.
14:30:45 14     Q. Okay. And that's how you did your analysis
14:30:48 15   for --
14:30:50 16     A. Well, I basically said when you were at
14:30:53 17   15-degrees cone, which sign would appear to be
14:30:55 18   bigger when both of them were at the 15-degree
14:30:58 19   boundary? That's how I did it.
14:31:00 20     Q. And so -- so there's a point at which, even
14:31:05 21   for this small pole sign with the bus routes, that
14:31:12 22   would be bigger than the bus shelter sign on your --
14:31:17 23   the way you did the analysis?
14:31:19 24     A. Yes. It's definitions, but yes, there's a
14:31:23 25   point where the one sign wouldn't count and the
                                                        151
```

```
14:31:24  1   other sign would be in the cone and clearly would be
14:31:28  2   the biggest sign.
14:31:31  3     Q. And how -- when you're looking, using this
14:31:31  4   15-degree cone principle in traffic safety, the
14:31:36  5   point is to determine -- to make the fonts or the
14:31:41  6   letters big enough so that they're visible at some
14:31:44  7   point within the cone, not at the edge, correct?
14:31:46  8     A. Well, at the edge. That's where
14:31:48  9   theoretically it would -- which -- it should be
14:31:51 10   equal. In other words, you should just be able to
14:31:53 11   read the sign when you're at the 15-degree cone.
14:31:55 12         If you're driving down the freeway, maybe
14:31:58 13   the easier example, but if you're driving down the
14:32:01 14   freeway, you see a big green sign, it's going to
14:32:03 15   tell you all the future exits.
14:32:05 16         Well, clearly when you first see that sign,
14:32:07 17   normally you're not going to be able to read it.
14:32:09 18   You know the sign's there, but you can't read it.
14:32:11 19         The goal is to make it so that in that
14:32:14 20   case, when you're in the fast lane, or a car pool
14:32:18 21   lane, and you get to about the 15-degree cone, that
14:32:20 22   sign should be readable by a typical driver.
14:32:25 23         And then you get into what's typical, and I
14:32:28 24   don't know if it's 20/20 or 20/40, but the point is,
14:32:32 25   is there's some point there when the -- the person
                                                        152
```

```
14:32:34  1   should be able to read the sign and know what it
14:32:37  2   says without going like that as they drive by it.
14:32:40  3   They don't have to follow it with their head as they
14:32:43  4   drive by.
14:32:43  5         So that's -- that's how it's used.
14:32:46  6     Q. So it can be anywhere -- it can be -- the
14:32:51  7   point is to make it legible within that cone, not
14:32:54  8   just at the edge of the cone, correct?
14:32:56  9     A. Well, yes, but -- but maybe not quite
14:32:58 10   exactly as you stated.
14:32:59 11         When you get to the point that the sign is
14:33:01 12   about to the 15-degree cone line, the edge of the
14:33:03 13   cone, that's the point in time which it should be
14:33:07 14   legible ta a, call it average driver. Before that
14:33:11 15   point when the sign is more in the center, assuming
14:33:13 16   it's a straight road, when the sign is more in the
14:33:15 17   center, you know, is well inside that cone. Not
14:33:19 18   necessarily legible. It's not necessarily --
14:33:22 19   necessarily legible.
14:33:24 20         But when you get to the point where the
14:33:26 21   sign is about 15-degree cone, you should be able to
14:33:29 22   pretty easily read it, or an average person, typical
14:33:33 23   person.
14:33:33 24     Q. And that, you're talking typically about
14:33:35 25   signs that are placed in the -- placed in the center
                                                        153
```

MERRILL    LEGAL    SOLUTIONS
800-826-0277    818-593-2300    Fax 818-593-2301    www.merrillcorp.com

Brill Declaration Ex. B
-51-

14:33:37  1   of a freeway, for example?
14:33:42  2       A. Well, my example was like if it's – It's
14:33:44  3   off to the edge. Let's say it's an off-ramp. Not
14:33:48  4   too many signs are in the middle of the freeway.
14:33:50  5   Some are, but – but – and some are overhead signs.
14:33:52  6       But typically a directional sign saying,
14:33:56  7   you know, Robertson Avenue is coming up, that kind
14:33:59  8   of sign is typically on the right-hand side up on a
14:34:02  9   pole. And the pole hangs cantilevered out to some
14:34:07 10   degree over the travel lanes, but not – not way
14:34:08 11   out. Just over a little bit. Typically it's maybe
14:34:12 12   over the slow lane. That's about it.
14:34:23 13       MS. BRILL: Okay. Well, do you have
14:34:24 14   anything else? No? ------
14:34:26 15       Okay. Well, thank you for – for coming in
14:34:29 16   today. And I appreciate your time.
14:34:32 17       THE VIDEOGRAPHER: Well, this concludes the
14:34:35 18   deposition of William Kunzman, Volume Number I. The
14:34:38 19   number of tapes used was two. And the original
14:34:47 20   videotapes will be retained by Merrill Legal
14:34:47 21   Solutions at 20750 Ventura Boulevard, Suite 205,
14:34:50 22   Woodland Hills, California. Going off of the
14:34:52 23   record. The time is 2:35.
         24       (Deposition concluded at 2:35 p.m.)
         25           -oOo-

                                                    154

 1   STATE OF CALIFORNIA    )
                            ) ss.
 2   COUNTY OF LOS ANGELES  )
 3
 4       I, Shanda Levine, Certified Shorthand
 5   Reporter, Certificate No. 10094, for the State of
 6   California, hereby certify:
 7       I am the deposition officer that
 8   stenographically recorded the testimony in the
 9   foregoing deposition:
10       Prior to being examined the witness was by
11   me first duly sworn;
12       The foregoing transcript is a true record
13   of the testimony given.
14       Before completion of the deposition, review
15   of the transcript [X] was [] not requested. If
16   requested, any changes made by the deponent (and
17   provided to the reporter) during the period allowed
18   are appended hereto.
19
20   Dated _____.
21
22
                 _____
23               Shanda Levine
                 CSR 10094
24
25

                                                    156

 1              DECLARATION
 2
 3
 4
 5
 6       I hereby declare I am the deponent in the
 7   within matter; that I have read the foregoing
 8   deposition and know the contents thereof, and I
 9   declare that the same is true of my knowledge except
10   as to the matters which are therein stated upon my
11   information or belief, and as to those matters, I
12   believe it to be true.
13       I declare under the penalties of perjury of
14   the State of California that the foregoing is true
15   and correct.
16       Executed on the _____ day of
17   _____ 2008, at
18   _____
19   California.
20
21
22
23
24
25          W I T N E S S

                                                    155

1 STATE OF CALIFORNIA     )
                          )  ss.
2 COUNTY OF LOS ANGELES   )

3

4        I, Shanda Levine, Certified Shorthand Reporter,

5 Certificate No. 10094, for the State of California,

6 hereby certify:

7        I am the deposition officer that

8 stenographically recorded the testimony in the foregoing

9 deposition;

10       Prior to being examined the witness was by me

11 first duly sworn;

12       The foregoing transcript is a true record of

13 the testimony given.

14       Before completion of the deposition, review of

15 the transcript [X] was [ ] was not requested.  If

16 requested, any changes made by the deponent (and

17 provided to the reporter) during the period allowed are

18 appended hereto.

19

20 Dated __July 23, 2008_____.

21

22                         _____

23                              Shanda Levine
                                 CSR 10094

24

25

# Exhibit 14

1  PAUL E. FISHER SBN 125309
   The Law Office of Paul E. Fisher
2  537 Newport Center Dr., #289
   Newport Beach CA  92660
3  Telephone: (949) 675-5619
   Facsimile:  (949) 675-5641
4
   ATTORNEYS FOR PLAINTIFF
5  METRO LIGHTS OUTDOOR MEDIA, INC.

6              UNITED STATES DISTRICT COURT

7           FOR THE CENTRAL DISTRICT OF CALIFORNIA

8  METRO LIGHTS, L.L.C., a New York ) Case No. CV 04-1037 GAF (Ex)
   corporation,                     )
9                                   ) The Hon. Gary A. Feess
           Plaintiff,               )
10                                  ) **DECLARATION OF WILLIAM**
       vs.                          ) **KUNZMAN SUBMITTED IN**
11 CITY OF LOS ANGELES, a California ) **SUPPORT OF MOTION FOR**
   municipal corporation; and DOE 1 ) **PARTIAL SUMMARY JUDGMENT**
12 through DOE 10, inclusive,        )
                                    ) Date:      September 26, 2005
13         Defendants.              ) Time:       9:30 a.m.
                                    ) Courtroom: 740
14                                  )
                                    )
15

16      Plaintiffs hereby submit the declaration of William Kunzman in

17 support of its Motion for Partial Summary Judgment.  This declaration was

18 previously filed in support of Plaintiff's Motion for Preliminary Injunction.

19 Date:  August 25, 2005          LAW OFFICE OF PAUL E. FISHER

20

21

22                               By: _____

23                                    PAUL E. FISHER
                                     Attorneys for Plaintiff
24                                   METRO LIGHTS, L.L.C.

25

26

27

   EXHIBIT  14
   Kunzman
   7-22-08

                          -1-      DECLARATION OF WILLIAM KUNZMAN
                                   IN SUPPORT OF MOTION FOR SUMMARY
                                   JUDGMENT  Brill Declaration Ex. B
                                                        -55-

FILED

2004 AUG -9 PM 3:30

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

1  PAUL E. FISHER SBN 125309
   The Law Office of Paul E. Fisher
2  537 Newport Center Dr., #289
   Newport Beach CA  92660
3  Telephone:  (949) 675-5619
   Facsimile:  (949) 675-5641
4
5  ATTORNEYS FOR PLAINTIFF
   METRO LIGHTS OUTDOOR MEDIA, INC.
6
7              UNITED STATES DISTRICT COURT
8          FOR THE CENTRAL DISTRICT OF CALIFORNIA
9
10 METRO LIGHTS, L.L.C., a New York )   Case No. CV 04-1037 GAF (Ex)
   corporation,                     )
11                                   )   DECLARATION OF WILLIAM
              Plaintiff,             )   KUNZMAN IN SUPPORT OF
12        vs.                        )   MOTION FOR PRELIMINARY
                                     )   INJUNCTION
13 CITY OF LOS ANGELES, a California )
   municipal corporation; and DOE 1 )
14 through DOE 10, inclusive,        )
                                     )   The Hon. Gary A. Feess
15            Defendants.            )
                                     )   Date:   August 30, 2004
16                                   )   Time:   10:00 a.m.
                                     )   Dept.   740
17 _____ )
18
19      I, William Kunzman, declare as follows:
20      1.    I am over the age of 18 and not a party to the within action.  I
21 have personal knowledge of each of the following facts and if called as a
22 witness, I could and would testify competently thereto.
23      2.    I am a registered professional traffic safety engineer in the State
24 of California, license no. TE0056.  A true and correct copy of my curriculum
25 vitae is attached hereto as Exhibit "A."
26      3.    I have a Bachelor of Science degree in engineering from the
27 University of California at Los Angeles and a certificate in traffic
28 engineering from Yale University.

4.    On or about July 19, 2004, I was retained by Plaintiff, Metro
Lights, L.L.C. ("Metro Lights") to conduct an inspection of signs to
determine whether they may constitute a traffic hazard.  On or about July 31,
2004, I conducted an inspection of seven separate locations where Metro
Lights has signs located within the City of Los Angeles.  At each location, I
found a sign physically identical, measuring approximately 67" in height and
46" in width, the exact dimensions of bus shelter signs that the City of Los
Angeles currently maintains in numerous locations.  Attached hereto as
Exhibit "B" is a table that I prepared comparing the physical aspects of the
signs maintained by Metro Lights with those located at City bus shelters.

5.    In order to determine the relative effect on traffic safety of the
Metro Lights sign and the adjacent bus shelter sign, I measured the distance
of each sign from the curbside and adjacent lanes of traffic.  On average, the
signs operated by Metro Lights, which are referred to in my report as
"outdoor media signs" are more than 3 times further from the curb face than
the bus shelter signs.  The outdoor media signs which are the subject of my
study are an average of 19.3 feet away from the curb face, while the average
bus shelter sign was only 5.3 feet from the curb face.

6.    I determined that all of the bus shelter signs in my sample were
closer to the curb face than all of the outdoor media signs owned by Metro
Lights.  All of the bus shelter signs were located on City owned right-of-way
while the outdoor media signs owned by Metro Lights were outside the City
owned right-of-way and located on what was apparently private property.
Accordingly, the outdoor media signs will always be further away from the
curb face than the bus shelter signs for a given right-of-way width.

7.    Attached hereto as Exhibit "C" is a table in which I describe
figures relevant to determining the degree to which the Metro Lights signs

DECLARATION OF
WILLIAM KUNZMAN   Prelim. Prohibition Ex. B
-57-

compare as a potential traffic hazard to the bus shelter signs maintained by the City. As described in Exhibit "C," the bus shelter signs are more visible to a driver than the outdoor media signs maintained by Metro Lights, based on the angle off straight ahead that a driver has to look to see the sign. Bus shelter signs are more visible and logically more distracting for the same size sign with the same message. Visibility is a function of the angle to the right of straight ahead that a driver has to look to see a sign.

8.    For the average bus shelter sign, it is within 15° of a driver's straight ahead line of sight at 80 or more feet back from the sign. For the average outdoor media sign, it is within 15° of a driver's straight ahead line of sight at 140 or more feet back from the sign. Outdoor media signs will always be further from the curb face and have a larger angle off straight ahead than a bus shelter sign for a given right-of-way width outside of the curb face. Therefore, the bus shelter signs in my study were more visible and more of a potential distraction than any of the outdoor media signs included in my study.

9.    In Exhibit "C" (Table 2), I chose 15° as a reasonable angle to represent the angle that one would expect a driver to notice a sign. Clearly, a driver is more likely to see a sign if it is less than 15° from his straight ahead line of sight and less likely to see a sign if it is more than 15° of his line of sight. Whether 15° or some other angle is used, similar results will be obtained. Because the bus shelter signs are closer to lanes of traffic, and the Metro Lights signs are further away from lanes of traffic, the bus shelter signs will almost invariably be within the driver's sight to a greater degree.

10.    Attached hereto collectively as Exhibit "D" are a series of photographs that I took of each of the sites I inspected. Each of these sites represent a bus shelter sign or outdoor media sign operated by Metro Lights

-3-

1  located in the City of Los Angeles.  In each instance, I have placed a red dot
2  in the photograph to indicate the location of the sign.

3      11.    The photographs depict the following:

4         Photo #1a - This shows a Metro Lights sign located at the
5  corner of Sunset and Hayworth.  The Metro Lights sign can be
6  seen on the right hand side of the photograph.

7         Photo #1b - This photo is of the same site as that depicted in
8  photo #1a, but the red dot is now placed by the bus shelter sign,
9  which can be seen to be far closer to the lanes of traffic and
10  more visible to motorists.

11         Photo #2a - This photo depicts a Metro Lights sign located at
12  the intersection of Olympic and La Brea.
13

14         Photo #2b - This photo indicates a bus shelter sign in the same
15  location as the sign depicted in photo #2a.

16         Photo #3a - This photo shows a Metro Lights sign located at La
17  Brea and Third.

18         Photo #3b - This photo depicts a similar bus shelter sign at the
19  same location.  Photo #3a and photo #3b are highly instructive
20  in determining the relative traffic safety of each of the two
21  types of signs.  Depicted in photos #3a and #3b are signs of the
22  identical dimensions and depicting the exact same advertising
23  copy, an advertisement for the film, "The Black Book."  The
24  most significant difference between the two types of signs is
25  that the City's sign depicted in photograph #3b is only 3.8'
26  from the curb face, while Metro Lights' sign is 16.7' away from
27  the curb face.  A driver looking straight ahead would have the
28  City sign within his line of sight using the 15° angle described

-4-

DECLARATION OF
WILLIAM KUNZMAN

Brill Declaration Ex. B
-59-

in Exhibit "C" for a much longer time than the corresponding
Metro Lights sign.  Accordingly, the photos #3a and #3b easily
demonstrate the greater visibility of the City's bus shelter signs
over the Metro Lights signs.

Photo #4a - This photo depicts a Metro Lights sign at the
intersection of Highland and Sunset.

Photo #4b - This photo shows a bus shelter sign at almost the
same location.

Photo #5a - This photo indicates another Metro Lights sign
located near Highland and Sunset, visible to westbound traffic.

Photo #5b - The closest bus shelter sign to the Metro Lights
sign depicted in Exhibit 5a can be seen in Exhibit 4b.

Photo #6a - This photo shows a Metro Lights sign located near
the corner of Rossmore and Melrose.

Photo #6b - This photo indicates a bus shelter sign situated in
close proximity to Photo #6a.

Photo #7a - This photo depicts another Metro Lights sign
located at the intersection of Rossmore and Melrose.

Photo #7b - The closest bus shelter sign closest to the Metro
Lights sign depicted in Photo 7a can be seen in Photo 6b.

12.    In all of the photographs described above, the bus shelter sign is
consistently closer to lanes of traffic than the outdoor media signs and
commensurately more visible to drivers.  The signs located closer to the
driver's straight ahead line of sight are visible for a greater length of time
than signs located at a greater angle from the driver's straight line of sight.

13.    Attached hereto as Exhibit "E" are a series of photographs that I
took of a bus shelter sign located on the east side of Figueroa between

-5-

1  Wilshire and Sixth. What is significant about this sign, is that it is not in fact
2  connected to the adjacent bus shelter, which is also visible in the
3  photograph. Instead, it is a two-sided freestanding sign located on the
4  sidewalk. Although it is close to a bus shelter, it is not attached and does not
5  constitute a part of the bus shelter.
6      14.    Based on my review of all of the available data, as described
7  above, I do not believe that the Metro Lights signs depicted in the attached
8  photographs and described in Exhibits "B," "C," and "D" create any unsafe
9  condition for the traveling public. In fact, based on my review of the signs
10  depicted in the photographs attached to this declaration, signs erected by the
11  City in connection with bus shelters are invariably closer to lanes of traffic
12  and, therefore, more visible and potentially a greater distraction than any of
13  the signs owned and operated by Metro Lights.
14
15      I declare under penalty of perjury under the laws of the United States
16  of America that the foregoing is true and correct.
17
18      Executed this 6th day of August, 2004, at Los Angeles, California.
19
20  *William Kunzman*
21  WILLIAM KUNZMAN
22
23
24
25
26
27
28

-8-