# EXHIBIT E

Court of Appeals Case No. 07-55207 and 07-55179

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

METRO LIGHTS, L.L.C.,

*Plaintiff/Cross-Appellant/Appellee*

v.

CITY OF LOS ANGELES,

*Defendant/Appellant/Cross-Appellee.*

Appeal from the United States District Court for the Central District of California in Case No. CV 04-1037 (GAF) (Ex), Judge Gary A. Feess

## SUPPLEMENTAL BRIEF OF *AMICUS CURIAE* CBS-DECAUX, L.L.C.

Laura W. Brill
Richard M. Simon
IRELL & MANELLA LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067
Telephone: (310) 277-1010

Attorney for *Amicus Curiae*,
CBS Decaux, L.L.C.

August 12, 2008

1913621

Amicus curiae CBS Decaux, L.L.C. ("CBS Decaux") respectfully submits this supplemental brief to remedy misleading statements made by Metro Lights and its "expert" witness in this case.

CBS Decaux submits this brief because CBS Decaux has recently learned that statements of a purported expert witness relied upon extensively by Respondent Metro Lights, L.L.C. ("Metro Lights") are materially misleading, and Mr. Paul Fisher, counsel for Metro Lights, had reason to know that the statements were misleading no later than December 2007. Counsel for Metro Lights, however, failed to correct the witness's statements or statements in Metro Lights' brief that relied on the misleading statements and described them in a manner that was even more untruthful.

The misleading statements concern the views of Metro Lights' "expert" witness William Kunzman, regarding issues of traffic safety. A critical part of Metro Lights' Opening and Responsive Brief ("Opposition Brief") focuses on the issue of traffic safety and argues that bus shelter signs are more of a traffic hazard than Metro Lights signs on private property. Metro Lights' Opposition Brief relies extensively on a declaration of Mr. Kunzman. Opp. Br. at 9-10, 23, 30. Mr. Kunzman's declaration states that he was retained by Metro Lights "to conduct an inspection of signs to determine whether they may constitute a traffic hazard." Metro Lights Supplemental Excerpts of Record ("AER"), Tab 13, at 358, ¶ 4. Mr. Kunzman goes on to state that he determined that bus shelters were closer to

1913621

- 1 -

traffic lanes than signs owned by Metro Lights. *Id.* ¶ 6. He then states that "Bus shelter signs are more visible and logically more distracting for the same size sign with the same message." *Id.* ¶ 7; *id.* ¶ 8 ("the bus shelter signs in my study were more visible and more of a potential distraction than any of the outdoor media signs included in my study.").

These statements about "distraction," were grossly misleading, as Mr. Fisher, counsel for Metro Lights, had reason to know no later than December 2007. On that date, Mr. Kunzman wrote a letter to Mr. Fisher in connection with another case challenging the City's sign regulations. In that letter, Mr. Kunzman made very clear that he a unique personal definition for the word "distraction," and to Mr. Kunzman, the label "distraction" does not correlate with traffic safety.

In 2007, Mr. Kunzman had this to say to Mr. Fisher about driver distraction:

- "To merely label something as a 'distraction' is not meaningful." Exhibit A to Declaration of Laura Brill ("Brill Decl.") at 10 (Kunzman letter at 9)[1].

- "Anything that a driver might look at while driving, other than the road ahead, is a distraction." Ex. A at 2 (Kunzman letter at 1).

---

[1] The Declaration of Laura Brill and the exhibits thereto are attached to the concurrently filed Motion of *Amicus Curiae* CBS-Decuax, L.L.C., for Leave to File Supplemental Brief to Remedy Misleading Statements by Metro Lights.

1913621

- 2 -

- "Drivers look around as they drive, whether it is looking at a building or a tree or clouds in the sky. The distinction needs to be made between a typical distraction and a significant distraction." *Id.* at 10 (Kunzman letter at 9).
- "[M]ost driver distractions are not significant, and do not lead to traffic accidents. *Id.* at 3 (Kunzman letter at 2).

Mr. Kunzman's 2007 letter also put counsel for Metro Lights on notice that the methodology that Mr. Kunzman had used in his "analysis" in this case was flawed beyond repair. In particular, Mr. Kunzman's opinion in this case was based on a traffic engineering rule of thumb that is meant to ensure that signs are safe and legible by placing them close enough to the road that they will be seen. Ex. A at 8 (Kunzman letter at 7) ("the eye easily sees anything within approximately a 15 degree vision cone. . . . In Traffic Engineering, signs are designed so that when in approximately a 15 degree vision cone, the sign can be read."). There is no basis to infer from this rule of thumb that bus shelter signs are more unsafe than Metro Lights signs because the former are closer to traffic lanes. Indeed, the opposite is true. Metro Lights signs, because they are at a greater angle from the roadway, are more likely to draw a driver's eyes off the road than bus shelter signs that are less likely to draw a driver's attention away from the road. As Mr. Kunzman told Mr. Fisher in 2007, when a driver's attention is diverted away from the road by an occurrence or object outside the 15 foot cone, accidents

can result. *Id.* at 3 (Kunzman letter at 2) ("We are all familiar with the rubber necking that occurs when there is an accident. One driver is looking at the accident and runs into the back of the care ahead which might have unexpectedly stopped.").

Mr. Fisher filed Mr. Kunzman's December 2007 letter in another action on May 5, 2008,[2] but failed to bring it to the attention of this Court during oral argument here on June 4, 2008, despite Metro Lights' substantial reliance on Mr. Kunzman's 2004 declaration in its Opposition Brief and oral argument.[3] Opp. Brief at 9-10, 23, 30.

Because Mr. Kunzman's declaration and Metro Lights' Opposition Brief were misleading, and because a truthful presentation of the facts relevant to traffic safety would not support summary judgment in this case, CBS Decaux now calls these issues to the Court's attention as further ground for reversal of the judgment below.

## BACKGROUND

Respondent Metro Lights LLC ("Metro Lights") has constructed hundreds of signs on private commercial and industrial property in the City

---

[2] See Document No. 69-3 in *World Wide Rush v. City of Los Angeles*, Central District of California, Case No. 2:07-cv-00238-ABC-JWJ.

[3] Professor Laurence Tribe presented oral argument on behalf of Metro Lights. CBS Decaux has no reason to believe and does not allege that Professor Tribe was aware of the matters set forth this in this motion or the accompanying brief at the time of oral argument or at any time prior to August 12, 2008, when CBS Decaux brought these matters to his attention in connection with seeking consent of Metro Lights to the filing of this motion.

of Los Angeles without seeking or obtaining permits from the City of Los Angeles.

Metro Lights sued the City of Los Angeles alleging that the City's "Street Furniture Agreement" with amicus curiae CBS Decaux LLC ("CBS Decaux") renders the City's restrictions of "off-site signs" on private property invalid under the First Amendment based on the Supreme Court's commercial speech line of cases. The Street Furniture Agreement provides for the construction of maintenance of bus shelters, public toilets, and other "street furniture" with advertising displays within the public right of way.

Critical to Summit's constitutional claim and argument before this Court was Summit's contention that bus shelters interfere with traffic safety because of their proximity to traffic lanes, whereas Metro Lights' signs placed farther away from traffic lanes do not. The only evidence in the record in support of this contention was a declaration by Mr. William Kunzman, who Metro Lights describes as a traffic safety expert.

Mr. Kunzman states in his 2004 declaration in this case that he was retained by Metro Lights "to conduct an inspection of signs to determine whether they may constitute a traffic hazard." AER, Tab 13, p. 538, ¶ 4. Mr. Kunzman goes on to state that he determined that bus shelters were closer to traffic lanes than signs owned by Metro Lights. *Id.* ¶ 6. He then states that "Bus shelter signs are more visible and logically more distracting for the same size sign with the same message." *Id.* ¶ 7; *id.* ¶ 8 ("the bus

shelter signs in my study were more visible and more of a potential distraction than any of the outdoor media signs included in my study."). Mr. Kunzman's declaration, taken as a whole, gave the impression that Mr. Kunzman's use of the term "distraction" was material to traffic safety.

Metro Lights made precisely such an argument to this Court in its Opposition Brief, and based this argument on Mr. Kunzman's declaration. In its brief before this Court, filed in September 14, 2007, Metro Lights, through its attorney Paul Fisher, argued that Mr. Kunzman's declaration showed that "many of the signs that the City allows on public property under the [Street Furniture] Agreement actually pose a greater threat to traffic safety than Metro Lights' off-site signs because many allowed signs are only inches away from the roadway, while Metro Lights' signs are located much further away from the roadway on private property." Opp. Br. at 23. Metro Lights went on to argue that in Mr. Kunzman's opinion, "the city's bus shelter signs are 'more distracting for the same size sign with the same message' than those signs owned and operated by the City." *Id.* Metro Lights also claimed that in Mr. Kunzman's view bus shelter signs "constitute a greater hazard, because they are closer to lanes of traffic and more directly within the line of sight of motorists." Opp. Br. at 24-25; *see also* Opp. Br. at 30 (relying on Mr. Kunzman and describing bus shelter sign as "a greater traffic hazard than any Metro Lights sign").

On December 21, 2007, Mr. Kunzman wrote to Mr. Fisher in connection with another lawsuit challenging the City's sign regulations. In that letter, Mr. Kunzman made clear that his use of the term "distraction" was not material to traffic safety. Indeed, his 2007 letter demonstrates that Mr. Kunzman's opinion does not support an argument that bus shelter signs are more of a traffic hazard than Metro Lights signs.

In particular, Mr. Kunzman's 2007 letter states that in his view, the term "'distraction,' is not meaningful." He clarified just how meaningless he felt the term was and that a "distraction" was in no way synonymous with the term traffic hazard. "Anything that a driver might look at while driving, other than the road ahead, is a distraction." Ex. A at 2 (Kunzman letter at 1). "Drivers look around as they drive, whether it is looking at a building or a tree or clouds in the sky. The distinction needs to be made between a typical distraction and a significant distraction." *Id.* at 10 (Kunzman letter at 9). "[M]ost driver distractions are not significant, and do not lead to traffic accidents. *Id.* at 3 (Kunzman letter at 2).

Mr. Kunzman's 2007 letter also placed Mr. Fisher on notice that the methodology that Mr. Kunzman had used in his "analysis" in this case was flawed beyond repair. In particular, Mr. Kunzma's opinion in this case was based on a traffic engineering rule of thumb that is meant to ensure that signs are safe and legible by placing them close enough to the road that they will be seen. Ex. A at 8 (Kunzman letter at 7) ("the eye easily sees anything

within approximately a 15 degree vision cone. . . . In Traffic Engineering, signs are designed so that when in approximately a 15 degree vision cone, the sign can be read."). There is no basis to infer from this rule of thumb that bus shelter signs are more unsafe than Metro Lights signs because the former are closer to traffic lanes. Indeed, the opposite is true. Bus shelter signs will be more likely to be visible to a driver without looking away from the road, whereas Metro Lights signs, because they are at greater angle from the roadway are less likely to be seen without a driver looking away from the road. As Mr. Kunzman told Mr. Fisher in 2007, when a driver's attention is diverted away from the road by an occurrence or object outside the 15 foot cone, accidents can result. *Id.* at 3 (Kunzman letter at 2) ("We are all familiar with the rubber necking that occurs when there is an accident. One driver is looking at the accident and runs into the back of the care ahead which might have unexpectedly stopped.").

Mr. Kunzman's letter to Mr. Fisher is dated December 2007. Mr. Fisher filed that letter in the United States District Court for the Central District of California in connection with another action on May 5, 2008. *See* n. 2, *supra*. Oral argument occurred in this case on June 4, 2008. Yet Mr. Fisher failed to bring these issues to the Court's attention, despite Metro Lights' substantial reliance on Mr. Kunzman's 2004 declaration in its Opposition Brief and argument. Opp. Brief at 9-10, 23, 30.

One of CBS Decaux's members, CBS Outdoor Inc. ("CBS Outdoor"), first learned of Mr. Kunzman's December 2007 opinion on June 25, 2008, when another attorney filed it in a separate action, *Summit Media LLC v. City of Los Angeles*, No. 07-2649 RSWL (C.D. Cal. filed Apr. 20, 2007). The Summit case includes a challenge to City sign regulations that is somewhat similar to the challenge launched by Metro Lights. CBS Outdoor intervened in the *Summit* case in order, among other things, to protect the Street Furniture Agreement.

In a deposition in the *Summit* case on July 22, 2008, Mr. Kunzman confirmed that he had used the concept of driver distraction in the same way in the 2004 and 2007 declarations. Brill Decl. Ex. B (transcript of the July 22, 2008 Deposition of William Kunzman) at 18 (Depo. 20-21), in other words, that his reference to "distraction" in 2004 was "not meaningful." *Id.* at 29 (Depo. at 62-63); *see also id.* at 48 (Depo. at 140-41) (buildings and palm trees are a "distraction" under his definition).

He also provided additional testimony demonstrating that his 2004 declaration cannot be credited, that bus shelters contribute to traffic safety and are an important public good, that advertising signs on bus shelters can enhance the visibility of bus stops, and many other facts that contradict Metro Lights' position in this case. The following is a sample of Mr. Kunzman's testimony as it relates to his work for Metro Lights:

- Bus stops are harder to see without bus shelters; advertisement on the bus shelters can make the shelters themselves more visible. *Id.* at 44-45 (Depo. at 123-126);

- Observing bus behavior is part of driving; making predictions about what will happen on the road is part of driving; bus shelters "obviously" help some drivers know when a bus is going to stop. *Id.* at 37, 49 (Depo. at 94, 143-44).

- Public transit is safer than riding in individual cars. *Id.* at 22 (Depo. at 37);

- Bus shelters help to increase transit ridership. *Id.* at 22 (Depo. at 36-37); *see also id.* at 49 (Depo. at 145) (convenience; place to sit; shelter from rain, wind, and sun; reduce traffic congestion); *id.* at 24 (Depo. at 43) (amenity for public transit).

- Bus shelters are usually privately constructed and financed; bus companies, including L.A. County MTA, seldom take enough money into the fare box to cover costs. *Id.* at 50 (Depo. at 146-47).

- There is no evidence anywhere that signs on bus shelters cause accidents. *Id.* at 28 (Depo. at 58);

- He has no expertise in numerous subjects that are relevant to determining whether signs placed at a greater angle away from

traffic lanes are more hazardous to driving than signs within a driver's line of vision. *Id.* at 25-26 (Depo. at 47-51);

- Rear-enders can occur when a driver turns his or her head to the side. *Id.* at 27 (Depo. at 56-57). In order to see a sign outside of a driver's 15 degree "vision cone," it is more likely that the driver will have to turn his or her head. *Id.* at 36 (Depo. at 92).

- His review of signs in connection with his 2004 declaration in this case was limited to a review of 4 or 5 bus shelter signs; he does not know whether these are representative of bus shelter signs in general, and the four or five locations were suggested to him by counsel for Metro Lights. *Id.* at 32-33 (Depo. at 74, 76, 81);

- In traffic engineering, the concept of the 15 degree vision cone upon which he relies in his 2004 declaration, is used to ensure legibility to an average driver. Seeing a sign within the 15 degree cone does not mean the sign is unsafe. If you see an object as you are looking ahead, you can still have your eyes safely on the road. *Id.* at 26, 27, 36, 50, 51 (Depo. at 51, 55, 93, 149-153).

- No data supports using the methodology in his 2004 declaration in this case as a basis for making an assessment of traffic safety. *Id.* at 35, 36, 50, 51 (Depo. at 89-91, 149-150); *see also id.* at

42 (Depo. at 115-116) ("I'll avoid the question. . . "). In contrast, other studies using actual traffic accidents to measure traffic safety use valid approaches. *Id.* at 30-31 (Depo. at 69-70).

- The Metro Lights signs that he reviewed for his 2004 declaration are within the 15 degree cone of vision at 140 feet. Mr. Kunzman did not determine whether such signs would be legible to an average driver at that distance and has no records demonstrating that this is the case. The lettering on a Metro Lights sign would look larger if a driver was closer and turned his or head to see the sign. He has no data on whether drivers in fact turn their heads to see signs outside the 15 degree vision cone. *Id.* at 36-38 (Depo. at 93-94, 96-98, 100-101).

- In preparing his 2004 declaration, he did <u>not</u> do any of the following: (1) assess whether drivers look at bus shelter signs while moving or while stopped; (2) collect data on how long drivers look at these signs; (3) collect data on whether drivers have to turn their heads to the side to see bus shelter signs or Metro Lights signs; (4) study traffic safety or traffic flow at bus stops with or without shelters; (5) study traffic safety or traffic flow at bus stops with or without advertising. *Id.* at 34-35 (Depo. at 84-87);

- There is a correlation between a driver turning his or her head to the side and traffic accidents. *Id.* at 37 (Depo. at 95-96).

- A small scale sign on a business is often used to identify the business to passersby. Drivers know to look for a sign on a building itself if they are looking for the business. If a small-scale sign that is affixed to a business displays an off-site message, it could create confusion for drivers looking to locate the business, and such confusion could affect traffic safety. *Id.* at 39-41 (Depo. at 104-106, 109-110).

- A bus shelter can provide seating from which a person can read smaller advertising messages. A Metro Lights sign has no such seating. *Id.* at 43 (Depo. at 120-121).

## ARGUMENT

Here, there is good cause for the Court to take post-argument consideration of the matters described above, including William Kunzman's December 2007 letter to counsel for Metro Lights and Mr. Kunzman's recent testimony in order to remedy misleading statements made to this Court. In particular, attorneys have a duty of candor when practicing before this Court. That duty includes the obligation to correct misleading statements in briefs. *Moser v. Bret Harte Union High School District*, 366 F. Supp. 2d 944, 986 (E.D. Cal. 2005) ("Defendant's statement that because the briefs were already submitted to the Court it made no effort to correct

any misstatements contained in the briefs, is an abdication of the duty of candor any party owes the court.").

Here, Mr. Fisher knew at the time of oral argument before this Court that the expert witness upon whom Metro Lights relied for an opinion on driver safety, and who opined on driver "distraction," regards the term "distraction" as "not meaningful" from the perspective of traffic safety. A supplemental memorandum is necessary to ensure that this Court is not left with the mistaken impression that Mr. Kunzman has provided a valid opinion that CBS Decaux signs are more dangerous than Metro Lights signs.

In addition, the statements in Mr. Kunzman's 2007 letter to Mr. Fisher make clear that looking off to the side of a road can be far more distracting than viewing an object or incident occurring within the line of vision, the classic example of rubber necking. This point, which Mr. Fisher also did not bring to the Court's attention, undermines the conclusions in Mr. Kunzman's 2004 declaration and demonstrates that the district court erred in granting summary judgment in favor of Metro Lights. The deposition of Mr. Kunzman has confirmed his actual views on signage and traffic safety and should be brought to the Court's attention as it provides additional bases to disregard Mr. Kunzman's declaration as a factor favoring Metro Lights in this case.

## CONCLUSION

Because Mr. Kunzman's declaration and Metro Lights' Opposition Brief were misleading, and because a truthful presentation of the facts relevant to traffic safety would not support summary judgment in this case, CBS Decaux respectfully requests that this Court take consideration of the foregoing information as further grounds for reversal of the judgment below.


Dated: August 12, 2008                IRELL & MANELLA LLP

                                      By: _____
                                          Laura W. Brill
                                          Richard M. Simon
                                          Attorneys for CBS Decaux, L.L.C.

## BRIEF FORMAT CERTIFICATION

Purusant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the foregoing brief is proportionately spaced, has a typeface of 14 points and contains 3,658 words according to the word count feature of the word processing program used in its creation.

Dated: August 12, 2008          IRELL & MANELLA LLP

                                By: _____
                                    Laura W. Brill
                                  ⁎ Richard M. Simon
                                    Attorneys for CBS Decaux, L.L.C.

# PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 1800 Avenue of the Stars, Suite 900, Los Angeles, California 90067-4276.

On August 12, 2008, I served two copies of the document described as **SUPPLEMENTAL BRIEF OF *AMICUS CURIAE* CBS-DECAUX** on each interested party, as follows:

| Attorneys for Plaintiff-Appellee | Attorneys for Defendant-Appellant |
|---|---|
| Two copies as follows: | Two copies as follows: |
| One copy to | Rockard J. Delgadillo |
| | Claudia McGee Henry |
| Paul E. Fisher, Esq. | Jeri L. Burge |
| The Law Offices of Paul E. Fisher | Kenneth T. Fong |
| 537 Newport Center Drive, Suite 289 | Office of the City Attorney of Los Angeles |
| Newport Beach, California 92660 | 700 City Hall East, 200 North Main Street |
| | Los Angeles, California 90012 |
| One copy to | |
| Laurence H. Tribe, Esq. | |
| Hauser Hall 420 | |
| 1575 Massachusetts Avenue | |
| Cambridge, MA 02138 | |

[X]  (BY MAIL) I placed a true copy of the foregoing document in a sealed envelope addressed to each interested party, as set forth above. I placed each such envelope, with postage thereon fully prepaid, for collection and mailing at Irell & Manella LLP, Los Angeles, California. I am readily familiar with Irell & Manella LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service. Under that practice, the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

Executed on August 12, 2008, at Los Angeles, California.

I declare under penalty of perjury that the foregoing is true and correct.

Patricia Zavad
(Type or print name)                                    (Signature)

1914581