# EXHIBIT A - 1

AS2000 968 00 56 X 00027512.doc

# ADVERTISING TRANSIT SHELTER AGREEMENT

## TABLE OF CONTENTS

|   |   |   | Page |
|---|---|---|---|
| I. | GRANT OF ADVERTISING TRANSIT SHELTER RIGHTS AND PRIVILEGES; OWNERSHIP OF SHELTERS | | 1 |
| | A. | Rights Granted | 1 |
| | B. | Rights Retained | 1 |
| | | 1. Advertising | 1 |
| | | 2. Existing Shelters | 2 |
| | | 3. Noncommercial Shelters | 2 |
| | C. | Ownership | 3 |
| | D. | Initially Authorized Advertising Transit Shelters | 3 |
| | | 1. General | 3 |
| | | 2. Number of Commercial and Noncommercial Shelters | 4 |
| | | 3. Locations | 4 |
| | | 4. Displays | 5 |
| | |    a. Conventional Advertising Shelters (including F-Line Shelters) | 5 |
| | |    b. Kiosks | 6 |
| | |    c. Stonestown Station | 6 |
| | |    d. MMX Platforms | 7 |
| | E. | Transit Shelters Defined | 7 |
| II. | PAYMENTS BY CONTRACTOR TO CITY | | 7 |
| | A. | General | 7 |
| | B. | Payments to CITY | 8 |
| | | 1. Late Payments | 8 |
| | | 2. Security Deposits | 9 |
| | | 3. Lower Market Street Transit Shelter Advertising Revenues | 10 |
| | C. | Reports | 10 |
| | | 1. Annual Financial Report | 10 |
| | | 2. Monthly Maintenance Log | 10 |
| III. | CHANGES IN AUTHORIZED ADVERTISING | | 10 |
| IV. | SPACE ALLOCATION AND UTILIZATION | | 11 |
| | A. | Noncommercial Advertising Space | 11 |
| | B. | Unsold Space | 11 |
| | C. | Promotion of Advertising Space | 11 |
| | D. | Public Service Announcements | 12 |
| | E. | Design Considerations and Use of Materials | 12 |
| | F. | Port Campaign | 13 |

# ADVERTISING TRANSIT SHELTER AGREEMENT

## TABLE OF CONTENTS

### *Continued*

|  |  | | Page |
|---|---|---|---|
| V. | INSTALLATION AND MAINTENANCE | | 13 |
| | A. | Installation of Shelters | 13 |
| | | 1. High-Level Boarding Platforms | 13 |
| | | 2. F-Line North Embarcadero Shelters | 14 |
| | B. | Maintenance | 15 |
| | | 1. General | 16 |
| | | 2. Maintenance Schedule | 16 |
| | | 3. Inspection and Clean-up | 16 |
| | | 4. Repair and Replacement | 16 |
| | C. | Talking Signs | 17 |
| | | | 17 |
| VI. | APPROVAL OF ADVERTISING MATERIAL | | 18 |
| | A. | General | 18 |
| | B. | Tobacco Advertising | 18 |
| | C. | Alcohol Advertising | 18 |
| | | | 19 |
| VII. | GENERAL STATEMENT OF SERVICES TO BE FURNISHED BY CONTRACTOR | | 19 |
| VIII. | CONSTRUCTION AND DESIGN | | 20 |
| | A. | Permit Approval | 20 |
| | B. | Construction Schedule | 20 |
| | C. | Shelter Construction | 20 |
| | | 1. Placement | 20 |
| | | 2. Location Drawings | 20 |
| | | 3. Construction Sites | 21 |
| | | 4. Shelter Design | 22 |
| | |   a. General | 22 |
| | |   b. Minimum Shelter Design Specifications | 22 |
| | |   c. Construction and Materials Specifications | 24 |
| | D. | Shelter Relocation | 25 |
| IX. | TERM AND TERMINATION | | 26 |
| | A. | Term and Extension of Term | 26 |
| | B. | Default of Contractor | 26 |
| | | 1. Termination | 28 |
| | | 2. Actual Damages | 28 |
| | | 3. Transfer of Title | 29 |
| | | 4. Other Remedies | 29 |
| | | 5. Port's Remedies | 29 |
| | | 6. Relocation and Termination; Waiver of Rights | 30 |
| | C. | Default of City | 30 |
| | | | 30 |

# ADVERTISING TRANSIT SHELTER AGREEMENT

## <u>TABLE OF CONTENTS</u>

### *<u>Continued</u>*

|  |  |  | Page |
|---|---|---|---|
| X. | MISCELLANEOUS CONTRACT PROVISIONS | | 31 |
| | A. | San Francisco Office | 31 |
| | B. | Letter of Credit Security Deposit and Performance Bond | 31 |
| | | 1. Letter of Credit | 31 |
| | | 2. Performance Bond | 32 |
| | C. | Subcontractors | 33 |
| | D. | Statement of Commitment | 33 |
| | E. | Insurance | 34 |
| | | 1. Limits | 34 |
| | | 2. Endorsements | 34 |
| | | 3. Notice | 35 |
| | | 4. Condition Precedent | 35 |
| | | 5. Approval | 35 |
| | | 6. Copies of Policies and General Provisions | 35 |
| | | 7. Breach | 36 |
| | F. | Indemnity | 36 |
| | G. | Social Security, Unemployment Compensation | 36 |
| | H. | Notices | 37 |
| | I. | Provisions of Charter | 37 |
| | J. | Bankruptcy or Reorganization Proceeding | 37 |
| | K. | No Waiver of Subsequent Breaches or Defaults | 38 |
| | L. | Assignment | 38 |
| | M. | Successors | 38 |
| | N. | Taxes | 39 |
| | O. | Legal Relationship | 39 |
| | P. | Conflict of Interest | 39 |
| | Q. | California Law | 39 |
| | R. | Section Headings | 40 |
| | S. | MacBride Principles – Northern Ireland | 40 |
| | T. | Nondiscrimination, Affirmative Action, and MBE/WBE Participation | 40 |
| | | 1. General | 40 |
| | | 2. Employment Work Force Goals | 40 |
| | | 3. MBE/WBE Goals | 41 |
| | |    a. Commitment | 41 |
| | |    b. MBE/WBE Defined | 41 |
| | |    c. Bona Fide Involvement | 42 |
| | | 4. "Minority" Defined | 43 |
| | | 5. Enforcement | 44 |

iii

# ADVERTISING TRANSIT SHELTER AGREEMENT

## TABLE OF CONTENTS

### *Continued*

Page

|  |  |  |  |
|---|---|---|---|
|  | 6. | Submission of Affidavit | 44 |
| U. | | Permits | 45 |
| V. | | Extent of Agreement | 45 |
| W. | | Amendments | 45 |
| X. | | Attorneys Fees | 45 |
| Y. | | Tropical Hardwood Ban | 45 |
| Z. | | Burma (Myanmar) Business Prohibition | 45 |
| AA. | | Compliance with Laws | 46 |
| BB. | | Prevailing Wages | 46 |
| CC. | | Non-Discrimination in City Contracts and Benefits Ordinance | 46 |
|  | 1. | Contractor Shall Not Discriminate | 46 |
|  | 2. | Subcontracts | 47 |
|  | 3. | Non-Discrimination in Benefits | 47 |
|  | 4. | Condition to Contract | 47 |
|  | 5. | Incorporation of Administrative Code Provisions by Reference | 47 |
| XI. | THIRD STREET LIGHT RAIL LINE | | 48 |
| XII. | MARKETING SUPPORT | | 48 |
| XIII. | MAYOR'S OFFICE SUPPORT | | 49 |
| XIV. | TRASH RECEPTACLES | | 49 |
| XV. | GPS DEMONSTRATION PROJECT | | 49 |

## ADVERTISING TRANSIT SHELTER AGREEMENT

## BETWEEN

## THE CITY AND COUNTY OF SAN FRANCISCO AND

## OUTDOOR SYSTEMS, INC.

**I.      GRANT OF ADVERTISING TRANSIT SHELTER RIGHTS AND PRIVILEGES; OWNERSHIP OF SHELTERS**

   **A.  Rights Granted**

      1. CITY hereby grants to CONTRACTOR the exclusive right to erect and maintain advertising transit shelters on CITY property during the term of this Agreement subject to the terms and conditions of this Agreement.  Port hereby grants to CONTRACTOR the exclusive right to erect and maintain advertising transit shelters for MUNI on property within Port jurisdiction during the term of this Agreement, subject to the terms and conditions in this Agreement.  CITY warrants and represents that CONTRACTOR shall have the exclusive right to place advertising on shelters as authorized.  CITY also grants CONTRACTOR the exclusive right to erect and maintain kiosks containing advertising in conjunction with CONTRACTOR's erecting and/or maintaining associated transit shelters without advertising on boarding islands subject to the terms and conditions of this Agreement.  It is understood by CONTRACTOR, in the exercise of the rights herein granted, that it or its employees or approved subcontractors will sell advertising space to individual advertisers.

      To the extent not already granted, Port grants to COMMISSION the right to erect City-owned transit shelters on South Embarcadero high level boarding platforms and F-Line platforms for as long as they are needed by the City for public transit purposes.  This grant shall survive the expiration or termination of this Agreement.

   **B.  Rights Retained**

      **1.  Advertising**

CONTRACTOR acknowledges that CITY intends to, and hereby does, retain and reserve all advertising rights which are not specifically granted by this agreement. The rights retained and reserved by CITY include, but are not limited to, the right to license or otherwise provide for the use of any trade name, trade mark, or other identifying device or symbol used, owned or registered by CITY.

### 2. Existing Shelters

CITY retains the right to require CONTRACTOR to remove, dispose of and replace existing transit shelters owned by COMMISSION. CITY, at its discretion, may designate certain existing shelters, because of the architecturally significant design of the shelters, to remain. CONTRACTOR shall renovate the existing shelters so designated in a manner approved by CITY and shall maintain said shelters for the duration of this agreement. Replacement shelters shall be constructed as commercial and noncommercial shelters, according to City Planning Code regulations, and shall be credited toward CONTRACTOR's construction requirements. Existing shelters shall be kept clean by CONTRACTOR until they are replaced, Market Street shelters excepted.

### 3. Noncommercial Shelters

CITY further retains the right to require CONTRACTOR to erect and maintain transit shelters which will not carry any commercial advertising, but which will carry transit information as stipulated in Section VIII.C.4 and be illuminated. Such shelters shall be comparable in construction to and shall be maintained at a level equal to the other transit shelters installed by CONTRACTOR. The location of noncommercial shelters shall be determined at the sole discretion of CITY, but the number of noncommercial shelters constructed shall be determined by CONTRACTOR's bid. CITY may further request a number of noncommercial shelters exceeding the number bid by CONTRACTOR; CITY shall pay CONTRACTOR the unit price for each such shelters, plus annual fees to cover CONTRACTOR's maintenance and electrical costs. CONTRACTOR shall bill CITY for the capital, maintenance and electrical costs for two sizes of the unit cost shelters purchased by CITY as follows:

8/18/2005

|  | Approx. 8 ½' | Approx. 13' |
|---|---|---|
| Capital Cost | $6,400 installed | $7,100 installed |
| Maintenance | 600/year | 636/year |
| Electrical Cost | 48/year | 48/year |

Capital cost includes the costs of all shelter components together with installation costs for providing of electric service, pouring of foundation slab and erection of shelter. The capital cost may be increased or decreased annually beginning with Year Three (3) of this agreement, said increase or decrease to be determined by the most recently published calendar year average of the CPI (Urban Wage Earners and Clerical Workers in San Francisco-Oakland Standard Metropolitan Statistical Area, 1967 = 100) from base year 1987.

Maintenance costs include all charges for routine maintenance, replacement of parts, special graffiti servicing, and any other services required to maintain unite cost shelters to the same standards required for non-unit cost shelters.

Electrical costs are calculated for time-metered service averaging 11 hours per day at a General Service, Schedule A-1 rate of $0.09971 per kilowatt-hour.

### C. Ownership

The advertising transit shelters shall be the property of CONTRACTOR, except those noncommercial shelters paid for by CITY on a unit cost basis, as specified in Section I.B.3 above. CITY may elect to take title of the non-unit cost shelters upon termination of this agreement, by paying the fair market value of said shelters pursuant to Section IX.A. If this agreement is terminated due to CONTRACTOR's default, the shelters shall become the property of CITY without any payments to CONTRACTOR. Title to the unit cost shelters shall always be in CITY.

### D. Initially Authorized Advertising Transit Shelters

#### 1. General

In accordance with the exclusive right to erect and maintain advertising transit shelters on CITY property and for exclusive advertising rights granted in Section I.A., above, CITY

authorizes, subject to change at the sole and exclusive discretion of COMMISSION, shelters and advertising as set forth below.

### 2. Number of Commercial and Noncommercial Shelters

The minimum number of shelters to be provided under this Agreement is one thousand one hundred (1,100) and the maximum number of shelters to be constructed is one thousand two hundred fifty (1,250) shelters without further amendment to this Agreement; provided, however, that CITY-constructed shelters are in addition to the maximum number of shelters specified in this section and are not included in the count. Subject to having received required permits from all permitting authorities, Contractor shall have installed a minimum of one thousand, one hundred (1,100) shelters within one (1) year from the date of this Third Amendment. The commercial and non-commercial shelters will be constructed at a ratio of two (2) commercial shelters to one (1) noncommercial shelter. For purposes of this section, a shelter associated with a kiosk shall be considered a commercial shelter. CONTRACTOR shall erect no more than one hundred fifty (150) kiosks, inclusive of those kiosks erected prior to this Third Amendment, without further amendment to this Agreement.

### 3. Locations

CITY shall retain the right to designate all shelter locations, including specification of which sites are available for commercial advertising. The Port Commission shall have sole discretion to approve locations for shelters on property under its jurisdiction; provided, however, Port Commission shall not approve any shelter locations on Port property which have not been identified by the COMMISSION as providing the greatest convenience for transit patrons. As part of the CITY's Waterfront Design process, the Port Commission has approved the location of advertising shelters for the high-level boarding platforms on the South Embarcadero ("MUNI Metro Extension" or "MMX" platforms)(see Exhibit H hereto). As part of the same process, the Port Commission has approved locations for the shelters on median boarding islands for the F-Line on the North Embarcadero (see Exhibit J hereto); provided, however, that the Port Commission shall have sole discretion over which sites shall be available for commercial

4

advertising at F-Line boarding islands on the North Embarcadero, maintaining the two (2) to one (1) ratio specified in Section I.D.2. By January 1, 1998, the Port shall designate which, if any, non-commercial shelters on F-Line boarding islands shall display public service announcements, including, but not limited to, displays promoting the Port, its tenants and Port special events.

It shall be CONTRACTOR's responsibility to determine the siting of shelters at bus stops and to present site plans to DPW or the Port for approval as specified in Section VIII.C. CITY shall cooperate with CONTRACTOR in determining shelter siting. If a site is found by CONTRACTOR to be unsuitable or economically infeasible for construction of a shelter, CONTRACTOR may appeal to the Director of Public Transportation for site abandonment and site substitution.

CITY shall have the right to require CONTRACTOR, at CONTRACTOR's sole cost, to remove or relocate shelters for the convenience of pedestrians and bus patrons or because of a change in a bus stop location as set forth in Section VIII.D. In addition, CITY or Port may, without limiting any other remedies hereunder, require or permit a CONTRACTOR-owned shelter to be removed or relocated if the maintenance and repair record of CONTRACTOR indicates that the shelter cannot be maintained properly due to excess vandalism. CONTRACTOR may not relocate or remove a bus shelter without prior written permission of the Director of Public Transportation, or the Port's Executive Director, as applicable, or their respective designees. CONTRACTOR shall remove or relocate an associated kiosk concurrently with the removal or relocation of any shelter hereunder.

**4.   Displays**

**a.   Conventional Advertising Shelters (including F-Line Shelters).** CITY authorizes CONTRACTOR to use the "downstream" side wall (furthest from approaching transit vehicles), the back panel, or outside of the downstream side wall of any advertising transit shelter for a two-sided or flared and secured panel to display advertising material. Unless authorized in advance by the Director of Public Transportation in writing, in no case will advertising be displayed on the "upstream" end wall closest to the approaching transit vehicle. Any advertising

or other material contained in a panel shall be back-lit. No advertising or other poster shall exceed twenty-four (24) square feet in area, or be greater than six (6) feet in height and four (4) feet in width.

**b.   Kiosks.** On Steuart and Market Streets from the Ferry Building turnaround to Castro Street, CONTRACTOR may display advertising on one or both of the two street-facing sides of a three-sided kiosk located no more than 50 (fifty) feet from the shelter, or as approved by the Department of Public Works. On Market Street from Gough to Castro Street, one kiosk may be placed on the sidewalk in conjunction with each median boarding island containing shelters. When otherwise required to support construction and/or maintenance of a shelter without advertising, CONTRACTOR may also display advertising on one or both of the two street-facing sides of a three-sided kiosk located in a commercial or industrial zone, as approved by DPW and all other CITY boards or commissions with jurisdiction. The design of each kiosk shall be in conformity with the specifications set forth in Section VIII.B.4.b(16) of this Agreement. The side of any kiosk facing away from the street shall be used solely for art, designs, graphics, and similar materials selected and furnished by the Art Commission or its designee and installed by CONTRACTOR. If such art materials are not available, the side facing away from the street shall, at the CITY's option, be used for public service announcements as provided in Section IV.D. herein. No commercial advertising by CONTRACTOR is permitted at any time on the side of the kiosk facing away from the street.

**c.   Stonestown Station.** With respect to the Stonestown Station only, CONTRACTOR may display advertising on the west-facing sides only of eight (8) double-sided display cases on the platform, each four feet by six feet (4' x 6') in dimension. Two (2) of the east-facing sides of the display cases may be used by CONTRACTOR for public service announcements as provided in Section IV.D herein. The remaining six (6) east-facing panels shall be used solely for art, designs, graphics, and similar materials selected and furnished by the CITY or its designee and installed by CONTRACTOR; however, the CITY shall also have access to these six (6) cases for insertion of time-sensitive materials. If such art and time-

sensitive materials from the CITY are not available, these six (6) cases may be used by CONTRACTOR for public service announcements.

CITY shall also have the exclusive use of the area provided by a two foot by three foot (2' x 3') sheet of Lexan attached to a curvilinear stainless steel panel for display of a standard MUNI route map. CITY shall supply such maps to CONTRACTOR as needed for insertion into the display panel. The CITY shall also have the exclusive use of and access to two (2) display cases, each two feet by three feet (2' x 3') in dimension, for display of MUNI time-sensitive information.

      **d.  MMX Platforms.** On each MMX platform constructed by CITY, CONTRACTOR may display advertising on both sides of each double-sided freestanding display case located on each high-level platform. The number and location of display cases on each MMX platform shall be as shown in Exhibit H. The design of each display case shall be consistent with final design as approved by applicable City agencies. No advertising or other poster shall exceed twenty-four (24) square feet in area, or be greater than six (6) feet in height and four (4) feet in width.

      **E.  Transit Shelters Defined**

The term "transit shelter" or "shelter" as used in this Agreement shall mean a transit shelter at an outdoor public transit stop on the sidewalk, on a low-level median boarding island or other area immediately adjacent to public transit rights-of-way. "Transit shelter" or "shelter" shall also include all elements on a high-level Muni boarding platform for which CONTRACTOR provides shelter amenities or maintenance, as defined in Section V.A.1 of this Agreement.

## II.      PAYMENTS BY CONTRACTOR TO CITY

      **A.  General**

During the term of this agreement, CONTRACTOR shall pay to CITY the sums as set forth below, without any deduction or offset whatsoever, in lawful money of the United States, to

8/18/2005

COMMISSION's Accounting Department, 425 Mason Street, San Francisco, California, or at such other place as CITY may from time to time designate by written notice to CONTRACTOR.

**B. Payments to CITY**

To cover CITY's costs of administering this Agreement and to assist COMMISSION and the Art Commission in youth art programs, CONTRACTOR shall pay CITY, at a minimum, one hundred fifty thousand dollars ($150,000) per year ("base rate"), as escalated by the percentage change in the most recently published calendar year average of the CPI (Urban Wage Earners and Clerical Workers in San Francisco, 1967 = 100) from base year (1987). Commencing with the fourth (4th) year of this Agreement, one-half (1/2) of each annual payment shall be paid to COMMISSION and one-half (1/2) of each annual payment shall be paid into an Art Commission fund to be established by ordinance for the purpose of providing programs and opportunities for the talents and creativity of young artists.   Payments for Years Two (2) through Eighteen (18) will be made to CITY on the respective anniversary date of the commencement of this Agreement, as defined in Section IX.A.

Commencing on June 10, 1997, the annual payment to CITY shall be computed pursuant to the following formula:  (base rate as adjusted by the cumulative CPI)/1000 x number of shelters in place on anniversary date (not including shelters on high-level boarding platforms). COMMISSION shall receive one-half (1/2) of the annual payment as previously calculated (*i.e.*, (base rate as adjusted by the cumulative CPI)/2) plus the incremental increase in the annual payment as a result of application of the new formula. The Art Commission shall continue to receive one-half of the annual payment as previously calculated ((base rate as adjusted by the cumulative CPI)/2).

In addition to using funds to cover its administrative costs, COMMISSION may use funds derived from annual payments to support bus stop maintenance, sign programs or any other programs designed to enhance convenience for MUNI patrons.

**1. Late Payments**

8/18/2005

Payments due hereunder which are not paid when due shall bear interest from and after the date said payment was due until the date paid at the maximum legal rate of interest.

CONTRACTOR hereby acknowledges that late payment by CONTRACTOR to CITY of payments due hereunder will cause CITY to incur costs not contemplated by this agreement, which costs shall constitute damages to CITY, and that the exact amount of such damages will be extremely difficult or impractical to fix. Such costs include, but are not limited to, processing and accounting charges. Accordingly, if any payment due from CONTRACTOR shall not be received by CITY within fifteen (15) days after such amount becomes due, CONTRACTOR shall pay to CITY a late charge of five hundred dollars ($500). CITY and CONTRACTOR hereby agree that such late charge and interest represent a fair and reasonable estimate of the costs CITY shall incur by reason of late payment by CONTRACTOR, and are fair compensation to CITY for its loss suffered by such late payment. This is intended to be, and is, a liquidated damages clause. Acceptance of such late charge by CITY shall not constitute a waiver of CONTRACTOR's default with respect to such overdue amount, nor prevent CITY from exercising any of the other rights and remedies granted hereunder or by law.

**2. Security Deposits**

CONTRACTOR agrees that within seventy-two (72) hours after notification that the City has approved the Third Amendment to this Agreement, CONTRACTOR will deliver to the Director of Public Transportation a performance bond in the amount of five hundred thousand dollars ($500,000) and, in addition, an irrevocable letter of credit in the amount of five hundred thousand dollars ($500,000) in accordance with the provisions of Section X.B below. The original copy of the letter of credit shall be held by CITY and shall constitute security for faithful performance of each and every one of the obligations of CONTRACTOR hereunder. The performance bond shall be maintained during the period of shelter construction, as determined by City, or until all shelters permitted under the Amendment have been completely constructed in accordance with the requirements of this Agreement, as approved by CITY. The letter of credit shall be returned within ninety (90) days after the end of the contract term, as defined in Section

8/18/2005

IX.A, provided that faithful performance has been maintained throughout the life of the contract. In the instance of assignment of this Agreement, as provided for in Section IX.A, CITY shall return or release the performance bond and letter of credit not later than the effective date of the assignment. If CONTRACTOR fails to deliver said performance bond and letter of credit within the said seventy-two (72) hours, CITY shall be entitled to cancel the amendment of this Agreement.

### 3. Lower Market Street Transit Shelter Advertising Revenues

Within ten (10) days of the execution of this Amendment, CONTRACTOR shall pay to CITY the sum of Fifty Thousand Dollars ($50,000.00) for the first year of operation of the Lower Market Street transit shelters and advertising kiosks. In each successive year of the Agreement, said sum shall be escalated by five percent (5%). Payments for succeeding years shall be on the anniversary date of the first payment, or the first working day thereafter. All such payments shall be subject to the late payment provisions of subsection B.1 of this Agreement. The payments received by CITY hereunder shall be placed in a fund established by ordinance. All proceeds in the fund shall be used at the discretion of the Art Commission for the maintenance of new and existing public art on Market Street.

### C. Reports

#### 1. Annual Financial Report

On or before the first (1st) day of the third (3rd) calendar month of its fiscal year for the duration of this agreement, CONTRACTOR shall submit to General Manager copies of CONTRACTOR's Annual Report prepared by an independent public accountant. CITY shall also be entitled to audit CONTRACTOR's books pertaining to the transit shelter project on demand.

#### 2. Monthly Maintenance Log

CONTRACTOR shall prepare monthly maintenance logs as described in Section V.B.2.

### III. CHANGES IN AUTHORIZED ADVERTISING

8/18/2005

It is mutually acknowledged and understood that advertising, and the grant of advertising rights provided for herein, are only incidental to CITY's transportation business, which may undergo changes affecting the advertising rights granted herein. CITY accordingly shall have no liability to CONTRACTOR for any change in its routes, in the number of transit vehicles operated by it, in ridership, or for any other change affecting the level or scope of advertising authorized by CITY. CONTRACTOR acknowledges that the space available for advertising on transit shelters may vary from time to time for various reasons, including legislative determinations by CITY relative to the desirability of having advertising displays in a particular area. CITY will give CONTRACTOR a minimum of ninety (90) days notification of any decision regarding changes in transit shelter advertising. CITY will designate a replacement for any such commercial shelter site deleted; any such deletions shall not change the ratio of commercial to noncommercial shelters as stated herein. CONTRACTOR agrees that any and all contracts it enters into with advertisers will contain a clause permitting cancellation without penalty, except for proration of fee, upon sixty (60) days notice.

## IV.    SPACE ALLOCATION AND UTILIZATION

### A.    Noncommercial Advertising Space

Exclusive of all commercial advertising space referred to in this agreement, CITY reserves the right to place on all transit shelters its informative material as set forth in Section VIII.C.4. Such informative material shall be displayed and posted by CONTRACTOR at no cost to CITY in a manner which does not interfere with advertising placed by CONTRACTOR or generate overtime costs for CONTRACTOR. CITY shall not sell such space to advertisers either directly or through any intermediary.

### B.    Unsold Space

Notwithstanding the provisions of Section I of this Agreement, CITY, at no charge to CITY except as specifically set forth herein, shall have the option to use advertising space which has not been sold. CITY shall have a priority over such unsold space over the rights of CONTRACTOR under Paragraphs C and D below.

8/18/2005

CITY shall have the right to use any unsold advertising space on a "space available" basis (for a minimum of thirty (30) days) ninety (90) days after construction of a particular shelter is completed. CITY shall bear the cost of providing printed posters ready for posting by CONTRACTOR. The Director of Public Transportation or Port Director, as applicable, shall notify CONTRACTOR of CITY's intention to use the unsold advertising space at least thirty (30) days prior to the date on which CITY's use will begin. If CONTRACTOR is unable to deliver said space for any reason after being notified properly by the Director of Public Transportation of CITY's intention to use unsold advertising space, CONTRACTOR shall reimburse CITY for all printing and related costs expended by CITY in anticipation of the use of said advertising space.

Port shall have a right of first refusal as to any unsold advertising space available to CITY on the MMX high-level boarding platforms. Such space may be used by Port for information and public service purposes.

### C.  Promotion of Advertising Space

CONTRACTOR may use, at its sole cost and expense, available unsold advertising space for its owns advertisements and promotion designed to increase the sale of advertising space.

### D.  Public Service Announcements

CONTRACTOR shall have the right, at its own discretion, to display free of charge on any spaces not contracted for use by paid advertisers and not being used by CITY or CONTRACTOR, certain public, educational, charitable and editorial displays.

### E.  Design Considerations and Use of Materials

It is the intent of both CITY and CONTRACTOR to provide an advertising program which is effective and aesthetically pleasing and which will be beneficial to both parties. The parties accordingly agree: (1) to maintain throughout the term of this agreement a continual liaison and exchange of plans and information to assure successful implementation of the agreement; and (2) to use advertising materials and technology presently available or subsequently developed that will enhance the appearance and image of the transit shelters.

### F.  Port Campaign

At least twice a year, CONTRACTOR shall design and furnish, at its sole cost, at least thirty (30) posters as a public service and information campaign, promoting the Port, its tenants and special events; provided, however, Port shall pay for CONTRACTOR's reasonable out-of-pocket costs for printing the Port promotional posters.  CONTRACTOR shall install the posters on available space in City and Bay Area advertising shelters; however, the majority of the posters shall be placed on shelters located in the City.  Each campaign shall last for at least four weeks. All designs shall be subject to prior Port approval, and CONTRACTOR shall consult with the Port as to potential available display space.  The posters supplied for the Port campaigns shall be in addition to any Port public service or information posters placed on Port property pursuant to Subsection B. above.

## V.    INSTALLATION AND MAINTENANCE

### A.  Installation of Shelters

CONTRACTOR shall install transit shelters and any associated kiosks in the locations designated by CITY and PORT.  CONTRACTOR shall comply with all applicable present or future Federal, State and local codes, including, but not limited to, CITY planning, public works, electrical and building codes, and 42 USC Sections 12101, *et seq.*, commonly known as the Americans With Disabilities Act.  Internal electrical components and hook-up procedures shall be arranged and performed by CONTRACTOR in accordance with the San Francisco Electrical Code.  Unless otherwise provided in this Agreement, CONTRACTOR shall bear the full cost of installing, providing, and maintaining electrical services to each shelter.  Installation of telephones in transit shelters shall be subject to the provisions of San Francisco Public Works Code Article 19.  Unless excepted by the Director of Public Transportation and the Director of Public Works, or their designees, all electrical service lines in each shelter site shall be underground and shall originate from the point-of-service designated by CITY or Pacific Gas and Electric Company ("PG&E"); provided, however, that CONTRACTOR may provide solar power where viable. CONTRACTOR may use City-owned street lighting conduit to house any

8/18/2005

electrical service wiring for the shelters under the following conditions: (1) there is available space in such conduits; (2) CONTRACTOR obtains prior approval from the CITY's Bureau of Light, Heat and Power ("BLHP") and provides BLHP with a schedule in advance of any work on street light conduits and pull boxes; (3) CONTRACTOR maintains a log of all of its activities when performing work with street light conduits and pull boxes, including dates of connection from BLHP pull boxes, and submits the log to BLHP on request; and (4) street lighting conduit may be used to facilitate electric service connection to PG&E source; however, with respect to any shelters installed after the effective date of this Third Amendment, CONTRACTOR shall not be permitted to tap into the street lighting circuit unless prior authorization is obtained from BLHP. CONTRACTOR shall contact PG&E and arrange for additional service not provided by CITY and shall pay CITY or PG&E directly for all charges for service connections and electricity. All liability related to electrical connection, use of City-owned street lighting conduit and pull boxes, installation, repair for transit shelter construction, operation, and maintenance shall be the sole responsibility of CONTRACTOR. Citation of specific code sections in this Agreement shall not exonerate CONTRACTOR from its obligation of compliance with all applicable laws and ordinances.

1.  **High-Level Boarding Platforms**

The CITY shall install or cause to be installed the ramp, platform, and shelter structure and amenities at the Stonestown Station, including installation of electrical service and provision of electricity to the station.

The CITY shall also supply, construct and install structural shelter components on any high-level boarding platforms constructed for the MMX and Mission Bay projects. CONTRACTOR shall reimburse CITY for the initial purchase and installation of shelter amenities for high-level boarding platforms that are part of the MMX and Mission Bay projects. CONTRACTOR's obligation to pay for shelter amenities shall not exceed an average of forty-five thousand dollars ($45,000) per MMX platform. Said payment shall be due upon the effective date of this Third Amendment or upon installation of the shelters, whichever occurs

8/18/2005

later. "Shelter amenities" include, but are not limited to, seating, trash receptacles, advertising display panels, and MUNI map and information display panels/kiosks that are part of the approved final design for the projects. CITY shall have sole responsibility and discretion to select the type and design of all shelter amenities to be installed. Except as provided under Section V.B.4 governing CONTRACTOR's repair and replacement responsibilities, CONTRACTOR shall not have any role or responsibility whatsoever in selecting or installing shelter amenities.

CONTRACTOR shall be responsible for the ongoing costs of all electrical service to each platform. CONTRACTOR shall arrange installation of telephone service to each platform, which shall be subject to the provisions of San Francisco Public Works Code Article 19.

All shelters, amenities and equipment installed on high-level boarding platforms shall be owned by the City upon completion and shall not be subject to the termination provisions of Section IX.A of this Agreement. CONTRACTOR agrees to provide a bill of sale or other documentation required to effect an unencumbered transfer to CITY of any amenities or equipment installed by CONTRACTOR on the high-level platforms.

### 2. F-Line North Embarcadero Shelters

The CITY shall install or cause to be installed all shelters on F-Line median boarding islands on the North Embarcadero, including installation of electrical service and provision of electricity to the islands. CONTRACTOR shall contribute a maximum of fourteen thousand dollars ($14,000) towards the costs of design and construction of each F-Line shelter. Said contribution shall be due upon award by CITY of a contract for construction of the F-Line shelters. CITY shall own such shelters upon completion and they shall not be subject to the termination provisions of Section IX.A of this Agreement.

Notwithstanding the above, at CITY's sole election, CONTRACTOR, at its sole expense, shall install its own shelters on the F-Line boarding islands. In that event, said shelters would be owned by CONTRACTOR and be subject to all design and permit approvals applicable to other CONTRACTOR-owned shelters under this Agreement.

### B. Maintenance

#### 1. General

CONTRACTOR shall maintain the transit shelters and kiosks installed by either CITY or CONTRACTOR under this Agreement, except for the transit shelter on the high-level boarding platform at 19th Avenue and Holloway.

#### 2. Maintenance Schedule

CONTRACTOR shall conform with the maintenance standards set forth in the Agreement and be responsible for maintaining shelters in "like new" condition throughout the term of the contract, including refurbishing, reconditioning, and, if necessary, replacing CONTRACTOR-provided worn shelters. CONTRACTOR shall develop a log for shelter inspections and maintenance work performed and submit the log at the end of every month, or as required by the Director of Public Transportation. If CONTRACTOR does not maintain its schedule or remedy outstanding deficiencies within forty-eight (48) hours of notification, CITY, including Port, shall be entitled to correct the deficiencies and bill CONTRACTOR for the work performed. In addition, CONTRACTOR shall furnish to the Director of Public Transportation a monthly narrative summary of its maintenance operations, noting problem areas and corrective actions taken.

#### 3. Inspection and Clean-up

CONTRACTOR shall routinely inspect each shelter and kiosk at least twice per week. CONTRACTOR shall make more inspections if conditions warrant. CONTRACTOR shall make daily visits to the Stonestown Station, all other high-level boarding platforms, and the F-Line median boarding island shelters for trash pick-up. At each inspection, if needed, CONTRACTOR shall clean and wash each shelter. Additionally, CONTRACTOR shall inspect the lighting fixtures and replace defective lights. CONTRACTOR also shall remove all graffiti, stickers, posters, litter, dust, dirt, and weeds from each shelter, and from a five-foot (5') radius surrounding the shelter, exclusive of private property and rail right-of-way. CONTRACTOR's maintenance duties with respect to the Stonestown Station and all other high-level boarding

8/18/2005

platforms are set forth in Exhibit F hereto. CONTRACTOR's maintenance duties with respect to the F-Line shelters (should CITY construct and own them) are set forth in Exhibit I hereto.

CITY shall be responsible for arranging the relocation of street furniture so as not to impede maintenance of the shelter or block the transit operator's view of the shelter.

### 4. Repair and Replacement.

CONTRACTOR shall repair within forty-eight (48) hours of notification by CITY, or with respect to shelters on Port property, by Port Director, or designee, any damage from vandalism or graffiti found on or around the shelter or kiosk, exclusive of other street furniture and private property. If the shelter or kiosk damage, vandalism, or graffiti is of a hazardous nature, or if light sources need replacing, CONTRACTOR shall repair, replace or remove the same within twenty-four (24) hours of notification or as needed. If the shelter or kiosk is destroyed, CONTRACTOR shall remove the shelter or kiosk remains within twenty-four (24) hours of notification and replace the shelter within thirty (30) days. In conjunction with such removal, CONTRACTOR shall, at its own expense, restore the affected sidewalk, median boarding island or curb area to a safe, finished condition.

CONTRACTOR's repair duties with respect to the Stonestown Station and all other high-level boarding platforms are set forth in Exhibit F hereto. CONTRACTOR's repair duties with respect to the F-Line shelters (should CITY construct and own them) are set forth in Exhibit I hereto. CONTRACTOR's repair and replacement obligations regarding the Stonestown Station, the other high-level boarding platforms, and the F-Line island shelters (if constructed and owned by CITY) shall be limited to repairs and/or replacements necessitated by vandalism or intentional damage or destruction; unless CONTRACTOR owns the shelters, CONTRACTOR shall have no obligation to repair or replace platform or shelter components on such shelters solely as a result of construction defects, normal wear and tear, accidents or acts of God. CONTRACTOR shall report such conditions to the Department of Public Transportation Power and Structures Section.

### C. Talking Signs

Each contract year, commencing with the 10th contract year, CONTRACTOR shall provide the CITY with five thousand dollars ($5,000) worth of "Talking Signs" remote infrared transmitters, or approved equals with multiple LED arrays, for installation on shelters at locations to be chosen by CITY. In addition, CONTRACTOR shall install and maintain, and pay all electricity costs for, the Talking Signs supplied by CONTRACTOR, as well as for any Talking Signs supplied by CITY or other sources. At each illuminated shelter constructed or relocated by CONTRACTOR after approval of this Third Amendment, CONTRACTOR shall provide conduit to the shelter or platform for operation of a Talking Sign, including a 110-Volt, 30-Watt minimum, outlet for installation of the Talking Signs.

## VI.    APPROVAL OF ADVERTISING MATERIAL

### A.    General

CONTRACTOR is expected at all times to use good judgment in accepting any material for advertising on transit shelters. CONTRACTOR agrees to remove promptly, upon written demand by the Director of Public Transportation or, for advertising on property under jurisdiction of the Port Commission, by the Port Director, any advertisement deemed to be objectionable, on stated grounds which shall be reasonable.

### B.    Tobacco Advertising

No later than one hundred twenty (120) days after the effective date of this Amendment, CONTRACTOR agrees to and shall prohibit all advertising of cigarette and tobacco products on shelters and kiosks permitted under this Agreement, in compliance with San Francisco Administrative Code Section 4.20. In addition, CONTRACTOR may not enter into any agreement for the advertising of cigarette or tobacco products on any shelter or kiosk located in the City and County of San Francisco after the effective date of this Third Amendment. The prohibition on advertising of cigarettes and tobacco products shall include the display of the name of any company producing, selling or distributing cigarettes or tobacco products or the name of any cigarette or tobacco product in any promotion of any event or product. This prohibition shall not apply to any advertisement sponsored by a state, local or non-profit entity,

18                                    8/18/2005

which advertisement is designed to communicate the health hazards of cigarettes or tobacco products or to encourage people not to smoke or to stop smoking.

### C.  Alcohol Advertising

CONTRACTOR agrees to limit advertising of alcoholic beverages (including beer, wine and spirits) on The Embarcadero to a maximum of ten percent (10%) of available advertising faces on the Embarcadero MMX platforms and F-Line boarding islands.  CONTRACTOR also agrees to prohibit advertising of alcoholic beverages within a 500-foot radius of any school. Within one hundred eighty (180) days after final approval of this Third Amendment, CONTRACTOR shall meet with representative community organizations in the South Bayshore area regarding restricting advertisement of alcohol products, in conformity with Policy 2.3 of the CITY's South Bayshore Plan.  CONTRACTOR shall implement any restrictions on alcohol advertising agreed to by such community organizations and applicable CITY representatives as soon thereafter as practicable, to the extent that such restrictions are consistent with Policy 2.3. Nothing herein shall limit CITY's rights under Section VI.A.

## VII.    GENERAL STATEMENT OF SERVICES TO BE FURNISHED BY CONTRACTOR

CONTRACTOR or its employees or approved subcontractors shall:

A.  Make a continuous, full-time, and good faith effort to sell the greatest practicable amount of advertising on the commercial transit shelters;

B.  Continuously maintain in a clean, safe, and first-class, "like new" condition during the entire term of this agreement all transit shelters, advertising panels, and any other displays installed under this agreement;

C.  Place, replace and maintain in a clean, safe, and first-class, "like new" condition all transit shelters, advertising copy, advertisements, posters, transit information and display materials;

D.  Provide an experienced sales force with the capability to acquire national advertising accounts;

8/18/2005

E.  Maintain its own offices and shop facilities in the City and County of San Francisco;

F.  Assure the best quality design and construction of exhibits and advertising material to be installed or used in advertising displays;

G.  Erect all transit shelters and display installations and insert all advertising matter, transit information and poster art whenever possible at hours of minimum MUNI passenger activity or at such hours as are approved by CITY; and,

H.  Provide the necessary personnel to insure the correct maintenance of transit shelters and displays of advertising matter contained therein.

## VIII.  CONSTRUCTION AND DESIGN

### A.  Permit Approval

CONTRACTOR may not submit applications for permits for shelters until the shelter designs and siting have been approved by all appropriate CITY agencies, including the Public Transportation Department, the Art Commission, the Recreation and Park Commission and the Port Commission, as applicable.  For all shelters or kiosks to be constructed by CONTRACTOR, CONTRACTOR shall submit location drawings and a three hundred fifty dollar ($350) permit fee for each shelter or kiosk to DPW or to the Port, as required.  DPW shall review the location drawings, inspect the sites, obtain Department of City Planning approval, as necessary, and hold public hearings on each application prior to approving and issuing encroachment and excavation permits.  The Port shall follow its own internal procedures for issuing permits on Port property. CONTRACTOR must obtain all applicable permits before proceeding with shelter or kiosk construction.

### B.  Construction Schedule

CONTRACTOR shall begin shelter construction within thirty (30) days after DPW or the Port has approved excavation and encroachment permits for shelter sites.

### C.  Shelter Construction

#### 1.  Placement

Shelters on sidewalks shall be placed so that the distance from the shelter to the outside edge of the curb is not less than twenty-four inches (24"), from the shelter to the nearest wall is not less than five feet (5'), and from the shelter to a fire escape directly behind is not less than seven feet (7'). Overhangs of the roof line are permitted on all sides. However, an overhang may not protrude to within eighteen inches (18") of the edge of the curb. A shelter may be placed against the property line to allow sufficient pedestrian movement if the shelter does not prohibit ingress or egress from a building or block a fire escape or window. No shelter shall be located over storm drain catch basins and similar structures. Shelters shall not obstruct sign posts. In cases where narrow sidewalks prohibit construction of a standard-sized shelter, a modified shelter design will be permitted. Shelters shall be placed at least five feet (5') from a driveway or corner and six feet (6') from a fire hydrant. Minimum clearance from any obstruction, i.e., street lights, power poles or trees, shall be forty-two inches (42"). On land under the jurisdiction of the Recreation and Park Department, shelter location shall be reviewed and approved by the Recreation and Park Commission. On land under the jurisdiction of the Port Commission, shelter location shall be reviewed and approved by the Port Commission.

**2. Location Drawings**

CONTRACTOR must submit to DPW or the Port, as applicable, a location drawing showing shelter or kiosk placement, accompanied by a three hundred fifty dollar ($350.00) permit fee, as required for each shelter or kiosk site submitted by CONTRACTOR. Location drawings shall contain a twenty feet (20') to one inch (1") scale (20:1 scale) representation of the proposed shelter site covering the area from the property line to the street centerlines at the nearest intersection. Mid-block sites can be shown with broken line ties. The drawing also shall give all necessary street dimensions, such as sidewalk width and street width, and denote all surface structures, including hydrants, utility poles and catch basins, and their accurate positions. CONTRACTOR is responsible for determining what utility lines lie beneath the shelter site and for showing them on the location drawing. CITY shall cooperate with CONTRACTOR in obtaining this information. As described in Section VIII.A and X.U, DPW or the Port, and,

8/18/2005

where applicable, the California Department of Transportation, must approve the location drawing and issue excavation and encroachment permits before construction work commences on a particular site.

### 3.    Construction Sites

When each shelter installation is complete, CONTRACTOR shall remove all excess materials and restore the work area to its pre-installation condition. All aspects of this work shall comply with CITY specifications and all details of the work shall be indicated on the site plan.

### 4.    Shelter Design

**a. General.** The shelter designs attached hereto as Exhibit B, Exhibit E (Lower Market Street shelters), and Exhibit G (island shelters) have been approved by the Art Commission and COMMISSION and are in conformity with the specifications set forth below. Only shelter designs so approved may be constructed. Designs for shelters to be situated on CITY parkland also will have to be approved by CITY's Recreation and Park Commission. Designs for shelters to be situated on property under the jurisdiction of the CITY's Port Commission (*e.g.*, F-Line) will have to be approved by the Port's Executive Director, or his designee.

**b. Minimum Shelter Design Specifications. Shelters:**

(1)    Shall provide a minimum height clearance of six feet eight inches (6'8"), and contain a sloped or curved roof; no design will be accepted which contains an adjustable roof capable of being lowered below six feet eight inches (6'8");

(2)    Shall have a minimum of two (2) wall panels or offer equivalent protection;

(3)    Shall offer see-through visibility from at least three directions;

(4)    Except for Lower Market Street shelters and island shelters, shall be adaptable for narrow sidewalks under ten feet (10') wide but not less than seven feet six inches (7'6") wide; island shelters shall be adaptable for street boarding islands five feet six inches (5'6") wide or wider;

8/18/2005

(5)   Shall be adaptable for sidewalk grades up to fifteen percent (15%);

(6)   Shall be approximately twelve feet to sixteen feet (12'-16') long and adaptable for expansion;

(7)   Shall provide a smaller, eight foot to nine foot (8'-9') shelter where deemed appropriate by MUNI;

(8)   Shall provide front and rear walk-through and complement existing street furnishings at Market Street locations from the Ferry Building turnaround through Gough Street;

(9)   Shall have permanent wheelchair access which allows thirty inch (30") minimum clearance on the side or back of the shelter, and shall not obstruct a wheelchair user boarding or alighting from an accessible vehicle; shall comply with all applicable laws affecting handicapped access in effect at the time of their construction, including, but not limited to, the American With Disabilities Act (ADA); shelters constructed before the passage of ADA and not in presently in compliance with ADA standards for new construction shall be brought into full compliance according to a timetable acceptable to the City, but in no event, later than June 30, 1998.

(10)  Except for island shelters, shall have individualized or other seating that discourages lying down, accommodates a minimum of three (3) people in 12-foot or longer shelters, and a minimum of two (2) people in 8-foot shelters, and can be removed if necessary;

(11)  Unless excepted by the Director of Public Transportation, shall be illuminated at night from dusk until dawn, providing the shelter with a minimum of five (5) foot candles of light, measured at a height of five feet (5') at the center of the shelter. Shall not be so illuminated as to be hazardous to passing vehicle operators;

(12)  Shall contain vandal-resistant lighting fixtures;

(13)  Shall have a roof drainage system with water taken away from access points to sidewalk level;

(14)  Shall be designed to prevent pooling of water on the shelter roof and floor;

(15)  For conventional sidewalk shelters (see Exh. B), shall contain, where permitted by City Planning Code, no more than one two-sided or flared, back-lit advertising panel designed to accommodate a poster no larger than

four feet wide by six feet high (4' x 6'), which panel shall be secured by screw or key locking metal doors which resist unauthorized entry. The ad panel shall be located on the downstream side of shelter, the back panel, or the sidewalk area immediately adjacent to the downstream side of the shelter so that unimpeded visibility of on-coming transit vehicles is permitted. If placed on the downstream side wall, the advertising panel must allow ten feet (10') minimum clearance along the back wall of shelter (*i.e.*, there must be at least ten feet (10') of sheltered space between the ad panel and the upstream side wall);

(16) Kiosks associated with shelters shall be located no more than fifty feet (50') from the shelter. Each side shall be designed to accommodate a back-lit panel no larger than four feet by six feet (4' x 6'). Commercial advertising is permitted on the two street-facing sides of the kiosk. The side facing away from the street shall contain noncommercial art, designs, graphics, and similar materials, or if unavailable, public service announcements;

(17) In a manner acceptable to MUNI, shall contain identification of the service company and the name, address and telephone number of CONTRACTOR;

(18) Except for island shelters, shall contain a secure, illuminated panel for transit information designed to hold a system route map and schedule information;

(19) Shall contain a pay telephone at a minimum of four hundred (400) shelters (not including island shelters) by June 30, 1998. Lower Market Street shelters and high-level boarding platforms may contain up to two pay telephones. At MUNI's request, telephones shall be equipped with programmed single-key access to MUNI's passenger information lines.

(20) Shall provide MUNI logo, and route numbers on a fascia or other surface (all transit information graphics shall be developed by the Director of Public Transportation);

c.  **Construction and Materials Specifications.**

(1)  Materials shall be chosen for ruggedness and ability to withstand vandalism and weathering.

(2)  Transparent vertical panels shall be of a sufficient thickness to be resistant and durable to vandalism and be able to maintain transparency.

(3)  Materials and design shall conform to all applicable public works and electrical codes.

24                                    8/18/2005

(4)   Shelters shall be able to withstand fifteen (15) P.S.F. wind pressure and thirty (30) P.S.F. loading pressure for live loads.

(5)   Shelter designs shall be developed and materials employed which maintain shelter durability but discourage people from using shelter roofs for parade viewing and from using shelter seating for lying down.

(6)   Foundations shall be secure but allow for shelter removal.

**D.    Shelter Relocation**

As provided in Section I.D.3, CONTRACTOR-owned shelters and kiosks may be removed and relocated because of private development, public works projects, public convenience, MUNI route or stop changes, repeated vandalism to a shelter, or at the order of the Director of DPW or the Executive Director of the Port. In the event of a relocation requested by the Executive Director of the Port, the Port shall endeavor to identify a suitable alternative location for such shelter.

CITY and Port do not guarantee any specific site for a CONTRACTOR-owned shelter or kiosk for the duration of the contract. CONTRACTOR shall bear the full cost of removal and relocation of a maximum of five percent (5%) of the total number of existing shelters per year, including, if affected by removal, sidewalk and curb repair. CITY will bear all costs of removal and relocation of shelters exceeding five percent (5%) per year so long as CONTRACTOR is not in default of this Agreement. The relocation cost may be increased or decreased annually beginning with year three (3) of this Agreement, said increase or decrease to be determined by the most recently published calendar year average of the CPI (Urban Wage Earners and Clerical Workers in San Francisco-Oakland Standard Metropolitan Statistical Area, 1967 = 100) from base year 1987. In the event shelters are unable to be used effectively due to private development, and permanently or temporarily must be removed from an existing site, CITY will use its best efforts to require developers to pay all costs associated with such relocation. Additionally, CONTRACTOR may request permission of the Director of Public Transportation to relocate a shelter, at CONTRACTOR's expense, if the shelter has been repeatedly vandalized

or damaged. Any relocation of a shelter requested by CONTRACTOR will not be included within the five percent (5%) per year maximum above-mentioned. All shelter relocations must commence within five (5) days of notification unless otherwise authorized by the Director of Public Transportation or the Port's Executive Director, as applicable.

In the event that CONTRACTOR fails to repair, maintain, replace or relocate shelters within the time specified by CITY, CITY may, at its sole discretion, cause the repair, maintenance, removal or relocation of said shelter and apply that portion of CONTRACTOR's letter of credit toward the CITY's cost thereof. Any costs not so applied shall be paid directly to CITY by CONTRACTOR within ten (10) days following receipt by CONTRACTOR of the invoice therefor.

## IX.    TERM AND TERMINATION

### A.  Term and Extension of Term

This Agreement shall commence on June 10, 1987. This Agreement shall terminate on June 9, 2007 unless sooner terminated as provided herein.

Upon termination of this Agreement by expiration of its term, or pursuant to Section IX.B.1, CITY shall, without limiting its rights and remedies, have the option to either:

1. After receiving appraisals as set forth below, assume title to all shelters, kiosks and associated equipment through purchase from CONTRACTOR of the then existing transit shelters, kiosks and associated equipment, free and clear of liens and encumbrances, at the then current fair market value of the shelters, kiosks and associated equipment. Said value shall be determined by three (3) appraisers, who shall be Members of the Appraisal Institute: one (1) chosen by CITY, one (1) chosen by CONTRACTOR, and one (1) chosen by the appraisers selected by CITY and CONTRACTOR. Said appraisers shall use recognized appraisal methods. If two (2) or more of the values determined by said appraisers are identical, that shall be the value attributed to the shelters, kiosks and associated equipment; if each appraisal is different, the value attributed to the shelters, kiosks and associated equipment shall be the one that is neither the highest nor the lowest. CITY shall pay for the cost of the appraisals, which cost shall be

8/18/2005

deducted from the purchase price of the shelters, kiosks and associated equipment in the event that CITY chooses to exercise its option to purchase them. Said appraisals shall be ordered within a sufficient amount of time so that they may be delivered to CITY no later than six (6) months prior to the expiration date of this Agreement; or

2. Direct CONTRACTOR to remove its transit shelters and kiosks and restore the respective sidewalks and curbs to a condition acceptable to the CITY within ninety (90) days of the termination date of this Agreement, at CONTRACTOR's own cost and expense, but if CONTRACTOR fails to do so within said ninety (90) days, CITY, without further notice and at CONTRACTOR's cost and expense, may remove the shelters and kiosks and restore the sidewalks and curbs to their proper condition; or

3. Negotiate amendments, including but not limited to time extensions, to this Agreement, approval of which amendments shall be as provided in Paragraph X.W below.

Except as provided under Section IX.B.1, CITY shall notify CONTRACTOR which of the above-stated options it chooses to exercise no later than ninety (90) days prior to the termination date of this Agreement. The exercise by CITY of any of the options set forth in this paragraph by commencement of legal proceedings, audit, or otherwise, shall not be deemed a waiver of its right to exercise any other option provided herein.

Notwithstanding the above, in consideration of the provisions granted to Contractor in this Third Amendment, Contractor shall also be subject to the following:

Beginning in the 15th year of the Agreement (June 10, 2001-June 9, 2002), CITY may elect to terminate or request an assignment of this Agreement by giving CONTRACTOR at least one (1) year's notice of said election. In that event, upon termination or assignment, CITY, or the person or entity under contract with CITY to supply and maintain coordinated street furniture for CITY ("street furniture contractor"), if such a contract is entered into during the term of this Agreement, shall pay to CONTRACTOR the entire unamortized value of CONTRACTOR's shelters, kiosks and associated equipment as of the date of the termination or assignment. This is defined as the costs of construction and installation, less depreciation on a straight-line basis

using an annual rate of depreciation of fifteen (15) years, or as otherwise reflected in CONTRACTOR's accounting records. If paid by the street furniture contractor, the payment shall also include reimbursement of CONTRACTOR's capital contribution to the construction of the MMX shelters and the F-Line shelters, less depreciation, according to the formula described above. The amounts required to be paid in exchange for termination or assignment of this Agreement, as provided for in this paragraph, shall be determined by a qualified, independent accounting firm that is selected by mutual, good faith agreement of the parties. Upon full payment as outlined above, Contractor agrees to execute any and all documents necessary to effect the termination or assignment, including, but not limited to, transfer of all of CONTRACTOR's right, title and interest in its shelters, kiosks and associated equipment to City or the street furniture contractor.

Upon termination or assignment of this Agreement, CITY shall return or release CONTRACTOR's performance bond and letter of credit. In addition, upon assignment of this Agreement to a street furniture contractor, CONTRACTOR shall be excused from any obligation under Agreement that arises after said assignment and shall be indemnified by the street furniture contractor from all liabilities that accrue after such assignment.

It is hereby stipulated that a "street furniture contractor," as the term is used herein, does not presently exist. If CITY proceeds to select a street furniture contractor during the term of this Agreement, CONTRACTOR will be entitled to compete for such a contract on a non-preferential basis.

**B.  Default of Contractor**

In the event that CONTRACTOR shall fail to carry out any term, covenant, condition, or promise herein set forth, CITY shall have, and may elect among, the following remedies:

**1.  Termination**

CITY may serve upon CONTRACTOR thirty (30) days written Notice of Termination of this agreement, and if CONTRACTOR does not cure the default within thirty (30) days, CITY may terminate this agreement and may assume title to the shelters and assume

all advertising contracts of CONTRACTOR relating to this agreement. CONTRACTOR thereafter shall not be entitled to any revenues whatsoever on advertising in place after the termination date. In the event of such termination, the parties agree that due to the nature of the breach, CITY's actual damages would be impracticable and extremely difficult to fix, and that CITY shall be entitled to the immediate payment of the full amount of the letter of credit provided in Paragraph B of Section X ("Letter of Credit Security Deposit") hereof as liquidated damages to cover the cost of maintenance of shelters to CITY hereunder. CITY shall also be entitled to make a demand on the construction performance bond, if CONTRACTOR has not fulfilled its construction obligations. No such termination of this agreement by CITY shall in any way affect the obligations of CONTRACTOR or the rights of CITY which have a accrued prior to such termination.

### 2. Actual Damages

In the event that CITY elects not to serve a Notice of Termination of this agreement, or if such a Notice is served but CONTRACTOR's default is cured, then CITY shall be entitled to recover from CONTRACTOR any loss or damage which CITY may have incurred by reason of CONTRACTOR's default; and CITY may, if it chooses to do so, utilize the procedure set forth in Paragraph B of Section X ("Letter of Credit Security Deposit") to resolve its claim for loss or damage.

### 3. Transfer of Title

In the event any default is not timely cured and CITY terminates this agreement, title to all transit shelters shall immediately transfer to CITY without cost to CITY.

### 4. Other Remedies

The exercise of the remedies provided for in this section shall be cumulative and shall in no way affect any other remedy available under the law to CITY.

### 5. Port's Remedies.

In the event that CONTRACTOR shall fail to carry out any term, covenant, condition, or promise herein set forth with respect to its shelters or kiosks located on Port property, Port

8/18/2005

shall so notify CONTRACTOR and CITY in writing. In the event CONTRACTOR fails to cure the default, or CITY fails to cause the default to be cured, within thirty (30) days of Port's written notice, then Port, without limiting any of CITY's remedies set forth above, may avail itself of any of the remedies set forth in subsections 1, 2, 3 and 4 of this Section IX.B., with respect to any CONTRACTOR-owned transit shelters and kiosks located on Port property. With respect to CITY-owned shelters located on Port property, Port may avail itself of any of the remedies set forth in subsections 2 and 4. Notwithstanding the foregoing, Port may only seek termination of CONTRACTOR's advertising rights on Port property with concurrence of COMMISSION.

### 6. Relocation and Termination; Waiver of Rights.

CONTRACTOR acknowledges that this Agreement includes provisions granting to CITY, subject to certain terms and conditions, the right to order the removal and relocation of a limited number of transit shelters and kiosks and, subject to certain terms and conditions, the right to terminate the Agreement and upon such termination to order the removal of all transit shelters and kiosks. CONTRACTOR fully waives, releases and relinquishes forever any and all claims, demands, rights and causes of action that it may have against CITY under the Outdoor Advertising Act (Business and Professions Code, §§ 5200, et seq.), any amendments thereto or other future laws, for any compensation from CITY not otherwise provided for herein, including the payment of just compensation, as defined in the eminent domain law (Title 7, commencing with Section 1230.010, of Part 3 of the Code of Civil Procedure), in the event CITY lawfully exercises any such rights in accordance with the provisions of this Agreement.

### C. Default of City

CONTRACTOR may cancel this agreement and terminate its obligations hereunder at any time subsequent to the commencement of the term or any extension thereof, upon or after a material breach of this agreement by CITY, which is not cured within ninety (90) days after receipt of a written notice from CONTRACTOR of the existence of such breach. CONTRACTOR shall then be entitled to return of its letter of credit and rescission of its obligation to maintain the performance bond and all remedies provided by law.

## X.     MISCELLANEOUS CONTRACT PROVISIONS

### A.  San Francisco Office

CONTRACTOR shall maintain a fully staffed business office within the City and County of San Francisco in order to facilitate coordination between CITY and CONTRACTOR.

### B.  Letter of Credit Security Deposit and Performance Bond

#### 1.   Letter of Credit

Within seventy-two (72) hours after receiving notification of approval of the Third Amendment to Agreement, CONTRACTOR shall establish, and throughout the term of this Agreement, and ninety (90) days thereafter, shall maintain, with a national or California bank with at least a Moody's A rating and having at least one branch office within the City and County of San Francisco, a confirmed, clean, irrevocable letter of credit in favor of the City and County of San Francisco, a municipal corporation, in the amount of five hundred thousand dollars ($500,000). The letter of credit shall have an original term of one (1) year, with automatic extensions of the full five hundred thousand dollar ($500,000) amount throughout the term of the Agreement. The letter of credit shall provide that payment of the entire face amount of the letter of credit, or any portion thereof, shall be made to the City and County of San Francisco, upon presentation of a written demand to the bank signed by the Director of Public Transportation, or the Port's Executive Director on behalf of the City and County of San Francisco. The letter of credit shall constitute a security deposit guaranteeing faithful performance by CONTRACTOR of all terms, covenants, and conditions of this Agreement, including all monetary obligations set forth herein.

If CONTRACTOR defaults with respect to any provision of this Agreement, CITY may, but shall not be required to, make its demand under the letter of credit for all or any portion thereof to compensate CITY for any loss or damage which CITY may have incurred by reason of CONTRACTOR's default. CITY shall present its written demand to the bank for payment under the letter of credit only after CITY shall have made its demand for payment directly to CONTRACTOR, and five (5) full business days have elapsed without CONTRACTOR having

made payment to CITY. CITY need not terminate this Agreement in order to receive compensation for its damages. If any portion of the letter of credit is so used or applied, CONTRACTOR, within ten (10) business days after written demand therefor, shall reinstate the letter of credit to its original amount; CONTRACTOR's failure to do so shall be a material breach of this Agreement.

The letter of credit shall provide for sixty (60) days notice by the bank to CITY in the event of non-extension of the letter of credit; in that event, CONTRACTOR shall replace the letter of credit at least ten (10) business days prior to its expiration. If CONTRACTOR fails to do so, CITY shall be entitled to present its written demand for payment of the entire face amount of the letter of credit. Any amounts so received by CITY shall be returned to CONTRACTOR upon replacement of the letter of credit.

If CITY receives any payments from the aforementioned bank under the letter of credit by reason of having made a wrongful or excessive demand for payment, CITY shall return to CONTRACTOR the amount by which CITY's total receipts from CONTRACTOR and from the bank under the letter of credit exceeds the amount to which CITY rightfully is entitled, together with interest thereon at the legal rate of interest, but CITY shall not otherwise be liable to CONTRACTOR for any damages or penalties.

## 2. Performance Bond

Within seventy-two (72) hours after receiving notification of approval of the Third Amendment to the Agreement , CONTRACTOR must file with the COMMISSION a performance bond, in a sum not less than five hundred thousand dollars ($500,000).

Bonding entities on the performance bond must be legally authorized to engage in the business of furnishing performance bonds in the State of California. All bonding entities must be satisfactory to COMMISSION and to the Controller and Risk Manager of the City and County of San Francisco.

During the period covered by the Agreement, if any of the sureties upon the bond shall become insolvent or, in the opinion of the COMMISSION, unable to pay promptly the amount of

such bond to the extent to which the surety might be liable, CONTRACTOR, within thirty (30) days after notice given by the COMMISSION to CONTRACTOR, shall by supplemental bond or otherwise, substitute another and sufficient surety approved by COMMISSION in place of the surety becoming insolvent or unable to pay. If CONTRACTOR fails within such thirty (30) day period to substitute another and sufficient surety, CONTRACTOR, if the COMMISSION so elects, shall be deemed to be in default in the performance of its obligations hereunder and upon the said bond. The COMMISSION, in addition to any and all other remedies, may terminate the Agreement or bring any proper suit or proceeding against moneys then due or which thereafter may become due CONTRACTOR under the Agreement. The amount for which the surety shall have justified on the bond and the moneys so deducted shall be held by CITY as collateral for the performance of the conditions of the bond.

C.    **Subcontractors**

CITY grants CONTRACTOR the authority to hire such subcontractors as CONTRACTOR deems necessary to fulfill the requirements detailed in this agreement, provided:

1.    No substitution of an MBE/WBE subcontractor shall be made at any time without the written consent of COMMISSION; AND

2.    If an MBE/WBE subcontractor is unable to perform successfully and is to be replaced, CONTRACTOR will be required to make good faith efforts to replace the original MBE/WBE subcontractor with another MBE/WBE subcontractor.

D.    **Statement of Commitment**

CONTRACTOR hereby agrees that in the performance of this agreement it will abide by the terms thereof, and no changes, alterations, or modifications shall be made or binding upon CITY unless authority has been given by CITY, evidenced by a Resolution of COMMISSION of which notice in writing shall be communicated to CONTRACTOR by the Secretary of COMMISSION.

E.    **Insurance**

8/18/2005

1.    **Limits**

CONTRACTOR shall maintain in force, during the full term of this agreement, insurance as follows:

    a.    Workers' Compensation, with Employers' Liability limits not less than one million dollars ($1,000,000) each accident;

    b.    Comprehensive General Liability Insurance, with limits not less than one million dollars ($1,000,000) each occurrence Combined Single Limit Bodily Injury and Property Damage, including Contractual Liability, Personal Injury, Advertising Liability, broad form Property Damage, Products and Completed Operations Coverages; and

    c.    Comprehensive Automobile Liability Insurance with limits not less than one million dollars (1,000,000) each occurrence Combined Single Limit Bodily Injury and Property Damage, including owned, non-owned and hired auto coverages, as applicable.

2.    **Endorsements**

Comprehensive General Liability and Comprehensive Automobile Liability Insurance policies shall be endorsed to provide the following:

    a.    To name as additional insureds the City and County of San Francisco, its Public Transportation Commission, its Port Commission, its officers, agents, employees and members of commissions;

    b.    To provide that such policies are primary insurance to any other insurance available to the additional insureds, with respect to any claims arising out of this Agreement, and that insurance applies separately to each insured against whom claim is made or suit is brought.

3. Notice

8/18/2005

All policies shall be endorsed to provide that there will be thirty (30) dyas advance written notice to CITY of cancellation, non-renewal or reduction in coverage, which shall be mailed to the following address:

General Manager
Public Utilities Commission
Room 287, City Hall
San Francisco, CA 94102

### 4. Condition Precedent

Certificates of insurance, satisfactory to CITY, evidencing all coverages above, shall be furnished to CITY before commencing any operations under this agreement, with complete copies of policies to be delivered to CITY upon its request.

### 5. Approval

Approval of the insurance by CITY shall not relieve or decrease the liability of CONTRACTOR.

### 6. Copies of Policies and General Provisions

In the event it makes any application for an extension of this agreement, CONTRACTOR shall submit evidence that the above required policies will remain in effect during the requested additional period of time.

If at any time during the term of this agreement, CONTRACTOR fails to maintain the required insurance in full force and effect, CONTRACTOR shall discontinue immediately all work under the agreement and shall not resume such work until authorized by General Manager after having given proper notice that the required insurance has been restored to full force and effect and that the premiums therefor have been paid for a period of time satisfactory to General Manager.

The insurance required herein shall be placed in a company or companies having policy holders' surplus of not less than ten (10) times the amount of coverage required hereunder.

### 7. Breach

8/18/2005

In the event of the breach of any provision of this section on "Insurance", or in the event any notice is received which indicates that any required insurance coverage will be diminished or cancelled, General Manager, in addition to other remedies provided for herein and notwithstanding any other provision of this agreement to the contrary, shall have the option to immediately declare a material breach of this agreement and suspend the further exercise by CONTRACTOR of all rights and privileges granted to CONTRACTOR pursuant to this agreement.

**F.    Indemnity**

CONTRACTOR shall take all responsibility for its work, shall bear all losses and damages resulting to it, to any of its contractors or subcontractors, to CITY, COMMISSION, Port, their members, officers, representatives, agents and employees, on account of any act, error or omission in the performance of this Agreement.

CONTRACTOR agrees to indemnify, to assume the defense of (if requested), and to hold harmless CITY, including, but not limited to, the COMMISSION, Port, their members, officers, representatives, agents, and employees from every claim, loss, damage, injury, expense, judgment and direct and/or vicarious liability of every kind, nature, and description arising in whole or in part from the performance of this Agreement, or failure to perform, except where such claim, loss, damage, injury, expense, judgment or direct and/or vicarious liability is caused solely, exclusively and directly by the willful misconduct or sole negligence of CITY, COMMISSION, Port, or their members, officers, representatives, agents, or employees.

The aforementioned indemnity shall extend to, but shall not be limited to, breach of contract, faulty workmanship or design, failure to comply with any law or regulation, including, but not limited to, the ADA and any law governing the release or storage of hazardous materials, any claim for infringement of patent rights, copyright, trade secret or any other proprietary right or trademark of any person or persons as a consequence of articles placed by CONTRACTOR in display panels (but not at CITY's request), or any negligent or intentional conduct whatsoever.

The foregoing indemnity shall include, without limitation, reasonable fees of attorneys, consultants and experts and related costs and CITY's costs of investigating any loss. CONTRACTOR specifically acknowledges and agrees that it has an immediate and independent obligation to defend CITY and the other indemnified parties from any claim which actually or potentially falls within this indemnity provision even if such allegation is or may be groundless, fraudulent or false, which obligation arises at the time such claim is tendered to CONTRACTOR by CITY and continues at all times thereafter. Insurance required under this Agreement shall not relieve CONTRACTOR or its subcontractors and/or consultants from liability under this hold harmless clause. CONTRACTOR's obligations under this Section shall survive the expiration or sooner termination of the Agreement

### G. Social Security, Unemployment Compensation

CONTRACTOR, upon request, shall furnish to CITY adequate evidence of compliance with laws relating to Social Security and Unemployment Compensation.

### H. Notices

Notices, as herein provided, shall be addressed by first class mail as follows:

To CITY:
General Manager
San Francisco Municipal Railway
949 Presidio Avenue
San Francisco, California 94115

To CONTRACTOR:
Donald Farias, President
Gannett Outdoor Co.
1695 Eastshore Highway
Berkeley, California 94710

Either party may change the above mailing address by serving written notice upon the other.

### I. Provisions of Charter

This agreement shall be governed by and shall be subject to the provisions of CITY's Charter.

### J. Bankruptcy or Reorganization Proceedings

37                                    8/18/2005

In the event that CONTRACTOR files a voluntary petition in bankruptcy, or in the event that proceedings in bankruptcy shall be instituted against CONTRACTOR and CONTRACTOR is thereafter adjudicated bankrupt pursuant to such proceedings, or in the event that a court takes jurisdiction of CONTRACTOR and its assets pursuant to proceedings brought under the provisions of any federal reorganization act, or in the event that a receiver of CONTRACTOR's assets is appointed, or in the event that CONTRACTOR executes an assignment for the benefit of its creditors, CITY shall have the right to terminate this agreement forthwith. Such termination shall be deemed to occur upon the happening of any of said events and, from thenceforth, CONTRACTOR or its successor in interest by operation of law or otherwise shall have no rights in or to this agreement or to any of the privileges herein conferred.

### K.  No Waiver of Subsequent Breaches or Defaults

The failure of either party to insist upon a strict performance of any of the terms, conditions and covenants hereinby the other party shall not be deemed a waiver of any subsequent breach or default in the terms, conditions and covenants herein contained.

### L.  Assignment

This agreement and the rights granted therein may not be assigned by CONTRACTOR without the prior written consent of CITY, and CITY's consent to any such assignment may be conditioned upon an increase in payments to be made to CITY under this agreement. This agreement and the rights granted therein may not be assigned by an assignee of CONTRACTOR without the prior written consent of CITY. Written consent shall be as required by Section X.V. below.

If CONTRACTOR is a corporation, any dissolution, merger, consolidation, or other reorganization of CONTRACTOR, or the sale or other transfer of a controlling percentage of the capital stock of CONTRACTOR, except by reason of death or mental incapacity, or the sale of fifty-one percent (51%) of the value of the assets of CONTRACTOR shall be deemed a voluntary assignment. The phrase "controlling percentage" means the ownership of, and the right to vote, stock possessing at least fifty-one percent (51%) of the total combined voting power of all classes

8/18/2005

of CONTRACTOR's capital stock issued, outstanding, and entitled to vote for the election of directors.

### M.  Successors

This agreement shall bind and inure to the benefit of the successors or assigns of the parties hereto.

### N.    Taxes

CONTRACTOR shall pay all lawful taxes and assessments levied or assessed in connection with its operation under this Agreement, including, but not limited to, taxes and assessments on its personal property and on any possessory interest in real property.

CONTRACTOR, on behalf of itself and any permitted successors and assigns, recognizes and understands that this Agreement may create a possessory interest subject to property taxation and that the CONTRACTOR, and any permitted successor or assign may be subject to the payment of such taxes.  CONTRACTOR, on behalf of itself and any other permitted successors and assigns, further recognizes and understands that any assignment permitted hereunder and any exercise of any option to renew or extend this Agreement may constitute a change in ownership for purposes of property taxation and therefore may result in a revaluation of any possessory interest created hereunder.

### O.  Legal Relationship

The parties hereby declare that it is not their intention by this agreement or any of the terms thereof to create a partnership, joint venture or agency relationship between them.

### P.  Conflict of Interest

CONTRACTOR hereby states that it is familiar with the provisions of Section 8.105 of the Charter of the City and County of San Francisco and certifies that it knows of no facts which constitute a violation of said section.  It further certifies that it will make a complete disclosure to CITY of all facts bearing upon any possible interest, direct or indirect (excluding remote interests) which it believes any member of CITY, or other officer or employee of CITY presently has or will have in this agreement or in the performance thereof or in any portion of the profits

8/18/2005

thereof. Willful failure to make such disclosure, if any, shall constitute grounds for termination of this agreement by CITY.

### Q.  California Law

This agreement shall be governed and construed in accordance with the laws of the State of California.

### R.  Section Headings

The section headings contained herein are for convenience in reference and are not intended to define or limit the scope of any provision hereof.

### S.  MacBride Principles--Northern Ireland

The City and County of San Francisco urges companies doing business in Northern Ireland to move towards resolving employment inequities, and encourages such companies to abide by the MacBride Principles.  The City and County of San Francisco urges San Francisco companies to do business with corporations that abide by the MacBride Principles.

### T.  Nondiscrimination, Affirmative Action, and MBE/WBE Participation

#### 1.  General

CONTRACTOR agrees to comply with (a) all provisions of Section 12B.2, as amended by Ordinance No. 340-68 (Chapter 12B San Francisco Administrative Code), regarding non-discrimination, a copy of which is attached hereto as Exhibit 1, and (b) all relevant provisions of Resolution No. 78-0022 of the Public Utilities Commission of the City and County of San Francisco (attached hereto as Exhibit 2), regarding affirmative action and minority business enterprises.

#### 2.  Employment Work Force Goals

In accordance with the mutual commitment of the parties to support affirmative action, CONTRACTOR agrees to affirmative action goals as follows:  at least forty percent (40%) of CONTRACTOR's San Francisco wages, salaries and draws will be paid to minority persons; and, in addition, at least fifty percent (50%) of CONTRACTOR's job slots in San Francisco will be filled by minority persons, reasonably reflective of the racial mix of minority persons in San

8/18/2005

Francisco.  At least ten percent (10%) of CONTRACTOR's San Francisco wages, salaries and draws will be paid to women; and, in addition, at least ten percent (10%) of CONTRACTOR's job slots in San Francisco will be filled by women.

### 3.  MBE/WBE Goals

In accordance with the mutual commitment of the parties to encourage the use of service agencies and suppliers of all ethnic groups, CONTRACTOR agrees to Minority Business Enterprise (MBE) and Women's Business Enterprise (WBE) goals as follows:

**a.     Commitment.**  With the commencement of this agreement, to the extent that CONTRACTOR purchases supplies or services in connection with this agreement, or subcontracts or joint ventures work under this agreement, the Minority Business Enterprise (MBE) participation goal shall be at least fifty percent (50%) of the total dollar amount thereof; and the Women's Business Enterprise (WBE) participation goal shall be at least ten percent (10%) of the total dollar amount thereof.  CONTRACTOR further agrees that its MBE/WBE commitments extend to real estate brokers, employment agencies, insurance agents, attorneys, accountants, printers, photographers, graphics firms, suppliers of office equipment and office supplies and the like.  CONTRACTOR further agrees to encourage advertisers to utilize MBEs and WBEs.  In order to facilitate efficiency, CONTRACTOR will endeavor to contract with MBEs and WBEs with San Francisco offices.   Information pertaining to Bay Area minority and woman-owned firms is available at the COMMISSION's Contract Compliance Office, 949 Presidio Avenue, San Francisco, CA 94115.

**b.     MBE/WBE Defined.**  An MBE/WBE is defined as follows:

(1)  A bona fide minority or woman-owned business enterprise is a business at least fifty-one percent (51%) of which is owned and controlled by minority group members or women.

41                                                8/18/2005

(2)  MBE ownership and control must be beyond the pro forma ownership as reflected in the owner's legal documents.  In determining whether a firm is a bona fide MBE or WBE, the following factors will be considered:

(a)  Whether the minority or woman owner is one of the company's highest ranking officers (e.g. partner, principal, president);

(b)  Whether the minority or woman owner sits on the Board of Directors if the firm is incorporated and has a controlling number of votes;

(c)  Whether the minority or woman owner is an authorized check signer on company accounts;

(d)  Whether the minority or woman owner has control over salaries, bonuses, profit sharing, pension and stock option plans;

(e)  Whether the minority or woman owner controls management of the day-to-day operations of the business in such areas as contract negotiation and management, technical and cost proposal development, business development and hiring of personnel;

(f)  Whether the minority or woman owner serves as partner or principal in charge of the company's contracts;

(g)  Whether the minority or woman owner is specialized in and can assume responsibility for the professional services provided by the firm.

(h)  Whether the minority or woman owner works on a daily basis in the firm;

(i)  Whether the minority or woman-owned  business is an independent business, which is real and continuing, and not created solely to meet the MBE/WBE requirements; and,

(j)  Whether the minority or woman-owned business has a permanent and independent place of business.

c.  **Bona Fide Involvement.**  The following criteria will be used to determine whether the involvement of the MBE/WBE is bona fide:

(1)  The MBE/WBE must perform work or supply products that are useful and necessary to the project and not act as a mere conduit.

8/18/2005

(2)    The MBE/WBE must perform work that is commensurate with its experience.

(3)    The work or product supplied by the MBE/WBE should be similar to the type of work or product supplied by the MBE/WBE in the normal course of its business.

(4)    MBE/WBE participation should include services required by the project, including suppliers of goods and materials.

(5)    If an MBE/WBE forms a joint venture with a firm that is not an MBE/WBE, the amount that may be credited toward meeting the MBE/WBE goals will be the percentage of the MBE/WBE share multiplied by the total project fee.

(6)    In determining the percentage of the project work that has been awarded to an MBE or WBE, only the dollar amount actually paid to the MBE or WBE may be counted. If the MBE or WBE subcontracts part of its work, this part must be deducted from the sum used to calculate the percentage of participation.

(7)    In developing a program to meet these goals and guidelines, only MBEs or WBEs that are owned and controlled by minority group members or women according to COMMISSION's definition may be used. A firm that is, for example, forty-five percent (45%) minority-owned cannot count forty-five percent (45%) of its fee towards meeting the goals and guidelines.

(8)    If a challenge or complaint is filed against the bona fide status of an MBE or WBE, the final determination will be made by the Director of the Human Rights Commission. The Director may consider, among other things, the recommendations of COMMISSION's Contract Compliance Officer, and any supporting findings from COMMISSION.

## 4. "Minority" Defined [1]/1

As used in this paragraph, the term "minority" refers to the following groups:

a.    The category "Black" (not of Hispanic origin): All persons having origins in any of the Black racial groups of Africa.

---

[1] For UMTA funded contracts, the definition of minority as set forth in 49 CFR Part 23 shall prevail.

8/18/2005

b.    The category "Hispanic":  All persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race.  (Persons from Brazil or Portugal should not be included in the Hispanic category unless they are of Spanish culture or origin.  They should be included in the "other" category.);

c.    The category "Asian or Pacific Islanders":  All persons having origins in any of the original peoples of the Far East, Southeast Asia, the Indian Subcontinent, or the Pacific Islands.  (This area includes, for example, China, Japan, Korea, Samoa, India, Pakistan, Nepal, Sikkim, Bhutan, Bangladesh, and Sri Lanka.);

d.    The category "Filipino":  All persons having origin in any of the original peoples of the Philippine Islands; and,

e.    The category "American Indian or Alaskan Native":  All persons having origins in any of the original peoples of North America, and who maintain cultural identification through tribal affiliation or community recognition. ·

5.    **Enforcement**

CONTRACTOR's performance under this Paragraph T shall be subject to periodic review by COMMISSION, through its Contract Compliance Officer.  Unresolved issues are subject to final determination by the Director of the Human Rights Commission, who may consider recommendations of COMMISSION's Contract Compliance Officer.  In order to establish its affirmative action and MBE/WBE program at the earliest possible date, CONTRACTOR agrees to engage a community services coordinator.  CONTRACTOR's failure to make a good faith effort to attain the affirmative action and MBE goals set forth above shall constitute a material breach of contract and in the event said breach is not cured within sixty (60) days from receipt of written notice of said breach, CITY shall be entitled to have and elect among any of the remedies set forth in Paragraph B of Section IX.

6. **Submission of Affidavit**

All MBEs and WBEs retained by CONTRACTOR are subject to review and recommendation by COMMISSION's Contract Compliance Officer and certification by the

Director of the Human Rights Commission. Such certification requires submission to COMMISSION's Contract Compliance Officer of a completed and notarized affidavit (PUC Form 5) with the requested supporting documents.

**U.  Permits**

CONTRACTOR will be required to obtain all permits to allow transit shelter construction. CONTRACTOR is solely responsible for acquiring such permits and paying for them. CONTRACTOR shall also obtain permits directly from the California Department of Transportation for all shelters existing or to be constructed on State highways in San Francisco.

**V.  Extent of Agreement**

This agreement represents the entire integrated agreement between CITY and CONTRACTOR, and supersedes all prior negotiations, representations or agreements, either written or oral.

**W.  Amendments**

This agreement may be amended only by a written instrument signed by both CITY and CONTRACTOR. Wherever in this agreement the written consent of CITY is required, that shall include the approvals of COMMISSION and the Board of Supervisors of CITY.

**X.  Attorneys' Fees**

In the event that at any time during the term of this agreement either CITY or CONTRACTOR shall institute any action or proceeding against the other relating to the provisions of this agreement, or any default hereunder, then, and in that event, the unsuccessful party in such action or proceeding agrees to reimburse the successful party for the reasonable expenses of attorneys' fees and disbursements incurred therein by the successful party.

**Y.  Tropical Hardwood Ban**

The City and County of San Francisco urges contractors not to import, purchase, obtain, or use for any purpose, any tropical hardwood or tropical hardwood product.

**Z.  Burma (Myanmar) Business Prohibition**

8/18/2005

CONTRACTOR is not the government of Burma (Myanmar), a person or business

entity organized under the laws of Burma (Myanmar) or a "prohibited person or entity" as

defined in Section 12J.2(G) of the San Francisco Administrative Code.  The city reserves the

right to terminate this Agreement for default if the CONTRACTOR violates the terms of this

Section Y.

Chapter 12J of the San Francisco Administrative Code is hereby incorporated by

reference as though fully set forth herein.  The failure of CONTRACTOR to comply with any of

its requirements shall be deemed a material breach of contract.  In the event that CONTRACTOR

fails to comply in good faith with any of the provisions of Chapter 12J of the San Francisco

Administrative Code, CONTRACTOR shall be liable for liquidated damages for each violation

in an amount equal to CONTRACTOR's net profit under the Agreement, or 10% of the total

amount of the Agreement, or $1,000, whichever is greatest.  CONTRACTOR acknowledges and

agrees that the liquidated damages assessed shall be payable to the CITY upon demand and may

be set off against any moneys due to the CONTRACTOR from any CITY contract.

**AA.    Compliance With Laws**

CONTRACTOR shall at all times comply with all applicable federal, state and local laws,

as they may be amended or enacted from time to time during the term of this Agreement, whether

foreseen or unforeseen, including, but not limited to, the ADA.

**BB.    Prevailing Wages**

CONTRACTOR and its subcontractors shall pay prevailing wages for those construction

or crafts classifications for which a prevailing wage has been established for work performed in

San Francisco.

**CC.    Non-Discrimination in City Contracts and Benefits Ordinance.**

**(1)    Contractor Shall Not Discriminate.**  In the performance of this

Agreement, Contractor agrees not to discriminate on the basis of the fact or perception of a

person's race, color, creed, religion, national origin, ancestry, age, sex, sexual orientation, gender

identity, domestic partner status, marital status, disability or Acquired Immune Deficiency

Syndrome or HIV status (AIDS/HIV status) against any employee of, any City employee working with, or applicant for employment with Contractor, in any of CONTRACTOR's operations within the United States, or against any person seeking accommodations, advantages, facilities, privileges, services, or membership in all business, social, or other establishments or organizations operated by Contractor.

      (2)    **Subcontracts.** Contractor shall incorporate by reference in all subcontracts the provisions of Sections 12B.2(a), 12B.2(c)-(k), and 12C.3 of the San Francisco Administrative Code and shall require all subcontractors to comply with such provisions. CONTRACTOR's failure to comply with the obligations in this subsection shall constitute a material breach of this Agreement.

      (3)    **Non-Discrimination in Benefits.** Contractor does not as of the date of this Agreement and will not during the term of this Agreement, in any of its operations in San Francisco or where the work is being performed for the City or elsewhere within the United States, discriminate in the provision of bereavement leave, family medical leave, health benefits, membership or membership discounts, moving expenses, pension and retirement benefits or travel benefits, as well as any benefits other than the benefits specified above, between employees with domestic partners and employees with spouses, and/or between the domestic partners and spouses of such employees, where the domestic partnership has been registered with a governmental entity pursuant to state or local law authorizing such registration, subject to the conditions set forth in Section 12B.2(b) of the San Francisco Administrative Code.

      (4)    **Condition to Contract.** As a condition to this Agreement, Contractor shall execute the "Chapter 12B Declaration: Nondiscrimination in Contracts and Benefits" form (Form HRC-12B-101) with supporting documentation and secure the approval of the form by the San Francisco Human Rights Commission.

      (5)    **Incorporation of Administrative Code Provisions by Reference.** The provisions of Chapters 12B and 12C of the San Francisco Administrative Code are incorporated in this Section by reference and made a part of this Agreement as though fully set forth herein.

8/18/2005

marketing purposes for the Municipal Railway. "Marketing purposes" may include, but are not limited to, advertising, public relations, and promotion of MUNI to the public and to news media organizations.

## XIII.  MAYOR'S OFFICE SUPPORT

Within thirty (30) days after execution of this Third Amendment, Contractor shall make a payment of Fifty Thousand Dollars ($50,000) to City.  Said amount shall be used by the Mayor's Office in its sole discretion to benefit CITY.

## XIV.    TRASH RECEPTACLES

By no later than June 30, 1998, Contractor shall provide to City one hundred and twenty-five (125) trash receptacles, the specifications of which shall be approved in advance by the Director of DPW.  By no later than June 30, 1999, Contractor shall provide to City an additional one hundred and twenty-five (125) trash receptacles identical to the ones previously furnished.  Contractor shall deliver all trash receptacles to DPW at a location to be selected by DPW.

## XV.    GPS DEMONSTRATION PROJECT

It is CITY's intention to conduct demonstration projects involving the use of Global Positioning System (GPS) technologies at transit stops along certain transit lines, as determined by MUNI, in order to provide MUNI patrons with "real time" transit information. CONTRACTOR agrees to participate in such a demonstration project by entering into agreements with qualified vendors to permit its transit shelters at stops along the selected lines to be outfitted with such equipment as may be necessary to receive signals and display such information to the public ("GPS equipment").  Notwithstanding Section I.D.4 of Agreement, CITY may permit CONTRACTOR to include advertising on the information display as part of the demonstration projects.  CONTRACTOR shall have no responsibility to purchase, install, operate, repair or replace any GPS equipment.  CONTRACTOR will provide cleaning, graffiti-removal and other basic maintenance of the GPS equipment consistent with its routine maintenance of the shelters.  CITY shall have no responsibility for the condition of the GPS

8/18/2005

Contractor shall comply fully with and be bound by all of the provisions that apply to this Agreement under such Chapters of the Administrative Code, including but not limited to the remedies provided in such Chapters. Without limiting the foregoing, Contractor understands that pursuant to Section 12B.2(h) of the San Francisco Administrative Code, a penalty of $50 for each person for each calendar day during which such person was discriminated against in violation of the provisions of this Agreement may be assessed against Contractor and/or deducted from any payments due Contractor.

## XI.    THIRD STREET LIGHT RAIL LINE

CONTRACTOR acknowledges that CITY is in the final planning and development stage of a light rail line to run along the Third Street corridor from Visitacion Valley to Downtown or Chinatown. Within the next few years, CITY will determine the exact configuration of the line, including the number and location of station stops and whether there will be high level or low level platforms at the stations. The line is expected to open for operation by 2003.

Upon request by CITY, CONTRACTOR agrees to negotiate with CITY a program for participation by CONTRACTOR in the construction, maintenance and repair of any shelters and boarding platform areas planned for the Third Street light rail line in exchange for advertising associated with shelters. Such a program may be similar to the programs for the MMX, F-Line or Stonestown shelters set forth in Sections I.D.4 (Displays), V.A (Installation of Shelters), and V.B (Maintenance) of this Agreement.

## XII.    MARKETING SUPPORT

CONTRACTOR shall contribute one hundred thousand dollars ($100,000) to the Public Transportation Department (PTD) no later than sixty (60) days after final approval of this Third Amendment; and thereafter, annually, on the anniversary date of the commencement of this Agreement, pay one hundred thousand dollars ($100,000) to PTD through the 14th year of this Agreement; one hundred twenty-five thousand dollars ($125,000) from the 15th year of this Agreement through the 18th year of this Agreement; and one hundred fifty thousand dollars ($150,000) in the 19th and 20th years of this Agreement. Said payments shall be used solely for

8/18/2005

equipment or any damage to the shelters resulting from the GPS equipment during the demonstration projects.

   If the CITY should decide to contract with vendor(s) of GPS equipment on a long-term basis, CONTRACTOR agrees to cooperate and negotiate in good faith with the CITY and the CITY's prospective vendor(s) to permit the GPS equipment to be installed on CONTRACTOR's shelters throughout San Francisco.

8/18/2005

## CITY AND COUNTY OF SAN FRANCISCO

AUTHORIZED BY:

Public Transportation Commission
Resolution No. _97-034, 97-160_

ATTEST:

_R. Boomer_
Secretary

_____
Director of Public Transportation

PORT

City and County of San Francisco, by
and through the San Francisco Port
Commission

_____
Executive Director
Port Commission Resolution No. 96-61

APPROVED AS TO FORM: AUTHORIZED BY:

LOUISE H. RENNE                          Board of Supervisors
City Attorney                            Ordinance No. _67-98_

By_____               ATTEST:
      Deputy City Attorney

                                         _____
                                         Clerk of the Board

APPROVED AS TO FORM:
   **LOUISE H. RENNE**
     **CITY ATTORNEY**

BY_____

                          CONTRACTOR

                  OUTDOOR SYSTEMS, INC.

         By_____
                    Lewis Lillian
         Market Manager, Transit Division