DENNIS J. HERRERA, State Bar #139669
City Attorney
KRISTEN A. JENSEN, State Bar #130196
THOMAS S. LAKRITZ, State Bar #161234
VICTORIA WONG, State Bar #214289
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102
Telephone:     (415) 554-6547
Facsimile:     (415) 554-4747
E-Mail:        tom.lakritz@sfgov.org

Attorneys for Defendant
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| METRO FUEL LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br>    vs.<br><br>CITY OF SAN FRANCISCO, a municipal corporation, COUNTY OF SAN FRANCISCO, a subdivision of the State of California, CITY AND COUNTY OF SAN FRANCISCO, a chartered California city and county and DOE 1 through DOE 10,<br><br>    Defendants. | Case No. C07-6067 JSW<br><br>**DECLARATION OF GAIL R. STEIN IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Hearing Date:  November 14, 2008<br>Time:          9:00 a.m.<br>Place:         Courtroom 2, 17th Floor<br><br>Trial Date:    October 26, 2009 |

I, GAIL R. STEIN, declare:

1. I have personal knowledge of the matters stated herein, except for those matters set forth on information and belief, which I believe to be true, and if called to testify, I can and will testify competently as to all matters set forth herein.

2. I am the Manager for Property Contracts and Development for the San Francisco Municipal Transportation Agency ("SFMTA"). I have held this position since January 2008. Prior to my current position, I was an aide to former Supervisor Barbara Kaufman from January 1996 to February 1999, a Principal Administrative Analyst for the SFMTA from June 1999 to November 2004 and then again from November 2005 to January 2008, and Chief Financial Officer at the San Francisco District Attorney's Office from November 2004 to November 2005.

3. As Manager for Property Contracts and Development for the SFMTA, I am the primary Project Manager for the SFMTA's Transit Shelter Advertising Agreement. I also have many other job responsibilities in the SFMTA's Real Estate unit.

4. **San Francisco Municipal Transportation Agency.** In November 1999, the voters approved Proposition E, which created the San Francisco Municipal Transportation Agency. Proposition E was codified as Article VIIIA of the San Francisco Charter. In 2002, the Department of Parking and Traffic became part of the SFMTA, which also includes the San Francisco Municipal Railway ("MUNI"). Under Article VIIIA, the SFMTA has "exclusive charge of the construction, management, supervision, maintenance, extension, operation, use, and control of all property, as well as the real, personal, and financial assets of the Municipal Railway; and [has] exclusive authority over contracting, leasing, and purchasing by the Municipal Railway." San Francisco Charter § 8A.102(b)(1).

5. **San Francisco Municipal Railway ("MUNI").** MUNI was founded in 1912 and is one of the oldest municipally owned transit agencies in the United States. MUNI operates 24 hours a day, 7 days a week. MUNI's fleet of vehicles is one of the most diverse in the world, operating historic streetcars, modern light rail vehicles, diesel buses, alternative fuel vehicles, electric trolley coaches and the world famous cable cars.

6.      According to the SFMTA's Short Range Transit Plan for fiscal years 2008 – 2027, MUNI has a network of 80 transit lines and provides access to most locations within the City and County of San Francisco (the "City") 24 hours a day, 365 days a year.  According to the SFMTA Service Planning staff, MUNI maintains approximately 4300 transit stops throughout the City and County of San Francisco.  MUNI carries over 672,000 riders each weekday, totaling over 204 million annual passengers trips, making MUNI the most heavily used transit system in the Bar Area and the eighth in the Nation.  According to the SFMTA's San Francisco Transportation Fact Sheet (May 2008), in 2006, 30.3% of San Francisco residents relied upon MUNI as their means of transportation to and from work.

7.      **MUNI's Operating Budget.**   According to SFMTA's Finance staff, MUNI's 2008-2009 and 2009-2010 Operating Budget includes revenues from transit fares, operating grants, parking and traffic fees and fines, and other revenues such as advertising and interest income.  For the same time period, MUNI's Operating Budget includes expenditures from seven major categories:  salaries and benefits, contracts and other services, materials and supplies, equipment and maintenance, rent and building, insurance and claims and work orders to other City departments.  Below are the revenue and expenditure projections for both years:

**Revenue Category**

| | 2008-2009 | 2009-2010 |
|---|---|---|
| Transit Fares | $144,017,496 | $160,614,850 |
| Operating Grants | 152,081,480 | 134,281,480 |
| Parking and Traffic Fees & Fines | 238,958,118 | 256,541,697 |
| Other (Advertising, Interest, Rent) | 20,844,917 | 24,179,917 |
| Transfers & Fund Balance | 228,675,511 | 242,535,287 |
| Taxi Fees | 2,201,729 | 2,219,729 |
| Total | $786,779,251 | $820, 372,960 |

//

//

//

**Expenditure Category**

|  | 2008-2009 | 2009-2010 |
|---|---|---|
| Salaries & Benefits | $484,317,574 | $510,785,131 |
| Contracts & Other Services | 65,775,667 | 68,580,343 |
| Materials & Supplies | 41,831,237 | 43,054,703 |
| Equipment & Maintenance | 51,060,390 | 49,043,696 |
| Rent & Building | 11,114,935 | 11,503,958 |
| Insurance & Claims | 61,486,614 | 63,643,046 |
| Reserve | 10,000,000 | 10,350,000 |
| Services from City Departments | 61,192,834 | 63,402,083 |
| Total | $786,779,251 | $820, 372,960 |

8. **Request for Proposals.** On February 1, 2007, the SFMTA issued a Request for Proposal ("RFP") seeking a company to design, supply, construct, maintain and repair transit shelters within the City during the term of the proposed contract. The SFMTA received 4 proposals.

9. The SFMTA created a Selection Committee and Technical Advisory Team of SFMTA and other City employees to review the proposals. The Selection Committee and Technical Advisory Team were made up of experts in, among other things, traffic safety, maintenance, disability access, and design and esthetics. Below is the list of the Selection Committee and Technical Advisory Team members:

**Selection Committee Members**

| | |
|---|---|
| Debra Johnson | MTA Chief of Staff, Director of External Affairs |
| Sonali Bose | MTA Director of Finance/CFO |
| Jenniffer Hamilton | MTA Chief Information Officer/Dir. Information Technology |
| Bond Yee | MTA Director of Parking and Traffic |

//

//

//

**Technical Advisory Team Members**

| | |
|---|---|
| Jamie Osborne | MTA Accessible Services |
| Ted Aranas | MTA Ways and Structures |
| Kylie Grenier | MTA IT Program Manager |
| Dan Rosen | MTA Transportation Planning and Development |
| Henry Li | MTA Budget Manager |
| Marisa Espinosa | MTA Manager, Strategic Policy Initiatives, |
| Scott Broady | MTA DPT Traffic Engineering |
| Dan Sider | Mayor's Office of Greening |
| Nancy Gonchar | Interim Director, Arts Commission |
| Mohammed Nuru | Deputy Director, Department of Public Works |

10. On June 19, 2007, the SFMTA Board of Directors authorized the SFMTA's Executive Director/CEO to enter into negotiations with the highest-ranked compliant proposer, Clear Channel Outdoor Inc. ("Clear Channel").

11. **Transit Shelter Advertising Agreement.** On September 4, 2007, the SFMTA Board of Directors adopted Resolution No. 07-149 authorizing the Executive Director/CEO of the SFMTA to execute the Transit Shelter Advertising Agreement between the City and County of San Francisco and Clear Channel ("Transit Shelter Advertising Agreement"). On October 23, 2007, the San Francisco Board of Supervisors gave final approval to Ordinance No. 240-07 approving the Transit Shelter Advertising Agreement. The Mayor approved Ordinance No. 240-07 on October 29, 2007. The Transit Shelter Advertising Agreement went into effect on December 10, 2007. A true and correct copy of the Transit Shelter Advertising Agreement is attached as Exhibit A.

12. **Existing Transit Shelters.** As set forth in Exhibits A, B-1 and B-2 of the Transit Shelter Advertising Agreement, there were 1063 existing transit shelters on December 10, 2007, the effective date of the Transit Shelter Advertising Agreement. Of the 1063 existing transit shelters on that date, advertising would have been allowed on up to 697 transit shelters ("Commercial Shelters") and not allowed on 366 shelters ("Noncommercial Shelters"). There were also 8 historic transit shelters that were Noncommercial Shelters and 34 kiosks on that date.

13. **Replacing Existing Transit Shelters.** The Transit Shelter Advertising Agreement requires Clear Channel to replace existing transit shelters and may require Clear Channel

1 to install new transit shelters.  Under Section 4.1.2 Clear Channel is required to maintain a minimum
2 of 1100 transit shelters and is allowed to maintain up to 1500 transit shelters and a minimum of 39
3 and a maximum of 150 Commercial Kiosks.

4     14. **Limits on Advertising in Transit Shelters.** The Transit Shelter Advertising
5 Agreement limits the number of structures on which Clear Channel can place advertising.  Under
6 Section 4.1.2, upon the completion of construction for the new shelters and kiosks under the Transit
7 Shelter Advertising Agreement, "there shall be one Noncommercial Structure for every two
8 Noncommercial Structures [other than shelters on high-level boarding platforms]."  Thus, if Clear
9 Channel installs the minimum number of transit shelters under the Transit Shelter Advertising
10 Agreement, there could be 737 transit shelters with advertising and 367 transit shelters without
11 advertising.  If Clear Channel installs the maximum number of transit shelters under the Transit
12 Shelter Advertising Agreement, there could be 1000 transit shelters with advertising and 500 transit
13 shelters without advertising.

14     15. The Transit Shelter Advertising Agreement also limits where the advertising may be
15 placed on a transit shelter.  Under Section 6.2, Clear Channel is only authorized "to use the
16 'downstream' side wall (furthest from approaching transit vehicles) or the back panel of any
17 Commercial Shelter to display advertising material."  In addition, except in limited locations, Clear
18 Channel is prohibited from placing advertisements on more than one wall of any transit shelter.
19 Finally, any advertisements may not exceed twenty-four square feet.

20     16. Under the Transit Shelter Advertising Agreement, the SFMTA also retained the right
21 to place transit information on every transit shelter and kiosk.  Under Section 5.1, the SFMTA
22 "reserves the right to place transit information, including maps, schedules, and service bulletins, on
23 every [transit shelter and kiosk]."

24     17. **Location of Transit Shelters.** Under the Transit Shelter Advertising Agreement
25 the SFMTA retained the right to designate the locations of all transit shelters and kiosks (other than
26 transit shelters and kiosks on Port property).  Under Section 4.2.1, the SFMTA "has sole discretion to
27 designate the locations of all Structures, including which sites are available for advertising" and "does
28 not guarantee any specific site for any particular Structure."

18. **Cost of Installing Transit Shelters.** Clear Channel recently estimated that the cost to manufacture a new version of the existing transit shelter would cost $9,000; installation would cost at least $2,500 more; neither amount includes power to the shelter.

19. **Maintenance and Repair of Transit Shelters.**     Under Section 9.4 of the Transit Shelter Advertising Agreement, Clear Channel is required to inspect all transit shelters and kiosks a minimum of twice per week, except for transit shelters and kiosks in certain locations which are inspected three times per week. In the course of each inspection of a Shelter or Kiosk, Clear Channel is required to "remove all Graffiti, stickers, posters, litter, dust, dirt, and weeds from each Shelter or Kiosk, and from a five-foot radius surrounding the Shelter or Kiosk."

20. Under Section 9.5.1 of the Transit Shelter Advertising Agreement, Clear Channel is required to "repair any damage, including, but not limited to, damage from vandalism or Graffiti, found on or around the Shelter or Kiosk" within 48 hours. In addition, Clear Channel is required to repair, replace or remove "any damage to a Shelter or Kiosk that is of a hazardous nature (e.g., broken glass, light sources that need replacing) within 24 hours." "If the Shelter or Kiosk is destroyed, [Clear Channel] shall remove the Shelter or Kiosk remains within 24 hours" and "replace the Shelter or Kiosk within 15 days."

21. **Cost of Maintaining and Repairing Transit Shelters.**     In 2007, the SFMTA did a Prop J analysis for the Controller's Office. The SFMTA estimated that the staff costs for building, maintaining and repairing shelters would run from $3.9 million to $4.7 million.

22. **Design of Transit Shelters and Kiosks.**     Under Section 8 of the Transit Shelter Advertising Agreement, Clear Channel is required to provide new master designs to the SFMTA for the new transit shelters and kiosks.

23. Under Section 8.1(d) of the Transit Shelter Advertising Agreement any design "must be approved by [the San Francisco Municipal Transportation Agency], the Arts Commission, the Port, the Recreation and Park Department, and any other department with jurisdiction."

24. In order to create safe transit shelters for MUNI riders, passing vehicle operators and the public, the Transit Shelter Advertising Agreement imposed minimum design and placement

1 specifications for new transit shelters and kiosks. Under Section 8.1.2(a), Clear Channel is required to design and construct transit shelters and kiosk to meet certain minimum design requirements.

25. For example, under Section 8.1.2(a)(ix) each transit shelter and kiosk must be designed and constructed to ensure compliance with the Americans with Disabilities Act.

26. As another example, under Section 8.1.2(a)(xi), each transit shelter "must not be so illuminated as to be hazardous to passing vehicle operators."

27. **Compliance with Local Ordinances.** The SFMTA is required to comply with all zoning and permitting requirements when installing transit shelters and kiosks on the public right-of-way. Under the San Francisco Charter, "the planning and zoning provisions of [the] Charter and the Planning Code as they may be amended from time to time shall apply to all real property owned or leased by the [San Francisco Municipal Transportation Agency]." San Francisco Charter, Section 8A.110.

28. With respect to other local requirements, Clear Channel is required to comply with all local ordinances in the design and construction of the new transit shelters and kiosks. Under Section 8.2, Clear Channel "shall be responsible for obtaining, at is sole cost, all required permits and approvals from City departments or other public entities before commencing construction for any [transit shelter or kiosk]."

29. **Approval by San Francisco Arts Commission.** Under San Francisco Charter Section 5.103, the San Francisco Arts Commission has the power to review and approve "the design of all public structures, any private structure which extends over or upon any public property and any yards, courts, setbacks or usable open space which are an integral part of any such structures."

30. The San Francisco Arts Commission Civic Design Review Committee has established a three-phase process for the review and approval of any public structures. Because the transit shelters and kiosks are public structures on City property, Clear Channel is required to obtain the Arts Commission's approval for the new designs for the transit shelters and kiosks. I represented the SFMTA before the Civic Design Review Committee during the review process.

31. Phase 1 of the process deals with the review and approval of the conceptual and schematic form of the project. Phase 2 of the process deals with the review of the project in more

DECLARATION OF GAIL R. STEIN   7   n:\land\li2008\080804\00504858.doc
USDC No. C07-6067 JSW

1  detail and addresses concerns raised in Phase 1.  Phase 3 deals with the review of contract documents
2  to ensure that the project conforms to the Phase 2 submission.

3      32.    SFMTA staff first met with Arts Commission staff to begin the design review process
4  on July 19, 2007.  The Civic Design Review Committee held a special meeting on September 17,
5  2007, to receive an informational presentation about the transit shelter and kiosk designs.  On October
6  15, 2007, the Civic Design Review Committee gave Phase 1 approval to the designs for new transit
7  shelters and kiosks.

8      33.    On December 3, 2007, the San Francisco Arts Commission gave Phase 2 approval to
9  Clear Channel's designs for new transit shelters and kiosks.

10      34.    On February 25, 2008, the Civic Design Review Committee gave Phase 3 approval to
11  Clear Channel's designs for new transit shelters and kiosks with two stipulations, followed by Arts
12  Commission approval of Phase 3 on March 3, 2008.  Due to certain design challenges in meeting the
13  stipulations, Clear Channel modified the designs and re-submitted them to the Civic Design Review
14  Committee.  On June 16, 2008, the Civic Design Review Committee gave approval to the changes to
15  the previously approved Phase 3 designs for new transit shelters and kiosks, followed by Arts
16  Commission approval on July 7, 2008.

17      35.    **Payments Under the Transit Shelter Advertising Agreement.**    Under the Transit
18  Shelter Advertising Agreement, Clear Channel is required to pay the San Francisco Transportation
19  Agency a minimum annual guarantee ("MAG") each year, or a percentage of gross revenues,
20  whichever is higher.  The MAG increases over the term of the contract.  Section 7.1.1(b)(iv) sets forth
21  the MAG for each year of the agreement.

22      36.    Under Section 8A.109 of the San Francisco Charter the SFMTA is required to
23  diligently seek to develop new sources of funding for the Agency's operations.  Clear Channel's
24  payments go into MUNI's Operating Budget and support, among other things, low transit fares for
25  MUNI riders.  MUNI's transit fares are significantly lower compared to other agencies locally and
26  nationally.

37.   Clear Channel will also make annual payments of $500,000 in administrative fees, $200,000 in marketing fees, and $265,000 for the Arts Commission. All these fees will escalate annually according to the Bay Area CPI.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed on August 22, 2008

By: _____/s/_____
GAIL R. STEIN

**SIGNATURE ATTESTATION**

(U.S.D.C. N.D. Cal. General Order 45, Section X.B.)

I obtained the concurrence in the filing of this document from the signatory of this declaration, in compliance with U.S.D.C. N.D. General Order 45, Section X.B.

Dated: August 29, 2008

DENNIS J. HERRERA
City Attorney
KRISTEN A. JENSEN
THOMAS S. LAKRITZ
VICTORIA WONG
Deputy City Attorneys

By: _____/S/_____ .
THOMAS S. LAKRITZ

Attorneys for Defendant
CITY AND COUNTY OF SAN FRANCISCO