# EXHIBIT A - 1

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

# San Francisco Municipal Transportation Agency

## TRANSIT SHELTER ADVERTISING AGREEMENT

Date: December 10, 2007

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

## TABLE OF CONTENTS

Page

1.  DEFINITIONS .................................................................................................... 1
    1.1.   ADA .................................................................................................. 1
    1.2.   Alternative Shelter ........................................................................... 1
    1.3.   Agreement ......................................................................................... 1
    1.4.   Annual Financial Report ................................................................. 1
    1.5.   Arts Commission .............................................................................. 1
    1.6.   Associated Equipment ..................................................................... 1
    1.7.   Bicycle-Sharing Program ................................................................ 1
    1.8.   Carryover Contract .......................................................................... 2
    1.9.   City .................................................................................................... 2
    1.10.  Commercial ...................................................................................... 2
    1.11.  Consumer Price Index, CPI ............................................................ 2
    1.12.  Days .................................................................................................. 2
    1.13.  Design ............................................................................................... 2
    1.14.  Design Approval Date ..................................................................... 2
    1.15.  DPW .................................................................................................. 2
    1.16.  Effective Date .................................................................................. 2
    1.17.  E-Line ............................................................................................... 2
    1.18.  Executive Director/CEO ................................................................. 2
    1.19.  Existing ............................................................................................ 2
    1.20.  Fiscal Year ....................................................................................... 2
    1.21.  F-Line ............................................................................................... 2
    1.22.  Graffiti .............................................................................................. 2
    1.23.  Gross Revenues ............................................................................... 3
    1.24.  High-Level Boarding Platform ...................................................... 3
    1.25.  Historic Shelters .............................................................................. 3
    1.26.  Kiosk ................................................................................................ 3
    1.27.  Low-Level Boarding Platform ....................................................... 3

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

1.28.   MAG; Minimum Annual Guarantee ............................................................ 3

1.29.   Maximum Ad Panel Size .......................................................................... 3

1.30.   New ........................................................................................................ 3

1.31.   Noncommercial ...................................................................................... 3

1.32.   Outage .................................................................................................... 3

1.33.   Port ........................................................................................................ 3

1.34.   Proposal .................................................................................................. 3

1.35.   Public Entity Shelters ............................................................................ 3

1.36.   Public Right(s)-of-Way .......................................................................... 3

1.37.   Records .................................................................................................. 3

1.38.   Request for Proposals, RFP ................................................................... 4

1.39.   San Francisco Municipal Transportation Agency; SFMTA ................... 4

1.40.   SFMTA-Constructed Shelters ................................................................ 4

1.41.   Shelter, Transit Shelter .......................................................................... 4

1.42.   Signal Control Cover .............................................................................. 4

1.43.   Small Business Enterprise; SBE ............................................................. 4

1.44.   Station Canopies ..................................................................................... 4

1.45.   Structures ................................................................................................ 4

1.46.   T-Line ..................................................................................................... 4

1.47.   Time and Materials ................................................................................. 4

1.48.   Transit Stop Poles .................................................................................. 4

1.49.   Unavoidable Delay ................................................................................. 4

1.50.   Union Square/Tenderloin Area ............................................................... 5

2.      GRANT OF ADVERTISING RIGHTS AND PRIVILEGES ........................ 5

2.1.    Rights Granted ........................................................................................ 5

        2.1.1  SFMTA to Contractor ................................................................ 5

        2.1.2  License ...................................................................................... 5

        2.1.3  Distance from other Advertising ............................................... 5

        2.1.4  Port to Contractor ..................................................................... 5

2.2.    Rights Retained/Limitations on Contractor's Rights .............................. 5

        2.2.1  Advertising ................................................................................ 5

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

|  | 2.2.2 | Advertising Space Subject to Change | 5 |
|---|---|---|---|
|  | 2.2.3 | Transportation Priority | 6 |
|  | 2.2.4 | Use of Structures | 6 |
|  | 2.2.5 | No Damage to City Property | 6 |
|  | 2.2.6 | Nuisances | 6 |
| 2.3. | Carryover Contracts | | 6 |
|  | 2.3.1 | Beginning of Term | 6 |
|  | 2.3.2 | End of Term | 6 |
| 3. | OWNERSHIP OF STRUCTURES | | 6 |
| 4. | INSTALLATION REQUIRED | | 7 |
| 4.1. | General | | 7 |
|  | 4.1.1 | Shelters and Kiosks | 7 |
|  | 4.1.2 | Number of Commercial and Noncommercial Shelters and Kiosks | 7 |
|  | 4.1.3 | Transit Stop Poles | 7 |
|  | 4.1.4 | Signal Control Covers | 7 |
| 4.2. | Locations | | 7 |
|  | 4.2.1 | General | 7 |
|  | 4.2.2 | Port Locations | 8 |
|  | 4.2.3 | Removal or Relocation of Shelters and Kiosks | 8 |
|  |  | (a) City Request | 8 |
|  |  | (b) Removal and Relocation Costs for City Requests | 8 |
|  |  | (c) Contractor Request | 8 |
|  |  | (d) Time for Relocation | 8 |
| 5. | NONCOMMERCIAL DISPLAY | | 8 |
| 5.1. | Transit Information | | 8 |
| 5.2. | Port Campaign | | 8 |
| 5.3. | Unsold Space | | 8 |
|  | 5.3.1 | City's Use of Unsold Space | 8 |
| 5.4. | Contractor's Use of Unsold Space | | 9 |
| 5.5. | Installation of Displays for City | | 9 |
| 6. | COMMERCIAL ADVERTISING DISPLAYS | | 9 |

**Municipal Transportation Agency**
Board of Directors & Parking Authority

| | 6.1. | Contractor's Best Efforts | 9 |
|---|---|---|---|
| | 6.2. | Commercial Shelters (including F-Line and E-Line Shelters) | 9 |
| | 6.3. | Kiosks | 9 |
| | 6.4. | Stonestown Station | 9 |
| | 6.5. | Municipal Railway Metro Extension Platforms | 9 |
| | 6.6. | T-Line Platforms | 10 |
| | 6.7. | Experimental Advertising. | 10 |
| 7. | | PAYMENTS | 10 |
| | 7.1. | Payments by Contractor to City | 10 |
| | | 7.1.1 General | 10 |
| | | (a) One-Time Payment | 10 |
| | | (b) Total Required Payments | 10 |
| | | (i) Administrative Payments | 10 |
| | | (ii) Payments for Art Commission | 10 |
| | | (iii) Marketing Support | 10 |
| | | (iv) MAG | 10 |
| | | (c) Revenue Share | 12 |
| | 7.2. | Late Payments | 12 |
| | 7.3. | Deduction for Decrease in Commercial Structures Below Minimum | 12 |
| 8. | | DESIGN AND CONSTRUCTION | 13 |
| | 8.1. | Designs | 13 |
| | | (a) New Master Designs | 13 |
| | | (b) City's Additional Design Option | 13 |
| | | (c) Alternative Shelter Designs | 13 |
| | | (d) Design Approval | 14 |
| | | 8.1.2 Minimum Shelter and Kiosk Design Specifications | 14 |
| | | 8.1.3 Construction and Materials Specifications | 15 |
| | | 8.1.4 LED Equipment | 16 |
| | | (a) Existing LED Installations | 16 |
| | | (b) Installation and Maintenance | 16 |
| | | (c) Damage to LED Equipment and Shelters | 16 |

iv

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

| | | |
|---|---|---|
| 8.2. | Permits | 16 |
| | 8.2.1 Permits | 17 |
| | 8.2.2 Applications for Permits in First Year | 17 |
| 8.3. | Demolition | 17 |
| 8.4. | Construction | 17 |
| | 8.4.1 Schedule | 17 |
| | 8.4.2 Commencing Work | 17 |
| | 8.4.3 Hours | 17 |
| | 8.4.4 Placement | 17 |
| | 8.4.5 Construction Sites | 17 |
| | 8.4.6 Quality Control/Quality Assurance | 17 |
| | 8.4.7 Power to Shelters and Kiosks | 17 |
| 9. | MAINTENANCE AND REPAIR | 18 |
| 9.1. | General | 18 |
| 9.2. | Complaint/Report Decal | 18 |
| 9.3. | Maintenance Schedule | 18 |
| 9.4. | Inspection and Clean-up | 18 |
| | 9.4.1 Union Square/Tenderloin Area Shelters | 18 |
| | 9.4.2 High-Level, E-Line and F-Line Boarding Platforms | 18 |
| 9.5. | Repair and Replacement | 19 |
| | 9.5.1 Transit Shelters; Kiosks | 19 |
| | 9.5.2 High-Level and Low-Level Boarding Platforms on E-Line and F-Line | 19 |
| | 9.5.3 Low-Level Boarding Platforms (other than E-Line and F-Line) | 19 |
| 9.6. | Remedies for Failure to Maintain or Repair | 19 |
| | 9.6.1 City May Repair | 19 |
| 9.7. | Inventory, Maintenance and Complaint Database System (IMCDS) | 19 |
| 9.8. | IMCDS Review and Approval | 20 |
| | 9.8.1 Inventory Records | 20 |
| | 9.8.2 Maintenance/Repair Records | 20 |
| | 9.8.3 Complaint/Report Records | 20 |
| | 9.8.4 3-1-1 Interface | 20 |

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

|  |  | 9.8.5 | Technical Requirements | 20 |
|  |  | (a) | Application Requirements | 20 |
|  |  | (b) | IMCDS Maintenance and Upgrades | 20 |
|  |  | (c) | Security | 21 |
|  |  | (d) | Outages | 21 |
|  | 9.8.6 | | Ownership | 21 |
|  | 9.8.7 | | Disaster Planning | 21 |
|  | 9.8.8 | | Public IMCDS Application | 21 |
| 9.9. | | | Quality Assurance/Quality Control Plan | 21 |
| 10. | | | APPROVAL OF ADVERTISING MATERIAL | 21 |
| 10.1. | | | General | 21 |
| 10.2. | | | Decals | 22 |
| 11. | | | REPORTING REQUIREMENTS; AUDITS | 22 |
| 11.1. | | | Annual Financial Statement | 22 |
| 11.2. | | | Annual Financial Report | 22 |
| 11.3. | | | Audits; Inspection of Records | 22 |
|  | 11.3.1 | | Records | 22 |
|  | 11.3.2 | | City's Right to Inspect and Copy | 22 |
|  | 11.3.3 | | Audit | 23 |
|  |  | (a) | Findings of Nonperformance | 23 |
| 12. | | | INSURANCE; INDEMNIFICATION | 23 |
| 12.1. | | | Insurance | 23 |
|  | 12.1.1 | | Required Coverages | 23 |
|  | 12.1.2 | | Endorsements | 23 |
|  | 12.1.3 | | Notice | 24 |
|  | 12.1.4 | | Claims-Made Coverage | 24 |
|  | 12.1.5 | | General Aggregate Limit | 24 |
|  | 12.1.6 | | Lapse of Coverage | 24 |
|  | 12.1.7 | | Condition Precedent | 24 |
|  | 12.1.8 | | Liability of Contractor | 24 |
| 12.2. | | | Indemnification | 24 |

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

13.    SECURITY DEPOSITS ..................................................................................... 25

    13.1.    Performance Bond .................................................................................. 25

        13.1.1 Amount of Bond ............................................................................ 25

        13.1.2 Sureties ......................................................................................... 26

    13.2.    Letter of Credit ...................................................................................... 26

        13.2.1 Requirements ................................................................................ 26

        13.2.2 Financial Institution ..................................................................... 26

        13.2.3 Extensions of Agreement .............................................................. 26

        13.2.4 Demand on Letter of Credit .......................................................... 26

        13.2.5 Expiration or Termination ............................................................. 27

        13.2.6 Return of Letter of Credit .............................................................. 27

        13.2.7 Excessive Demand ........................................................................ 27

14.    LIQUIDATED DAMAGES ............................................................................... 28

    14.1.    General .................................................................................................. 28

        14.1.1 Maintenance Breaches .................................................................. 28

        14.1.2 Construction Schedule Breaches .................................................. 28

        14.1.3 Annual Report ............................................................................... 29

        14.1.4 Failure to Remove Shelters and Kiosks ....................................... 29

        14.1.5 Failure to Cure Audit Deficiencies .............................................. 29

    14.2.    Failure to Comply with Advertising Policy ........................................... 29

    14.3.    Failure to Pay Liquidated Damages ....................................................... 29

15.    TERM; OPTIONS TO EXTEND ....................................................................... 29

    15.1.    Term and Extension of Term .................................................................. 29

    15.2.    Option to Extend .................................................................................... 29

16.    TERMINATION ................................................................................................ 29

    16.1.    Termination for Convenience ................................................................. 29

        16.1.1 Options on Expiration or Termination for Convenience ............... 30

            (a)    Removal of Shelters and Kiosks .................................... 30

            (b)    Transfer of Title ............................................................. 30

    16.2.    Default of Contractor ............................................................................. 30

        16.2.1 Termination ................................................................................... 30

**Municipal Transportation Agency**
Board of Directors & Parking Authority

 

16.2.2  Valuation of Property ...................................................................31

16.2.3  Port's Remedies .........................................................................31

16.2.4  Actual Damages .........................................................................31

16.2.5  Non-exclusive Remedies ............................................................31

16.3.  Protection of City Property ...................................................................31

16.4.  Relocation and Termination; Waiver of Rights ......................................31

16.5.  Survival ................................................................................................32

16.6.  Cooperation ..........................................................................................32

17.  SMALL BUSINESS PARTICIPATION; EMPLOYMENT REQUIREMENTS ........32

17.1.  SBE GOAL .............................................................................................32

17.1.1  Commitment ...............................................................................32

17.1.2  Nature of SBE Participation .........................................................32

17.1.3  Function .....................................................................................32

17.1.4  Determining the Amount of SBE Participation ..............................33

(a)    SBE Prime Contractor .................................................33

(b)    SBE Subcontractor ......................................................33

(c)    SBE Joint Venture Partner ...........................................33

(d)    Other SBEs .................................................................33

(e)    Materials or Supplies ...................................................33

17.1.5  Substitution of Subcontractor and Suppliers ................................33

17.1.6  Addition of Subcontractors and Suppliers ....................................34

17.1.7  Reporting Requirements ..............................................................34

17.1.8  Enforcement ...............................................................................34

17.2.  Employment Requirements ....................................................................34

17.2.1  Reporting Requirements ..............................................................34

17.2.2  Enforcement ...............................................................................34

18.  REQUIRING MINIMUM COMPENSATION FOR COVERED EMPLOYEES .............35

19.  REQUIRING HEALTH BENEFITS FOR COVERED EMPLOYEES ........................36

20.  OTHER OPTIONS ...........................................................................................37

20.1.  Bicycle-Sharing Program .......................................................................37

20.2.  Canopies over Subway Entrances ...........................................................37

**Municipal Transportation Agency**
Board of Directors & Parking Authority

 

21.    MISCELLANEOUS CONTRACT PROVISIONS .................................................. 38

21.1.    San Francisco Office .................................................................. 38

21.2.    Qualified Personnel .................................................................. 38

21.3.    Subcontractors........................................................................ 38

21.4.    Notices .................................................................................. 38

21.5.    Bankruptcy or Reorganization Proceedings................................. 39

21.6.    Non-Waiver of Rights ............................................................... 39

21.7.    Assignment............................................................................. 39

21.8.    Successors ............................................................................. 39

21.9.    Taxes..................................................................................... 39

            21.9.1  Payment of Taxes ......................................................... 39

            21.9.2  Possessory Interest ....................................................... 39

21.10.  Legal Relationship .................................................................. 40

21.11.  Conflict of Interest .................................................................. 40

21.12.  Agreement Made in California; Venue ....................................... 40

21.13.  Section Headings .................................................................... 40

21.14.  MacBride Principles--Northern Ireland ..................................... 40

21.15.  Nondiscrimination; Penalties .................................................... 40

            21.15.1 Contractor Will Not Discriminate ................................... 40

            21.15.2 Subcontracts ............................................................... 41

            21.15.3 Nondiscrimination in Benefits ....................................... 41

            21.15.4 Condition to Contract ................................................... 41

            21.15.5 Incorporation of Administrative Code Provisions by Reference.......... 41

21.16.  Compliance with Americans with Disabilities Act ....................... 41

21.17.  Resource Conservation............................................................ 41

21.18.  Sunshine Ordinance ................................................................ 41

21.19.  Proprietary or Confidential Information ..................................... 42

            21.19.1 City Information ........................................................... 42

            21.19.2 Contractor Information.................................................. 42

21.20.  Preservative-Treated Wood Containing Arsenic .......................... 42

21.21.  Prohibition on Political Activity with City Funds ......................... 42

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

21.22.  Limitations on Contributions ..................................................................... 43

21.23.  Protection of Private Information ............................................................... 43

21.24.  Extent of Agreement .................................................................................. 43

21.25.  Amendments .............................................................................................. 43

21.26.  Attorneys' Fees .......................................................................................... 43

21.27.  Tropical Hardwood and Virgin Redwood Ban ............................................ 43

21.28.  Compliance With Laws .............................................................................. 43

21.29.  Prevailing Wages ....................................................................................... 44

      21.29.1 Compliance with Laws ......................................................................... 44

      21.29.2 Payroll Records ................................................................................... 44

21.30.  No Third Party Beneficiaries ..................................................................... 44

21.31.  Severability ................................................................................................ 44

21.32.  Precedence ................................................................................................. 44

21.33.  Biannual Meetings ..................................................................................... 44

21.34.  Submitting False Claims; Monetary Penalties ............................................ 44

21.35.  Disputes ..................................................................................................... 45

22.  First Source Hiring Program ................................................................................. 45

22.1.  Incorporation of Administrative Code Provisions by Reference ................... 45

22.2.  First Source Hiring Agreement .................................................................... 45

22.3.  Hiring Decisions ......................................................................................... 46

22.4.  Exceptions .................................................................................................. 46

22.5.  Liquidated Damages ................................................................................... 47

22.6.  Subcontracts ............................................................................................... 48

## EXHIBITS

Exhibit A    List of SFMTA Historic Shelters (All Non-Commercial)

Exhibit B-1  List of Shelters and Kiosks by Number

Exhibit B-2  List of Shelters and Kiosks (Alphabetical)

Exhibit C    Municipal Railway Metro Extension High Level Boarding Platform and
              E-Line Low-Level Boarding Platforms

Exhibit D    List of Low-Level & High Level Platforms Under Port Jurisdiction

Exhibit E    Map of E-Line Low-Level Boarding Platforms and Third Street T-Line
              High Level Boarding Platforms

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

| | |
|---|---|
| Exhibit F | List of Low Level Platforms |
| Exhibit G | Stonestown High Level Boarding Platform |
| Exhibit H | Contractor's Maintenance and Repair Duties |
| Exhibit I | DPW Order No. 117,159 |
| Exhibit J | Policy Governing Advertising on MTA Property, effective January 16, 2007 |
| Exhibit K | Map of F-Line |
| Exhibit L | NextBus Specifications |
| Exhibit M | San Francisco GIS Data License Agreement |
| Exhibit N | SFMTA SBE Form No. 4 Subcontractor Participation Declaration, and SFMTA SBE Form No. 5 Small Business Enterprise Acknowledgment Declaration |
| Exhibit O | Map of Zone 1 |

**Municipal Transportation Agency**
Board of Directors & Parking Authority

 

## TRANSIT SHELTER ADVERTISING AGREEMENT

This Agreement is made and entered into this 10th day of December, 2007, by and between the City and County of San Francisco ("City"), by and through its Municipal Transportation Agency ("SFMTA") and by and through its San Francisco Port Commission ("Port"), and Clear Channel Outdoor, Inc., a Delaware corporation ("Contractor").

### RECITALS

**A.**    SFMTA operates a municipal transportation system known as the San Francisco Municipal Railway and governs the operations of the San Francisco Department of Parking and Traffic.

**B.**    SFMTA desires to enter into a Transit Shelter Advertising Agreement for the benefit of San Francisco transit passengers and City residents, for the placement, maintenance and repair of Structures on public property that may carry advertising.

**C.**    After a competitive solicitation, SFMTA has awarded this Transit Shelter Maintenance and Advertising Agreement to Clear Channel Outdoor, Inc.

**D.**    Contractor represents and warrants that it is qualified to perform the services required by City as set forth under this Agreement;

NOW, THEREFORE, the parties have agreed to the following terms and conditions:

1. **DEFINITIONS.** The terms used in this Agreement will have the following meanings:

    **1.1.    ADA.** The Americans With Disabilities Act of 1990, as amended, including all relevant regulations adopted by the U.S. Department of Justice and the U.S. Department of Transportation.

    **1.2.    Alternative Shelter.** A Shelter designed to provide, at a minimum, seating and rider information, for locations where conditions will not accommodate a Shelter meeting the requirements of Section 8.1.2.

    **1.3.    Agreement.** This Transit Shelter Advertising Agreement and all referenced Exhibits to this Transit Shelter Advertising Agreement, which are incorporated by reference as though fully set forth herein.

    **1.4.    Annual Financial Report.** The report required to be submitted under Section 11.2.

    **1.5.    Arts Commission.** The San Francisco Arts Commission, the City Commission with responsibility for approving the designs for public Structures and the design and location of works of art placed upon or removed from City property, and for promoting art and artists in San Francisco neighborhoods pursuant to the authority granted in San Francisco Charter Section 5.103.

    **1.6.    Associated Equipment.** All spare parts in Contractor's possession for the maintenance and repair of Structures.

    **1.7.    Bicycle-Sharing Program.** A program to be implemented by Contractor pursuant to Section 20.1, as further described in Contractor's Proposal, which program shall include the provision of bicycles, bicycle racks, and related equipment and services.

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

**1.8.    Carryover Contract.** Any advertising contract that is assigned to Contractor by City as of the Effective Date of this Agreement until the expiration of the original term of the advertising contract, and any advertising contract entered into by Contractor with an expiration date later than the termination of this Agreement.

**1.9.    City.** The City and County of San Francisco, a municipal corporation. The rights of City in this Agreement inure to the benefit of the City and County of San Francisco and all of its constituent departments. However, except as otherwise expressly provided herein, the powers and duties to be exercised by City pursuant to this Agreement shall be exercised by SFMTA by and through the Executive Director/CEO.

**1.10.    Commercial.** When used to describe any Structure, "Commercial" refers to the authority granted under this Agreement and applicable law to display advertising.

**1.11.    Consumer Price Index, CPI.** Consumer Price Index distributed by the Bureau of Labor Statistics (BLS) for the Consolidated Metropolitan Statistical Area (CMSA) covering San Francisco - Oakland - San Jose.

**1.12.    Days.** Unless otherwise specified, all references to the term "Days" refer to calendar days.

**1.13.    Design.** A detailed representation of the architectural and artistic features for a set of related Structures as requested by the City.

**1.14.    Design Approval Date.** The date that the Arts Commission or, if required, the Port, whichever is later, has approved Designs submitted by Contractor pursuant to Section 8.1(a).

**1.15.    Department of Public Works, DPW.** The San Francisco Department of Public Works.

**1.16.    Effective Date.** December 10, 2007.

**1.17.    E-Line.** The future streetcar line from Fisherman's Wharf to Mission Bay, and as it may be renamed, extended or changed.

**1.18.    Executive Director/CEO.** The Executive Director and Chief Executive Officer of the SFMTA, or his or her designee.

**1.19.    Existing.** When used to describe any Shelter or Kiosk, "Existing" refers to a Shelter or Kiosk that was owned by CBS Outdoor, Inc. prior to the Effective Date of this Agreement, as listed in Exhibits B1 and B2.

**1.20.    Fiscal Year.** July 1 through June 30.

**1.21.    F-Line.** The streetcar line going from Castro Street to Fisherman's Wharf, as illustrated in the map attached as Exhibit K, and as it may be renamed, extended or changed.

**1.22.    Graffiti.** Any inscription, word, figure, marking or design that is affixed, marked, etched, scratched, drawn or painted on any building, Structure, fixture or other improvement, whether permanent or temporary, including by way of example only and without limitation, Shelters, Kiosks, signs, banners, billboards and fencing surrounding construction sites, whether public or private, without the consent of the owner of the property or the owner's authorized agent, and which is visible from the public right-of-way. "Graffiti" does not include: (1) any sign or banner that is authorized by, and in compliance with, the applicable requirements of the San Francisco Public Works Code, the San Francisco Planning Code or the San Francisco Building Code; or (2) any mural or other painting or marking on the property that is protected as a work of fine art under the

 **Municipal Transportation Agency**
Board of Directors & Parking Authority



California Art Preservation Act (California Civil Code Sections 987 et seq.) or as a work of visual art under the Federal Visual Artists Rights Act of 1990 (17 U.S.C. §§ 101 et seq.).

**1.23.    Gross Revenues.**  Total amounts received annually by Contractor in connection with the rights granted and duties performed under this Agreement less: (a) verified advertising agency commissions actually paid by Contractor or deducted by an advertising agency from advertising revenues payable to Contractor; and (b) sales commissions paid by Contractor to its employees amounting to three percent of revenues received by Contractor or receivable in connection with advertising sales under this Agreement.

**1.24.    High-Level Boarding Platform.**  The boarding platforms supplying level boarding directly into light rail vehicles without the necessity of a ramp or lift.  As of the Effective Date of this Agreement, High-Level Boarding Platforms serve the Stonestown, Folsom Street, Brannan Street, King and 2nd Streets, Caltrain Station, and T-Line transit stops.

**1.25.    Historic Shelters.**  Those Shelters owned by SFMTA with an architecturally significant design as listed in Exhibit A.

**1.26.    Kiosk.**  A Structure containing no more than three display panels.

**1.27.    Low-Level Boarding Platform.**  The boarding platforms in the street right-of-way that are not High-Level Boarding Platforms.  As of the Effective Date of this Agreement,  Low-Level Boarding Platforms serve the E-Line, F-Line, and parts of the J-Line, K-Line, L-Line, M-Line, and N-Line as described in Exhibit F.

**1.28.    MAG or Alternate MAG.**   The minimum annual guarantee or alternate minimum annual guarantee payment required by Section 7.1.1(b)(iv) of the Agreement.

**1.29.    Maximum Ad Panel Size.**  Twenty-four square feet ($24 ft^2$) in area, and no greater than six feet (6') in height or four feet (4') in width.

**1.30.    New.** When used to describe any Structure, "New" refers to a Structure that is constructed or installed under the terms of this Agreement.

**1.31.    Noncommercial.** When used to describe any Structure or a display that is part of a Structure, "Noncommercial" refers to a Structure that is not permitted to contain commercial advertising under this Agreement.

**1.32.    Outage.**  Any period of time during which the IMCDS, required by Section 9.7, is not fully operational in accordance with the requirements of this Agreement or is not accessible to the SFMTA or the public.

**1.33.    Port.**  The Port of San Francisco, a department of the City, acting through its Executive Director, its Port Commission, or their respective designees.

**1.34.    Proposal.**  The proposal submitted by Contractor in response to the City's Request for Proposals, dated April 23, 2007, as such proposal was amended on April 26, 2007 and May 4, 2007.

**1.35.    Public Entity Shelters.**  Shelters within the geographic boundaries of the City but owned by a public entity other than the City.

**1.36.    Public Right(s)-of-Way.**  The area across, along, beneath, in, on, over, under, upon, and within the dedicated public alleys, boulevards, courts, lanes, roads, sidewalks, spaces, streets, and ways within the geographic boundaries of the City.

**1.37.    Records.**  All documents created, received or maintained by Contractor in connection with performance under this Agreement, including, but not limited to, books, accounts, invoices,

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

maintenance and service logs, database information, contracts, construction documents, payroll information, maintenance, construction and service logs and other documents, whether or not kept in electronic format.

**1.38.    Request for Proposals, RFP.**    The Request for Proposals issued by the City on February 1, 2007, attached hereto and incorporated by reference as though fully set forth.

**1.39.    San Francisco Municipal Transportation Agency; SFMTA.**  The Municipal Transportation Agency, an agency of the City and County of San Francisco established by San Francisco Charter Article VIIIA, or any successor agency.

**1.40.    SFMTA-Constructed Shelters.**  Shelters on the High-Level Platforms and Historic Shelters.

**1.41.    Shelter, Transit Shelter.**  A Structure for the use of the SFMTA and its transit passengers located at an outdoor public transit stop on the sidewalk, a Low-Level Boarding Platform, a High-Level Boarding Platform or in any other area immediately adjacent to public transit rights-of-way.  Except where otherwise specified in this Agreement, "Transit Shelter" and "Shelter" include Historic Shelters, Alternative Shelters, SFMTA-constructed Shelters, and Public Entity Shelters, and all elements on High-Level Boarding Platforms, including advertising display cases, for which Contractor is required to provide amenities, maintenance, or any other services under this Agreement.

**1.42.    Signal Control Cover.**  A Structure to cover signal control equipment owned by SFMTA.

**1.43.    Small Business Enterprise; SBE.**  A disadvantaged business enterprise certified through the California Unified Certification Program, a local business certified by the San Francisco Human Rights Commission, a small business enterprise certified by the State of California, or any similar business certified by a successor process approved by the SFMTA.

**1.44.    Station Canopies.** The canopies that may be installed over entrances to subway stations pursuant to Section 20.2.

**1.45.    Structures.**  All infrastructure and facilities required to be constructed, installed or maintained pursuant to this Agreement including but not limited to Shelters, Kiosks, Boarding Platforms, Signal Control Covers, Transit Stop Poles, and, if required to be installed, Station Canopies and equipment installed under the Bicycle-Sharing Program.

**1.46.    T-Line.**  The light rail vehicle transit line that extends from the Caltrain Station at Fourth and King Streets to the Sunnydale Station, as illustrated in the map attached as <u>Exhibit E</u>, and as it may be renamed, extended or changed.

**1.47.    Time and Materials.**  If performed by Contractor's employees, a payment rate to include the cost of materials without mark-up, and an hourly rate of no more than $50.00 during the first year of the Agreement as adjusted by the CPI annually thereafter; if performed by an independent contractor, the actual amount billed by the independent contractor without further mark-up by Contractor.

**1.48.    Transit Stop Poles.**  The poles to be installed by Contractor at transit stops in accordance with the requirements of Section 4.1.3.

**1.49.    Unavoidable Delay.**  A delay in Contractor's performance of its duties under the Agreement that Contractor demonstrates within 10 Days of City demand could not have been avoided by Contractor's exercise of due care, prudence, foresight, or diligence and that arises directly from: an act of God; fire; flood; windstorm; tornado; earthquake; war; riot; insurrection; epidemic;

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

quarantine restrictions; acts of terrorism; inability of Contractor to procure labor to the extent that such inability is not caused by disputes related to collective bargaining; inability of Contractor to procure material; fuel shortage; freight embargo; accident; priorities or privileges established for the manufacture, assembly or allotment of materials by order, decree, or otherwise of the United States or by any department, bureau, commission, committee, agent or administrator of any legally constituted public authority; the prevention by the City of Contractor from commencing or prosecuting any of its duties under the Agreement; inability of Contractor to obtain applicable permits and licenses from relevant governmental authorities; or failure of public utility service or internet service outside the control of Contractor.

**1.50.** **Union Square/Tenderloin Area.** The area of the City bounded by Market Street, Sutter Street, Polk Street, and Grant Avenue.

## 2. GRANT OF ADVERTISING RIGHTS AND PRIVILEGES

**2.1.** **Rights Granted**

**2.1.1.** **SFMTA to Contractor.** During the term of this Agreement, and subject to the requirements of this Agreement and applicable laws, SFMTA grants to Contractor the exclusive right to place print advertising on Transit Shelters and Kiosks governed by this Agreement (a) on the City's Public Rights-of-Way outside the jurisdiction of the Port; and (b) on any Public Right-of-Way that is serviced by a public transit line under an arrangement between the SFMTA and another public entity.

**2.1.2.** **License.** In conjunction with the rights granted in this Section 2, and subject to all provisions of this Agreement and applicable law, the City grants Contractor a license to install Commercial Structures on the Public Rights-of-Way.

**2.2.** **Distance from other Advertising.** City shall not enter into any contract or agreement, including any amendment to any existing agreement, granting to any third party any right to place advertising larger than eighteen (18) square feet on any free-standing structure on the Public Rights-of-Way (except buildings of at least 250 square feet of floor area) within a 60-foot radius from any Shelter or Kiosk; provided, however, that nothing in this section shall limit the display of public service announcements on behalf of any non-profit, public, educational, or charitable organization. This restriction shall not apply to any free-standing structure that has been constructed prior to the Effective Date of this Agreement.

**2.3.** **Port to Contractor.** Port grants to Contractor the exclusive right to place print advertising on Structures on City property within Port jurisdiction during the term of this Agreement, subject to the terms and conditions of this Agreement.

**2.4.** **Rights Retained/Limitations on Contractor's Rights.**

**2.4.1.** **Advertising.** Contractor acknowledges that City retains and reserves all advertising rights that are not specifically granted by this Agreement. Except as otherwise provided in this Agreement, the rights retained and reserved by City include, but are not limited to, the right to sell or contract to sell advertising on SFMTA property, and the right to license or otherwise provide for the use of any trade name, trade mark, or other identifying device or symbol used, owned or registered by City.

**2.4.2.** **Advertising Space Subject to Change.** Contractor acknowledges and agrees that the space available for advertising on Structures may vary from time to time for various reasons.

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

      **2.4.3.    Transportation Priority.** Contractor acknowledges and agrees that advertising, and the grant of advertising rights provided for in this Agreement, are incidental to the SFMTA's transportation business, which may undergo changes affecting the advertising rights granted. Except as provided in Section 7.3, SFMTA will have no liability to Contractor for any change in its routes, in the number of transit vehicles operated by it, in ridership, or for any other change affecting the level or scope of advertising authorized by SFMTA.

      **2.4.4.    Use of Structures.** Contractor may not use the Structures for any purpose other than those expressly provided in this Agreement.

      **2.4.5.    No Damage to City Property.** Contractor and its subcontractors may not damage City property. If in the course of its activities under the Agreement Contractor or any of its employees or subcontractors damages any property belonging to City, Contractor shall compensate the City for the full extent of its losses resulting from the damage. At City's option, City may require Contractor to repair any such damage.

      **2.4.6.    Nuisances.** Contractor shall conduct its activities under this Agreement in a manner that does not constitute waste, nuisance or unreasonable annoyance (including, without limitation, emission of objectionable odors, noises or lights) to City, or to the public.

**2.5.    Carryover Contracts**

      **2.5.1.    Beginning of Term.** As of the Effective Date of this Agreement, SFMTA will transfer to Contractor the rights to all Carryover Contracts it has acquired from CBS Outdoor, Inc., along with copies of those Contracts. Following such transfer, Contractor shall pay to CBS Outdoor, Inc., when and as received from the advertisers, 20% of the gross income received from such Carryover Contracts for a period of no greater than 180 days following the Effective Date of this Agreement. Contractor agrees that CBS Outdoor, Inc. is a third party beneficiary with a right to enforce against Contractor only the payment obligation imposed by this Section 2.3.1.

      **2.5.2.    End of Term.** Contractor shall not enter any contracts related to performance under this Agreement that extend beyond the termination date of this Agreement without written approval from the City. Contractor shall immediately assign and transfer, and does assign and transfer, to SFMTA any Carryover Contract in effect upon expiration of this Agreement, and such Carryover Contracts thereupon shall become the property of SFMTA. Following such transfer, City shall pay Contractor when and as received from advertisers 20% of the gross income received from such Carryover Contracts for a period of no greater than 180 Days following expiration of this Agreement. City shall not be responsible for payment to Contractor of Contractor's portion of the gross income after City assigns the Carryover Contracts to a nominee provided that the nominee makes Contractor a third party beneficiary with a right to enforce the payment obligation against the nominee. Contractor agrees that the existence of any Carryover Contract will not in any way extend the term of this Agreement. Contractor agrees that it will use its best efforts in good faith to enter into advertising contracts and maximize revenues until the final day of the Agreement.

**3.    OWNERSHIP OF STRUCTURES.**

      Structures governed by this Agreement will be the property of City except that Kiosks and Shelters that are not SFMTA-constructed Shelters shall be the property of Contractor and ownership of equipment installed under the Bicycle-Sharing Program will be governed by the amendment to this Agreement reflecting the City's exercise of the option set forth in Section 20.1. Title to any Associated Equipment, and to the Shelters and Kiosks listed on <u>Exhibit B-1</u>, will be transferred to Contractor as of the Effective Date of this Agreement. Public Entity Shelters shall remain the property of the relevant public entity or its successor.

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

## 4.  INSTALLATION REQUIRED

**4.1.    General.**  In consideration for the exclusive advertising rights granted in Section 2.1, above, Contractor shall design, install, repair and maintain Structures as set forth below.

**4.1.1.    Shelters and Kiosks.**  Except as otherwise authorized in writing by the City, all Existing Shelters and Existing Kiosks shall be replaced with New Shelters and New Kiosks no later than six years from the Effective Date.  Contractor shall install at least five New Shelters within 12 months from the Design Approval Date.  In addition, the City may require Contractor to install New Shelters and Kiosks up to the limits established in Section 4.1.2.

**4.1.2.    Number of Commercial and Noncommercial Shelters and Kiosks.**  Contractor shall maintain a minimum of 1,100 and a maximum of 1,500 Shelters and a minimum of 39 and a maximum of 150 Commercial Kiosks or Commercial Signal Control Covers at all times through the term of this Agreement, not including SFMTA-constructed Shelters.  Upon completion of construction, in accordance with any approved construction schedule required by Section 8.4.1, there shall be one Noncommercial Structure for every two Commercial Structures, not including Shelters on High-Level Boarding Platforms.

**4.1.3.    Transit Stop Poles.**  In accordance with its Proposal and the approved construction schedule, and at no cost to City, Contractor shall install 3,000 Transit Stop Poles with attached signs at transit stops where there are no Shelters within seven years from the date on which the Design receives final approval from the Arts Commission.  Contractor shall be responsible for removing existing Transit Stop Poles at locations where they are to be replaced.  City will designate those stops where the Transit Stop Poles are to be installed and what information will be contained in the sign attached to each Transit Stop Poles.  Contractor shall be responsible for obtaining any required permits to install or remove the Transit Stop Poles.  SFMTA will pay the Contractor on a Time and Materials basis for (a) any maintenance and repair of Transit Stop Poles that the SFMTA requests and (b) procurement and installation of any additional Transit Stop Poles it requests over 3,000.  Contractor, at its own cost, shall replace and dispose of any Transit Stop Poles that are damaged too severely to be repaired provided that it has not installed the 3,000 required Transit Stop Poles.  Such replacement shall be credited towards the Contractor's 3,000 Transit Stop Pole commitment.

**4.1.4.    Signal Control Covers.**  Within one year of any City request, Contractor shall construct and install a Signal Control Cover at any location up to a total of 1,500 Signal Control Covers.  Contractor shall be responsible for all construction and installation costs for each Commercial Signal Control Cover and for one additional Noncommercial Signal Control Cover for every Commercial Signal Control Cover, provided that Contractor shall have the right to determine the location of any and all Commercial Signal Control Covers from a list of potential locations provided by the SFMTA.  SFMTA will pay the Contractor on a Time and Materials basis for (a) any additional Noncommercial Signal Control Covers it requires, and (b) any maintenance and repair of Noncommercial Signal Control Covers that SFMTA requests, which amounts may be deducted from the MAG payments.  Upon approval by the City, Contractor may access and use any electrical connections situated within any Signal Control Cover for Contractor's electrical power needs.

**4.2.    Locations**

**4.2.1.    General.**  Except as otherwise provided in connection with Shelters and Kiosks on Port property, the SFMTA has sole discretion to designate the locations of all Structures, including which sites are available for advertising.  SFMTA does not guarantee any specific site for any particular Structure.  SFMTA will cooperate with Contractor in determining siting.  If Contractor finds a site to be unsuitable or economically infeasible, Contractor may appeal to the SFMTA for site abandonment and site substitution.

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

**4.2.2.    Port Locations.** The Port has sole discretion to approve locations recommended by the SFMTA on property under its jurisdiction, including which sites will be available for advertising. Contractor shall maintain one Noncommercial Shelters for every two Commercial Shelters maintained on Port property.  Locations already approved by the Port are listed in Exhibits C and D.

**4.2.3.    Removal or Relocation of Shelters and Kiosks.**

**(a)    City Request.** City will have the right to require Contractor, at Contractor's sole cost, to remove or relocate any Shelter or Kiosk because of private development, public works projects, public convenience, improved accessibility, City public transit route or stop changes or repeated vandalism.  In the event of removal of a Shelter or Kiosk that is requested by the Port pursuant to this Section 4.2.3, the Port will endeavor to identify a suitable alternative location.

**(b)    Removal and Relocation Costs for City Requests.** Contractor will bear the full cost of removal and relocation of a maximum of six percent of the total number of Shelters and Kiosks per year, including all necessary sidewalk and curb repairs, and all required permit costs.  City will bear all costs of additional removal and relocation requests over six percent of Shelters or Kiosks so long as Contractor is not in default of this Agreement.  In the event that a Shelter and Kiosk requires relocation because private development has affected its use, City will use good faith efforts to require developers to pay the costs associated with such relocation.

**(c)    Contractor Request.** Contractor may request permission from City to relocate a Structure, at Contractor's expense, if the Installation has been repeatedly vandalized or damaged.  Approval of any such request shall be in the sole discretion of the City.

**(d)    Time for Relocation.** All removals or relocations of Shelters or Kiosks must commence within five business days of notification by SFMTA to Contractor unless otherwise authorized by SFMTA or the Port's Executive Director through SFMTA, as applicable. Contractor may not relocate or remove a Structure without prior written permission of the SFMTA, or the Port's Executive Director through SFMTA, as applicable, or their respective designees. Contractor is responsible for obtaining all required City permits to relocate a Shelter or Kiosk.

**5.    NONCOMMERCIAL DISPLAY**

**5.1.    Transit Information.** SFMTA reserves the right to place transit information, including maps, schedules, and service bulletins, on every Structure. SFMTA will provide transit information materials to Contractor, and Contractor shall display such transit information at no cost to SFMTA. SFMTA may not sell such space to advertisers either directly or through any intermediary.

**5.2.    Port Campaign.** At least twice a year and subject to the request of the Port, Contractor shall design and furnish, at its sole cost, at least 30 posters as a public service and information campaign, promoting the Port, its tenants and special events.  Contractor shall install the posters on available space in SFMTA and Bay Area advertising shelters on which Contractor has a contractual right to place advertising; however, the majority of the posters will be placed on Shelters and Kiosks located in the City. Each campaign will last for at least four weeks.  All Designs will be subject to prior Port approval, and Contractor will consult with the Port as to potential available display space. The posters supplied for the Port campaigns will be in addition to any Port public service or information posters placed on Port property pursuant to subsection 5.3.1.

**5.3.    Unsold Space**

**5.3.1.    City's Use of Unsold Space.** By the first day of each month, Contractor shall provide a projection of all unsold advertising space on Shelters and Kiosks anticipated over the next

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

60 Days to SFMTA and the Port, Shelters and Kiosks in an electronic format. Notwithstanding the provisions of Section 2 of this Agreement, the City has the first option to use, for a minimum of 14 Days, any advertising space, at no charge to the City and for any public purpose, that has not been sold by Contractor. The City will be responsible for providing all printed posters ready for posting by Contractor. The Port, with respect to Shelters and Kiosks on Port property, and the SFMTA with respect to all other Shelters and Kiosks, shall notify Contractor of the City's intention to use the unsold advertising space at least 30 Days prior to the date on which the City's use would begin. If Contractor is unable to deliver said space for any reason after being notified of the City's intention to use unsold advertising space, and if the printed materials are time sensitive and cannot be reused, Contractor shall reimburse the City for all printing and design costs expended in anticipation of the City's use of that advertising space.

 **5.4.** **Contractor's Use of Unsold Space.** To the extent that the City does not exercise its option to use unsold advertising space in accordance with Section 5.3.1, Contractor may use, at its sole cost and expense, available unsold advertising space: 1) for its own advertisements and promotion designed to increase the sale of advertising space, or 2) to display public service announcements provided by non-profit public, educational, and charitable organizations.

 **5.5.** **Installation of Displays for City.** Contractor shall install transit information and other displays requested by City within two business days unless the urgency of the situation requires that the displays be installed within a shorter period of time

**6. COMMERCIAL ADVERTISING DISPLAYS**

 **6.1.** **Contractor's Best Efforts.** In the exercise of the rights granted by this Agreement, Contractor shall use its best efforts, from the Effective Date through the termination or expiration of this Agreement, to maximize advertising revenues through the sale of advertising space to third parties.

 **6.2.** **Commercial Shelters (including F-Line and E-Line Shelters.** Except as otherwise provided below, City authorizes Contractor to use the "downstream" side wall (furthest from approaching transit vehicles) or the back panel of any Commercial Shelter to display advertising material. Except as otherwise provided below, no Commercial Shelter can contain advertisements on more than one wall, and no advertisement may exceed the Maximum Ad Panel Size. Unless authorized in advance by City in writing, in no case may Contractor display advertising on the "upstream" end wall closest to the approaching transit vehicle. Any advertising or other material contained in a panel shall be back-lit.

 **6.3.** **Kiosks.** Subject to all applicable law and approval by any City department with jurisdiction over the matter, Contractor may display advertising on any Kiosk.

 **6.4.** **Stonestown Station.** Notwithstanding the limitations of Section 6.2, with respect to the Stonestown Station only, Contractor may display advertising on the west-facing sides of eight double-sided display cases on the platform, each four feet by six feet (4'x6') in dimension. Contractor may display public service announcements on two of the east-facing sides of the eight display cases. Contractor shall display only materials provided by the City or public service announcements on the six remaining east-facing sides. City shall have exclusive use of three additional display cases at least two feet by three feet (2' x 3'). The displays under this Section shall be consistent with the photograph of the Stonestown Station attached as Exhibit G.

 **6.5.** **Municipal Railway Metro Extension Platforms.** Contractor may display advertising on both sides of each double-sided freestanding display case located on each Municipal Railway Metro Extension High-Level Platform along the South Embarcadero and King Street, from

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

Folsom to 4th and King Streets. The number of display cases on each platform is as shown on
<u>Exhibit C</u>.

6.6.    **T-Line Platforms.** On each of the High Level Boarding Platforms serving T-Line
transit stops, one two-sided display case shall be reserved solely for materials furnished by the
SFMTA or Arts Commission and installed by Contractor within two Days of receipt. Contractor
may display advertising in all remaining panels.

6.7.    **Experimental Advertising..** Notwithstanding any other provision of this
Agreement, Contractor may propose experimental advertisements on a limited basis. Contractor may
implement experimental advertisements with the prior written approval of the SFMTA after a public
hearing before the SFMTA Board of Directors, subject to all conditions stated in the approval.


7.  **PAYMENTS**

7.1. **Payments by Contractor to City**

7.1.1.    **General.** During the term of this Agreement, Contractor shall pay to City the
sums set forth below, without any deduction or offset whatsoever except as provided under
subsection (b)(iv) of this section 7.1.1. Payments shall be made electronically in accordance with
wiring or other remittance instructions provided in writing by City.

(a) **One-Time Payment.** Contractor shall pay SFMTA a one-time payment
of $5,000,000.00 no later than 30 Days before the Effective Date.

(b) **Total Required Payments.**

(i)    **Administrative Payments.** No later than 30 Days after the
Effective Date and no later than September 1 of each year thereafter during the term of the
Agreement, Contractor shall pay SFMTA a minimum of $500,000.00 ("base rate"), as escalated each
year by the percentage change in the most recently published 12 month average CPI. The first
payment following the Effective Date shall be prorated according to the number of months of
performance under this Agreement in the then current Fiscal Year.

(ii)    **Payments for Art Commission.** No later than 30 Days after
the Effective Date and no later than September 1 of each year thereafter during the term of the
Agreement, Contractor shall pay a minimum of $265,000.00 to support the Arts Commission, as
escalated each year by the percentage change in the most recently published 12 month average CPI.
The first payment following the Effective Date shall be prorated according to the number of months
of performance under this Agreement in the then current Fiscal Year.

(iii)    **Marketing Support.** No later than 30 Days after the
Effective Date and no later than September 1 each year thereafter during the term of the Agreement,
Contractor shall contribute $200,000.00 to the SFMTA, as escalated each year by the percentage
change in the most recently published 12 month average CPI. The first payment following the
Effective Date shall be prorated according to the number of months of performance under this
Agreement in the then current Fiscal Year.

(iv)    **MAG.** Based on the minimum Gross Revenues in the
previous Fiscal Year, Contractor shall pay to the SFMTA either the MAG amount or Alternate MAG
amount set forth in Table I below. Contractor shall pay the applicable MAG amount unless the
Gross Revenues in the previous fiscal year meet or exceed the amounts set forth in Table 1. The
MAG or Alternate MAG amount shall be paid in 12 equal installments due on the first business day
of each month subject to any offset that may be approved in writing by SFMTA in accordance with

 

**Municipal Transportation Agency**
Board of Directors & Parking Authority

Section 9.4.1 and 9.5.3 and subject to any approved inventory deduction applicable under Section 7.3. In any Fiscal Year in which this Agreement is effective for less than 12 months, the MAG amount shall be prorated according to the number of months of performance in the Fiscal Year, and payment shall be due in and for any month in which Contractor holds title to Shelters and Kiosks for 15 or more Days. MAG or Alternate MAG payments made during the months of July and August shall be adjusted with the September MAG or Alternate MAG payment as may be required according to the findings of the Annual Financial Report. During Fiscal Year 2007-2008, Contractor shall pay the MAG amount and shall make the first MAG payment by December 17, 2007.

### Table 1: MAG Amounts and Revenue Share Percentage

| Fiscal Year | MAG | Minimum Gross Revenues in Previous Fiscal Year | Alternate MAG | Revenue Share |
|---|---|---|---|---|
| 2007-08 | $6,909,000.00 | $21,000,000.00 | $10,318,000.00 | 55% |
| 2008-09 | $7,614,000.00 | $23,000,000.00 | $11,553,000.00 | 55% |
| 2009-10 | $8,232,000.00 | $25,000,000.00 | $12,607,000.00 | 55% |
| 2010-11 | $8,644,000.00 | $27,000,000.00 | $13,237,000.00 | 55% |
| 2011-12 | $9,076,000.00 | $29,000,000.00 | $13,899,000.00 | 55% |
| 2012-13 | $11,812,000.00 | $31,000,000.00 | $14,595,000.00 | 55% |
| 2013-14 | $12,339,000.00 | $33,000,000.00 | $15,324,000.00 | 55% |
| 2014-15 | $12,893,000.00 | $35,000,000.00 | $16,090,000.00 | 55% |
| 2015-16 | $13,474,000.00 | $34,000,000.00 | $16,895,000.00 | 55% |
| 2016-17 | $14,084,000.00 | $36,000,000.00 | $17,739,000.00 | 55% |
| 2017-18 | $15,577,000.00 | $38,000,000.00 | $18,626,000.00 | 55% |
| 2018-19 | $16,293,000.00 | $41,000,000.00 | $19,558,000.00 | 55% |
| 2019-20 | $17,044,000.00 | $42,000,000.00 | $20,536,000.00 | 55% |
| 2020-21 | $17,834,000.00 | $44,000,000.00 | $21,563,000.00 | 55% |
| 2021-22 | $18,661,000.00 | $46,000,000.00 | $22,640,000.00 | 55% |
| 2022-23* | $21,082,000.00* | $48,000,000.00* | $24,637,000.00* | 57%* |
| 2023-24* | $22,073,000.00* | $50,000,000.00* | $25,869,000.00* | 57%* |
| 2024-25* | $23,114,000.00* | $53,000,000.00* | $27,162,000.00* | 57%* |
| 2025-26* | $24,207,000.00* | $56,000,000.00* | $28,521,000.00* | 57%* |
| 2026-27* | $25,353,000.00* | $59,000,000.00* | $29,946,000.00* | 57%* |
| Total | $306,315,000.00 | | $381,315,000.00 | |
| | | | | |
| *Assumes the option is exercised to extend the term | | | | |

 **Municipal Transportation Agency**
Board of Directors & Parking Authority

 

(c) **Revenue Share.** By September 1 of each year, Contractor shall provide the SFMTA with documentation of its Gross Revenues and Total Required Payments for the previous Fiscal Year as part of the Annual Financial Report due under Section 11.2. Contractor shall apply the revenue share percentage designated in Table 1 above to the Gross Revenues for the previous Fiscal Year to determine the SFMTA's "Annual Revenue Share." If the Annual Revenue Share exceeds the Total Required Payments made to the SFMTA pursuant to subsection (b) of this Section (as they may be pro-rated for any partial Fiscal Year or offset pursuant to Sections 7.3, 9.4.1 or 9.5.3), Contractor shall pay the SFMTA any difference between the Total Required Payments made and the Annual Revenue Share by September 1. In the event this Agreement terminates for any reason before the completion of a Fiscal Year, Contractor shall submit the documentation required by this subsection and any final payment required by this subsection within 60 Days of termination.

7.2.    **Late Payments.** Payments from Contractor that are not paid when due will bear interest compounded daily from and after the date said payment was due until the date paid at the prime rate plus three percent. Acceptance of a late payment by SFMTA will not constitute a waiver of Contractor's default with respect to the overdue amount, nor prevent SFMTA from exercising any of the other rights and remedies granted under this Agreement or by law. SFMTA shall have no responsibility to notify Contractor of payments not received by the due dates.

7.2.1.    **Minimum Inventory Deduction.** If the inventory of sites approved by the City for Commercial Structures falls below 337 in Zone 1 (as illustrated in Exhibit O) or 433 in Zone 2 (any area not in Zone 1) for more than 90 Days, Contractor shall be entitled to decrease monthly MAG or Alternate MAG payments due after such an occurrence according to the following process: After Contractor notifies the SFMTA of any decrease, the SFMTA will have 30 Days to find substitute location(s) in the same Zone for the Commercial Structure(s) that have been decreased or, if no appropriate locations are found, to confirm the inventory count and the deduction from the MAG or Alternate MAG. If the SFMTA identifies substitute locations, Contractor shall submit permit applications for such locations to the appropriate permitting authorities. To the extent permits are granted for the substitute locations, Contractor shall not be entitled to a MAG or Alternate MAG deduction. To the extent permits are denied for the substitute locations, the Contractor shall notify the SFMTA, and beginning the month following the denial, be entitled to deduct from the required MAG or Alternate MAG payment the amount set forth in Table 2 for each approved Commercial Structure site below the minimum within Zone 1 or Zone 2. Beginning the month immediately following any increase in the inventory of sites approved by the City for Commercial Structures, the monthly MAG or Alternate MAG payment shall be increased by the applicable amount set forth in Table 2. For purposes of determining the inventory of sites approved for Commercial Structures, any two advertising panels on a free-standing Structure shall constitute a site approved for a Commercial Structure, so that, for example, a High Level Platform containing four two-sided advertising panels shall constitute a site approved for four Commercial Structures.