1   PAUL E. FISHER, State Bar No. 125309
    The Law Office of Paul E. Fisher
2   537 Newport Center Dr., #289
    Newport Beach, CA 92660
3   Telephone: (949) 675-5619
    Facsimile:  (949) 675-5641
4
    ERIC HECKER (admitted *pro hac vice*)
5   Emery Celli Brinckerhoff & Abady LLP
    75 Rockefeller Plaza, 20th Floor
6   New York, NY 10019
    Telephone: (212) 763-5000
7   Facsimile:  (212) 763-5001

8   ATTORNEYS FOR PLAINTIFF
    METRO FUEL LLC
9

10              UNITED STATES DISTRICT COURT

11       FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13  METRO FUEL LLC, a Delaware limited        Case No. C07-6067 (JSW)
    liability company,
14                                            The Hon. Jeffrey S. White

15              Plaintiff,                    **PLAINTIFF'S REPLY MEMORANDUM
                                              IN FURTHER SUPPORT OF ITS
          vs.                                 MOTION FOR A PRELIMINARY
16                                            INJUNCTION AND IN OPPOSITION TO
    CITY OF SAN FRANCISCO, a municipal        DEFENDANTS' MOTION FOR
17  corporation, COUNTY OF SAN                JUDGMENT ON THE PLEADINGS**
    FRANCISCO, a subdivision of the State of
18  California, CITY AND COUNTY OF SAN        Date:     November 14, 2007
    FRANCISCO, a chartered California city and Time:     9:00 a.m.
19  county,                                   Ctrm.     2, 17th Fl.

20              Defendants.
21
22
23
24
25
26
27
28
                                              **CASE NO. C07-6067 (JSW)
                                              PRELIM. INJ. REPLY**

## **TABLE OF CONTENTS**

**PAGE NO(s):**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iii

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    THE CITY'S REGULATORY SCHEME VIOLATES THE FIRST
        AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.    The City Ignores or Misrepresents Controlling Legal Precedent . . . . . . . . 8

        B.    The City's Purported Traffic Safety and Aesthetic Concerns
            Are Belied By the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            (a)    Traffic Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            (b)    Aesthetics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        C.    The City Violates Its Own Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    II.    PLAINTIFF IS NOT REQUIRED TO EXHAUST ADMINISTRATIVE
        REMEDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    III.    PLAINTIFF HAS STANDING TO CHALLENGE, AND DOES
         CHALLENGE, ARTICLE 6 OF THE PLANNING CODE IN
         ITS ENTIRETY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**FEDERAL CASES**:

*Ackerley Comm. of the Northwest v. Krochalis,*
 108 F.3d 1095 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 5

*Ballen v. City of Redmond,*
 466 F.3d 736 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*City of Cincinnati v. Discovery Network, Inc.,*
 507 U.S. 410 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*City of Los Angeles v. Vincent,*
 466 U.S. 789 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Clear Channel Outdoor v. City of Los Angeles,*
 340 F.3d 810 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Desert Outdoor Advertising v. City of Moreno Valley,*
 103 F.3d 814 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Embury v. King,*
 191 F. Supp. 2d 1071 (N.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Fair Assessment in Real Estate Ass'n, Inc. v. McNary,*
 454 U.S. 100 (1981)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Greater New Orleans Broadcasting Ass'n v. United States,*
 527 U.S. 173 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Horizon Outdoor, LLC v. City of Industry,*
 228 F. Supp. 2d 1113 (C.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Metro Lights, LLC v. City of Los Angeles,*
 488 F. Supp. 2d 927 (C.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 11, 12

*Metromedia, Inc. v. City of San Diego,*
      453 U.S. 490 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 6, 7

*Miller v. County of Santa Cruz,*
      39 F.3d 1030 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Outdoor Systems v. City of Mesa,*
      997 F.2d 604 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Patsy v. Board of Regents of the State of Fla.,*
      457 U.S. 496 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rubin v. Coors Brewing Co.,*
      514 U.S. 476 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 6, 7, 12

*Steffel v. Thompson,*
      415 U.S. 452 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Truth v. Kent School Dist.,*
      524 F.3d 957 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*World Wide Rush, LLC v. City of Los Angeles,*
      __ F.Supp.2d __, 2008 WL 2477440 (C.D. Cal. June 9, 2008) . . . . . . . . . . . . . . . . . . 7, 8


**STATE CASES**:

*Briggs v. City of Rolling Hills Estates,*
      40 Cal. App. 4th 637 (Cal. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Swartzendruber v. City of San Diego,*
      3 Cal. App. 4th 896 (Cal. App. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## SUMMARY OF ARGUMENT

The City's opposition to Plaintiff's motion for a preliminary injunction, as well as its motion for judgment on the pleadings, studiously avoid the central questions – both legal and factual – that govern the merits of this dispute.

With respect to the law, the City simply ignores the Supreme Court case law that two District Courts have held control the legal analysis in this case. The City's papers do not even discuss *Greater New Orleans Broadcasting Ass'n v. United States*, 527 U.S. 173 (1999), or *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995). Instead, the City contends that this case is controlled by *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981), and *Ackerley Comm. of the Northwest v. Krochalis*, 108 F.3d 1095 (9th Cir. 1997) – cases in which no underinclusiveness arguments were made or analyzed, and which therefore never addressed the central question presented here: whether there are "exceptions and inconsistencies" in the City's scheme that "undermine and counteract" the rationale for restricting Plaintiff's commercial speech. *Rubin*, 514 U.S. at 489.

With respect to the facts, the City attempts to evade – but does not and cannot deny – the two fundamental facts that doom its position in this case: (1) that it has placed (and/or plans to place) *thousands* of new street furniture advertising signs on the streets of San Francisco since the City enacted its supposed ban on new general advertising signs in 2002; and (2) that many if not most of the City's own street furniture advertising signs violate the very district-based zoning rules that Plaintiff's signs allegedly violate. Because the City's street furniture signs have at least as much potential to distract drivers and are at least as unsightly as Plaintiff's signs supposedly are, the fact that the City unabashedly chooses to ignore its own rules causes its purported regulatory justifications – "traffic safety" and "aesthetics" – to collapse.

1

1   Unable to explain why Plaintiff's signs are problematic but its own signs are not, the City

2   devotes most of its energy to its attempts to erect roadblocks in this Court's path to the merits.

3   None of the City's procedural arguments is persuasive.

4   For example, the City contends that this Court should ignore the testimony of Jeremy Paul

5   (who demonstrated that the City's street furniture signs violate its zoning rules) and Jerry Wachtel

6   (who demonstrated that the City's street furniture signs have at least as much potential to distract

7   drivers as Plaintiff's signs). Tellingly, however, the City makes no attempt to deny or counter

8   these witnesses' observations or conclusions, notwithstanding the copious case law confirming

9   that the City bears the burden of proof under *Central Hudson*. Instead, the City makes a

10  barebones and specious *Daubert* argument – and even resorts to outright character assassination –

11  in a vain attempt to sweep the facts it does not like under the rug.

12  The City also takes a stab at "exhaustion" and "standing" arguments. Regarding the

13  former, the City contends that Plaintiff should be precluded from adjudicating its First

14  Amendment claims in federal court because certain lessors – but not Plaintiff – were issued

15  notices of violation that were never challenged in any administrative or judicial forum, were never

16  pursued by the City, and were never the subject of any administrative or judicial factfinding. In

17  support of its "standing" argument, the City goes to bizarre lengths attempting to manufacture the

18  false impression that Plaintiff's challenge is limited to Planning Code § 611 when it plainly

19  encompasses not only the prospective ban on new signs but also the underlying zoning provisions

20  that the City does not deny its signs violate. As will be demonstrated below, these arguments are

21  not just meritless. They reveal the lengths to which the City will go in order to avoid a serious and

22  honest discussion of its hypocrisy.

23  Notably, the City is still at it. Just two weeks ago, the San Francisco Municipal

24  Transportation Agency ("SFMTA") released a request for proposals ("RFP") announcing an

25

26

27

28

CASE NO. C07-6067 (JSW)
PRELIM. INJ. REPLY

1  ambitious plan to generate hundreds of millions of dollars in additional revenue by allowing

2  advertising to be placed in and on a wide variety of facilities not covered by the Shelter

3  Agreement with Clear Channel Outdoor.  Hecker Decl. ¶¶ 2-11 & Exh. A.  Among other things,

4  the City is soliciting proposals to cover the interior and exterior of every bus, cable car, street car,

5  and light rail vehicle with commercial advertising (including full exterior "wrap" ads); to place

6  panel signs bearing commercial messages (many of them similar to but far larger than Plaintiff's

7  panel signs) in each of the City's 19 municipally-owned parking garages; to place commercial

8  advertising signs in all public facilities and on all land owned by the SFMTA; and to place

9  commercial advertising on all fare media, such as Muni "Fast Passes."  *Id.*  Indeed, the City's RFP

10  expressly "encourages proposals that include creative ideas for enhancing revenue from all

11  SFMTA property."  *Id.* ¶ 4.  The City has established minimum bids for this franchise of $11.15

12  million for the first year; over $130 million for the mandatory 10-year period; and over $300

13  million if the franchise is extended to the full 20 years.  *Id.* ¶ 11.  The fact that the City is eagerly

14  contemplating this massive increase in streetscape advertising lays to rest any suggestion that its

15
16  "traffic safety" or "aesthetic" objections to Plaintiff's 164 panel signs are significant or sincere.

17

18

19                                                          **ARGUMENT**

20  I.     **THE CITY'S REGULATORY SCHEME VIOLATES THE FIRST AMENDMENT**

21         A.     **The City Ignores or Misrepresents Controlling Legal Precedent**

22                The City does not discuss the Supreme Court case law that two District Courts have held

23  control this dispute.  The City says nothing about *Greater New Orleans Broadcasting Ass'n v.*

24  *United States*, 527 U.S. 173 (1999), which held that a scheme restricting commercial speech

25  cannot survive the *Central Hudson* test when it is "pierced by exemptions and inconsistencies."

26  *Id.* at 190.  Nor does the City make any effort to distinguish *Rubin v. Coors Brewing Co.*, 514 U.S.

27
28  476 (1995), which reaffirmed the rule that "exceptions and inconsistencies" are constitutionally

1   fatal under *Central Hudson* because they "undermine and counteract" the government's rationale

2   for restricting commercial speech. *Id.* at 489. Nor does the City acknowledge any of the cases

3   cited in Plaintiff's Opening Brief establishing that a regulatory regime that systematically favors

4   government speech over commercial speech violates the First Amendment. Opening. Br. at 22-23.

5          Rather than confronting this precedent, the City would have this Court believe that "the

6   Ninth Circuit has *unequivocally rejected* the underinclusiveness theory's application to a content-

7   neutral billboard regulation." City Opp. Br. at 17 (emphasis supplied). This representation is

8   blatantly false. No Court – in the Ninth Circuit or otherwise – has ever so held. The case upon

9   which the City relies, *Ackerley Comm. of the Northwest v. Krochalis*, 108 F.3d 1095 (9th Cir.

10  1997), did not involve an underinclusiveness theory at all. Rather, the only issue in *Ackerley* was

11  the quantum of evidence required for a municipality to demonstrate that a challenged restriction on

12  commercial speech furthers its stated goals – the "virtually identical" issue addressed in

13  *Metromedia. Id.* at 1097-1100. *Ackerley* said nothing about, and did not remotely address, what

14  happens when a profit-seeking municipality purports to exempt thousands of its own advertising

15  signs from rules that supposedly are necessary to protect traffic safety or aesthetics. Indeed,

16  *Ackerley* did not mention *Greater New Orleans*, and it cited *Rubin* only connection with the

17  "evidentiary burden" issue, not in connection with any underinclusiveness theory, which was

18  never presented or discussed in the case in any way. The City's bold claim that *Ackerley*

19  "unequivocally rejected" Plaintiff's underinclusiveness theory is very misleading.[1]

---

[1] The other Ninth Circuit cases cited by the City – *Clear Channel Outdoor v. City of Los Angeles*, 340 F.3d 810 (9th Cir. 2003); *Desert Outdoor Advertising v. City of Moreno Valley*, 103 F.3d 814 (9th Cir. 1996); and *Outdoor Systems v. City of Mesa*, 997 F.2d 604 (9th Cir. 1993) – are similarly inapposite because none of them addressed Plaintiff's underinclusiveness claim or in any way considered the applicability of *Greater New Orleans* or *Rubin* to a billboard scheme. Nor did *City of Los Angeles v. Vincent*, 466 U.S. 789 (1984). Indeed, it is peculiar that the City would cite

4                                              CASE NO. C07-6067 (JSW)
                                               PRELIM. INJ. REPLY

There similarly is no merit to the City's insistence that this case is controlled by *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981). *Metromedia* – the only *holding* of which was that San Diego's billboard scheme was *un*constitutional – is important in three respects, none of which supports the City's position in this case. First, *Metromedia* reaffirmed that, contrary to the City's spin, billboards are entitled to very significant constitutional protection. *Id.* at 501 (plurality opinion) (recognizing that "[t]he outdoor sign or symbol is a venerable medium for expressing political, social and commercial ideas" and that "outdoor signs have played a prominent role throughout American history, rallying support for political and social causes"). Second, as Plaintiff has already recognized, *Metromedia* established the unremarkable proposition that a city's interests in protecting traffic safety and aesthetics are, in theory – to the extent those interests actually exist and are sincerely held – substantial for purposes of the second *Central Hudson* prong. Finally, *Metromedia* established that a city may, consistent with the First Amendment, treat on-site advertising signs differently than off-site advertising signs.[2] Just as in *Ackerley*, the *Metromedia* Court simply was not presented with the underinclusiveness claim vindicated in *Greater New Orleans* and *Rubin* and squarely presented here.[3]

---

*Ballen v. City of Redmond*, 466 F.3d 736, 742 (9th Cir. 2006), for that case *did* address underinclusiveness in this context, striking down a ban on advertising signs in part because "[t]he City has failed to show how the exempted signs reduce vehicular and pedestrian safety or besmirch community aesthetics any less than the prohibited signs." *Id.* at 743.

[2] In the instant case, the on-site/off-site distinction is irrelevant because this case only involves off-site signs: Plaintiff's signs and the City's street furniture signs both advertise goods and services offered elsewhere than on the sites where they are located.

[3] In a passing footnote, *Metromedia* quoted the section of the San Diego statute providing various exemptions from the restrictions at issue, including an exemption for bus stop bench signs. *Id.* at 495 n.3. But *Metromedia* did not address or consider the significance of this very limited exemption because no underinclusiveness argument was presented.

5

CASE NO. C07-6067 (JSW)
PRELIM. INJ. REPLY

1    Tacitly conceding that *Metromedia* never considered and has nothing to say about the

2   underinclusiveness theory that is the heart of this case, the City suggests that this Court should

3   simply ignore *Greater New Orleans* and *Rubin* because those cases involved media other than

4   billboards – *i.e.*, that "the law of billboards" is somehow unique.  City Opp. Br. at 16-17.  It is true

5   that *Metromedia* observed that billboards are a specific medium of communication, but

6   *Metromedia* did not remotely suggest that Supreme Court case law decided in the broadcast or

7   print media context should simply be ignored in a billboards case.  Far from insulating billboards

8   issues from the reach of other *Central Hudson* case law, *Metromedia* made clear that the

9   constitutional "task" in any commercial speech case is "assessing the First Amendment interest at

10   stake and weighing it against the public interest allegedly served by the regulation," and that

11   "[p]erformance of this task requires a particularlized inquiry into the nature of the conflicting

12   interests at stake."  *Id.* at 502-03 (plurality opinion).  In this case, the requisite "particularlized

13   inquiry" asks this Court to look beneath the City's "traffic safety" and "aesthetics" justifications

14   and analyze how the City can maintain that its restrictions are imperative to those purported

15

16   concerns when the City has authorized thousands of similar street furniture signs that blatantly

17   violate its own rules.

18

19    Nor has the City meaningfully distinguished the District Court case that is squarely on

20   point: *Metro Lights, LLC v. City of Los Angeles*, 488 F. Supp. 2d 927 (C.D. Cal. 2006).  The City

21   contends that this case is different because the City "limits" both the "number of advertising

22   signs" it allows on the street furniture and the "areas of the City" in which it is allowed.  City Opp.

23   Br. at 21.  The City fails to acknowledge, however, that it "limits" its franchisees to a total of *well*

24   *over three thousand* advertising signs – nearly *twenty times* the 164 panel signs that Plaintiff

25

26

27

28

6

operates.[4] Moreover, the scheme struck down in *Metro Lights* likewise was "limited" – to 5,860 street furniture advertising panels – and the City offers no reason why this Court should find that its multi-thousand-panel advertising program is any less offensive than the same "limited" program that doomed the scheme in *Metro Lights*.

The geographical "limits" imposed by the City on its street furniture advertising in Planning Code § 603(j) are equally unimpressive, for these "limits" expressly permit Clear Channel Outdoor to place bus shelter advertising signs in virtually every type of zoning district in the City – all "RTO, RM-2, RM-3, RM-4, RC, NC, C, M and South of Market Districts" – including in all residential and neighborhood commercial districts.[5] Just as in *Metro Lights*, the City's street furniture advertising signs are anything but "limited" geographically. As any San Francisco resident knows firsthand, they are ubiquitous.[6]

Finally, the City makes no effort to distinguish *World Wide Rush, LLC v. City of Los Angeles*, __ F. Supp. 2d __, 2008 WL 2477440 (C.D. Cal. June 9, 2008), which, just like *Metro Lights*, expressly rejected the argument that *Metromedia* rescues an underinclusive billboard scheme from scrutiny under *Greater New Orleans* and *Rubin*. Indeed, since Plaintiff filed its Opening Brief in this Court on July 18, 2008, the *World Wide Rush* Court has now gone beyond

---

[4] The City has authorized 1,000 bus shelters bearing two advertising signs each (Stein Decl. ¶ 14); 150 "commercial kiosks" bearing three advertising signs each (Stein Decl. ¶ 13); 112 "public service kiosks" bearing two advertising signs each (McKenna Decl. ¶ 16); and 485 newsracks bearing one advertising sign each (McKenna Decl. ¶ 21).

[5] Likewise, public service kiosks and newsracks bearing advertising signs are permitted in an "advertising zone" comprising virtually the entire northeast quadrant of the City. McKenna Decl. ¶¶ 14, 21.

[6] The City observes that *Metro Lights* is on appeal to the Ninth Circuit, but the mere fact that Los Angeles exercised its right to appeal does not itself cast doubt on the correctness of the District Court's opinion. The City also faults *Metro Lights* for failing to "acknowledge[e] that *Ackerley* is controlling precedent," City Opp. Br. at 18, but as discussed above, *Ackerley* does not even arguably control this underinclusiveness analysis.

**CASE NO. C07-6067 (JSW)**
**PRELIM. INJ. REPLY**

1  its initial preliminary injunction and entered summary judgment in favor of the plaintiff. Hecker

2  Decl. Exh. B.

3

4  **B.    The City's Purported Traffic Safety and Aesthetic Concerns Are Belied By the Record**

5  As Plaintiff's Opening Brief made clear, Plaintiff accepts that the City's purported interests

6  in protecting traffic safety and aesthetics are, *in theory*, substantial government interests that

7  satisfy the second *Central Hudson* prong. The question is whether, *in fact*, the City sincerely is

8  concerned about and has been sufficiently faithful to these supposed interests. In *Central Hudson*

9  terms, the question is whether the City's regulation of advertising signs, taken as a whole, directly

10  and materially advances (third prong) and is narrowly tailored to (fourth prong) its alleged traffic

11

12  safety and aesthetic concerns. The record, including the City's opposition papers, make clear that

13  the answer to this question is no.[7]

14

15

16

17

18

19

20

21

22  [7] The City suggests that Plaintiff has not satisfied the first *Central Hudson* prong, implying that Plaintiff's signs advertise unlawful activities or are otherwise misleading. Opp. Br. at 18-19.

23  That is false. The City has not adduced a shred of evidence of any unlawful or misleading advertisements that Plaintiff has ever run, nor could it. As confirmed in the Reply Declaration of

24  Michael A. Freedman, Plaintiff's advertisers are legitimate, reputable companies – such as Starbucks, Land Rover, eBay, Jet Blue, and Bristol Myers Squibb – running many of the very

25  same advertisements that appear on the City's street furniture. Freedman Reply Decl. ¶ 2.

26  Contrary to the City's unsupported innuendo, Plaintiff does not accept advertisements from methamphetamine labs, houses of ill repute, ponzi schemes, or any other unlawful or misleading

27  advertisers.

28

8    **CASE NO. C07-6067 (JSW)**
     **PRELIM. INJ. REPLY**

### (a)    Traffic Safety

The City has placed into evidence the written siting criteria that govern the placement of its street furniture on the public rights of way. The City does not discuss these siting criteria in any detail, but appears to be attempting to manufacture the impression that its street furniture advertising sign locations have been vetted and determined not to have the potential to distract passing motorists. Scrutiny of these siting criteria reveals that this is not the case.

Take, for example, the bus shelter regulations that appear at Exhibit H to the City's Request for Judicial Notice. Pages 11-12 contain DPW's "Placement Guidelines" for bus shelters. These Placement Guidelines contain various clear path requirements, which logically are necessary to ensure that the bus shelter *structures* do not impede safe pedestrian flow. They contain clear corner requirements, which logically are necessary to ensure that bus shelter *structures* will not block the view of motorists entering intersections. Critically, however, nothing in the Placement Guidelines addresses whether *the advertising signs themselves* – as opposed to the bus shelter *structures* – have the potential to interfere with driver safety. The City's invocation of § 8.1.2(a)(xi) of the Shelter Agreement is instructive. As the City highlights, that provision requires that bus "shelters must . . . not be so illuminated as to be hazardous to passing vehicle operators." Stein Decl. ¶ 26 & Exh. A. Plainly, however, this provision refers to the illumination of *the shelters themselves*, not to the illumination of *the shelters' advertising signs*.[8]

Because these Placement Guidelines and franchise agreement specifications confirm that the City has embarked on its ambitious street furniture advertising program without giving any thought (let alone careful consideration) to controlling the potential for its advertising signs to

---

[8] Moreover, the City has adduced no evidence regarding how this provision supposedly is enforced – *i.e.*, how the City supposedly ensures, in fact, that its franchisees actually are not exceeding safe illumination levels.

CASE NO. C07-6067 (JSW)
PRELIM. INJ. REPLY

1  district passing motorists, the City cannot credibly contend that its prohibition of Plaintiff's

2  identical signs, set further back from the right of way, is necessary to further its ostensible traffic

3  safety goals.

4      Critically, the opposite is also true.  To the extent that any of the City's Placement

5  Guidelines can fairly be characterized as addressing the potential of street furniture advertising

6  signs to cause driver distraction, then that only proves that Plaintiff's signs easily could be

7  regulated to eliminate driver distraction concerns – and thus that the scheme is not narrowly

8  tailored and violates the fourth *Central Hudson* prong.  Take, for example, the City's Placement

9  Guidelines for public service kiosks, which appear at pages 3-5 of Exhibit I to the City's Request

10  for Judicial Notice.  One such criterion is that no more than two kiosks shall be placed at any

11  Market Street intersection.  We doubt that this reflects a traffic safety concern, but if it does, the

12  solution logically must apply equally to Plaintiff's signs:  they are fine so long as there are no

13  more than two near any busy intersection.  It is axiomatic that a scheme is not narrowly tailored if

14  it completely bans signs that could be allowed, consistent with the City's goals, subject to the

15  imposition of safety-driven siting rules such as those to which the City points.  What's good for

16  the goose is good for the gander.

17      Faced with this logical "Catch 22" – which flows directly from the stark similarity between

18  the City's permitted signs and Plaintiff's prohibited signs – the City attempts to disqualify

19  Plaintiff's traffic safety expert, Jerry Wachtel.  This strategy fails for numerous reasons.

20      First, as demonstrated in Plaintiff's opening brief, Plaintiff bears no burden under *Central*

21  *Hudson*; rather, it is settled law that this burden lies squarely with the City.  *Greater New Orleans*,

22  527 U.S. at 183; *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416 (1993); *Horizon*

23  *Outdoor, LLC v. City of Industry*, 228 F. Supp. 2d 1113, 1126 (C.D. Cal. 2002).  Because it is *the*

24  *City's* responsibility to prove that all four *Central Hudson* prongs have been satisfied, Plaintiff

10

was under no obligation to adduce testimony from Mr. Wachtel in the first place. Rather, it was *the City's* responsibility to affirmatively demonstrate – through its own traffic safety expert or otherwise – not only that its street furniture signs do not have undue potential to distract drivers, and not only that Plaintiff's signs do, but that whatever siting or other rules supposedly sanitized the City's signs could not be applied to Plaintiff's signs as well. The City has made no attempt to do this.

Second, as the *Metro Lights* Court recognized, the conclusion that the City's street furniture signs – which largely are identical to Plaintiff's signs but are located far closer to the active roadway – have at least as much potential to distract drivers is so obvious and unassailable that expert testimony is unnecessary. Indeed, the *Metro Lights* Court expressly held that traffic safety expert opinion was "unnecessary to the Court's ruling since the study tends to confirm that which common sense suggests." 488 F. Supp. 2d at 944. The same is true here: the City's purported concern about traffic safety obviously is belied by the gaping exemptions it bestowed upon its street furniture franchisees, regardless of what any expert does or does not say.

On the merits, the City's attack on Mr. Wachtel's credentials and analysis falls far short of the mark. The City contends – in conclusory fashion, without supporting testimony from any person with knowledge – that Mr. Wachtel's testimony is improper under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because his methodology "has not attained general acceptance." Objections (Docket #69) at 1. That plainly is not true. As Mr. Wachtel's Reply Declaration makes clear, the field study and analysis he performed is a generally accepted and valid scientific methodology that is based on well-established, peer-reviewed scientific research. He has served as an expert witness in the areas of traffic safety, human factors, ergonomics, and engineering psychology in dozens of cases – on behalf of government entities as often as plaintiffs – and has never been denied qualification as an expert witness in any of those areas. And his

CASE NO. C07-6067 (JSW)
PRELIM. INJ. REPLY

conclusion that Plaintiff's signs have less potential to distract drivers than the City's street furniture signs is so obviously correct that any suggestion to the contrary is not worthy of serious consideration.[9]

Finally, the City observes that "Mr. Wachtel never concluded that advertising signs on San Francisco's street furniture constitutes a hazard to motorists or pedestrians." Objections at 3. That is true. It also is beside the point. The purpose of Mr. Wachtel's study was not to prove that the City's advertising signs are in fact dangerous, but rather to prove that they have at least as much *potential* to be dangerous as Plaintiff's signs supposedly do. The question for this Court is whether the City's prohibition of Plaintiff's signs is justified on the basis that they threaten traffic safety. To the extent that the City itself has rolled out thousands of its own signs that have at least as much *potential* to cause the very harm the scheme supposedly is designed to combat, the City's case under the third and fourth prongs of *Central Hudson* collapses. Accordingly, Plaintiff never set out to prove, and has not purported to prove, actual danger. It is *the relative potential* to be dangerous on the part of the City's signs, compared to Plaintiff's signs, that evidences the hypocrisy that is fatal under *Greater New Orleans* and *Rubin*.[10]

---

[9] Unable to cast doubt on Mr. Wachtel's opinion, the City erects and attempts to attack a straw man: William Kunzman, the plaintiff's expert in *Metro Lights*. Though Mr. Kunzman arrived at the same core conclusion as Mr. Wachtel, he used a different methodology to get there. That the City would waste time in this case attacking a different expert's opinion in a different case speaks volumes about the desperation of its position.

[10] The City takes a swipe at Plaintiff's counsel, accusing Plaintiff's counsel of "misrepresent[ing] Mr. Wachtel's conclusions." Objections at 3. This serious allegation is demonstrably false. Plaintiff's counsel never said that the City's signs actually are dangerous. Rather, as the City acknowledges, Plaintiff's counsel merely stated that, according to Mr. Wachtel, the City's signs pose a "greater *threat* to traffic safety" (emphasis added) than Plaintiff's signs. That is precisely what Mr. Wachtel concluded. Wachtel Decl. ¶ 31 (concluding that "the Fuel signs, without exception, cause me less concern about the *potential* for driver distraction than the signs on City structures") (emphasis added).

CASE NO. C07-6067 (JSW)
PRELIM. INJ. REPLY

**(b)    Aesthetics**

In its opening brief, Plaintiff demonstrated that the City could not possibly have a substantial or sincere concern about the aesthetic impact of Plaintiff's 164 panel signs given that the City has purposefully blanketed its streetscape with *over three thousand* essentially identical street furniture signs (and, through the RFP recently issued by SFMTA, intends to place many more advertising signs in the streetscape). The City's only response is that the San Francisco Arts Commission reviewed and approved the designs for each category of street furniture structure. Opp. Br. at 6-7, 22. This is a sleight of hand, for the City's submission makes clear that the Arts Commission only reviewed the designs for the street furniture *structures*; the Arts Commission had no involvement whatsoever in *the decision to place advertising panels on the street furniture structures*. That decision, which drives the legal analysis in this case, was made long prior to the Arts Commission's involvement, is reflected in the request for proposal and franchise agreement, and was presented to the Art Commission as a *fait accompli*. City Request for Judicial Notice, Exh. O (minutes of Oct. 15, 2007 meeting of Arts Commission Civic Design Review Committee), at 6 (reflecting Commissioner Cochran's view that "fewer structures on the street are better than more structures on the street," but that "it is not the decision of this Committee to review the economics of the [street furniture] contract, but [only] the design of the shelters"). Because the Arts Commission had no say in whether or the extent to which the street furniture structures would bear advertising signs, their aesthetic review of the design of the structures is simply a red herring.

Furthermore, evidence presented in the City's papers confirms unmistakably that the City's supposed aesthetic concerns are dwarfed by its thirst for profit. Paragraph 18 of the Stein Declaration establishes that Clear Channel Outdoor expects the cost of manufacturing and installing each bus shelter to be about $11,500. Given that Clear Channel Outdoor is obligated to install a maximum of 1,500 new shelters, the total buildout cost is *under $20 million*. Pursuant to

**CASE NO. C07-6067 (JSW)**
**PRELIM. INJ. REPLY**

the franchise agreement, however, Clear Channel Outdoor has guaranteed the City *in excess of*

*$300 million* under the Shelter Agreement, and perhaps a great deal more depending upon

advertising revenue. Opening Br. at 5. Given this massive gulf between the cost of erecting the

structures and the minimum payments due to the City, it is undeniable that the City easily could

have scaled back the bus shelter advertising program dramatically – rolling out only a tiny fraction

of advertising signs – and still covered the cost of manufacturing, installing, and maintaining new

shelters. The fact that the City's street furniture advertising program goes an order of magnitude

beyond what is necessary to implement a cost-free bus shelter upgrade proves that the City has no

sincere aesthetic objection to the presence of panel advertising signs on its streets.[11]

### C.    The City Violates Its Own Rules

As Plaintiff's Opening Brief made clear, there are two fundamental aspects to the City's

hypocrisy with respect to its regulations of advertising signs: (1) its failure to abide by the

prospective ban on new advertising signs enacted in 2002 through Proposition G; and (2) its

failure to abide by the underlying district-based zoning regulations that purportedly restrict the

placement of advertising signs in various locations throughout the City. The City's opposition

papers confirm Plaintiff's allegations that the City violates both sets of rules.

Despite the smokescreen created by the voluminous materials submitted by the City in

opposition to Plaintiff's motion, the facts are clear: the City has constructed new advertising signs

subsequent to the enactment of Proposition G in 2002 with respect to *all* of its categories of street

furniture. *All* of the City's existing bus shelters bearing advertising signs will be replaced – and

---

[11] Indeed, the City's new advertising RFP issued by the SFMTA does not require prospective franchisees to commit to building any City infrastructure (such as bus shelters or pay toilets) at all.

**CASE NO. C07-6067 (JSW)**
**PRELIM. INJ. REPLY**

1    many new bus shelters bearing advertising signs will be installed – with new advertising signs that

2    did not exist in 2002. Stein Decl. ¶¶12-13. *All* of the City's newsracks bearing advertising signs

3    were installed after 2002. McKenna Decl. ¶ 26. And public service kiosks bearing advertising

4    signs have been installed since 2002 as well. *Id.* ¶ 17. These undisputed facts constitute stark

5    evidence that the City had no sincere, legitimate interest in imposing a complete and total

6    prospective ban on new advertisings signs in 2002. If the City truly had such a sincere and

7    legitimate interest, it plainly would not be ignoring the ban left and right.[12]

8

9        The City's only response to these inconvenient facts is to point to Proposition K, a "policy

10    statement" referendum through which San Francisco voters expressed a *preference* not to allow

11    any further expansion of the City's street furniture advertising program. Despite the policy

12    preference expressed by a majority of San Francisco voters nearly a year ago, the City Council

13    still has not enacted actual *legislation* precluding its ability to expand the program in the future.

14    Moreover, even assuming the City were to formally commit to weaning itself from additional

15    program expansions at some point in the future – which the new SFMTA RFP demonstrates is not

16    currently on the horizon – that still would not explain why the City was so cavalier about

17    expanding the program significantly (including by installing numerous new shelter advertising

18    panels, kiosk advertising panels, and *all* of the City's hundreds of newsrack advertising panels)

19    subsequent to the passage of Proposition G in 2002.

20

21

22 _____

23      [12] Any argument that the bus shelter franchise is not inconsistent with Proposition G because it mostly replaces previously-existing shelters is foreclosed by the Planning Code.

24    Section 604(h) makes clear that, although a sign erected prior to 2002 is grandfathered and may continue to "remain until the end of its normal life," such a sign "may not, however, be replaced,

25    altered, [or] reconstructed." Although "[o]rdinary maintenance and minor repairs shall be permitted," "such maintenance and repairs shall not include replacement, alteration, [or]

26    reconstruction." *Id.* Thus, *none* of the replaced bus shelter advertising signs complies with Proposition G.

27

28

**CASE NO. C07-6067 (JSW)**
**PRELIM. INJ. REPLY**

With respect to the underlying zoning issue, the City has no direct response at all. Confronted with the irrefutable evidence contained in the Declaration of Jeremy Paul – that the City repeatedly violates numerous district-based advertising sign restrictions that ostensibly are necessary to protect traffic safety and aesthetics – the City attempts to deflect attention from its hypocrisy by attacking the messenger. The City's "objections" to the Paul Declaration are twofold, neither of which holds water.

First, the City asks this Court to disregard Mr. Paul's declaration entirely on the ground that he is not an expert witness. Objections at 4. But Mr. Paul was not tendered as an expert witness. To the contrary, he is a *fact* witness. He merely testified that certain City signs are located in certain places, and that published and easy-to-read zoning rules purport to prohibit advertising signs at those locations. The City adduced similar facts from its own non-expert witnesses – such as, for example, Kimberly Durandet, who has only worked for the Planning Department for less than three years, and whose only prior employment of significance was as an intern at the Interior Department. Durandet Decl. ¶ 2. Given that a neophyte like Ms. Durandet apparently is competent to testify about the legality, under the City's district-based zoning rules, of Fuel's signs, certainly Mr. Paul – who has been a professional zoning and permit advisor since 1989, and who regularly represents property owners before the Planning Commission and Board of Appeals – is similarly competent to testify about the legality, under the City's district-based zoning rules, of the City's street furniture signs.

The City's other line of attack is more insidious, suggesting that Mr. Paul's testimony should be disregarded because of findings made in an unrelated civil litigation in which he was a defendant. This argument should not even be dignified with a response. Suffice it to say that the *Nadelman* litigation is no more relevant to Mr. Paul's testimony than a civil judgment entered against Ms. Durandet in an unrelated civil case would be to her testimony.

CASE NO. C07-6067 (JSW)
PRELIM. INJ. REPLY

The absurdity of the City's aspersions against Mr. Paul, of course, is that the City does not (and cannot) deny the substance of his testimony.  If there were anything false about Mr. Paul's account that the City's street furniture advertising signs violate numerous provisions of Article 6 of the Planning Code – including by placing advertising signs in residential zoning districts – surely the City would simply say so.  That the City would resort to character assassination in lieu of an honest debate about the facts may be surprising, but the uncontested fact that the City does not bother to follow its own zoning rules governing advertising signs is not.  Unfortunately, the City's hypocrisy in this case is elegantly consistent:  despite its purportedly sacred concern for traffic safety and aesthetics, the City has never hesitated to seize – and continues to seize, as evidenced by the pending SFMTA RFP – new opportunities to generate revenue by auctioning off its streetscape to advertisers, notwithstanding any of the restrictions that ostensibly apply to identical signage on private property.

## II.    PLAINTIFF IS NOT REQUIRED TO EXHAUST ADMINISTRATIVE REMEDIES

Unable to muster a plausible defense on the merits, the City argues that Plaintiff's claims are precluded – and should not be heard at all – because some of Plaintiff's lessors received notices of violation that have not been adjudicated administratively or in state court.  For numerous reasons, this argument has no merit.

Most importantly, the City ignores the bedrock principle of constitutional law that one need not exhaust administrative or state court remedies prior to filing a federal civil rights action in federal court under 42 U.S.C. § 1983.  As the Supreme Court has reaffirmed time and again, "[w]hen federal claims are premised on [§ 1983,] we have not required exhaustion of state judicial or administrative remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 472-473 (1974); *see also Patsy v. Board of Regents of the State of Fla.*, 457 U.S. 496, 500-516 (1982) ("[T]his Court

CASE NO. C07-6067 (JSW)
PRELIM. INJ. REPLY

1  has stated categorically that exhaustion is not a prerequisite to an action under § 1983."); *Fair*

2  *Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 104 (1981) ("The federal remedy

3  is supplementary to the state remedy, and the latter need not be first sought and refused before the

4  federal one is invoked."); *Truth v. Kent School Dist.*, 524 F.3d 957, 966 (9th Cir. 2008) ("The

5  Supreme Court has explicitly held that exhaustion is not required for claims brought under 42

6  U.S.C. § 1983."). Thus, the City's argument that "Metro Fuel must exhaust its administrative and

7  judicial remedies" by challenging the notices of violation before City agencies and in state court,

8  *see* City Opp. Br. at 25, is not worthy of serious consideration.

9

10      The only federal case the City cites in support of its argument – *Miller v. County of Santa*

11  *Cruz*, 39 F.3d 1030 (9th Cir. 1994) – is inapposite. In *Miller*, a former employee of the Santa Cruz

12  Sheriff's Department contested his dismissal before the Santa Cruz County Civil Service

13  Commission. The Commission held a public hearing during which the employee was represented

14  by counsel, presented documentary evidence, and called witnesses. The Commission then made

15  written findings that the employee was terminated for legitimate reasons. The employee did not

16  appeal these adverse factual findings in state court, opting instead to challenge his dismissal in

17

18  federal court. The Ninth Circuit held that he was precluded from doing so, reasoning that his

19  failure to appeal the Commission's adverse findings rendered them final, and that those findings

20  collaterally estopped him from relitigating the same issue for a second time in a federal forum.

21  The Ninth Circuit explained that the findings of a state administrative tribunal can have preclusive

22  effect in subsequent litigation so long as three requirements are met: (1) the administrative agency

23  acted in a judicial capacity; (2) the agency resolved disputed issues of fact properly before it; and

24  (3) the parties had an adequate opportunity to litigate. *Id.* at 1032-33. In this case, none of these

25  three requirements is satisfied.

26

27

28

**CASE NO. C07-6067 (JSW)**
**PRELIM. INJ. REPLY**

The local administrative agency that issued the notices of violation (the San Francisco Planning Department) plainly did not act in a judicial capacity or resolve any disputed issues of fact. Rather, each notice spelled out a procedure through which the property owner could "request consideration of this Notice of Violation before an Administrative Law Judge." City Request for Judicial Notice, Exh. T. The notices further made clear that, absent such an administrative challenge, the violations would be "referr[ed] to the City Attorney for further action." *Id.*; *see also* Planning Code § 610(b)(2)(C) (City Attorney must pursue collection of any penalty in a state court civil action). None of this happened. None of the violations was ever heard before any administrative law judge, nor has the City Attorney ever attempted to enforce any of the violations in any state court. No administrative law judge, review commission, or state court judge has even examined any of these violations, let alone concluded that they are proper, let alone resolved any underlying disputed issues of fact. This case thus is a far cry from *Miller*, where the legitimacy of the employee's termination was actually litigated in a full-blown proceeding before a duly convened judicial tribunal that heard copious evidence regarding, and resolved, numerous disputed issues of fact.

In addition, Plaintiff obviously has not had an adequate opportunity to litigate before the Planning Department the constitutionality of the City's scheme for regulating panel signs. To begin with, Plaintiff is not even a party to any of the notices of violation. Rather, they were issued only to Plaintiff's lessors, not to Plaintiff. Moreover, even assuming that Plaintiff had been a party to the notices of violation – which they were not – the procedure for challenging the violations spelled out in the Planning Code is anything but adequate for challenging the constitutionality of the regulatory scheme. There is a non-refundable hearing fee of $3,400 per violation just to go before an administrative judge; there is no right to conduct discovery; and there is no right to appeal to the Board of Appeals. *Id.* ¶¶ 610(d)(1)(B), (d)(2). And although state court review is

CASE NO. C07-6067 (JSW)
PRELIM. INJ. REPLY

available through California's mandamus procedure, this Court has squarely held that on-the-record mandamus review fails to satisfy the "adequate opportunity to litigate" prong of the *Miller* test. *Embury v. King*, 191 F. Supp. 2d 1071, 1083-84 (N.D. Cal. 2001) (Wilken, J.), *aff'd*, 361 F.3d 562 (9th Cir. 2004).

Unable to cite any federal authority supporting its argument that Plaintiff is not entitled to a federal forum for its federal constitutional claims, the City turns to two state court cases, neither of which rescues its argument. In *Briggs v. City of Rolling Hills Estates*, 40 Cal. App. 4th 637 (Cal. App. 1995), the plaintiff sought a zoning variance before the City Planning Commission, was denied the variance following a full public hearing, appealed the decision to the City Council unsuccessfully, and failed to seek mandamus review of the city council's affirmance. The Court of Appeal held that the Commission's and Council's unreviewed findings precluded subsequent plenary litigation because the plaintiff already had availed himself of a full and adequate opportunity to litigate the issue. Similarly, in *Swartzendruber v. City of San Diego*, 3 Cal. App. 4th 896 (Cal. App. 1992), the plaintiff was a police officer who was terminated for refusing to comply with a uniform requirement. She actively litigated the validity of her termination through the department's internal appeals procedures, unsuccessfully appealed to the city's Civil Service Commission, but failed to seek mandamus review of the Commission's affirmance. As in *Briggs*, the Court of Appeal held that the department's and Commission's unreviewed findings precluded plenary litigation because she had availed herself of a full and adequate opportunity to challenge her termination.

Here, unlike in *Briggs* or *Swartzendruber* (or *Miller*), Plaintiff is not a party to any of the violations that supposedly preclude this lawsuit; no administrative law judge or reviewing court ever considered (let alone engaged in factfinding regarding) the validity of any of the violations; the available procedure for challenging the violations does not permit discovery or appeal to the

CASE NO. C07-6067 (JSW)
PRELIM. INJ. REPLY

1    Board of Appeals; and the City never attempted to enforce the violations in state court through the

2    procedure set forth in the Planning Code.[13]

3         For all of these reasons, there is no merit to the City's argument that Plaintiff's First

4    Amendment claims are precluded.

5

6    **III.    PLAINTIFF HAS STANDING TO CHALLENGE, AND DOES CHALLENGE, ARTICLE 6 OF THE PLANNING CODE IN ITS ENTIRETY**

7

8         In another attempt to evade the merits of Plaintiff's First Amendment claim, the City

9    contends that Plaintiff lacks standing to challenge the prospective ban on general advertising signs

10   set forth in Planning Code § 611. The idea is that, because there are provisions other than § 611

11   that Plaintiff's signs violate, an order that narrowly enjoined § 611 – but only § 611 – would not

12   redress Plaintiff's injury because at least some of Plaintiff's signs would still be illegal.

13        To advance this argument, the City resorts to mischaracterizing the nature of Plaintiff's

14   challenge. The City's claim that a "review of Metro Fuel's First Amended Complaint and moving

15   papers for this motion makes clear that it is only challenging San Francisco's ban on new general

16   advertising signs" – rather than challenging Article 6 of the Planning Code more broadly – appears

17   to be a deliberate attempt to mislead the Court. City Opp. Br. at 25.

18

19        Plaintiff's Amended Complaint (Docket #22) is clear that this case is not limited narrowly

20   to the prospective ban on new signs set forth in § 611, but rather includes all of Article 6 of the

21   Planning Code – including all of the underlying zoning provisions that ostensibly apply to

22

23   _____

24        [13] It bears emphasis that even assuming there were any merit to the City's argument – which there is not – the City has only issued notices of violation for 29 out of Plaintiff's 164 panel
25   signs. Thus, there can be no doubt that Plaintiff's First Amendment claims are properly before this Court, at the very least, with respect to the 135 of Plaintiff's panel signs that have not been
26   ticketed. Accordingly, the City's exhaustion/preclusion argument could only be relevant, at the very most, to the scope of the injunction to which Plaintiff is entitled.

27

28

**CASE NO. C07-6067 (JSW)**
**PRELIM. INJ. REPLY**

1  Plaintiff's signs but not to the City's street furniture signs.  Paragraph 3 of the Amended

2  Complaint clearly defines the term "Sign Ordinance" to include Article 6 of the Planning Code in

3  its entirety.  Paragraph 9 of the Amended Complaint urges that all of the provisions of the Sign

4  Ordinance (*i.e.*, Article 6) that purportedly apply to Fuel's signs should be declared

5  unconstitutional.  The prayer for relief at the end of the Amended Complaint seeks an order

6  enjoining the City from enforcing the Sign Ordinance – including all of the zoning rules in Article

7  6 that ostensibly apply to Plaintiff's signs but not to the City's signs – against Plaintiff's panel sign

8  inventory.

9

10         Even assuming the Amended Complaint is susceptible to any confusion about the scope of

11  Plaintiff's challenge, the same cannot possibly be said about Plaintiff's moving papers.  On page 4

12  of its opening brief, Plaintiff explained the "two basic categories" of restrictions it is challenging:

13         First, through its adoption of Proposition G in March 2002, the City added Section 611 to
           its Planning Code, which purports to impose a complete and total ban on any and all new
14         general advertising signs erected after that date (including virtually all of Fuel's panel
           signs).
15
           Second, with respect to those panel signs that were installed prior to March 2002 and
16         therefore are not subject to the prospective ban, Article 6 of the Planning Code contains a
           slew of highly restrictive underlying zoning regulations that, if enforced, would prohibit
17         most of Fuel's panel signs.  For example, general advertising signs are completely
           prohibited in residential zoning districts (Planning Code § 606(a)(3)); in close proximity to
18         schools and parks (Planning Code § 608.2); along certain streets that have been designated
           as scenic (Planning Code § 608.6); and in a variety of designated special sign districts
19         (e.g., Planning Code §§ 608.3, 608.9, 609.10).

20  Plaintiff's brief went on to observe, on page 9, that the City has granted itself blanket exemptions

21  *both* from the prospective ban set forth in § 611 *and also*:

22
           from the underlying district-based zoning restrictions that supposedly are critical to the
23         City's efforts to protect "traffic safety" and "aesthetics."  Planning Code § 603(j)
           (exempting bus shelters and associated kiosks from all of the district-based restrictions
24         contained in Article 6); id. § 603(m) (public service kiosks); id. § 603(n) (newsracks).
25
26  In its argument section, Plaintiff then emphasized, on page 21, that there are "two distinct aspects"

27  to the City's scheme that are being challenged:

28

                                                    22                CASE NO. C07-6067 (JSW)
                                                                      PRELIM. INJ. REPLY

1  the City's failure to comply with the prospective ban on all new general advertising signs
2  erected after March 2002 (Planning Code § 611); and its refusal to comply with its
   underlying zoning provisions that restricted the placement of pre-ban general advertising
3  signs based on location (Planning Code §§ 605-608).

4  There thus is no basis whatsoever for the City's suggestion that Plaintiff's challenge somehow is

5  limited narrowly to § 611.

6      Once the falsity of the City's premise about the scope of Plaintiff's challenge is exposed,

7  its standing argument falls apart. On page 26 if its brief, and in ¶¶ 12-27 of the Durandet

8  Declaration, the City lists numerous Planning Code provisions that Plaintiff's panel signs

9  allegedly violate: §§ 227(k); 606(a)(3); 607.1(e); 607.2(e); 607.3(c)(3); 608.5; 608.10(b); 710.30;
10
   711.30; 721.30; 723.30; 815.76; and 1111.7(a). None of these provisions in any way deprives
11
12  Plaintiff of standing.

13      With respect to the first provision (§ 227(k)), the City is simply confused, for Ms.

14  Durandet's declaration actually makes clear that Planning Code § 227(k) *does* allow advertising

15  signs in C-3-G zoning districts and that Plaintiff's panel signs therefore *do not* violate this

16  provision. Durandet Decl. ¶¶ 20, 26, 27.

17      Each of the next several provisions (§§ 606(a)(3); 607.1(e); 607.2(e); 607.3(c)(3); 608.5;
18
   and 608.10(b)) plainly are part of Plaintiff's broad challenge to the district-based zoning rules set
19
20  forth in Article 6 – rules that the City has exempted itself from in derogation of the traffic safety

21  and aesthetics concerns that supposedly justify them. For example, paragraph 8 of the Declaration

22  of Jeremy Paul details how the City's street furniture signs violate the ban on advertising signs in

23  residential districts set forth in § 606(a)(3). Paragraph 14 of the Paul Declaration likewise details

24  how the City violates § 608.10(b), which prohibits advertising signs in the Upper Market Special

25  Sign District. Because Plaintiff plainly is challenging each of these provisions, the City's standing

26  argument fails.
27

28

                          23                    CASE NO. C07-6067 (JSW)
                                                PRELIM. INJ. REPLY

1   The next several provisions (§§ 710.30; 711.30; 721.30; 723.30; and 815.76) do not

2   themselves prohibit advertising signs at all.  Instead, each of these provisions merely describe

3   different types of zoning districts and contain charts incorporating by reference restrictions on

4   signage set forth in Article 6.  For example, § 710 does not itself say anything about advertising

5   signs.  Rather, it merely defines a "Neighborhood Commercial" zoning district.  The subsection

6   cited by the City – § 710.30 – is just a chart clarifying that advertising signs are not permitted in

7   such districts by operation of various zoning restrictions on signage set forth in Article 6.  The

8   same is true for §§ 711.30; 721.30; 723.30; and 815.76.  Each of them merely incorporates by

9
10  reference provisions of Article 6 that plainly are part of Plaintiff's challenge.

11      Finally, the City cites Planning Code § 1111.7(a), which bans new advertising signs in

12  designated historic districts.  Leaving aside that the City itself has placed a slew of new street

13  furniture advertising signs in historic districts in violation of § 1111.7(a) – including numerous bus

14  shelters bearing advertising signs in the Alamo Square, Bush Street-Cottage Row, Dogpatch,

15
16  Jackson Square, and Liberty Hill Historic Districts – the City can point to only one panel sign that

17  Plaintiff has placed in a historic district, and the City has not even issued a notice of violation for

18  this sign.  Durandet Decl. ¶ 27.  Because virtually none of Plaintiff's panel signs are in historic

19  districts, and because the one that is has not even been ticketed, Ms. Durandet's observation about

20  Plaintiff's sign at 3420 Taylor street hardly defeats Plaintiff's standing to assert its First

21  Amendment claim in this Court.[14]

22
23
24
_____

25  [14] It is not clear what the point is of the Declaration of Daniel Sider, which relates to a
26  panel sign located at 2399 Market Street.  To the extent Mr. Sider is speculating that this sign may
    not have an electrical permit or may violate the City's electric code, he is wrong.  Freedman Reply
27  Decl. ¶ 3 & Exh. A.

28

CASE NO. C07-6067 (JSW)
PRELIM. INJ. REPLY

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that Plaintiff's motion for a preliminary injunction should be granted, and the City's motion for judgment on the pleadings should be denied.[15]

Date:  September 12, 2008                    LAW OFFICE OF PAUL E. FISHER


                                            _____/s/_____
                                    By:  PAUL E. FISHER, State Bar No. 125309
                                         The Law Office of Paul E. Fisher
                                         537 Newport Center Dr., #289
                                         Newport Beach, CA 92660
                                         Telephone: (949) 675-5619
                                         Facsimile:  (949) 675-5641

                                         ERIC HECKER (admitted *pro hac vice*)
                                         Emery Celli Brinckerhoff & Abady LLP
                                         75 Rockefeller Plaza, 20th Floor
                                         New York, NY 10019
                                         Telephone: (212) 763-5000
                                         Facsimile:  (212) 763-5001

                                         ATTORNEYS FOR PLAINTIFF
                                         METRO FUEL LLC

---

[15] The City includes its exhaustion and standing arguments in its motion for judgment on the pleadings, but those arguments plainly do not support dismissal as a matter of law because they go well beyond the pleadings (raising factual questions about administrative proceedings and alleged violations of code provisions that are not pled in the Amended Complaint).  Moreover, the City's motion for judgment on the pleadings should be denied for the additional reason that it does not address the alternative legal theories (government monopoly power and discrimination against non-commercial speech) that Plaintiff has pled.