1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                       CENTRAL DISTRICT OF CALIFORNIA

10
WORLD WIDE RUSH, LLC, a          )    CASE NO.: CV 07-238 ABC  (JWJx)
11  Pennsylvania corporation, and  )
INSITE OUTDOOR WORKS LA, LLC, a)
12  Delaware limited liability      )    **ORDER RE: PLAINTIFFS' MOTION FOR**
company,                         )    **SUMMARY JUDGMENT**
13                                   )
                    Plaintiffs, )
14                                   )
      v.                          )
15                                   )
CITY OF LOS ANGELES, a           )
16  California municipal            )
corporation and DOE 1 through    )
17  DOE 10, inclusive,              )
                                 )
18                      Defendant. )
                                 )
19  ─────────────────────────────── )

20        Pending before the Court is Plaintiffs World Wide Rush, LLC and

21  Insite Outdoor Works LA, LLC's ("Plaintiffs'") Motion for Summary

22  Judgment, filed on July 24, 2008.  Defendant City of Los Angeles (the

23  "City") opposed on August 4, 2008 and Plaintiffs replied on August 11,

24  2008.  The Court finds this matter appropriate for resolution without

25  oral argument and VACATES the August 18, 2008 hearing date.  See Fed.

26  R. Civ. Proc. 78; Local Rule 7-15.  After considering the papers and

27  case file in this matter, the Court GRANTS Plaintiffs' motion.

28

# I.    PROCEDURAL AND FACTUAL BACKGROUND[1]

Plaintiffs' current motion rests on the identical grounds addressed by the Court in its June 9, 2008 Order granting Plaintiffs' motion for preliminary injunction. The facts are undisputed. Plaintiffs are licensed to engage in the business of leasing outdoor advertising space for advertisers to erect signs in the City of Los Angeles. Plaintiffs lease 21 sign sites[2] within the City and the signs do not typically advertise goods or services available on the premises where they are located. Some of these signs are located within 2,000 feet of a freeway.

The City regulates outdoor signs through its "sign ordinance," Section 14 of Article 4.4 of the Los Angeles Municipal Code ("LAMC"). The sign ordinance defines "off-site" signs as:

> A sign that displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution or any other commercial message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the premises where the sign is located.

Section 14.4.2 (also defining "on-site" signs as "[a] sign that is other than an off-site sign."). A "supergraphic sign" is:

> A sign, consisting of any image projected onto a wall or printed on vinyl, mesh, or other material with or without

---

[1]The City asserts various evidentiary objections. The Court has considered them and has not relied on any inadmissible evidence in granting Plaintiffs' motion.

[2]Since the Court imposed the preliminary injunction in this case, Plaintiffs have indicated that they were unable to secure a lease for the site at 15300 Ventura Blvd. and the City has indicated that Plaintiffs have dropped 12 other sites from the scope of the preliminary injunction. The Court addresses the effect of these revisions in a separate Order ruling on Proposed Intervenor Community Redevelopment Association, LLC d.b.a. Liberty Media Group's Ex Parte Application to Intervene (Docket No. 122). For the purposes of this Order, only 21 sites remain at issue.

written text, supported and attached to a wall by an adhesive and/or by using standard cable and eye-bolts and/or other material or methods and which does not comply with [certain other provisions of the sign ordinance].

Id.

The sign ordinance imposes a blanket ban on all off-site and supergraphic signs, unless the proposed signs are "specifically permitted pursuant to a legally adopted specific plan, supplemental use district, [or] an approved development agreement." Section 14.4.4(B)(9), (11). Off-site signs are also exempt from the blanket ban if they are "specifically permitted pursuant to . . . a relocation agreement entered into pursuant to California Business and Professions Code Section 5412." Section 14.4.4(B)(11).

A separate provision of the sign ordinance regulates signs with "Freeway Exposure": "No person shall erect, construct, install, paint, maintain, and no building or electrical permit shall be issued for, any sign or sign support structure within 2,000 feet of a freeway . . . ." Section 14.4.6. This ban exempts signs that the City's "Department of Building and Safety . . . determine[s] will not be viewed primarily from a main traveled roadway of a freeway or an on-ramp/off-ramp." Id. "Viewed primarily from" a freeway means "that the message may be seen with reasonable clarity for a greater distance by a person traveling on the main traveled roadway or freeway or on-ramp/off-ramp than by a person traveling on the street adjacent to the sign." Id. This provision has two exceptions:

- Signs that "identify the building where the sign is located" are exempted, so long as "the area of the sign is not more than 50 square feet or is not larger than five percent of the area of the side of the building, which faces primarily to the freeway, which ever is greater[.]"

- Wall signs are also exempted "on which the advertising is limited to the name of any person, firm, or corporation

3

occupying the building, or the type of business, services rendered, or the name of any product manufactured or sold on the premises," so long as "[t]he total area of all wall signs on a building permitted in this subdivision shall not exceed 100 square feet [and] [a]ny one sign shall not exceed 50 square feet in area."

Id. § 14.4.6B 1, 2.  The "Freeway Exposure" provision also exempts signs that are "specifically permitted pursuant to a legally adopted specific plan, supplemental use district, [or] an approved development agreement."  Section 14.4.4(B)(9), (11).

So far, the City has enforced the sign ordinance against seven of Plaintiffs' sign locations.  The City's Orders to Comply for these sites alleged that the signs are unpermitted "supergraphic" signs. Plaintiffs have applied for permits for these sites, which have been denied.  One site at 6081 Center Drive has been subject to criminal prosecution and the City has threatened criminal prosecution for the other six sites.

This litigation has been pending since January 2007.  The City moved to dismiss Plaintiffs' initial complaint and the Court partially granted that motion, allowing Plaintiffs to pursue their facial unfettered discretion and overbreadth challenges to certain aspects of the sign ordinance.  The Court ruled that most of Plaintiffs' other challenges, including their as-applied challenges, failed because they did not allege that the City had taken (or was likely to take) any enforcement efforts against their sign sites.  After this ruling, Plaintiffs declined to file an amended complaint.

In January 2008, Plaintiffs moved for a preliminary injunction based upon claims that either had not survived the motion to dismiss or were never alleged in Plaintiffs' complaint to begin with.  To compound Plaintiffs' problems, the deadline to amend the pleadings in

4

1  the Scheduling Order had passed.  The Court declined to rule on the

2  motion for preliminary injunction, instead ordering Plaintiffs to move

3  to amend the Scheduling Order.  Plaintiffs so moved the Court, and,

4  although the Court initially denied Plaintiffs' motion to add new

5  claims to its complaint, the Court ultimately allowed Plaintiffs to

6  filed an amended and supplemental complaint adding facts to allege

7  standing and asserting new claims.  The Court also reopened discovery.

8      In lieu of filing an answer, the City filed a motion to dismiss

9  Plaintiffs' amended complaint, which the Court partially granted in

10  the June 9, 2008 Order.  The Court also partially granted Plaintiffs'

11  motion for a preliminary injunction, concluding that Plaintiffs were

12  likely to prevail on two of their claims, namely their facial

13  challenge to sections 14.4.4B(9) and 14.4.4B(11) because those

14  provisions unfettered discretion to City officials to deny signs, and

15  their as-applied challenge to section 14.4.6 because this provision

16  constitutes an impermissible restriction on commercial speech.  The

17  Court recognized that Plaintiffs had other claims that survived the

18  Court's Order, but Plaintiffs have since indicated that they will

19  abandon those additional claims in favor of the two identified above

20  should the Court grant their motion for summary judgment.  Therefore,

21  the Court will focus only on those claims in this Order.

22  **II.  LEGAL STANDARD**

23      It is the burden of the party who moves for summary judgment to

24  establish that there is "no genuine issue of material fact, and that

25  the moving party is entitled to judgment as a matter of law."  Fed. R.

26  Civ. P. 56(c); British Airways Bd. v. Boeing Co., 585 F.2d 946, 951

27  (9th Cir. 1978).  If the moving party has the burden of proof at trial

28  (the plaintiff on a claim for relief, or the defendant on an

1  affirmative defense), the moving party must make a showing sufficient

2  for the court to hold that no reasonable trier of fact could find

3  other than for the moving party.  See Calderone v. United States, 799

4  F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, Summary Judgment

5  Under the Federal Rules: Defining Genuine Issues of Material Fact, 99

6  F.R.D. 465, 487-88 (1984)).  This means that, if the moving party has

7  the burden of proof at trial, that party "must establish beyond

8  peradventure all of the essential elements of the claim or defense to

9  warrant judgment in [that party's] favor."  Fontenot v. Upjohn Co.,

10  780 F.2d 1190, 1194 (5th Cir. 1986).

11      If the opponent has the burden of proof at trial, then the moving

12  party has no burden to negate the opponent's claim.  See Celotex Corp.

13  v. Catrett, 477 U.S. 317, 323 (1986).  In other words, the moving

14  party does not have the burden to produce any evidence showing the

15  absence of a genuine issue of material fact.  Id. at 325.  "Instead .

16  . . the burden on the moving party may be discharged by 'showing' –

17  that is, pointing out to the district court – that there is an absence

18  of evidence to support the nonmoving party's case."  Id.

19      Once the moving party satisfies this initial burden, "an adverse

20  party may not rest upon the mere allegations or denials of the adverse

21  party's pleadings . . .  [T]he adverse party's response . . . must set

22  forth specific facts showing that there is a genuine issue for trial."

23  Fed. R. Civ. P. 56(e) (emphasis added).  A "genuine issue" of material

24  fact exists only when the nonmoving party makes a sufficient showing

25  to establish the essential elements to that party's case, and on which

26  that party would bear the burden of proof at trial.  Celotex, 477 U.S.

27  at 322-23.  "The mere existence of a scintilla of evidence in support

28  of the plaintiff's position will be insufficient; there must be

1  evidence on which a reasonable jury could reasonably find for

2  plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252

3  (1986).  The evidence of the nonmovant is to be believed, and all

4  justifiable inferences are to be drawn in favor of the nonmovant.  Id.

5  at 248.  However, the court must view the evidence presented to

6  establish these elements "through the prism of the substantive

7  evidentiary burden."  Id. at 252.

8  **III. DISCUSSION**

9      This case involves no disputed facts and Defendants have provided

10  no persuasive reason why the Court should deviate from its decision

11  granting Plaintiffs' motion for preliminary injunction.  As a result,

12  the foregoing analysis largely tracks the Court's June 9, 2008 Order.

13      **A.    Plaintiffs' Facial Unfettered Discretion Challenge to**

14          **Sections 14.4.4(B)(9) and 14.4.4(B)(11)**

15      Plaintiffs move for summary judgment on their claims that the

16  exceptions to the off-site and supergraphic sign bans found in Section

17  14.4.4(B)(9) and 14.4.4(B)(11) as giving the City unfettered

18  discretion to restrict speech.  An ordinance violates the First

19  Amendment "[w]here the licensing official enjoys unduly broad

20  discretion in determining whether to grant or deny a permit."  G.K.

21  Ltd. Travel v. City of Lake Oswego, 436 F.3d 1064, 1082 (9th Cir.

22  2006) (quoting Thomas v. Chicago Park Dist., 534 U.S. 316, 323

23  (2002)).  For this reason, "a law cannot condition the free exercise

24  of First Amendment rights on the 'unbridled discretion' of government

25  officials."  Desert Outdoor Advertising v. City of Moreno Valley, 103

26  F.3d 814, 818 (9th Cir. 1996).  "This requirement seeks to 'alleviate

27  the threat of content-based, discriminatory enforcement that arises

28  where the licensing official enjoys unduly broad discretion in

7

1    determining whether to grant or deny a permit.'" Outdoor Media Grp.,

2    Inc. v. City of Beaumont, 506 F.3d 895, 903-04 (9th Cir. 2007)

3    (quoting G.K. Ltd. Travel, 534 F.3d at 1082).  Therefore, a regulation

4    must "contain adequate standards to guide the official's decision and

5    render it subject to effective judicial review." Id. at 904.

6        Three Ninth Circuit cases guide the Court's analysis in the

7    specific context of billboard regulations like the sign ordinance at

8    issue here. See id.; Desert Outdoor, 103 F.3d at 818-19; G.K. Ltd.

9    Travel, 436 F.3d at 1082-84.  First, in Outdoor Media, the plaintiff

10   sought a permit under a scheme that allowed city officials to approve

11   a permit application within 15 days if it was "in conformance with

12   this Chapter and [] consistent with its intent and purpose." Outdoor

13   Media, 506 F.3d at 904.  The "intent and purpose" of the City's sign

14   ordinance included "encouraging 'a desirable urban character which has

15   a minimum of overhead clutter,' enhancing the 'economic value of the

16   community and each area thereof through the regulation of the size,

17   number, location, design and illumination of signs,' and encouraging

18   'signs which are compatible with on-site and adjacent land uses.'"

19   Id. (quoting sign ordinance).  The sign ordinance defined off-site

20   signs as the City does here, and the city in that case also had a

21   restriction on freeway-visible signage: "the planning commission could

22   grant permits for freeway-facing signs only if the signs are 'located

23   upon or within five hundred (500) feet of the property upon which the

24   use identified is located' and 'in the vicinity of a freeway

25   interchange and within three hundred (300) feet of the freeway right-

26   of-way and six hundred (600) feet of the intersecting street right-of-

27   way.'" Id. (quoting sign ordinance).  Moreover, the city officials

28   granting the permits were required to make "specific findings"

1  regarding the "proposed height in relation to the freeway elevation,
2  the number and spacing of signs in the area, and the sign's height,
3  design, and location in relation to its proposed use." Id. Finally,
4  the sign ordinance at issue required any signs to be "'compatible with
5  the style and character of existing improvements upon lots adjacent to
6  the site,' including incorporating specific visual elements such as
7  type of construction materials, color, or other design detail." Id.
8      The court in Outdoor Media concluded that these provisions
9  provided sufficient guidance to eliminate the risk of unfettered
10 discretion.  First, the definition of "off-site" signs in the
11 ordinance was "sufficiently clear to guide [the city official's]
12 discretion, particularly when coupled with the additional restrictions
13 governing freeway-facing signs." Id.  The city official's discretion
14 was also "cabined by specific findings regarding the relationship of
15 the sign to the site, the freeway, and other signs in the area." Id.
16 at 904-05.  Notably, the court concluded that, although the "design
17 review criteria are 'somewhat elastic and require reasonable
18 discretion to be exercised by the permitting authority, this alone
19 does not make the Sign Code an unconstitutional prior restraint.'"
20 Id. at 905 (quoting G.K. Ltd. Travel, 436 F.3d at 1083).
21     In Desert Outdoor, the plaintiffs challenged a sign ordinance
22 that conditioned a permit on a finding that it "will not have a
23 harmful effect upon the health or welfare of the general public and
24 will not be detrimental to the welfare of the general public and will
25 not be detrimental to the aesthetic quality of the community or the
26 surrounding land uses." 103 F.3d at 817.  Unlike Outdoor Media, the
27 court in this case invalidated the ordinance because it gave officials
28 unfettered discretion based on these "ambiguous and subjective

9

1  reasons," because it contained "no limits on the authority of City

2  officials to deny a permit," and because it allowed officials to deny

3  an application "without offering any evidence to support the

4  conclusion that a particular structure or sign is detrimental to the

5  community."   Id. at 818, 819.

6      Finally, in G.K. Ltd. Travel, the plaintiffs challenged a sign

7  ordinance that required: "[S]igns must be compatible with other nearby

8  signs, other elements of street and site furniture and with adjacent

9  structures.  Compatibility shall be determined by the relationships of

10  the elements of form, proportion, scale, color, materials, surface

11  treatment, overall sign size and the size and style of lettering."

12  436 F.3d at 1082 n.15.  The ordinance required processing of an

13  application within 14 days and provided for appeal of a denial to the

14  city council.  Id. at 1083.  Moreover, the ordinance provided that

15  "[a]pproval or denial of a [minor development permit] application

16  shall be accompanied by written findings that explain the criteria and

17  standards considered relevant to the decision, state the facts relied

18  upon in rendering the decision and explain the justification for the

19  decision based on the criteria, standards, and facts set forth."  Id.

20  (brackets in original).

21      Like Outdoor Media, the court in G.K. Ltd. Travel concluded that

22  these facts sufficiently reigned in discretion so as to prevent any

23  First Amendment violations.  Specifically, the court reasoned that

24  using "compatibility" as the standard for a permit denial was

25  sufficiently definite because the term was defined in the ordinance

26  and the ordinance contained specific factors upon which the city

27  official could determine "compatibility," such as "form, proportion,

28  scale, color, materials, surface treatment, overall sign size and the

10

1  size and style of the lettering." Id. The court also reasoned that

2  requiring prompt adjudication and requiring a specific statement of

3  reasons for denial "ensures that the compatibility determination is

4  properly limited in scope and allows the Sign Code to be 'enforceable

5  on review.'" Id. (citing Chicago Park Dist., 534 U.S. at 324).

6  　　　　As this Court concluded on two previous occasions, three

7  considerations emerge from these cases to determine whether an

8  ordinance confers unfettered discretion in violation of the First

9  Amendment: (1) whether the ordinance contains "reasonably specific"

10  criteria on which a denial may rest; (2) whether the ordinance

11  outlines objective factors to consider in denying an application under

12  the "reasonably specific" criteria; and (3) whether the ordinance

13  requires officials to "state the reasons for his or her decision to

14  either grant or deny a permit so as to facilitate effective review of

15  the official's determination," which allows the determination to be

16  "enforceable on review." See id.; Desert Outdoor, 103 F.3d at 818-19.

17  　　　　Consistent with its ruling at the preliminary injunction stage,

18  the Court concludes that the specific plan, supplemental use district,

19  and development agreement exceptions contained in Sections

20  14.4.4(B)(9) and (11) fall much closer to the ordinance invalidated in

21  Desert Outdoor than the ordinances upheld in G.K. Ltd. Travel and

22  Outdoor Media, but that the relocation agreement exception in section

23  14.4.4(B)(11) does not grant the City unfettered discretion to deny

24  signs based on content. The Court will discuss each of these

25  exceptions in turn.

26  　　　　　　1.　　Specific Plans that Permit Off-Site and Supergraphic

27  　　　　　　　　　Signs

28  　　　　The City explains that it is required by state law to adopt a

11

1 | "general plan" that includes a land-use element that "designates the

2 | proposed general distribution and general location and extent of the

3 | uses of the land . . . ." Cal. Govt. Code §§ 65300, 65302. A

4 | "specific plan" is used to implement and refine a city's "general

5 | plan," but must also be consistent with the City's general plan. See

6 | id. § 65450; DeVita v. County of Napa, 9 Cal. 4th 763, 803 (1995).

7 | Specific plans are created by the City Council. Los Angeles City

8 | Charter § 558.[3]

9 |     The City first argued in opposition to Plaintiffs' preliminary

10 | injunction motion that a specific plan is not a permitting scheme, so

11 | Plaintiffs may not bring an unfettered discretion challenge. Yet the

12 | two cases the City cites for this proposition, City of Lakewood v.

13 | Plain Dealer Publ'g Co., 486 U.S. 750, 781-82 (1988) (White, Stevens,

14 | O'Connor, JJ., dissenting) and Get Outdoors II, LLC v. City of San

15 | Diego, 506 F.3d 886, 894 (9th Cir. 2007), do not support this

16 | conclusion. In both of those cases, the laws at issue were permitting

17 | schemes, so the Courts never needed to decide the question posed by

18 | the City here. In any event, there is no logical or legal reason to

19 | limit unfettered discretion challenges only to statutes that, on their

20 | face, are explicit permitting schemes. Unfettered discretion can come

21 | in many forms, but its hallmark is the grant of authority to approve

22 | or deny speech with a concomitant failure to adopt standards to cabin

23 | that authority to decisions based on factors other than the content of

24 | speech. See City of Lakewood, 486 U.S. at 759 ("Standards provide the

25 | guideposts that check the licensor and allow courts quickly and easily

26 | to determine whether the licensor is discriminating against disfavored

27 |

28 |     [3]The Court previously took judicial notice of this document.

1    speech."). To limit these challenges to pure licensing schemes would

2    simply push cities and states to adopt creative measures that do not,

3    on their face, look much like traditional permitting or licensing

4    ordinances, but still grant officials unfettered discretion to allow

5    or deny speech based on its content. As discussed below, this case is

6    a perfect example of a non-traditional scheme that nevertheless

7    creates broad unfettered discretion to limit speech based on content.

8        Without providing much detail, the City next argued that, because

9    a specific plan must be legislatively adopted and applies only to

10   specific geographic areas of the City, it passes First Amendment

11   muster. The City again has missed the point of Plaintiffs' challenge.

12   Whether the specific plans apply to any particular geographic area is

13   largely irrelevant if the City can adopt a specific plan with no

14   discernable standards to cabin the City's discretion. In other words,

15   the City can avoid the blanket ban on off-site and supergraphic signs

16   simply by enacting a specific plan in a certain area, but there are no

17   standards that would prevent the City from enacting a specific plan

18   because it wishes to approve particular speech or a particular

19   speaker, or conversely, decline to enact a specific plan because it

20   disagrees with particular speech or a particular speaker. This is the

21   precise evil the prohibition on unfettered discretion was meant to

22   prevent and the City has failed to demonstrate that this evil is

23   absent here. See id.[4]

24   _____

25       [4]The Court also previously rejected the City's specious argument
     that the exceptions to the off-site and supergraphic sign ban do not
26   create the risk of self-censorship. The risk of self-censorship is
     always present in an ordinance that grants a municipality unfettered
27   discretion. See City of Lakewood, 386 U.S. at 758 (requiring
     objective standards for approving speech because they add "an element
28                                                          (continued...)

13

1    The City's analogy to <u>Outdoor Systems, Inc. v. City of Mesa</u>, 997

2  F.2d 604 (9th Cir. 1993) is unavailing.  That case involved a

3  challenge to two sign ordinances, one of which imposed a blanket ban

4  on all off-site signs and the other which restricted off-site signs in

5  some parts of the City but not others.  The City argued that this case

6  supports its argument that a mere "geographic" restriction on off-site

7  signs is valid.  Even if that were true under <u>Outdoor Systems</u>, the

8  City's specific plan exception goes far beyond a geographic

9  limitation.  True, a specific plan is defined by geographic

10  boundaries, but nothing prevents the City from drawing those

11  geographic boundaries so as to allow certain speech and speakers it

12  favors and prohibit others it disfavors.  The mere geographic

13  limitation here does nothing to prevent the unfettered discretion that

14  the First Amendment prohibits and <u>Outdoor Systems</u> did not address this

15  specific question.  Therefore, summary judgment is warranted in

16  Plaintiffs' favor on this point.

17    2.  <u>Supplemental Use Districts that Permit Off-Site and</u>

18    <u>Supergraphic Signs</u>

19    Supplemental Use Districts ("SUDs") may only be created by the

20  City Council and are designed to "regulate and restrict the location

21  of certain types of uses whose requirements are difficult to

22  anticipate and cannot adequately be provided for in the 'Comprehensive

23

24  _____

25    [4](...continued)
of certainty fatal to self-censorship.").  In any event, this risk is
26  primarily relevant to proving injury (and thus standing) to bring an
unfettered discretion challenge without the municipality actually
27  subjecting the plaintiff to the challenged law.  Once the plaintiff
can point to the risk of self-censorship, the relevant inquiry is
28  whether objective standards exist to cabin unfettered discretion.

1  Zoning Plan.'"  LAMC § 12.32 C, S1(a).[5]  The type of SUD at issue here

2  is called a "sign district."  Id. § 12.32 S1(b).  The LAMC imposes

3  some restrictions on where these districts can be created:

   (1)  they may only be established where "high intensity uses" are
        permitted, which include "only properties in the C
        [commercial] or M [industrial] Zones, except that R5
        [multiple dwelling] Zone properties may be included in a
        'SN' sign district provided that the R5 zoned lot is located
        within an area designated on an adopted community plan as a
        'Regional Center,' 'Regional Commercial,' or 'High Intensity
        Commercial,' or within any redevelopment project area"; and

   (2)  they may not "contain less than one block or three acres in
        area, whichever is the smaller."

Id. § 13.11B.  The provision permitting the City to enact an SUD sign

district provides that it must be "designed to enhance the theme or

unique qualities of that district, or which eliminate blight through a

sign reduction program."  Id. § 13.11A.  Most important:

   The sign regulations shall enhance the character of the
   district by addressing the location, number, square footage,
   height, light illumination, hours of illumination, sign
   reduction program, duration of signs, design and types of
   signs permitted, as well as other characteristics, and can
   include murals, supergraphics, and other on-site and off-
   site signs.

Id. § 13.11C.

    The City argued that this provision provides no discretion to

grant or deny permission to erect signs within an SUD, but only the

ability to create an SUD.  According to the City, Plaintiffs should

only challenge an SUD if it does not provide the appropriate objective

criteria for allowing off-site and supergraphic signs.  Again, the

City misunderstands Plaintiffs' challenge.  Certainly if Plaintiffs'

signs are located within an SUD that does not provide the appropriate

objective criteria for allowing signs, they may challenge it under the

_____

[5]The Court previously took judicial notice of this document.

15

1  First Amendment.  But here, Plaintiffs are challenging the lack of

2  standards by which the City can create an SUD in the first place.

3  Should the City wish to permit (or deny) the content of proposed

4  signage or signs from a particular speaker, Plaintiffs argue that the

5  SUD exception to the ban on off-site and supergraphic signs allows it

6  to do so simply by enacting an SUD.

7      At first glance, the guidelines in subsection C appear to save

8  this provision and provide the necessary objective criteria to cabin

9  discretion in SUDs and sign districts.  As in Outdoor Media and G.K.

10 Ltd. Travel, these specific guidelines are sufficiently concrete to

11 provide little leeway in permitting signs and they contain objective

12 criteria to guide officials' permitting decisions.  Most important,

13 these guidelines are concrete enough that an official is compelled to

14 provide a specific, content-neutral reason for a permit denial and a

15 court can easily review that decision to determine if it was based

16 upon the permissible criteria in subsection C or based upon

17 impermissible content-based considerations.

18     While this might end the Court's inquiry, the City has provided

19 itself a loophole that eviscerates the standards it has set out in

20 this provision: "However, the regulations for a 'SN' Sign District

21 cannot supersede the regulations of an Historic Preservation Overlay

22 District, **a legally adopted specific plan**, supplemental use district

23 or zoning regulation needed to implement the provisions of an approved

24 development agreement."  LAMC § 13.11C (emphasis added).  In other

25 words, even though the City may create a sign district, it may also

26 eliminate that sign district (and its attendant permitting guidelines)

27 simply by enacting a specific plan.  The Court has invalidated the

28 specific plan exception above, and this "exception to the exception"

16

1  that can change a sign district into a district covered by a specific

2  plan must also be invalidated.  The City has set up a system that

3  allows it to eliminate speech based on content, despite the objective

4  criteria contained in the sign district provision, and it cannot

5  stand.  Therefore, Plaintiffs are entitled to summary judgment on this

6  point.

7          3.    Development Agreement Exception

8          As the specific plan exception goes, so goes the development

9  agreement exception.  A development agreement essentially freezes

10  development laws at the time the agreement is executed.  See Cal.

11  Govt. Code § 65866 ("Unless otherwise provided by the development

12  agreement, rules, regulations, and official policies governing

13  permitted uses of the land, governing density, and governing design,

14  improvement, and construction standards and specifications, applicable

15  to development of the property subject to a development agreement,

16  shall be those rules, regulations, and official policies in force at

17  the time of execution of the agreement.").  Notably, "[a] development

18  agreement shall not be approved unless the legislative body finds that

19  the provisions of the agreement are consistent with the general plan

20  and any applicable specific plan."  Id. § 65867.5(b).

21          The Court has invalidated the specific plan exception to the

22  blanket off-site and supergraphic sign ban, and that provision takes

23  down the development agreement exception with it.  The specific plan

24  legislative mechanism allows the City to enact a specific plan to

25  allow or deny signs without objective criteria, and because a

26  development agreement must be consistent with that specific plan, it

27  too is not cabined by specific objective criteria to permit or deny

28  signs.

1    The Court notes that, other than its contingency on a specific

2    plan, this provision appears to be valid and unrelated to restricting

3    speech.  Plaintiffs argue that California Government Code section

4    65865.2 allows the City to restrict speech because the development

5    agreement "may include conditions, terms, restrictions and

6    requirements for subsequent discretionary actions."  However, the

7    Court finds Plaintiffs' concerns unlikely under this provision.  This

8    statute governs the terms of any agreement and the Court can presume

9    that, under this provision, the City will not include terms that would

10   allow it to restrict speech based on its content.  Moreover, even

11   though the statute allows the City to adopt restrictions for

12   subsequent discretionary actions, a development agreement is still an

13   agreement, subject to at least some negotiation, so any potential risk

14   of the City reserving discretion to deny signs based on content will

15   likely fail in that negotiation process.  Other than the express

16   recognition of a potentially invalid specific plan, this development

17   agreement exception to the ban on off-site and supergraphic signs is

18   more properly subject to an as-applied challenge between the City and

19   a signatory to the agreement.  Plaintiffs have not mounted that

20   challenge here.  Therefore, although the provision is otherwise valid,

21   Plaintiffs have nevertheless demonstrated a likelihood of success in

22   their unfettered discretion challenge to this provision because the

23   development agreement exception can be tied to the specific plan

24   exception.

25        4.    Relocation Agreement Exception for Off-Site Signs Under

26              Section 14.4.4(B)(11)

27        Off-site signs are also exempt from the blanket ban pursuant to

28    "a relocation agreement entered into pursuant to California Business

18

1  and Professions Code Section 5412." LAMC § 14.4.4(B)(11). The Court

2  previously concluded that Plaintiffs could not demonstrate a

3  likelihood of success on the merits of this claim and ultimately

4  dismissed this challenge with prejudice. Therefore, Plaintiffs are

5  not entitled to summary judgment on this claim.

6            5.   <u>Interference with Legislative Prerogative</u>

7       For the first time in opposition to summary judgment, the City

8  argues that the Court's invalidation of these provisions violates

9  separation of powers principles and impinges on the City's legislative

10  prerogative to pass laws governing signage. The City relies on two

11  cases to support its argument, neither of which persuades the Court to

12  deviate from its prior ruling. See <u>Associated Gen. Contractors of</u>

13  <u>Amer. v. City of Columbus</u>, 172 F.3d 411 (6th Cir. 1999); <u>New Orleans</u>

14  <u>Water Works Co. v. City of New Orleans</u>, 164 U.S. 471 (1896). In both

15  of these cases, the Courts rejected injunctions that purported to

16  enjoin legislative bodies from passing future legislation. See

17  <u>Associated Gen. Contractors</u>, 172 F.3d at 418 (citing <u>New Orleans Water</u>

18  <u>Works</u> and stating: "The Supreme Court consistently has held that 'a

19  court of equity cannot properly interfere with, or in advance

20  restrain, the discretion of a municipal body while it is in the

21  exercise of powers that are legislative in their character."). Here,

22  the Court has not enjoined the City from enacting any new sign

23  provisions. Rather, the Court has invalidated the exceptions adopted

24  by the City that afford it unfettered discretion to decide when signs

25  will be permitted pursuant to a specific plan. Consistent with

26  <u>Associated General Contractors</u> and <u>New Orleans Water Works</u>, the Court

27  certainly will not (and cannot) prevent the City from enacting

28  legislative guidelines to address the constitutional infirmity of

1  these exceptions, but the legislation, as it has been enacted, is

2  unconstitutional.

3          6.    Severability of the Exceptions in Sections 14.4.4(B)(9)

4                and 14.4.4(B)(11)

5          After concluding at the preliminary injunction stage that the

6  exceptions in section 14.4.4(B)(9) and three of the four exceptions in

7  section 14.4.4(B)(11) were invalid, the Court ruled that those

8  provisions were not severable from the rest of the sign ordinance.

9  The Court finds that this is still the case.  The Court must look to

10 state law to determine whether a provision is severable.  See Qwest

11 Commc'ns, Inc. v. City of Berkeley, 433 F.3d 1253, 1259 (9th Cir.

12 2006).  "Under California law, the presence of a severability clause

13 coupled with the ability functionally, mechanically, and grammatically

14 to sever the invalid portion from the valid portions of an enactment

15 ordinarily will allow severance but only if the remainder of the

16 enactment is complete in itself and would have been adopted without

17 the invalid portion."  Id.  If the law contains a severability clause,

18 the Court still must look to these factors.  See MHC Fin. Ltd. P'ship

19 Two v. City of Santee, 125 Cal. App. 4th 1372, 1393 (2005) ("When the

20 ordinance contains a severability clause, an invalid provision is

21 severable if it is grammatically, functionally, and volitionally

22 separable.");  Metromedia, Inc. v. City of San Diego, 32 Cal. 3d 180,

23 190 (1982) (Metromedia II) (stating that, even in light of a

24 severability clause, "[t]he final [severability] determination depends

25 on whether the remainder . . . is complete in itself and would have

26 been adopted by the legislative body had the latter forseen [sic] the

27 partial invalidation of the statute . . . or constitutes a completely

28 operative expression of the legislative intent . . . [and] are [not]

1  so connected with the rest of the statute as to be inseparable."

2  (internal citations omitted; ellipses and brackets in original)).  If

3  any one of these three requirements is not met, then the provision is

4  not severable.  See, e.g., People v. Library One, Inc., 229 Cal. App.

5  3d 973, 989 (1991) (declining to address volitional severability

6  because the invalid provision was not functionally severable).

7  Plaintiffs contend that the invalid exceptions to the blanket off-site

8  and supergraphic sign bans are not functionally and volitionally

9  severable, and the Court agrees.[6]

10      A provision is functionally severable if the remaining provisions

11  "stand on their own, unaided by the invalid provisions nor rendered

12  vague by their absence nor inextricably connected to the [invalid

13  provisions] by policy considerations."  Id.  The sign ordinance was

14  enacted specifically to "promote pubic safety and welfare" by

15  regulating the design and construction of signs, on the one hand, and

16  "equalizing the opportunity for messages to be displayed" on the

17  other.  LAMC § 14.4.1.  The detail of the sign ordinance itself

18  suggests that the City sought to strike this balance between

19  permitting commercial messages and preserving the safety and

20  aesthetics of the City.  Severing the exceptions in the ban on off-

21  site and supergraphic signs would upset this policy balance that the

22  City attempted to achieve and would, in effect, cause the Court to

23  legislate a blanket ban that the City did not itself enact.  See

24  Metromedia II, 32 Cal. 3d at 191 (refusing to sever invalid billboard

25  provisions because doing so would "leave the city with an ordinance

26

27      [6]The parties agree that the exceptions are grammatically
    severable because they "can be cleanly excised from the remainder of
    the statute without affecting the wording of any other provision."
28  National Broiler Council v. Voss, 44 F.3d 740, 749 (9th Cir. 1994).

1   different than it intended"). The City's interests lie in balancing

2   the dissemination of messages against the preservation of safety and

3   aesthetics, and severing the exceptions to these blanket bans would

4   upset that balance.

5       Likewise, these exceptions are not volitionally severable because

6   the City likely would not have enacted these blanket bans had it

7   foreseen that their exceptions would be invalidated. See Mendoza v.

8   California, 149 Cal. App. 4th 1034, 1063 (2007). While the City

9   sought to ban off-site and supergraphic signs, it clearly did not

10  intend for those bans to eliminate all of these signs. In fact, the

11  City seems to have utilized the exceptions to these bans numerous

12  times and in numerous areas to generate revenue for the City, probably

13  reaching into the millions of dollars. Invalidating these exceptions

14  but not the blanket bans would, with a stroke of the Court's pen,

15  eliminate these revenue streams. Nothing in the sign ordinance

16  suggests that the City would have imposed blanket bans, although

17  permitted, see Outdoor Systems, 997 F.2d at 611, at the expense of its

18  ability to allow some signs and not others.

19      The City also sent only a weak legislative signal that these

20  exceptions may be severed by enacting a mere general severability

21  clause. See LAMC § 11.00(k). As Plaintiffs correctly point out,

22  despite this provision, the City has routinely tacked on specific

23  severability clauses to individual code provisions. See, e.g., LAMC §

24  12.70(F) (Adult Entertainment Zoning); § 16.05(J) (Site Plan Review);

25  § 41.23.6 (Trespass on Housing Authority Property). Given the clear

26  legislative intent to strike a balance between permitted and

27  prohibited signage, the Court can presume that the City would have

28  specifically enacted a severability clause somewhere in the sign

22

1 ordinance as it did elsewhere if it harbored a desire to enact the

2 blanket bans absent their exceptions. Cf. Sanford v. Memberworks,

3 Inc., 483 F.3d 956, 965 (9th Cir. 2007) ("Where Congress includes

4 particular language in one section of a statute but omits it in

5 another . . . it is generally presumed that Congress acts

6 intentionally and purposely in the disparate inclusion or

7 exclusion.").

8     Severing the invalid exceptions here is particularly

9 inappropriate because it would effectively require "the State to

10 restrict more speech than it currently does." Rappa v. New Castle

11 Cty., 18 F.3d 1043, 1072-73 (3d Cir. 1994) (emphasis in original). In

12 Rappa, the court found invalid several exceptions to a ban on

13 commercial signs within 25 feet of any public highway, but declined to

14 sever those provisions from the blanket ban because the net effect

15 would restrict more speech than the county had originally intended.

16 The court noted that the severability question had a "constitutional

17 dimension": "We refuse to strike down the exception in part because of

18 the special status of speech in our constitutional scheme, a scheme

19 which generally favors more speech." Id. at 1073. The court also

20 recognized the disincentives created by severing the invalid

21 exceptions because, even if a litigant successfully challenges those

22 invalid exceptions, it still would be unable to erect signs under the

23 remaining blanket ban. Id. Notably, the court refused to cause such

24 a result absent a much clearer legislative signal than a mere general

25 severability clause (much like the one enacted by the City here). Id.

26     The City advances only one additional point on severability in

27 opposition to summary judgment: because the Court was primarily

28 concerned with the specific plan exemption, that provision can be

23

1  severed and the sign district and development agreement exceptions,

2  along with the rest of the sign ordinance, may remain in place.

3  However, as discussed above, the specific plan exemption is so

4  integrated into the fabric of the sign ordinance that the Court cannot

5  extricate it without undermining the entire scheme. Perhaps this is

6  best illustrated by the City's own contention that the sign district

7  and development agreement exemptions themselves incorporate and rely

8  on the specific plan provision.  To sever the specific plan exception

9  would legislate new meaning into the sign ordinance, a step the Court

10  will not take.  As it did at the preliminary injunction stage, the

11  Court concludes that the exceptions in section 14.4.4(9) and three of

12  the four exceptions in section 14.4.4(11) are not severable from the

13  blanket ban on off-site and supergraphic signs, so those entire

14  provisions must be invalidated and enjoined.[7]

15       **B.    Plaintiffs' Central Hudson Challenge to Section 14.4.6**

16       Plaintiffs also seek summary judgment on their challenge to the

17  section 14.4.6 Freeway Exposure provision as an impermissible

18  restriction on commercial speech under Central Hudson Gas & Elec.

19  Corp. v. Public Serv. Comm'n, 447 U.S. 557 (1980) ("Central Hudson").

20  The Court previously ruled that Plaintiffs had demonstrated a

21  likelihood of prevailing on this claim, and the Court now finds that

22  they are entitled to summary judgment on this claim.

23       The Supreme Court's Central Hudson case set out the four-part

24  test for regulating commercial speech: (1) whether the speech concerns

25  lawful activity and is not misleading; (2) whether the restriction

26

27       [7]The Court previously dismissed Plaintiffs' challenge to the
    relocation agreement exception in section 14.4.4(B)(11) so the Court
28  will not enjoin enforcement of that provision.

24

1  seeks to implement a substantial government interest; (3) whether the

2  restriction directly advances that interest; and (4) whether the

3  restriction reaches no further than necessary to accomplish the

4  government's stated objectives.  447 U.S. at 566.  The City's stated

5  interests in the Freeway Exposure provision are safety and aesthetics,

6  which Plaintiffs do not challenge.  Nor does the City argue that

7  Plaintiffs' signs concern unlawful activity or are misleading.

8  Rather, the parties dispute the last two prongs of the Central Hudson

9  test.[8]

10     The City's Freeway Exposure provision must have "a reasonable fit

11  between the restriction and the goal" and must "include a means

12  narrowly tailored to achieve the desired objective."  Ballen v. City

13  of Redmond, 466 F.3d 736, 742 (9th Cir. 2006) (citations and

14  quotations omitted).  However, "[a] regulation need not be absolutely

15  the least severe that will achieve the desired end, but if there are

16  numerous and obvious less-burdensome alternatives to the restriction

17  on commercial speech, that is certainly a relevant consideration in

18  determining whether the fit between ends and means is reasonable."

19  Id. (quoting City of Cincinnati v. Discovery Network, Inc., 507 U.S.

20  410, 417 n.13 (1993)).  Plaintiffs argue that, despite the prohibition

21

22     [8]The City argues for the first time that, although Plaintiffs
23  maintain signs within 2000 feet of a main traveled roadway, Plaintiffs
    have presented insufficient evidence to suggest that their signs will
24  also be "primarily viewed from a main traveled roadway" as required by
    section 14.4.6.  Put to its proof, Plaintiffs, in their reply, have
25  provided testimony and photographs conclusively establishing that they
    have signs that fall within section 14.4.6.  The City has provided no
26  contrary evidence to create a factual dispute.  In any event, the
    Court finds it highly implausible that Plaintiffs' signage, which is
27  commercial in nature, would not be situated to be viewed primarily
    from a main traveled roadway, since that positioning maximizes sign
28  exposure.

1  on commercial signs within 2,000 feet of a freeway, the City routinely

2  exempts some commercial signs from this restriction while permitting

3  others, which violates the Central Hudson test.

4      Plaintiffs rely on Ballen, where the court invalidated a ban on

5  portable and off-site signs under Central Hudson in part because the

6  prohibition facially exempted certain other commercial signs from that

7  prohibition.  The Ballen court relied on Discovery Network, where the

8  Supreme Court invalidated a law that prohibited all commercial news

9  racks but allowed non-commercial news racks.  The Court found that

10 this selective ban created a distinction that had "no relationship

11 whatsoever to the particular interests that the city has asserted" in

12 safety and aesthetics.  Discovery Network, 507 U.S. at 424 (emphasis

13 in original).  The court in Ballen then focused on the several

14 exceptions to the ban on off-site signs to conclude that those

15 permitted signs posed no less of a traffic and safety hazard that the

16 other signs banned under the ordinance.  466 F.3d at 743.  The court

17 also found the exceptions impermissibly content-based, which further

18 undercut the ordinance's narrow tailoring.  See id. at 743; Discovery

19 Network, 507 U.S. at 417 (stating that, by enacting a content-based

20 restriction, the city had "not carefully calculated the costs and

21 benefits associated with the burden on speech imposed by its

22 prohibition.").

23     The City relies on Outdoor Systems, Inc. v. City of Mesa, 997

24 F.2d 604 (9th Cir. 1993) to argue that the Freeway Exposure provision

25 is a valid blanket ban of off-site and supergraphic signs within 2,000

26 feet of a freeway.  In that case, the plaintiffs challenged two

27 ordinances, one in Tucson that classified signs as either on-site or

28 off-site, limited the size and number of on-site signs, and limited

26

1  off-site signs primarily to commercial and industrial areas and within

2  certain zoning classifications of the city. Id. at 608. The

3  plaintiffs also challenged an ordinance in the city of Mesa that

4  distinguished between on-site and off-site signs and prohibited off-

5  site signs entirely. Id. at 608. The Ninth Circuit upheld the Tucson

6  ordinance because it limited regulation of off-site signs to the

7  "noncommunicative aspects" of those signs and upheld both ordinances,

8  despite certain exemptions, because it "does not follow from the fact

9  that the [cities] have concluded that some commercial interests

10 outweigh [their] municipal interests . . . that [they] must give

11 similar weight to all other commercial advertising." Id. at 611

12 (quoting Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 512, 541

13 (1981) (plurality opinion; Stevens, J., joining on this point)). Most

14 important, the court found these ordinances reasonably fit with the

15 cities' traffic safety and aesthetics concerns because "the cities

16 have stopped short of achieving their goals because they have not

17 banned outdoor signs entirely." Id. (citing Metromedia, 453 U.S. at

18 508).

19      Neither Ballen nor Outdoor Systems quite answers the question

20 posed by Plaintiffs, however. Here, Plaintiffs are not challenging

21 the Freeway Exposure sign as facially discriminating against

22 commercial messages, the primary issue in Ballen and Outdoor Systems.

23 Rather, Plaintiffs here claim that the way in which the City has

24 applied the Freeway Exposure ban discriminates against certain

25 commercial speech and speakers, some of which the City has approved

26 and some of which the City has prohibited. See Desert Outdoor, 506

27 F.3d at 805 (noting that an as-applied challenge involves

28 "discriminatory enforcement of a speech restriction [that] amounts to

27

1  viewpoint discrimination in violation of the First Amendment.  It is

2  for this reason that a successful as-applied challenge does not render

3  the law itself invalid, but only the particular application of the

4  law.  An as-applied challenge goes to the nature of the application

5  rather than the nature of the law itself.").

6      For this as-applied challenge, Plaintiffs properly rely on

7  Greater New Orleans Broadcasting Ass'n v. United States, 527 U.S. 173

8  (1999), where the Supreme Court invalidated commercial speech

9  regulations that the government justified by pointing to specific

10 interests even though those interests were directly undermined by

11 other governmental policies.  In that case, the FCC had banned

12 advertising featuring privately owned commercial casino gambling.  Id.

13 at 180.  The FCC refused to permit New Orleans broadcasters to run

14 private gambling advertising because the broadcast signals could reach

15 into states where gambling was prohibited and undermined the

16 government's interest in preventing the spread of casino gambling and

17 the social costs attached to these activities.  Id.  The Court

18 ultimately invalidated this ban because it did not reasonably fit the

19 government's interests.  Id. at 189.  The government maintained a

20 clear policy of giving "simultaneous encouragement of tribal casino

21 gambling," which worked directly at cross purposes with its stated

22 interest in preventing the spread of gambling and the attendant

23 societal ills.  Id.  "[A]ny measure of the effectiveness of the

24 Government's attempt to minimize the social costs of gambling cannot

25 ignore Congress' simultaneous encouragement of tribal casino gambling,

26 which may well be growing at a rate exceeding any increase in gambling

27 or compulsive gambling that private casino advertising could produce."

28 Id.  Absent a reasonable fit between the government's ban and its

1  stated interests, the commercial speech ban did not survive the

2  application of Central Hudson.  Id. at 195.

3      The district court in Metro Lights, LLC v. City of Los Angeles,

4  488 F. Supp. 2d 927 (C.D. Cal. 2006) applied this "cross purposes"

5  principle to invalidate the City's ban on newly constructed off-site

6  signs for the purposes of safety and aesthetics, since the City

7  simultaneously allowed thousands of off-site signs under an exclusive

8  contract with a single speaker.  Id. at 943.  The court relied on

9  Greater New Orleans to conclude that "[t]he City, on the one hand,

10 enacted the Sign Ordinance for the express purpose of promoting

11 traffic safety and eliminating visual clutter, while, on the other

12 hand, awarded a large contract that permits its contractor to do

13 precisely what its Ordinance prohibits.  In short, the two operate at

14 cross purposes."  Id. at 945.  This met neither Central Hudson's third

15 prong of advancing the City's interests nor the fourth prong of

16 reasonable fit.  Id. at 947-50.

17      Like the plaintiffs in Greater New Orleans and Metro Lights,

18 Plaintiffs here have persuasively demonstrated that, despite the

19 City's interests in safety and aesthetics that support its ban on

20 signs within 2,000 feet of a freeway, the City has permitted giant

21 commercial billboards in these areas that directly undermine those

22 interests.  Plaintiffs point to five specific examples: an electronic

23 sign near Staples Center; billboards in the 15th Street Signage

24 Supplemental Use District; a 10,000 square foot supergraphic sign at

25 939 S. Figueroa Street; the "Freeway Overture" sign, depicting members

26 of the Los Angeles Chamber Orchestra; and a sign at 1100 Wilshire

27 Boulevard.  The first two examples directly support Plaintiffs'

28 argument, which is sufficient to demonstrate a First Amendment

29

1  violation.

2         The electronic pole sign at the Staples Center changes messages

3  frequently and can easily be seen from both directions of the 110

4  Harbor Freeway.   This sign was permitted 10 years ago pursuant to an

5  ordinance that required, in exchange for the signs permitted, that the

6  applicant remove "nine (9) off-site signs and approximately forty (40)

7  additional on-site signs", resulting in fewer signs at that location.

8  However, the Freeway Exposure provision was in force at that time, and

9  this ordinance permitting the Staples center sign exempted this

10  specific land owner from its prohibition.   This is precisely the First

11  Amendment evil both Greater New Orleans and Metro Lights prohibited.

12  Plaintiffs submitted an expert declaration from a traffic engineer

13  that makes clear what is already common sense: electronic signage,

14  with its changing messages, can create traffic hazards.   (Declaration

15  of William Kunzman ¶ 2, Ex. B.)[9]  See Metro Lights, 488 F. Supp. 2d at

16  944 (discussing Mr. Kunzman's experience and opinions, but noting that

17  "this evidence is not necessary to the Court's ruling since [Mr.

18  Kunzman's traffic hazard] study tends to confirm what common sense

19  suggests," i.e., that "[i]f a sign is in the field of vision of a

20  driver . . . it will have the potential of distracting the driver from

21  his or her primary task of safely operating the vehicle.").   That

22  erecting this sign might also reduce the number of other signs in and

23  around the Staples Center is irrelevant; the City does not indicate

24  whether these removed signs were within 2,000 feet of the 110 freeway

25  and, in any event, preserving even one freeway-facing sign still

26  _____

27        [9]Mr. Kunzman is a registered professional traffic safety engineer
   in California with 30 years of experience in the area.   (Kunzman Decl.
28  ¶ 2, Ex. A.)

1    undermines the City's stated interests in traffic safety and

2    aesthetics.

3         The billboards in the 15th Street Signage Supplemental Use

4    District suffer from a similar flaw.  The City argues that this SUD

5    was created pursuant to a relocation agreement entered pursuant to

6    California Business and Professions Code section 5412 and that it

7    results in the reduction of 16 billboards along Santa Monica Boulevard

8    in exchange for four billboards permitted in the SUD.  The Court

9    cannot determine whether this reduction generally furthered the City's

10   interests in traffic safety and aesthetics because the City has failed

11   to indicate where the other 16 billboards were located.  If they did

12   not fall within the Freeway Exposure ban, the Court can see little

13   advancement of traffic safety by removing those 16 (which did not

14   implicate freeway traffic safety) and erecting four billboards that

15   now face a freeway.  Again, even so, the signs facing the freeway

16   directly undermine the City's stated concerns of traffic safety and

17   aesthetics.

18        Plaintiffs also point to a gigantic 10,000 square foot commercial

19   sign at 939 S. Figueroa Street, which is located within 2,000 feet of

20   the 110 freeway.  The City explains in opposition to summary judgment

21   that this sign was permitted at a time when the ban on commercial

22   signs near roadway extended only 500 feet.  Even if this sign were

23   permissible under prior versions of the sign ordinance, the other

24   sites above sufficiently undermine the City's interests in aesthetics

25   and safety that section 14.4.6 must fail.[10]  Plaintiffs are entitled

26

27        [10]The City argues that the "Harbor Freeway Overture" mural is not
     a commercial sign and not subject to the same Freeway Exposure ban on
28                                                          (continued...)

1   to summary judgment on this claim.

2   **IV.   CONCLUSION**

3       Plaintiffs have demonstrated that no genuine issues of material

4   fact exist on their remaining claims, so the Court GRANTS summary

5   judgment in their favor and ENJOINS the City based upon the terms

6   found in the concurrently issued Judgment and Permanent Injunction.

7   Plaintiffs have agreed to waive any remaining claims not subject to

8   this Order and are not pursuing any claims for damages.  Therefore,

9   this case is finally adjudicated and should be closed, subject only to

10   the Court retaining jurisdiction to enforce the terms of this Order.

11

12       **IT IS SO ORDERED.**

13       **DATED:**      <u>**August 20, 2008**</u>

14                                             **AUDREY B. COLLINS**
                                **UNITED STATES DISTRICT JUDGE**

15

16

17

18

19

20

21

22

23

24

---

25       [10](...continued)
commercial speech.  The Court need not decide this question because,

26   even absent this sign, Plaintiffs have demonstrated that other
exceptions undermine the Freeway Exposure provision.  The Court finds

27   that Plaintiffs' arguments regarding 1100 Wilshire Boulevard are
irrelevant because the signs in that location were erected in 1997 and

28   1998, and have long since been removed.