United States District Court
For the Northern District of California

1
2
3          UNITED STATES DISTRICT COURT
4          NORTHERN DISTRICT OF CALIFORNIA
5
6
7   METRO FUEL LLC,
8          Plaintiff,                    No. C 07-6067 PJH
9      v.                                **ORDER GRANTING MOTION FOR**
                                         **JUDGMENT ON THE PLEADINGS**
10  CITY OF SAN FRANCISCO, et al.,
11         Defendants.
    _____/
12
13         Defendants' motion for judgment on the pleadings came on for hearing before this

14  court on December 15, 2010.  Plaintiff appeared by its counsel Eric Hecker, and

15  defendants appeared by their counsel Thomas Lakritz.  Having read the parties' papers

16  and carefully considered their arguments and the relevant legal authority, the court

17  GRANTS defendants' motion.

18                            **BACKGROUND**

19         This is a case brought under 42 U.S.C. § 1983, alleging First Amendment violations.

20  Plaintiff Metro Fuel LLC ("Metro Fuel") asserts that certain laws restricting outdoor

21  advertising, enacted by defendant City and County of San Francisco ("the City"[1]), are

22  unconstitutional.

23         In 1965, the City enacted San Francisco Planning Code Article 6, to regulate and

24  control signs and billboards in San Francisco.  See S.F. Planning Code art. 6.  According to

25  its "Purposes" clause, the City and County adopted Article 6 to, among other things,

26  _____

27         [1] San Francisco is both a city and a county, and has the powers of both.  See Blum v.
28  City and County of San Francisco, 200 Cal. App. 2d 639, 644-45 (1962).  In the present action,
    Metro Fuel has sued the City and County of San Francisco, the County of San Francisco, and
    the City of San Francisco.

United States District Court

For the Northern District of California

1   regulate signs; safeguard and enhance property values; protect the appearance, character,

2   dignity, and aesthetics of San Francisco; and promote the public health, safety, and welfare

3   by reducing visual distractions to pedestrians and motorists.  Id. § 601.

4          The City, following the dictates of Metromedia, Inc. v. City of San Diego, 453 U.S.

5   490 (1981), regulates signs based on the "on-site" and "off-site" distinction.  In San

6   Francisco, on-site signs are designated "business signs" (as defined in Planning Code

7   § 602.3) and off-site signs are designated "general advertising signs" (as defined in

8   Planning Code § 602.7).  The regulation of business signs is not at issue in this lawsuit,

9   and the case turns on the City's regulation of general advertising signs.

10         In 2002, members of the County Board of Supervisors ("the Board") sought to

11  prohibit new off-site advertising signs as of March 5, 2002.  To this end, they placed

12  Proposition G on the ballot.  While imposing a ban on new off-site advertising signs,

13  Proposition G expressly stated that "[n]othing in this ordinance shall be construed to

14  prohibit the placement of signs . . . in the public right-of-way as permitted by local law."

15  The voters approved Proposition G with almost 80% of the vote, and it was codified as

16  Planning Code § 611.  Proposition G included extensive findings setting forth the necessity

17  of restricting new advertising signs.

18         In November 2009, four members of the Board sought to limit new advertising signs

19  on "street furniture" (e.g., bus shelters, kiosks), and they placed Proposition E on the ballot

20  to accomplish that goal.  Proposition E was passed with almost 58% of the vote, and was

21  codified at § 420-1 of the San Francisco Administrative Code.  Proposition E provides that

22  "[n]o increase in the number of general advertising signs shall be allowed in street furniture,

23  including transit shelters, kiosks, benches, and newspaper racks, over the number

24  authorized by City law and negotiated under the provisions of City contracts that were in

25  effect as of January 1, 2008" and that "[t]hese limitations shall apply to any successor

26  contracts."

27         The City has enacted ordinances and adopted policies that limit the number and

28  placement of general advertising signs on street furniture.  See, e.g., S.F. Planning Code

2

§ 603(j) (limiting areas of San Francisco where advertising can be placed on transit shelters, and the size and number of general advertising signs that are allowed); id. § 603(m) (limiting number and size of general advertising signs allowed on public service kiosks); id. § 603(n) (restricting placement of advertising on fixed pedestal news racks in accordance with San Francisco Public Works Code § 184.12).

The City's position is that its oversight of the placement of street furniture, including the placement of general advertising signs on street furniture, advances the City's goals of safety and aesthetics.  The City asserts that the design of each piece of street furniture is subject to a comprehensive administrative review for safety and aesthetics, and a public review process allows residents to comment on proposed design and placement for various types of street furniture.

Metro Fuel is engaged in the business of outdoor advertising in several metropolitan areas, and operates approximately 160 illuminated "panel signs" throughout the City.  As described in the first amended complaint ("FAC"), panel signs are internally illuminated poster advertisements that have a surface area of approximately 24 square feet (approximately 6 feet by 4 feet).  Metro Fuel entered the panel sign business in San Francisco when it acquired the assets of Metro Lights LLC in August 2006, and it operates approximately 160 panel signs in San Francisco.  Metro Fuel has not sought or obtained permits for its panel signs.

Metro Fuel filed this action on November 30, 2007, seeking an order enjoining the City from enforcing various provisions of Article 6 of the Planning Code, and an order striking down Planning Code § 611.  In the FAC, Metro Fuel alleges a single cause of action under 42 U.S.C. § 1983, premised on three distinct legal theories.

First, Metro Fuel alleges that Article 6 violates the First Amendment to the United States Constitution – specifically, that § 611 is unconstitutional when viewed together with the various agreements that San Francisco entered into with other sign companies regarding the placement of advertising on street furniture in the right-of-way, because under the various agreements, San Francisco could put similar or even identical signs on

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  street furniture in the public right-of-way, when such signs are prohibited on private

2  property.  The City refers to this as the "Metro Lights" claim.

3      Second, Metro Fuel alleges that the practical effect of the ban on new advertising

4  signs in Planning Code § 611, along with the agreements for the placement of advertising

5  on certain street furniture, is the reservation "for itself [of] a monopoly over outdoor

6  advertising signs in San Francisco" in violation of the First Amendment.  The City refers to

7  this as the "Government Monopoly" claim.

8      Third, Metro Fuel asserts that various provisions of Article 6 of the Planning Code

9  discriminate against non-commercial speech in violation of the First Amendment, because

10  Article 6 imposes greater restrictions on non-commercial messages than on commercial

11  messages, because it prohibits certain non-commercial messages based on their content,

12  and because Planning Code § 603 fails to define certain terms and is therefore

13  unconstitutionally vague.[2]  The City refers to this as the "Non-Commercial Speech" claim.

14      On January 6, 2009, the Ninth Circuit issued its ruling in Metro Lights LLC v. City of

15  Los Angeles, 551 F.3d 898 (2009), cert denied, 130 S.Ct. 1014 (2009).  In that decision,

16  the court held that Los Angeles' regulatory scheme prohibiting new off-site general

17  advertising signs did not violate the First Amendment, even though Los Angeles (like San

18  Francisco) allows off-site advertising on city-owned transit stops and other street furniture.

19  See id. at 906-14; see also Clear Channel Outdoor, Inc. v. City of New York, 594 F.3d 94,

20  107-10 (2nd Cir. 2010) (citing Metro Lights with regard to challenge to New York City

21  regulatory scheme), cert denied sub nom. Metro Fuel LLC v. City of New York, 131 S.Ct.

22  _____

23      [2]  Section 603 is entitled "Exempted Sings" and provides that nothing in Article 6 shall
     apply to, e.g., official public notices; traffic and street signs; signs posted in connection with
24  political and health/safety/welfare campaigns, provided the signs are removed within 60 days
     following the conclusion of the campaign; flags and insignia of any nation or political
25  subdivision; temporary displays of patriotic, religious, or charitable character; house numbers;
     commemorative plaques placed by recognized historical agencies; signs within stadiums or
26  open-air theaters; religious symbols attached to buildings, so long as they do not extend
     beyond the property line; flags signifying weather conditions; flags that are emblems of
27  business firms or other organizations; adverting placed on newsstands; and two general
     advertising signs each not exceeding 24 square feet in an area on either a transit shelter or
28  associated advertising kiosk furnished by contract with the Metropolitan Transit Agency or
     "MTA."  S.F. Planning Code § 603.

United States District Court

For the Northern District of California

414 (2010)

In light of this ruling, the parties stipulated to judgment on the pleadings on the <u>Metro Lights</u> claim.  Thus, the only two claims remaining at issue are the Government Monopoly claim and the Non-Commercial Speech claim.  Defendants now seek judgment on the pleadings.

**DISCUSSION**

A.    Legal Standards

1.    Motions for Judgment on the Pleadings

A motion for judgment on the pleadings pursuant to Rule 12(c) "challenges the legal sufficiency of the opposing party's pleadings."  William Schwarzer et al, <u>Federal Civil Procedure Before Trial</u> § 9:316 (2010); Fed. R. Civ. P 12(c).  The legal standards governing Rules 12(c) and 12(b)(6) are "functionally identical."  <u>Dworkin v. Hustler Magazine, Inc.</u>, 867 F.2d 1188, 1192 (9th Cir. 1989), as both permit challenges directed at the legal sufficiency of the parties' allegations.  Thus, a judgment on the pleadings is appropriate when the pleaded facts, accepted as true and viewed in the light most favorable to the non-moving party, entitle the moving party to a judgment as a matter of law.  <u>Hoeft v. Tucson Unified Sch. Dist.</u>, 967 F.2d 1298, 1301 (9th Cir. 1992); <u>see also</u> <u>Fleming v. Pickard</u>, 581 F.3d 922, 925 (9th Cir. 2009).

Articulating the standard for a Rule 12(b)(6) motion to dismiss, the Supreme Court noted that "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."  <u>Ashcroft v. Iqbal</u>, __ U.S. __, 129 S.Ct. 1937, 1949 (2009).  Indeed, "a plaintiff's obligations to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. at 544, 555 (2007) (citations and quotations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  <u>Id.</u>

The standard articulated in <u>Twombly</u> and <u>Iqbal</u> applies equally to a motion for judgment on the pleadings.  <u>Lowden v. T-Mobile USA, Inc.</u>, 378 Fed. Appx. 693, 2010 WL

United States District Court

For the Northern District of California

1841891 at *1 (9th Cir., May 10, 2010) ("To survive a Federal Rule of Civil Procedure 12(c)

motion, a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its

face'" (quoting Twombly, 550 U.S. at 544)).

    2.    Challenges to Regulation of Outdoor Advertising

        Commercial speech, such as billboards and other outdoor advertising, is entitled to

only limited First Amendment protection, "commensurate with its subordinate position in the

scale of First Amendment values." Board of Trustees of State Univ. of New York v. Fox,

492 U.S. 469, 477 (1989) (quotation and citation omitted). Indeed, at times, "First

Amendment values must yield to other societal interests." Metromedia, Inc. v. City of San

Diego, 453 U.S. 490, 501 (1981). The protection available for particular commercial

expression turns on the nature of both the expression and the governmental interests

served by the regulation. Central Hudson Gas & Elec. Corp. v. Public Service Comm'n,

447 U.S. 557, 562-63 (1980).

        In Central Hudson, the Supreme Court adopted a four-part analysis to determine

whether a particular type of commercial speech can be banned or regulated. For

commercial speech to come within the protection of the First Amendment, it must concern

lawful activity and not be misleading; and the asserted government interest must be

substantial. If both those criteria are met, the court must determine whether the regulation

directly advances the governmental interest asserted, and whether it is more extensive

than necessary to serve that interest. Id. at 566. The last two steps of the Central

Hudson analysis (which have received the most attention by courts) "involve a

consideration of the 'fit' between the legislature's ends and the means chosen to

accomplish those ends." United States v. Edge Broad. Co., 509 U.S. 418, 427-28 (1993).

        In Metromedia, the Supreme Court applied the Central Hudson test to review a San

Diego ordinance banning offsite advertising, and held that off-site advertising and billboards

are a subset of commercial speech and must be analyzed differently than other forms of

commercial speech. The court found that there was "no substantial doubt" that the stated

purposes of the ordinance – to eliminate hazards to pedestrians and motorists, and to

United States District Court

For the Northern District of California

preserve and improve the appearance of the city – were "substantial government goals." Metromedia, 453 U.S. at 493, 507-08.  The court held further that the prohibition on commercial billboards directly advanced the city's safety and aesthetic interests, even though the city had relied only on its legislative judgment that billboards are traffic hazards and cause aesthetic blight.  Id. at 508-10.  Finally, the court held that the ordinance was no broader than necessary to serve the city's interests.  Id. at 508.

The Court subsequently affirmed Metromedia in City of Ladue v. Gilleo, 512 U.S. 43, 49-51 (1994).  The Ninth Circuit has expressly upheld total bans on advertising or on-site/off-site distinctions based on the Metromedia ruling.  See Ackerly Commc'ns of the Northwest, Inc. v. Krochalis, 108 F.3d 1095, 1099-1100 (9th Cir. 1997); Outdoor Sys., Inc. v. City of Mesa, 997 F.2d 604, 610 (9th Cir. 1993).

B.     The City's Motion

The City argues that judgment on the pleadings is warranted as to both the Government Monopoly claim and the Non-Commercial Speech claim.

1.     Government Monopoly claim

The City notes that even though Metro Fuel has conceded that Planning Code § 611 is constitutional, even in light of various agreements that the City has entered into that allow limited placement of general advertising on street furniture, Metro Fuel continues to argue, based on allegations in the FAC, that § 611, when viewed with those various agreements, creates a monopoly over outdoor advertising in violation of the First Amendment.  See FAC ¶¶ 81-89 (practical effect of City's complete ban on off-site advertising signs on private property is that City will be able to gradually reduce and eventually eliminate all off-site advertising signs on private property, which will give the City control over off-site speech and ability to censor speech based on content of speaker's message).

The City asserts, however, that the Ninth Circuit summarily rejected this argument in Metro Lights, as just another variant of the core First Amendment challenge to Los Angeles' regulatory scheme.  In Metro Lights, the court stated,

7

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> We are aware of other variants of the charge that the City has shown illegal favoritism. Metro Lights has implied several times that the City's overall scheme makes the City a monopolist in the supply of commercial advertising space. Even the district court found the SFA suspect because of its proximity in time to the enactment of the Sign Ordinance and its broad scope relative to the City's previous advertising agreements. But the First Amendment does not prohibit municipal monopolies. As long as the City can show with plausibility sufficient to merit the deference of Metromedia that the Sign Ordinance, even coupled with the SFA, advances the City's interests and is narrowly tailored, then the City's policy survives First Amendment scrutiny.

Id. at 914 n.13.

The City argues that because, as the Ninth Circuit recognized, the First Amendment does not prohibit cities such as Los Angeles and San Francisco from creating such a "monopoly," Los Angeles and San Francisco can exercise control over advertising on street furniture in the public right-of-way. See id. at 909 n.12. The City contends that by stipulating to the granting of judgment on the pleadings on the Metro Lights claim, Metro Fuel has conceded that San Francisco's regulatory scheme of banning new general advertising signs on private property and allowing a limited number on street furniture in the public right-of-way advances the City's twin interests of safety and aesthetics, and is also sufficiently narrowly tailored to merit deference under Metromedia and the First Amendment.

The City makes two additional arguments with regard to its transit shelter advertising policy – that the policy is a reasonable regulation of a non-public forum, and that Metro Fuel lacks standing to challenge the transit shelter agreement.

In December 2007, the City granted Clear Channel Outdoor, Inc. ("Clear Channel") the exclusive right to place general advertising signs on City transit shelters and kiosks. In exchange for this monopoly, Clear Channel agreed to replace all existing transit shelters and kiosks and maintain 1100 to 1500 new shelters and 39-150 new commercial kiosks or commercial signal control covers. All advertising placed on transit shelters is governed by the Metropolitan Transit Agency ("MTA") Advertising Policy, which prohibits political ads, ads that promote the use of firearms, or ads for tobacco or alcohol products. Any unsold advertising space can be used by the City to advertise for its own public purposes.

1    In the FAC, Metro Fuel alleges that this "monopoly" on advertising (control by the

2  City on advertising on transit shelters) violates the First Amendment because the City uses

3  this power to regulate the content of ads (e.g., no political ads or ads promoting guns on

4  transit shelters) and to control political speech.

5    The City argues that the MTA Advertising Policy is a reasonable regulation of a non-

6  public forum.  First, the City notes that in <u>Metro Lights</u>, the Ninth Circuit recognized that Los

7  Angeles could constitutionally limit commercial speech on its street furniture, whether it

8  entered into street furniture agreements or not.  <u>See</u> <u>Metro Lights</u>, 551 F.3d at 913 ("such

9  control is . . . a simply attribute or the City's ownership of the transit facilties").  The City

10  contends that this reasoning defeats Metro Fuel's "monopoly" challenge against San

11  Francisco.

12    Second, the City contends that government ownership of property does not

13  automatically open the property up as a public forum, and that the government does not

14  create a public forum by permitting limited discourse – instead, the government must

15  intentionally open up a non-traditional forum for public discourse.  In a non-public forum, a

16  city like San Francisco has the right to make distinctions in access on the basis of subject

17  matter and speaker identity.  <u>See</u> <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460

18  U.S. 37, 46-49 (1983).

19    The City notes that in <u>Uptown Pawn & Jewelry, Inc. v. City of Hollywood</u>, 337 F.3d

20  1272, 1278-80 (11th Cir. 2003), the Eleventh Circuit, relying on <u>Lehman v. City of Shaker</u>

21  <u>Heights</u>, 418 U.S. 298, 303 (1974), held that a bus bench at a transit stop is a non-public

22  forum.  Similarly, in <u>Children of the Rosary v. City of Phoenix</u>, 154 F.3d 972, 976-80 (9th

23  Cir. 1998), the Ninth Circuit, also relying on <u>Lehman</u>, held that a city could prohibit

24  advertising on buses that, among other things, advocated or opposed a religion or belief,

25  and that the city's interest in protecting revenue and in maintaining neutrality on political

26  and religious issues was particularly strong.

27    The City also asserts that Metro Fuel lacks standing to challenge the transit shelter

28  agreement, because it has not and cannot allege that the MTA Advertising Policy has

9

United States District Court

For the Northern District of California

1  caused it any injury.  The only "speech" being regulated is the "speech" of politicians,

2  gunmakers, and tobacco and liquor companies.  Metro Fuel's speech is not being regulated

3  (nor is Clear Channel's for that matter).

4       In opposition, Metro Fuel argues that it has adequately pled the existence of an

5  unconstitutional government monopoly over commercial advertising signs.  Metro Fuel

6  asserts that its Government Monopoly claim is premised on two "core" facts – (1) that

7  through its adoption of Proposition G in 2002, the City added § 611 to the Planning Code,

8  which imposes a complete ban on any and all new general advertising signs erected after

9  that date (other than advertising signs placed on government-controlled street furniture);

10 and (2) that although Proposition G did not require the immediate removal of any pre-2002

11 general advertising signs, it did relegate such signs to the "non-conforming use" status,

12 which means that such signs may remain in place, but may not be "altered" or

13 "reconstructed" (citing Planning Code § 604(h)).  Metro Fuel contends that because all

14 signs eventually require significant maintenance, the practical effect of relegating pre-2002

15 signs to "non-conforming use" status is that sooner or later, all such signs will reach the end

16 of their useful lives and disappear.

17      Metro Fuel argues that the result of the above two facts is that there will eventually

18 be no lawful general advertising signs anywhere in the City of San Francisco – with the

19 exception of the thousands of panel signs on government property, which the City has

20 exempted from its otherwise total ban.

21      Metro Fuel asserts that this effective ban is unconstitutional, because it amounts to

22 the usurpation of monopoly control over a medium of communication.  Metro Fuel contends

23 that under this regulatory scheme, companies seeking to advertise their goods and

24 services to consumers will have no choice but to do business with the City, which will

25 exercise full editorial control over the content of their messages, as it has already started

26 doing with its bus shelter franchisee, Clear Channel.  Metro Fuel claims that the City will be

27 able to prevent entire categories of speakers – including those seeking to engage in

28 political speech – from reaching their intended audiences.

United States District Court
For the Northern District of California

1    With regard to the City's argument that this claim is foreclosed by footnote 13 in the

2  Metro Lights decision, Metro Fuel asserts that it is not clear what the Ninth Circuit meant

3  when its stated that "the First Amendment does not prohibit municipal monopolies," but that

4  in any event, this court should not read the Ninth Circuit's statement as meaning that

5  municipalities have free reign to usurp monopoly control over "channels of speech."  That,

6  according to Metro Fuel, is not what the Ninth Circuit said, and such a finding would violate

7  a bedrock tenet of First Amendment jurisprudence established by the Supreme Court and

8  the Ninth Circuit.

9    With regard to the City's second main argument – that the City's transit shelter

10  advertising policy is a reasonable regulation of a non-public forum – Metro Fuel asserts that

11  the City has constructed a "straw man" by arguing that it is entitled to control the content of

12  speech it permits on its street furniture.  Metro Fuel contends that it is not claiming that the

13  City is not entitled to restrict the kinds of speech it allows on its street furniture – but rather

14  that the very fact that the City has that right underscores that the City does not have the

15  concomitant right to restrict private parties from engaging in protected speech on private

16  property.

17    Metro Fuel argues that the City can do whatever it wants on its own property, but

18  asserts that it is improper for the City to issue a blanket ban on the ability of others to

19  engage in protected speech, especially when it is seeking to impose content-based speech

20  restrictions on, an entire medium of communication.  Metro Fuel asserts that it is precisely

21  because the City does have the power to restrict speech on its property that it is so critical

22  that the court enforce the constitutional principle that, when it comes to speech, the

23  government must allow and foster competition, and must not dominate the marketplace of

24  ideas.

25    Finally, Metro Fuel does not respond to the City's third argument – that Metro Fuel

26  lacks standing to challenge the transit shelter agreement.

27    The court finds that the motion must be GRANTED as to the Government Monopoly

28  claim.  Metro Fuel's argument – that the City creates an impermissible "monopoly" by

11

United States District Court

For the Northern District of California

1  prohibiting commercial advertising on private property while allowing commercial

2  advertising on City-owned street furniture – ignores the ruling of <u>Metro Lights</u>.  The Ninth

3  Circuit has clearly held that the First Amendment does not prohibit cities from banning

4  offsite commercial advertising, while simultaneously allowing offsite commercial advertising

5  on city-owned street furniture.  <u>See</u> <u>Metro Lights</u>, 551 F.3d at 906-12; <u>see also</u> <u>id.</u> at 900

6  (describing court's task in <u>Metro Lights</u> case as "determin[ing] whether a city violates the

7  First Amendment by prohibiting most offsite commercial advertising while simultaneously

8  contracting with a private party to permit sale of such advertising at city-owned transit

9  stops").

10       As for Metro Light's claim that "it is not clear" what the Ninth Circuit meant when it

11  stated in <u>Metro Lights</u>, at footnote 13, that "the First Amendment does not prohibit

12  municipal monopolies," the court finds that in this context, the Ninth Circuit's meaning is

13  entirely clear.  Immediately after saying that the First Amendment does not prohibit

14  municipal monopolies, the court stated, "As long as the City can show with plausibility

15  sufficient to merit the deference of <u>Metromedia</u> that the Sign Ordinance, even coupled with

16  SFA [Sign Furniture Agreement], advances the City's interest and is narrowly tailored, then

17  the City's policy survives First Amendment scrutiny."  <u>Id.</u> at 914 n.13.  Indeed, the court

18  found that even were there no SFA but only a Sign Ordinance, the municipality would still

19  exercise proprietary control over who gets to advertise on its transit facilities" as "[s]uch

20  control is . . . a simple attribute of the City's ownership of the transit facilities."  <u>Id.</u> at 913.

21       Metro Fuel has already conceded that the City's ban on new general advertising

22  signs (Planning Code § 611) and the various agreements that San Francisco has entered

23  into that allow the placement of commercial advertising on city-owned street furniture merit

24  the deference of <u>Metromedia</u>.  For this reason, Metro Fuel's Government Monopoly claim

25  fails as a matter of law.

26       As for the cases cited by Metro Fuel regarding government monopolies, none of

27  those cases involved review of billboard regulations under the First Amendment.  Courts

28  cannot apply broad First Amendment principles to every form of expression, as each

United States District Court
For the Northern District of California

method of communicating ideas is different and must be considered on its own merits.  See
Metromedia, 453 U.S. at 501.  In deciding Metro Lights, the Ninth Circuit cited this
proposition in holding that Metromedia – not other cases dealing with other forms of
communications – controls the outcome of cases dealing with First Amendment challenges
to billboard regulations.  See Metro Lights, 551 F.3d at 911; see also Clear Channel, 594
F.3d at 108.

    2.    Non-Commercial Speech claim

The City asserts that San Francisco's regulation of non-commercial speech does not
violate the First Amendment, for any of the three reasons advanced by Metro Fuel in the
FAC.  First, the City contends that Metro Fuel's claim that Article 6 imposes greater
restrictions on non-commercial speech demonstrates a fundamental misunderstanding of
Article 6, as § 603(a)-(i) expressly exempts non-commercial speech from its requirements,
and therefore Article 6 imposes no greater restrictions on non-commercial speech than it
does on commercial speech.

Second, the City argues that Metro Fuel's claim that Article 6 imposes content-based
restrictions by allowing limited categories of non-commercial messages, while prohibiting
other non-commercial messages, such as political ads, has already been rejected by the
California Court of Appeal in City and County of San Francisco v. Eller Ourdoor Advertising,
192 Cal. App. 3d 643 (1987) ("Eller").

In Eller, the court acknowledged that Planning Code § 603, by permitting many but
not all categories of signs displaying ideological communication throughout the City, "San
Francisco transgresses Metromedia's prohibition against content-based discrimination" in
the area of non-commercial speech.  Id. at 662.  However, the court noted, its inquiry did
not end there.  Instead, it was required to engage in the task of determining whether the
defect it had identified required invalidation of the entire ordinance, or whether the
offending provision could be construed in such a way as to maintain its constitutionality.
The court concluded that it could, if subdivisions (c) and (d) of § 603 were construed to
embrace all categories of non-commercial messages, which would preserve the

United States District Court

For the Northern District of California

1   ordinance's neutrality.  Id. at 664-65.

2       The City argues, based on Eller, that all non-commercial messages are included in

3   Planning Code § 603(c) and (d).  The City concedes that it must apply the ordinance in

4   accordance with Eller.  Because § 603 includes all non-commercial messages, the City

5   asserts, Article 6 is content-neutral with regard to non-commercial speech, and Metro

6   Fuel's claim that Article 6 regulates non-commercial messages based on content fails as a

7   matter of law.

8       Third, as for Metro Fuel's allegation that § 603 is "woefully and unconstitutionally

9   vague" because it does not define certain terms,[3] the City argues that Eller resolves most

10  of this claim.  The Eller court construed "temporary" to mean "signs without independent

11  structural support."  Id. at 665.  The City does not address the other terms that are alleged

12  in the FAC to be overly vague (not does Metro Fuel in its opposition).

13      In opposition, Metro Fuel contends that it has adequately pled the existence of

14  unconstitutional discrimination against non-commercial speech.  Metro Fuel asserts that the

15  First Amendment affords greater protection to non-commercial speech than to commercial

16  expression, and that it is for this reason that a municipality may not allow some types of

17  non-commercial speech but prohibit others based on the content of the message.  Metro

18  Fuel contends, however, that this is exactly what the Planning Code does in § 603(c) and

19  603(d).

20      As noted above, Planning Code § 603, which is entitled "Exempted Signs," sets forth

21  categories of signs that are exempted from the provisions of Article 6.  These include, in

22  subdivision (c),

23      [t]emporary display posters, without independent structural support, in
        connection with political campaigns and with civil noncommercial health,
24      safety and welfare campaigns, provided that in R [residential] districts such
        posters shall be removed within 60 days following the conclusion of the

25  _____

26      [3] Metro Fuel alleges that "the limited exception to the ban of non-commercial off-site
    signs – allowing 'temporary displays of a patriotic, religious, charitable or other civic character'
27  – is woefully and unconstitutionally vague.  No reasonable speaker could possibly know what
    it means for a sign to be 'temporary,' to constitute a 'display,' to be 'patriotic,' or to be of 'other
28  civic character,' terms that the Sign Ordinance nowhere defines.  FAC ¶ 100.

United States District Court

For the Northern District of California

1   campaign;

2   and, in subdivision (d),

3   [f]lags, emblems, insignia and posters of any nation or political subdivision,
    and temporary displays of a patriotic, religious, charitable or other civic
4   character[.]

5   Metro Fuel asserts that in citing Eller, the City has effectively admitted that § 603 is

6   unconstitutional on its face.  Metro Fuel contends that rather than defend the

7   constitutionality of the language of the Planning Code, the City instead asks this court to

8   "perform judicial surgery" interpret the Code it to allow "all non-commercial messages,"

9   even though this is not at all what the Code says.  Metro Fuel claims that the City even

10  promises to ignore the patently unconstitutional language in the Code and to enforce it

11  consistent with the requirements of the First Amendment.

12  Metro Fuel concedes that in Eller, the court did read the Planning Code to allow all

13  non-commercial advertising in order to avoid its obvious constitutional infirmity.  However,

14  Metro Fuel notes, Eller was decided years before Proposition G was enacted in 2002, and

15  at the time that Eller was decided (1987), general advertising signs were broadly permitted

16  throughout San Francisco, except in certain "special signs districts."  Because the City's

17  attitude toward outdoor signage was, according to Metro Fuel, relatively liberal at that time,

18  the Eller court concluded that "little violence is done to the legislative purpose to interpret

19  the exceptions created in subdivisions (c) and (d) of 603 to embrace all categories of

20  noncommercial messages, thereby preserving the ordinance's neutrality and saving it from

21  the constitutional problem."  Eller, 192 Cal. App. 3d at 664.

22  But now, Metro Fuel asserts, this court faces a different regulatory landscape, for it

23  can no longer be said that "little violence" would be done to the scheme by reading the

24  exceptions in § 603 more broadly than they were intended.  Specifically, Metro Fuel argues

25  that because Proposition G made all new off-site signs illegal (both commercial and non-

26  commercial), but did not amend the unconstitutional language in subdivisions (c) and (d), or

27  even make clear that the intent was that § 603 embraces "all" noncommercial messages, §

28  603 is unconstitutional.

15

United States District Court
For the Northern District of California

1    At a minimum, Metro Fuel argues, this issue raises factual disputes that cannot be

2    resolved on a motion for judgment on the pleadings.  Metro Fuel asserts that the court

3    should deny the motion and allow discovery to proceed so that Metro Fuel can determine

4    why the City has never conducted any enforcement action against non-commercial signage

5    since 1987.  At the hearing, counsel for Metro Fuel also argued that discovery was

6    necessary to allow the City to "explain to us what it is that we can and can't do" and to allow

7    Metro Fuel "the opportunity to briefly examine the responsible officials."  Transcript,

8    December 15, 2010 Hearing, at 11-12.

9    The court finds that the motion must be GRANTED as to the Non-Commercial

10   Speech claim.  Metro Fuel does not dispute the fact that Planning Code § 603, as

11   construed by the California Court of Appeal in Eller, comports with the First Amendment

12   and the holding in Metromedia, because it treats all non-commercial messages in the same

13   fashion – as exempt from the requirements and regulation of Planning Code Article 6.

14   Rather, Metro Fuel appears to be asking the court to disregard Eller, calling the state

15   court's analysis "judicial surgery" and "artifice," and suggesting that Eller is no longer good

16   law because the City  adopted Proposition G, which banned all new general advertising

17   signs throughout San Francisco.

18   Proposition G did not undermine the rationale of the Eller holding, which was that it

19   was evident that San Francisco intended to allow the expression of all non-commercial

20   messages throughout San Francisco, see Eller, 192 Cal. App. 3d at 664-65, and that "[i]t is

21   the duty of the courts, wherever possible, to construe a statute in a manner which is

22   reasonable, consistent with the statutory purpose, and eliminates doubts as to its

23   constitutionality," id. at 663.  And while the Ninth Circuit has not specifically adopted Eller, it

24   has endorsed Eller's approach to statutory interpretation.  See Center for Bio-Ethical

25   Reform, Inc. v. Los Angeles County Sheriff Dep't, 533 F.3d 780, 792 (9th Cir. 2008).

26   Moreover, Proposition G, which prohibited the erection of new general advertising

27   signs after March 5, 2002, did not change the fact that all non-commercial messages are

28   still allowed throughout San Francisco.  Indeed, Proposition G expressly states that it does

United States District Court

For the Northern District of California

1  not regulate non-commercial speech.  For this reason, Metro Fuel's Non-Commercial

2  Speech claim fails as a matter of law.

3         Finally, the dispute regarding the scope of Planning Code § 603 is a legal question,

4  not a factual one.  Thus, Metro Fuel is not entitled to discovery into the beliefs or practices

5  of Planning Department officials in San Francisco with regard to enforcement.  Moreover,

6  Metro Fuel lacks standing to pursue a challenge to the application of § 603 as to a

7  hypothetical third party.  The entity that has standing to challenge a billboard regulation

8  regarding the content of the message is the speaker of the message, not a company like

9  Metro Fuel that sells space for placement of messages.  See Metro Lights, 551 F.3d at

10 912.

11                                    **CONCLUSION**

12        In accordance with the foregoing, defendants' motion for judgment on the pleadings

13 is GRANTED.  The court finds further that Metro Fuel has not raised factual issues

14 sufficient to warrant denying this motion and allowing discovery to proceed.

15        No later than March 22, 2011, the parties shall submit a proposed form of judgment.

16

17 **IT IS SO ORDERED.**

18 Dated: March 15, 2011

19                                    _____
                                     PHYLLIS J. HAMILTON
20                                   United States District Judge

21

22

23

24

25

26

27

28